IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 20-2266 |
| AMERICAN FUTURE SYSTEMS, INC., et al., | |
| Defendants. | |

## <u>OPINION</u>

**Slomsky, J.**                                                                      **April 30, 2021**

## I.   INTRODUCTION

The Federal Trade Commission ("the FTC") and the Commonwealth of Pennsylvania, by Attorney General Josh Shapiro ("the Commonwealth"), bring this suit against Defendants (1) American Future Systems, Inc. ("AFS"), Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), and Edward M. Satell (collectively "AFS Defendants"); and (2) International Credit Recovery, Inc. ("ICR"), Richard Diorio, Jr., and Cynthia Powell (collectively "ICR Defendants"). In a First Amended Complaint ("FAC"), the FTC alleges violations of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a)(1), and the Unordered Merchandise Statute ("UMS"), 39 U.S.C. § 3009, and the Commonwealth alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 <u>et</u> <u>seq.</u>, and in one Count a combined claim of a violation of the UTPCPL and the UMS.

Before the Court are Defendants' Motions to Dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  (Doc. Nos. 48, 55.)  Defendants argue that the Commonwealth as a party and its claims should be dismissed as a

matter of law because the UTPCPL does not apply to the business-to-business transactions at issue. ICR Defendants also move to dismiss the FTC's claim against them in Count III because the FAC does not sufficiently allege that they engaged in any deceptive acts or practices under the FTCA.

The Motions are now ripe for disposition. For reasons discussed <u>infra</u>, Defendants' Motions to Dismiss will be denied. (Doc. Nos. 48, 55.)[1]

## II.    BACKGROUND[2]

On May 13, 2020, the FTC initiated this action against American Future Systems, Inc. ("AFS"), Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), and Edward M. Satell (collectively the "AFS Defendants"). (<u>See</u> Doc. No. 1.) Defendant Edward M. Satell is "the Chief Executive Officer and sole owner" of AFS, a Pennsylvania corporation, and PBPNJ, a New Jersey corporation. (<u>Id.</u> at 3; <u>see also</u> Doc. Nos. 1 at 2-3; 19 at 7.) Also sued were International Credit Recovery, Inc. ("ICR"), Richard Diorio, Jr., and Cynthia Powell (collectively the "ICR Defendants"). (<u>See</u> Doc. No. 1 at 3-4.)

AFS Defendants market and publish "business-related newsletters and school or employment law books" under the trade names Progressive Business Publications ("PBP") and Center for Education & Employment Law ("CEEL"). (Doc. No. 43 ¶ 19; <u>see also</u> Doc. No. 19 ¶ 16.) They sell annual subscriptions to these publications to "organizations nationwide, including

---

[1]    In reaching a decision, the Court has considered the following: ICR Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 48), AFS Defendants' Motion to Dismiss (Doc. No. 55), Joinder of ICR Defendants to AFS Defendants' Motion to Dismiss (Doc. No. 59), Plaintiffs' Joint Response in Opposition to Defendants' Motions to Dismiss (Doc. No. 62), AFS Defendants' Reply in Support of its Motion to Dismiss (Doc. No. 66), Plaintiffs' Joint Notice of Supplemental Authority (Doc. No. 71), ICR Defendants' Reply in Support of Their Motion to Dismiss (Doc. No. 73), AFS Defendants' Response to Plaintiffs' Joint Notice of Supplemental Authority (Doc. No. 74), and AFS Defendants' Notice of Supplemental Authority (Doc. No. 82).

[2]    The following facts are taken from the FAC (Doc. No. 43) and are accepted as true for purposes of this Opinion.

businesses, schools, fire and police departments, and nonprofits." (Ids.) "AFS Defendants

typically charge several hundred dollars for a[n] . . . annual subscription" to their PBP newsletter.

(Doc. No. 43 ¶ 19.)

Defendant ICR is a collection agency hired by AFS to collect unpaid accounts for its PBP

publications. (See id. ¶ 32.)[3] AFS is "ICR's largest client, accounting for more than 99% of its

revenue." (Id. ¶ 33.) In the 1990s, Defendants Richard Diorio, Jr. and Cynthia Powell began

working at ICR as debt collectors. (See id. ¶¶ 50-51.) Today, Defendant Diorio is the Vice

President of ICR, and Defendant Powell is the manager. (See id. ¶ 14-15.)

In the original Complaint (Doc. No. 1), the FTC alleged that Defendants violated Section

5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a),[4] and the Unordered

Merchandise Statute ("UMS"), 39 U.S.C. § 3009,[5] through a nationwide telemarketing scheme

---

[3]  It is undisputed that the conduct alleged in the FAC involves business-to-business transactions
between AFS Defendants and "organizations nationwide." (See Doc. Nos. 43 ¶ 19; 19 ¶ 16.)
It is also undisputed that ICR Defendants collect debts stemming from AFS's alleged business-
to-business sale of subscriptions to its PBP publications. (See Doc. Nos. 43 ¶ 32; 48-2 at 2
n.2.)

[4]  15 U.S.C. § 45(a)(1) provides as follows:

> Unfair methods of competition in or affecting commerce, and unfair
> or deceptive acts or practices in or affecting commerce, are hereby
> declared unlawful.

[5]  39 U.S.C. § 3009 provides as follows:

involving the "deceptive selling of and collection of payment for publication subscriptions." (Id. ¶ 1.)[6]

On July 13, 2020, AFS Defendants filed their Answer with Affirmative Defenses to the original Complaint, denying that they engage in any unlawful practices in violation of federal law when they sell their business and professional publications to organizations. (See Doc. No. 19.)[7]

## A.    The First Amended Complaint

On July 23, 2020, the FTC filed a Motion for Leave to File a First Amended Complaint in which it sought to add to this action the Commonwealth of Pennsylvania as a co-Plaintiff, and four

---

(a)  Except for (1) free samples clearly and conspicuously marked as such, and (2) merchandise mailed by a charitable organization soliciting contributions, the mailing of unordered merchandise or of [a bill for such merchandise, or any dunning communications] constitutes an unfair method of competition and an unfair trade practice in violation of [15 U.S.C. § 45(a)(1)].

(b)  Any merchandise mailed in violation of subsection (a) of this section, or within the exceptions contained therein, may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender.  All such merchandise shall have attached to it a clear and conspicuous statement informing the recipient that he may treat the merchandise as a gift to him and has the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender.

