UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION, *et al*.,

      Plaintiffs,

      v.

AMERICAN FUTURE SYSTEMS, INC., *et al.,*

      Defendants.

Case No. 2:20-cv-02266

**MEMORANDUM IN SUPPORT OF JOINT MOTION OF PLAINTIFFS FEDERAL TRADE COMMISSION AND COMMONWEALTH OF PENNSYLVANIA TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO REQUESTS FOR PRODUCTION OF DOCUMENTS TO AMERICAN FUTURE SYSTEMS, INC. AND MOTION FOR SANCTIONS DUE TO AFS'S FAILURE TO PRODUCE SLACK MESSAGES**

**EXPEDITED RELIEF REQUESTED**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     FACTUAL BACKGROUND ..................................................................2

        A.  AFS's Business Activities...........................................................2

        B.  AFS's Failure to Disclose Its Usage of Slack or Produce Slack Data .........2

        C.  Plaintiffs' Discovery of the Significance of Slack Data ............................4

            1.  AFS Exchanged Tens of Thousands of Slack Messages During
                the Relevant Time Period..................................................4

            2.  Slack Messages Are Not Duplicative of Any Other Documents,
                Such as Emails. ...............................................................5

            3.  AFS Employees Used Slack to Communicate Regarding
                Telemarketing of Publications and Other Highly Relevant Issues. .6

            4.  There Is No Clear Distinction Between AFS's Slack Accounts
                and All of the Accounts Contain Relevant Data.............................8

        D.  Plaintiffs' Attempt to Confer and AFS's Continued Refusal to Produce
            Slack Data. ...............................................................................10

        E.  Slack's Policies ..............................................................................11

            1.  Slack's Retention of Data ...............................................11

            2.  Exporting and Producing Slack Data Is Possible and Simple........12

III.    LEGAL STANDARD: SCOPE OF DISCOVERY .........................................13

IV.     ARGUMENT ...........................................................................................14

        A.  The Court Should Compel AFS to Produce All Slack Data from
            July 1, 2015 to Present.................................................................14

            1.  The Slack Messages Are Highly Relevant to Plaintiffs' Claims. ...14

            2.  Production of the Slack Messages Is Proportional to the Needs
                of the Case.....................................................................14

                a.  Importance of the Issues at Stake in the Action &
                    Amount in Controversy.....................................................14

i

b. Parties' Relative Access to the Relevant Information & Importance of the Discovery in Resolving the Issues........15

c. Parties' Resources & the Burden of Production ...............16

B. AFS's Failure to Identify and Produce Its Slack Data Is Sanctionable .....18

1. AFS and Its Counsel Failed to Conduct a Reasonable Search for Relevant Documents......................................19

2. AFS Failed to Produce Slack Documents Responsive to This Court's Prior Order. ......................................21

V. CONCLUSION..............................................22

LIST OF DOCUMENT REQUESTS TO WHICH SLACK DATA IS LIKELY RESPONSIVE ..................................................25

CERTIFICATION PURSUANT TO RULE 37 AND LOCAL RULE 26.1(f) ................29

## TABLE OF AUTHORITIES

### Cases

*Benebone LLC v. Pet Qwerks, Inc.,*
No. 820CV00850ABAFMX, 2021 WL 831025 (C.D. Cal. Feb. 18, 2021)  .........18

*Brown v. Tellermate Holdings Ltd.,*
No. 2:11-CV-1122, 2014 WL 2987051 (S.D. Ohio July 1, 2014), *adopted as modified,* No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015)12, 19

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*,
244 F.R.D. 614....................................................12

*Calendar Rsch. LLC v. StubHub, Inc.*,
No. CV 17-4062 SVW (SSX), 2019 WL 1581406 (C.D. Cal. Mar. 14, 2019) .....18

*Consumer Fin. Prot. Bureau v. Navient Corp.*,
No. 3:17-CV-101, 2018 WL 6729794 (M.D. Pa. Dec. 21, 2018).........................17

*Corrigan v. Methodist Hosp.*,
158 F.R.D. 54 (E.D. Pa. 1994).......................................13, 14

*Drips Holdings, LLC v. Teledrip*,
No. 5:19-CV-2789, 2022 WL 4545233 (N.D. Ohio Sept. 29, 2022)....................18

*Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC*,
No. 1:05–CV–2343, 2007 WL 3492762 (N.D. Ga. Nov. 5, 2007).......................17

*High Point SARL v. Sprint Nextel Corp.*,
No. 09–2269, 2011 WL 4526770 (D. Kan. Sept. 28, 2011) ................................17

*In re Actavis Holdco U.S., Inc.*,
No. 19-3549, 2019 WL 8437021 (3d Cir. Dec. 6, 2019).......................................17

*In re Generic Pharms. Pricing Antitrust Litig.*,
490 F. Supp. 3d 901 (E.D. Pa. 2020) ...................................................................17

*Mobile Equity Corp. v. Walmart Inc.*,
No. 221CV00126JRGRSP, 2022 WL 36170 (E.D. Tex. Jan. 4, 2022) ................18

*Newill v. Campbell Transp. Co.*,
No. 2:12-CV-1344, 2013 WL 6002349 (W.D. Pa. Nov. 12, 2013)................19, 21

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)..............................................................................................13

*Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt., LLC*,
No. CV 19-10119-MLW, 2022 WL 4112081 (D. Mass. Sept. 8, 2022) .........17, 18

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
306 F.3d 99 (2d Cir. 2002)....................................................................................12

*Savage v. City of Lewisburg, Tenn.*,
No. 1:10-0120, 2014 WL 6827329 (M.D. Tenn. Dec. 3, 2014) ...........................21

*Tarlton v. Cumberland Cnty. Corr. Facility*,
192 F.R.D. 165 (D.N.J. 2000)...............................................................................21

*Treppel v. Biovail Corp.*,
233 F.R.D. 363 (S.D.N.Y. 2006) ..........................................................................12

*UPMC v. Highmark Inc.*,
No. 2:12-CV-00692-JFC, 2013 WL 12141530 (W.D. Pa. Jan. 22, 2013).............17

*Warner Bros. Ent. Inc. v. Random Tuesday, Inc.*,
No. CV 20-2416-SB (PLAX), 2021 WL 6882166 (C.D. Cal. Dec. 8, 2021) ........18

*Winner v. Etkin & Co., Inc.*,
No. 2:07–cv–903, 2008 WL 5429623 (W.D. Pa. Dec. 31, 2008).........................19

*Williams v. Taser Int'l, Inc.*,
No. CIVA 1:06CV-0051-RWS, 2007 WL 1630875 (N.D. Ga. June 4, 2007) ......17

**Rules and Statutes**

Federal Rule of Civil Procedure 26 ........................................................................13, 14, 19

Federal Rule of Civil Procedure 34 ....................................................................................19

Federal Rule of Civil Procedure 37 ........................................................................13, 22, 23

FTC Act, 15 U.S.C. § 45........................................................................................................2

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. § 201-1 *et. seq.*..................................................................................................................2

Unordered Merchandise Statute, 39 U.S.C. § 3009..............................................................2

I.   **INTRODUCTION**

Throughout the discovery process in this case, Defendant American Future Systems, Inc. has made it incredibly difficult for Plaintiffs to obtain the necessary documentation to prepare for depositions and trial. Recently, more than two months after AFS claimed it completed its production, Plaintiffs discovered that ***AFS did not identify the Slack messaging platform ("Slack") as an electronic platform likely to contain relevant information in AFS's Disclosure of Electronically Stored Information and did not produce <u>any</u> data directly from Slack.***

Slack is a messaging application used by businesses that offers employees a simple and fast way to instantly communicate throughout the day. Plaintiffs learned during AFS's December 15, 2022 30(b)(6) deposition that AFS's executives, managers, and, most significantly, telemarketers frequently used Slack to exchange messages regarding highly probative topics throughout the time period relevant to this case. Upon subsequent request from Plaintiffs for immediate production of all Slack messages, AFS refused to produce any relevant Slack messages, claiming the messages are unavailable. However, as set forth in detail below, AFS's position regarding the unavailability of Slack messages for production is completely inaccurate.

