UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *et al*.,<br>Plaintiffs,<br>v.<br>AMERICAN FUTURE SYSTEMS, INC., *et al.*,<br>Defendants. | Case No. 2:20-cv-02266 |

**MEMORANDUM OF PLAINTIFFS FEDERAL TRADE COMMISSION AND COMMONWEALTH OF PENNSYLVANIA IN OPPOSITION TO AFS'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................1

II. FACTS AND RELEVANT PROCEDURAL BACKGROUND ................................2

A. The "Facts" AFS Sets Forth Are Immaterial, Unsupported and/or Misrepresent the Record ....................................................................................2

B. Relevant Procedural Background. ....................................................................5

III. ARGUMENT....................................................................................6

A. The Alleged Cessation of Telemarketing During this Lawsuit Does Not Defeat Plaintiffs' Right to Injunctive Relief, and the Court Can Award Restitution of Money "Acquired by Means of" Conduct that Violates the UTPCPL ....................6

1. Permanent Injunctive Relief Can Be Entered Based on Past Conduct in Pennsylvania ....................................................................................6

2. AFS's Interpretation and Application of "Cognizable Danger" Standard Is Flawed....................................................................................9

a. Granting AFS's Motion for Summary Judgment on Injunctive Relief Would Eviscerate Consumer Protection Laws ........................................9

b. Summary Judgment Should Be Denied on Injunctive Relief Because There Is a Cognizable Danger that AFS's Violations Will Reoccur .........10

i. AFS's Extensive and Recent Violations ..............................................10

ii. AFS's Current Activities ....................................................................12

iii. AFS's Unrelenting Denials of Wrongdoing ......................................14

c. The "Is Violating or About to Violate" Is a Pleading Standard that the Court Has Already Held Has Been Satisfied ..........................................15

3. The UTPCPL Authorizes the Restoration of Money "Acquired by Means of" Conduct that Violates the UTPCPL ..............................................16

B. AFS's Motion for Summary Judgment on Liability Should Be Denied Because the Sales Scripts Were Deceptive and AFS's Subsequent Communication Did Not Legally or Factually Cure this Deception ....................................................20

1. Summary Judgment on Count VI Should Be Denied Because AFS Failed to Make Statements that Are Required by the UTPCPL ......................21

2. Summary Judgment Should Be Denied Because AFS Failed to Argue that Its Automatic Renewal Process Was Not Unfair or Deceptive ................22

3. AFS's Motion for Summary Judgment Is Premised on Manufactured, Mischaracterized and Unsupported "Facts ....................................................23

4. AFS's "Confirmatory Emails" Were Not "Incorporated by Reference" into the Solicitation and Did Not Cure the Deceptive Scripts ...............................24

a. AFS's Confirmatory Emails Are Not "Incorporated by Reference" into the Telemarketing Call..............................................................................24

b. Alternatively, the Content of the Confirmatory Emails Did Not Alter the Deceptive Scripts .........................................................................27

c. Consumer Complaints Bolster a Legal Finding of Deception...................29

C. AFS Did Not Obtain Consent from Consumers to Send Costly Publications, Automatically Renew Book Subscriptions, or Enroll in a Negative Option Plan. 34

1. AFS Did Not Obtain "Affirmative Consent" for a "Sales Offer" from Consumers...............................................................................................34

2. AFS's "Negative Option" Argument Ignores the Commonwealth's Section 201-2(4)(xvii) Claims, Relies on its Failed "Affirmative Consent" Theory, and Relies on Inapplicable TSR Law ..........................................................38

D. AFS's "Public Interest" Argument Is a Request for Reconsideration of this Court's Prior Ruling That Should Be Summarily Denied ..................................39

E. Laches Does Not Bar the Commonwealth's Claims............................................40

1. Laches May Not Be Raised as a Defense in this Exercise of the Commonwealth's Police Power.......................................................................40

2. Alternatively, AFS Did Not Change Its Position and Does Not Identify Prejudice ..............................................................................................42

3. Satell's Hearsay Testimony Is Inadmissible and May Not Be Considered for Summary Judgment .........................................................................44

IV. CONCLUSION.......................................................................................................45

## TABLE OF AUTHORITIES

### Cases

*Am. Home Prods. Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982)........................................30

*AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341 (2021)................................................18, 25

*AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213 (3d Cir. 2009)..........................20

*Azer Sci. Inc. v. Quidel Corp.*, No. 5:21-CV-02972-JMG, 2022 WL 17419347 (E.D. Pa. Dec. 5, 2022) ..............................................................................................36

*Checchia v. Solo Funds*, 2023 U.S. Dist. LEXIS 98889 (E.D. Pa. June 7, 2023) ............26

*Chrysler Corp. v. FTC,* 561 F.2d 357 (D.C. Cir. 1977) ...................................................26

*Clearview Land Development Co. v. Commonwealth*, 15 Pa. Cmwlth. 303, 327 A.2d 202 (1974) ..........................................................................................41

*Commonwealth v. Folcroft Landfill Corp.*, 1 Pa. Commw. 356 (1971) .....................40, 44

*Commonwealth v. Percudani*, 844 A.2d 35 (Pa. Commw. Ct. 2004) ............................6, 8

*Commonwealth v. TAP Pharm. Prods.*, 36 A.3d 1197 (Pa. Commw. Ct. 2011) ...........7–9

*Commonwealth v. TAP Pharm. Prod., Inc.*, No. 212 M.D. 2004, 2015 WL 9915456, (Pa. Commw. Ct. Jan 27, 2015), *aff'd*, 128 A.3d 1202 (Pa. 2015)....................................7

*Commonwealth v. Zasloff*, 8 A.2d 801 (Pa. Super. Ct. 1939) ..........................................41

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC,* 194 A.3d 1010 (Pa. 2018) .............................................................................................................18

*Commonwealth ex rel. v. Philadelphia & Reading Coal & Iron Co.*, 50 Pa. D. & C. 411 (Phila. Com. Pl. 1944) ..........................................................................................41

*Com. ex rel. Corbett v. Hasan*, No. 150 C.D. 2012, 2013 WL 3970234 (Pa. Commw. Ct. 2013) ............................................................................................18

*Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.,* 923 A.2d 1230 (Pa. Commw. Ct. 2007) ............................................................................................41

*Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 U.S. Dist. LEXIS 4649 (E.D. Pa. Jan. 14, 2016) ..................................................................19

*De Lage Landen Fin. Servs., Inc. v. Miramax Film Corp.*, No. CIV. A. 06-2319, 2008 WL 4348074 (E.D. Pa. Sept. 23, 2008) ....................26

*DISH Network, L.L.C. v. Jones*, 2012 U.S. Dist. LEXIS 98319 (E.D. Pa. July 16, 2012) ....................10

*Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961) ....................24

*FTC v. AbbVie, Inc.*, 976 F.3d 327 (3d Cir. 2020) ....................10–12

*FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007)...12–13

*FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009)....................13

*FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018)....................25–26

*Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021) ....................25

*F.T.C. v. BlueHippo Funding, LLC*, 762 F.3d 238 (2d Cir. 2014) ....................18–19

*F.T.C. v. Com. Planet, Inc.*, 878 F. Supp. 2d 1048, 1093 (C.D. Cal. 2012), *aff'd in part*, 642 F. App'x 680 (9th Cir. 2016), and a*ff'd in part, vacated in part on other grounds, remanded*, 815 F.3d 593 (9th Cir. 2016) ....................39

*FTC v. Cyberspace.Com LLC*, 453 F.3d 1196 (9th Cir. 2006)....................30

*F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)....................24

*FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268 (N.D. Ga. 2022)....................24

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) ....................24

*FTC v. Grant Connect, LLC*, No. 09-1349, 2009 U.S. Dist. LEXIS 94201 (D. Nev. Sept. 22, 2009) ....................30

*FTC v. GTP Mktg, Inc.*, 1990 U.S. Dist. LEXIS 3325 (N.D. Texas Mar. 25, 1990) ........11

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ....................24

*FTC v. Johnson*, 2017 U.S., Dist. LEXIS 132820 (D. Nev. 2017) ....................39

*F.T.C. v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) ....................19

*FTC v. Magazine Solutions, LLC*, No. CV 7-692, 2008 WL 11383877 (W.D. Pa. Dec. 1, 2008) ....................21

*F.T.C. v. Magazine Solutions., LLC*, 432 F. App'x 155 (3d Cir. 2011) ..........................19

*FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) ........................................30

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ..................12

*FTC v. Neora, LLC*, 552 F. Supp 3d 628 (N.D. Tex. 2021) .....................................11, 16

*FTC v. NHS Sys.*, 936 F. Supp. 2d 520 (E.D. Pa. 2013) ...................................................19

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)..............................10, 15–16

*FTC v. SuperTherm, Inc.*, No. cv-20-08190, 2021 U.S. Dist. LEXIS 147123
(D. Ariz. Aug. 4, 2021) ......................................................................................................12

*F.T.C. v. Think All Publ'g, L.L.C.*, No. 4:07-CV-11, 2007 WL 173854
(E.D. Tex. Jan. 19, 2007) ...................................................................................................36

*FTC v. USA Fin.., LLC*, 415 Fed. Appx. 970 (11th Cir. 2011)........................................30

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) .................................24

*Granger v. One Call Lender Servs., LLC*, 2012 U.S. Dist. LEXIS 104885,
(E.D. Pa. July 26, 2012) .....................................................................................................10

*Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021)...............................17–18, 27–28

*Hahnemann Med. Coll. & Hosp. of Philadelphia v. Hubbard*, 267 Pa. Super. 436,
406 A.2d 1120 (Pa. Super. 1979) .......................................................................................37

*In re Estate of Atkinson*, 2020 PA Super. 87, 231 A.3d 891 (Pa. Super. 2020) ...............26

*In re Nat'l Credit Mgmt. Grp*, L.L.C., 21 F. Supp. 2d 424 (D.N.J. 1998)........................19

*In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373 (D. Md. 2020).............................13, 14

*In re Trust Estate of Grote*, 390 Pa. 261, 135 A.2d 383 (1957) .....................................40

*Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975) ...............................................................42

*Kelly v. Washington*, 302 U.S. 1 (1937) ...........................................................................41

*N.M. ex rel. Balderas v. Real Estate Law Ctr., P.C.*, 401 F. Supp. 3d 1229
(D.N.M. 2019) ..................................................................................................................7, 8

*Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634 (3d Cir. 2000) ...............................8, 9

*Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018) ..............................7

*R&B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.2d 783 (8th Cir. 2001) ................20

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989)..................................26–27

*Resort Car Rental Sys., Inc. v. F.T.C.*, 518 F.2d 962 (9th Cir. 1975)..........................24, 30

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990) ................27

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012).......................................26–27

*Simeon Management Corp. v. FTC,* 579 F.2d 1137 (9th Cir. 1978) ...............................30

*Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009) .................................................45

*St. Clair Area School Dist. Bd. of Educ. v. E.l. Assocs.*, 733 A.2d 677
(Pa. Commw. Ct. 1999) ............................................................................................40–42

*Stahl v. First Pa. Banking & Trust Co.*, 191 A.2d 386 (Pa. 1963) ..................................44

*State ex rel. Miller v. Vertrue, Inc.*, 834 N.W. 2d 12 (Iowa 2013)...................................35

*Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131 (3d Cir. 1977) .................8

*Taha v. Bucks Cnty.*, No. 12-6867, 2014 U.S. Dist. LEXIS 22878
(E.D. Pa. Feb. 21, 2014) ......................................................................................................8

*United Mercantile Agencies v. Slotsky*, 121 Pa. Super. 1 (Pa. Super. 1936) ....................37

*U.S. v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258 (D. Utah 2015) ......................21

*U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) ....................10, 11

*United States v. Or. State Med. Soc.*, 343 U.S. 326 (1952) ............................................10

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953).................................................9–10

*Warner Bros. Theatres v. Proffitt*, 329 Pa. 316 (Pa. 1938) ..............................................37

*Weinberg v. Com., State Bd. of Examiners of Pub. Accts.*, 501 A.2d 239
(Pa. 1985) ..................................................................................................................40, 42

*Weinberg v. Sun Co., Inc.*, 777 A.2d 442 (Pa. 2001) .......................................................17

*West v. AT&T Co.*, 311 U.S. 223 (1940) ........................................................................ 8-9

*Yarnall v. Phila. Sch. Dist.*, 180 F. Supp. 3d 366 (E.D. Pa. 2016) ..................................10

*Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.*, 285 Pa. Super. 84, 426 A.2d 1152 (Pa. Super. 1981) ..........................................................................................36–37

**Rules and Statutes**

Federal Rule of Civil Procedure 56 ............................................................... *passim*

FTC Act, 15 U.S.C. § 45............................................................................... *passim*

Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.............................................................................. *passim*

Unordered Merchandise Statute, 39 U.S.C. § 3009.................................................. *passim*

Telemarketing Sales Rule, 16 C.F.R. § 310 ("TSR") ................................................38–39

## I. INTRODUCTION

AFS's[1] Motion for Summary Judgment and supporting arguments are factually and legally flawed in many ways. For example, in light of AFS's 30-year history of deceptive telemarketing, admitted financial self-interest, and undisputed current business activities, the alleged cessation of outbound telemarketing of publications *during this litigation* does not preclude injunctive relief under relevant state or federal law. Also regarding relief, AFS provides a tortured statutory interpretation for restitution under the UTPCPL that would have the Court ignore the "means" by which AFS generated millions of dollars in revenue (as required by the statute), and instead require proof of actual deception or reliance – standards that have been rejected by state and federal courts.