. . .

(d)  For the purposes of this section, "unordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

[6]    The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.  (See Doc. Nos. 1 at 2; 19 at 7.)

[7]    In their Motion, AFS Defendants reference and incorporate their Answer (Doc. No. 19) to the original Complaint.  (See Doc. No. 55 at 3-4.)

additional claims by the Commonwealth against Defendants under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), § 201-1 et seq. (See Doc. No. 20 at 1.) Defendants opposed the Motion, arguing that amendment would be futile because the UTPCPL does not apply to the business-to-business transactions described in this case. (See Doc. No. 22 at 9.)

On January 20, 2021, the Court granted the FTC's Motion for Leave to File a First Amended Complaint. (See Doc. Nos. 41-42.) In an Opinion issued that day, the Court noted that it had supplemental jurisdiction over the UTPCPL claims and that the Commonwealth could properly be added as a party to this action under the Federal Rules of Civil Procedure. (See Doc. No. 41 at 6-10.) The Court deferred ruling on the scope of coverage of the UTPCPL so that the matter could be fully briefed by all parties with the filing of motions to dismiss and responses. (See id. at 11.)

The following day, January 21, 2021, the FTC and the Commonwealth filed the First Amended Complaint ("FAC"),[8] alleging in eight Counts violations of federal and state law as follows:

- Count I:      FTC v. AFS Defendants for Misrepresentation of Trial Offers, in violation of Section 5(a) of the FTCA, 15 U.S.C. § 45(a);

- Count II:     FTC v. AFS Defendants for Failure to Disclose Negative Option Terms, in violation of Section 5(a) of the FTCA, 15 U.S.C. § 45(a);

- Count III:    FTC v. ICR Defendants for False or Unsubstantiated Representations to Induce Payment, in violation of Section 5(a) of the FTCA, 15 U.S.C. § 45(a);

- Count IV:     FTC v. AFS Defendants for Sending and Billing for Unordered Merchandise, in violation of the UMS, 39 U.S.C. § 3009;

---

[8]   The facts in the FAC are identical to those in the original Complaint. (See Doc. Nos. 1; 20 at 1; 43.)

- Count V: Commonwealth v. AFS Defendants for Deceptive Misrepresentations, in violation of the UTPCPL, 73 P.S. § 201-3 and 73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi);

- Count VI: Commonwealth v. AFS Defendants for Failure to Disclose Material Terms, in violation of the UTPCPL, 73 P.S. § 201-3 and 73 P.S. § 201-2(4)(ii), (iii), (v), (xvii) and (xxi);

- Count VII: Commonwealth v. ICR Defendants for False, Misleading, Deceptive or Unsubstantiated Representations to Induce Payment, in violation of the UTPCPL, 73 P.S. § 201-3 and 73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi); and

- Count VIII: Commonwealth v. AFS Defendants for Sending and Billing for Unordered Merchandise, in violation of the UMS, 39 U.S.C. § 3009, and the UTPCPL, 73 P.S. § 201-3 and 73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi).

(See Doc. No. 43 ¶¶ 56-95.)

To summarize, "[o]n the basis of federal law, the FTC alleges" claims against AFS Defendants in Counts I, II, and IV, and a claim against ICR Defendants in Count III. (Doc. No. 62 at 2; see also Doc. No. 43 ¶¶ 56-71.) "On the basis of Pennsylvania law, the Commonwealth alleges" claims against AFS Defendants in Counts V, VI, and VIII, and a claim against ICR Defendants in Count VII. (Doc. No. 62 at 2; see also Doc. No. 43 ¶¶ 72-95.)

In the FAC, Plaintiffs assert that AFS Defendants sell publication subscriptions to organizations through unsolicited telephone calls. (See Doc. No. 43 ¶¶ 19-20.) During the calls, their telemarketers "create the impression that they are sending free samples with no obligation and do not disclose that, in reality, they have enrolled the organization into . . . [their] subscription service and . . . will charge the organization for the samples unless affirmative action is taken to cancel." (Id. ¶ 21.) Within 60 days of the initial sales call, AFS Defendants send an invoice to the organization, informing them that there is a "balance due" of several hundred dollars. (See id. ¶ 22.) Plaintiffs allege that they continue to send additional iterations of publications and invoices and within six months of the initial call, if payment is not made in accordance with the invoices,

they refer unpaid accounts relating to their PBP publications to ICR Defendants for collection. (See id. ¶¶ 23, 32.)

In conducting these transactions, the FAC alleges that AFS Defendants have engaged in unfair or deceptive conduct, in violation of the FTCA, UMS, and UTPCPL, by misrepresenting "that consumers will receive publications for free with no risk," "fail[ing] to disclose . . . to consumers material terms and conditions of the offer" of publications, "ship[ping] [publications] without the prior express request or consent of the recipients," and "sen[ding] to the recipients of such merchandise one or more bills or dunning communications for such goods." (Id.¶¶ 58, 62, 69-70; see also id. ¶¶ 76, 80, 89-90.)

As to ICR Defendants, the FAC alleges that they have engaged in deceptive conduct, in violation of the FTCA and UTPCPL, by misrepresenting to businesses that: "(a) . . . AFS Defendants' debts are valid; (b) consumers have a legal obligation to pay . . . [such] debts; and (c) failure to pay will result in a negative impact on a credit rating or will result in legal action." (Id. ¶¶ 64, 84.) The FAC further alleges that "[w]hen ICR collectors represent that the organizations owe the purported AFS Defendants' debt, the ICR Defendants know or have reason to know that many of [the consumers] had not agreed to any financial obligation for . . . [the] publications." (Id. ¶ 38.)[9] Additionally, ICR Defendants allegedly "do not report the nonpayment of PBP accounts

---

[9] ICR Defendants' knowledge regarding the invalidity of the debts they pursue on behalf of AFS Defendants is predicated on the following events as alleged in the FAC: (1) a 1998 Better Business Bureau ("BBB") alert "advising the public that AFS has an unsatisfactory business performance record due to a pattern of complaints alleging billing for unordered merchandise[;]" (2) a 2001 defamation suit by AFS against BBB based on its 1998 alert; (3) a 2009 U.S. Department of Agriculture alert "advising of . . . ICR's collection efforts for payment for publications that people claim not to have purchased," of which ICR allegedly became aware in 2009 or 2010; (4) a May 2016 notice sent by BBB to ICR stating that it "was concerned about a pattern of complaints against ICR concerning collection attempts for the AFS Defendants" and "that consumers advised . . . BBB that they had not ordered any publications from . . . AFS Defendants and therefore did not owe the debt that ICR was

to credit bureaus and do not initiate litigation against or 'refer to collections' consumers who do not pay." (Id. ¶ 37.)