For the reasons set forth below, Plaintiffs request that the Court enter an Order compelling AFS to produce all its Slack data on an expedited basis[1], ordering AFS to provide that Order to Slack, and awarding Plaintiffs reasonable costs, including attorneys' fees, incurred in filing this Motion.

---

[1] On a standard briefing schedule, this Motion will be fully briefed on February 17. Assuming the Court entered Plaintiffs' Proposed Order one week later, AFS provided Slack with the Order in two business days, Slack provided export access to AFS the next day, and AFS produced Slack data three business days later, production would not begin until March 6, just one week before the close of discovery, effectively prohibiting Plaintiffs from reviewing the documents and using them at upcoming depositions. Thus, Plaintiffs seek expedited relief.

## II.     FACTUAL BACKGROUND

### A. AFS's Business Activities

AFS has been publishing and telemarketing books and newsletters for over 30 years to consumers comprised predominantly of small businesses, schools, colleges, fire departments, churches, and non-profit organizations. The AFS Defendants[2] have conducted their telemarketing operations in violation of Section 5 of the FTC Act; the Unordered Merchandise Statute, 39 U.S.C. § 3009; and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. §201-1 *et seq.* ("UTPCPL"). [*See* ECF 43.] These violations arise out of, among other conduct, misrepresentations and the non-disclosure or inadequate disclosure of material information throughout the sales, billing, and collection process. [*Id.*] AFS claims that it ceased telemarketing of publications on September 3, 2021. However, AFS continues to operate one or more outbound telephone call-based business operations, including under the fictitious name Successfuel.

### B. AFS's Failure to Disclose Its Usage of Slack or Produce Slack Data.

On August 28, 2017, Plaintiff FTC served a Civil Investigative Demand on AFS, which instructed AFS to implement a litigation hold on all relevant documents (the "Litigation Hold"), which has remained in effect through the time the FTC filed this lawsuit on May 13, 2020. [App. 004.] On October 16, 2020, AFS served its Disclosure of Electronically Stored Information upon Plaintiffs. [App. 006–8.] Therein, AFS identified "electronic systems [that] are currently being utilized by AFS or were utilized by AFS at the time relevant to this litigation." ***Slack was not included in the list of eight electronic systems or otherwise mentioned in AFS's Disclosure.***

---

[2] The AFS Defendants are corporate Defendants American Future Systems, Inc. and Progressive Business Publications of New Jersey, Inc. and individual Defendant Edward M. Satell. ("AFS").

The FTC[3] served AFS with Second Requests for Production of Documents (the "Second Set") on November 4, 2020. The Second Set defined "Document" to include "all writings . . . stored in any medium, including electronically stored information." The Second Set has requests on topics including Documentation of AFS's General Operations; Debt Collectors; Online Reviews and Reputation Management; Complaints; and Employee Training and Monitoring.[4] [ECF 113-5, at 86–103.]

On October 29, 2021, Plaintiffs sent a letter to AFS, enclosing a List of Proposed Deposition Topics for AFS's 30(b)(6) deposition, including Topic 22: "PBP's use of messaging apps, including Slack, since January 1, 2015." [*See* ECF 137-3, at 5–8.] On November 12, 2021, AFS responded via letter and expressly stated that it had "No objection" to Topic 22, which was then included in Plaintiffs' November 10, 2022 Notice of Deposition of AFS. [*See id.* at 11; ECF 250-2, at 29.] Despite knowing, and not disagreeing, that Slack messaging would be an issue as early as November 2021, in the 11 months of document production that followed,[5] AFS did not produce any Slack messages, other than a handful that were captured in emails. However, even the few Slack messages captured in emails show that AFS routinely used Slack to exchange messages that are highly relevant to the issues in this case, encompassed by the Litigation Hold, and responsive to discovery requests served on AFS. Moreover, Plaintiffs have learned that the

---

[3] As the Commonwealth was not added as a Plaintiff until January 21, 2021 [ECF 43], the FTC alone issued the Second Set. The Commonwealth subsequently issued identical discovery requests [ECF 113-5, at 104–123]. The Commonwealth has an equivalent request for all FTC requests referenced herein, but for the purposes of this Motion Plaintiffs refer to the FTC's Requests for simplicity's sake.

[4] Plaintiffs have enclosed a list of all document requests from the Second Set to which Plaintiffs believe Slack messages are likely responsive. [*See* page 25, *infra*.]

[5] AFS represented that it completed its document production on October 31, 2022.

messages captured in emails that were produced in discovery are a very small fraction of the relevant messages that AFS should have identified, exported, and produced.

## C. **Plaintiffs' Discovery of the Significance of Slack Data.**

Documents produced by AFS, together with AFS's 30(b)(6) testimony, leave no doubt that Slack messages are a significant source of relevant and responsive information that AFS failed to identify or produce.

### 1. *AFS Exchanged Tens of Thousands of Slack Messages During the Relevant Time Period.*

AFS has used Slack since at least the fall of 2015 and continues to use it to this day. [App. 009; Townsend Depo. Tr., 50:11–12, App. 011.] AFS's corporate designee William Townsend[6] testified that during the relevant time period:[7]

- AFS employees used Slack messaging to communicate "regarding telemarketing of the publications that are at issue in this lawsuit." [*Id.* at 62:3–7, App. 019.]

- AFS used at least three different "workspaces" or accounts: one for "telemarketers," one for "lead generation," and another for Successfuel. [*Id.* at 60:25–61:9; 80:25–82:2, App. 017–18, 023–25.]

- The Slack telemarketing account was probably a free account, but the other two accounts were paid accounts and Slack preserves data for paid accounts. [*See id.* at 80:20–82:2; App. 023–25.]

- AFS employees used Slack messages not only to communicate one-on-one through "direct messages," [*Id.* at 56:22–57:3, App. 014–15] but also to exchange messages with groups of employees, referred to as "channels." [*Id.* at 57:4–6, App. 015.]

- AFS created and used multiple "channels" on specific subjects, including but not limited to the "Customer Interaction team" and "Inbound PBP team" channels. [*Id.* at 63:11–17; 78:12–19, App. 020, 022.]

- AFS had both "public channels," which were "generally available to anybody" and used to share non-business related information (like photos of "cats and dogs" and "Christmas trees"), [*id.* at 57:7–11; App. 015], and "private channels," which were established for more limited groups of employees to discuss particular topics. [*See id.* at 58:3–5, App. 016.]

---

[6] Mr. Townsend, one of two AFS corporate designees who provided 30(b)(6) testimony, is AFS's Director of Technology Publishing Operations.

[7] The Court previously set July 1, 2015 to the present as the relevant time period for discovery.

- **Tens of thousands of Slack messages** were likely exchanged between AFS employees. [*Id.* at 85:23–86:2, App. 028–29.]
- AFS's Slack data should be preserved, because AFS has not deleted any Slack messages and Slack's default policy is to preserve messages indefinitely. [*Id.* at 83:23–84:9; App. 026–27.]