Regarding liability, AFS's motion on Count VI must be denied because it cannot and does not claim that telemarketers "first clearly, affirmatively and expressly" stated the proper identity of the seller (AFS) and that the purpose of the calls was to sell goods or services. Further, AFS's reframing of "confirmatory emails" from being sent "after an order was placed" to being "incorporated by reference" into the solicitation must be taken for what it is – a tacit admission of the deceptiveness of AFS's telemarketing script and recognition that this deception could not later be "cured."

AFS provides sparse legal support for its arguments on the above issues, as well as its smattering of other summary judgment theories. AFS does not discuss a *single fact* from a *single case*; AFS ignores glaring factual distinctions between the cases it does cite and this action; AFS attempts to impose limitations and definitions from laws that are not at issue in Plaintiffs' Complaint; and AFS repackages a key issue that the Court has already decided – Plaintiffs are able

---

[1] American Future Systems, Inc. (AFS), Progressive Business Publications of New Jersey, Inc. (PBP-NJ), and Edward Satell d/b/a the Center for Education & Employment Law (collectively "AFS").

to bring these claims even though AFS did not use its deceptive practices on individual consumers. For these, and the reasons set forth below, the Court should deny AFS's Motion in its entirety.

## II. FACTS AND RELEVANT PROCEDURAL BACKGROUND

### A. The "Facts" AFS Sets Forth Are Immaterial, Unsupported and/or Misrepresent the Record

AFS relies on three categories of purported "undisputed material facts" to support its motion for summary judgment. First, there are a handful of facts that are not in dispute, although they are either immaterial or in actuality support summary judgment for Plaintiffs, not AFS. For example, the parties agree that for 30 years, AFS "used the same approach" to telemarketing its publications and Plaintiffs do not dispute that AFS contends it expected telemarketers to "strictly adhere" to portions of the sales scripts. [ECF 342, p. 16.] [2]

Second, AFS, at times, appears to pull immaterial "facts" from the ether and does not include any citation to the record. AFS does this with actual statements of fact, such as saying that "the most sophisticated law enforcement entities in the United States" are among its "loyal subscribers" and listing the United States Secret Service and the "Administrative Office of the Courts" among examples of such entities. [ECF 342, p. 15 n.5.]. AFS does not provide any evidence of record for this statement and actually produced documents showing that both the Secret Service and the First Judicial District of Pennsylvania (Philadelphia Court) were sent and/or

[2] In citing to particular pages of ECF filings, Plaintiffs are using the ECF pagination rather than the conventional page numbering at the bottom of the PDF document.

billed for publications that they never ordered. [Pl. Opp. Facts[3] ¶ 67.][4] AFS also manufactures facts through its excessive and factually unsupported use of adjectives. In a single paragraph of the "Summary of ***Undisputed*** Material Facts," AFS describes itself as a "trusted" publisher, its publications as "highly-valued," its telemarketers as "well-trained and closely supervised," and its scripts as including "detailed disclosures." [ECF 342, p. 16.] To be clear, the voluminous evidentiary record does not support *any* of these descriptions.

Finally, even when AFS does "support" its factual statements with citations to the record, it often mischaracterizes the source material as to render the statements false. An egregious example includes, "it is undisputed that AFS's business practice involved calling business entities that may have a need for or interest in AFS's publications." *See* ECF 342, at 39 (citing ECF 342-11, at 15, Exhibit K, Bandy Depo. 39:7-15.][5] The referenced deposition testimony is:

> Q [to the FTC's designee]: Do you understand that AFS's sale of publications and books were directed at managers and business executives who worked at businesses or organizations?
>
> A: I understand that ***that's the claim, that that's AFS's position***, yes.

---

[3] Plaintiffs cite to their Joint Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment, which contains both Plaintiffs' Counterstatement in Opposition to AFS's Statement of Facts and Plaintiffs' Joint Statement of Additional Facts that Preclude Summary Judgment in AFS's Favor, filed contemporaneously herewith, as "Pl. Opp. Facts."

[4] Even if true, tricking or coercing a government employee into using public or personal funds to pay for a publication does not a "loyal subscriber" make.

[5] AFS's intent is transparent – it wants the Court to believe it was engaged in telemarketing that did *not* involve "cold calls" – however, the *actual* undisputed evidence of record is that AFS did make cold calls to consumers. [Pl. Opp. Facts ¶ 47.] Concerningly, when this Court directly asked AFS's counsel "Did the telemarketers make cold calls?" counsel for AFS did not answer "yes." Instead, she responded, "[b]y the very nature of telemarketing, we receive lists of people who are interested in a certain publication and we give those people a call." [Transcript of August 5, 2022 Court Hearing, 51:1-4.]

*Id.* (emphasis added). While the facts themselves are immaterial, AFS's mischaracterization of the record is deeply concerning. The referenced testimony did not touch on whether the target consumers "may have a need for or interest in AFS's publications," and Mr. Bandy admitted *nothing* other than his *understanding* of what AFS is claiming in the litigation. A 30(b)(6) witness's acknowledgment that he knows the opposing party's position is not an admission of that position or the facts underlying it, and to represent it as such calls into question every assertion of "undisputed fact" made by AFS.

There are two interrelated "facts" that warrant specific discussion here, as AFS contends they are "undisputed" and proceeds as if the entirety of the case rises and falls on them. Specifically, after three decades of operating its telemarketing scam, AFS says, "AFS closed its telemarketing business entirely and stopped outbound telemarketing calls as of September 3, 2021," and "AFS has no plan, intention, or incentive to resume any telemarketing for the sale of any newsletters, publications, or books." [ECF 342, at 70-71, ¶¶ 44, 45.]

As set forth below, even if true, these facts would be insufficient to grant summary judgment on injunctive relief for AFS or to deny summary judgment on injunctive relief for Plaintiffs on their cross-motions. Thus, these are not disputed issues of fact that need to be tried. However, it must be noted that after the close of fact discovery and resolution of a vigorously contested motion to compel, ***AFS produced evidence that it has continued to engage in telemarketing activities since September 3, 2021.*** [Pl. Opp. Facts, ¶¶ 44, 45 (Slack messages among AFS employees from February and May 2022 stating that most subscribers to AFS's digital publication "HR Morning" "come from [telemarketing] followed by our webinars," and that "previously [leads] were very much inbound, and the [telemarketing] stuff was like supplemental

Now they're majority [telemarketing]," and a Slack message from March 2023 stating that telemarketing reps are just called "Lead Development Reps now."]

As necessary, Plaintiffs will identify additional misstatements of facts, both in this Memorandum and in Plaintiffs' response to AFS's separate Statement of Undisputed Material Facts. However, Plaintiffs' corrections are not indicative of materiality, or in many instances even "dispute." Rather, Plaintiffs have endeavored to identify facts that are misrepresented, not disputed. Thus, corrections of the factual record do not preclude summary judgment for Plaintiffs on their cross-motions. Fed. R. Civ. P. 56(c)(1).[6]

**B. Relevant Procedural Background**

After more than two years of fact and expert discovery, the production of millions of documents, and depositions of 21 corporate, individual, and expert witnesses and parties, all parties filed Motions for Summary Judgment on June 26, 2023. [ECF 338 (Commonwealth), 339 (FTC), 342 (AFS).] Concurrently with their Motions for Summary Judgment, Plaintiffs filed separate Memoranda in support of those motions [ECF 338-1, 339-1], and together filed a Joint Statement

---

[6] **(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c).

of Undisputed Material Facts [ECF 339-3] together with thirteen volumes of exhibits supporting the Joint Statement [ECF 339-5 through 339-15.] Concurrently with this Memorandum, and as required by Section V of the Court's Scheduling and Motion Policies and Procedures, Plaintiffs are filing Plaintiffs' Joint Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and Plaintiffs' Joint Statement of Additional Facts that Preclude Summary Judgment in AFS's Favor, and cite to that collective document herein as "Pl. Opp. Facts."

## III. ARGUMENT

### A. The Alleged Cessation of Telemarketing During this Lawsuit Does Not Defeat Plaintiffs' Right to Injunctive Relief, and the Court Can Award Restitution of Money "Acquired by Means of" Conduct that Violates the UTPCPL

Unconventionally, and presumably leading with what it believes is the strongest argument, AFS defers discussion of liability until after issues of relief. Nearly one-third of AFS's argument for summary judgment turns on its contention that it ceased telemarketing publications in September 2021, and that it does not plan to restart. [ECF 342, pp. 25-38.] Again, in light of recently produced evidence, Plaintiffs do not concede that AFS has stopped telemarketing activities. [Pl. Opp. Facts, ¶¶ 44, 45.] However, Plaintiffs herein address AFS's motion for summary judgment under the standards applicable to violations that have ceased during the course of litigation. As set forth below, even if it was true, AFS's voluntary cessation of unlawful activities more than a year after this case started is insufficient as a matter of law to grant summary judgment for AFS on injunctive relief and, by extension, restitution under the UTPCPL.

1. <u>Permanent Injunctive Relief Can Be Entered Based on Past Conduct in Pennsylvania</u>

It has long been the law in Pennsylvania that past conduct provides a sufficient basis for the Commonwealth to obtain an injunction restraining future violations of the UTPCPL. *Commonwealth v. Percudani*, 844 A.2d 35, 45–46 (Pa. Commw. Ct. 2004) (explaining that it

would be "absurd or unreasonable" to interpret the UTPCPL to allow a defendant to avoid liability "by discontinuing its actions *even after proceedings are commenced* and claim[ing] that the matter is moot"); *see also Commonwealth v. TAP Pharm. Prods.*, 36 A.3d 1197, 1240 (Pa. Commw. Ct. 2011), *vacated on other grounds,* 626 Pa. 1, 94 A.3d 350 (Pa. 2014); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 555-57 (M.D. Pa. 2018) (denying a motion to dismiss even though conduct violating the UTPCPL alleged in the complaint ceased 10 years prior to filing). In *TAP Pharmaceuticals,* the Commonwealth Court concluded that, under the UTPCPL:

> 1) that an injunction can issue to restrain future conduct ***based on prior unlawful activity***; 2) that ***cessation of the offending conduct does not, in and of itself, bar a claim for injunctive relief***; and 3) the Court ***may consider*** whether the offending conduct is likely to reoccur absent the grant of an injunction.[7]

*TAP Pharm.*, 36 A.3d at 1238 (emphasis added). The court reasoned that because "[t]he remedy of injunctive relief here is explicitly provided by statute," the common law requirements for permanent injunction are not necessary to prove under the UPTCPL, "[r]ather, the Commonwealth must prove a violation of the [UTP]CPL." *Id.* at 1236.

AFS attacks *Percudani* and its progeny by cobbling together a couple of de-contextualized cases. To inject the specter of a "split" on whether state or federal substantive law applies to determine the standard for permanent injunction, AFS cites *N.M. ex rel. Balderas v. Real Estate Law Ctr., P.C.,* 401 F. Supp. 3d 1229, 1348 n.93 (D.N.M. 2019). [ECF 342, p. 28 n.45.] However, the "split" referred to in *Balderas* is only relevant in the absence of an express statutory right to

[7] In the same opinion, the Court also uses the word "*should*" instead of "may," but regardless of whether deciding courts "may" or "should" consider the likelihood that a violation will reoccur, there is no requirement that the Commonwealth *prove* it will, or even is likely, to reoccur. *Id.* at 1242 (emphasis added). On remand, the Commonwealth Court said, "a strong argument can be made that nothing other than a violation of the UTPCPL need be shown to support an injunction under the statute." *Commonwealth v. TAP Pharm. Prod., Inc.*, No. 212 M.D. 2004, 2015 WL 9915456, at *2 (Pa. Commw. Ct. Jan 27, 2015), *aff'd*, 128 A.3d 1202 (Pa. 2015).

injunctive relief and, like the majority of courts that have addressed the issue, the Third Circuit looks to state substantive law for permanent injunction standards. *Id.* (citing *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1143 (3d Cir. 1977)).