**B. The Instant Motions to Dismiss**

On February 4, 2021, ICR Defendants filed a Motion to Dismiss Counts III and VII of the FAC (Doc. No. 48)[10] under Fed. R. Civ. P. 12(b)(6) for failure to state claims on which relief can be granted, and on February 11, 2021, AFS Defendants filed a Motion to Dismiss Counts V, VI, and VIII (Doc. No. 55)[11] on the same ground. In their Motions, Defendants seek to dismiss the Commonwealth's claims in Counts V through VIII,[12] arguing that such Counts fail to state a claim

---

attempting to collect[;]" (5) ICR's response to BBB's May 2016 notice "stating that [ICR] was aware that . . . AFS Defendants' customers were upset about being billed for a product they felt they did not order and that they thought was free[;]" (6) a May 2016 BBB alert "emphasizing the pattern of complaints and noting that ICR responds identically to many of them[;]" (7) BBB and state Attorneys General's forwarding to ICR complaints by consumers stating "that they did not owe the AFS . . . Defendants' alleged debts[;]" (8) direct complaints made by consumers to ICR stating that "they had no agreements with the AFS . . . Defendants for paid subscriptions[;]" and (9) a meeting several years ago between Defendants Powell and Diorio and the New York Attorney General's office "to discuss complaints against ICR regarding collection of . . . AFS . . . Defendants' debts[.]" (Doc. No. 43 ¶¶ 27, 39-42, 44, 46.) Additionally, the FAC alleges knowledge by individual Defendants Powell and Diorio based on, inter alia, their: (1) 30+ year employment histories with ICR; (2) current positions of authority in the company; and (3) involvement in the day-to-day operations and employee training for ICR, including setting collection policies and procedures. (See id. ¶¶ 14-15, 50-52.)

[10] The Motion of ICR Defendants is titled "ICR Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint." (Doc. No. 48.) As noted supra, however, the claims against ICR Defendants appear only in Counts III and VII. Thus, their Motion to Dismiss the FAC as to them seeks dismissal of these two Counts only. (See Doc. Nos. 62 at 2-3; 43 ¶¶ 64-68, 84-86.)

[11] The Motion of AFS Defendants is titled "AFS Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint." (Doc. No. 55 at 1; see also Doc. No. 55-1.) In their Reply, however, AFS Defendants clarify that they are only moving to dismiss Counts V, VI, and VIII. (See Doc. No. 66 at 3.)

[12] Specifically, as referred to earlier, AFS Defendants move to dismiss Counts V, VI, and VIII of the FAC and ICR Defendants move to dismiss Count VII. (See Doc. Nos. 55 at 1, 6; 48-2 at 9-11.) But it should be noted that Count VIII also alleges a violation of the UMS, 39 U.S.C. §

as a matter of law because the UTPCPL does not apply to business-to-business transactions. (See Doc. Nos. 48-2 at 9-12; 55 at 6-11.)[13] They contend the Commonwealth lacks the authority to enjoin their alleged unlawful conduct in the sale of, and collection of payment for, publication subscriptions to organizations nationwide. (See ids.)[14]

ICR Defendants also move to dismiss Count III, arguing that this claim fails as a matter of law because: (1) the FTCA is inapplicable to ICR as an agency that collects "commercial debts" on behalf of AFS Defendants; and (2) alternatively, if the Court finds businesses are "consumers" under the FTCA, the FTC cannot establish that ICR Defendants committed deceptive practices under Section 5(a). (See Doc. No. 48-2 at 5-9, 18-24.)

On March 4, 2021, Plaintiffs filed a Joint Response in Opposition to Defendants' Motions to Dismiss the First Amended Complaint. (Doc. No. 62.) In the Response, Plaintiffs submit that the Attorney General is permitted to bring a lawsuit for violations of the UTPCPL against the individual Defendants and the corporate Defendants for engaging in business transactions with organizations. (See id. at 9-12.) Further, they allege that unlawful commercial practices in business-to-business transactions, such as the transactions of Defendants here, can be enjoined

---

3009. For this reason, it appears that AFS Defendants may not be seeking a dismissal of Count VIII in its entirety, but only of that portion alleging a violation of the UTPCPL, 73 P.S. §§ 201-3 and 201-2(4)(ii)-(iii), (v), and (xxi).

[13] On February 25, 2021, ICR Defendants filed a Response in support of AFS Defendants' Motion ("Joinder of ICR Defendants to AFS Defendants' Motion to Dismiss") in which they adopt AFS Defendants' arguments for dismissal of the Commonwealth's UTPCPL claims in Counts V through VIII of the FAC "since the ICR Defendants collect commercial debts that stem from business-to-business transactions." (See Doc. No. 59 at 1.) In their Motion, AFS Defendants also expressly adopt the arguments made by ICR Defendants in their Motion to Dismiss. (See Doc. No. 55 at 6.)

[14] ICR Defendants also argue that the Commonwealth's claim in Count VII fails as a matter of law because the FAC does not establish that they engaged in deceptive acts or practices in violation of the UTPCPL. (See Doc. No. 48-2 at 12-18.)

under the UTPCPL.  (See id. at 9-13.)

Regarding ICR Defendants' Motion to Dismiss Count III, Plaintiffs argue that the FTCA authorizes the FTC to enjoin unlawful commercial practices involving small businesses who purchase goods or services.  (See id. at 5-9.)  Moreover, they assert that the Federal Fair Debt Collections Practices Act (the "FDCPA"), 15 U.S.C. §§ 1692 et seq., neither preempts nor exempts from coverage by the FTCA of "debt collection activities against organizations," but instead serves as a supplement to it.  (Id. at 9.)