## 2. *Slack Messages Are Not Duplicative of Any Other Documents, Such as Emails.*

All available evidence demonstrates that the Slack messages are <u>not</u> redundant or duplicative of other documents AFS has produced.

**As a general matter, companies that begin using Slack often see their email usage decline by approximately 49%**[8], indicating that communications that would ordinarily be conducted through email instead take place on Slack. This was certainly true at AFS, because multiple documents provide examples of AFS employees avoiding continuing discussions via email and moving the conversation to Slack. For instance, on one occasion, AFS employees Denise Haney (Customer Service) and Mike Gorton began an email exchange regarding a consumer complaint to the BBB, then Mr. Gorton abruptly instructed Ms. Haney to "Pls sign into slack." [App. 033–34.] In another instance, an AFS employee simply responded to an email about a customer complaint with "I slacked you on this…" [App. 035.]

At minimum, Slack was a central channel of communication among AFS employees and it was essentially the **sole** source of written communication for AFS telemarketers. Critically, it was AFS's policy <u>not</u> to provide telemarketers with AFS email addresses [Townsend Depo. Tr., 186:25–187:3, App. 031–32], whereas <u>AFS instructed new telemarketers to sign up for Slack</u>, because "SLACK . . . is the program we use to communicate with each other during and after orientation." [App. 036.] From October 9, 2020 [App. 038–39] to August 17, 2021 [App. 040–

---

[8] *See* https://www.logikcull.com/slack, *last accessed on* Jan. 25, 2023.

45], alone, <u>AFS's Boardman office hired more than **300** new telemarketing employees and instructed all of them to communicate via Slack.</u>[9] *See also* App. 048 (SPU Feb 2021 Script directing telemarketers to "SLACK (Manager) WITH NAME of CUSTOMER AFTER CALL!").

Mr. Townsend also testified that Slack's default setting would *not* convert messages into email. Therefore, the vast majority of AFS's Slack data has not been provided to Plaintiffs, in email format or otherwise.[10] [Townsend Depo. Tr., 64:6–13, App. 021.]

### 3. <u>*AFS Employees Used Slack to Communicate Regarding Telemarketing of Publications and Other Highly Relevant Issues.*</u>

AFS uses Slack messaging to communicate regarding matters central to this case and which were targeted through Plaintiffs' discovery requests. For example: ***responses to consumer complaints***[11] [App. 049–50 ("that guy from BBB that they threw at me . . . i got him to pay! ahahahha"); App. 051 ("Did you just sent me a [customer service] email . . . ? Id [sic] this meant to be an email challenge, since she is threatening BBB?"); App. 052 ("i just got an earful of a complaint about denise. Should i write it up and email it to mike? Should i copy denise?")];

---

[9] The number of telemarketers hired and instructed to use Slack during this time period could be far higher. This number is based solely upon emails sent from the Boardman office to new telemarketers. AFS has admitted to failing to preserve emails from six of its branches, therefore Plaintiffs do not have access to any emails sent from those branches. [*See* ECF 118-2, at 33–34.] Similarly, AFS claims that Susan Grabert, who oversaw AFS's Quality Control, deleted her emails and AFS was unable to recover and produce them. [App. 053–54.] This is one more reason Slack messages offer a source of otherwise unavailable, relevant evidence – while the emails allegedly no longer exist, presumably the Slack messages sent by employees of those branches have *not* been deleted.

[10] Mr. Townsend also testified that AFS employees exchanged documents via Slack. [*See* Townsend Depo. Tr., 54:24–55:2, App. 012–13.]. Thus, Plaintiffs framed their request for relief to encompass all Slack "data" (including messages, documents, and any other information).

[11] The Second Set included multiple requests seeking documents reflecting consumer complaints. *See, e.g.*, Requests 35 & 38, at page 27, *infra*.

**complaints concerning AFS's debt collector, ICR**[12] [*See* App. 055 ("Jim [Richard Diorio's alias] from ICR told the customer not to call us because we'll put them on a spam list . . . second time she's heard that in two weeks"); App. 056–60 (Slack message containing copy of complaint re. ICR)]; **employee training**[13] [App. 061 ("Hi Roberta I'll call you on Slack at 9:30 AM for orientation."); App. 062–63 (email subject is "TRAINEE SOURCES" and Colin Drummond emails Heather Wood "I'd like to speak to Dave. Can you set it up? Is he on slack or skype so we can chat throughout the day?")]; and **telemarketing performance issues**.[14] [App. 064 ("OMG … every one of Rice's that I didn't listen to was bunk. I am so pissed I didn't listen to the ones she screwed up on or I would've caught her sooner. I just listened to the others and she literally went though [sic] 2 that I didn't catch where she was reciting the whole script and the hold menu was playing!"); App. 065 ("see memo in A480976802 and see if i should note on the icr sheet as a complaint. I think becky just doing her job, but she put other business in jeopardy with her attitude")].

The Slack messages also capture the day-to-day instructions given to employees on key issues in this case.[15] [App. 067 (copies email complaint and end of message is "besides memo'ing, ceasing with no payment due and personal suppression, is there anything else I need to do?"); App. 069 ("need your opinion on rather [sic] to write this voice mail up or not."); App.

---

[12] The Second Set included multiple requests seeking documents related to AFS's debt collectors. *See, e.g.*, Requests 15, 16 & 17, at page 25, *infra*.

[13] The Second Set included multiple requests seeking documents related to AFS's training of employees. *See, e.g.*, Requests 44, 45 & 46, at page 28, *infra*.

[14] *See* Second Set, Request 47: Produce all Documents that Refer or Relate to any suspected or confirmed quality-control lapse by any sales representative . . . .

[15] *See* Second Set, Request 46: Produce all Documents, including written instructions, training manuals, memoranda, reports, and emails, that Refer or Relate to the processing, handling, resolution of Complaints or issues related to subscriptions . . . .

071 ("i know jenn told me yesterday she only responds to bbb threat emails, but I think someone should be aware if a bbb complaint could possibly be stopped from a phone call too.")]

### 4. *There Is No Clear Distinction Between AFS's Slack Accounts and All of the Accounts Contain Relevant Data.*

As discussed in Section II.C.1, *supra*, AFS has represented that it used at least three different Slack accounts: one for telemarketers, one for "lead generation," and another for Successfuel. AFS's counsel has taken the position that only the "telemarketing account" (hereinafter referred to as the "PBPPubs Account") contains relevant information and that the "lead generation" account ("TMLeadgen Account") and Successfuel account ("Successfuel Account") are entirely irrelevant. *See* further discussion of AFS's position at Section II.D, *infra*. However, all of AFS's Slack accounts contain relevant data.

For example, AFS's documents show the TMLeadGen Account was used for communications with telemarketers. *See* App. 073, 076 (email directing new employee to use the TMLeadGen Account and attaching Safety Compliance Alert telemarketing script); App. 077 (Colin Drummond May 13, 2021 email to new telemarketer instructing her to use tmleadgen.slack.com). Likewise, the Successfuel Account contains discussions pertaining to telemarketing. *See* App. 078 (email containing Slack message from Successfuel Account, stating "Hi kate! This is Liz from Customer success. I got a richpanel message & I'm not sure where to send it. It was a localtouch vm requesting that a # be suppressed from our system. From the sound of it it's a TM rep call."). This is unsurprising, because Successfuel telemarketed publications.[16] *See* App. 080 (Drummond email referencing hiring "pub reps," i.e. telemarketers,

---

[16] Successfuel is a fictitious name of AFS [ECF 164-2, at 3] that serves as the "overriding brand" for several streams of AFS's business, [Dec. 14, 2022 Drummond Depo. Tr. 194:3–7, App. 092], including distribution of digital newsletters and lead generation, i.e. identifying potential "leads" who may be targeted for the sale of particular products or services and selling companies a list of those "leads." *See generally* https://www.successfuel.com/.

under the Successfuel brand); App. 082 (Drummond email to employee re. deviations from telemarketing scripts, with Drummond's Successfuel signature block).