In its effort to disregard *Percudani* and *TAP Pharmaceutical* (past conduct is sufficient for injunctive relief) in favor of imposing the federal "cognizable danger" standard on the Commonwealth's right to statutory injunctive relief, AFS also selectively quotes *Taha v. Bucks Cnty.*, No. 12-6867, 2014 U.S. Dist. LEXIS 22878, at *5 (E.D. Pa. Feb. 21, 2014). [ECF 342, p. 28 (citing *Taha*, 2014 U.S. Dist. LEXIS 22878, at *5).] What *Taha* actually says is, "***[w]here the law is unclear and*** there is no controlling decision by the Pennsylvania Supreme Court, this Court must 'predict' how it would rule, ***giving 'due regard, but not conclusive effect, to the decisional law of lower state courts.***'" *Taha*, 2014 U.S. Dist. LEXIS 22878, at *5 (quoting *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)) (emphasis added to text *that was omitted by AFS*). This reading of *Taha* is contrary to AFS's position and consistent with United States Supreme Court and Third Circuit precedent. *West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."); *Buffetta*, 230 F.3d at 637 ("The opinions of intermediate appellate state courts are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (quotations omitted).

Here, the Commonwealth has a statutory right to injunctive relief, 73 P.S. § 201-4, and long-standing Pennsylvania intermediate appellate precedent holds that a permanent injunction can issue under the UTPCPL based on past unlawful activity. *Percudani*, 844 A.2d at 45–46; *TAP*

*Pharm. Prods.*, 36 A.3d at 1238. AFS provides no "persuasive data that the [Pennsylvania Supreme Court] would decide otherwise." *West*, 311 U.S. at 237; *Buffetta*, 230 F.3d at 637. Accordingly, the Court should not supplant state substantive law (an injunction can issue based on unlawful past conduct) with federal substantive law ("cognizable danger").

2. AFS's Interpretation and Application of "Cognizable Danger" Standard Is Flawed

*a. Granting AFS's Motion for Summary Judgment on Injunctive Relief Would Eviscerate Consumer Protection Laws*

Again, AFS seeks to avoid an injunction based on its alleged cessation of unlawful conduct more than a year into this lawsuit and its contention that Defendants do not plan to resume telemarketing publications. [ECF 342, pp. 25–26.] This result would eviscerate consumer protection laws by allowing scammers to continue their unlawful activity up until a lawsuit is filed, and then avoiding injunctive, monetary, and other relief simply by ceasing in the middle of the lawsuit and saying that they do not plan to restart. The Pennsylvania Commonwealth Court's warning in *Percudani* is as equally as instructive for the FTC Act as it is controlling for the UTPCPL:

> [A] party could simply avoid liability . . . by discontinuing its actions even after proceedings are commenced and claim that the matter is moot. Such an interpretation would do little in the way of preventing unfair or deceptive acts or practices and compensating injured consumers. In ascertaining legislative intent, we may consider the consequences of a particular interpretation and may presume that the legislature did not intend a result that is absurd or unreasonable… To allow a party to avoid liability for its actions by merely discontinuing its conduct would render the penalty provisions of the [UTPCPL] meaningless in their application.

*Commonwealth v. Percudani*, 844 A.2d at 45–46.

To avoid such an absurd result, it is well-established that, "[the] court's power to grant injunctive relief survives the discontinuance of the illegal conduct." *United States v. W. T. Grant*

*Co.*, 345 U.S. 629, 633, 73 S. Ct. 894, 897 (1953); *see also United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952) (stating that courts must "beware of efforts to defeat injunctive relief by protestations of repentance and reform"); *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 157 (3d Cir. 2019) ("A party can generally obtain injunctive relief for past conduct that is likely to recur; the wrongdoer cannot avoid an injunction by voluntarily ceasing its illegal conduct.") (citing *W.T. Grant Co.*, 345 U.S. at 632).

*b. Summary Judgment Should Be Denied on Injunctive Relief Because There Is a Cognizable Danger that AFS's Violations Will Reoccur*

i. AFS's Extensive and Recent Violations

AFS fails to provide any case that supports its desired result.[8] The facts of *FTC v. AbbVie*, where the Third Circuit adopted the "cognizable danger" standard, are so drastically different than this action that the outcome there is inapposite. *Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327 (3d Cir. 2020). In *AbbVie*, the defendants filed two sham lawsuits related to a drug patent **seven years prior** to the time the district court determined that the FTC did not demonstrate a

[8] AFS cites to several cases between private litigants, but the "function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants." *U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987). Further, the cases cited by AFS are so factually dissimilar as to render them inapposite in any context. *See Granger v. One Call Lender Servs., LLC*, 2012 U.S. Dist. LEXIS 104885, *4-5, *17 (E.D. Pa. July 26, 2012) (denying injunctive relief in copyright case where defendant removed infringing material from its website more than three years prior to lawsuit being filed and one week after receiving a letter from plaintiff regarding the copyright); *Yarnall v. Phila. Sch. Dist.*, 180 F. Supp. 3d 366, 370-71 (E.D. Pa. 2016) (denying injunctive relief in hostile work environment case based upon conduct nine years earlier by perpetrator that defendant had not employed for six years *and* plaintiff who had not purchased a trial transcript pointed to nothing in the trial record to support claim for permanent injunctive relief); *DISH Network, L.L.C. v. Jones*, 2012 U.S. Dist. LEXIS 98319, *8 (E.D. Pa. July 16, 2012) (denying injunctive relief where defendant purchased cable descrambling service from third-party that was no longer operating *and* plaintiffs presented no evidence that the piracy would continue in the absence of an injunction or that the statutory damages awarded would provide insufficient deterrence).

"cognizable danger of recurrent violation." *Id*. at 379–80. By the time the district court declined to enter injunctive relief, the defendant had filed numerous legitimate lawsuits on the same patent, generic versions of the medicine were on the market, and the drug patent would soon expire. *Id*. In light of these facts, the Third Circuit held that the district court did not abuse its discretion in determining that there was no cognizable danger of the defendants engaging in further sham litigation. *Id*.

Here, AFS did not engage in an isolated violation many years ago. To the contrary, for decades AFS used unfair and deceptive business practices to market, "sell," renew, and collect payment for newsletter and book subscriptions. [Pl. Opp. Facts ¶ 46; ECF 339-3, ¶¶ 25, 34-104; 184-197.] AFS's "extensive history of violations does beget an inference that future violations are likely to occur." *FTC v. GTP Marketing, Inc*., 1990 U.S. Dist. LEXIS 3325, *12-13 (N.D. Texas Mar. 25, 1990); *U.S.A. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987) ("[A]n inference arises from Odessa's past violations that future violations are likely to occur."); *FTC v. Neora, LLC*, 552 F. Supp 3d 628, 637 (N.D. Tex. 2021) (collecting cases for proposition that "allegations of past conduct can give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive."). AFS continued its practices throughout multi-year investigations ***and for more than a year after this lawsuit was filed.*** [ECF 342, p. 1, 62-63.] Then, even after AFS allegedly stopped telemarketing and argued that no injunction was necessary, AFS continued to bilk consumers out of hundreds of dollars each for bogus subscriptions. [Pl. Opp. Facts ¶ 48; ECF 339-3, ¶¶ 24, 26, 33].

ii. AFS's Current Activities

In contrast to *AbbVie*, courts have awarded injunctive relief in situations factually similar to this case, especially where current business activities provide a platform for future violations. In *FTC v. SuperTherm, Inc.*, No. cv-20-08190, 2021 U.S. Dist. LEXIS 147123 (D. Ariz. Aug. 4, 2021), the court awarded an injunction in 2021 based on misrepresentations that occurred from 2014 to 2020 and the individual defendants' continued ownership of two additional companies that appeared to be engaged in a similar line of business. *Id.* at *20. While the corporate defendant had dissolved, the court held that the violations could recur whether by "individuals, through one of their companies, or through a reconstituted SuperTherm." *Id.*; *see also FTC v. Nat'l Urological Grp., Inc*., 645 F. Supp. 2d 1167, 1209-10 (N.D. Ga. 2008) (holding that it was "readily apparent" that the defendants' "current business endeavors could serve as a platform for continuing violations of the FTC Act" that would financially harm consumers).[9]

Similarly, in *FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007) the court held that "because [d]efendants continue to operate in the information brokerage business, the FTC persuasively argues that injunctive relief is still necessary to prevent defendant from engaging in similar unfair acts or practices." *Id.* at *26.[10] The court explained that the FTC does not have to establish that a defendant is "likely to engage in the *same precise conduct* found

---

[9] This was true even though the defendants did not advertise or even make the products at issue anymore. *Id.* at 1209-11. Also relevant to the entry of injunctive relief was the fact that the defendants did not engage in an isolated incident of deception, but instead the violations were "numerous and grave" and "generated a handsome profit." *Id.* at 1209.

[10] Prior to the commencement of the litigation, the defendant obtained and sold confidential customer phone records without the customers' authorizations. Although it had stopped dealing in telephone records before litigation commenced, and a new law would criminalize future violations, the defendants' website still offered records of GPS traces, social security number verification, utility records and other information for sale. *Accusearch*, 2007 U.S. Dist. LEXIS 74905, *2, 25.

to be in violation of the law" in order to obtain injunctive relief. *Id.* at *25-26 (emphasis in original). The Tenth Circuit affirmed the District Court on appeal, restating the trial court's reasoning. *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1202 (10th Cir. 2009); *see also In re Sanctuary Belize*, 482 F. Supp. 3d 373 (D. Md. 2020), *affirmed in part, vacated in part on other grounds*, *FTC v. Pukke*, 53 F.4th 80 (4th Cir. 2022) (relying on the "clear transferability" of the unlawful behavior, and noting that the defendant "appears quite ready to mobilize identical or similar misrepresentations in his real estate ventures hereafter, as well as in other activities in the future").

Here, AFS is poised to restart (or continue) telemarketing activities and/or transfer its unlawful practices to other business activities. [Pl. Opp. Facts 49-58; ECF 339-1, Sections II.H (p. 30-32) and V (p. 54-59); ECF 338-1, Sections II.H (p. 32-34) and V (p. 62-68); ECF 339-3, ¶¶ 324-337.] Satell decided to stop telemarketing, and he has the authority to restart if he feels AFS should invest in that again. [Pl. Opp. Facts ¶ 49; ECF 339-3, ¶ 324.] AFS has "rebranded" to SuccessFuel and is using unregistered names to identify itself and shed the negative reputation of Progressive Business Publications and/or Center for Education and Employment Law. [ECF 339-3, ¶¶ 325-335; Pl. Opp. Facts ¶¶ 50, 54.] AFS is still monetizing outbound calling, employing telemarketing professionals, and using telemarketing call lists in its other business activities. [Pl. Opp. Facts ¶ 51; ECF 339-3, ¶ 336.] The financial benefits to AFS from telemarketing have long extended beyond publication subscriptions, as AFS cross-sold other products on the telemarketing calls and converted the telemarketing customers into "leads" that it sells to other businesses. [Pl. Opp. Facts. ¶¶ 44, 54]

AFS's *current* "lead generation" business both utilizes telemarketing resources and closely mirrors telemarketing activities. In this line of business, AFS makes outbound calls to entities

(including former telemarketing customers), gathers information about their employees, invites them to free memberships that offer paid digital content, and sells these "sales leads" to other companies. [Pl. Opp. Facts ¶¶ 50-55; ECF 339-3 ¶ 336.] As it did with telemarketing newsletters and books, AFS continues to use unregistered names to identify itself. [Pl. Opp. Facts ¶¶ 50, 54; ECF 339-3 ¶ 336.] Also like its telemarketing practices, in lead generation, AFS misrepresents why they are calling – for instance saying, "I'm just sending over the report with upcoming 2021 sales and use tax changes," before asking for their email and title, which AFS later sells as a "lead" to other companies. [Pl. Opp. Facts ¶ 56.] The parallels between this and "I can… send you a link and you can look at [AFS's website] later on today!...what's your email address?" in the telemarketing sales script are undeniable. [ECF 339-3 ¶ 86.] Furthermore, like its deceptive book renewal, AFS still engages in the automatic sending of "updated" workplace regulation posters when there is a change in the regulations. [Pl. Opp. Facts ¶ 57; ECF 339-3 ¶ 336(l).] AFS sells the posters (and other products) over the telephone. [Pl. Opp. Facts ¶ 58; ECF 339-3 ¶ 336(a).]

iii. AFS's Unrelenting Denials of Wrongdoing

AFS's continued denial that it has done anything wrong, especially in the context of overwhelming evidence over the years, also weighs against granting its motion for summary judgment on injunctive relief. *In re Sanctuary Belize*, 482 F. Supp. 3d at 468 (granting injunctive relief and noting "[Defendant] vigorously denies that any [violations] were committed and denied that the representations were in any way misleading, which implies that he believes everything he…said in their marketing and sales efforts was legitimate").