Thereafter, Defendants submitted supplemental briefs in support of their Motions to Dismiss.  (Doc. Nos. 66, 71, 73-74.)[15]

## III.  STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell

---

[15]  In their Reply, ICR Defendants make several arguments which they did not originally raise in their Motion to Dismiss, including several factual insufficiency challenges to the Commonwealth's claims under 73 P.S. § 201-2(4)(ii)-(iii), (v), and (xxi), the Commonwealth's inability to enforce § 201-4's injunction provisions of the UTPCPL against ICR Defendants because they are domiciled outside of Pennsylvania, and the FAC's failure to establish that they are engaged in "trade" or "commerce" within Pennsylvania.  (See Doc. No. 73); see also infra note 26.  These arguments were not made in reply to Plaintiffs' averments in their Response in Opposition.  (See Doc. No. 62.)  Because ICR Defendants failed to raise these arguments in the opening brief of their Motion to Dismiss (Doc. No. 48), they have been waived, and the Court need not address them here.  See Anspach ex rel. Anspach v. City of Philadelphia, 503 F.3d 256, 258 (3d Cir. 2007) ("[F]ailure to raise an argument in one's opening brief waives it."); Laborers' Int'l Union of North Am. v. Foster Wheeler Energy Corp., 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion)) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'").  Moreover, the Court has considered each argument on the merits and finds them to be unavailing.

Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

## IV.  ANALYSIS

Viewing the allegations in the FAC in the light most favorable to Plaintiffs and drawing all inferences in their favor, the Commonwealth has plausibly alleged claims against Defendants in Counts V through VIII for violations of the UTPCPL,[16] and the FTC has plausibly alleged a claim against ICR Defendants in Count III for violations of the FTCA.

First, the Court will address AFS Defendants' Motion to Dismiss Counts V, VI, and VIII of the FAC and ICR Defendants' Motion to Dismiss Count VII.  (See Doc. Nos. 55 at 1, 6; 48-2 at 9-11.)  Second, the Court will address ICR Defendants' Motion to Dismiss Count III.  (See Doc. No. 48-2 at 5-9, 18-24.)

### A.  Defendants' Motions to Dismiss the UTPCPL Claims in Counts V through VIII Will be Denied

#### 1.  The Pennsylvania UTPCPL

Section 201-3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq., makes it unlawful for any person to use "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  73 P.S. § 201-3(a).  "Person" is defined as:

> [N]atural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities.

---

[16]  As noted above, AFS Defendants move to dismiss Counts V, VI, and VIII of the FAC, and ICR Defendants move to dismiss Count VII.  (See Doc. Nos. 55 at 1, 6; 48-2 at 9-11.)

§ 201-2(2); <u>see also</u> § 201-2(11) (also defining "[p]erson" as "an individual, corporation, trust, estate, partnership, unincorporated association or any other legal or commercial entity.").[17]

Section 201-2(4) defines "unfair or deceptive acts or practices" as, <u>inter alia</u>:

(ii)     Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(iii)    Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

. . .

(v)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

. . .

(xvii)   Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating:

    (A)     the identity of the seller;

    (B)     that the purpose of the call is to sell goods or services;

    (C)     the nature of the goods or services; and

    (D)     that no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered. . . .; [and]

. . .

(xxi)    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

§ 201-2(4)(ii)-(iii), (v), (xvii), (xxi); <u>see also</u> <u>Meyer v. Cmty. Coll. of Beaver Cnty.</u>, 93 A.3d 806,

---

[17]   The word "person" as quoted above is defined twice in the definition section of the UTPCPL, 73 P.S. § 201-2. Regardless of which definition of "person" is used here, the individual Defendants and the corporate Defendants are included within the definition.

811 (Pa. 2014) (describing § 201-2(4) as "detailing a litany of unlawful business practices").  The

statute defines "trade" and "commerce" as:

> [T]he advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.

§ 201-2(3).  Significantly, the General Assembly did not define the word "consumer" in the

UTPCPL.  See § 201-2.

### a. Distinction Between the Public and Private Enforcement Provisions

The UTPCPL has different public and private enforcement provisions.  See Weinberg v.

Sun Co., 777 A.2d 442, 446 (Pa. 2001) ("Commonwealth actions and private actions [under the

UTPCPL] are distinguishable.").  The public enforcement provision—the one being used here[18]—

provides that:

> Whenever the Attorney General . . . has reason to believe that any person is using or is about to use any method, act or practice declared by [§ 201-3][19] of this act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person . . . .

73 P.S. § 201-4.[20]

In contrast, the private enforcement provision, added eight years after the UTPCPL's

---

[18]  (See Doc. No. 43 ¶ 2.)

[19]  Section 201-3 of the UTPCPL makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by [§ 201-2(4)(i)-(xxi)] . . . ."  73 P.S. § 201-3(a).

[20]  In accordance with § 201-4, the Attorney General may seek a temporary or permanent injunction to restrain a person's use of unlawful acts or practices and may also "obtain, 'on behalf of the Commonwealth,' civil penalties in varying amounts, up to $5,000 per violation." Meyer v. Cmty. Coll. of Beaver Cnty., 93 A.3d 806, 414-15 (Pa. 2014) (quoting 73 P.S. § 201-8).

enactment,[21] permits:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [§ 201-3] of this act, [to] bring a private action to recover actual damages . . . .

§ 201-9.2(a). Unlike the public enforcement provision, the private enforcement provision contains language limiting the class of persons who can bring a private action for violations of the UTPCPL to those who "purchase . . . goods or services primarily for personal, family or household purposes." Id.

Recently, the Third Circuit Court of Appeals in Conboy v. United States Small Business Administration affirmed a district court's grant of summary judgment dismissing the plaintiffs' UTPCPL and FDCPA claims because the debt at issue was a commercial one. 992 F.3d 153, 157-58 (3d Cir. 2021). In Conboy, the plaintiffs brought a private enforcement action under § 201-9.2 of the UTPCPL. See id. at 156-57. The Third Circuit discussed the limitations of the private enforcement provision as follows:

> UTPCPL claims and FDCPA claims . . . apply to consumer debts, not commercial ones like the debt at issue. In re Smith, 866 F.2d 576, 583 (3d Cir. 1989) (73 Pa. Cons. Stat. § 201-9.2, the UTPCPL section on private actions, applies "only [to] those persons who purchase or lease goods or services primarily for consumer use rather than for commercial use"); Staub v. Harris, 626 F.2d 275, 278 (3d Cir. 1980) (the FDCPA "was intended to apply only to debts contracted by consumers for personal, family or household purposes" (citation and internal quotation marks omitted)).