Furthermore, AFS's present lead generation activities – conducted under AFS's fictitious name Successfuel – overlap with AFS's prior telemarketing business, which is relevant not only to AFS's prior telemarketing activities, but also AFS's ability to resume similar activities. For example, nine of the ten lead generation representatives currently employed by AFS previously worked in AFS's telemarketing business and still use scripts to make their calls. [Dec. 14, 2022 Drummond Depo. Tr. 169:18–174:11; 169:2–15, App. 086–091.][17] The "vast majority" of the targets of AFS's lead generation efforts are prior AFS contacts, including "former subscribers to AFS publications that were secured through telemarketing." [*Id.* at 168:6–21, App. 085.] Successfuel even used (and may still use) the same WCCX phone call platform that AFS created for use by its telemarketers. *Compare* App. 073 *with* Townsend Depo. Tr. 138:2, 14, App. 030.

In fact, it appears that the only time that AFS made any effort to separate the Successfuel brand from AFS was to engage in reputation management. *See* App. 093–94 (Colin Drummond emails Denise Haney: "Which company gets the BBB complaint PBP or Successfuel . . . ?" Ms. Haney responds "The BBB was to PBP[.]" Mr. Drummond replies: "That's good let PBP absorb the complaints at this point! We have to be careful that SuccessFuel does not get any"); App. 080 (November 18, 2020 email from Drummond to Heather Wood "We ae [sic] trying to protect the SuccessFuel brand and I see Crystal is hiring pub reps under this brand I am using CEEL as the division they will be working forwhen [sic] I hire pub reps. It has a better online reputation than PBP . . . We are worried about the high turnover and reps bitching about the job on Successfuel

---

[17] Colin Drummond is the Senior Director at AFS. [Dec. 14, 2022 Drummond Depo. Tr. 7:7–8, App. 084.]

glassdoor which one of mine on [lead generation] has already done!"); App. 095–96 (December 27, 2021 emails from Drummond to Melissa Schwenk stating: "Ok do you need to use snail mail address in your signature at bottom of email? We want to protect the brand reputation of SuccessFuel and do not want our collection efforts on pbp to synch up with SuccessFuel" and "Yeh we may want to ask Kamil to open a P.O. Box to have collection payments sent. . . . I think we should tread lightly so not to have ticked off customers connect the dots between pbp and SuccessFuel").

There is no evidence AFS made any real efforts to segregate its various Slack accounts. The evidence shows that all of AFS's Slack accounts contain relevant information and therefore all of the accounts should be produced.

### D.  **Plaintiffs' Attempt to Confer and AFS's Continued Refusal to Produce Slack Data.**

On December 23, 2022, Plaintiffs requested that AFS produce Slack messages from July 1, 2015 to present, and AFS refused, in part based on broad, inaccurate statements regarding the purposes of its accounts. [App. 097–98; App 099–102 "January 2 Letter."] AFS's counsel wrote, "Successfuel.slack.com and Leadgen.slack.com, were paid accounts specifically created for other areas of AFS' business, **entirely unrelated** to the business activities and practices at issue in this litigation." [App. 100 (emphasis added).] To the contrary, as described above, AFS used both accounts to message about telemarketing.

Additionally, unless AFS has failed to disclose *another* Slack account,[18] counsel's reference to the TMLeadGen Account as "Leadgen.slack.com" suggests an intent to omit the

---

[18] AFS's emails contain the true URLs for each of AFS's Slack accounts, which are: tmleadgen.slack.com [*see* App. 064]; successfuel.slack.com [App. 078–79]; and pbppubs.slack.com [App. 103], which Plaintiffs suspect is the Pbpbpubs.slack.com account referenced in AFS's January 2 letter. However, AFS's documents also reference a <u>fourth</u> account - inboundpbp.slack.com ("Inbound PBP Account") [App. 071] – that AFS has not disclosed. It

letters "TM."  AFS routinely uses "TM" to refer to "Telemarketing," further indicating that the TMLeadGen account *is* relevant to the core issues in this case – AFS's telemarketing activities. [*See, e.g.*, App. 078.]

AFS also asserts that AFS cannot produce Slack data in its unpaid account after 90 days and without certain policies in place. [App. 101.] As set forth below, AFS's statements regarding its ability to produce Slack data are erroneous and incomplete and, in fact, production of AFS's Slack data is not only possible, but also very simple.

**E.  Slack's Policies**

Slack's website provides detailed information regarding its data preservation policies and ability to export data to enable production in a lawsuit.

### 1.  *Slack's Retention of Data*

By default, Slack retains all messages for the lifetime of a workspace.[19] Then, "When your workspace reaches the visibility limit of the free plan, Slack will start hiding messages and files older than 90 days to make room for new ones. **If you upgrade your workspace to a paid plan, you'll unlock access to your entire message and file history**."[20] Thus, AFS could have upgraded its "free" account in order to access data from that account. In sum, AFS's statement in its January 2 Letter that after 90 days, it could no longer apply for access to messages in its "free account" is incorrect.

---

was in use from at least 2015 [App. 067] until June 2020 and contained the "Customer Interaction Team" channel. [App. 104.]

[19] https://slack.com/help/articles/115005393586-Edit-message-retention-settings-for-specific-conversations, *last accessed* January 27, 2023, App. 107.

[20] https://slack.com/help/articles/115002422943-Message-file-and-app-limits-on-the-free-version-of-Slack, *last accessed* January 27, 2023 (emphasis added), App. 111.

## 2. *Exporting and Producing Slack Data Is Possible and Simple*

If users with a free account or the paid "Pro plan" need to export <u>all</u> data, including data from private channels and direct messages, users may contact Slack and request an export of data from all channels and conversations, and Slack will grant request if the user shows "(a) valid legal process, **or** (b) consent of members,[21] **or** (c) a requirement or right under applicable laws in order to export data."[22]

Plaintiffs' counsel contacted Slack technical support to request clarification regarding the type of documentation that would satisfy the "valid legal process" basis. Within just three email exchanges, Jay Donde, Senior Director of Slack's Privacy Team, confirmed that "**If [AFS] presents [Slack] with a signed order from a judge stating that they are required to produce this data, [Slack] will enable them to export all of the content from that workspace that Slack currently stores, including all such content uploaded since the creation of the workspace (irrespective of whether [AFS] itself has ongoing access)**." [App. 117 (emphasis

---

[21] AFS also raised in its January 2 letter the issue of "consent" of its members. But AFS identified no steps taken to obtain such consent, even from current employees. Furthermore, AFS's use of a messaging platform from 2017 to 2022 without implementing a policy for AFS to be able to access and produce employees' Slack data is a violation of the preservation obligation. **Once a "litigation hold" has been established, a party cannot continue a routine procedure that effectively ensures that potentially relevant and readily available information is no longer "reasonably accessible" under Rule 26(b)(2)(B)**. *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 629 (D. Colo. 2007); *Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *20 (S.D. Ohio July 1, 2014), *adopted as modified,* No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015); *see also Treppel v. Biovail Corp.*, 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006) ("The Second Circuit has held that conduct that hinders access to relevant information is sanctionable, even if it does not result in the loss or destruction of evidence. Accordingly, permitting the downgrading of data to a less accessible form—which systematically hinders future discovery by making the recovery of the information more costly and burdensome—is a violation of the preservation obligation.") (citing *Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 110 (2d Cir. 2002)).