Like the defendant in *Sanctuary Belize*, AFS has continued to vigorously deny that its practices were misleading, saying, "To this day, we still feel we're not doing anything wrong." [Pl. Opp. Facts ¶ 59.] For decades, AFS ignored cease-and-desist letters, negative press, a BBB alert, an adverse jury verdict in its defamation case against the BBB, and, most compelling,

countless consumer complaints directly to AFS as well as to third-parties. [Pl. Opp. Facts ¶¶ 59, 65; ECF 339-1, pp. 57-58; ECF 91 (denying all claims); ECF 339-3, ¶¶ 196, 198-229; 242, 247-63; 279-81; 285-306, 308-12; 354-55. 58, 365-66, 368-378, 386-87.]

AFS's continued denial of any wrongdoing undermines any expressed intent by AFS regarding its future conduct. *In re Sanctuary Belize*, 482 F. Supp. 3d at 468; *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (listing the "bona fides of the expressed intent to comply" as relevant to a grant of injunctive relief after discontinuance of the illegal conduct).

*c. The "Is Violating, or About to Violate" Is a Pleading Standard that the Court Has Already Held Has Been Satisfied*

AFS's summary judgment motion as it relates to injunctive relief relies in part on language from both the FTC Act and the UTPCPL setting forth the pleading standards for statutory claims. [ECF 342, pp. 16-17 (citing FTC Act requirement that the Commission believes a defendant "is violating, or is about to violate" a law enforced by the FTC, 15 U.S.C. § 53(b) and the UTPCPL requirement that the Attorney General believes a defendant "is using or is about to use" an act that violates the UTPCPL, 73 P.S. § 201-4).]

The Third Circuit has expressly held that the ***pleading*** standard of whether a defendant "is violating, or is about to violate" Section 13(b) of the FTC Act is **not the same** as the standard for determining whether an injunction would be appropriate relief in a given case: "[T]he 'about to violate' and 'likelihood of recurrence' standards coexist. The 'about to violate' pleading requirement – which is applied right out of the gate – is not inconsistent with the likelihood of recurrence standard, which a court uses to determine the FTC's entitlement to an injunction." *Shire*, 917 F.3d at 158.[11]

[11] In *Shire*, the FTC sued five years after the defendant stopped the conduct at issue and two years after the defendant divested itself of the product at issue. *Shire*, 917 F.3d at 159-60. Moreover,

Here, the Court has already held that the FTC met its pleading standard. [ECF 108, at 6–7 n.1, Section B ("Based on the allegations in the [First Amended Complaint], FTC pleads that it 'has reason to believe that Defendants are violating or are about to violate laws [it] enforce[s]'…Accordingly, the [First Amended Complaint] sufficiently alleges 'existing or impending' violations of the [Federal Trade Commission Act] by the Defendants, and FTC's claims for injunctive relief will not be dismissed.")] At this stage of the litigation, the "is violating, or is about to violate" standard is no longer at issue.

3. <u>The UTPCPL Authorizes the Restoration of Money "Acquired by Means of" Conduct that Violates the UTPCPL</u>

AFS argues that the Commonwealth is not entitled to restitution (1) unless the Court grants permanent injunctive relief; and (2) because restitution "does not fit within the statutory language of Section 201-4.1 of the UTPCPL." [ECF 342, p. 37 (citing 73 P.S. § 201-4.1 ("Section 201-4.1")]. AFS's first argument warrants little discussion. As set forth above, AFS's motion for summary judgment on injunctive relief should be denied for the UTPCPL based on AFS's past conduct and even under the "cognizable danger" standard such relief would be appropriate as a matter of law.

AFS's second argument requests summary judgment on restitution because the Commonwealth does not "correlate [AFS's $24.7 million in] earnings to customers…who

---

the FTC's complaint did not include sufficient allegations that Shire was "about to violate" with respect to its other product. *Id.* Thus, the issue before the court was whether the FTC had met the necessary ***pleading*** standard, with the Third Circuit holding that the FTC had not pled sufficient facts to show that Shire "is violating, or is about to violate" the law based on such long-past conduct. *Id.* at 160-61. As explained by one district court, *Shire* did <u>not</u> hold that "past conduct can never be considered when evaluating whether injunctive relief is available." *FTC v. Neora LLC*, 552 F. Supp. 3d 628, 637 (N.D. Tex. 2021) ("Thus, *Shire* only stands for the proposition that, in that case, the amount of time between the violation and the filing of the complaint – 5 years – was too far removed temporally to establish that the defendant was about to commit more violations.").

complained and paid any money to AFS." [ECF 342, p. 38.] AFS provides no legal support for this argument other than its own tortured interpretation of Section 201-4.1, an interpretation that ranges from legally incorrect to nonsensical.[12] [ECF 342, pp. 37-38.]

It would defy the plain meaning of Section 201-4.1, as well as judicial precedent, to require the Commonwealth to prove a correlation between AFS's revenue and consumers who complained. [ECF 342, p. 27.] Section 201-4.1 grants the Court authority to "direct that the defendant or defendants ***restore*** to any person in interest ***any moneys*** or property, real or personal, which may have been ***acquired by means of any violation of this act.***" 73 P.S. § 201-4 (emphasis added). While private rights of action under the UTPCPL require a causal connection between unlawful practices and harm to specific consumers,[13] restitution for consumers in Attorney General enforcement actions is premised on the actions of the defendant, *i.e.*, whether the money to be restored was "acquired by means of any violations" of the statute. 73 P.S. § 201-4.1.

AFS's "correlation" argument, if accepted by the Court, would be akin to requiring the Commonwealth to prove "actual deception" to establish liability, which is directly contrary to Pennsylvania law. *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 648 (Pa. 2021) ("'An act or a practice is deceptive or unfair if it has the capacity to deceive, and ***neither the intention to deceive***

[12] For example, of course the Commonwealth is not seeking restitution for consumers who were able to successfully navigate AFS's cancellation process and never paid any money. [ECF 342, p. 37.] Rather, the Commonwealth seeks restitution for the many thousands of consumers from whom AFS acquired an undisputed total of $24.7 million over six years of AFS's thirty-year scheme. [ECF 338-1, pp. 68-70.]

[13] 73 P.S. § 201-9.2 (providing a private right of action to recover actual or statutory damages for any person who "suffers any ascertainable loss of money…as a result of" the use of methods, acts or practices that are unlawful under the UTPCL); *see also Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 445-46 (Pa. 2001) (reversing class certification on UTPCPL false advertising claims because "[t]he statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action," and noting that "Commonwealth actions and private actions are distinguishable").

***nor actual deception must be proved***; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way.'") (quoting *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023) (Pa. 2018) (emphasis added); *see also Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 923 A.2d 1230, 1236 (Pa. Commw. Ct. 2007) (same). The proper inquiry for liability is whether a practice is "capable of being interpreted in a misleading way" and the proper inquiry for restitution is the means by which a defendant acquired money from consumers. *Gregg*, 245 A.3d at 648; 73 P.S. § 201-4.1. Thus, it is wholly irrelevant, and a red herring, as to whether there were some consumers who actually understood the offer or later renewed subscriptions.

The telemarketing scheme and book renewal process at issue here are "unfair or deceptive acts or practices" that are unlawful under the UTPCPL, so every dollar that AFS received from consumers as a result of these practices was "acquired by means of [a] violation of [the UTPCPL]." 73 P.S. § 201-2(4) and 201-4.1. [*See* ECF 338-1, p. 35-56, 68–71; ECF 339-3, p. 3-38 (Section B) .] Therefore, every one of these dollars acquired by such means during the relevant time period fits squarely within the statutory language of Section 201-4.1.

Focusing the restitution inquiry on the means by which AFS acquired money from consumers is consistent with the well-reasoned decisions in many cases involving restitution awards for the FTC.[14] "To require proof of each individual consumer's reliance on a defendant's misrepresentations would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate," and, of course the same could be said for the UTPCPL. *F.T.C. v. BlueHippo*

[14] Although *AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341 (2021) resulted in the inability of the FTC to seek restitution in Section 5 cases because the FTC Act does not expressly provide for it, nothing in *AMG* negates the usefulness of FTC cases for guidance and interpretation of equitable monetary relief as expressly provided for in the UTPCPL.

*Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014) (collecting cases from four other circuit courts for the proposition); *In re Nat'l Credit Mgmt. Grp, L.L.C.*, 21 F. Supp. 2d 424, 441-442 (D.N.J. 1998) (applying *BlueHippo* standard); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 U.S. Dist. LEXIS 4649 at *70 (E.D. Pa. Jan. 14, 2016) (rejecting justifiable reliance as a requirement under the UTPCPL).

An underlying premise of awarding net revenue as restitution is a "presumption of consumer reliance" that arises when a defendant makes and widely disseminates material misrepresentations and consumers purchase the defendant's products, which would certainly arise based on the undisputed facts of this case. *BlueHippo*, 762 F.3d at 244.[15] Once the presumption of reliance is triggered, the Court "should use [AFS's] gross receipts as a baseline for calculating the actual loss to consumers" *Id* at 246; *see also F.T.C. v. Magazine Solutions., LLC*, 432 F. App'x 155, 158 (3d Cir. 2011) (rejecting argument that the trial court "erred in calculating restitution as total net revenue, rather than net profits"); *F.T.C. v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004) ("[W]here a defendant has engaged in a pattern or practices of contemptuously misleading consumers…using the defendant's gross receipts is a proper baseline in calculating the amount of sanctions necessary to compensate injured consumers."); *FTC v. NHS Sys., Inc.*, 936 F. Supp.2d 520 (E.D. Pa. 2013) (holding that where there is no genuine issue of material fact

[15] Here, using telemarketers from locations in Pennsylvania, Ohio and New Jersey, AFS disseminated the deceptive sales script nationwide over a period of three decades. [ECF 339-3, ¶¶ 16, 24-26, 318.] Between 2016 and 2021, it is undisputed that consumers paid AFS a total of $24.7 million for subscriptions that AFS acquired using the telemarketing script and the automatic book renewal process. [*Id.* ¶ 307.]

regarding the defendant's net revenue, it is appropriate for a court to grant restitution in a specified amount upon motion for summary judgment).[16]

For the reasons set forth above, the Court should deny AFS's motion for summary judgment on Plaintiffs' right to injunctive relief, as well as the Commonwealth's right to restitution under Section 201-4.1.

### B. AFS's Motion for Summary Judgment on Liability Should Be Denied Because the Sales Scripts Were Deceptive and AFS's Subsequent Communication Did Not Legally or Factually Cure this Deception

Turning to liability, AFS argues that its "communications were not deceptive" as a matter of law. [ECF 342 pp. 38-43.] In support of its motion for summary judgment on liability, AFS proffers the following: (1) a myriad of "facts" that are irrelevant, unsupported or mischaracterize the evidentiary record; (2) an entirely new argument that "confirmatory emails" sent after telemarketing calls were part of the "entirety of the sales communication"; and (3) the false contention that Plaintiffs have improperly relied on consumer complaints. [*Id.*] However, AFS

[16] AFS's reliance on irrelevant and/or nonbinding 30(b)(6) testimony does not advance its cause. [*See* ECF 342, p. 37-38.] There were only two deposition topics for the Commonwealth designee related to restitution: (1) "The factual basis of the facts related to Your allegations…that AFS has been unjustly enriched as a result of its unlawful acts or practices" [Pl. Opp. Facts ¶¶ 73-74 (Depo. Topic 12),] and (2) "The monetary amount by which you claim that AFS has been unjustly enriched by its alleged unlawful acts or practices…" [Pl. Opp. Facts ¶¶ 73-74 (Depo. Topic 13).] In actuality, AFS asked many questions about information well beyond the scope of these topics and/or that called for legal conclusions. [Pl. Opp. Facts, ¶¶ 73-75.] For example, whether restitution should be awarded for a consumer "who valued the subscription" and "Has the Commonwealth identified persons to whom money should be restored?" [*Id.*] AFS argues that Ms. Oleckna's response to these questions was so powerful as to create a "statutory limitation on [the Commonwealth's] equitable authority." [ECF 342, p. 37–38.]. However, a 30(b)(6) designee's characterization of which consumers are entitled to restitution does not supplant statutory interpretation, case law, and judicial discretion to determine the scope of equitable remedies under the UTPCPL and is certainly not binding. *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009) (30(b)(6) testimony that constitutes a legal conclusion is not binding); *see also R&B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 787 (8th Cir. 2001) (stating that 30(b)(6) witnesses' testimony "was a legal conclusion…which, as [the court has] already said, is incorrect.").

fails to provide (1) even a fleeting reference to the Commonwealth's claim in Count VI for AFS's failure to make express statements required by the UTPCPL; and (2) any meaningful discussion of relevant case law.