Id. at 157 (emphasis added).

As noted above, § 201-9.2 is not the provision under which the Commonwealth brings its claims. The Commonwealth brings this action pursuant to § 201-4, which allows the Pennsylvania

---

[21] "The UTPCPL was enacted in 1968, and a private cause of action was added in 1976." Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001).

Attorney General to bring a public enforcement action against any person who is using any method, act, or practice declared unlawful under the UTPCPL, and included within the definition of "person" are the individual Defendants and the corporate Defendants sued here. (See Doc. No. 43 ¶ 2.)[22]

### b. The UTPCPL's Remedial Purpose and Liberal Construction

In 1968, the Pennsylvania General Assembly enacted the UTPCPL as remedial legislation designed "to benefit the public at large" by combatting fraud in the marketplace. Commonwealth v. Monumental Props., 329 A.2d 812, 815 (Pa. 1974); see also id. at 816 ("Although the [UTPCPL] did articulate the evils desired to be remedied, the statute's underlying foundation is fraud prevention."). In Commonwealth v. Monumental Properties, the Pennsylvania Supreme Court stressed the remedial purpose underlying the UTPCPL's enactment as follows:

> The Legislature sought by the [UTPCPL] to benefit the public at large by eradicating, among other things, "unfair or deceptive" business practices. Just as earlier legislation was designed to equalize the position of employer and employee and the position of insurer and insured, this Law attempts to place on more equal terms seller and consumer. These remedial statutes are all predicated on a legislative recognition of the unequal bargaining power of opposing forces in the marketplace. Instantly, the Legislature strove . . . to ensure the fairness of market transactions. No sweeping changes in legal relationships were occasioned by the [UTPCPL], since prevention of deception and the exploitation of unfair advantage has always been an object of remedial legislation.

329 A.2d at 815-16. "The UTPCPL was created to even the bargaining power between consumers and sellers in commercial transactions, and to promote that objective, it aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices."

---

[22] It is undisputed that Defendants are "persons" under the statute. See 73 P.S. § 201-2(2) (defining "[p]erson" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."); see also § 201-2(11) (also defining "[p]erson" as an "an individual, corporation, trust, estate, partnership, unincorporated association or any other legal or commercial entity.").

Commonwealth v. Golden Gate Nat'l Senior Care LLC, 194 A.3d 1010, 1023 (Pa. 2018).[23]  And under the public enforcement provision, the Attorney General has the ability to protect as consumers not only individuals but also business entities.  See 73 P.S. § 201-4.

To effectuate this remedial purpose, the legislature purposefully drafted the UTPCPL using broad, "sweeping" language.  Monumental, 329 A.2d at 817.[24]  Accordingly, the Pennsylvania Supreme Court has made it abundantly clear, on numerous occasions, that the UTPCPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices."  Id.[25]

### 2.    Section 201-4 Covers Business-to-Business Transactions

---

[23]  Defendants argue that because the alleged victims in this case are businesses, they can easily protect themselves and are on equal footing with Defendants with equal bargaining power. (See Doc. Nos. 48-2 at 19-21; 55 at 6.)  This argument is unpersuasive because as alleged in the FAC, telemarketers are calling thousands of businesses and talking to unsuspecting employees about publications that could affect their business without notifying them that a purported sale is being consummated.  (See Doc. No. 43 ¶¶ 20-25.)  When businesses are misled in this manner, it is difficult to perceive how the bargaining power is equal.

[24]  In Commonwealth v. Monumental Properties, the Pennsylvania Supreme Court noted the "expansive" and "sweeping" language of Sections 2 and 3 of the UTPCPL, 73 P.S. §§ 201-2, 201-3, as follows:

> Section 3 in sweeping language declares the concerns of the Legislature, and [S]ection 2 further and more fully defines those concerns. These expansive provisions reflect the legislative judgment that unfairness and deception in all consumer transactions must be halted.  These sections of the [UTPCPL], in accordance with the legislative intent, are to be liberally construed to effectuate that intent.

329 A.2d 812, 817 (Pa. 1974).

[25]  See also Danganan v. Guardian Protection Servs., 179 A.3d 9, 16 (Pa. 2018) (quoting Monumental, 329 A.2d at 817) (citing "the notion of the UTPCPL as remedial legislation—as well as its corollary liberal interpretation, so as to 'effect its object of preventing unfair or deceptive practices'"—in support of the court's holding that the statute protects non-Pennsylvania residents); Commonwealth v. Golden Gate Nat'l Senior Care LLC, 194 A.3d 1010, 1034 (Pa. 2018) (describing "the long-recognized directive that the UTPCPL be construed liberally to achieve its objective of preventing fraud or unfair or deceptive business practices and leveling the playing field between businesses and consumers.").

As noted earlier, the FAC alleges that Defendants violated § 201-3 in transactions involving "organizations nationwide" by using unfair or deceptive acts or practices in selling and collecting payment for publication subscriptions. (See Doc. No. 43 ¶¶ 1-2, 19.)[26] The Commonwealth brings these claims against Defendants in Counts V through VIII, using the UTPCPL's public enforcement provision codified in § 201-4. (See Doc. No. 43 ¶ 2.)

In their Motions to Dismiss, Defendants contend that the Commonwealth's claims fail as a matter of law because the UTPCPL only regulates "unfair or deceptive practices" in trade or commerce involving individual "consumers" and for this reason does not apply to transactions they conduct with organizations such as business entities. (See Doc. Nos. 48-2 at 9-11; 55 at 6-11.) Defendants define consumers as "person[s] who purchase[] or lease[] goods or services

---

[26] AFS Defendants do not dispute that they are engaged in "trade" and "commerce." (See Doc. No. 55.) Although ICR Defendants contend that they are not engaged in "trade" and commerce" as those terms are defined in § 201-2(3), they waived this argument by not raising it in their opening brief. See supra note 15. This contention would nonetheless fail because the FAC plausibly alleges that ICR Defendants, as a collection agency for Pennsylvania corporation AFS, sell their services to AFS Defendants and pursue collections in Pennsylvania. (See Doc. No. 43 ¶¶ 9, 19, 32.) For these reasons, they have engaged in "trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3); see also Yelin v. Swartz, 790 F. Supp. 2d 331, 337-38 (E.D. Pa. 2011) (quoting Beyers v. Richmond, 937 A.2d 1082, 1089 (Pa. 2007)) ("[T]he [Pennsylvania Supreme Court] acknowledged that debt collection [is] 'an act in trade or commerce' within the meaning of the UTPCPL."). And in using the language "any trade or commerce directly or indirectly affecting the people of this Commonwealth," § 201-2(3), the General Assembly has manifested an intent that the UTPCPL reach unlawful conduct in "trade" or "commerce" to the broadest extent possible.