[22] https://slack.com/help/articles/204897248-Guide-to-Slack-import-and-export-tools#export-overview, *last accessed* January 27, 2023 (emphasis added), App. 113–14.

added).] Thus, if this Court grants the instant Motion and orders AFS to produce all data from all its Slack accounts, AFS can submit that Order to Slack and obtain and produce all of its Slack data to Plaintiffs.[23]

### III.   LEGAL STANDARD: SCOPE OF DISCOVERY

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that any party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). It is well settled that Rule 26 establishes a fairly liberal discovery policy. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978).

Federal Rule of Civil Procedure 37 bestows upon the Court enforcement powers to ensure parties' cooperation in the discovery process, by allowing a party to move for an order compelling production of documents. Fed. R. Civ. P. 37(a)(3)(B). For purposes of a Rule 37 motion, "an evasive or incomplete disclosure" is treated as a failure to answer. *Id*. at 37(a)(4). "The party opposing discovery has the burden to raise an objection, then the party seeking discovery must demonstrate the relevancy of the requested information." *Corrigan v. Methodist Hosp.,* 158 F.R.D. 54, 57 (E.D. Pa. 1994) (citation omitted). "Once this showing is made, the

---

[23] Slack does not offer many options for exporting limited portions of data. For example, Slack's website states: "You can't select specific channels to export data from." [https://slack.com/help/articles/201658943-Export-your-workspace-data, *last accessed* January 27, 2023, App. 124.] It appears that Slack allows for limiting the date range of an export, but only when exporting data for a single user. *Id.* Due to these limitations, as well as the delay that would be imposed by any subsequent application of a keywords search or relevance review, Plaintiffs are simply asking for all data within AFS's Slack accounts.

burden switches again to the party opposing discovery to show why discovery should not be permitted.*" Id.* (citation omitted).

**IV.    ARGUMENT**

**A.    The Court Should Compel AFS to Produce All Slack Data from July 1, 2015 to Present.**

Plaintiffs' request for AFS's Slack messages satisfies the requirements of Rule 26(b)(1). Plaintiffs are entitled to the messages under Rule 26, because the messages are relevant to Plaintiffs' claims. Furthermore, considering all the factors listed in Rule 26(b)(1), the request is proportional to the needs of the case. Thus, the Slack messages are discoverable and the Court should order AFS to produce all Slack messages from July 1, 2015 to present.

**1.    *The Slack Messages Are Highly Relevant to Plaintiffs' Claims.***

AFS's Slack messages contain information that is highly relevant to Plaintiffs' claims. Moreover, the messages are responsive to multiple document requests propounded by Plaintiffs, not to mention a prior Order from this Court compelling production pursuant to certain requests, [*see* ECF 155 ¶¶ 5, 8 and discussion in Section IV.B.2, *infra*] and therefore the messages should have already been produced. As was shown in detail in Section II.C.3, above, the Slack messages are a voluminous source of information relevant to issues including telemarketing, employee training, quality control, consumer complaints, and other matters.

**2.    *Production of the Slack Messages Is Proportional to the Needs of the Case.***

Consideration of all the factors set out by Rule 26(b)(1) shows that production of the Slack messages is proportional to the needs of this case.

**a.    Importance of the Issues at Stake in the Action & Amount in Controversy.**

This is a multimillion dollar case affecting tens (if not hundreds) of thousands of businesses and organizations. AFS made $30 million in revenue in 2015, with approximately

$13.5 million of that from sales of newsletters and books, and $27 million in revenue in 2016 with approximately $13 million of that from sales of newsletters and books. *See* 9/27/17 AFS Response to CID Interrogatory 1.[24] AFS had 172 telemarketers in 10 telemarketing branches and 130 corporate employees as of September 12, 2017, spoke to 800 companies per hour and generated approximately 1,500 subscriptions a day. *Id.* & Response to CID Interrogatory 11. As AFS used deceptive practices for all these activities, while generating millions of dollars in annual revenue, Plaintiffs' request for Slack data is proportional to the needs of the case.

b. **Parties' Relative Access to the Relevant Information & Importance of the Discovery in Resolving the Issues.**

As previously described herein, the Slack messages bear on many of the most critical issues in this case. AFS employees used Slack to discuss all aspects of AFS's telemarketing business. AFS trained its telemarketers using Slack, answered ongoing questions related to the telemarketing business via Slack, discussed the receipt of and response to consumer complaints through Slack, and very likely used Slack to discuss numerous other issues relevant to this case. Slack provides an informal and instantaneous method of communication, similar to text messaging, which undoubtedly captures employees' unfiltered commentary and observations. *See, e.g.*, App. 049 ("that guy from BBB that they threw at me . . . i got him to pay! ahahahha"); App. 064 ("OMG….. I am so pissed I didn't listen to the ones she screwed up on or I would've caught her sooner."); App. 126 ("i like giivng [sic] you the play by play" regarding receipt and responses to customer complaints).

---

[24] As this Motion is already accompanied by substantial numbers of documents, Plaintiffs are not attaching as an Exhibit each and every document referenced herein.  Should AFS dispute the characterization of any document not attached, or should the Court wish to view any document that is cited, but not attached, Plaintiffs will provide the Court with such documents right away.

AFS has not produced <u>any</u> data directly from Slack and Plaintiffs cannot obtain the relevant information through any other available sources. *See* Section II.C.2, *supra*. AFS did not provide corporate email addresses to its telemarketers, therefore Slack messages are essentially the sole source of written communication by AFS's telemarketers, who are key witnesses to AFS's deceptive practices. The Slack messages provide contemporaneous evidence of AFS's telemarketing activities, which Plaintiffs cannot obtain through other channels.

Despite AFS's arguments to the contrary, the Slack data <u>is</u> and always has been reasonably accessible to AFS. As stated by Slack's Lead Director of Privacy, all that AFS must do is provide an Order from this Court for AFS to produce all of its Slack data and Slack will enable AFS to export "all [ ] content uploaded since the creation of the workspace (irrespective of whether [AFS] itself has ongoing access)." [App. 117.] Thus, AFS has no basis to refuse to produce its Slack data.

### c.  <u>Parties' Resources & the Burden of Production.</u>

AFS has the resources to produce the Slack messages. AFS generated tens of millions of dollars in revenue during the relevant time period and has repeatedly stated that it has expended millions on this lawsuit. Recently, AFS retained a <u>fourth</u> law firm to represent it in this case. [ECF 257.] Clearly, AFS spares no expense while defending its own interests, therefore AFS cannot credibly object to incurring minor additional costs to forward an Order to Slack, use Slack's export tool to export the data, and provide the data to Plaintiffs. *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 387 (D.N.J. 2006) ("Although the cost of compliance is indeed high, Defendants have litigated this case without regard to cost when it has been in their interest to do so.").