1. Summary Judgment on Count VI Should Be Denied Because AFS Failed to Make Statements that Are Required by the UTPCPL

In Count VI, the Commonwealth alleges, among other failures to disclose, that AFS used "unfair or deceptive acts or practices" as defined by 73 P.S. § 201-2(4)(xvii)(A)-(B). [ECF 43, ¶¶ 79-83.] Section 201-2(4) defines "unfair methods of competition" and "unfair or deceptive acts or practices" to include "(xvii) Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating: (A) the identity of the seller; [and] (B) that the purpose of the call is to sell goods or services." 73 P.S. § 201-2(4)(xvii).

While AFS requests summary judgment on Count VI, AFS proceeds as though no claim has been made pursuant to Section 201-2(4)(xvii) of the UTPCPL. AFS does not even attempt to argue that it first clearly, affirmatively, and expressly stated the identity of the seller[17] or that the purpose of the telemarketing calls was to sell goods or services.[18] Further, reading the scripts

[17] Certainly, the absence of this argument is a tacit recognition that countless sales scripts fail to properly identify any legal entity as the seller of the products. *See U.S. v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258 (D. Utah 2015) (holding that using a product name or "certification name" rather than a registered fictitious name is insufficient to provide the "identity of the seller" under the federal Telemarketing Sales Rule); *Complying with the Telemarketing Sales Rule*, available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#promptdisclosures (last visited June 25, 2023) (stating that the identity of the seller is the "entity" that provides goods in exchange for payment, which could also include "a fictitious name that is registered with appropriate state authorities").

[18] Any indication included in the sales scripts that AFS might, at some point, be selling a product happened long after AFS provided "substantive information to the consumer" about the product and was far too vague to "expressly" state that the purpose of the call was to sell subscriptions. *See FTC v. Magazine Solutions, LLC*, No. CV 7-692, 2008 WL 11383877, *7 (W.D. Pa. Dec. 1, 2008) (concluding that "disclosure was neither prompt nor clear" considering the FTC's "Statement of basis and purpose and final rule" (citing 60 F.R. ¶ 43842, 1995 WL 49773)).

themselves, there is no possibility that the Court could conclude as a matter of law that such required statements were made. On this basis alone, AFS's Motion for Summary Judgment as it relates to Count VI must be denied.

2. Summary Judgment Should Be Denied Because AFS Failed to Argue that Its Automatic Renewal Process Was Not Unfair or Deceptive

AFS fails to argue that its enrolling of consumers in an automatic renewal process and then invoicing consumers for books is not unfair or deceptive, nor when or how the consumers consented to receive such merchandise. The sales script for combined subscriptions did not mention any renewal process. [ECF 339-3, ¶ 185.] Consumers who paid for the initial book, regardless of whether they wanted it or because of AFS's deceptive billing and collection tactics, were enrolled in a "standing order" and were sent a letter and a postcard "disclosing" the CEEL book renewal policy. [*Id.* at ¶¶ 186-190.] If consumers did not return the postcard indicating they did not want another book, AFS automatically sent them an updated CEEL book and invoiced them for the renewal books. [*Id.* at ¶¶ 191-92.] Consumers did not agree to this renewal process during the initial call or anytime thereafter. [*Id.* at ¶¶ 185-191.]

Thus, summary judgment should be denied on all claims on this basis alone. For Counts I and IV, AFS's representation that the subscription was "no risk" was misleading in light of the very real risk that consumers would be sent costly renewal books that they did not order; for Counts II and VI, the renewal process was not disclosed, nor agreed to; and for Counts III and VII, consumers were sent and billed for unordered renewal books.[19] [*See generally* ECF 338-1 and ECF 339-1.]

[19] Though not addressed directly, AFS may be claiming that it is entitled to summary judgment on Counts III and VII for the automatic renewal process as well as the initial sales based upon its flawed "unordered merchandise" argument discussed *infra*.

3. AFS's Motion for Summary Judgment Is Premised on Manufactured, Mischaracterized and Unsupported "Facts"

As set forth above, AFS relies on a litany of immaterial, unsupported, or manufactured facts. [*See supra* Section II.] This is most prevalent in its argument that its "sales communication" was not deceptive, for example:

- AFS made cold calls, not, as it contends, calls "involving businesses that may have a need for or interest in AFS's publications"; [*Compare* ECF 342, p. 39 *to* Pl. Opp. Facts ¶ 47.]

- AFS's sales pitch was ***not*** "directed *only* to managers and business executives with authority to make purchasing decisions…"; [*Compare* ECF 342, p. 39 *to* Pl. Opp. Facts ¶ 8.]

- AFS's characterization of its sales script as including "material disclosures" is a statement of law that is at issue in this case; [*Compare* ECF 342, p. 40 *to* ECF 43, Counts II, VI.]

- Again, AFS stating that "the Script ***discloses***" certain information is a statement of law, where Plaintiffs have numerous allegations about the sales scripts' ***failure to disclose or adequately disclose*** material information; [*Id.*]

- In stating that it obtained and confirmed consumers' email addresses, AFS fails to state that it did so by misleading consumers by saying email addresses were being obtained for a preview of web content; [*Compare* ECF 342, p. 40 *to* Pl. Opp. Facts ¶ 9.]

- AFS's statement that "the confirmatory emails disclose all material terms and are ***not*** deceptive" is both immaterial (because AFS cannot cure its deceptive scripts), inaccurate, *and* a statement of law; [*Compare* ECF 342, p. 41 *to* Pl. Opp. Facts ¶¶ 15, 60-61.]

- AFS's inclusion of the word "no risk" in the sales scripts (and subsequent communications) was neither factually nor legally accurate; [*Compare* ECF 342, p. 42 *to* ECF 339-3, ¶¶ 307-314.]

- AFS stating that "confirmatory emails" were "incorporated by reference" does not make it factually or legally true, which it is neither. [*See* Section III.B.4, *infra*.]

4. <u>AFS's "Confirmatory Emails" Were Not "Incorporated by Reference" into the Solicitation and Did Not Cure the Deceptive Scripts</u>

a. *AFS's Confirmatory Emails Are Not "Incorporated by Reference" into the Telemarketing Call*

AFS has fashioned a brand new spin for summary judgment, for the first time arguing that AFS's "confirmatory email" sent to consumers *after* the telemarketing call was "incorporated by reference" into the sales script. [ECF 342, p. 40-41.] This novel argument is raised for the first time more than three years into the litigation and strongly indicates that AFS is aware of the facially deceptive nature of the sales script, otherwise it would not put so much effort into this new theory. AFS's "incorporated by reference" argument is also an obvious attempt to circumvent the established rule of law that "post-hoc disclosures cannot cure earlier misleading representations." *FTC v. Fleetcor Technologies, Inc.*, 620 F. Supp. 3d 1268, 1298–99 (N.D. Ga. 2022) (citations included in footnote below).[20] Both factually and legally, AFS's "incorporation by reference" theory fails.

[20]*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (rejecting defendant's position that "if these consumers had read the disclosures sent to them" they would not have been deceived, and noting that defendant "offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales"); *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1274–75 (M.D. Fla. 2012) (rejecting defendants' position that agreements contained disclaimers sufficient to dispel misrepresentation where "the homeowner receives the retainer agreement [with the disclaimer] far too late," and only after seeing the misleading representation and signing up for a payment plan); *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("The [FTC] Act is violated if [the seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.") (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961)); *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014) (affirming summary judgment for FTC and noting that defendant's later-filed contracts, with more accurate information about services, did not cure representations made in ads that promised up to 70% reductions in mortgage or credit card debt); *see also FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (granting summary judgment to FTC even after the defendants presented evidence of more accurate statements and disclaimers found in consumer contracts), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

AFS's "incorporated by reference" argument directly contradicts undisputed facts and AFS's own pleadings. The emails themselves unequivocally communicated that they were distinct from the telemarketing script. [ECF 342-15, Ex. O ("Thanks for taking the time to speak with me and ***placing your no-risk order***…You've made a smart decision to ***start your no-risk subscription***…") (emphasis added).] Likewise, AFS's Answer describes the confirmatory email as a "written ***verification and confirmation of the order***" and alleges that "***[a]fter an order is taken*** by a sales representative, two confirmatory emails (one with graphics and one without…) are sent to subscribers…" (ECF 91, 1-2(c) & (e) (emphasis added); Pl. Opp. Facts ¶ 9.]). AFS's own employees testified that the emails confirmed orders that had been placed for consumers. [Pl. Opp. Facts ¶ 9.] Finally, it makes no sense that AFS would "incorporate by reference" communications that it knew may go to spam folders, never be opened, looked like "junk email," or were never received by consumers. [Pl. Opp. Facts ¶¶ 9, 14.]

AFS's "incorporated by reference" theory also fails legally – while it may be new in this case, it is not a new tactic in FTC Act jurisprudence. When *AMG* was first appealed to the Ninth Circuit the defendant argued, "the district court erred because its narrow focus on [a single loan note] fails to capture the 'net impression' on consumers…[T]he court should have considered all of [the defendant's] loan disclosures and all of his communications regarding those disclosures." *Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 910 F.3d 417, 424 (9th Cir. 2018), *rev'd and remanded on sub nom. AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021), and *vacated sub nom. Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021). The appellate court rejected this argument, explaining that (1) the argument "wrongly assumes that

non-deceptive practices can somehow cure the deceptive nature" of another practice; and (2) the FTC "must only show that a specific 'representation' is 'likely to mislead.'" *Id.*[21]

AFS makes the same argument rejected in *AMG* – that the court should consider its telemarketing script *and* the subsequent emails "as a whole." [ECF 342, p. 38–39.] However, AFS's telemarketing script and "confirmatory emails" are separate communications. As such, "[e]ach advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads." *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) (citing *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C. Cir. 1977)).[22]

---

[21] To the extent that AFS suggests that the subsequent sending of "confirmation emails" after concluding a telemarketing call somehow proves consumers consented, this argument fails. A basic contract law principle is that mere silence does not constitute acceptance. *See* 2 Williston on Contracts § 6:3 (4th ed.) (explaining that due to the requirement of a "manifestation of apparent intention to accept," "silence, standing alone" cannot operate as acceptance). Consumers' failure to read or respond to the "confirmation emails" does not show consent to a subscription and, to the contrary, demonstrates that consumers believed they could simply disregard mailings from AFS without any "risk." *See De Lage Landen Fin. Servs., Inc. v. Miramax Film Corp.*, No. CIV. A. 06-2319, 2008 WL 4348074, at *10 (E.D. Pa. Sept. 23, 2008) (holding that individual acted reasonably by not immediately reading subsequent copy of an agreement, where "she had no reason to believe that these copies contained terms that were any different"). Consumers were under the impression they merely agreed to receive risk-free samples and that they were at liberty to disregard any future correspondence from AFS, thus they acted reasonably by disregarding the purported "confirmation emails" from AFS. AFS's "incorporation by reference" theory also fails for lack of "mutual assent" as there was no explicit incorporation by reference provision. *Checchia v. Solo Funds*, 2023 U.S. Dist. LEXIS 98889, *32-33 (E.D. Pa. June 7, 2023) (distinguishing case involving explicit incorporation by reference provision that the party signed: "I have reviewed and read the accompanying [Agreement], including the documents incorporated by reference in the [Agreement] and agree to be bound by the terms and conditions contained therein."); *In re Estate of Atkinson*, 2020 PA Super 87, 231 A.3d 891, 899 (Pa. Super. 2020) ("The terms of a contract include terms in documents that a signed contract document specifically and clearly identifies and expressly incorporates by reference.")

[22] Similarly, a consumer cannot be bound by terms contained in an unsolicited email sent *after* the consumer has already been enrolled in a "free trial." For example, in *Schnabel v. Trilegiant Corp.*, the Second Circuit, held that the district court did not err in concluding as a matter of law that the

*b. Alternatively, the Content of the Confirmatory Emails Did Not Alter the Deceptive Scripts*

Alternatively, even if it was proper to consider the confirmatory emails as part of AFS's sales communications for consumers who actually received and read them, these emails would only relieve AFS of liability for the deceptive sales script if they were "sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron*, 884 F.2d at 1497.