Here, for example, at the very least, ICR Defendants' collection activities "directly [and] indirectly affect[] the people of this Commonwealth" because when businesses are allegedly defrauded, it affects not only the businesses themselves, but also the individuals who work for those businesses and its customers. § 201-2(3). This is because ICR Defendants are attempting to collect purportedly invalid debts from the proceeds of another business that could use the proceeds for other purposes to benefit the company, its employees, and the people of this Commonwealth who they serve. Accordingly, they are engaged in "trade" or "commerce" that affects the people of this Commonwealth as defined in § 201-2(3).

primarily for personal, family or household use," relying on language found in § 201-9.2(a), the provision creating the private enforcement action. (Doc. Nos. 48-2 at 9; 55 at 9.) In their Response, Plaintiffs submit that § 201-4 clearly covers "trade" and "commerce" with businesses and grants the Commonwealth, through the Attorney General, the authority to bring a public enforcement action to enjoin Defendants' alleged deceptive practices in their transactions with organizations. (See Doc. No. 62 at 9-16.)

Under Pennsylvania law, "the paramount goal of statutory interpretation" is to "ascertain and effectuate the intention of the General Assembly." Golden Gate, 194 A.3d at 1034, 1037 (quotations omitted) (quoting 1 Pa.C.S. § 1921(a)). "The best indicator of the General Assembly's intent is the plain language of the statute." Id. at 1034; see also Danganan, 179 A.3d at 16 ("Words that are clear and free from all ambiguity are presumed to be the best indicator of legislative intent.").

Importantly, where the language of a statute is clear and unambiguous, a court "must give effect to the plain language, and [it] cannot ignore the text of the statute in pursuit of its spirit." Golden Gate, 194 A.3d at 1027.[27] This means that "a court may not, under the guise of construction, add matters the legislature saw fit not to include at the time." Commonwealth v. Tarbert, 535 A.2d 1035, 1044 (Pa. 1987); see also Danganan, 179 A.3d at 17 (where language is clear and unambiguous, courts may not "supply additional terms to, or alter, the language that the [l]egislature has chosen.").[28] In reading the plain language, a court must construe "words and

---

[27] See also 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

[28] See, e.g., Commonwealth v. Tarbert, 535 A.2d 1035, 1044 (Pa. 1987) (refusing to "engraft" upon the statute an exception to the stated restriction therein); Danganan, 179 A.3d at 17 (refusing to import limitations into plain language definitions of "person" and "trade" and "commerce" because "there is no textual basis in the UTPCPL for [their] imposition, and the

phrases . . . according to . . . their common and approved usage," 1 Pa.C.S. § 1903(a)), and

"consider the statutory language at issue not in isolation, but in the context in which it appears."

Golden Gate, 194 A.3d at 1027.

Moreover, the Pennsylvania Supreme Court has cautioned against consulting external

sources to determine meaning when the words of a statute are explicit and unambiguous. See id.

(quoting 1 Pa.C.S. § 1921(c)) ("It is only when 'the words of the statute are not explicit' on the

point at issue that resort to statutory construction is appropriate."). "[A]n ambiguity exists when

there are at least two reasonable interpretations of the text under review." Delaware Cnty. v. First

Union Corp., 992 A.2d 112, 118 (Pa. 2010) (citing Trizechahn Gateway LLC v. Titus, 976 A.2d

474, 483 (Pa. 2009)).

As noted, Section 201-4 provides that:

> Whenever the Attorney General or a District Attorney has reason to believe that any
> person is using or is about to use any method, act or practice declared by [§ 201-3]
> of this act to be unlawful, and that proceedings would be in the public interest, he
> may bring an action in the name of the Commonwealth against such person to
> restrain by temporary or permanent injunction the use of such method, act or
> practice.

73 P.S. § 201-4.

Nothing in the plain language of § 201-4 limits the Attorney General's right to seek

injunctive relief to a suit on behalf of individual "consumers" or "person[s] who purchase[] or

lease[] goods or services primarily for personal, family or household purposes." (Doc. No. 48-2

at 10; see also Doc. No. 55 at 8-9.) [29] The latter language appears in § 201-9.2(a), which covers a

---

Court may not supply additional terms to, or alter, the language that the Legislature has
chosen.").

[29] Again, because Defendants' purported meaning is entirely lacking in textual support, the Court
need not "resolve the question with reference to principles of statutory construction."
Delaware Cnty. v. First Union Corp., 992 A.2d 112, 118-19 (Pa. 2010); see also Danganan, 179

private action. Rather, § 201-4 empowers the Attorney General to bring an action in the name of the Commonwealth against "persons"[30] who violate the UTPCPL by engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce" so long as such "proceedings [are] in the public interest." §§ 201-3(a), 201-4.

As expressly authorized, the Commonwealth is a named co-Plaintiff here and has brought suit to enjoin Defendants' alleged deceptive practices in transacting business with "organizations nationwide." (Doc. No. 43 ¶ 19.) The text of § 201-4 does not contain any limitation on the target of a person's unfair or deceptive business practices. It does not say that the Attorney General can only restrain deceptive practices of a person conducting trade or commerce with a "consumer," an "individual," or a "natural person" "who purchases or leases goods or services primarily for personal, family or household purposes." Notably, the word "consumer" is not even defined under the UTPCPL. See § 201-2.[31] The General Assembly could have limited the reach of § 201-4 to

---

A.3d at 17. Instead, the language of § 201-4 is explicit and unambiguous, and the Court must give effect to its plain meaning. See Golden Gate, 194 A.3d at 1027 (quoting 1 Pa.C.S. § 1921(c)) ("It is only when 'the words of the statute are not explicit' on the point at issue that resort to statutory construction is appropriate.").