The benefit of Plaintiffs receiving these highly relevant documents far outweighs the potential burden of production. <u>Plaintiffs' requested relief imposes a minimal burden upon AFS,</u>

while still ensuring that Plaintiffs will obtain as much relevant information as possible. Plaintiffs are requesting all of the data from AFS's Slack accounts from July 1, 2015 to present, which Slack has agreed to make available to AFS for export. This request, for which there is ample legal support, will eliminate the need for AFS to conduct any costly and time-consuming manual review for relevance prior to production.

"[T]he Federal Rules of Civil Procedure permit a district court to compel the production of documents within broad parameters" and the Third Circuit has upheld a district court's order for the production of documents without a manual relevance review. *In re Actavis Holdco U.S., Inc.*, No. 19-3549, 2019 WL 8437021, at *1 (3d Cir. Dec. 6, 2019) (citing *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-CV-101, 2018 WL 6729794, at *2 (M.D. Pa. Dec. 21, 2018); *UPMC v. Highmark Inc.*, No. 2:12-CV-00692-JFC, 2013 WL 12141530, at *2 (W.D. Pa. Jan. 22, 2013); *Williams v. Taser Int'l, Inc.*, No. CIVA 1:06CV-0051-RWS, 2007 WL 1630875, at *6 (N.D. Ga. June 4, 2007)); *see also High Point SARL v. Sprint Nextel Corp.,* No. 09–2269, 2011 WL 4526770, at *12 (D. Kan. Sept. 28, 2011) (requiring production of entire database over objection that irrelevant information would be included); *Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC,* No. 1:05–CV–2343, 2007 WL 3492762, at *1 (N.D. Ga. Nov. 5, 2007) (requiring production of database over objections based on relevance and confidentiality); *In re Generic Pharms. Pricing Antitrust Litig.*, 490 F. Supp. 3d 901, 903 (E.D. Pa. 2020).

Courts have imposed a requirement to produce all Slack communications without the application of search terms. *Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt., LLC*, No. CV 19-10119-MLW, 2022 WL 4112081, at *10 (D. Mass. Sept. 8, 2022) (referencing prior court order compelling production of all Slack communications between certain custodians, without regard to any search terms, subject to an "Attorney's Eyes Only" provision in the parties' Protective

Order); *see also Mobile Equity Corp. v. Walmart Inc.*, No. 221CV00126JRGRSP, 2022 WL 36170, at *2 (E.D. Tex. Jan. 4, 2022) (ordering production of all relevant Slack channels, rather than individual Slack messages).

Slack messages have been found to be a source of relevant information, which must be produced, in numerous cases. *Benebone LLC v. Pet Qwerks, Inc.*, No. 820CV00850ABAFMX, 2021 WL 831025, at *3 (C.D. Cal. Feb. 18, 2021) (holding that production of Slack documents was proportional to the needs of the case, where the plaintiff sought "the full range of monetary damages in this case, plus injunctive relief against Defendants' accused products – sales of which are allegedly in the millions of dollars"); *Mobile Equity*, 2022 WL 36170, at *2 (ordering production of relevant Slack channels); *Warner Bros. Ent. Inc. v. Random Tuesday, Inc.*, No. CV 20-2416-SB (PLAX), 2021 WL 6882166, at *5 (C.D. Cal. Dec. 8, 2021); *Calendar Rsch. LLC v. StubHub, Inc.*, No. CV 17-4062 SVW (SSX), 2019 WL 1581406, at *4 (C.D. Cal. Mar. 14, 2019). In some cases, Slack messages have been found to contain the "smoking gun" regarding liability in the case. *Red Wolf*, 2022 WL 4112081, at *15 (noting that withheld Slack messages were a "proverbial 'smoking gun'").

In some instances, parties have been sanctioned for failing to produce Slack messages. *Red Wolf*, 2022 WL 4112081, at *20–25 (entering default judgment against defendants for failure to produce Slack messages, noting that the deficient production of some Slack messages after depositions were conducted was prejudicial to the plaintiff); *Drips Holdings, LLC v. Teledrip, LLC*, No. 5:19-CV-2789, 2022 WL 4545233, at *5 (N.D. Ohio Sept. 29, 2022) (concluding that deletion of Slack messages was intentional and imposing a mandatory adverse-inference instruction).

**B.**    **AFS's Failure to Identify and Produce Its Slack Data Is Sanctionable.**

AFS's failures regarding the Slack data are sanctionable.

1. ***AFS and Its Counsel Failed to Conduct a Reasonable Search for Relevant Documents***.

AFS and its counsel failed to conduct a reasonable search for relevant documents. "[P]rior to responding to a request for production of documents under Rule 34, a party must undertake a reasonable search to determine whether it has any responsive documents in its possession, custody, or control." *Newill v. Campbell Transp. Co.*, No. 2:12-CV-1344, 2013 WL 6002349, at *5 (W.D. Pa. Nov. 12, 2013). "[C]ounsel cannot simply take a client's representations about such matters at face value." *Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *18 (S.D. Ohio July 1, 2014), *adopted as modified,* No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015). When an attorney signs discovery responses, as is required by Rule 26(g), he certifies that such an effort has been made. *Winner v. Etkin & Co., Inc.,* No. 2:07–cv–903, 2008 WL 5429623, at *4 (W.D. Pa. Dec. 31, 2008) (citation omitted). Moreover, the obligations imposed by these Rules are continuing in nature, as a party must "amend a prior response to an interrogatory, request for production, or request for admission if [it] learns that the response is in some material respect incomplete or incorrect." *Id.* (citing Fed. R. Civ. P. 26(e)(2)).

**AFS and its counsel have repeatedly breached their duties to conduct a reasonable inquiry into the relevant Slack data**. AFS had the initial duty to identify electronic platforms likely to contain relevant information, yet AFS failed to identify Slack in its October 16, 2020 disclosures. Even if the omission of Slack from the October 16, 2020 Disclosures was inadvertent, AFS and its counsel were on notice of Slack no later than November 12, 2021, when AFS's counsel wrote to Plaintiffs that AFS had "no objection" to Topic 22, relating to "PBP's use of messaging apps, **including Slack**[.]" [*See* ECF 137-3, at 8, 11 (emphasis added).] More than a year has passed since that date, yet AFS and its counsel still have not complied with their duties to supplement those disclosures and attempt to retrieve and produce the Slack data.

19

Even more egregiously, after being faced with the undisputable existence and relevance of Slack data through several hours of Mr. Townsend's 30(b)(6) testimony, AFS still refused to engage in a good faith meet and confer with Plaintiffs regarding production of the data. **To the contrary, AFS's January 2, 2023 letter contains multiple statements that appear designed to mislead Plaintiffs into believing that the Slack data is both inaccessible and irrelevant**. [App. 99–102.] For example, AFS's omission of the "TM" in the name of the TMLeadGen Account (concealing the obvious telemarketing connection); failure to disclose the existence of a fourth Slack account related to AFS's telemarketing (InboundPBP Account); and misrepresentation that the Successfuel Account and TMLeadGen Account do not contain any relevant information, despite documentation showing messages about telemarketing in those accounts. **<u>All of this information comes directly from AFS's own documents that it produced in this case</u>**. Either AFS still has not conducted even the most basic investigation regarding Slack data or AFS is deliberately misleading Plaintiffs regarding the data.

AFS and its counsel have also misrepresented the Slack policies governing AFS's ability to produce the Slack data. AFS's counsel informed Plaintiffs that "[a]fter 90-days, AFS could no longer apply for access" to messages in AFS's free account(s), whereas Slack's website clearly states that upgrading a free account will "unlock access to your entire message and file history." [App. 111.] Similarly, AFS's failure to have implemented a policy or to have sought consent from its employees to access and produce Slack data would support an award of sanctions.