Here, the confirmatory emails were insufficient to leave an accurate impression with consumers regarding the nature of AFS's offer. Like AFS's sales scripts, the confirmatory emails were "capable of being interpreted in a misleading way." *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir. 1990); *see also Gregg v. Ameriprise Fin., Inc.*, 245 A.3d

parties had not mutually agreed to a provision included in an unsolicited email sent after the consumers were already unknowingly enrolled in a paid membership. 697 F.3d 110 (2d Cir. 2012). In *Schnabel*, the Plaintiffs were enrolled in Great Fun unintentionally after making a purchase on other merchant sites. *Id.* at 114–15. Similar to this case, at the moment of enrollment, the plaintiffs in *Schnabel* were briefly advised that they would receive an email with additional information and they would not owe anything if they cancelled before the end of the free trial period. *Id.* at 115–16. However, the subsequent email contained additional terms, including an arbitration provision. *Id.* at 116. The court held that the plaintiffs were not bound by the terms of the subsequent email because "regardless of apparent manifestation of [ ] consent," a party "is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* at 123. The court reasoned that the plaintiffs could not be considered to have notice of terms contained in an unsolicited email regarding a service in which they had *already* been enrolled or that "a failure to act affirmatively to cancel the membership will, alone, constitute assent." *Id.* Specifically, "that someone has received an email does not without more establish that [they] should know that the terms disclosed in the email relate to a service in which [they] had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms." *Id.* at 126. "[A] reasonable person would not be expected to connect an email that the recipient may not actually see until long after enrolling in a service (if ever) with the contractual relationship he or she may have with the service provider, especially where the enrollment required as little effort as it did for the plaintiffs here." *Id.* at 127.

637, 648 (Pa. 2021) ("An act or a practice is deceptive or unfair if…[it is] capable of being interpreted in a misleading way.").

For example, the subject lines of two exemplar emails are vague at best: "Our Phone Call – The Information You Requested" and "Our Phone Call: CFO/Controller intelligence you requested." [ECF 339-3, ¶ 140; *see also* Pl. Opp. Facts ¶ 60.] These subject lines do not communicate anything about any subscription – much less a subscription that the consumer is financially obligated to pay for unless they cancel. [ECF 339-3, ¶ 140; *see also* Pl. Opp. Facts ¶ 60.] Then, just like the sales script, the exemplar uses the term "no-risk," referring to a "***no-risk order***" in the first paragraph, a "***no-risk*** subscription" at the beginning of the second paragraph, and then saying later in the second paragraph, "Please see…how this ***no-risk offer works***." (Pl. Opp. Facts ¶ 61; ECF 342-15 (Exhibit O); ECF 339-3, ¶ 140) (emphasis added). The repeated use of the phrase "no-risk," coupled with the word "offer" has the capacity to mislead consumers into believing that the terms included at the end of the email (cost, payment procedures, cancellation procedures, etc.) are terms of an *offer* that the consumer is still permitted to accept or reject after reviewing free samples of the publications. Thus, for consumers who received and read the email, it was "only likely to cause confusion by creating contradictory double meanings," and is inadequate as a matter of law for AFS to prevail on summary judgment or avoid liability. *Removatron*, 884 F.2d at 1497.

In sum, AFS provides no legal support for its new "incorporated by reference" argument, which directly conflicts with the language of the confirmatory emails, the pleadings, and the factual record.[23] Because misrepresentations cannot legally be "cured" by subsequent

---

[23] AFS references the testimony of both of Plaintiffs' 30(b)(6) witnesses as though it is an admission of AFS's "incorporated by reference" argument. [ECF 342, p. 40-41.] However, the

communications, AFS did not actually incorporate its confirmatory emails into its solicitation and the emails themselves are misleading, AFS's Motion for Summary Judgment should be denied.

*c. Consumer Complaints Bolster a Legal Finding of Deception*

AFS makes every effort to minimize both the number and the validity of consumer complaints, again by relying on untrue facts and unsupported statements of law. [ECF 342, p. 43-46.][24] AFS frames this lawsuit as "predicated on" consumer complaints and says that Plaintiffs' allegations of deception are "because certain customers claimed" they did not consent to receive AFS's productions or "believed the subscription was 'free.'" [ECF 342, p. 20.]

AFS both overstates *and* oversimplifies the role of consumer complaints in this matter. Plaintiffs' filings could not be more clear - the case is "premised on" the language and judicial interpretation of conduct that violates the FTC Act, the Unordered Merchandise Statute,

---

Commonwealth's designee only acknowledged her awareness that AFS had a practice of sending confirmatory emails after the sales call, and that the emails were referenced in the script. [Pl. Opp. Facts ¶ 63.] The FTC's designee testified, "I don't think that we are saying that the emails weren't sent," and that "the script says two e-mails" were coming after the call. [Pl. Opp. Facts ¶ 64.] The 30(b)(6) witnesses acknowledging that the sales scripts referenced sending emails *after the telemarketing call* does not support AFS's incorrect legal theory that the emails were "incorporated by reference" into the solicitation.

[24] In connection with its argument regarding consumer complaints, AFS again states that it is "undisputed" that AFS sold publications "to executives and managers only." [ECF 342, p. 44.] Plaintiffs reiterate both the immateriality and the falsity of this statement. [*See* Sections II.A and III.B.3, *supra*; Pl. Opp. Facts ¶ 8.] Furthermore, this Court has already opined:

> Defendants argue that because the alleged victims in this case are businesses, they can easily protect themselves and are on equal footing with Defendants with equal bargaining power. (See Doc. Nos. 48-2 at 19-21; 55 at 6.) This argument is unpersuasive because as alleged in the FAC, telemarketers are calling thousands of businesses and talking to unsuspecting employees about publications that could affect their business without notifying them that a purported sale is being consummated. (See Doc. No. 43 ¶¶ 20-25.) ***When businesses are misled in this manner, it is difficult to perceive how the bargaining power is equal.***

[ECF 85, p. 17 n.23 (emphasis added).]

and the UTPCPL, and the fact that AFS's scripts and other business practices violate these statutes. [*See generally*, ECF 43 (First Amended Complaint), ECF 339-1 (Pl. Joint Statement of Undisputed Material Facts), ECF 338-1 (Commonwealth summary judgment brief arguing that AFS has violated the UTPCPL as a matter of law), 339-1 (FTC summary judgment brief arguing that AFS has violated the FTC Act as a matter of law).] Although not necessary for a finding of deception,[25] evidence of actual deception is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *see also FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) (same); *FTC v. Grant Connect, LLC*, No. 09-1349, 2009 U.S. Dist. LEXIS 94201, at *24 (D. Nev. Sept. 22, 2009) (same). Furthermore, in the context of summary judgment, undisputed evidence of "actual deception" can "bolster" a court's conclusion that a representation or practice is deceptive as a matter of law. *USA Fin.*, 415 F. App'x at 973–74 (finding of deception bolstered by low usage of product by consumers); *Cyberspace.com*, 453 F.3d at 1200–01 (same).

Because they are "highly probative" and can "bolster" a finding of deception as a matter of law, it is proper for the Court to consider consumer complaints. Complaints about AFS went

[25] *American Home Products Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) (reviewing a Commission order and holding that the FTC's finding that the advertisement has the "inherent capacity to deceive" did not need buttressing with direct evidence that consumers were misled); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077–78, 1083 (N.D. Cal. 2009) (granting summary judgment in favor of FTC without "extrinsic evidence" regarding consumer perception of the advertisement) (citing *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n.11 (9th Cir. 1978) ("'Consumer testimony, although sometimes helpful, is not essential' to determining whether advertisements have the capacity to deceive or mislead.")); *Resort Car Rental Sys., Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975) ("The Commission could have arrived at the same conclusions regarding the deceptive nature of petitioners' advertising without its consumer witnesses, whose testimony merely supported the inferences which can logically be drawn by scrutinizing the advertising alone. The 'Dollar-A-Day' slogan carries strong psychological appeal. Its connotations are obvious. The design of the form contracts used by petitioners tended to continue the deception initiated by the slogan.")

far beyond formal complaints filed with the BBB or the Office of Attorney General. Rather, consumers bombarded AFS directly with complaints by phone, email and regular mail. [Pl. Opp. Facts ¶ 65.] Consumers also repeatedly complained about AFS to its debt collectors and in online forums. [*Id.*]

Yet, AFS asks for summary judgment based on its own unsupported contention that Plaintiffs should ignore every consumer complaint except those formally made to the BBB,[26] and then apply elementary math skills to divide the number of those BBB complaints by the exorbitant number of "orders" that AFS telemarketers placed. "Orders" that, it must be noted, countless consumers said they never placed, and sometimes paid for under protest and/or out of their own funds. [ECF 339-3, ¶¶ 172-173 and 308-309.] At least, this is the process AFS has used in its calculations about the ratio of complaints to "orders." [*See* ECF 342, p. 46 (relying on ECF 342-18, Ex. R, Daley Rpt.); Pl. Opp. Facts, ¶ 42.]

AFS's efforts to undermine the validity of consumer complaints is also an insufficient basis upon which to grant summary judgment in its favor.[27] First, AFS argues that consumer complaints are invalid if the person who filed the complaint was different from the person with whom the telemarketer spoke. [ECF 342, pp. 21, 46.] AFS makes much about its selling to "businesses" in arguing that there is no "public interest" at issue. [ECF 342, pp. 52-54.] However,

[26] AFS also fails to acknowledge that it made substantial and direct efforts to prevent consumers from filing complaints with the BBB. [Pl. Opp. Facts ¶ 71; *see generally* ECF 342.]

[27] Discrepancies between an individual's recollection or impression left during the call and the call recording are *not* a basis on which to grant summary judgment for AFS or deny it for Plaintiffs. For example, declarant and witness Kelly Rickard, a Certified Public Accountant, initially did not recall giving her day and month of birth during the telemarketing call, which she said in an email a year after the call (*not* in a sworn statement). Ms. Rickard misremembering this detail does not render her complaint invalid, rather it is indicative of the trickery used by AFS. Ms. Rickard testified, this time under oath, that she still cannot believe she gave AFS her birth date. [Pl. Opp. Facts ¶¶ 72-74.]

in challenging the validity of the consumer complaints, AFS acts as though it sells to individuals and not organizations – organizations that work through a variety of individuals and departments. AFS's own practice was to send first invoices to the individual the telemarketer spoke with and then subsequent invoices generally to "accounts payable." [ECF 339-3 ¶ 161(a).] It makes sense, then, that at times a different employee would be the person making complaints about AFS.[28] In sum, there is no legal or factual reason to invalidate consumer complaints made by an individual from the same organization to which AFS deceptively marketed its publications.

Second, based on calculations performed by its expert Margaret Daley, AFS contends that nearly 40% of complainants "affirmatively reported they were satisfied" after AFS responded to their BBB complaint. [ECF 342, p. 21 & n.32 (citing Exhibit R, Daley Rpt. at 22-27; Exhibit S, Daley Depo. at 106:19-107:1).] However, Daley calculated the percentage of consumers who "affirmatively reported they were satisfied" *based on the BBB assigning a closing code of "Resolved" for the complaint*, not on any affirmative statement by the consumer of "satisfaction" or any retraction or modification of the complaint. [*See* ECF 342-18 ¶ 77.] Moreover, if a consumer did report that they were "satisfied" when AFS cancelled the bogus subscription, stopped invoices, stopped threatening (nonexistent) service charges, and/or called off its debt collectors, being "satisfied" with the resolution of their BBB complaint[29] does not magically

---

[28] An example of one such BBB complaint that AFS would declare invalid states "This organization allegedly had mailings and representatives contacting our nonprofit peddling a newsletter on environmental issues, although we are not in that field. We work with families who have children with behavioral health issues. They say that our office manager, who is not authorized to make such agreements on behalf of our organization, agreed to a $299 per year subscription…Our office manager insists that she did not speak to a representative. This looks like a spam email and fraudulent practices. The collection agent insists that the subscription was purchased because they knew the office manager's month and date of birth." [Pl. Opp. Facts ¶ 68.]

[29] Ms. Daley testified that complainant "satisfaction" may have been based on AFS's cancelling their account. [Pl. Opp. Facts, ¶ 70 (testifying "Because if you get what you're asked – if you ask for something and it's given to you, you're often satisfied.").]

invalidate the initial complaint that the consumer never ordered the product in the first place. Indeed, numerous "Resolved" BBB complaints show that consumers were not "satisfied" with AFS.[30]

Next, in an egregious misrepresentation of purported "facts," AFS contends that "Ms. Daley found" that the "remainder of the customers simply forgot about the interaction with AFS or were flat wrong…." [ECF 342, p. 21.] However, Daley only calculated the percentage of complaints for which AFS was able to match the complaint to a particular individual that AFS identified as the "ordering party."[31] [ECF 342-18, (Ex. R, Daley Rpt. at p. 32 ¶ 94).] She did not make any calculations or conclusions as to the veracity of the complaints. [ECF 342-18, (Ex. R, Daley Rpt.]