[30] It is undisputed that Defendants are "persons" under the statute. See supra note 22.

[31] Defendants argue that because the UTPCPL has the word "consumer" in its title ("Consumer Protection Law"), the reach of § 201-4 is limited to "person[s] who purchase[] or lease[] goods or services primarily for personal, family or household purposes." (See Doc. Nos. 48-2 at 9; 66 at 5; 73 at 3.) It is well-established that the text in the body of a statute controls, not its name or purpose. See Pennsylvania Dep't of Corrs. v. Yeskey, 524 U.S. 206, 212 (alterations in original) (quotations omitted) (quoting Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 528-29 (1947)) ("[T]he title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, [it is] of use only when [it] shed[s] light on some ambiguous word or phrase."); Carter v. United States, 530 U.S. 255, 256 (2000) ("[T]he title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself."). As noted supra, the word "consumer" does not appear in § 201-4. Nor is the text of this provision ambiguous. See supra note 29. Nothing in its plain language limits the Attorney General's right to bring a public action on behalf of "consumers" as Defendants contend. Thus, the plain meaning of the text of § 201-4 controls, not the title of the statute.

transactions involving "consumers" and it could have defined this term to mean individual consumers or natural persons. It also could have included in § 201-4 the specific language Defendants rely upon. It did not do so. <u>Cf.</u> <u>Golden Gate</u>, 194 A.3d at 1034 ("If the General Assembly intended to restrict eligibility for a remedy under [§ 201-4.1] to those encompassed by 'person' as defined in [§ 201-2(2)], it could have employed that term. Instead, it defined the class of eligible recipients as any 'person in interest.'").[32] Similarly, the text of § 201-4 does not exclude from its coverage unlawful practices directed at a "corporation, trust, estate, partnership, . . . association or any other legal or commercial entity."

Further, as already discussed <u>supra</u>, the limiting language included in the private enforcement provision, § 201-9.2, is clearly absent from § 201-4. That language, as it appears in § 201-9.2(a), is as follows:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes . . . may bring a private action . . . .

73 P.S. § 201-9.2(a).

Again, the General Assembly could have limited the reach of § 201-4 in the same way that it did § 201-9.2, but it chose not to do so. Defendants' interpretation of § 201-4 essentially asks the Court to read into the text of that provision the limiting language contained only in § 201-9.2. But where the text of a statue is explicit and unambiguous, as it is here, Pennsylvania law constrains the Court from "supply[ing] additional terms to, or alter[ing], the language that the Legislature has chosen." <u>Danganan</u>, 179 A.3d at 17; <u>see also</u> <u>Tarbert</u>, 535 A.2d at 1044 ("Where

---

[32] In <u>Golden Gate</u>, the Pennsylvania Supreme Court held that "the Commonwealth is a 'person in interest' as used in [§ 201-4.1] of the UTPCPL[] and may seek the remedies provided thereunder." 194 A.3d at 1034. Section 201-4.1 provides, in relevant part, that a court "may in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property . . . which may have been acquired by means of any violation of [the UTPCPL]." 73 P.S. § 201-4.1.

the language of a statute is clear and unambiguous, a court may not, under the guise of construction, add matters the legislature saw fit not to include at the time.").

Moreover, Defendants' interpretation would controvert the purpose underlying the UTPCPL to protect the public—whether the "public" is an individual or a business buying goods or services—from fraudulent, unfair, and deceptive conduct. See Monumental, 329 A.2d at 817 (stating that the "expansive" language in the UTPCPL "reflect[s] the legislative judgment that unfairness and deception in all consumer transactions must be halted."). The broad, open-ended language of § 201-4 instead evinces a legislative intent to protect both individual and business consumers in the marketplace. Contrary to Defendants' contentions, the UTPCPL's remedial purpose—"as well as its corollary liberal interpretation, so as to 'effect its object of preventing unfair or deceptive practices"—supports the conclusion reached here. Danganan, 179 A.3d at 16 (quoting Monumental, 329 A.2d at 817).

In the absence of any language limiting the target of "unfair or deceptive acts or practices," a natural reading of § 201-4 compels the conclusion that the General Assembly intended to empower the Attorney General to bring a public action to protect both individuals and businesses. Thus, the Commonwealth can bring this action against Defendants to enjoin their alleged deceptive conduct in the sale of, and collection of payment for, publication subscriptions to organizations.

### 3. The Commonwealth Has Plausibly Alleged that ICR Defendants Engaged in Unfair or Deceptive Practices in Count VII

In their Motion to Dismiss, ICR Defendants also argue that the Commonwealth's claim in Count VII should be dismissed because they have not, as a matter of law, engaged in unfair or deceptive conduct under the UTPCPL.

Under the UTPCPL, "unfair or deceptive acts or practices" are defined in relevant part, as quoted above:

Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services; . . . [c]ausing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; . . . [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have; . . . [and] [e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4)(ii)-(iii), (v), and (xxi). From a reading of the FAC, this statute would cover the conduct of ICR Defendants.

Here, however, ICR Defendants rely on another statute, the Federal Fair Debt Collections Practices Act (the "FDCPA"), 15 U.S.C. §§ 1692 et seq., to argue that they have not engaged in unfair or deceptive conduct because they had no independent obligation to verify the validity of debts that businesses purportedly owed to AFS prior to and during their collection efforts. (See Doc. No. 48-2 at 12-18.) Because they were "properly relying on the information provided [to them] by . . . AFS Defendants that the debts [were] valid and owed," ICR Defendants contend that they did not, as a matter of law, engage in deceptive conduct in violation of the UTPCPL. (Id. at 14.) In their Response, Plaintiffs submit that ICR Defendants are making a factual contention completely at odds with the allegations in the FAC and that this argument cannot properly serve as a basis for dismissal. (See Doc. No. 62 at 17-18.)