Although Plaintiffs are presently only seeking sanctions related to filing this Motion to Compel,[25] Plaintiffs will note that AFS and its counsel indisputably failed to satisfy their

---

[25] *See* Fed. R. Civ. P. 37(a)(5)(A) (providing that a court must award a successful party seeking a motion to compel the "reasonable expenses incurred in making the motion, including attorney's fees")

obligation to conduct a reasonable inquiry regarding the Slack data, from the outset of the case to present and additional sanctions may be warranted.[26] When confronted with the undeniable existence of Slack as a source of relevant data, AFS and its counsel made serious misrepresentations to Plaintiffs regarding the relevance of the Slack data. AFS and its counsel's representations regarding the number of AFS Slack accounts, the names of those accounts, and the relevance of the data contained therein are directly rebutted by AFS's own documents.

As a final matter, even if AFS subsequently produces its Slack data, AFS will not "cure" its failure to conduct a reasonable search for potentially relevant information. *Newill*, 2013 WL 6002349, at *6 (citing *Wollam v. Wright Med. Grp., Inc.,* No. 10–cv–03104–DME–BNB, 2011 WL 1899774, at *5 (D. Colo. May 18, 2011); *Tarlton v. Cumberland Cnty. Corr. Facility*, 192 F.R.D. 165, 170 (D.N.J. 2000) (concluding that "[d]efendants are sadly mistaken" insofar as they claim that "there can be 'no harm, no foul'" since sought after documents were eventually produced)). This is particularly true in this case, considering Plaintiffs have already completed multiple depositions without the benefit of any Slack data.

### 2. *AFS Failed to Produce Slack Documents Responsive to this Court's Prior Order.*

This Court's January 28, 2022 Order directed AFS to produce, pursuant to Paragraphs 5 and 8, <u>all</u> responsive documents to certain requests, including the FTC's Requests 35 and 38. [*See* ECF 155, ¶¶ 5, 8.] Requests 35 and 38 both instructed AFS to "Produce all Documents that Refer or Relate to complaints" from various sources. Plaintiffs have shown that many Slack

---

[26] If, after the Court enters an Order granting this Motion, AFS still refuses or fails to produce its Slack data, additional sanctions will be appropriate. *See Savage v. City of Lewisburg, Tenn.*, No. 1:10-0120, 2014 WL 6827329, at *3 (M.D. Tenn. Dec. 3, 2014) (providing defendant with two options: 1) pay for the conversion of relevant files by a date certain and the court would refrain from issuing "additional sanctions," or 2) "if Defendant is unwilling or unable to convert the files . . . then we will permit Plaintiff to argue an adverse inference to the jury"); *see also* Fed. R. Civ. P. 37(b)(2)(A).

messages pertained to complaints received by AFS, thus AFS was obligated to produce the responsive Slack messages. AFS violated the Court's Order by failing to produce the responsive Slack data, therefore sanctions under Federal Rule of Civil Procedure 37(b)(2)(A) are also available.

## V.  <u>CONCLUSION</u>

For the reasons set out herein, Plaintiffs respectfully request that the Court enter an Order:

1. Granting this Motion;

2. Ordering AFS to produce, in a readable format, all Slack data, including but not limited to data contained in private channels and direct messages, for the time period of July 1, 2015 to present, from all Slack accounts (or "workspaces") used by AFS at any time from July 1, 2015 to present, (the "Slack Data"), including but not limited to the following accounts:

    a.  tmleadgen.slack.com;

    b.  successfuel.slack.com;

    c.  pbppubs.slack.com;

    d.  inboundpbp.slack.com;

3. Ordering AFS to provide a copy of this Order to Slack, through privacy@slack.com and/or other appropriate channels, and request access to Slack's export tool, within 2 business days of the date of entry of the Order;

4. Ordering AFS to produce the Slack Data within 3 business days after AFS obtains access to Slack's export tool;

5. Ordering AFS to take any and all additional measures necessary to facilitate production of the Slack Data in compliance with this Order; and

6.   Awarding Plaintiffs' reasonable expenses, including attorney's fees, incurred in association with filing the Motion to Compel [ECF 280] and any subsequent Reply, pursuant to Fed. R. Civ. P. 37(a)(5)(A).

Respectfully submitted,

Dated: ___January 27, 2023_____     ___/s/ Maris K.V. Snell_____
AMY C. HOCEVAR (Ohio Bar #0075510)
CHRISTIAN M. CAPECE (N.Y. Bar # 4045936)
MARIS K.V. SNELL (Florida Bar #125585)
CONOR P. DUFFY (New York Bar #5203757)
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, Ohio  44114
Hocevar Phone:  (216) 263-3409
Capece Phone:  (216) 263-3419
Snell Phone:  (216) 263-3412
Duffy Phone:  (216) 263-3401
Fax:  (216) 263-3426
ahocevar@ftc.gov
ccapece@ftc.gov
msnell@ftc.gov
cduffy@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

___/s/ Heather Z. Kelly_____
SARAH A. E. FRASCH (PA I.D. #203529)
JOHN M. ABEL (PA I.D. #47313)
HEATHER Z. KELLY (PA I.D. #86291)
JONATHAN R. BURNS (PA I.D. #315206)
15th Floor, Strawberry Square
Harrisburg, Pennsylvania 17120
Frasch Phone: 717.497.5123
Abel Phone: 717.497.5931
Kelly Phone: 717.678.4613
Burns Phone: 717.645.7269
Fax: 717.705.3795
sfrasch@attorneygeneral.gov
jabel@attorneygeneral.gov

23

hkelly@attorneygeneral.gov
jburns@attorneygeneral.gov

Attorneys for Plaintiff
COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

## <u>LIST OF DOCUMENT REQUESTS TO WHICH SLACK DATA IS LIKELY RESPONSIVE</u>

### <u>General Operations</u>

**Request 7**: For each newsletter or book publication, produce all Documents that Refer or Relate to telemarketing, advertising, or marketing plans or strategies for that publication.

**Request 8**: Without regard to time period, produce all Documents that Refer or Relate to any governmental or law enforcement inquiry, investigation, or proceeding (other than this litigation) regarding the sales or collection practices of You or any other Defendant in this litigation.

**Request 9**: Without regard to time period, produce all Documents that Refer or Relate to Your compliance with applicable local, state, or federal laws, statutes, regulations, or codes that Refer or Relate to sales practices, unfair business practices, or Consumer protection, including the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*., or the Unordered Merchandise Statute, 39 U.S.C. § 3009.

### <u>Debt Collectors</u>

**Request 15:** "Produce all Documents that Refer or Relate to, or were attached to, communications between You and any debt collector that is collecting or has collected debts for newsletter or book subscriptions on Your behalf, including but not limited to International Credit Recovery, Inc. (ICR), and JSD Management (JSD), and including but not limited to Documents that Refer or Relate to policies or procedures for the collection of debts purportedly owed to You." *Id.*, p. 15.

**Request 16**: Produce all Documents that Refer or Relate to the collection practices of any debt collector that is collecting or has collected debts for newsletter or book subscriptions on Your behalf, including but not limited to ICR and JSD.

**Request 17**: Produce all Documents that Refer or Relate to the relationship between You and any debt collector that is collecting or has collected debts for newsletter or book subscriptions on Your behalf, including but not limited to ICR and JSD, including any contracts, agreements, memoranda of understanding, sales or collection scripts, emails, internal memoranda, and correspondence.