AFS's unsupported contention that customers were "flat wrong," which conclusion is improperly attributed to Ms. Daley, is based solely on AFS's recordings or records showing that an AFS telemarketer spoke to the consumer, and that the consumer gave their personal information to them. [ECF 342, p. 21.] However, a consumer complaint that they did not believe they had ordered anything or thought they were just receiving free samples is not invalidated by the fact that the script was read to them and they provided some information (to receive the free samples). A consumer is not "flat wrong" if they were read a deceptive script and then later complained that

[30] One "Resolved" complaint says, "I have reviewed the response made by the business… and find that this resolution is satisfactory to me. However, I fail to understand why this company is able to use the same tactics, over and over again, seemingly without escalation or punitive action…I'm sure many companies just pay the invoices, not realizing that it is a scam. When will something be done to stop them, versus just acting on individual claims?") [Pl. Opp. Facts ¶ 69.]

[31] In addition, Daley's calculation did not include 120 of the 671 complaints, as her calculation is based only on the 551 complaints for which she reviewed AFS's response, not the 671 complaints filed with the BBB from January of 2015 to March 31, 2020. [ECF 342-18, Ex. R at p. 31 ¶ 92 and 32, ¶ 94.]

they did not place an order. AFS's disagreement as to whether its script is deceptive does not invalidate consumer complaints.

In conclusion, the consumer complaints from many sources demonstrate a pattern of deception that bolsters a determination of the facial deceptiveness of the scripts. The law is clear however, that the Court can grant summary judgment on Plaintiffs' cross motions based on the plain language of the scripts, without any consideration of consumer complaints.

### C. AFS Did Not Obtain Consent from Consumers to Send Costly Publications, Automatically Renew Book Subscriptions, or Enroll in a Negative Option Plan

#### *1. AFS Did Not Obtain "Affirmative Consent" for a "Sales Offer" from Consumers*

AFS seeks summary judgment on Counts IV (FTC – violation of the Unordered Merchandise Statute (UMS)) and VIII (Commonwealth – violation of the UTPCPL by violating the UMS) based on its contention that consumers "affirmatively consented" to AFS's "sales offer." [ECF 342, p. 46–49]. The observation of one of AFS employees is insightful in this regard: "[i]f we wanted a d*mn implied agreement we wouldn't trick the customer to say OK by ending the script with OK." [ECF 339-3, ¶ 337(h).] AFS's "affirmative consent" argument turns on its efforts to do just that – trick consumers into replying to "OK?" with a responsive "OK" (or, as set forth below, even a "maybe" or "we'll see"). AFS argues that the sales script "demonstrates on its face that any potential subscriber was required to ***affirmatively*** accept the sales offer before AFS would complete the order," but consumers could not accept a "sales offer" that AFS failed to communicate was being made. [ECF 342, p. 46 (emphasis in original).][32]

---

[32] The easiest way for AFS to have made clear that it was making a sales offer would have been to "first clearly, affirmatively and expressly state that the purpose of the call was to sell goods or services," as required by Section (xvii) of the UTPCPL, but, again, AFS did not do this. [*See supra* Section III.B.1.]

In a state Supreme Court case involving a telemarketing script very similar to AFS's, the court held that "the telemarketer's sales pitch, which briskly transitioned from a deceptive 'thank you,' to the hastily recited terms, and then to an abrupt 'OK?' did not reveal to consumers that they were being confronted with a purchase decision." *See State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 36 (Iowa 2013). In the same way, AFS telemarketers moved quickly through sales scripts with "quick question[s]," brisk transitions (including the instruction "Don't Pause" at certain points), and often abrupt "OK?"s. [ECF 339-3, ¶¶ 80, 93(b), 96.] The script in *Vertrue* used the phrase "risk free," which is indistinguishable from AFS's use of "no risk." *Id.* at 35–36. Thus, like the *Vertrue* scripts, the AFS sales scripts did not reveal to consumers that they were being asked to make a purchase, or, in AFS's words, that AFS was making a "sales offer." Therefore, the consumers that AFS targeted could not and did not ***affirmatively consent*** to such an offer.

AFS's scripts only required telemarketers to say "OK?" and wait for a response at two points. First, the script says "Keep the newsletters either way. OK? (MUST WAIT FOR RESPONSE)."[33] [ECF 342, at 47.] Thus, a consumer who responds affirmatively is only agreeing to keep two newsletters, which can hardly be interpreted as affirmative consent to a "sales offer." Second, the script asks, "[I]f you DO find that it's a good resource, CAN you work that into your budget? [wait for response]."[34] [ECF 339-1, at 18.] Again, this is not a sales offer to which AFS is seeking affirmative consent, it's a hypothetical question about a future possibility. A consumer who responds affirmatively to this question is stating nothing more than the possibility that they *could* fit a valuable resource into their budget, <u>not</u> agreeing to a "sales offer."

---

[33] OK?" does not appear in all of AFS's telemarketing scripts. *See* ECF 339-1, at 18.

[34] Again, this question does not appear in all scripts. *See* ECF 339-1, at 18 n.15.

Pursuant to contract principles, "'[a]n agreement to agree is incapable of enforcement.'" *Azer Sci. Inc. v. Quidel Corp.*, No. 5:21-CV-02972-JMG, 2022 WL 17419347, at *8 (E.D. Pa. Dec. 5, 2022), *reconsideration denied*, No. 5:21-CV-02972-JMG, 2023 WL 289696 (E.D. Pa. Jan. 18, 2023). Here, an affirmative response to the "budget question" is *not even* an "agreement to agree," it is a statement of possibility. It falls short of even "an aspirational goal to reach some future agreement," and it is certainly not consent to enter into a subscription during the telemarketing call. *See id.* Moreover, AFS only required a "non-negative response" to the budget question (including "maybe" and "well, we'll see,") which falls woefully short of the "affirmative consent" that AFS now claims to have obtained. [ECF 339-3, ¶¶ 93, 99, 100, 137.]

Also factually relevant is *F.T.C. v. Think All Publ'g, L.L.C.*, No. 4:07-CV-11, 2007 WL 173854, at *2 (E.D. Tex. Jan. 19, 2007), where the magistrate judge recommended entry of a preliminary injunction due, in part, to violations of the UMS. There consumers consented only to receiving a free CD, but the defendant sent additional items for which it charged consumers unless they cancelled their "trial period" within 10 days. *See id.* at *1. Here, at most, consumers consented to receive and keep free samples of AFS's publications. ("Keep the newsletters either way. OK? (MUST WAIT FOR RESPONSE).") Like the consumers in *Think*, consumers here did *not* affirmatively consent to receive newsletters and books for which they would receive invoices and be financially obligated to pay absent affirmative steps to cancel. This is especially true for the costly books that AFS slipped into the script under the guise of "reference guides" and then automatically renewed. [339-3, ¶¶ 112-120, 187-193.]

Basic contract law principles are consistent with finding consumers did not "affirmatively consent" to AFS's paid subscriptions. Under Pennsylvania law, a contract "must represent a meeting of the parties' minds on the essential terms of their agreement." *Yellow Run Coal Co. v.*

*Alma-Elly-Yv Mines, Ltd.*, 285 Pa. Super. 84, 88, 426 A.2d 1152, 1154 (Pa. Super. 1981). "[T]he very essence of an agreement is that the parties mutually assent to the **same thing."** *Hahnemann Med. Coll. & Hosp. of Philadelphia v. Hubbard*, 267 Pa. Super. 436, 440, 406 A.2d 1120, 1122 (Pa. Super. 1979) (emphasis added). Although AFS now claims that consumers consented to a "sales offer" before it sent newsletters or books, AFS's scripts show that is not the case. [ECF 342, pp. 46–47.]

Here, the sales scripts begin with statements that gave the impression that AFS is only sending a free, "no risk" sample and that if the consumer "find[s] it valuable" the consumer could choose to enter into a subscription in the future. [ECF 339-3, ¶¶ 76-77, 88–89, 93 (telling consumers in sales scripts that AFS is "sending out a couple copies for you to look at, then we'll call you back to see how you like it" and that "our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first").] On their face, the scripts communicate that consumers are being offered a "no risk" sample of newsletters (and, in some instances, a "reference guide"). So, consumers did not "affirmatively consent" to a "sales offer" for a paid subscription – and no agreement was entered.

This is especially true when AFS interpreted responses of "ok" and even "maybe" or "we'll see," as affirmative consent. Again, these were responses to questions about keeping the newsletters and whether valuable resources could someday fit into the consumer's budget, not direct questions about whether the consumer wanted to buy a subscription. "[A]cceptance of an offer, to be effective, must be unequivocal." *Warner Bros. Theatres v. Proffitt*, 329 Pa. 316, 319 (Pa. 1938). "It is not enough that the words of a reply justify a probable inference of assent." *United Mercantile Agencies v. Slotsky*, 121 Pa. Super. 1, 4 (Pa. Super. 1936).

*2. AFS's "Negative Option" Argument Ignores the Commonwealth's Section 201-2(4)(xvii) Claims, Relies on its Failed "Affirmative Consent" Theory, and Relies on Inapplicable TSR Law*

AFS appears to seek summary judgment on Counts II and VI based on categorizing them as "negative option claims." [ECF 342, p. 49-51.] However, Count VI is a Commonwealth claim for "Failure to Disclose Material Terms." [ECF 43, Count VI.] Among the Commonwealth's allegations in Count VI is AFS's failure to make the clear, affirmative and express statements required by Section 201-2(4)(xvii) of the UTPCPL. [ECF 43, Count VI, ¶¶ 79-83.] Because AFS fails to even assert that it has made such statements, its motion for summary judgment on Count VI must be denied. [*See* Section III.B.1, *supra*.]

AFS's motion for summary judgment on Counts II and VI also fail for the reasons set forth above regarding its "affirmative consent" theory and its legally and factually meritless contention that it disclosed all "material terms" during the telemarketing call. (*See* Section III.C.1, *supra*). [ECF 43, Counts II and VI (alleging that AFS failed to disclose "***or disclose adequately***," material terms) (emphasis added).] To be clear, AFS failed to disclose or disclose adequately that a consumer's agreement to receive two free issues of a newsletter would result in (1) enrollment in a paid subscription; (2) the consumer's obligation to take affirmative steps to cancel the subscription within a specified time period to avoid charges and collection activities; (3) the consumer's obligation to return books to avoid charges for the subscriptions; and (4) that AFS would enroll consumers in undisclosed continuity plans and invoice them for unsolicited books. [Pl. Opp. Facts ¶ 9; ECF 339-3. at ¶¶ 92-124; 130-34, 184-97, and Section C (Consumer Complaints).]

AFS's lengthy discussion of the definition of a "negative-option feature," as defined in 16 C.F.R. § 310.2(w) of the Telemarketing Sales Rule, 16 C.F.R. § 310 ("TSR"), is entirely

superfluous since *there is no TSR claim in this case.*[35] Certainly there is no legal support for AFS's implication that any case involving a negative option must be brought only under the TSR. [ECF 342, p. 50.] *See, e.g., FTC v. Johnson*, 2017 U.S., Dist. LEXIS 132820, *62-63, 81 (D. Nev. 2017) (holding that the terms of the negative option were inadequately disclosed in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a)); *F.T.C. v. Com. Planet, Inc.*, 878 F. Supp. 2d 1048, 1093 (C.D. Cal. 2012), *aff'd in part*, 642 F. App'x 680 (9th Cir. 2016), and *aff'd in part, vacated in part on other grounds, remanded,* 815 F.3d 593 (9th Cir. 2016) (finding that the defendant's failure to adequately disclose the negative option constituted an unfair and deceptive practice that violated § 5(a) of the FTC Act)

**D. AFS's "Public Interest" Argument Is a Request for Reconsideration of this Court's Prior Ruling That Should Be Summarily Denied**

Following a lengthy discussion, AFS finally admits in a footnote that its statutory "public interest" argument is nothing more than a repackaged request for reconsideration of an issue that has already been fully briefed and decided by the Court. (ECF 342, p. 53 n.55). Specifically, AFS holds tight to its position that the Attorney General should be restricted from bringing claims under the UTPCPL where the unfair trade practices are aimed at any entity other than individual consumers, and now even seek to extend it to the FTC. [*Id.* at 52-54.]

More than two years ago, in denying AFS's motion to dismiss, the Court held that "the General Assembly intended to empower the Attorney General to bring a public action to protect both individuals and businesses." [ECF 85, p. 17-23]. The Court also held that the Federal Trade Commission Act "clearly prohibits 'unfair or deceptive acts or practices' in commercial activities

[35] The Court summarily rejected a similar tactic used by the settling debt collector Defendants early in the litigation. [ECF 85, p. 26 ("This argument is unavailing, as ICR Defendants are sued in Count III under the FTCA, not the FDCPA.").]

involving small businesses and other organizations like those in the transactions at issue." (*Id.* at 26.) Nothing set forth by AFS in its unsupported "public interest" argument warrants the Court to veer from its well-reasoned prior decisions.