The Court agrees with Plaintiffs. In Count III of the FAC, the Commonwealth alleges that ICR Defendants violated the UTPCPL by misrepresenting to businesses that: "(a) . . . AFS debts are valid; (b) consumers have a legal obligation to pay . . . AFS Defendants' debts; and (c) failure to pay will result in a negative impact on a credit rating or will result in legal action." (Doc. No. 43 ¶ 84.) The FAC contains a plethora of allegations detailing complaints and investigations against Defendants over many years that, when viewed in the light most favorable to Plaintiffs, plausibly show that ICR Defendants "knew or had reason to know that many consumers had not

actually agreed to accept any financial obligation for . . . AFS Defendants' publications." (Doc. No. 62 at 17; see also Doc. No. 43 ¶¶ 38-48, 50-54); supra note 9. Moreover, the FAC alleges that ICR Defendants "never took . . . any action to affect a consumer's credit rating, nor do the supposed debts ever result in legal action." (Doc. No. 62 at 17.)

Clearly, the question of ICR Defendants' knowledge regarding AFS Defendants' business practices and the validity of debts they collect on behalf of their largest client, AFS, is a factual issue at the center of Plaintiffs' claims in Count VII. (See Doc. No. 43 ¶ 33.) Thus, "accepting all factual allegations as true and construing the [FAC] in the light most favorable" to Plaintiffs, McGovern v. City of Philadelphia, 554 F.3d 114, 115 (3d Cir. 2009), the Commonwealth has plausibly alleged that ICR Defendants violated the UTPCPL by misrepresenting to businesses that AFS's debts are valid, that they have a legal obligation to pay the debts, and that ICR will take legal action to affect a consumer's credit rating. Consequently, ICR Defendants' Motion to Dismiss Count VII will be denied.

**B.     ICR Defendants' Motion to Dismiss Count III Will be Denied**

In Count III of the FAC, the FTC plausibly alleges deceptive practices by ICR Defendants in violation of the FTCA. Section 5(a) of the FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the [FTCA]." (Doc. No. 43 ¶ 57.)

In Count III, the FTC alleges that ICR Defendants engaged in deceptive practices in violation of the FTCA by misrepresenting to consumers that debts owed to AFS were valid, that they had a legal obligation to pay the debts, and that failure to do so "will result in a negative impact on a credit rating or will result in legal action." (Id. ¶ 64.) In their Motion to Dismiss, ICR

Defendants argue that Count III fails as a matter of law because: (1) the FTCA is inapplicable to ICR Defendants because ICR is an agency that collects "commercial debts" on behalf of AFS Defendants; and (2) alternatively, if the Court finds businesses are "consumers" under the FTCA, the FTC cannot establish that ICR Defendants committed deceptive practices under Section 5(a). (See Doc. No. 48-2 at 5-9, 18-24.)

Regarding their first argument in support of dismissal of Count III, ICR Defendants rely on the FDCPA in arguing that the FTCA does not regulate debts that are not "contracted by consumers for personal, family or household purposes." Conboy, 992 F.3d at 157 (quoting Staub v. Harris, 626 F.2d 275, 278 (3d Cir. 1980)). According to ICR Defendants, because ICR collects debts owed by commercial entities as opposed to "consumers," they contend that the FTCA does not apply to their alleged deceptive practices. (See Doc. No. 48-2 at 7-9.)

This argument is unavailing, as ICR Defendants are sued in Count III under the FTCA, not the FDCPA, and the FTCA clearly prohibits "unfair or deceptive acts or practices" in commercial activities involving small businesses and other organizations like those in the transactions at issue. See F.T.C. v. IFC Credit Corp., 543 F. Supp. 2d 925, 941 (N.D. Ill. 2008) ("Consistent with its Congressional mandate, the FTC has concluded that small businesses and religious and other not-for-profit organizations are consumers and are entitled to protection from deceptive and unfair acts and practices."). Accordingly, the businesses to which ICR Defendants direct their alleged deceptive collection activities are "consumers" entitled to protection under the FTCA.

In their second argument for dismissal of Count III, ICR Defendants aver that their conduct, as alleged in the FAC, does not amount to deceptive acts or practices under the FTCA. (See Doc. No. 48-2 at 18-24.) In Response, Plaintiffs submit that "those who engage in deceptive practices to obtain money from targets by misrepresenting that they owe debts or that their failure to pay

will result in a negative impact on a credit rating or legal action violate the [FTCA] . . . ."  (Doc. No. 62 at 9.)

"To establish that an act or practice is deceptive, the FTC must demonstrate that '(1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material.'"  FTC v. Click4Support, LLC, No. 15-5777, 2015 U.S. Dist. LEXIS 153945, at *14 (E.D. Pa. Nov. 10, 2015) (quoting F.T.C. v. NHS Sys., Inc., 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013)).  Under the second element, the FTC need not prove that ICR Defendants made representations to organizations with an intent to deceive.  See Regina Corp. v. Federal Trade Comm'n, 322 F.2d 765, 768 (3d Cir. 1963).  Instead, representations need only have a capacity to or tendency to deceive.  See id.

ICR Defendants do not dispute the first and third elements of this test.  Rather, they contend that Count III fails as a matter of law because their alleged representations to organizations that AFS Defendants' debts were valid, that businesses had a legal obligation to pay the debts, and that failure to do so would result in a negative credit rating or legal action were not likely to mislead a reasonable business consumer under the circumstances because businesses are more sophisticated consumers than individual or natural persons.  (See Doc. No. 48-2 at 19-21.)  ICR Defendants, however, cite no precedential authority to support their contention regarding differential treatment of businesses under Section 5(a) of the FTCA.

Moreover, when there is deceptive conduct as described in the FAC, the playing field is uneven.  See supra note 23.  And courts have found that "representations regarding the 'valuable nature of the coupons;' the consumers' legal obligation to pay for the Defendants' services; and the Defendants' intention to initiate legal action, were likely to mislead consumers acting reasonably under the circumstances."  See, e.g., FTC v. Magazine Sols., LLC, No. 7-692, 2010

U.S. Dist. LEXIS 145377, at *32 (W.D. Pa. Mar. 15, 2010).

Accordingly, viewing the facts in the light most favorable to Plaintiffs, the FAC plausibly alleges that ICR Defendants engaged in deceptive collection practices in violation of the FTCA. Thus, ICR Defendants' Motion to Dismiss Count III will be denied.

## V. CONCLUSION

For the foregoing reasons, both ICR Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 48) and AFS Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 55) will be denied. An appropriate Order follows.