**Request 18**: "Produce all Documents that Refer or Relate to a Complaint with any debt collector that is collecting or has collected debts for newsletter or book subscriptions on Your behalf, including but not limited to ICR and JSD, or to the withdrawal of any purported subscriber or subscriber's account from any debt collector, whether by placement on a cancel list or otherwise, including Documents that Refer or Relate to analyses of the purported subscriber's account(s), reasons for a decision to withdraw or not withdraw the account from the debt collector, communications to and from the subscriber, the purported subscriber's other current or prior subscriptions, and Your communications to the subscriber." *Id.*, p. 17.

**Request 19**: "Produce all Documents sent to or received from any debt collector that is collecting or has collected debts for newsletter of book subscriptions on Your behalf, including but not limited to ICR and JSD, that Refer or Relate to a Complaint, including any statement by a Consumer that they do not believe the debt is owed." *Id.*, p. 18.

## Consumer Understanding

**Request 23**: Produce all Documents, regardless of when created, that Refer or Relate to the effectiveness of, or alternative wording considered for, any script that has been in use by You or any of Your debt collectors at any point since 2015.

**Request 24**: Produce all Documents, regardless of when created, that Refer or Relate to confusion or potential confusion of Consumers as to the existence of or terms of a subscription resulting from any of Your sales presentations or scripts that have been in use by You or any of Your debt collectors at any point since 2015.

**Request 25**: Produce all Documents, regardless of when created, that Refer or Relate to any study, research, test, survey, or other analysis of Consumer interpretations of or Consumer recollections from Your sales presentations or scripts that have been in use by You or any of Your debt collectors at any point since 2015.

**Request 26**: Produce all Documents, regardless of when created, that Refer or Relate to the decision to include and the drafting of the section on Your website discussing "Received an Invoice? Here's why."

## Recordings of Calls to Consumers

**Request 28**: "Produce all recordings and documentation of the occurrence and results of the 'second calls' that You claim to place to purported subscribers. *See* Answer, ¶ 1.h. If voluminous, please contact the FTC to discuss a sampling mechanism." *Id*., p. 24.

## Consumer Complaints

**Request 29**: "Produce all Documents that indicate that any email sent by You to a Consumer was not delivered to the intended recipient, including any automatic replies stating that the message cannot be delivered to the intended recipient. If voluminous, please contact the FTC to discuss a sampling mechanism." *Id*.

**Request 30**: "Produce all Documents that Refer or Relate to the number or cause of any email sent by You to a Consumer not being delivered to the intended recipient, including Documents referencing Your "bounce rate," Documents regarding Your emails being rejected by the recipient's server, or Documents that Refer or Relate to emails from You being moved to a spam or junk email folder or archive." *Id.*, p. 25.

**Request 35**: "Produce all Documents that Refer or Relate to complaints, whether oral, written, or electronic about You or any of Your debt collectors, that were received from any governmental agency or private consumer protection entity (e.g. a Better Business Bureau), including each Complaint; all correspondence and other communications related to the Complaint; Complaint logs; notes in databases or elsewhere; recordings of any telephone contacts with any complaining Consumer or corresponding subscriber; internal communications or communications with any debt collector regarding the Complaint; Your response to the governmental agency or private consumer protection agency about each Complaint; and the complete Consumer file, including records of all previous subscriptions, cancellations, and cancellation efforts by the complainant or the corresponding subscriber." *Id.*, p. 28.

**Request 36:** Without regard to time period, produce all Documents that Refer or Relate to any Better Business Bureau ("BBB") alert, warning, or press release regarding You or any Defendant in this litigation.

**Request 38**: "Produce all Documents that Refer or Relate to Complaints made directly to You or to any debt collector that is collecting or has collected debts for newsletter or book subscriptions on Your behalf about Your sales practices or the account collection practices, including the Complaint, Your response to it, communications with the Complainant or corresponding subscriber, and records of all previous subscriptions, cancellations, and cancellation efforts by the Complainant or corresponding subscriber." *Id.*, p. 31.

**Request 40**: "To the extent not produced in response to the FTC's First Set of Requests for Production, produce all correspondence sent to You from Consumers regarding Your contacting of or dealings with them, including but not limited to suppression or cease-and-desist letters. This Request does not include invoices for book or newsletter subscriptions that were returned to You by Consumers unless such invoice was an attachment to the Consumer's correspondence." *Id*.

**Request 43**: Produce all Documents Referring or Relating to refunds requested by or given to Consumers.

## Online Reviews and Reputation Management

**Request 33:** Produce all Documents that Refer or Relate to Your online reputation management, including but not limited to brand building, the removal of information from search results, reputation repair, management of online reviews, and the management of existing negative news, comments, or reviews.

**Request 34:** Produce all Documents that Refer or Relate to online reviews of Your goods, services, or publications, including but not limited to any reviews or comments prepared, authorized, reviewed, or posted by You or that You know or suspect were prepared or posted by any of Your Employees.

**Employee Training and Monitoring**

**Request 44**: Produce all Documents that Refer or Relate to the training of Your Employees who communicate on Your behalf with Consumers in connection with the sale of or collection of payment for book or newsletter subscriptions.

**Request 45**: Produce all Documents that Refer or Relate to policies or procedures to be followed by Your Employees in connection with the sale of or collection of payment for book or newsletter subscriptions.

**Request 46**: Produce all Documents, including written instructions, training manuals, memoranda, reports, and emails, that Refer or Relate to the processing, handling, resolution of Complaints or issues related to subscriptions, or other activities performed by Customer Service Representatives, Quality Assurance Managers, Quality Control Supervisors, or the Quality Assurance Department.

**Request 47**: Produce all Documents that Refer or Relate to any suspected or confirmed quality-control lapse by any sales representative, including but not limited to the forwarding to the Quality Assurance Department of any Complaint or issue related to a subscription and any communications that Refer or Relate to the analysis or resolution of the Complaint or issue.

**Request 50**: Produce all Documents that Refer or Relate to Employee Monitoring or Discipline, including any statements of policy, personnel handbooks, or instructions to persons responsible for administering Employee Monitoring or Discipline, and including reports, studies, or other analyses that Refer or Relate to the Employee Monitoring or Discipline.

**Request 51**: Produce all Documents that Refer or Relate to any person who is receiving or has received Employee Monitoring or Discipline, including employment or other applications, evaluations, Documents or recordings underlying the need for monitoring or discipline, Documents or recordings pertaining to any change in monitoring or discipline, interview or hearing notes, and letters of resignation, termination, final W2 or 1099 forms, and other Documents ending the relationship between You and the individual.

**Request 52**: Produce all Documents that Refer or Relate to the review, discipline and corrective training referenced in paragraph 1.f of Your Answer and Affirmative Defenses of Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell (ECF 19).

## CERTIFICATION PURSUANT TO RULE 37 AND LOCAL RULE 26.1(f)

I certify that, in an effort to resolve these disputes without Court involvement, Plaintiffs' counsel wrote to counsel for AFS on December 23, 2022 to request that AFS produce its Slack data from July 1, 2015 to present. On January 2, 2023, AFS's counsel wrote to Plaintiffs and refused to produce any relevant Slack data.

Plaintiffs aver that it would be futile to attempt to confer with counsel for AFS any further on this matter because the parties cannot agree on a resolution to the subjects of the Motion.

*/s/ Maris K.V. Snell*
Attorney for Plaintiff
Federal Trade Commission