**E. Laches Does Not Bar the Commonwealth's Claims**

Finally, AFS seeks summary judgment against the Commonwealth based on the affirmative defense of laches. (ECF 342, p. 54-58.) "Laches arises when a defendant's position or rights are so prejudiced by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be an injustice to permit presently the assertion of a claim against him." *Commonwealth v. Folcroft Landfill Corp.*, 1 Pa. Commw. 356, 359-60 (1971) (quoting *In re Grote's Est.*, 390 Pa. 261, 269–70, 135 A.2d 383, 387 (1957)). "[T]he defense of laches is an affirmative defense and the burden of proving laches is, therefore, on the defendant/respondent." *Weinberg v. Com., State Bd. of Examiners of Pub. Accts.*, 501 A.2d 239, 242 (Pa. 1985). The defense of laches is not legally available to AFS against the Commonwealth, and even if it was, AFS fails to establish its right to prevail on the defense because it asserts neither a change of position nor prejudice.

1. Laches May Not Be Raised as a Defense in this Exercise of the Commonwealth's Police Power

In *St. Clair Area School Dist. Bd. of Educ. v. E.l. Assocs.*, the Commonwealth Court acknowledged that laches may be available against the Commonwealth in certain "rare cases," but then said, "***laches may not be raised as a defense in situations where the Commonwealth is attempting to enforce duties and obligations under its police power***." 733 A.2d 677, 682 (Pa.

Commw. Ct. 1999)[36] (citing *Clearview Land Development Co. v. Commonwealth*, 15 Pa. Commw. 303, 327 A.2d 202, 205 (1974) (emphasis added); *see also Clearview*, 327 A.2d at 309 (holding that laches was not available to a landfill where Commonwealth is seeking to enforce waste management laws "under its police power") (citing *Kelly v. Washington*, 302 U.S. 1, 14 (1937) (stating "much is made of the fact that the state law remained unenforced for a long period. But it did not become inoperative for that reason. Where the state police power exists, it is not lost by nonexercise but remains to be exerted as local exigencies may demand."), and *Commonwealth ex rel. v. Philadelphia & Reading Coal & Iron Co.*, 50 Pa. D. & C. 411, 419 (Phila. Com. Pl. 1944) (stating "as to the Commonwealth, laches cannot be raised where the public interest is involved.")).

Here, the Commonwealth's action to enforce the consumer protection laws set forth in the UTPCPL are an exercise of its police power. *See Commonwealth v. Zasloff*, 8 A.2d 801, 803 (Pa. Super. Ct. 1939) ("[E]nactment of proper legislation to insure fair trade practices is undoubtedly within the police power of the State."); *Com. ex rel. Corbett v. Hasan*, No. 150 C.D. 2012, 2013 WL 3970234, at *6 (Pa. Commw. Ct. 2013) ("[E]nforcement of consumer protection statutes is an exercise of government police…power."). Accordingly, laches is not available to AFS, and the Court should deny AFS's motion for summary judgment, holding as a matter of law that laches does not bar the Commonwealth's claims.

[36] In *St. Clair*, the defendant filed a motion to dismiss and for entry of a judgment of non pros because the plaintiff had initiated the action by praecipe for writ of summons and then did not file a complaint until approximately eight years later. *St. Clair*, 733 A.3d at 679. "A grant of a judgment of non pros…is based on the equitable principle of laches and not upon a statute of limitations." *Id.* at 681 (citing *Jacobs v. Hollaran*, 710 A.3d 1098, 1103 (Pa. 1998)). Thus, the entirety of the court's opinion is premised on the doctrine of laches. *Id.*

2. Alternatively, AFS Did Not Change Its Position and Does Not Identify Prejudice

Putting aside AFS's factual misrepresentations[37] since they are immaterial to the outcome of the cross-motions for summary judgment, AFS's laches defense would fail even if this was one of the "rare cases" where the affirmative defense of laches was available against the Commonwealth. *See St. Clair*, 733 A.2d at 682. "[A]sserting laches against the Commonwealth requires 'a stronger case of delay or acquiescence" as well as "a higher degree of prejudice than is normally required." *St. Clair*, 733 A.2d at 681-82.

AFS's vague assertions of prejudice appear to be (1) that AFS continued to violate the UTPCPL for several more years because the Commonwealth did not initiate an enforcement action sooner; and (2) "the loss of key employees with institutional knowledge relevant to AFS's defenses in this litigation." (ECF 342, p. 56-58). Neither of these provide a legally sufficient basis to enter judgment for AFS on the affirmative defense of laches.

"Laches is founded on some change in the condition or relations of the parties which occurs during the period the complainant unreasonably failed to act." *Weinberg v. Com., State Bd. of Examiners of Pub. Accts.*, 501 A.2d 239, 245 (Pa. 1985); *see also Kay v. Kay*, 460 Pa. 680, 685, 334 A.2d 585, 587 (Pa. 1975) (holding that laches did not preclude equitable relief where a party "has not changed his position in anticipation that [the other party's] claims have been waived."). In *Weinberg*, a laches defense failed, in part, because the alleged prejudice was a business decision made long before the action was commenced – the defendant did not make any changes during the period that he asserted that the Commonwealth failed to act. *Id.* at 153-54. Here, AFS repeatedly

[37] Such factual misrepresentations include that the investigation was closed in 2017 [Pl. Opp. Facts ¶ 27] that "AFS cooperated fully with the Attorney General's Office" [Pl. Opp. Facts ¶¶ 24-25 (evidence that AFS provided a fake script to the Attorney General in 2014 during the investigation)] and that the Commonwealth was permitted to "monitor and listen in on sales calls" during the investigation [Pl. Opp. Facts ¶ 26].

admits that *it changed nothing* related to its telemarketing practices over a period of three decades, tying its prejudice to its own continued use of the sales script "unabated or unchanged" after 2017, when AFS thought the Commonwealth closed its investigation.[38] [ECF 342, p. 22, 56.][39] Because AFS did *not* change its condition in any way during the Commonwealth's alleged "delay" in forcing AFS to stop using unlawful practices, AFS cannot establish its affirmative defense of laches.

With regard to the loss of witnesses or evidence, the Pennsylvania Supreme Court has rejected the application of laches when "[p]otential witnesses have not died or become otherwise unavailable [and] substantiating records have not been lost or destroyed." *Kay*, 334 A.2d at 587. While AFS alleges prejudice due to the "loss of key employees,"[40] the broad and unspecific testimony about "institutional knowledge" is a far cry from an assertion that such individuals have

---

[38] In a written discovery response served more than 6 months ago, the Commonwealth told AFS that the designation of its investigation was administratively changed to "closed" on July 13, 2018. [Pl. Opp. Facts ¶ 27.] Thus, it is unclear whether AFS's continued insistence that the investigation was closed in 2017 is intentional or an oversight. Nonetheless, it is immaterial to the issue of laches for the reasons set forth above.

[39] The implication is that AFS was not obligated to stop engaging in "unfair or deceptive acts or practices" under the UTPCPL *unless* the Commonwealth took legal action to force AFS to do so. This is the only logical interpretation since AFS did not change its practices in 2012 when the Commonwealth started its investigation, in 2014 when the Commonwealth outlined its concerns in writing, in 2017 when the Commonwealth met with Satell and AFS's lawyers in person and identified concerns with AFS's business practices, in 2020 after Satell had an unsatisfactory meeting with individual commissioners from the FTC, or even for more than a year after this lawsuit was filed. In fact, Satell admitted in his deposition that he believed there was a change the Commonwealth wanted him to make in 2017, *and he refused to do so*. [Pl. Opp. Facts ¶ 27.]

[40] One such individual identified by Drummond is Mike Gorton, AFS's Director of Administration, who told a co-worker in 2017 "im never signing a deposition again – not spending retirement in jail…for PA AG and Washington st AG – Tom and I had to sign written depositions to protect ed." [Pl. Opp. Facts ¶ 75.] While Plaintiffs, to date, have been unable to ascertain the "deposition" being referred to, it is clear that the value of such a witness to *AFS*'s case would be marginal at best.

"died or become otherwise unavailable." AFS's could not provide any specific details about what information they might have, did not reach out to any of these individuals for helpful information, or to prepare for the 30(b)(6) deposition, and, most significantly, ***AFS admits that it has or could get contact information for these individuals***. [Pl. Opp. Facts ¶ 79.]

The only two cases cited in AFS's laches argument, without any reference to the facts of those cases, are inapposite. [*See* ECF 342, p. 54–55 (citing *Commonwealth v. Folcroft Landfill Corp.*, 1 Pa. Commw. 356, 359 (1971) and *Stahl v. First Pa. Banking & Trust Co.*, 191 A.2d 386 (Pa. 1963)).] In *Folcroft*, the court held that aiding the defendant in getting permits and "regularly" inspecting its operations over eight years was insufficient to dismiss the claim as a matter of law based on laches. *Folcroft* at 359. In the case at bar, of course, the Commonwealth did not assist AFS in obtaining permits or conduct regular inspections of AFS's operations. Further, under *Folcroft*, even if the Commonwealth did these things, it would be insufficient to prove the affirmative defense of laches. *Id.* at 360. The current case also does not present the risk of harm or prejudice to innocent third-party stockholders as did the Attorney General's claim in *Stahl* that was brought thirty years after the allegedly offending conduct. *Stahl*, 191 A.2d at 391–92.

3. Satell's Hearsay Testimony Is Inadmissible and May Not Be Considered for Summary Judgment

AFS makes a valiant, but ultimately futile, effort to conceal the obvious – its laches argument relies almost entirely on hearsay. While AFS vaguely refers to matters that "the Attorney General's Office discussed with AFS," it is undisputed that the *only* evidence AFS offers regarding the Commonwealth's closing of its investigation is the following: Ed Satell testified that in 2017, AFS's attorney William Sasso told Satell that an attorney from the Commonwealth told Sasso that the Commonwealth was closing its investigation.

This "evidence" is textbook hearsay that is inadmissible and fails to provide a basis for summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."). Moreover, even if true, such a statement would certainly not result in the Commonwealth's claim being barred by laches. Finally, the alleged statement is inconsistent with the undisputed communications from the Attorney General's Office to AFS during the investigation identifying concerns about AFS's business practices, Satell's own belief that nothing was resolved during an in-person meeting in late May 2017, and the Commonwealth designee's testimony that it is not the Commonwealth's policy to tell businesses when it is closing an investigation. [Pl. Opp. Facts ¶¶ 27-28.]

## IV. CONCLUSION

For the reasons set forth above and in Plaintiffs' cross-motions for summary judgment, Plaintiffs request that this Court deny AFS's Motion for Summary Judgment and grant Plaintiffs' motions for summary judgment.

Respectfully submitted,

Dated: 7/17/2023

/s/ *Maris K.V. Snell*

AMY C. HOCEVAR (Ohio Bar #0075510)
DEREK E. DIAZ (Ohio Bar #0069755)
CHRISTIAN M. CAPECE (New York Bar #4045936)
MARIS K.V. SNELL (Florida Bar #125585)
CONOR P. DUFFY (New York Bar #5203757)
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, Ohio 44114
Hocevar: (216) 263-3409 | ahocevar@ftc.gov
Diaz: (216) 263-3421 | ddiaz@ftc.gov
Capece: (216) 263-3419 | ccapece@ftc.gov
Snell: (216) 263-3412 | msnell@ftc.gov
Duffy: (216) 263-3401 | cduffy@ftc.gov

Fax: (216) 263-3426

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

*/s/ Heather Z. Kelly*

SARAH A.E. FRASCH (PA I.D. #203529)
JOHN M. ABEL (PA I.D. #47313)
HEATHER Z. KELLY (PA I.D. #86291)
JONATHAN R. BURNS (PA I.D. #315206)
15th Floor, Strawberry Square
Harrisburg, Pennsylvania 17120
Frasch Phone: 717.497.5123
Abel Phone: 717.497.5931
Kelly Phone: 717.678.4613
Burns Phone: 717.645.7269
Fax: 717.705.3795
sfrasch@attorneygeneral.gov
jabel@attorneygeneral.gov
hkelly@attorneygeneral.gov
jburns@attorneygeneral.gov

Attorneys for Plaintiff
COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2023, copies of the foregoing **MEMORANDUM OF PLAINTIFFS FEDERAL TRADE COMMISSION AND COMMONWEALTH OF PENNSYLVANIA IN OPPOSITION TO AFS'S MOTION FOR SUMMARY JUDGMENT** were filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

/s/ *Maris K.V. Snell*
Attorney for Plaintiffs