**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.*, | : | Civil Action No. 2:20-cv-02266 |
| *Plaintiffs*, | : | |
| v. | : | |
| AMERICAN FUTURE SYSTEMS, INC., *et al.* | : | |
| *Defendants*. | : | |

**DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

COUNTER-STATEMENT OF FACTS .......... 3

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 8

I. NO GROUNDS EXIST FOR INJUNCTIVE RELIEF .......... 8

A. Injunctive Relief is Available for Present or Imminent Conduct Only. .......... 8

B. There Is No Cognizable Danger that AFS's Alleged Telemarketing Conduct Is Likely to Reoccur. .......... 13

C. As a Matter of Law, Neither the FTC Nor the Commonwealth Has a Claim for Restitution. .......... 19

D. As the Special Master Found, the Commonwealth Has Not Pled a Claim for Civil Penalties. .......... 20

II. PLAINTIFFS HAVE NOT PROFFERED ADMISSIBLE EVIDENCE OF DECEPTION UNDER THE FTC ACT OR THE UTPCPL .......... 21

A. Plaintiffs Rely on Inadmissible Hearsay Evidence Consisting of Unverified Complaints and Declarations Representing Less Than One Percent of AFS's Sales. .......... 22

1. Insufficient Guarantee of Trustworthiness. .......... 23

2. Non-Hearsay Evidence is More Probative on the Material Issues. .......... 29

3. Plaintiffs Are Effectively Proffering a Survey without Even Attempting to Meet Any of the Established Standards for Such Hearsay Evidence. .......... 32

B. AFS's Communications as a Whole Were Not Likely to Deceive Prospective Subscribers of Its Newsletters and Books. .......... 35

1. Plaintiffs invoke a vague and arbitrary standard that violates AFS's right to due process under the Fifth and Fourteenth Amendments. .......... 35

2. Scripts used by AFS were not likely to deceive or create confusion among its business customers. .......... 40

3. AFS's billing practices were also not likely to deceive or create confusion. .......... 51

C. Plaintiffs Have Not Demonstrated Any Unlawful Failure to Disclose on the Part of AFS. .......... 54

1. The material terms of the subscriptions were fully disclosed in the calls and e-mails. .......... 54




30905761v.1

2. The seller of the newsletters and books and the purpose of the telemarketing calls were clearly and timely disclosed in the calls and e-mails. ........ 58

D. AFS Did Not Violate the Unordered Merchandise Statute........ 59

III. PLAINTIFFS HAVE NOT ESTABLISHED A BASIS OF JOINT LIABILITY FOR EDWARD SATELL. ........ 61

IV. PLAINTIFFS HAVE NOT PRESENTED CAUSE TO STRIKE AFS'S AFFIRMATIVE DEFENSES........ 65

CONCLUSION........ 70

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

*AAMCO Transmissions, Inc. v. Baker*,
591 F. Supp. 2d 788 (E.D. Pa. 2008) ....................23

*Abella v. Student Aid Ctr., Inc.*,
CIVIL ACTION NO. 15-3067, 2015 WL 6599747 (E.D. Pa. Oct. 30, 2015)....................70

*Allah v. Ricci*,
532 Fed. App'x 48 (3d Cir. 2013)....................7

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*,
No. 13-cv-324, 2017 WL 3528606 (D. Del. Aug. 16, 2017)....................35

*AMG Cap. Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021)....................9, 19, 69

*Appelmans v. City of Phila.*,
826 F.2d 214 (3d Cir. 1987)....................7

*Azur v. Chase Bank, USA, Nat'l Ass'n*,
601 F.3d 212 (3d Cir. 2010)....................7

*B&R Res., LLC v. Dep't of Env't Prot.*,
180 A.3d 812 (Pa. Commw. Ct. 2018) ....................63

*Beneficial Corp. v. FTC*,
542 F.2d 611 (3d Cir. 1976)....................41, 42, 43

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014)....................51, 52

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)....................38

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001)....................23

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998)....................33

*Campbell v. Travelers Home & Marine Ins. Co.*,
558 F. Supp. 3d 230 (E.D. Pa. 2021) (Slomsky, J.)....................66

*Cayuga Indian Nation v. Pataki*,
413 F.3d 266 (2d Cir. 2005)....................67




30905761v.1

*Clearview Land Dev. Co. v. Commonwealth*,
327 A.2d 202 (Pa. Commw. Ct. 1974) ....................67

*In re Cliffdale Assocs., Inc.*,
Docket 9156, 1984 WL 565319 (Fed. Trade Comm'n Mar. 23, 1984).......... *passim*

*Commonwealth ex rel. Biester v. Luther Ford Sales, Inc.*,
430 A.2d 1053 (Pa. Commw. Ct. 1981) ....................10

*Commonwealth ex rel. Corbett v. Hasan*,
Nos. 150 C.D.2012, 151 C.D.2012, 2013 WL 3970234
(Pa. Commw. Ct. May 2, 2013)....................68

*Commonwealth ex rel. Creamer v. Monumental Props., Inc.*,
329 A.2d 812 (Pa. 1974)....................11, 13

*Commonwealth ex rel. Preate v. Pa. Chiefs of Police Ass'n, Inc.*,
572 A.2d 256 (Pa. Commw. Ct. 1990) ....................10

*Commonwealth ex rel. Zimmerman v. Nat'l Apartment Leasing Co.*,
519 A.2d 1050 (Pa. Commw. Ct. 1986) ....................10

*Commonwealth ex rel. Zimmerman v. Soc'y of 28th Div.*,
538 A.2d 76 (Pa. Commw. Ct. 1987) ....................10

*Commonwealth v. Armolt*,
294 A.3d 364 (Pa. 2023)....................11

*Commonwealth v. Green*,
291 A.3d 317 (Pa. 2023)....................11

*Commonwealth v. Hush-Tone Indus., Inc.*,
4 Pa. Commw. 1 (1971)....................47

*Commonwealth v. Manson*,
903 A.2d 69 (Pa. Commw. Ct. 2006) ....................64

*Commonwealth v. Percudani*,
844 A.2d 35 (Pa. Commw. Ct. 2004) ....................9, 10, 11–12

*Commonwealth v. Zasloff*,
8 A.2d 801 (Pa. Super. Ct. 1939)....................67

*DeLa Cruz v. Piccari Press*,
521 F. Supp. 2d 424 (E.D. Pa. 2007)....................70

*In re Dos Santos*,
589 B.R. 413 (Bankr. D. Colo. 2018)....................67

*Eck v. Oley Valley Sch. Dist.*,
431 F. Supp. 3d 607 (E.D. Pa. 2019) ....................52

*Ellis v. Beemiller, Inc.*,
287 F.R.D. 326 (W.D. Pa. 2012) ....................66

*In re Encyc. Britannica*,
Docket 8908, 1976 WL 179997 (Fed. Trade Comm'n Mar. 9, 1976) ....................44

*Exposition Press, Inc. v. FTC*,
295 F.2d 869 (2d Cir. 1961) ....................44

*Favata v. Seidel*,
511 F. App'x 155 (3d Cir. 2013) ....................7, 66

*Fin. Software Sys. v. Questrade, Inc.*,
CIVIL ACTION No. 18-742, 2019 WL 2027282 (E.D. Pa. May 8, 2019) ....................52

*Frishman v. Dep't of State*,
592 A.2d 1389 (Pa. Commw. Ct. 1991) ....................10

*FTC v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020) .................... *passim*

*FTC v. Adept Mgmt.*,
Civ. No. 16-cv-00720, 2018 WL 4623152 (D. Or. Sept. 25, 2018) ....................40, 45

*FTC v. Am. Standard Credit Sys.*,
874 F. Supp. 1080 (C.D. Cal. 1994) ....................64

*FTC v. AMG Cap. Mgmt., LLC*,
910 F.3d 417 (9th Cir. 2018) ....................47

*FTC v. AMG Servs., Inc.*,
No. 12-cv-00536, 2014 WL 317781 (D. Nev. Jan. 28, 2014) ....................32

*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564 (7th Cir. 1989) ....................63

*FTC v. Bay Area Bus. Council, Inc.*,
423 F.3d 627 (7th Cir. 2005) ....................63

*FTC v. City W. Advantage, Inc.*,
No. 08-CV-00609, 2008 WL 2844696 (D. Nev. July 22, 2008) ....................45

*FTC v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) ....................56

*FTC v. Cyberspace.com, LLC*,
453 F.3d 1196 (9th Cir. 2006) ....................................................................................45, 64

*FTC v. Cyberspace.com, LLC*,
No. C00-1806, 2002 WL 32060289 (W.D. Wash. July 10, 2002) ..........................................64

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ..........................................................................................44

*FTC v. Figgie Int'l, Inc.*,
994 F.2d 595 (9th Cir. 1993) ..........................................................................................32

*FTC v. Fleetcor Technologies*,
620 F. Supp. 3d 1268 (N.D. Ga. 2022)...........................................................................57

*FTC v. Johnson*,
96 F. Supp. 3d 1110 (D. Nev. 2015)...............................................................................46

*FTC v. Lalonde*,
545 F. App'x 825 (11th Cir. 2013) ............................................................................15, 16

*FTC v. Mag. Sols., LLC*,
Civil Action No. 7-692, 2009 WL 690613 (W.D. Pa. Mar. 16, 2009) ...................................32

*FTC v. Mag. Sols.*,
Civil Action No. 7-692, 2008 WL 11383877 (W.D. Pa. Dec. 1, 2008) ..........................58–59

*FTC v. Millennium Telecard, Inc.*,
Civil Action No. 11-2479, 2011 WL 2745963 (D.N.J. July 11, 2011)...................................64

*FTC v. NHS Sys., Inc.*,
936 F. Supp. 2d 520 (E.D. Pa. 2013)........................................................................62, 64

*FTC v. Patriot Alcohol Testers*,
798 F. Supp. 851 (D. Mass. 1992)..................................................................................47

*FTC v. Publishers Bus. Servs., Inc.*,
821 F. Supp. 2d 1205 (D. Nev. 2010)..............................................................................46

*FTC v. Ross*,
897 F. Supp. 2d 369 (D. Md. 2012).............................................................................15, 63

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019)...............................................................................................9

*FTC v. Staples, Inc. et al.*,
15-cv-02115, ECF No. 444 (D.D.C. Apr. 20, 2016).....................................................31–32

*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) ....................................................................................47

*FTC v. USA Fin., Ltd. Liab. Co.*,
415 F. App'x 970 (11th Cir. 2011) ............................................................................47

*FTC v. Wilh. Wilhelmsen Holding ASA, et al.*,
18-cv-00414, ECF No. 87 (D.D.C. July 13, 2018) ......................................................31

*FTC v. World Media Brokers*,
415 F.3d 758 (7th Cir. 2005) ......................................................................................63

*Gilson v. Pa. State Police*,
676 F. App'x 130 (3d Cir. 2017) ................................................................................39

*Gregg v. Ameriprise Fin., Inc.*,
245 A.3d 637 (Pa. 2021) ..............................................................................................47

*J&J Snack Foods Corp. v. Earthgrains Co.*,
220 F. Supp. 2d 358 (D.N.J. 2002) ............................................................................34

*Laurie v. Nat'l Passenger R.R. Corp.*,
105 F. App'x 387 (3d Cir. 2004) ................................................................................52

*Leese v. Lockheed Martin Corp.*,
6 F. Supp. 3d 546 (D.N.J. 2014) ................................................................................34

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)......................................................................................................13

*Merisant Co. v. McNeil Nutritionals, LLC*,
242 F.R.D. 315 (E.D. Pa. 2007)..........................................................................33, 34

*MRO Corp. v. Humana Inc.*,
383 F. Supp. 3d 417 (E.D. Pa. 2019) ..........................................................................69

*Murray Space Shoe Corp. v. FTC*,
304 F.2d 270 (2d Cir. 1962)..........................................................................................47

*N.L.R.B. v. First Termite Control Co.*,
646 F.2d 424 (9th Cir. 1981) ......................................................................................35

*In re Nat'l Credit Mgmt. Grp., L.L.C.*,
21 F. Supp. 2d 424 (D.N.J. 1998) ..............................................................................16

*Newborn Bros. Co. v. Albion Eng'g Co.*,
481 F. Supp. 3d 312 (D.N.J. 2020) ............................................................................32

*Nitkin v. Main Line Health*,
67 F.4th 565 (3d Cir. 2023) ....................................................................................14, 54

*NLRB v. P*I*E Nationwide, Inc.*,
894 F.2d 887 (7th Cir. 1990) ....................................................................................67

*Northview Motors, Inc. v. Commonwealth*,
562 A.2d 977 (Pa. Commw. Ct. 1989) ....................................................................10

*Novartis Consumer Health v. Johnson & Johnson-Merk Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)......................................................................................32

*Pennsylvania v. Navient Corp.*,
354 F. Supp. 3d 529 (M.D. Pa. 2018)........................................................................9

*Pittsburgh Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978)......................................................................................33

*Reiff v. Marks*,
511 F. App’x 220 (3d Cir. 2013) ..............................................................................14

*Removatron Int’l Corp. v. FTC*,
884 F.2d 1489 (1st Cir. 1989)....................................................................................57

*Rode v. Dellarciprete*,
845 F.2d 1195 (3d Cir. 1988)....................................................................................39

*In re Sanctuary Belize*,
482 F. Supp. 3d 373 (D. Md. 2020)..........................................................................15

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
902 F.2d 222 (3d Cir. 1990)......................................................................................46

*SEC v. Bonastia*,
614 F.2d 908 (3d Cir. 1980)..................................................................................14, 15

*St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.*,
733 A.2d 677 (Pa. Commw. Ct. 1999) ......................................................................67

*State ex rel. Miller v. Vertrue, Inc.*,
834 N.W.2d 12 (Iowa 2013) ................................................................................ *passim*

*In re Sterten*,
546 F.3d 278 (3d Cir. 2008)..................................................................................68, 69

*Temple-Inland, Inc. v. Cook*,
192 F. Supp. 3d 527 (D. Del. 2016)..........................................................................67

*United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*,
Civil Action No. 02-5702, 2009 WL 4576097 (D.N.J. Dec. 1, 2009)....................................67

*United States v. Bailey*,
581 F.2d 341 (3d Cir. 1978)....................................................................................23

*United States v. Corps. for Character, L.C.*,
116 F. Supp. 3d 1258 (D. Utah 2015)........................................................................58

*United States v James*,
Civil Action No. 11-913, 2011 WL 1422894 (E.D. Pa. Apr. 12, 2011)................................32

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004)....................................................................................35

*United States v. Olano*,
62 F.3d 1180 (9th Cir. 1995) ...................................................................................35

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953)...............................................................................................13

**Statutes, Rules & Regulations**

16 C.F.R. §§ 310–310.9 ....................................................................................56, 58

16 C.F.R. § 310.2(w) ...............................................................................................56

16 C.F.R. § 310.3(a)(1)(vii) .................................................................................56–57

16 C.F.R. § 310.4 .....................................................................................................58

16 C.F.R. § 310.6(7) ................................................................................................56

73 P.S. § 201-2(4) ........................................................................................52, 53, 58

73 P.S. § 201-3.........................................................................................................52

73 P.S. § 201-4.....................................................................................................9, 11

73 P.S. § 201-4.1 ..................................................................................................19, 20

1 Pa. C.S. § 1921.....................................................................................................11

15 U.S.C. § 13...................................................................................................9, 13, 19

15 U.S.C. § 45(a) ................................................................................................6, 52

39 U.S.C. § 3009...........................................................................................6, 59, 60

Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60823 (Nov. 4, 2021)........56

Fed. R. Civ. P. 8........68, 69, 70

Fed. R. Civ. P. 12(b)(6)........54

Fed. R. Civ. P. 12(f)........69, 70

Fed. R. Civ. P. 56........7, 22, 54, 69

Fed. R. Evid. 801(c)........22

Fed. R. Evid. 802........22

Fed. R. Evid. 803........23

Fed. R. Evid. 804........23

Fed. R. Evid. 807........21, 22, 23

**Other Authorities**

Federal Trade Commission Advertising Enforcement, *revised* March 1, 2008, available at https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf........36

U.S. Const. amend. V........38

U.S. Const. amend. XIV........38

Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell (collectively referred to herein as "AFS"), by their undersigned counsel, file this Consolidated Memorandum of Law in Opposition to Plaintiffs' Motions for Summary Judgment. The reasons for denying summary judgment or, in the alternative, summary adjudication to both the Federal Trade Commission and the Commonwealth of Pennsylvania are set forth below and in the accompanying Response to Plaintiffs' Statement of Material Facts, which is incorporated herein by reference.

**INTRODUCTION**

Plaintiffs Federal Trade Commission ("FTC") and the Commonwealth of Pennsylvania (the "Commonwealth") have submitted two separate motions for summary judgment, totaling over 120 pages, and a joint statement of facts consisting of 387 numbered paragraphs, together with an appendix of 201 exhibits and 4123 pages, all of which are purportedly intended to show that there are no genuine issues of material fact on their claims under, respectively, the FTC Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). That effort fails. In fact, Plaintiffs' extraordinarily large submissions amount to little more than a tactical effort to obscure the absence of any record evidence to support their request for injunctive relief. The undisputed facts on this material (and case-dispositive) issue are that years of declining profitability led AFS to terminate its outbound telemarketing business nearly two years ago, and there is no "cognizable danger" (which is more than a mere possibility) that AFS will resume its telemarketing activities. *FTC v. AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020).

The volume of Plaintiffs' summary judgment submissions is also a mismatch with what their own designated representatives have said about the narrowness of their claims:

> Q. Okay. So let me ask the question again and see if I have an understanding of the Commonwealth's position in this case. Is it basing its claims against AFS in this litigation based on the

> adherence to the scripts or based upon the sales representatives departing from those scripts. [Objection omitted.]
>
> THE WITNESS: It's based on the script as written.

Exhibit EE, Oleckna Dep. at 129:6–17. *See also* AFS S.J. Br. At Exhibit K, Bandy Dep. at 35:24–36:3 ("But I think to use the word you would use, primarily, this is primarily about the scripts as read and not about the deviation."). Nevertheless, instead of confronting head on the disclosures in the one-page telemarketing script used by AFS's sales representatives and the contemporaneous emails, Plaintiffs have inundated this Court with unverified and inadmissible customer complaints and declarations, which have proven to be demonstrably false by audio recordings and which collectively represent a small fraction of one percent of AFS's sales. For example, after listening to the recording of the AFS sales call, this is what Plaintiffs' customer witness, Kelly Rickard, testified about her own declaration to the FTC:

> Q. And the call also stated that along with the second newsletter, there would be an invoice for the year? [Objections omitted.]
>
> A. Yes. After listening back to the call, I did hear that.
>
> Q. . . . is it fair to say that your memory of that call wasn't entirely accurate, correct? [Objection omitted.]
>
> A. Yes. I think by the time I filed my complaint in June, I wasn't recalling all of that conversation.
>
> ***
>
> Q. And you confirmed for him that that statement in your declaration was not accurate; is that right? [Objection omitted.]
>
> A. At the time I made the declaration, I thought it was accurate, but after listening to the phone call back, it is, I guess, not accurate.

Exhibit SS, Rickard Dep. at 74:17–78:5.

The Rickard declaration is not an outlier. Rather, the record evidence demonstrates that Plaintiffs repeatedly rely on similarly inaccurate and hearsay statements (including declarations drafted by the FTC itself), even when the objective ***recorded*** evidence flatly contradicts the central claim of the complaint. Meanwhile, Plaintiffs have conducted *no* systematic review or quantitative analysis of these complaints, a fact not only conceded by each of their 30(b)(6) witnesses, but also evident from their summary judgment papers. *See also, more generally*, § II(A), *infra*. While Plaintiffs acknowledge that the Scripts and contemporaneous emails ***expressly*** disclose the material terms of the subscriptions, they are unable to prove anything about the ***implied*** "net impression" based on the unrepresentative and unverified (or provably false) hearsay complaints.

In sum, for the reasons discussed more fully below, the size of Plaintiffs' filings does not add weight to their motions. When the record evidence is pared down to what is both material and probative, there is no merit to the claim for injunctive relief under either the FTC Act or the UTPCPL. Accordingly, Plaintiffs' motions for summary judgment should be denied, and AFS's motion for summary judgment granted.

## COUNTER-STATEMENT OF FACTS

AFS filed a Statement of Undisputed Material Facts in connection with its Motion for Summary Judgment, which AFS incorporates herein by reference. ECF No. 342 at p.62. Also, as part of its opposition to Plaintiffs' two summary judgment motions, AFS has responded to each of the 387 numbered paragraphs in their Joint Statement of Undisputed Material Facts. Below is a summary of the undisputed facts that are set forth at greater length in the Memorandum of Law in Support of AFS's Motion for Summary Judgment ("AFS S.J. Br."):

***AFS Was a Publisher of Industry-Specific Newsletters and Books for More than Three Decades.*** At its height, AFS employed dozens of fulltime members on its editorial staff, including attorneys, professors, and other experts in their fields, to create the content for its weekly or

monthly newsletters. All of AFS's publications were sold to executives and managers of businesses and other institutional organizations; none of AFS's customers was a consumer of household goods or services. *See* AFS S.J. Br. at 4–5.

***AFS's Well-Trained Sales Staff Strictly Adhered to a Telemarketing Script.*** AFS employed a well-trained and closely supervised staff of telemarketing sales representatives, who were required to strictly adhere to detailed disclosures in a one-page Script, which always described the features of the publication, the cost, the term, the number of issues in the subscription, and the process for cancellation of a subscription. As called for in the Script, the sales representative also verified the subscriber's authority and consent to the subscription; collected and verified the subscriber's email address; and expressly referenced and incorporated confirmatory emails that subscribers would immediately receive containing "the whole offer in writing" at the email address the customer provided. *See id.* at 5.

***As Expressly Stated in the Script, when a Customer Agreed to the Subscription, He or She Automatically Received Same-Day Email Verification.*** In short, plain language, the follow-up emails confirmed the price, term, and cancellation process. AFS did not accept payment during the initial sales calls, nor did it take or keep financial information of any type, such as credit cards or banking information. *See id.* at 5–6.

***AFS Maintained a Rigorous Quality Control Process.*** Every telemarketing sales call was recorded, and these recordings were systematically checked to ensure adherence to the approved Script and other AFS policies. The sales representatives were required to read the key portions of the Script verbatim and "[i]f the recording displayed that the rep was not on the script a hundred percent or did not answer the questions clearly, then it would be considered a quality infraction

and the rep would be disciplined." AFS also would cancel any order where it found a deviation from the Script's order and disclosure language. *See id.* at 6–7.

***AFS's Quality Control Program Was Highly Effective.*** In fact, the analysis conducted by expert forensic data analyst, Margaret Daley, demonstrated that adherence to the Script was "remarkable", with a statistically sound sample showing over 99% of the calls accurately and completely provided customers with every element of the offer and subscription terms. *See id.* at 7.

***AFS Had a Liberal Cancellation Policy.*** After the initial sales call, customers had up to sixty days to review the subscription and decide to continue as a paid subscriber, by providing payment to AFS, or, alternatively, to cancel the subscription. Customers were instructed to cancel by writing "cancel" on the invoice and mailing it back to AFS or by calling AFS's toll-free number. Even if a subscriber failed to follow AFS's specific cancellation instructions (to write "cancel" on the invoice or call AFS's toll-free number), AFS would cancel the order if the subscriber otherwise communicated a desire to cancel, and AFS accepted customer cancellation requests within a grace period of up to five months, typically without charge. *See id.* at 7–8.

***The Commonwealth Terminated an Investigation of AFS in 2017, Without Requiring AFS to Change Its Executive Script or Other Business Practices.*** In or about 2012, the Commonwealth's Office of Attorney General opened an investigation into AFS, and AFS provided the Commonwealth with a detailed explanation of its telemarketing policies and practices, along with copies of the Executive Script used during telemarketing calls. The Commonwealth also was permitted to monitor and listen in on sales calls that it self-selected. The Commonwealth closed its investigation of AFS in 2017 without issuing any findings of wrongdoing and without requiring AFS to change its Executive Script or other business practices. *See id.* at 8.

***The FTC Initiated This Lawsuit Predicated on Unverified and Unreliable Customer Complaints.*** On May 13, 2020, the FTC initiated this action against AFS, alleging violations of 15 U.S.C. § 45(a) and 39 U.S.C. § 3009, and the FTC was granted leave to amend its complaint in 2021 to add four state-law claims brought by the Commonwealth for alleged violations of the Pennsylvania UTPCPL. ECF No. 43. *See* AFS S.J. Br. at 9. The Commonwealth's belated state-law claims challenge the same AFS Script that it investigated and allowed AFS to continue using unabated or unchanged when it closed its investigation in 2017. *See* AFS S.J. Br. at 11.

***Neither the Plaintiffs nor the BBB Performed Any Investigation of the Factual Accuracy of the Complaints Received from Customers***. The customer complaints, which do not necessarily match the issues raised in the Complaint, were presumed to be true. Also, the customers who complained to the BBB constitute a small fraction of one percent (0.05%, to be precise) of the customers who placed orders with AFS and an infinitesimal percentage of the millions of potential customers with whom AFS made telephone contact over the same period. *See id.* at 9.

***AFS Has Undertaken an Extensive Analysis of the Customer Complaints.*** AFS's forensic expert, Margaret Daley, found that AFS sales representatives adhered to the Script and accurately presented the subscription terms fully and accurately over 99.5% of the time, and that AFS representatives suggested that the subscription was "free" or "complimentary" less than 1% of the time. *See id.* at 10.

***After Years of Unprofitability, AFS Terminated Its Telemarketing Business and Ceased Any Use of the Executive Script in September 2021.*** When the FTC brought its lawsuit in 2020, AFS's publication business was already in decline. After at least six years of declining profits, and two consecutive years of losses, AFS closed this line of business entirely and stopped outbound telemarketing calls as of September 3, 2021. *See id.* at 12. AFS no longer prints any paper

newsletters nor makes any outbound telemarketing calls, and it has no plans to resume this business. *See id.*

**STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the movants with the burden of proof, Plaintiffs must come forward with evidence showing that there is no genuine issue of material fact. *Favata v. Seidel*, 511 F. App'x 155, 158 (3d Cir. 2013) (citing *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). Moreover, the evidence that Plaintiffs present must be "in a form that would be admissible in evidence." Fed. R. Civ. P 56(c)(2). As the Advisory Committee Notes specify, the burden is on the Plaintiffs, as the proponents of such evidence, to show "that the material is admissible as presented." Fed. R. Civ. P. 56, Advisory Committee Notes, 2010 Amendment.

When the parties file cross-motions for summary judgment, as they have done here, the same legal standards and burdens apply. *Allah v. Ricci*, 532 Fed. App'x 48, 50 (3d Cir. 2013) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). However, there is a difference between what Plaintiffs and Defendants must demonstrate to obtain summary judgment in their favor. To obtain summary judgment on any of their claims, Plaintiffs must demonstrate the absence of a genuine issue of material fact on each essential element; in contrast, AFS can obtain summary judgment by demonstrating no genuine issue of material fact on any one of those essential elements of Plaintiffs' claims. A fact is considered "material," if it has the potential to alter the outcome of the case. *Favata*, 511 F. App'x at 158.

## ARGUMENT

## I. NO GROUNDS EXIST FOR INJUNCTIVE RELIEF

As set forth in detail in the Memorandum of Law in Support of AFS's Motion for Summary Judgment, both the FTC Act and the UTPCPL permit injunctive relief for ongoing or imminent conduct only. *See* AFS S.J. Br. at 16–19. The undisputed record evidence demonstrates that AFS ceased the challenged conduct on September 3, 2021, and there is no likelihood, let alone a cognizable danger, that such conduct will reoccur. *See id.* at 19–23. Accordingly, neither the FTC nor the Commonwealth is entitled to injunctive relief in this action. *See id.* at 14–23. Furthermore, Plaintiffs are not entitled to any monetary relief. *See id.* at 24–27. As a result, all of Plaintiffs' claims fail, and summary judgment for AFS is warranted.[1] *See id.* at 14–27. In their own summary judgment motions, Plaintiffs have not identified any genuine issue of material fact that would change this outcome.

### A. Injunctive Relief is Available for Present or Imminent Conduct Only.

The FTC concedes that it must prove a "cognizable danger of recurrent violation" to obtain an injunction. FTC S.J. Br. at 46 ("To obtain an injunction, there must be a 'cognizable danger of recurrent violation, something more than mere possibility which serves to keep the case alive.'" (quoting *AbbVie*, 976 F.3d at 379)). To the extent the Commonwealth takes the contrary position that it can obtain an injunction for past conduct that might ***possibly*** return, it is wrong as a matter of law. Commonwealth S.J. Br. at 55–58 (arguing courts should consider whether conduct is likely to reoccur). The Plaintiffs have no evidence, much less evidence showing a "cognizable danger,"

[1] Despite defining the ***Relevant*** Time Period for this action as July 1, 2015 to the present, Plaintiffs suggest, without citing any legal authority, that "for purposes of the need for injunctive relief, the Court's evaluation of Defendants' knowledge and conduct should not be so limited." FTC S.J. Br. at 4 n.6; Commonwealth S.J. Br. at 4 n.6.

that AFS would resume its shuttered subscription newsletter business and its unprofitable telemarketing operation.

In arguing for an injunction based on AFS's past conduct, the Commonwealth makes no reference to the plain language of the UTPCPL, which expressly limits injunctive relief to "[w]henever the Attorney General or a District Attorney has reason to believe that any person ***is using or is about to use*** any method, act or practice declared by section 3 of this act to be unlawful." 73 P.S. § 201-4 (emphasis added) (footnote omitted); *see also* Commonwealth S.J. Br. at 53–55 (lacking any discussion of the plain language of the statute). As set forth in AFS's Summary Judgment Brief, that clear and unambiguous language ends the statutory construction inquiry—injunctive relief is available for ongoing or imminent conduct only. *See* AFS S.J. Br. at 17–18.

Ignoring the statutory language, the Commonwealth bases its argument on a single, decades-old case from a Pennsylvania intermediate court. *See* Commonwealth S.J. Br. at 53–55 (relying solely on *Commonwealth v. Percudani*, 844 A.2d 35 (Pa. Commw. Ct. 2004), *amended on reconsideration by*, 851 A.2d 987 (Pa. Commw. Ct. 2004)).[2] As discussed in AFS's Summary

[2] The Commonwealth cites *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018), as a purported example of factors courts examine in "considering whether violations of the UTPCPL will reoccur." *See* Commonwealth S.J. Br. at 54. *Navient Corp.* is inapposite for various reasons, including, but not limited to, that it was decided on a motion to dismiss where the face of the complaint alleged ongoing and imminent violations, and the opinion was issued before—and without the guidance of—*AMG*, *AbbVie*, and *Shire ViroPharma*. *See Navient Corp.*, 354 F. Supp. 3d at 556 (explaining that "at the motion to dismiss stage" the court has "only the allegations in the Commonwealth's Complaint available for Court consideration," and "[t]he Commonwealth . . . alleges that Navient is 'using, [has] used, or [is] about to use methods, acts or practices declared unlawful' by the [UTP]CPL"); *see also AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1349 (2021) (concluding the plain language of Section 13(b) of the FTC Act limits the FTC to prospective injunctive relief only); *AbbVie*, 976 F.3d at 376 ("[I]f a violator's conduct is neither imminent nor ongoing, there is nothing to enjoin."); *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("Section 13(b) does not permit the FTC to bring a claim based on long-past conduct.").

Judgement Brief and in further detail below, *Percudani* is not persuasive for numerous reasons. *See, e.g.*, AFS S.J. Br. at 18–19, 18 n.46.

In *Percudani*, a 2-1 divided court determined the Commonwealth could seek injunctive relief for past conduct because "research has uncovered several cases in which the Commonwealth had sought to enjoin future conduct based on past acts." 844 A.2d at 45. In purported support, the court included a string cite with a single case preceded by the signal "*see*" and five cases preceded by "*see also*." *See id.* at 45–46. ***But not a single one of the cases cited by the court addressed the issue of whether an injunction can issue pursuant to the UTPCPL for past conduct that has ceased***—and one of the cases did not even address an injunction under the UTPCPL at all.[3] In addition, the slim-majority's conclusion was considered at the preliminary-objections stage without the benefit of a factual record, and the majority explained that "the propriety of the actual issuance of an injunction against [the defendant] [was] premature" and "a matter to be heard at another time." *Percudani*, 844 A.2d at 46. In other words, the court recognized that the evidence developed in discovery might ultimately show that an injunction would be inappropriate. *See id.*

[3] *See Commonwealth ex rel. Zimmerman v. Nat'l Apartment Leasing Co.*, 519 A.2d 1050, 1053 (Pa. Commw. Ct. 1986) (containing no discussion of the availability of injunctive relief for past conduct and, in fact, sustaining defendant's demurrer because the Commonwealth failed to state a claim under the UTPCPL); *Frishman v. Dep't of State*, 592 A.2d 1389, 1390 (Pa. Commw. Ct. 1991) (containing no discussion of the availability of injunctive relief for past conduct and finding that a prior consent decree with the Commonwealth did not prohibit the State Board of Vehicle Manufacturers, Dealers and Salespersons "from revoking Petitioner's vehicle salesperson's license and . . . imposing a civil penalty"); *Commonwealth ex rel. Zimmerman v. Soc'y of 28th Div.*, 538 A.2d 76, 77–81 (Pa. Commw. Ct. 1987) (containing no discussion of injunctive relief for past conduct and, in fact, containing numerous findings of fact concerning ongoing conduct); *Commonwealth ex rel. Preate v. Pa. Chiefs of Police Ass'n, Inc.*, 572 A.2d 256, 257–58 (Pa. Commw. Ct. 1990) (containing no discussion of injunctive relief for past conduct or any consideration of whether the allegedly violative conduct was ongoing or imminent); *Northview Motors, Inc. v. Commonwealth*, 562 A.2d 977, 978–81 (Pa. Commw. Ct. 1989) (same); *Commonwealth ex rel. Biester v. Luther Ford Sales, Inc.*, 430 A.2d 1053, 1053–55 (Pa. Commw. Ct. 1981) (same).

Even further, the majority failed to adhere to the requirements of Pennsylvania's Statutory Construction Act and ignored the Pennsylvania Supreme Court's directive to look to cases interpreting the FTC Act for guidance concerning the UTPCPL. *See* 1 Pa. C.S. § 1921(b) (instructing that clear and unambiguous words are "not to be disregarded"); *id.* § 1921(c) (permitting additional considerations only "[w]hen the words of a statute are not explicit"); *Commonwealth ex rel. Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 818 (Pa. 1974) (instructing courts to courts to "look to the decisions under those [FTC and Lanham] Acts for guidance and interpretation" concerning the UTPCPL).

While "[t]he purpose of statutory interpretation is to 'ascertain and effectuate the intention of the General Assembly' so as to give the statute its intended effect," courts are required to "first consider the language of the statute itself" in conducting any statutory analysis. *Commonwealth v. Armolt*, 294 A.3d 364, 372 (Pa. 2023) (quoting 1 Pa. C.S. § 1921(a)); *see also Commonwealth v. Green*, 291 A.3d 317, 327 (Pa. 2023) ("Generally, the plain language of the statute 'provides the best indication of legislative intent.'"). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Armolt*, 294 A.3d at 372 (quoting 1 Pa. C.S. § 1921(b)).

In *Percudani*, the majority gave no consideration to the language of the UTPCPL itself, and instead concluded, in cursory fashion, that limiting the reach of the statute "to ongoing activities" would "frustrate[]" the purpose of the law. 844 A.2d at 46. In contrast, the dissent recognized that the language of the UTPCPL has meaning:

> The UTPCPL authorizes the Attorney General to institute an action to enjoin an unfair trade method, act or practice "[w]henever the Attorney General . . . has reason to believe that any person *is using or is about to use*" this practice. 73 P.S. § 201-4. The Attorney General asserts that this provision authorizes his action against [defendant], who is out of the business of appraising real estate and will be for at least the next five years. Stated otherwise, the Attorney General sees no

> distinction between "has used" in the past, "is using" in the present or "about to use" in the future. However, ***the only way to read the actual words of the UTPCPL is that past conduct that is no longer continuing cannot support a complaint***.
>
> ***
>
> In sum, the words "is using or is about to use" have a meaning separate from "has used." We must enforce the actual language used by the General Assembly in the UTPCPL, and we must not insert words that are not there under the principle *expressio unius est exclusio alterius*. ***The allegation that [defendant] may have engaged in an unfair trade practice in the past, but is no longer, cannot support an action under the UTPCPL***.

*Id.* at 51–53 (Leavitt, J., dissenting) (first emphasis in original) (footnotes omitted).

The dissent also looked to federal circuit-level case law interpreting the FTC Act for guidance. *See id.* at 52 n.6 (Leavitt, J., dissenting) ("The parties are in agreement that the UTPCPL is modeled on the Federal Trade Commission Act."). Specifically, the dissent observed that "the FTC may not issue a cease-and-desist order to restrain a practice long discontinued and where there is no reason to believe it will be renewed" and concluded that the Commonwealth is similarly precluded from pursuing injunctive relief for past conduct that has ceased. *Id.* (Leavitt, J., dissenting) (collecting cases).

The well-reasoned analysis of the dissent is also consistent with the requirements of the Pennsylvania Statutory Construction Act, well-settled guidance from the Pennsylvania Supreme Court, and recent opinions from the Supreme Court of the United States and Third Circuit. In short, the proper analysis under Pennsylvania law makes clear that the UTPCPL precludes injunctive relief for conduct that has ceased and has no cognizable risk of recurrence. *See* AFS S.J. Br. at 17-19.

### B. There Is No Cognizable Danger that AFS's Alleged Telemarketing Conduct Is Likely to Reoccur.

To obtain an injunction under either Section 13 of the FTC Act or the UTPCPL, the government "must show there is a 'cognizable danger of recurrent violation.'" *AbbVie*, 976 F.3d at 379 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also Monumental Props., Inc.*, 329 A.2d at 818 (instructing courts to construe the UTPCPL consistently with the FTC Act); AFS S.J. Br. at 16–19 (discussing the "cognizable risk of recurrence" standard under the FTC Act and UTPCPL); FTC S.J. Br. at 46 (acknowledging this standard); Commonwealth S.J. Br. at 55 (same). A "cognizable danger" requires showing "something more than the mere possibility" of recurrence.[4] *AbbVie*, 976 F.3d at 379 (quoting *W.T. Grant Co.*, 345 U.S. at 633).

Despite the FTC acknowledging the appropriate standard, both Plaintiffs seek to apply an entirely different—and nonexistent—standard based solely on speculation and conjecture about the possibility that AFS could, at some unidentified point in the future, resume some form of telemarketing business.[5] *See* FTC S.J. Br. at 46–51; Commonwealth S.J. Br. at 55–58. In addition

---

[4] When, as here, a defendant's First Amendment rights are at issue, the importance of this standard is heightened because "[a]n injunction that implicates a defendant's First Amendment rights must 'burden no more speech than necessary to serve a significant government interest.'" *AbbVie*, 976 F.3d at 379 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). Plaintiffs' have failed to identify ***any*** government interest, let alone a ***significant*** government interest, that would be served by issuing an injunction to restrain some unidentified, potential future speech of AFS that, as Plaintiffs argue, could possibly ensue if market conditions completely reverse and, in direct contravention of AFS's sworn testimony, AFS resumed some form of telemarketing. Indeed, Plaintiffs have failed to identify any public interest at all that is served by their attempt to intervene in private contract disputes arising years ago between sophisticated business executives. *See* AFS S.J. Br. at 41–43.

[5] While Plaintiffs acknowledge the "cognizable danger of recurrence" standard, they also cite to older cases in an apparent attempt to suggest some lesser standard. *See* FTC S.J. Br. at 46; Commonwealth S.J. Br. at 55–56. The Third Circuit, however, is clear: an injunction here would require showing a "cognizable danger of recurrent violation" *AbbVie*, 976 F.3d at 379; *see also* AFS S.J. Br. at 16–19. Regardless, even if the standard were a mere likelihood of recurrence, Plaintiffs' unsupported speculation would fall far short.

to failing to rise to the standard of a cognizable danger of recurrence, Plaintiffs' unsupported speculation is insufficient, as a matter of law, to overcome the undisputed evidence that there is no likelihood that AFS will resume the challenged conduct at issue in this litigation. *See Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) ("[A] plaintiff who reaches the summary judgment stage may no longer rest upon the mere allegations or denials of his pleadings. Nor will bare assertions, conclusory allegations, or suspicions suffice." (cleaned up) (citation omitted)).

As set forth in AFS's Motion for Summary Judgment, there is no genuine dispute that AFS ceased the challenged conduct on September 3, 2021, and there is no likelihood that AFS will resume that conduct. *See* AFS S.J. Br. at 19–23. Plaintiffs' arguments to the contrary are legally baseless and ignore the unrebutted record evidence.[6]

As an initial matter, Plaintiffs rely on factors that were "developed by the courts to determine if an injunction should issue in a case involving securities violations."[7] *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980). As the FTC recognizes,[8] the Third Circuit has stated it is

---

[6] In their briefs, Plaintiffs improperly suggest there may be a dispute as to whether AFS ceased its telemarketing activities on September 3, 2021. Both Plaintiffs include a footnote stating that "AFS has ***averred*** that it ceased telemarketing" but that "[t]he use of the past tense in relation to AFS's telemarketing activities in this or any other submission to the Court is ***not an admission*** that AFS did, in fact, cease telemarketing activities at any time during the Relevant Time Period." FTC S.J. Br. at 5 n.8 (emphasis added); Commonwealth S.J. Br. at 5 n.8 (same). The record contains no evidence refuting AFS's sworn testimony that its telemarketing practices ceased on September 3, 2021, and Plaintiffs have acknowledged, under oath, that AFS ceased the challenged practices. *See* AFS S.J. Br. at 19–23. Plaintiffs cannot disavow the record evidence ***and their own admissions*** through argument in their briefing on summary judgment. *See Reiff v. Marks*, 511 F. App'x 220, 224 (3d Cir. 2013) ("[A]ttorney arguments are not evidence.").

[7] Those factors are "the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur." *Bonastia*, 614 F.2d at 912.

[8] *See* FTC S.J. Br. at 47 n.40. Although the Commonwealth's brief is, in many ways, identical to the FTC's brief, and the Commonwealth cites the same factors and cases in purported support, the Commonwealth does not acknowledge this Third Circuit guidance.

"disinclined to extend" those factors to the context of alleged FTC Act violations. *AbbVie*, 976 F.3d at 380. While "the likelihood-of-recurrence test . . . governs SEC cases," in FTC Act and UTPCPL cases, courts must determine whether it is "a cognizable danger or merely possible" that the defendant will resume the alleged past conduct. *Id.* Indeed, the Third Circuit has noted that it has "never applied [the *Bonastia* securities-litigation factors] in FTC Act cases." *Id.* Nor should this Court apply them here.

First, the cases Plaintiffs rely on for the proposition that these securities-litigation factors are appropriate were all decided before the Third Circuit's admonition that it had never applied those factors in FTC Act cases and was disinclined to do so. *See* FTC S.J. Br. at 47 (citing cases preceding *AbbVie*); Commonwealth S.J. Br. at 55 n.47 (same).

Second, the cases Plaintiffs cite are factually distinguishable in a material way. Here, it is undisputed that AFS ceased the challenged conduct two years ago when it made the business decision to close its print publication business and cease telemarketing efforts. But none of Plaintiffs' cases involved conduct long-since terminated for business reasons. Rather, in each case cited by Plaintiffs, the ***defendants were compelled to cease conduct found to violate the FTC Act*** either through a preliminary injunction entered earlier in the case or in an effort to avoid a preliminary injunction. *See FTC v. Lalonde*, 545 F. App'x 825, 830 (11th Cir. 2013) (involving circumstances where the court had previously issued a preliminary injunction, which "included an asset freeze of entities owned or controlled by [defendant]");[9] *In re Sanctuary Belize*, 482 F. Supp. 3d 373, 385–86 (D. Md. 2020), *vacated in part by FTC v. Pukke*, 53 F.4th 80, 97 (4th Cir. 2022) (same); *FTC v. Ross*, 897 F. Supp. 2d 369, 374 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014)

[9] Although Plaintiffs cite *Lalonde* to support application of the securities-litigation factors in FTC Act and UTPCPL cases, the Eleventh Circuit ***did not analyze or apply those factors in the case***. *See generally Lalonde*, 545 F. App'x at 825.

(same); *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 447 (D.N.J. 1998) (finding defendants' conduct deceptive and determining that any changes to its business practices, made as recently as two weeks prior to the court's decision, were "simply a reaction to the initiation of the instant suit" and "not sincere").[10]

In other words, in Plaintiffs' cases, the defendants ceased the challenged conduct because the court determined the conduct violated or was likely to violate the FTC Act, and the court considered the securities-litigation factors in determining whether defendants would return to their prior conduct if not enjoined from doing so. Outside of the context in which liability has been finally or preliminarily determined, the securities-litigation factors make little sense. Indeed, all of the factors would almost always cut against a wrongfully accused defendant exercising its right to zealously defend the allegations against it.

As for Plaintiffs' application of the five securities-litigation factors, their arguments are summarized in two points: (1) AFS allegedly knew its conduct was wrong; and (2) AFS could, at some unidentified point in the future, resume the challenged conduct if there were a financial incentive to do so.[11] Plaintiffs' first point is inaccurate as a matter of undisputed fact, and its second point does not suggest any likelihood of recurrence, let alone a cognizable danger.

---

[10] Notably, these cases involved expressly false representations and egregious—and in some cases criminal—conduct that resulted in preliminary injunctions and the freezing of assets. *See, e.g.*, *Lalonde*, 545 F. App'x at 830 ("[Defendant] was sentenced to 60 months of imprisonment and ordered to pay over $1.5 million in a criminal case based on the allegations underlying Count 5 of the FTC's complaint."). In contrast, here, Plaintiffs do not dispute the value of AFS's publications, do not allege any express misrepresentations, and have never sought preliminary injunctive relief.

[11] The FTC, but not the Commonwealth, also argues that AFS engaged in the challenged conduct for three decades. That argument relies on (1) the ***fact*** that AFS was in business for thirty years, and (2) Plaintiffs' ***unsupported theory*** that AFS's business practices were deceptive. *See* FTC S.J. Br. at 48. The fact that AFS's business survived thirty years reflects its value to customers, and, furthermore, the undisputed facts demonstrate that the challenged practices were not deceptive as a matter of law. *See* AFS S.J. Br. at 27–28; *see also* § II, *infra*. But even if the challenged practices were determined to be deceptive, AFS operated in good faith for thirty years and had no way of

While Plaintiffs have cluttered the summary judgment record with out-of-context excerpts from documents and inadmissible hearsay,[12] AFS has demonstrated that the unrebutted evidence proves that its telemarketing communications were not deceptive. *See* AFS S.J. Br. at 27–35. It follows, as a matter of law, that AFS did not "know of " or "recognize" actionable conduct.[13]

Furthermore, the unrebutted evidence also demonstrates that (1) AFS used a substantially similar Script for thirty years; (2) AFS's telemarketing practices withstood prior government scrutiny; (3) the Commonwealth commenced an investigation of AFS in or about 2012 ***and did not seek a preliminary injunction at that time***; (4) the Commonwealth had a copy of the Script in its possession no later than 2014 ***and did not seek a preliminary injunction at that time***; and

---

knowing its practices would later be deemed deceptive—***particularly given that the Commonwealth closed its multi-year investigation of AFS and allowed those practices to continue***.

[12] For example, Plaintiffs cite to testimony from former AFS employee Kelly Strosnider in purported support for their claim that "Satell, as well as many other key employees, knew that the telemarketing scripts and other practices were deceptive." *See* FTC S.J. Br. at 47; Commonwealth S.J. Br. at 56. Plaintiffs reference testimony that Ms. Strosnider left her job as a telemarketer for AFS because she "just wasn't comfortable doing the work anymore," but they ignore her testimony that she had no concerns about her own interactions with customers—rather, she testified she "was always very clear . . . always very distinct . . . always took [her] time in saying, this is how this works. This is what it will cost. Here's how you cancel." Exhibit C, Strosnider Dep. at 79:12–16. Ms. Strosnider further testified that she "was very meticulous in not speeding through that part of the call because [she] wanted [customers] to fully be aware that they were, indeed, take the subscription that they had the right to cancel." *Id.* at 79:16–20. Even further, Ms. Strosnider testified that she "***never*** put through a sale that [she] didn't feel a customer was aware of what they were getting into." *Id.* at 81:16–18 (emphasis added). *See also* § II.A.1, *infra* (discussing the unreliability and unrepresentative nature of the customer complaints relied on by Plaintiffs); AFS Resp. to Pls.' SMF ¶¶ 130–34, 17–20, 198–242, 256–64, 287, 308, 312–13, and 337.

[13] To the extent Plaintiffs suggest there was something nefarious about AFS's brand-management efforts or its practice of escalating customer complaints when appropriate, they fail to provide any support. Such brand management and customer service efforts are common business practices. Indeed, these concepts are taught at the most reputable business schools in the nation. *See, e.g.*, Syllabus, Marketing 2780—Strategic Brand Management, The Wharton School of the Univ. of Penn., https://apps.wharton.upenn.edu/syllabi/202310/MKTG2780001/ (discussing "the complexity and significance of the long-term task of brand maintenance" and "topics like brand repositioning").

(5) the Commonwealth informed AFS in 2017 that it was closing its investigation ***and did not require AFS to change its Script or other business practices***; (6) the Commonwealth did not discover any new information concerning AFS before joining this lawsuit in 2020; and (7) AFS's Script and business practices remained substantially the same between the time the Commonwealth closed its investigation and the time AFS closed its print publication business and ceased all outbound telemarketing. *See* AFS S.J. Br. at 4–11, 43–47. On these facts—where the Commonwealth conducted a years-long investigation and then specifically allowed the now-challenged conduct to continue—AFS cannot be charged with knowledge of any wrongdoing.

Finally, Plaintiffs' argument that AFS could, at some unidentified point in the future, resume the challenged telemarketing practices—if it determined it had a financial incentive to do so—does not even rise to the level of "mere possibility," and certainly not "cognizable danger." *See AbbVie*, 976 F.3d at 379. Plaintiffs attempt to support their argument by claiming AFS uses the telephone in connection with a completely different business, SuccessFuel. *See* FTC S.J. Br. at 50; Commonwealth S.J. Br. at 57. But virtually all businesses use the telephone, and, regardless, none of AFS's practices with respect to that entirely separate business is alleged to be deceptive or at issue in this case. *See generally* Am. Compl. SuccessFuel does not engage in telemarketing sales. *See* Exhibit HH, Satell Dep., Vol. II, at 351:10–353:7 ("Companies hire us to call and get data. ***We do not sell anything*** . . . ***we're not involved in any sales of any kind***." (emphasis added)). Plaintiffs' vague suggestions that this unrelated business somehow positions AFS to resume telemarketing of its now-closed print publication business are unsupported and unsupportable.[14]

On the contrary, the unrefuted evidence shows that AFS closed its print publication and telemarketing business after at least six consecutive years of declining revenues and two years of

[14] AFS Resp. to Pls.' SMF ¶¶ 326, 336(a)–(n).

losses—a lack of profitability that was verified by AFS's financial expert, Harris Devor. *See* AFS S.J. Br. at 12. AFS's losses were consistent with industry-wide trends that do not have any indication or suggestion of reversal. *See id.* at 23. Accordingly, even if AFS could potentially restart its telemarketing business if it became financially beneficial to do so, the record evidence demonstrates that it is highly improbable that such practices would be profitable in the future. In other words, the evidence proves it is ***highly unlikely*** that AFS will ever resume the challenged conduct. This conclusion is corroborated by the testimony of Ed Satell and Colin Drummond, which Plaintiffs have made no effort to impeach. *See id.* at 20–23.

In sum, absent a genuine dispute that AFS made a business decision to cease the challenged conduct on September 3, 2021, and that AFS is highly unlikely to resume, Plaintiffs are not entitled to injunctive relief, as a matter of law.

### C. As a Matter of Law, Neither the FTC Nor the Commonwealth Has a Claim for Restitution.

In response to *AMG Capital*, the FTC has acknowledged that it is not entitled to any monetary relief in this action. *See* FTC S.J. Br. at 54 ("[T]he FTC is not pursuing equitable monetary relief."); *see also AMG Cap. Mgmt., LLC*, 141 S. Ct. at 1352 (holding Section 13(b) of the FTC Act "does not grant the Commission authority to obtain equitable monetary relief"). Accordingly, the FTC is not entitled to monetary relief as a matter of law.

In addition, the Commonwealth acknowledges that "the Court has discretion" to order restitution ***only*** "[u]pon entry of a permanent injunction." Commonwealth S.J. Br. at 58. Thus, because the Commonwealth is not entitled to injunctive relief, it is, likewise, not entitled to restitution. *See id.*; *see also* 73 P.S. § 201-4.1 (requiring an injunction as a prerequisite to restitution); AFS S.J. Br. at 24–25. That ends the matter. But, even if it did not, the

Commonwealth's claim for restitution would fail because it does not fit within the statutory bounds of restitution or the facts of this case. *See* AFS S.J. Br. at 26–27.

The Commonwealth admits that no amount of restitution is warranted to a person who has either cancelled the subscription before payment was made or knowingly agreed to the subscription and valued receiving it. *See id.* at 26 (citing Oleckna Dep. at 255:10–23, 255:25–256:20). In addition, the Commonwealth understands that Section 201-4.1 limits its recovery to "anyone that was enrolled in a subscription without their authorization and were forced to pay for it." *Id.* at 26–27 (quoting Oleckna Dep. at 255:5–9). Furthermore, the Commonwealth is aware that nearly all customers who raised a complaint of one kind or another about their subscription were permitted to cancel without any financial obligation. *See id.* These customers simply have no payments to be "restored" within the meaning of the statute.

Yet, instead attempting to tie its restitution claim to customers who qualify for having their money or property restored, the Commonwealth has claimed it is owed restitution of ***all*** revenues earned by AFS on the sales of newsletters and books for the past several years, which comes to $24.7 million. *See* Commonwealth S.J. Br. at 59–60. Because its request for restitution is completely untethered to the language of the UTPCPL and because it has made no attempt to identify customers who paid for subscriptions that they deny were ordered, the Commonwealth's request for restitution fails as a matter of law.

### D. As the Special Master Found, the Commonwealth Has Not Pled a Claim for Civil Penalties.

Despite Special Master Rohn's well-reasoned recommendation that the Commonwealth be precluded from pursuing civil penalties because it failed to plead them and did not disclose its intent to seek them until eleven days before the close of fact discovery, *see* ECF No. 313, the Commonwealth asks this Court to enter summary judgment awarding such civil penalties, *see*

Commonwealth S.J. Br. at 60–61. That request should be rejected out of hand. Special Master Rohn decided this issue correctly, and the Commonwealth is not entitled to civil penalties for all of the reasons AFS has previously presented to this Court in prior briefing on the issue, filed at ECF Nos. 293, 300 and 307, which AFS expressly references and incorporates as if fully set forth herein.

Furthermore, even if the Commonwealth had pleaded a claim for civil penalties—and it did not—the claim would fail because the unrefuted evidence demonstrates that AFS did not willfully violate the UTPCPL. While the Commonwealth, again, relies solely on out-of-context excerpts and inadmissible hearsay, the undisputed evidence shows that the Commonwealth spent years investigating AFS's challenged business practices and then closed its investigation and allowed AFS to continue those practices without modification. *See* AFS S.J. Br. at 44–45. AFS justifiably relied on the Pennsylvania Attorney General's representation that it was closing its investigation without requiring changes to AFS's Script or business practices, and AFS continued to operate its business in good faith. *See* AFS S.J. Br. at 45–46. It would be the height of inequity to find AFS willfully violated the UTPCPL by engaging in conduct that the Commonwealth investigated and then specifically allowed to continue, without modification of any kind. *See id.* at 45–47.

## II. PLAINTIFFS HAVE NOT PROFFERED ADMISSIBLE EVIDENCE OF DECEPTION UNDER THE FTC ACT OR THE UTPCPL

With their two summary judgment motions and two lengthy notices sent pursuant to Federal Rule of Evidence 807, Plaintiffs have manifested their intent to rely heavily on hearsay to prove their case.[15] The documents, which largely consist of unverified complaints and declarations from a fraction of one percent of AFS's customers, are not only insufficient to create a disputed

[15] *See, e.g.*, First Notice of Plaintiffs' Intent to Offer Evidence Under Federal Rule of Evidence 807; Second Notice of Plaintiffs' Intent to Offer Evidence Under Federal Rule of Evidence 807. *See also, e.g.*, Plaintiffs' Joint Statement of Undisputed Material Facts at ¶¶ 198–306.

issue of fact, they are also inadmissible.[16] These hearsay statements are demonstrably untrustworthy and not nearly as probative as the telemarketing Scripts and recordings in the possession of the parties. They do not, therefore, qualify for any recognized hearsay exception. Moreover, Plaintiffs' heavy reliance on this hearsay to substantiate their allegations of deception is also notable, considering that they sought and obtained hundreds of recordings of AFS telemarketing calls in discovery. Yet, Plaintiffs do not rely on any of those call recordings, presumably because they demonstrate that AFS's sales representatives did, in fact, disclose the material terms of the newsletter subscriptions. Plaintiffs' reliance on these hearsay complaints is also tantamount to an end around the standards for customer surveys, which courts in this Circuit have recognized must consist of a representative sample from a proper universe, conducted by an expert in the field and based on data that are properly gathered and accurately reported.

When the allegations of deception are evaluated based on the business documents that are probative and do meet the standards of admissibility—namely, the telemarketing Scripts and the recordings of sales calls, Plaintiffs' FTC Act and UTPCPL claims fail, as a matter of law.

### A. Plaintiffs Rely on Inadmissible Hearsay Evidence Consisting of Unverified Complaints and Declarations Representing Less Than One Percent of AFS's Sales.[17]

Hearsay, which is an out of court statement proffered for the truth of the matter asserted, is inadmissible at trial pursuant to Federal Rules of Evidence 801(c) and 802, unless it qualifies

[16] Federal Rule of Civil Procedure 56(c)(2) provides that: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes to Rule 56(c)(2) further note that: "The burden is on the proponent to show that the material is admissible as presented." Fed. R. Civ. P. 56, Advisory Committee Notes, 2010 Amendment.

[17] Pursuant to the Fifth Amended Scheduling Order, AFS will file a motion *in limine* on August 2, 2023 to exclude from the trial in this action the hearsay documents identified in the two "Rule 807" notices served by Plaintiffs and relied upon by them in their two summary judgment motions.

for one of the hearsay exceptions. Based on their two "Rule 807 notices" served on June 22 and June 23, 2023, Plaintiffs appear to concede the lack of any applicable hearsay exception under Rules 803 and 804 and, instead, intend to invoke the so-called "residual" hearsay exception. Federal Rule of Evidence 807 provides that hearsay is admissible under the residual exception only under the following two conditions:

> (1) The statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) It is more probative on the point for which is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a). However, as the Third Circuit has observed, the residual exception should be used only rarely and in exceptional circumstances, so as not to create a gaping loophole in the hearsay rule. *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978). The proponent of a hearsay statement proffered under the residual exception "bears a heavy burden," and invoking the exception "demands 'some degree of rigor.'" *AAMCO Transmissions, Inc. v. Baker*, 591 F. Supp. 2d 788, 799 (E.D. Pa. 2008). Moreover, the district court is obligated to make specific findings prior to the admissibility of any hearsay exception pursuant to the residual exception. *See, e.g.*, *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 112 (3d Cir. 2001) (noting that "the District Court made careful and extensive findings in support of its conclusion" that this was one of those rare occasions"). Here, the totality of circumstances does not support a finding that either condition of admissibility under Rule 807 has been met, much less both conditions.

**1. Insufficient Guarantee of Trustworthiness**

There are multiple reasons why Plaintiffs cannot meet their "heavy burden" of demonstrating that the customers complaints and declarations are trustworthy. First, and

remarkably, neither the Plaintiffs nor the BBB made any attempt to investigate the veracity of the customer complaints. This is how the Commonwealth's 30(b)(6) representative responded when asked what the Office of Attorney General did to assess the veracity of the customer complaints:

> In my line of work, I take complaints as they come. We would ask every consumer to be as truthful and forthright as possible. So I can only assume that what consumers are reporting in their complaints are accurate. I have no reason to think otherwise.

*See* Exhibit EE, Oleckna Dep. at 152:18–24. The FTC's 30(b)(6) representative, Chief Litigation Counsel Bikram Bandy, described his "pretty random" process reviewing customer complaints as "scrolling down a couple of pages, and let me read this one, let me read that one." Exhibit OO, Bandy Dep. at 350:13–351:15. The BBB also disavowed any role in investigating the facts asserted in the complaints it received:

> So we don't do an investigation. We're not an investigative agency. We are an agency that's designed to help people and businesses and businesses resolve disputes.

*See* Exhibit X, Goode Dep. at 77:6–10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13–20.[18] Nonetheless, Plaintiffs proffer these third-party statements wholesale as true and imply, without having conducted any quantitative analysis, that these statements are representative of the opinions of hundreds of thousands of other AFS customers.[19]

---

[18] Significantly, in connection with this self-proclaimed role as a neutral between the parties, the BBB found it "very rare" for an answer by AFS to a complaint not to resolve the dispute to the customer's satisfaction. *See* Exhibit X, Goode Dep. at 136:8–14.

[19] The deposition testimony of Denise Haney, an AFS employee, provides insights with regard to a far more complete sample of AFS's customers—those who called the customer service center. Exhibit S, Haney Dep. at 303:13–305:13. AFS's customer service center fielded complaints, in addition to handling customers' address changes, subscription renewals, and account upgrades to receive additional publications. *Id.*

This random reliance on hearsay statements certainly fails where, as discussed in Section II(A)(2), below, the Plaintiffs' and the BBB's assumptions of trustworthiness are completely unfounded. Indeed, even the customer complaints from the Plaintiffs' ***handpicked declarants*** are riddled with material factual inaccuracies that undermine the core issues in their complaints, *i.e.*, whether the complainants spoke with AFS representatives, were told the terms of the subscription, and understood those terms, including the price. *Compare, e.g.*,

- Exhibit PP, Decl. of Kelly Rickard *with* Exhibit SS, Rickard Dep. at 75:4–6 ("I think by the time I filed my complaint in June, I wasn't recalling all of that conversation."); *id.* at 75:20–21 ("At the time of the declaration, I didn't recall that."); *id.* at 108:13–15 ("After listening to that phone call yesterday for the first time, I realized that I did provide my birth date."); *id.* at 124:17–19 ("I can't believe I provided my birth date. I honestly had no recollection and would not have thought I would have done this.");

- Exhibit TT, Decl. of Lori Ray at ¶ 3 ("I checked with the Head of School and he had no recollection of ordering the book.") *with* AFS000512 (audio recording of Bob Lovelady, Head of School, placing book order on October 22, 2019) and AFS0446052 (AFS letter responding to complaint by Mr. Ray); and

- Exhibit QQ, Decl. of Matthew Krause at ¶ 3 ("After this call, I did not believe that I had agreed to pay for the newsletter subscription.") *with* Exhibit RR, Krause Dep. at 63:20–23 ("Q. And from the conversation with the sales representative, you understood that there was an annual cost to a subscription for the newsletter, correct? A. I do.") and *id.* at 81:3–8 ("Q. So you know upon receiving the invoice that you needed to cancel your subscription or you would have to pay the $299, correct? [Objection omitted.] A. Correct.").

Second, the complaints relied upon by the Plaintiffs for the truth of the matters asserted did not always come from the specific employee at the customer who received the sales call, thus amounting to hearsay within hearsay. *See, e.g.*, Exhibit TT, Decl. of Lori Ray (FTC declaration of customer complaint by Human Resources Director, Lori Ray, even though book order was actually

placed by Mr. Ray's direct report, Bob Lovelady, Head of School). Andrew Goode of the BBB acknowledged that it is "[n]ot necessarily" the case the person interacting with the business at issue is the one who submits the complaint, and he had no information on how often this occurs. *See* Exhibit X, Goode Dep. at 60:7–20. By the estimate of AFS's forensic data expert, Margaret Daley, the complaints were made by someone *other than* the person on the call nearly 50% of the time. *See* AFS S.J. Br. at Exhibit R, Daley Rpt. at 32–33. And, even when the complainant or the declarant was the employee who interacted with AFS, the hearsay statements were not necessarily contemporaneous with the sales call, and they sometimes took place months, or even years, later. *See, e.g.*, Exhibit SS, Rickard Dep. at 107:23–108:1 ("On September 22 of 2021, I did not recall providing my date of birth ***almost a year before*** on a phone call. I thought that to be true at the time, yes.") (emphasis added).

Finally, the nature of the complaints received by the Plaintiffs and the BBB are not self-explanatory, and it is not always clear how they might relate, if at all, to the allegations in the Complaint. As Mr. Goode of the BBB observed, it can be "hard to tell" the nature of the customer complaint—*e.g.*, whether the complainant is asserting that it was never contacted by AFS or, alternatively, that it was contacted but allegedly misled by the sales call. *See* Exhibit X, Goode Dep. at 107:12–108:4; 113:6–19. Mr. Goode attributes that ambiguity in the complaints to the BBB's practice of having the complainant self-select among "broad" categories of issues (*e.g.*, billing issue or contract issue), *id.* at 114:5–16, and to what he describes as the "nebulousness" of the complaint categories. *Id.* at 115:20–25. In fact, the BBB would accept customer complaints that, even if valid, would not amount to civil liability under any federal or state law. *Id.* at 55:2-12.

The selective out-of-court statements Plaintiffs proffer from a small number of former AFS employees suffer from many of the same hearsay problems. *See, e.g.*, Commonwealth S.J. Br. at 17–

19. As a starting point, the Plaintiffs' citations of employee statements originate from only a handful of AFS employees who were among the dozens of employees at a single AFS branch in Boardman, Ohio. Yet, nothing in Plaintiffs' submission suggests this is representative of the views of AFS employees more generally. To put the selective nature of Plaintiffs' hearsay evidence in context, AFS at its height formerly employed ***287 telemarketing sales reps at 12*** branches, nationwide (which diminished year over year, and are now closed since the closure of the publication business and telemarketing sales operation). *See* AFS S.J. Br. (Exhibit Z). Indeed, Plaintiffs disclosed that they interviewed ***nearly 200 former employees—***yet they report nothing about what the ***other 198*** stated, presumably because those statements were unhelpful to their case.[20]

Meanwhile, even the testimony and statements of the handful of AFS employees who are cited, when read in full, do not substantiate Plaintiffs' assertions of facts. For example, Plaintiffs assert that one employee—a former telemarketing sales representative, Amy Luchette—expressed "concerns" that the "beginning of the script wasn't clear." But Plaintiffs glaringly omit the context and fail to provide to the Court Ms. Luchette's immediate clarification of that statement. When read in full, Ms. Luchette testimony was that she ***did not*** have concerns that the script as a whole was unclear or misleading; indeed, her testimony was unequivocal on that point:

> Q: Did you have any concerns about the script itself in terms of clarity?
>
> ***A: No.***
>
> . . .
>
> A: I did feel that the beginning of the script [which discussed the publication itself and the benefits of the publication] wasn't clear. It almost seemed like a different message than what we ended up communicating at the bottom of the script. ***But the bottom of the script [including the offer and disclosure paragraph] I felt was clear.***

[20] Plaintiffs have refused to produce notes from their interviews of nearly 200 former AFS employees.

*Id*. at PX 9, 146:14–16, 146:23–147:25 (App. 00374–75) (emphasis added to highlight Plaintiffs' intentional omission).

Similarly, Plaintiffs cite the testimony of another part-time, former, telemarketing sales representative, Kelly Strosnider, as claiming that she stopped working for AFS because, "I just felt like I was somewhat misleading folks" and that she was uncomfortable because "not telling them until the end of the call that it was a subscription with a right of cancellation . . . . And I think that's where a lot of the confusion came in, where people assumed it was a free trial and not something that they had to opt out." Commonwealth S.J. Br. at 18. But, again, they fail to cite the rest of Ms. Strosnider's testimony that made clear that she "never put through a sale that I didn't feel a customer was aware of what they were getting into." Exhibit C, Strosnider Dep. at 81:16–18. Strosider affirmed that she "strove to make sure that each and every one understood the offer and disclosure." *Id.* 81:8–14. Ms. Strosnider explained how she was confident that customers understood the offer when she interacted with them:

> Q: [I]s it correct that you felt strongly about making sure that the customers you spoke with understood the offer and the terms of the subscription?
>
> A That's correct. I was always very clear. I was always very distinct. I always took my time in saying, this is how this works. This is what it will cost. Here's how you cancel. I was very meticulous in not speeding through that part of the call because I wanted them to fully be aware that they were, indeed, take the subscription that they had the right to cancel.

Ms. Strosnider elaborated in her own words:

> I would go–again, I would go over everything and clarify everything. And even if I had already disclosed to them the disclosure paragraph, I would again at the end of the call say, hey, I know I've already told you this. But I'm just going to go over it again, one more time, to make sure you understand everything. And I would read the disclosure paragraph and proceed through the end of the call. ***So yes, I do feel like the customers I dealt with understood***.

*Id.* 82:1–11. None of that is presented in Plaintiffs' statement of material facts.[21]

**2. Non-Hearsay Evidence is More Probative on the Material Issues.**

Plaintiffs also cannot meet their heavy burden of satisfying the second condition of the residual hearsay exception—*i.e.*, that the proffered third-party hearsay is "more probative" than non-hearsay documents in the parties' possession.

Both the Federal Trade Commission and the Commonwealth in their 30(b)(6) deposition testimony described their complaint against AFS to be based on the telemarketing Script "as written" or "as read":

> Q. Okay. So let me ask the question again and see if I have an understanding of the Commonwealth's position in this case. Is it basing its claims against AFS in this litigation based on the adherence to the scripts or based upon the sales representatives departing from those scripts. [Objection omitted.]
>
> THE WITNESS: It's based on the script as written.

Exhibit EE, Oleckna Dep. at 129:6–17. *See also* AFS S.J. Br. at Exhibit K, Bandy Dep. at 35:24–36:3 ("But I think to use the word you would use, primarily, this is primarily about the scripts as read and not about the deviation."). Yet, incredibly, despite purporting to base their Complaint on the Scripts themselves, the Plaintiffs eschew the primary source material—the telemarketing

[21] Even less reliable and probative are the employee "chats" between 2020–2021 that Plaintiffs cite. Even if such casual online chats, between sales representatives and similar employees had any probative value, Plaintiffs' citations reflect a rank mischaracterization of the full conversations. In one stark example, both the Commonwealth and the FTC's summary judgment briefs cite an employee as complaining: "I don't [like] to work for a company that pulls some crazy illegal sh*t every d*mn day," to which another AFS employee responded "yeah exactly. That's why I hate this job. I feel like I'm taking part in some illegal scam." Pls.' SMF ¶ 337(d); Commonwealth S.J. Br. at 18; FTC S.J. Br. at 18. But these employees were not talking about anything of relevance to this case. Rather, the source document (AFS0724368) shows that this comment was a telemarketing representative complaining to a colleague that a customer contact information included personal cell phone number not a work phone number, and that employee asserts this is "illegal." The rest of this document includes a highly inappropriate chat string between these employees, who use explicit terms to rant about their lives and jobs.

Scripts and the available call recordings—in favor of unverified complaints and declarations, some of which were made months after the fact and nearly half by persons who were not even parties to the calls.

Not only are these complaints and declarations proffered by the Plaintiffs less probative than the telemarketing Scripts and the recordings, but they have proven in many instances to be demonstrably false. For example, one of the Plaintiffs' declarants, Kelly Rickard, made the following misstatements in her FTC Declaration ***before*** hearing the audio recording of the AFS sales call:

- ***She did not think there was any financial obligation.*** *See* Exhibit PP, Decl. of Kelly Rickard at ¶ 4; *but see* Exhibit SS, Rickard Dep. at 75:16–76:1 ("Q. At the time of your declaration, did you recall that the sales representative indicated that an invoice would be sent? [Objection omitted.] A. No. At the time of the declaration, I didn't recall that. Q. But sitting here today, you don't deny that, in fact, the sales representative did indicate an invoice would be forthcoming, correct? A. Yes, I don't deny that.");

- ***She was not given a certain amount of time in which to cancel the subscription.*** *See* Exhibit PP, Decl. of Kelly Rickard at ¶ 4; *but see* Exhibit SS, Rickard Dep. at 77:12–78:5 (Q. And you confirmed for him that that statement in your declaration was not accurate; it that right? [Objection omitted.] A. At the time I made the declaration, I thought it was accurate, but after listening to the phone call back, it is, I guess, not accurate."); and

- ***The invoice has her birthday of October 4 on it which she knows she would not have provided to them at any point.*** *But see* Exhibit SS, Rickard Dep. at 108:10–15 ("Q. And, in fact, you did provide that information? A. Yes. After listening to that phone call yesterday for the first time, I realized I did provide my birth date.").

The primary documents—the telemarketing Script and the audio recording of the AFS sales call—prove that each of these statements by Ms. Rickard to the FTC was false, and the declarant has admitted as much after listening to the sales recording: "I think by the time I filed my complaint in June, I wasn't recalling all of that conversation." *Id.* at 74:24–75:6.

Similar discrepancies between the customer complaints and the audio recordings of sales calls can be found throughout the hearsay materials proffered by the Plaintiffs. *Compare, e.g.*,

- Exhibit UU, Decl. of Christopher Thomas at ¶ 3 ("I said that I did not want to receive the publication and ended the call") and *id.* at ¶ 5 ("I did not provide the person on the phone with business address, but I imagine they could have gotten it from my website.") *with* Exhibit KK, AFS0639723 (audio recording of sales call has no statement from Mr. Thomas not wanting the publication and clearly reflects him providing his business address);

- Exhibit NN, Decl. of Wendy Babcock at ¶ 4 ("The representative did not mention anything about how to cancel the trial subscription during the call.") *with* Exhibit LL, AFS0000581 (audio recording of sales call reflects sales representative clearly explaining how to cancel the subscriptions and providing the 60-day right of cancellation."); and

- Exhibit OO, Decl. of Sandra Prevost at ¶ 3 ("I declined the offer and explained that we did not have money in the budget to it.") and *id.* at ¶ 4 ("I asked why she needed my birthdate. The caller explained that my birthdate would function as a password to receive the two free publications.") *with* Exhibit MM, AFS0000511 (audio recording of call with a male representative named Mike, not a woman as Ms. Prevost mistakenly recalled, has no statement by her declining the offer or asking why a birthdate was needed)

Clearly, the hearsay declarations and customer complaints are not the "more probative" evidence, as the second condition of admissibility under the residual exception requires; it is the telemarketing Scripts and the audio recordings that are the most probative evidence, and those documents are in the Plaintiffs' possession.

Undaunted by the proven unreliability of the hearsay statements, Plaintiffs can be expected to cite to any number of inapposite FTC cases that purportedly support the admission of this evidence. There are FTC cases involving preliminary injunction proceedings, where the admissibility standards are relaxed, in contrast to trials on the merits. *See, e.g., FTC v. Wilh. Wilhelmsen Holding ASA, et al.*, 18-cv-00414, ECF No. 87 (D.D.C. July 13, 2018) (expert reports, declarations and deposition testimony in preliminary injunction proceeding); *FTC v. Staples, Inc.*

*et al.*, 15-cv-02115, ECF No. 444 (D.D.C. Apr. 20, 2016) (same); *see also United States v James*, Civil Action No. 11-913, 2011 WL 1422894, at *3 n.7 (E.D. Pa. Apr. 12, 2011) ("evidence that might constitute hearsay is admissible in a preliminary injunction hearing."). There are other FTC cases that have admitted third-party hearsay when the first-party documents were not available, which is not the case here. *See, e.g.*, *FTC v. Mag. Sols., LLC*, Civil Action No. 7-692, 2009 WL 690613, at *2 (W.D. Pa. Mar. 16, 2009) (hearsay evidence particularly probative because defendants conceded that they failed to retain all records); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 609 (9th Cir. 1993) (hearsay letters admissible to prove prices paid by consumers, where defendants proffered no conflicting evidence).

In sum, there is no blanket rule allowing Plaintiffs to admit hearsay into the record simply by invoking the residual exception. Or, as another district court put it: "There is no FTC-consumer complaint exception to the hearsay rule." *FTC v. AMG Servs., Inc.*, No. 12-cv-00536, 2014 WL 317781, at *15 (D. Nev. Jan. 28, 2014).

**3. Plaintiffs Are Effectively Proffering a Survey without Even Attempting to Meet Any of the Established Standards for Such Hearsay Evidence.**

It is not uncommon in consumer protection actions for either the plaintiff or the defendant (or both) to proffer a survey on the meaning of marketing communications. *See, e.g.*, *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 353 (D.N.J. 2020). Here, the material terms of the AFS subscriptions (their cost and duration, the invoicing with the second newsletter, and the right to cancel) are all clearly disclosed in the telemarketing Scripts and accompanying e-mails, and they are confirmed by the recording of sales calls. *See, e.g.*, *id.* ("A plaintiff is not required to produce and rely on a survey when 'consumer deception can be determined by examining the challenged name or advertising on its face.'") (citing *Novartis Consumer Health v. Johnson & Johnson-Merk Consumer Pharms. Co.*, 290 F.3d 578, 587 (3d Cir. 2002)). Nevertheless, if the

Plaintiffs wanted to build a record of deception or confusion extrinsic to the primary source materials, they needed to comply with the well-established standards of customer surveys.

As the Third Circuit has recognized, survey results are inadmissible hearsay unless the satisfy certain evidentiary standards:

> A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516 n.14 (3d Cir. 1998) (citing *Pittsburgh Press Club v. United States*, 579 F.2d 751, 755–58 (3d Cir. 1978)); *see also Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 319–20 (E.D. Pa. 2007). Plaintiffs' hearsay evidence meets none of these standards.

First, Plaintiffs made no attempt to examine a representative sample of AFS sales transactions; instead, they have proffered an assortment of unverified complaints and declarations. The FTC's 30(b)(6) witness, Chief Litigation Counsel Bikram Bandy, admitted as much when he described his own "random" process of evaluating the complaints sufficient only to get the "gist" of issues raised without quantification or analysis:

> I mean I kind of was reading through–you know, sort of scrolling down, reading through different narratives that were in the complaints, in the spreadsheet, saying, okay, well, what is this person saying. Like okay. And then read a few more, read a few more, read a few more. And ***I'm not like reading them in order***, but I'm just like scrolling down a couple of pages, and ***let me read this one, let me read that one***. ***It was pretty random***. And then after awhile, I'm like okay, it's like–***I felt like I had the gist of it***. Okay, I see people are complaining about like the same kinds of things, like cancellation wasn't honored or I didn't order a book or I didn't think I ordered anything and like now I'm getting a bill. Like so I saw that level of–I saw similar complaints about that. And I reviewed enough to get to a point where I'm like okay, I see that we have complaints from consumers on the issues that, you know, are relevant to the complaint.

* **

> Q. Is it fair to say that you didn't quantify those categories of complaints yourself?
>
> A. Yes, that's fair to say.

AFS S.J. Br. at Exhibit K, Bandy Dep. at 351–53.

Both Plaintiffs' 30(b)(6) witnesses conceded ignorance as to how these select complaints relate to the large universe of AFS transactions. *Id.*, Bandy Dep. at 350:13–53:11; Exhibit EE, Oleckna Dep. at 148:23–155:9, 172:7–22, 206:3–9, 214:24–215:23. By contrast, AFS's expert, Margaret Daley, has done the due diligence, and she found that the BBB complaints (the largest source of complaints proffered by the Plaintiffs) amount to less than .05% (*i.e.*, less than 1 in 2000) of all AFS orders. *See* AFS S.J. Br. at Exhibit R, Daley Rpt. at 22–27. Second, the assortment of customer complaints and declarations relied upon by Plaintiffs was not collected and subjected to analysis by a survey expert following appropriate protocols; indeed, Plaintiffs have proffered no affirmative experts at all this case to address the statements by AFS's customers. Finally, in order for such hearsay evidence to be admissible, the survey design must "fit" the issues to be decided in the case. *See, e.g.*, *Merisant Co.*, 242 F.R.D. at 320 (citing *J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 (D.N.J. 2002)). Here, there was no survey design or common questionnaire submitted to customers; quite the contrary, the hearsay proffered by Plaintiffs consists of an assortment of customer issues which do not necessarily relate to any of the claims in this case or any other type of civil liability. *See* § I(A)(1), *supra*; *see generally Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 558 (D.N.J. 2014) ("Although some methodological flaws go to weight, here the methodology is unreliable at each step . . . McHale's survey valuation must be excluded as unreliable.").

Plaintiffs will likely respond that the assortment of out-of-court statements are not being proffered as a formal customer survey, and that much is true. But, at the same time, Plaintiffs cannot admit into evidence the varied experiences of a non-representative sample of AFS customers simply by removing the label "survey" and jettisoning any quality-control standards to justify this hearsay evidence. *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.*, No. 13-cv-324, 2017 WL 3528606, at *7 (D. Del. Aug. 16, 2017) (recognizing that survey evidence need not be "scientific . . . in any formal sense," but excluding an "informal survey" that was not "moored in some reliable process that can be tested on cross-examination"). Not only would this amount to a huge loophole in the hearsay rule, the result would be fundamentally unfair to the Defendants. A customer brought into Court is subject to cross-examination and impeachment, as AFS was able to do effectively in its examinations of the only two customers deposed by Plaintiffs, Kelly Rickard and Matthew Krause. Likewise, any expert who conducts a survey of customers is subject to rigorous scrutiny of data and methodology. *See id.* (citing *United States v. Mitchell*, 365 F.3d 215, 244–45 (3d Cir. 2004)). In contrast, the wholesale introduction of hundreds of unverified customer complaints and a multitude of declarations is directly at odds with the fundamental purposes of the hearsay rule, which is to afford the opposing party an opportunity for cross examination and the trier fact an opportunity to evaluate the witnesses' credibility. *See, e.g.*, *N.L.R.B. v. First Termite Control Co.*, 646 F.2d 424, 426–27 (9th Cir. 1981); *United States v. Olano*, 62 F.3d 1180, 1189 (9th Cir. 1995).

**B. AFS's Communications as a Whole Were Not Likely to Deceive Prospective Subscribers of Its Newsletters and Books.**

**1. Plaintiffs invoke a vague and arbitrary standard that violates AFS's right to due process under the Fifth and Fourteenth Amendments.**

As discussed above, Plaintiffs' claims of deception rest largely on cherry-picked, hearsay customer complaints that Plaintiffs have failed to verify, analyze, or quantify in any way. *See also*

AFS S.J. Br. at 33–34 (discussing testimony from Plaintiffs' Rule 30(b)(6) witnesses confirming they relied on select complaints that were not verified or quantified in any way). Moreover, Plaintiffs have persisted in pursuing their claims in the face of unrefuted evidence demonstrating that the particular complaints on which their case relies represent an insignificant and unrepresentative segment of AFS's customers. *See id.* at 34–35. In doing so, they have sought to enforce their respective statutes in such a vague and overbroad manner that, not only AFS, but virtually any business could be subject to an enforcement action based on unverified customer complaints.

It is well established that "[v]irtually all representations, even those that are true, can be misunderstood by some consumers." *In re Cliffdale Assocs., Inc.*, Docket 9156, 1984 WL 565319, at *37 (Fed. Trade Comm'n Mar. 23, 1984).[22] Not surprisingly, then, virtually all businesses will receive complaints that some customers misunderstood or felt misled by the company's sales pitch—and this is especially true in the modern age of Internet reviews. Indeed, the FTC recognizes as much. *See* FTC, Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, (acknowledging that "misrepresentations are prevalent" in online customer reviews).[23] Notwithstanding that recognition, Plaintiffs base their case on unsubstantiated complaints that they have made no effort to verify or analyze because those complaints allege, for example, that AFS was operating a "scam." *See, e.g.*, FTC S.J. Br. at 15–17; Commonwealth S.J. Br. at 15–17.

---

[22] The FTC continues to rely on its findings in *Cliffdale* as setting its own policy for what constitutes deceptive conduct. *See, e.g.*, Federal Trade Commission Advertising Enforcement, *revised* March 1, 2008, available at https://www.ftc.gov/sites/default/files/attachments/training-materials/enforcement.pdf.

[23] Available at https://www.ftc.gov/system/files/ftc_gov/pdf/r311003consumerreviewsandtestimonials_nprm.pdf.

They do so, moreover, even though a simple online search of Yelp, Google, or indeed BBB reviews and complaints for other reputable news publications—including *The Wall Street Journal*, *The New York Times*, and *The Philadelphia Inquirer*—demonstrates that some segment of customers thinks all of them are "scams":

- "This is a predatory subscription company. Under no circumstances should you do business with their subscription service. . . . I called customer service and they will not refund the predatory $40. . . . ***What a scam***." Review of *The Wall Street Journal* (Feb. 23, 2023), https://www.yelp.com/biz/the-wall-street-journal-new-york?hrid=4CZ6yKv6LMeexm6Ep_39YA (emphasis added).

- "This company is a ***scam***. . . . I called to cancel at the beginning of January and that was that. Little did I know they kept charging me. . . . The Wall Street journal should be ashamed of themselves for trying to ***scam*** people out of their money. ESPECIALLY STUDENTS! I can tell you for a fact I will tell as many people as possible how poor this paper represents itself and how ***it is a SCAM***." Review of *The Wall Street Journal* (Mar. 1, 2019), https://www.yelp.com/biz/the-wall-street-journal-new-york?hrid=KrIo37RVkoIAJ7EIkZJ4lA (emphases added).

- "The wall street journal subscription ***is a SCAM***. . . . The Government should shut this down." Review of *The Wall Street Journal* (Aug. 14, 2018), https://www.yelp.com/biz/the-wall-street-journal-new-york?hrid=WRjS3MKh3r9nuCLwrhykdA (emphasis added).

- "It's a ***scam***." Review of *The New York Times* (Sept. 13, 2021), https://www.yelp.com/biz/the-new-york-times-new-york?hrid=i42jxqDF1ZiMGLGRKNdP-g (emphasis added).

- "[T]he customer service is terrible and ***they are running a scam***." Review of *The New York Times* (Aug. 16, 2019), https://www.yelp.com/biz/the-new-york-times-new-york?hrid=IT5eFOxLmHQ1bOhelCMmaA (emphasis added).

- "Never get a subscription. They will never let you cancel. . . . ***What a scam!***" Review of *The New York Times* (Mar. 2, 2015), https://www.yelp.com/biz/the-new-york-times-new-york?hrid=8Igheg_Z6dNNXObHQlOKLQ (emphasis added).

- "[S]igned up for promo and then automatically charged $38 with no notice - ***total scam*** - indicates complete lack of integrity- not good for media company - lack of values permeates organization - they can't be trusted." Review of the *Philadelphia Inquirer* (June 8, 2023), https://www.yelp.com/biz/philadelphia-inquirer-philadelphia?hrid=IZXXzPIgXSsDKXR6JpVuSw (emphasis added).

- "What a ***scam***. . . . They purposely make it impossible for you to cancel." Review of the *Philadelphia Inquirer* (June 6, 2023), https://www.yelp.com/biz/philadelphia-inquirer-philadelphia?hrid=AePcGa1ja9Nsmz0biRt-0w (emphasis added).

- "The Philadelphia Inquirer is ***running a SCAM!*** They have no problem taking the money out your account but WONT DELIVER YOUR PAPERS that YOU PAID FOR!" Review of the *Philadelphia Inquirer* (Oct. 22, 2017), https://www.yelp.com/biz/philadelphia-inquirer-philadelphia?hrid=hw4ZAFr78eqx-ZxTnoBabQ (emphasis added).

Conversely, in the same way that the above-referenced publications have many satisfied subscribers counterbalancing the anecdotal complaints and negative Internet reviews they received, AFS has positive reviews to contrast the hearsay statements relied upon by Plaintiffs. *See, e.g.*, Exhibit II, AFS0458618 ("I think it's a great resource . . . we are always learning something."); Exhibit JJ, AFS0506239 (testimonials from confidential subscriber survey).

If the FTC and Commonwealth were permitted pursue an enforcement action because some small subgroup of customers accuses a business of running a "scam" or subjects it to other forms of online invectives, virtually no business would be safe from the government's overreach.[24] The arbitrariness and unreliability of online invectives would displace any discernable legal standard for what constitutes a deceptive trade practice under the FTC Act or UTPCPL. The Fifth and Fourteenth Amendments to the U.S. Constitution prohibit such arbitrary and capricious regulation. U.S. Const. Amend. 5; *id.* 14.

Indeed, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996). When a statute or standard governing conduct "either forbids or requires the

---

[24] Indeed, even the Pennsylvania Attorney General's Office is not immune from negative online reviews. *See, e.g.*, Mz. Nica, Google Review of the PA Attorney General, https://g.co/kgs/5jEoa9 ("Unprofessional, ignorant, brainwashed and very corrupt.").

doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application," it is "unconstitutionally vague" and "violates the first essential of due process of law because it neither affords fair notice to potential violators nor provides standards for enforcement." *Rode v. Dellarciprete*, 845 F.2d 1195, 1199 (3d Cir. 1988) (internal quotation marks and citations omitted). "In a void-for-vagueness challenge, [courts] must ensure that a statute or standard is fair in that it is not so vague that a party would not know what conduct is prohibited." *Gilson v. Pa. State Police*, 676 F. App'x 130, 137 (3d Cir. 2017). That is exactly what would occur if the FTC and Commonwealth are permitted to rely on unrepresentative online reviews and complaints.

These constitutional concerns are especially pronounced as applied here to a publication business, which engages in core First Amendment activity. "Statutory vagueness is especially problematic when it may 'chill' the exercise of protected first amendment rights." *Rode*, 845 F.2d at 1199. For thirty years, AFS published biweekly specialty newsletters and annual reference guides, researched, written, and edited by a team of highly trained journalists, lawyers, and subject-matter experts, and subscribed to by hundreds of thousands of business and organization managers and executives. Nothing is closer to the heart of the First Amendment's protections than the publication of newsletters and books.

When an objective standard required by the law is applied, there is no genuine dispute that the communications at issue were not deceptive. *See* AFS S.J. Br. at 27–35. As a matter of settled law, "an advertisement [will] ***not*** be considered deceptive merely because it could be 'unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37 (emphasis added) (footnote omitted). In contrast to the unverified complaints and the

declarations from hand-picked customers, the unrebutted evidence shows that those complaints are not representative of the business executives and managers to whom AFS sold its subscriptions. *See* AFS S.J. Br. at Exhibit R, Daley Rpt. at 22–33 (finding the BBB complaints relied on by Plaintiffs represent less that 0.05% of orders during the relevant timeframe and, thus, a much smaller percentage of individuals presented with the telephone sales communication; finding also that a substantial percentage of the BBB complaints were not valid for various reasons, including that they were demonstrably inaccurate or made by someone other than the person to whom the sale was made).

In sum, as a matter of statutory interpretation and constitutional principle, Plaintiffs here should be bound by the objectively reasonable standard that is well established and known to govern claims of deception. To allow them to eschew it in favor an undefined and subjective standard embodied in the complaints made by a small number of vocal customers would violate AFS's Fifth and Fourteenth Amendment right to fair notice and due process of the law.

**2. Scripts used by AFS were not likely to deceive or create confusion among its business customers.**

As set forth in AFS's Summary Judgment Brief, AFS's sales communications, when viewed as a whole, as the law requires, had no tendency to deceive AFS's audience of business executives and managers acting reasonably under the circumstances. *See* AFS S.J. Br. at 27–32. Plaintiffs' arguments to the contrary are factually and legally unsupportable for several reasons.

***First***, in a misplaced attempt to paint AFS's sales communications as somehow deceptive despite being literally true, Plaintiffs "engage in disputatious dissection," while ignoring the net impression of the entire sales communication. *See* FTC S.J. Br. at 26–27 (quoting *FTC v. Adept Mgmt.*, Civ. No. 16-cv-00720, 2018 WL 4623152, at *2 (D. Or. Sept. 25, 2018) (Clarke, U.S.M.J.)); *see also* Commonwealth S.J. Br. at 37 (recognizing the "totality" of the communication

must be considered). As an initial matter, Plaintiffs' failure to even consider the written emails that are ***expressly incorporated into the verbal phone presentation*** shows they are not evaluating the entire sales communication as the law requires. *See* FTC S.J. Br. at 29–33 (focusing solely on the verbal phone presentation, while ignoring the confirmatory writings that are expressly incorporated by reference in the verbal presentation); Commonwealth S.J. Br. at 39–43 (same). When the totality of the phone presentation and the confirmatory writings are considered, as the law requires, it is undisputed that AFS's sales communication is truthful and non-misleading.[25] *See Beneficial Corp. v. FTC*, 542 F.2d 611, 616–17 (3d Cir. 1976) ("[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context."); *see also* AFS S.J. Br. at 27–32. Plaintiffs, however, rely solely on isolated phrases in the verbal presentation, which is fatal to their claims. *See Beneficial Corp.*, 542 F.2d at 616–17.

For example, Plaintiffs focus on language in the Offer Paragraph of the Executive Script that states AFS would send copies of the publication "at no risk."[26] *See* FTC S.J. Br. at 29; Commonwealth S.J. Br. at 39. According to Plaintiffs, AFS's use of the phrase "no risk" "falsely impl[ied] that consumers would have no obligation to pay for" the publication being sent. *See id.* Plaintiffs' conclusion, however, ignores the clear spoken explanation by phone that an invoice for

[25] Indeed, when the totality of the phone presentation, standing alone, is considered, there can be no genuine dispute that it has no tendency to deceive. The plain text of the Executive Script discloses all material terms, expressly state the subscription annual price, and provide step-by-step instructions for accepting, trying, and cancelling the subscription. *See* AFS S.J. Br. at Exhibit L (Script).

[26] Plaintiffs inject their own adjectives throughout their briefs and in their discussion of the Executive Script, but the Script is a writing that speaks for itself. For example, Plaintiffs claim "the Offer Paragraph said that AFS was sending out the ***unsolicited*** publications 'at no risk.'" FTC S.J. Br. at 29 (emphasis added); Commonwealth S.J. Br. at 39 (same). The Executive Script did not contain this statement, and AFS did not send "unsolicited" publications. *See* § II(D), *infra*; *see also* AFS S.J. Br. at Exhibit L (Script).

the year would be sent along with the second issue and that the offer was "no risk" because the customer could cancel within sixty days. *See* AFS S.J. Br. at Exhibit L (Script). This spoken explanation also included the cost for the year, the number of issues included in that annual cost, and specific instructions for cancelling with no financial obligation. *See id.* These details were then confirmed in written emails, which the FTC has admitted were not misleading, and which Plaintiffs improperly ignore. *See* AFS S.J. Br. at 27–32.

In tacit recognition that the net impression of the ***entire*** sales call is a clear description of the cost and details of the publication and the step-by-step instructions on the method for canceling without financial obligation, Plaintiffs attempt to excise portions of the call from the totality of the communication. Indeed, Plaintiffs argue that "AFS's 'Disclosure Paragraph' in and of itself is internally inconsistent and insufficient as a matter of law to ***change*** the net impression of the call."[27] FTC S.J. Br. at 29 (emphasis added); Commonwealth S.J. Br. at 40 (same). But the "Disclosure Paragraph" is not a separate communication that could somehow ***change*** the sales communication; ***it is part of the sales communication itself***. Accordingly, the language in the Disclosure Paragraph ***contributes to and is part of*** the net impression of the sales communication. Plaintiffs' attempt to treat it as a distinct communication is incorrect as a matter of fact and law and fatal to their claims. *See Beneficial Corp.*, 542 F.2d at 616–17.

In short, Plaintiffs attempt to construe AFS's sales communication as deceptive by (1) ignoring the confirmatory writings that are expressly incorporated; (2) focusing on isolated words and phrases taken out of context and modified by their own adjectives; and (3) excising substantial, material portions of the telephone communication. Their proposed construction

---

[27] Plaintiffs do not explain how the Disclosure Paragraph is purportedly "internally inconsistent," and, indeed, it is not.

contravenes common sense and the law. *See Beneficial Corp.*, 542 F.2d at 616–17; AFS S.J. Br. at 27–32.

***Second***, the undisputed factual record forecloses Counts I and V of Plaintiffs' Complaint to the extent their claims rely on the argument that "Defendants affirmatively misrepresent the true purpose of the call, even when asked during their first contact with consumers." FTC S.J. Br. at 28 (cleaned up); Commonwealth S.J. Br. at 38–39 (same). Plaintiffs' argument is based solely on the so-called "Secretary Script," some versions of which suggested a negative response if a secretary or other "gatekeeper" asked the telemarketing representative whether the caller was "selling something." *See* FTC S.J. Br. at 28; Commonwealth S.J. Br. at 38–39. But the evidence demonstrates this challenged language was not used in practice.

This is not guesswork: the entire interaction with customers, including the initial contact with any secretary or gatekeeper is recorded, and those recordings have been produced en masse in this litigation. Here, the unrebutted record evidence demonstrates that, of a representative sample of call recordings, only 63.19% included preliminary contact with "a secretary or 'gatekeeper' prior to reaching the intended party." AFS S.J. Br. at Exhibit R, Daley Rpt. at 19. Of that subset, less than one percent (0.32%) ***even asked*** if the AFS representative was selling something. *See id.* ***Zero*** recordings in this representative sample involved a false, negative response to that question. This was confirmed by unrebutted testimony of AFS witnesses, including Colin Drummond and Ed Satell, who stated that, in the thousands of recordings that they reviewed in the course of their employment and leadership at AFS, neither ever heard an AFS telemarketing representative tell a secretary or gatekeeper they were ***not*** selling something. Exhibit A, Drummond Dep. 81:3–84:15; Exhibit H, Satell Dep. Vol. I at 147:11–12 ("I've never heard it said."). Indeed, Mr. Satell unequivocally testified he would "never allow" AFS to have said "no"

if asked "are you selling something" because "we don't allow anything that's not true to be said." Exhibit H, Satell Dep. Vol. I at144:19–21; 145: 18–20.

Tellingly, despite filing 387 paragraphs of purportedly undisputed material facts and access to thousands of produced recorded telemarketing sales calls, Plaintiffs have not identified a single instance in which AFS told a secretary or gatekeeper that nothing was being offered for sale.[28] *See generally* Pls.' SMF. Moreover, it is undisputed that AFS did not sell its publications to secretaries or gatekeepers. *See* AFS S.J. Br. at 33. In fact, AFS telemarketing representatives would be disciplined or even terminated if they sold to a secretary or gatekeeper rather than a manager or executive with authority to agree to the publication; and in such instances AFS branch managers or quality assurance would immediately cancel any such order. Exhibit A, Drummond Dep. 64:4–11; Exhibit E Orischak Dep. at 108:16–24; Exhibit J, Luchette Dep. at 140:15–22.

The cases Plaintiffs rely on to suggest that a court need not look past the first contact are not on point for a number of reasons, including that those cases involved the question of whether the court should look beyond an initial, literally false and facially deceptive statement that was subsequently followed by a separate communication ***to the same individual*** providing ***different*** information than the original communication. *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 633 (6th Cir. 2014) (corrections and disclaimers in subsequent communications); *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961) (facially deceptive print advertisement also determined to injure the advertiser's competitors); *In re Encyc. Britannica*, Docket 8908, 1976 WL 179997, at *52 (Fed. Trade Comm'n Mar. 9, 1976), *aff'd*, 605 F.2d 964 (7th Cir. 1979)

[28] Notably, the FTC acknowledges that a communication's materiality is a requirement for a claim under the FTC Act, but the FTC makes no attempt to argue that the "Secretary Script" was material. *See* FTC S.J. Br. at 25, 35–36. Nor could the FTC make any such argument because a communication must be received by the allegedly deceived customer in order to have any effect on the customer's purchasing decision.

(truthful information was "withheld until after applicants ha[d] kept an appointment and ha[d] taken certain initial screening tests"); *FTC v. City W. Advantage, Inc.*, No. 08-CV-00609, 2008 WL 2844696, at *3 (D. Nev. July 22, 2008) (telemarketers made literally false statements). There are no similar facts here. As a result, Counts I and V of the Complaint fail insofar as they are based on AFS's purported communication to secretaries.

***Third***, the cases the FTC cites for the proposition that an advertisement may be deemed deceptive on summary judgment are materially different from this case. *See* FTC S.J. Br. at 27 & 27 n.27. In *Adept Management*, for example, a company that was not affiliated with a newspaper sent advertisements designed to look like they were bills from the newspaper to renew existing subscriptions. 2018 WL 4623152, at *2–3. They were not. *See id.* Also, the fine-print disclosure on the back of the advertisement addressed magazine subscriptions, which led the court to conclude the disclosure was "confusing because it relate[d] to magazines, not newspapers" and "ineffective because it [was] buried in the middle of a block of text, with no prominent placement or distinguishing features." *Id* at *3.

In *FTC v. Cyberspace.com, LLC,* the individual defendants formed several companies for the specific purpose of carrying out their purposeful scam, pursuant to which they mailed $3.50 checks to individuals, which were designed to look like rebates owed to the consumers, but fine-print text intentionally hidden on the back of the document stated that cashing the check would enroll the individual in Internet service billed monthly to the consumer's phone bill. *See* 453 F.3d 1196, 1198 (9th Cir. 2006). Although hundreds of thousands of people cashed the checks, "less than one percent" of them ever logged in or used the accounts, demonstrating they did not even know they had signed up for service. *Id.* In contrast, AFS sold its subscriptions directly to the business executive or manager in charge of the subject area covered by the publication and took

care to ensure that each subscriber understood the terms before processing an order. *See* AFS S.J. Br. at 4–5, 28, 32–33; AFS SUF ¶ 8. In the event a quality check of a call demonstrated that a customer may not have understood the offer, the order was automatically cancelled. AFS S.J. Br. at 5–8; AFS SUF ¶¶ 17–19.

The other cases Plaintiffs cite in passing are equally inapposite for numerous reasons, including that they involved high-pressure sales tactics, targeted vulnerable populations, intentionally spoke too fast to be understood, made expressly false representations, and/or offered a product in exchange for payment of low-cost shipping, while hiding other continuity subscriptions in fine print. *Sandoz Pharmaceutical Corporation v. Richardson-Vicks, Inc.* involved a private lawsuit by one pharmaceutical company against a competitor, alleging violations of the Lanham Act. 902 F.2d 222, 223 (3d Cir. 1990). The Third Circuit affirmed the district court's holding that the plaintiff had not satisfied its burden of proving deception under the Lanham Act. *See id.* The facts of this case offer no support for Plaintiffs' Motions here. *See also, e.g., FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010) (misrepresenting the offer as a thank-you for participating in a nonexistent survey, stating falsely that the consumer was not being asked to buy any subscriptions but only to defray the costs of "getting them out to you," withholding information concerning the total cost of the subscription, and refusing to cancel unwanted subscriptions); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1139–47 (D. Nev. 2015) (discussing deceptive online advertisement that prominently displayed an offer for a free or risk-free CD, required payment information purportedly for shipping and handling or downloading the CD, and only in fine print disclosed that the individual would be billed for a continuity membership plans that was unrelated to the CD that was the hook for providing the credit card information in

the first instance).[29] Again, the facts regarding the sale of AFS's subscriptions, which expressly disclosed the term, the cost and the process of cancellation, are materially different.

Plaintiffs ultimately rely heavily on a 2013 case from Iowa state court, applying Iowa law, that Plaintiffs claim has "factual circumstances similar to this case." *See* FTC S.J. Br. at 30 (citing *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12 (Iowa 2013)); Commonwealth S.J. Br. at 40 (same). Plaintiffs go so far as to assert that "there is no real distinction between AFS's promise to send out publications 'at no risk' and the *Vertrue* defendants' 'risk-free 30-day trial membership.'" FTC S.J. Br. at 32; Commonwealth S.J. Br. at 42. This case, however, is nothing like *Vertrue*.

To begin with, AFS marketed its own products to business executives and managers in business-to-business sales calls only, while the *Vertrue* defendant's "marketing practices disproportionately affected elderly Iowans" and either elicited inbound contact through deceptive means or contacted them at their homes. 834 N.W.2d at 44; *see also id.* at 34 n.11 (describing

[29] *See also, e.g.*, *FTC v. USA Fin., Ltd. Liab. Co.*, 415 F. App'x 970 (11th Cir. 2011) (involving a scheme pursuant to which consumers were offered a credit card with a $2,000 credit limit, 8.9% interest rate, and cash-advance capabilities in exchange for a $200 fee but, instead, were sent a merchant card that could only be used to buy merchandise from the defendants and which were used by only 3% of consumers who purchased them); *FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018), *rev'd on other grounds*, 141 S. Ct. 1341 (2021) (involving a payday loan scheme that targeted "cash-strapped" consumers, facially misrepresented the total cost of the loan, and hid key details in fine print); *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) (involving an individual who created a company to sell a get-rich-quick program pursuant to which potential customers were told they could easily earn $3,000 to $5,000 per mortgage deal working just five to ten hours per week; customers were charged $3,000 to $8,000 for the program; but, in fact, the program was incredibly time-consuming and difficult and "survey results from a marketing expert show[ed] that only a small percentage of customers were able to broker deals using [defendant's] method"); *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1962) (involving review of a cease-and-desist order issued by the FTC to enjoin advertising shoes as having therapeutic benefits they did not have); *FTC v. Patriot Alcohol Testers*, 798 F. Supp. 851, 856 (D. Mass. 1992) (making literally false statements in advertisements); *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021) (involving a private action against a financial advisor who affirmatively misrepresented to plaintiffs how he was investing their money); *Commonwealth v. Hush-Tone Indus., Inc.*, 4 Pa. Commw. 1 (1971) (enjoining advertisements for hearing aids that contained literally false statements but declining to order resitution).

inbound-contact solicitation); *id.* at 38–39 (describing outbound telemarketing). As a matter of law, when evaluating whether a sales communication has a tendency to deceive, courts must consider the communication from the perspective of a customer "acting reasonably in the circumstances," taking into consideration the sophistication of the intended audience. *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37. A communication that may tend to deceive elderly consumers does not necessarily have that tendency when the target audience are managers and business executives considering business or organizational purchases. Accordingly, *Vertrue* would be inapposite even if the communications at issue were identical. But, in fact, the communications at issue are materially distinct.

Indeed, the deceptive script that Plaintiffs allege is similar to AFS's Script was used for ***inbound*** calls, and the inbound nature of the call was a key factor in the Script's deception. *See id.* at 34–35. Specifically, an unsuspecting—often elderly—consumer would "initiate[] a call to purchase a product or service from an unrelated business having a partnership arrangement with [the defendant]"—a partnership of which the consumer, of course, was unaware. *Id.* at 34 n.11. At the conclusion of the call, the defendant's "partner" would "either personally solicit[] the consumer or transfer[] the consumer to one of [the defendant's] sales representatives for the purpose of trying to 'upsell' (*e.g.*, offer) the consumer a trial membership." *Id.* The unsuspecting consumer would be greeted with the opening line, "***To thank you***, we're sending you a voucher for a free $25 ***gift*** card to The Home Depot with a risk-free 30-day trial membership in Home Works Plus."[30] *Id.* at 35 (emphases added). Under these circumstances, the court concluded that "[o]pening with an ostensible 'thank you' . . . fosters the misleading impression that the new interaction is somehow

[30] Although the opening "thank you" is material to the finding of deception in *Vertrue*, Plaintiffs omit it from their primary discussion of the script, relegating it to the full-text rendition of the script in a footnote. *See* FTC S.J. Br. at 30 n.28; Commonwealth S.J. Br. at 41 n.36.

related to the initial transaction." *Id.* Furthermore, the combination of the thank-you "gift" card in the same sentence as the risk-free trial membership contributed to the net impression that the consumer "was merely acquiescing to a 'risk-free' ***gift***." *Id.* at *36 (emphasis added). There are no similar tactics or representations in this case, and the material distinctions do not stop there.

In *Vertrue*, the defendant was not selling its own services, but instead was selling a discount program, known as a "Buying Club Membership," which purportedly entitled the holder to discounts on unrelated goods and services. *See id.* at *27. Under Iowa law, the sale of Buying Club Memberships is subject to heightened disclosure requirements that were initially created for door-to-door sales because such "sales can often involve unfair, high pressure tactics." *Id.* at 21. In addition to the inbound-sales practices discussed above, the *Vertrue* record was replete with evidence of such tactics. *See, e.g.*, *id.* at 36 (discussing the use of a free gift card to confuse the consumer); *id.* (discussing "the hastily recited terms" and use of an "abrupt 'OK?'"); *id.* at *38 (describing an example call recording as follows: "the 'telemarketer had a heavy accent, and spoke at a very fast pace, rendering much of the pitch unintelligible'"); *id.* at *39 ("This unintelligible telemarketing pitch that proceeded at a lightning pace was likely to mislead consumers as to the material terms of the transaction."). The court described the defendant's outbound telemarketing as follows:

> Our review demonstrates that critical portions of the exchange cannot be understood without carefully scrutinizing the recording. It would have been unreasonable for the telemarketer to presume that [the elderly consumer] would have had an opportunity to record the telephone number provided for cancellation. In addition it would have been unreasonable for the telemarketer to presume [the elderly consumer] had acquired a basic understanding of the essential terms of membership enrollment. Yet, the telemarketer made no attempt to verify that [the elderly consumer] had actually understood and assented to those terms.

*Id.* at 38.

The evidence here shows no similar tactics or circumstances. On the contrary, there is substantial, unrebutted evidence demonstrating that AFS made every attempt to ensure its offer was fully understood and, in fact, cancelled orders when its quality control checks determined that a customer may not have fully comprehended the full terms of the subscription and cancellation policy. *See* AFS S.J. Br. at 5–7. In addition, AFS maintained a liberal cancellation policy that could be affected in numerous ways, including by mail, phone, fax, and email. *See id.*

Furthermore, there is no record evidence here that any customer ever paid for a subscription that was unwittingly ordered. In *Vertrue*, however, the defendant's expert testified that that "90%–95% of [defendant's] Internet customers would not have signed up for a membership" if the defendant had complied with the required disclosures under the law. *Vertrue, Inc.*, 834 N.W.2d at 29. In addition, the Consumer Protection Division of the Iowa Attorney General's Office conducted a survey of "Iowans who had been enrolled in one of four membership programs offered by [defendant]" and determined that "67% indicated they were either unaware of their membership or did not authorize the membership charges, or both." *Id.* at 19. Notably, "None of the survey respondents indicated consumer satisfaction." *Id.* Moreover, data from the defendant's own marketing studies showed "that 84.6% of members ***never used their memberships***." *Id.* at *36 (emphasis added). In stark contrast to these data, Plaintiffs here conducted no such survey and rely instead on hearsay complaints that they have not analyzed or quantified, while the unrebutted evidence demonstrates those complaints are not representative of AFS's customers and that AFS, in fact, has a thirty-year history of repeat, loyal customers. *See* AFS S.J. Br. at 4, 9–11, 32–35.

***Finally***, Plaintiffs' argument that "there is substantial undisputed evidence that consumers were actually misled by AFS's telemarketing scripts," is based entirely on ***disputed*** hearsay complaints and ignores the ***unrebutted*** evidence that the individuals who were purportedly



30905761v.1

confused represent an insignificant and unrepresentative segment of the class of persons to whom AFS's sales communications were addressed. In fact, while neither of the Plaintiffs has undertaken any quantitative analysis of the customer complaints, those received by the BBB during the relevant time period amount to a very small fraction of one percent (0.05%, to be precise) of AFS's subscription sales. *See* AFS S.J. Br. at 32–35. Under these circumstances, AFS's sales communications were not deceptive as a matter of law. *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37 ("[A]n advertisement [will] not be considered deceptive merely because it could be 'unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.'" (footnote omitted)).

#### 3. AFS's billing practices were also not likely to deceive or create confusion.

Plaintiffs also purport to move for summary judgment on Counts I (alleging violations of the FTC Act) and V (alleging violations of the UTPCPL) on the basis that AFS engaged in allegedly deceptive internal collections and billing practices. *See* FTC S.J. Br. at 33–35; Commonwealth S.J. Br. at 44–45. But Plaintiffs have not alleged this theory of liability in their Complaint, so it fails as a matter of law. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 286 n.57 (3d Cir. 2014). As Plaintiffs have previously attempted to do in this action, *see* ECF No. 293, they seek to amend their pleadings through briefing many years into this litigation. But as the Third Circuit explained in *Blunt*, "summary judgment is not a procedural second chance to flesh out inadequate pleadings." 767 F.3d at 286 n.57.

In Count I, the FTC alleges that "[i]n numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of newsletters or books, the AFS Defendants represent, directly or indirectly, expressly or by implication, that consumers will receive publications for free with no risk." Am. Compl. ¶ 58. The FTC then alleges that, "[i]n truth

and in fact, in numerous instances in which the AFS Defendants have made the representation set forth in Paragraph 58, consumers do not receive publications for free with no risk"; [t]herefore, the AFS Defendants' representation as set forth in Paragraph 58 is false or misleading and constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." *Id.* ¶¶ 59–60. In Count V, the Commonwealth makes identical allegations, differing only in the statutory provisions allegedly violated. *See id.* ¶¶ 76–78 (alleging Defendants have therefore engaged in unfair or deceptive acts or practices in violation of 73 P.S. § 201-3 and defined by 73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi)).

Nowhere in the operative pleading does either Plaintiff allege violations of the FTC Act or UTPCPL based on allegedly deceptive internal collections or billing practices. As a result, Plaintiffs cannot obtain summary judgment on this unpled theory of liability. *See Blunt*, 767 F.3d at 286 n.57; *Laurie v. Nat'l Passenger R.R. Corp.*, 105 F. App'x 387, 393 (3d Cir. 2004) (finding no abuse of discretion where trial court did not entertain a new theory of liability first raised on summary judgment); *Eck v. Oley Valley Sch. Dist.*, 431 F. Supp. 3d 607, 629 (E.D. Pa. 2019) (explaining plaintiff "cannot create a new cause of action at summary judgment"); *Fin. Software Sys. v. Questrade, Inc.*, CIVIL ACTION No. 18-742, 2019 WL 2027282, at *7 (E.D. Pa. May 8, 2019) ("As many courts in this Circuit and others have done before, the Court will preclude [plaintiff's] new theory of liability because [defendant] spent significant time and tens of thousands of dollars on discovery based on the claims as pleaded by [plaintiff], and allowing [plaintiff] to proceed with its eleventh hour theory of liability would require additional discovery and would impermissibly prejudice [defendant]." (collecting cases)).

Regardless, Plaintiffs have offered no legal support for their newly-raised theory of liability. Indeed, Plaintiffs proffer only their own conclusory opinions on the purported

deceptiveness of AFS's internal collections and billing practices. *See* FTC S.J. Br. at 33–35 (providing Plaintiffs' conclusory allegations only and not a single citation to any supporting legal authority); Commonwealth S.J. Br. at 44–45 (same). In addition to lacking any legal support, Plaintiffs' theory also belies the unrebutted factual record. As plainly set forth in the Executive Script, AFS provided an express disclosure during the initial sales call:

> ***Right ALONG with the second issue there's an invoice for THE YEAR*** . . . The cost for the year is only $299 for 23 issues, 24/7 access to the online safety training center, and email updates on our related products. If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number within 60 days, there's no further obligation.

*See* AFS S.J. Br. at Exhibit L (Script) (emphasis added). In addition, AFS provided two confirmatory emails, which the FTC admits were non-deceptive, that included an express disclosure:

> As you'll remember from our phone discussion, . . . the cost for a full year is just $299. ***You can submit payment using the invoice we mail you***, or you can use your personal invoice under the "My Account" tab on the CFO & Controller Alert website.

AFS S.J. Br. at Exhibit O, AFS0396629.

There is no dispute that AFS sent invoices to customers just as described in both the initial sales call and the written, confirmatory emails. It follows that these practices were not deceptive because no business executive or manager acting reasonably under the circumstances could be deceived by AFS's compliance with its express representations concerning its invoicing practices. *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37. In addition, due to AFS's liberal cancellation process, there is no evidence that anyone paid an invoice for a subscription that they unwittingly ordered. *See* AFS S.J. Br. at 7–8, 26–27. Accordingly, Plaintiffs' unpled theory of liability fails.[31]

---

[31] To the extent the Commonwealth argues, in passing, that AFS somehow violated 73 P.S. § 201-2(4)(b)(ii), (iii), and (v), it identifies no factual support and merely restates the elements of the

*See In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37 (explaining objective standard and that "the representation, omission, or practice [must be] material" to be deceptive).

**C. Plaintiffs Have Not Demonstrated Any Unlawful Failure to Disclose on the Part of AFS.**

FTC's Count II (Failure to Disclose Negative Option Terms) and the Commonwealth's Count VI (Failure to Disclose Material Terms) of the Complaint are not models of clarity. The FTC devotes less than two pages in its motion for summary judgment to Count II, and it makes little effort to substantiate its allegation that AFS failed to disclose a "negative option" plan. Instead, like the Commonwealth in Count VI, the FTC appears to be half-heartedly pursuing a more general claim that AFS "failed to disclose material terms and conditions of the subscription offer." *See* FTC S.J. Br. at 38. Whether or not the FTC's claim is framed in terms of a negative option plan, its Count II and the Commonwealth's Count VI fail as a matter of law, because the record evidence is clear that AFS disclosed all material terms in conjunction with its sales calls and follow-up emails.

**1. The material terms of the subscriptions were fully disclosed in the calls and e-mails.**

The material disclosures that AFS made during the initial sales call and repeated in two follow-up emails cover the features of the publication, the cost of the subscription, its term, the number of issues during the year, the timing of when the invoice would be received by the customer, and the process for cancelling the subscription. The telemarketing Scripts, audio

cause of action in conclusory fashion. *See* Commonwealth S.J. Br. at 46. The Commonwealth's argument is not sufficient as a matter of law to state a claim on which relief can be granted, let alone as a basis for summary judgment. *See* Fed. R. Civ. P. 12(b)(6), 56; *Nitkin*, 67 F.4th at 571 (explaining that "[b]are assertions, conclusory allegations, [and] suspicions" are insufficient for summary judgment).

recordings of sales calls and follow-up emails all provide uncontroverted evidence of such disclosures. *See* § II(B), *supra*.

Moreover, despite the Plaintiffs' allegations to the contrary, the telemarketing Scripts used by sales representatives did not use the word "free" in describing the terms and conditions for AFS subscriptions to AFS's newsletters and books, and it was ***not*** the policy or practice of AFS to tell potential customers that its newsletters and books were "free" of charge. *Id.* To the contrary, AFS has a policy never to use the word "free" or similar phrasing in its sales presentation and it trained sales representatives with a list of "No-No Phrases" that expressly ***prohibited*** telemarketing representatives from using the words "free," "no charge," "complimentary" similar phrasing. *See* Exhibit G, AFS0588579; Exhibit J, Luchette Dep. at 152:19–153:7. That sales representative training further provides "This is NOT a comprehensive list. Any phrase that misrepresents our offer, that this is a subscription with the right of cancellation, may not be used." *Id.* Consistent with this policy, AFS branch managers and quality assurance personnel would automatically cancel any order that they found used similar phrases and would write up the sales representative for discipline that included warnings or even termination. *See* Exhibit O, AFS0591663; Exhibit J, Luchette Dep. at 152:19—153:7.

AFS's expert forensic data analyst, Margaret Daley, undertook a statistical analysis and found that this training and quality assurance process resulted in over 99% of the sales calls adhering exactly to the Script, and providing the customers with every element of the offer and subscription terms verbatim. *See* AFS S.J. Br. at Exhibit R, Daley Rpt. at 19; AFS S.J. Br. at Exhibit S, Daley Dep. at 76:4–77:4; 124:7–18. In contrast, the script in the *Vertrue* case cited by the Commonwealth begins with the offer of a "free" $25 gift card to The Home Depot, and, unlike the Plaintiffs here, the Consumer Protection Division of the Iowa Attorney General's Office

conducted a consumer survey, which found that sixty-seven percent of the Vertrue members did not believe they had authorized any credit card charges. 834 N.W.2d at 37, 39. Also, unlike the defendant in *Vertrue*, AFS did not take or solicit ***any*** payment information from customers until after they had received the sales call, the two follow-up e-mails and the second monthly newsletter.

Given these material disclosures, Plaintiffs cannot avoid summary adjudication on their failure to disclose claims by mischaracterizing AFS's subscriptions as an offer for a "negative-option" plan. "A negative-option feature is a provision in an offer under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 770 (7th Cir. 2019) (cleaned up); *see also* 16 C.F.R. § 310.2(w) ("Negative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."). Negative options are not inherently deceptive; rather, as the FTC has expressly acknowledged, "Negative option programs are widespread in the marketplace and can provide substantial benefits for sellers and consumers." Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60823 (Nov. 4, 2021).

Pursuant to the Telemarketing Sales Rule,[32] "[i]t is a deceptive telemarketing act or practice" if, "[b]efore a customer consents to pay for goods or services offered," the seller "fail[s] to disclose truthfully, in a clear and conspicuous manner, the following material information:"

[32] The FTC has authority to enforce the unfair and deceptive use of a negative-option program through the Telemarketing Sales Rule. *See* 16 C.F.R. §§ 310–310.9. That Rule, however, does not apply to the business-to-business transactions at issue here. *See* 16 C.F.R. § 310.6(7) (noting "[t]elephone calls between a telemarketer and any business to induce the purchase of goods or services or a charitable contribution by the business" are exempt from the Telemarketing Sales

> If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s).

16 C.F.R. § 310.3(a)(1)(vii). AFS did not collect any payment information on the initial sales call because it did not use a negative option. *See* AFS0455429.

Instead, AFS disclosed that the customer would receive an invoice for the annual cost of the subscription concurrently with the second issue of the newsletter. *Id.* AFS further disclosed that the cost for the year-long subscription was "$299 for 23 issues, 24/7 access to the online safety training center, and email updates on our related products." *Id.* AFS also provided specific instructions for canceling without paying the invoice: "If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number within 60 days, there's no further obligation." *Id.*[33] All of these disclosures and the subscribers' affirmative assent took place ***before*** AFS ever took payment information, sent an invoice or collected any payment from the customer. They are by no means comparable to the "tiny, inscrutable print of the disclaimers" in *FTC v. Fleetcor Technologies*, 620 F. Supp. 3d 1268, 1296 (N.D. Ga. 2022), or the disclaimers in sales ads for permanent hair loss, which were reviewed by the First Circuit in *Removatron International Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989). AFS instead provided clear, direct, and repeated explanations of the price, term, and cancellation process both verbally and in full-sized, prominent text in its one-page email confirmations.

---

Rule). Accordingly, the FTC lacks any legal basis for a claim based on the Telemarketing Sales Rule, but the regulation is nonetheless instructive on the meaning of negative option plans.

[33] The clarity of the Script and follow-up emails is manifest in the fact that thousands of customers (a vast majority of all sales) canceled their subscriptions in the prescribed manner, by sending their invoice back to AFS with the word "cancel" written on it. Exhibit H, Satell Dep. Vol. I 99:1–8.

In sum, regardless of whether the FTC is still pursuing a claim based an alleged non-disclosure being a "negative-option" plan, its claim in Count II and the Commonwealth's claim in Count VI fail as a matter of law.

**2. The seller of the newsletters and books and the purpose of the telemarketing calls were clearly and timely disclosed in the calls and e-mails.**

The Commonwealth has advanced an additional theory of liability under its Count VI that the FTC is not pursuing in its Count II—namely, that AFS failed to disclose, at the onset of the telemarketing calls, its identity or the purpose of the calls, allegedly in violation of § 201-2(4)(xvii) of the UTPCPL. That allegation is belied by both the telemarketing Scripts and the audio recordings of the sales calls, as well by the follow-up emails that arrived within minutes of each call. Moreover, the limited ***federal*** case law cited by the Commonwealth does not support this claim under UTPCPL.

As the Commonwealth acknowledges, there is an absence of case law applying § 201-2(4)(xvii) of the UTPCPL. *See* Commonwealth S.J. Br. at 27. In that absence, the Commonwealth turns to federal court decisions under the federal Telemarketing Sales Rule, 16 C.F.R. §§ 310–310.9, which as noted above, does not cover the sales of AFS, because they are business-to-business transactions. *See* n.32, *supra*. Putting aside the legal hijinks, the Commonwealth is undertaking to support a claim by relying on a federal law that does not apply to the transactions at issue, the limited case law identified under the federal Telemarketing Sales Rule are not remotely comparable. In *United States v. Corporations for Character, L.C.*, 116 F. Supp. 3d 1258, 1277–78 (D. Utah 2015), the regulatory requirements for identification were in the context of caller-identification services, not outbound telemarketing calls, and they involved a different provision of the Telemarketing Sales Rule–§ 310.4(a)(8), not § 310.4(d). The other federal case relied upon by the Commonwealth, *FTC v. Magazine Solutions*, Civil Action No. 7-692, 2008 WL 11383877

(W.D. Pa. Dec. 1, 2008), is also factually and legally distinguishable. There, the district court analyzed whether the purpose to sell magazines was disclosed "promptly" when even the defendant conceded that the appropriate disclosures were not made until a ***second*** call with the customer. *Id.* at *7. Indeed, during the first call, the telemarketer assured the customer, "Now don't get worried . . . I'm not selling anything today . . . ." *Id.* Also, contrary to the very premise of the Commonwealth's UTPCPL claim here, the court in *Magazine Solutions* noted the FTC's guidance that "prompt disclosure" does not "require[] disclosure at the beginning of the telephone call." *Id.*

Here, as reflected in the Scripts, the sales representative identified at the onset of each call either the company name or the publication name, which is common practice in the publication industry. The terms of the subscription are provided immediately after the sales representative discusses with the customer the features and benefits of the particular newsletter and publication. Likewise, the follow-up e-mails all refer to the publication and the publisher by name, and they provide contact information. Finally, the company's website provides ample information about AFS and the nature of its business. Also, contrary to the Commonwealth's allegation, the telemarketing Script is clear that the purpose of the call is to sell newsletter and books. While the Commonwealth alleges that AFS sales representatives told secretaries that they were "not selling" something, the allegation of any such policy or practice by AFS is unsubstantiated by the record evidence, as demonstrated above. AFS's forensic expert, Ms. Daley, found that the sales representative went off script and suggested that the subscription was "free" or "complimentary" less than 1% of the time. AFS S.J. Br. at Exhibit R, Daley Rpt. at 15–22.

**D. AFS Did Not Violate the Unordered Merchandise Statute.**

The FTC and the Commonwealth both pleaded claims in Counts IV and VIII of the Complaint under the Unordered Merchandise Statute, 39 U.S.C. § 3009 ("UMS"), and they both move for summary judgment on those claims. The UMS prohibits the mailing of "unordered

merchandise" unless it is sent by a charitable organization or is clearly and conspicuously marked as a free sample. 39 U.S.C. § 3009(a). Further, it prohibits the mailing of bills or dunning communications for "unordered merchandise." *Id.* § 3009(c). Significantly, the UMS includes a definition of the operative language: "unordered merchandise" is defined as "merchandise mailed without the prior expressed request or consent of the recipient." *Id.* § 3009(d).

As explained above and in AFS's Motion for Summary Judgment, the Script laid out AFS's offer, the cost of the subscription, how to cancel the subscription and—of particular significance given the definition of "unordered merchandise"—required the customer to expressly acknowledge that it would be receiving the newsletters and/or books. Most notably, the script required AFS's telemarketing representative to wait for affirmative consent before processing a subscriber's order. *See* AFS S.J. Br. at Exhibit L (Script). If a customer did not consent by responding in the affirmative, AFS would not ship a newsletter or book. *See* Exhibit A, Drummond Dep. at 299:13–301:13.

Moreover, the two e-mails, which were sent by AFS immediately after the sales calls, confirmed in writing that the customer had orally consented to receive the newsletters and/or books. *See, e.g.*, AFS S.J. Br. at Exhibit CC, AFS0000193 ("As we just discussed on the phone, you are starting a no-risk subscription. . . . You can expect the first issue of the print newsletter in a couple weeks."). As noted above, the FTC admitted that those e-mails were ***not*** deceptive and were received by the customer ***before*** any newsletter or books were shipped. By the UMS's own definition, when customers consent to the receipt, as they did here, the merchandise shipped is not "unordered merchandise." *See* 39 U.S.C. § 3009(d).

Accordingly, because it is undisputed that AFS customers provided consent during the sales calls to the receipt of the newsletters and books, this Court should deny Plaintiffs' motion for

summary judgment on Counts IV and VIII of the Complaint and instead enter summary judgment in favor of AFS on the UMS claims.

## III. PLAINTIFFS HAVE NOT ESTABLISHED A BASIS OF JOINT LIABILITY FOR EDWARD SATELL.[34]

Plaintiffs have not proven as a matter of law that Mr. Satell should be held liable for any conduct of the entity-defendants, nor could they.

As an initial matter, Plaintiffs argue that Mr. Satell should be liable for any conduct of the Center for Education & Employment Law, but their argument contradicts the factual and procedural record in this action, and Plaintiffs cite no legal authority to support their position. *See* FTC S.J. Br. at 40; Commonwealth S.J. Br. at 48. While Plaintiffs attempt to hold Mr. Satell liable based on the manner in which the fictitious name "Center for Education & Employment Law" was purportedly registered, Plaintiffs are aware that it was American Future Systems, Inc.—not Ed Satell—that did business as the Center for Education & Employment Law. *See* FTC S.J. Mot. at 1 (moving the Court "for summary judgment against American Future Systems, Inc., also d/b/a Progressive Business Publications, Progress Business Publications, Inc., and Center for Education & Employment Law."); Commonwealth S.J. Mot. at 1 (same); Pls.' SMF ¶ 23 ("AFS does or has done business during the Relevant Time Period as . . . Center for Education & Employment Law"). As a result, their argument is unsupported and untenable. *See also* AFS's Response to Plaintiffs' SMF ¶ 22 (explaining that Mr. Satell registered the fictitious business name in his role as CEO of AFS, as evidenced by AFS's Malvern, Pennsylvania headquarters being listed as the Center for Education & Employment Law's principal address).

---

[34] Without conceding that Plaintiffs have proven any Defendants liable on any count, AFS does not contest that the corporate Defendants—American Future Systems, Inc., and Progressive Business Publications of New Jersey, Inc.— are potentially subject to joint liability.

Plaintiffs next acknowledge that an individual may be held liable for a corporate entity's violations of the FTC Act or UTPCPL ***only*** upon a showing that both "(1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 533–34 (E.D. Pa. 2013); *see also* FTC S.J. Br. at 40–41 (citing *NHS Sys.* for this standard); Commonwealth S.J. Br. at 48 n.41 (same). The unrebutted evidence demonstrates that Plaintiffs cannot satisfy the second prong for several reasons.

***First***, Plaintiffs' suggestion that Mr. Satell's efforts in furtherance of brand management and resolving customer complaints were somehow improper is not supported by the facts, law, or common sense. *See* FTC S.J. Br. at 43–45; Commonwealth S.J. Br. at 50–52. To the extent Mr. Satell undertook efforts to promote a positive brand image, he simply engaged in brand management, which is a common, legitimate, and accepted business practice. *See* n.13, *supra*. Nor does Mr. Satell's knowledge of customer complaints suggest any misfeasance. Such complaints are normal in the course of business—all companies receive them, and "[v]irtually all representations, even those that are true, can be misunderstood by some consumers." *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, at *37.

Far from exhibiting any knowledge of deceptive conduct, Mr. Satell's efforts to ensure that all customer complaints were addressed and resolved reflect the high standards of integrity, transparency, and communication that AFS and Mr. Satell consistently exhibited for over thirty years of business.[35] Indeed, the record evidence demonstrates that none of the BBB complaints

[35] Mr. Satell demonstrated that same integrity, transparency, and communication when the Commonwealth investigated the challenged practices at issue here between 2012 and 2017. AFS cooperated fully with that investigation, including by providing the Pennsylvania AG's Office with

filed against AFS between January 5, 2015, and March 31, 2020, "were marked with the Closing Status of 'Unanswered' and 'Unresolved,' indicating that ***every complaint was answered***, and [that] ***AFS made a 'good faith effort to resolve it***.'" AFS S.J. Br. at Exhibit R, Daley Rpt. at 13 (emphases added) (footnotes omitted) (quoting the Deposition of the BBB's Rule 30(b)(6) representative, A. Goode, (Feb.21, 2023) at 135–36).

***Second***, all of the cases Plaintiffs cite are inapposite because they either had nothing to do with the FTC Act or UTPCPL,[36] or because those cases' egregious facts involved literally false representations or valueless products or services, such that the individuals who orchestrated those intentional scams would necessarily know of the express or intentional misrepresentations. *See, e.g.*, *Ross*, 897 F. Supp. 2d at 374 n.1 (operating a purposeful "scareware" scheme, which is "a software-driven, Internet-based scheme that exploits consumers' legitimate concerns about Internet-based threats like spyware and viruses by issuing false security or privacy warnings to consumers for the sole purpose of selling software to fix the imagined problem" (cleaned up); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005) (involving a scheme through which defendants targeted individuals who had recently been denied credit, offered them a credit card for a stated price, charged them a higher price, sent a fake card that could be redeemed for a debit-type (but not credit) card only upon sending an additional activation fee, and automatically enrolled them in a recurring-fee continuity service).[37] This case does not involve any similar facts

---

a copy of the Executive Script and allowing that Office to listen in on AFS's telemarketing sales calls. *See* AFS S.J. Br. at 44–45.

[36] *See B&R Res., LLC v. Dep't of Env't Prot.*, 180 A.3d 812, 817 (Pa. Commw. Ct. 2018) (discussing the "participation theory" of liability in a case that had nothing to do with allegations of deceptive practices under either the UTPCPL or FTC Act).

[37] *See also, e.g.*, *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), *overruled on other grounds by Credit Bureau Ctr.*, 937 F.3d at 764 (involving the use of expressly false statements to sell certificates that could be used to purchase future travel and that the court determined were "of little actual value"); *FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) (involving a

that would impute knowledge to Mr. Satell that his company's good-faith business practices could somehow be deceptive. Indeed, they are not deceptive as a matter of law. *See* § II, *supra*.

***Finally***, Plaintiffs are simply wrong when they argue that Mr. Satell knew or should have known that the challenged conduct was deceptive because "[h]e listened to hundreds of call recordings and paid specific attention to the language used in sales scripts." FTC S.J. Br. at 43; Commonwealth S.J. Br. at 50. Indeed, when the Commonwealth had the opportunity to listen to numerous call recordings and review the Executive Script during its multiyear investigation, it apparently reached the opposite conclusion and, in fact, closed its investigation in 2017 without requiring any changes to AFS's Script or business practices. *See* AFS S.J. Br. at 8, 43–47. Mr. Satell justifiably relied on the Pennsylvania Attorney General's representations that it was closing its investigation without requiring any changes to the Script or other business practices. *See id.* at

---

scheme through which defendants falsely represented it was lawful to play the Canadian lottery in the United States in order to induce U.S. consumers to illegally purchase Canadian lottery tickets); *NHS Sys.*, 936 F. Supp. 2d at 520 (operating sham companies to further a scheme in which defendants represented they were providing government grants for sham healthcare discount programs in order to elicit consumers' financial information, which defendants used to charge their accounts, after expressly representing that no charges would occur); *FTC v. Millennium Telecard, Inc.*, Civil Action No. 11-2479, 2011 WL 2745963, at *1 (D.N.J. July 11, 2011) (issuing a preliminary injunction against entity-defendants and their sole principal where defendants sold calling cards, often to immigrants, that "delivered an average of only 45% of the advertised minutes" and delivered the advertised minutes in fewer than 2% of cases, based on testing conducted on the cards); *FTC v. Cyberspace.com, LLC*, No. C00-1806, 2002 WL 32060289 (W.D. Wash. July 10, 2002) (involving a scheme through which the individual defendants created companies for the specific purpose of sending checks to trick people into purchasing internet services by cashing the check: "the solicitations contain[ed] false representations of a pre-existing relationship . . . [and] literally hid[] the offer and its terms behind the facade of a rebate or payment"), *aff'd*, 453 F.3d 1196 (9th Cir. 2006) (noting the record evidence showed that less than 1% of individuals who cashed the check ever used the service they were then billed for); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080 (C.D. Cal. 1994) (involving literally false representations concerning requirements in advertisements for credit cards); *Commonwealth v. Manson*, 903 A.2d 69 (Pa. Commw. Ct. 2006) (involving a company that offered furniture for sale that it knew it could not deliver, accepted payment for such furniture, failed to deliver same, and failed to refund payments).

45. Under these circumstances—and, particularly given that neither the FTC, nor the Commonwealth, has ever sought a preliminary injunction in this matter—there is no basis to impute any knowledge of wrongdoing to Mr. Satell.

## IV. PLAINTIFFS HAVE NOT PRESENTED CAUSE TO STRIKE AFS's AFFIRMATIVE DEFENSES.

The FTC and Commonwealth do not argue that they are entitled to summary judgment on AFS's affirmative defenses of equitable estoppel, waiver, laches, and unclean hands by pointing to record evidence that they brought their claims to Court in a timely manner, in good faith, with clean hands, and in a way that serves equity. *See* FTC S.J. Br. at 51–55; Commonwealth S.J. Br. at 61–64. Instead, Plaintiffs argue that they should not be held to these equitable standards. *See* FTC S.J. Br. at 51 (arguing "these defenses . . . are unavailable against the government"); Commonwealth S.J. Br. at 62 (same). In the alternative, Plaintiffs argue that they are entitled to summary judgment on AFS's affirmative defenses because "AFS has failed to produce evidence to support them," FTC S.J. Br. at 51; Commonwealth S.J. Br. at 62, or because AFS did not properly title its affirmative defenses, *see* FTC S.J. Br. at 53–55; Commonwealth S.J. Br. at 63–64. Those arguments fail, as a matter of law.

As an initial matter, in its Summary Judgment Brief, AFS has demonstrated that the unrebutted evidence supports its affirmative defense of laches. *See* AFS S.J. Br. at 43–47. Indeed, as set forth in AFS's Summary Judgment Brief, this Court should enter summary judgment for AFS on all claims in this action, but, if it does not, then AFS is entitled to present its defenses—including its affirmative defenses—at trial. Plaintiffs have offered no legal authority to justify depriving AFS of its day in court, and their arguments are otherwise baseless for several reasons.[38]

[38] In arguing that the Commonwealth is entitled to summary judgment on AFS's affirmative defenses, including those that AFS has not yet presented to the Court, the Commonwealth cites

***First***, as the "proponent[s] of summary judgment" on AFS's affirmative defenses, including for equitable estoppel, waiver, laches, and unclean hands, it is Plaintiffs' burden to "point[] to evidence demonstrating no issue of material fact exists." *Campbell v. Travelers Home & Marine Ins. Co.*, 558 F. Supp. 3d 230, 233 (E.D. Pa. 2021) (Slomsky, J.) (quoting *Favata*, 511 F. App'x at 158). It is only after Plaintiffs satisfy this burden that "the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists." *Id.* (quoting *Favata*, 511 F. App'x at 158). Plaintiffs, however, have not identified any record evidence to support their motion. Instead, they argue generally that AFS has not pled or produced evidence to support its affirmative defenses. *See* FTC S.J. Br. at 51–52; Commonwealth S.J. Br. at 61–62. Moreover, to the extent Plaintiffs argue that they are entitled to summary judgment on AFS's allegedly mislabeled affirmative defenses because "there are no genuine issues of material fact as to any of them," they do so in conclusory fashion only and without citing any record evidence to support their argument. FTC S.J. Br. at 55; Commonwealth S.J. Br. at 64. Because Plaintiffs' motions for summary judgment fail to cite any evidence to demonstrate lack of genuine dispute as to AFS's affirmative defenses, their motion fails as a matter of law and should be denied. *See Campbell*, 558 F. Supp. 3d at 233.

***Second***, Plaintiffs argument that they are not subject to the affirmative defense of laches is premised on their unsupported, conclusory claim that this case in the public interest. *See* FTC S.J.

---

*Ellis v. Beemiller, Inc.*, 287 F.R.D. 326, 346 (W.D. Pa. 2012) for the legal proposition that "it is 'egregious' to continue to pursue a claim or theory after discovery is closed and a party 'has garnered no more support for [its theory] than he had when he filed the [initial pleading].'" *See* Commonwealth S.J. Br. at 61. But it is the Plaintiffs to whom such conduct can be fairly attributed. In this case, they have based their allegations of deception on customer complaints that were never investigated and that have been shown through audio recordings and business records to be invalid and factually inaccurate, and Plaintiffs are the ones who have persisted in pursuing their claims long after the absence of admissible evidence has been revealed. *See* AFS S.J. Br. at 32–35.

Br. at 52; Commonwealth S.J. Br. at 62–63. The FTC raises a similar argument with respect to AFS's unclean hands defense, claiming, without citing any evidence, that "it is undisputed that the FTC commenced this action in order to protect a public interest." FTC S.J. Br. at 52–53. Plaintiffs cite no record evidence to support this conclusory claim, and, indeed, the unrebutted record evidence demonstrates that there is no genuine dispute that Plaintiffs have not, and cannot, identify any public interest served by intervening in private contractual disputes arising years ago between sophisticated business entities. *See* AFS S.J. Br. at 41–43. Moreover—and also fatal to Plaintiffs' argument—"government suits in equity are subject to the principles of equity," which include laches and unclean hands. *See NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 894 (7th Cir. 1990) ("[L]aches is generally and we think correctly assumed to be applicable to suits by government agencies as well as by private parties."); *see also Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 278 (2d Cir. 2005) ("[I]n appropriate circumstances, laches can apply to suits by the federal government."); *In re Dos Santos*, 589 B.R. 413, 423 (Bankr. D. Colo. 2018) ("[A]n emerging trend allows the defense of laches in suits brought by the government."); *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 542 n.12 (D. Del. 2016) (noting cases "recognizing that laches may apply to the state government"); *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, Civil Action No. 02-5702, 2009 WL 4576097, at *7 (D.N.J. Dec. 1, 2009) (discussing "persuasive authority" that "laches may be applied successfully against the Government").[39]

[39] Moreover, to the extent the Commonwealth suggests laches is not available because this action is an exercise of police power, the cases it cites are not on point. *See St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.*, 733 A.2d 677, 681–82 (Pa. Commw. Ct. 1999) (holding that "laches ***may*** be imputed to the Commonwealth" but noting in *dicta* that there may be an exception for exercises of the Commonwealth's police power (citing *Clearview Land Dev. Co. v. Commonwealth*, 327 A.2d 202 (Pa. Commw. Ct. 1974)) (emphasis added)); *Clearview Land Dev. Co.*, 327 A.2d at 205 n.7 (noting "[l]aches ***may*** be defense against the Commonwealth assertion of its police powers" in certain situations (emphasis added)); *Commonwealth v. Zasloff*, 8 A.2d 801, 802 (Pa. Super. Ct. 1939), *aff'd*, 13 A.2d 67 (Pa. 1940) (including no discussion or consideration of UTPCPL actions;

***Third***, Plaintiffs' conclusory assertion that AFS's remaining affirmative defenses are not "true affirmative defenses" is not supported by the facts or law, nor is it a basis for granting summary judgment. *See* FTC S.J. Br. at 54; *see also* Commonwealth S.J. Br. at 64. As an initial matter, Rule 8 provides a mechanism for stating, in a responsive pleading, defenses, avoidances, and affirmative defenses. *See* Fed. R. Civ. P. 8(b)(1)(A) ("In responding to a pleading, a party must . . . state in short and plain terms its defenses to each claim asserted against it."); *id.* (c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."). Although the Rule provides a list of affirmative defenses, there is no suggestion that the list is exhaustive. *See id.* In its Answer, AFS included headings that refer to "affirmative defenses," but AFS plainly stated that it was offering "***additional*** and/or affirmative defenses." *See* AFS's Ans., ECF No. 91 at p.18 (emphasis added). Accordingly, AFS has complied with the letter and spirit of the Rule. Regardless, Plaintiffs have offered no case law—nor could they—to support their suggestion that they are entitled to summary judgment on any defense or avoidance merely because it appeared under an "affirmative defenses" heading in AFS's Answer.

Indeed, the propriety of AFS's affirmative defenses is confirmed by reference to the purpose of the pleading requirement. In *In re Sterten*, a case relied on by Plaintiffs,[40] the Third Circuit explained that "[t]he purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with

---

rather considering the "constitutionality of [an] act as an exercise of the police power of the State" that made it a misdemeanor for retailers to sell goods below cost); *Commonwealth ex rel. Corbett v. Hasan*, Nos. 150 C.D.2012, 151 C.D.2012, 2013 WL 3970234, at *6 (Pa. Commw. Ct. May 2, 2013) (including no discussion of laches; rather, finding "enforcement of consumer protection statutes" falls within an exception to the rule for staying proceedings pending bankruptcy because it is "an exercise of government police or regulatory power").

[40] The FTC cites *In re Sterten* for a definition of "affirmative defense," *see* FTC S.J. Br. at 53–54, but, in *Sterten*, the Third Circuit noted that definition was from a case that "[did] not dictate the course of our inquiry here." *In re Sterten*, 546 F.3d 278, 284 n.9 (3d Cir. 2008).

notice and the opportunity to demonstrate why the affirmative defense should not succeed." 546 F.3d at 285. Here, the affirmative defenses that Plaintiffs challenge specifically demonstrate that AFS has fulfilled this purpose. For example. Plaintiffs argue that AFS's affirmative defenses that are premised on its cessation of telemarketing in September 2021 are not affirmative defenses such that Plaintiffs should be granted summary judgment with respect to them. *See* FTC S.J. Br. at 54; Commonwealth S.J. Br. at 64. The FTC also argues that AFS has not raised a true affirmative defense by pleading that the FTC's claims are barred by *AMG Capital*. *See* FTC S.J. Br. at 54–55. AFS, however, has raised both of these issues in its motion for summary judgment. *See* AFS S.J. Br. at 14–27 (arguing that *AMG Capital* allows for prospective injunctive relief only and that injunctive relief would be inappropriate here because AFS ceased the challenged conduct in September 2021). Because AFS pled these affirmative defenses, Plaintiffs have no cause to argue they were surprised by AFS's summary judgment arguments or, potentially, its arguments concerning these affirmative defenses at trial. In other words, AFS's affirmative defenses comply with the letter, spirit, and purpose of Rule 8, and Plaintiffs have proffered no legitimate basis for awarding them summary judgment on these issues.

***Finally***, to the extent Plaintiffs seek to strike AFS's affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f), they have similarly failed to satisfy their burden. Indeed, it is entirely unclear from Plaintiffs briefing if they are moving, in the alternative, to strike AFS's affirmative defenses pursuant to Rule 12(f). Although Plaintiffs state that, "[a]lternatively, Plaintiffs request that the affirmative defenses be stricken," FTC's Br. at 55; Commonwealth's Br. at 64, they do not reference Rule 12(f), and, in the case they cite for this request, the court concluded it would review a motion to strike affirmative defenses "under a Rule 56 standard," *MRO Corp. v. Humana Inc.*, 383 F. Supp. 3d 417, 421 n.22 (E.D. Pa. 2019). To the extent Plaintiffs

move to strike under Rule 12(f), their request for such a "drastic remedy" should be denied. *Abella v. Student Aid Ctr., Inc.*, CIVIL ACTION NO. 15-3067, 2015 WL 6599747, at *4 (E.D. Pa. Oct. 30, 2015) ("Motions to strike are generally disfavored, as striking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice." (cleaned up)). "To prevail on a motion to strike, the moving party must demonstrate that 'the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.'" *Id.* (quoting *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428–29 (E.D. Pa. 2007)). Plaintiffs have not, and cannot, make this required showing as AFS's affirmative defenses relate to the dispute in issue and AFS is entitled to preserve and pursue its defenses. *See* Fed. R. Civ. P. 8(b)–(c).

## CONCLUSION

For all of the foregoing reasons, this Court should deny summary judgment in favor of Plaintiffs on all claims asserted in the First Amended Complaint and, in the alternative, summary adjudication.

Respectfully submitted,

**WHITE AND WILLIAMS, LLP**

*<u>/s/ David H. Marion</u>*
David H. Marion, Esquire
Morgan S. Birch, Esquire
PA ID Nos. 3590; 319358
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
Fax: (215) 789-7517
*mariond@whiteandwilliams.com*
*birchm@whiteandwilliams.com*

**DLA PIPER LLP**

*<u>/s/ Ilana H. Eisenstein</u>*
Ilana H. Eisenstein, Esquire
Marie Bussey-Garza, Esquire
PA ID No. 94907
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 606-3301
*ilana.eisenstein@us.dlapiper.com*
*marie.bussey-garza@us.dlapiper.com*

**FAEGRE DRINKER BIDDLE &**
**REATH, LLP**

/s/ *Paul H. Saint-Antoine*
Paul H. Saint-Antoine, Esquire
Henry M. Grabbe, Esquire
PA ID No. 526224; 328928
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
*paulsaint-antoine@faegredrinker.com*
*henry.grabbe@faegredrinker.com*

*Attorneys for Defendants American Future Systems, Inc.,*
*Progressive Business Publications of New Jersey, Inc., and Edward M. Satell*

Dated: July 17, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of July, 2023, the foregoing Response in Opposition to Plaintiffs' Motions for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

*/s/ Morgan S. Birch*
Morgan S. Birch

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.*, | : | Civil Action No. 2:20-cv-02266 |
| *Plaintiffs*, | : | |
| v. | : | |
| AMERICAN FUTURE SYSTEMS, INC., *et al.* | : | |
| *Defendants*. | : | |

**AFS'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell (collectively referred to herein as "AFS"), by their undersigned counsel, submit this Response to Plaintiffs' Statement of Material Facts.

**GENERAL OBJECTIONS**

Plaintiffs have submitted 387 paragraphs of "facts," many of which include subparts, and most of which are misleading excerpts of deposition testimony or selective out-of-context quotes from documents that distort their meaning. Not only does this extraordinarily lengthy submission fail to comply with this Court's mandate to include "[o]nly those facts which bear on dispositive material issues," but it attempts to obscure the one material ***and undisputed*** fact that is dispositive of all of Plaintiffs' claims: the absence of any prospective conduct warranting injunctive relief.

For all the volume of paper devoted to their dual summary judgment filings, Plaintiffs nowhere raise a genuine issue of material fact regarding AFS's termination of its telemarketing business in September 2021 and the absence of any likely prospect that it will resume such activities. Instead, to avoid summary judgment against them, Plaintiffs misstate the standard of

what must be proven to obtain injunctive relief. Yet, the law is clear that they must show a "cognizable danger" (more than a mere possibility) of a recurrent violation to obtain an injunction. *See FTC v. AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020). Their misstatement of the law does not constitute a genuine issue of material fact precluding summary judgment in AFS's favor, nor does it justify the Plaintiffs' unnecessarily long submission of non-material issues.

Below, AFS provides specific responses to each of the 387 individually-numbered paragraphs of Plaintiffs' Statement of Material Facts. In responding, AFS does not concede that the substance of any excerpted document or deposition testimony is accurate, complete, or contextualized, such that it provides any probative value to the Court on summary judgment. Further, within Plaintiffs' submission—which can only be understood as an attempt to overwhelm the Court by creating the appearance that there are volumes of evidence prejudicial to AFS—many statements are irrelevant, are hearsay, have been proven to be invalid, or contain hearsay within hearsay. Furthermore, by responding, AFS does not waive any objections to the admissibility of any irrelevant or out-of-court statements quoted by Plaintiffs.

Finally, Plaintiffs' Statement of Material Facts contains dozens of misleading, false, and irrelevant headings not supported by any reference to the summary judgment record. AFS has removed such improper headings from this response and maintains its express denial of each.

**DEFINITIONS**

1. "AFS" refers to American Future Systems, Inc.

**RESPONSE:** No objection.

2. "Answer" refers to ECF 91, the AFS Defendants' Answer With Affirmative Defenses to Plaintiffs' Federal Trade Commission and the Commonwealth of Pennsylvania First Amended Complaint.

**RESPONSE:** No objection.

3. "BBB NY" refers to the Better Business Bureau of Upstate New York.

**RESPONSE:** No objection.

4. "BBB PA" refers to the Better Business Bureau serving Metro Washington DC and Eastern Pennsylvania

**RESPONSE:** No objection.

5. "CEEL" refers to AFS d/b/a/ Center for Education & Employment Law

**RESPONSE:** No objection.

6. "Consumer" refers to a natural person, corporation, trust, partnership, incorporated or unincorporated association, or legal entity, including any employee of each.

**RESPONSE:** AFS objects to the term "Consumer" and its use throughout Plaintiffs' Statement of Material Facts because the term is confusing and misleading insofar as the term "Consumer" is commonly understood – and is defined within the dictionary – as a person who purchases goods or services for personal, family, or household use. To the extent Plaintiffs use the term "Consumer" to refer to AFS's customers, AFS further objects to the term as overbroad in its inclusion of "natural person" because AFS did not sell its publications to individuals for their personal, family, or household use. Specifically, AFS engaged in strictly Business-to-Business Sales, constituting transactions between two businesses rather than between a business and an individual consumer for the consumer's personal, family or household use. *See* Exhibit A, Drummond Dep. Vol. II at 381:22—23 ("…we don't market to consumers. These are business executives.").

7. "Defendants" refers to American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Ed Satell.

**RESPONSE:** No objection.

8. "Drummond" refers to Colin Drummond, AFS's former head of telemarketing, and one of its Corporate Designees.

**RESPONSE:** AFS has no objection to the term "Drummond" referring to Colin Drummond; no objection to the reference that Drummond was one of AFS's Corporate Designees; and that Drummond's title has been referred to as "head of telemarketing." However, AFS notes Drummond's official title was Director of Call Center Operations from July 1, 2015 to September 3, 2021, when AFS closed its publication business. *See* Exhibit A, Drummond Dep. Vol. I at 7:2-15.

9. "ICR" refers to International Credit Recovery, Inc.

**RESPONSE:** No objection.

10. "JSD" refers to James, Stevens and Daniels.

**RESPONSE:** No objection.

11. "PBP" refers to AFS d/b/a Progressive Business Publications

**RESPONSE:** No objection.

12. "PBP-NJ" refers to Progressive Business Publications of New Jersey, Inc.

**RESPONSE:** No objection.

13. "Satell" refers to Edward M. Satell.

**RESPONSE:** No objection.

14. "Relevant Time Period" means from July 1, 2015 to present.

**RESPONSE:** AFS has no objection to responding to Plaintiffs' Statement of Material Facts based on the time period July 1, 2015 to the present; however, AFS objects to the extent Plaintiffs are taking position that this is the relevant period for all purposes. AFS also objects to Plaintiffs' fn. 1, which is incorporated by reference into the definition set forth by Plaintiffs for the "Relevant Time Period", to the extent Plaintiffs suggest, without citing any legal authority, that "for purposes of the need for injunctive relief, the Court's evaluation of Defendants' knowledge and conduct should not be so limited." *See* Plaintiffs' Statement of Material Fact at fn. 1; FTC's Br. at 4 n.6; Commonwealth's Br. at 4 n.6. The parties have not conducted discovery for the time period prior to July 1, 2015, and the Court has not made any determination that the earlier period is relevant. Plaintiffs' suggestion that this Court should consider irrelevant evidence is proscribed by the Federal Rules. *See* Fed. R. Evid. 402 ("Relevant evidence is admissible").

**PLAINTIFFS' "STATEMENT OF MATERIAL FACT"**

15. Defendant American Future Systems, Inc. is a corporation incorporated in Pennsylvania in 1973. [PX 19 ¶ 10(a) (and Ex. 2–3) (App. 0909, 01053, 01055); PX 18 ¶ 18 (and Ex. 1) (App. 00683, 00705); ECF 43 ¶ 9; ECF 91 ¶ 9]. During the Relevant Time Period, AFS has maintained its principal place of business in either Malvern, Pennsylvania or King of Prussia, Pennsylvania. [PX 14, 51:12-17 (App. 00497); PX 1, 205:23–206:3 (App. 000398-399); PX 12, 17:21-25 (App. 00432); ECF 43 ¶ 9; ECF 91 ¶ 9.]

**RESPONSE:** Admitted.

16. During the Relevant Time Period, AFS had telemarketing branch locations in Ohio and Pennsylvania and employed hundreds of telemarketers. [PX 5, 24:15-20, 28:1-5 (App. 00235-236).]

**RESPONSE:** Admitted.

17. Defendant Progressive Business Publications of New Jersey, Inc., was incorporated in New Jersey in 2005 and was dissolved in 2019. [PX 18 ¶ 21 and Exhibit 4 thereto (App. 00685-686, 00751); ECF 43 ¶ 10; ECF 91 ¶ 10.] PBP-NJ had its headquarters or

principal place of business at AFS's headquarters in Malvern, PA. [ECF 43 ¶¶ 9–10; ECF 91 ¶¶ 9–10; PX 14, 51:12-17 (App. 00497).]

**RESPONSE:** Admitted.

18. Defendant Ed Satell is the founder, CEO and sole owner of AFS. [PX 14, 6:23–7:4 (App. 00486-487); PX 15, 14:24-16:13 (App. 00526-528); ECF 91 ¶¶ 11, 49.].

**RESPONSE:** Admitted.

19. Progressive Business Publications, Inc., Progressive Business Publications, and Nonprofit Board Report are fictitious names that AFS registered with the Pennsylvania Department of State. [PX 19 ¶ 10(c) and 10(e), and Exhibits 6, 7, 8, and 11 thereto (App. 00909-910, 01066, 01069, 01072.] Progressive Business Publications, Inc. is also a domestic corporation that was incorporated in Pennsylvania in 1989. [PX 19 ¶ 10(b), and Exhibits 4 and 5 thereto (App. 0909, 01058, 01061); PX 18 ¶ 19(c) and Exhibit 2 thereto (App. 00684, 00732).]

**RESPONSE:** Admitted.

20. "The Selling Advantage for Sales Professionals" is a fictitious name that Progressive Business Publications, Inc. registered with the Pennsylvania Department of State. [PX 19 at ¶ 10(f) and Exhibit 12 thereto (App. 09010, 01091).]

**RESPONSE:** Admitted.

21. "SuccessFuel" is a registered fictitious name of AFS registered with the Pennsylvania Department of State on September 20, 2021, three weeks after AFS contends that it stopped telemarketing. [PX 19 ¶ 10(g) and Exhibit 13 thereto (App. 00910, 01094) and *infra* FACT 26.]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it officially registered "Successfuel" as a registered fictious name of AFS on September 20, 2021. AFS further admits that it ceased all outbound publication telemarketing sales on September 3, 2021. *See* AFS's S.J. Br. at Exhibit X, Devor Rpt. at 8; AFS's S.J. Br. at Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; AFS's S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 5; Exhibit L, Townsend Dep. at 249:3–5. AFS expressly denies Plaintiffs' implicit mischaracterization that these two events are correlated in any way.

22. The Center for Education & Employment Law is a registered fictitious name of Ed Satell; a 2005 Application for Registration of Fictitious Name identifies Edward Satell as the only "individual interested in the business" to be carried out by the Center for Education & Employment Law, and the Pennsylvania Department of State identifies Edward Satell as the "owner" of this fictitious name. [PX 19 ¶ 10(d) and Exhibits 9 and 10 thereto (App. 00910, 01081, 01084); PX 18 ¶ 20 and Exhibit 3 thereto (App. 00683, 00747).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies that Edward Satell registered the Center for Education

& Employment Law as a registered fictitious name in his individual capacity, but in his role as CEO of AFS, as evidenced by AFS's Malvern, Pennsylvania headquarters being listed as the Center for Education & Employment Law's principal address. PX 19 at App. 01082—83; PX 15:8—13 (title).

23. AFS does or has done business during the Relevant Time Period as Progressive Business Publications, Progressive Business Publications, Inc., and Center for Education & Employment Law; and AFS treats these entities as "all the same company." [PX 1 113:22–114:3, 136:4–9, 140:15–141:2 (App. 00048-49; 00058; 00062-63); ECF 43 ¶ 9; ECF 91 ¶¶ 9, 19.]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs' selective mischaracterization of this testimony, as Plaintiffs have omitted relevant portions providing context to this topic. Specifically, when asked "which legal entity published" a certain newsletter, Drummond provided clarifying testimony that PBP published the newsletter, to which AFS is "the parent company." *See* PX 1, 113:13—21. By way of further response, when asked "which legal entity sold" the same newsletter, Drummond clarified that "American Future Systems, Progressive Business Publications, [and the] Center for education and Employment Law" all fall under "the same auspices." *Id*. at 113:22—3. AFS denies that the aforementioned entities were all the same company. *See, e.g.* PX 1, at 113:19—21 ("American Future Systems is the parent company of Progressive Business Publications."); *id.* at 140:21—141:2 (describing the Center for Education & Employment Law as a publisher of certain books sold by Progressive Business Publications).

24. AFS started in the publication business in 1989. [PX 14, 15:24–16:12 (App. 00488-489).]

**RESPONSE:** Admitted.

25. For over 30 years, AFS's telemarketers placed telephone calls to consumers nationwide to sell subscriptions to its newsletters and books. [ECF 91 ¶¶ 1-2, 20-21; PX 14, 16:9–12, 24:12–15, 26:3–19 (App. 00489-491).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that is has been in the publication business for over 30 years. AFS denies that it ever placed telephone calls to consumers in their individual capacity to sell its publications for personal, family or household use. *See* Exhibit A, Drummond Dep. Vol. I at 207:14—23.

26. AFS claims to have ceased "outbound" telemarketing newsletter and book subscription services on September 3, 2021. [PX 35, Ex. 18, at 3 ¶ 5 (App. 02148) (Affidavit of Drummond).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it ceased its outbound publication telemarking business on September 3, 2021. *See* AFS S.J. Br. at Exhibit X, Devor Rpt. at 8; AFS S.J. Br. at Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; AFS S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 5; Exhibit L, Townsend Dep. at 249:3–5. AFS further admits that it has no plan, intention, or incentive to

resume any telemarketing for the sale of any newsletters, publications, or books. *See* AFS S.J. Br. at Exhibit A, Drummond Dep., Vol I, at 17:24–18:6; 157:20–25; AFS S.J. Br. at Exhibit P, Satell Dep., Vol. II, at 342:15–21; AFS S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 7. Nor has the Commonwealth identified any reason why AFS might resume telemarketing. *See* AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 117:24–118:6. AFS denies Plaintiffs' mischaracterization of this unrebutted fact as a "claim." *Id*. *See also* referenced document.

27. Drummond says that the decision to cease outbound telemarketing "was just a simple business decision based on economics…it just wasn't working anymore." [PX 1, 156:10–20 (App. 00071).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs' selective mischaracterization of this testimony, as Plaintiffs have omitted relevant portions of the document which provide context to the statement referenced therein. By way of further response, Drummond testified that the decision to cease outbound telemarketing "was just a simple business decision based on economics. The cost of acquiring and retaining and producing the product became prohibitive, you know, to the ratio of revenue that we were bringing in. … It just wasn't working anymore. And it had been declining for quite sometime [sic]." *See* referenced document.

28. AFS says that it has no plans to resume outbound telemarketing for the sale of publications because it does not make any business sense to do so. [PX 1, 157:20–158:4 (App. 00072-73); PX 35, Ex. 18 ¶ 7 (App. 02148).]

**RESPONSE:** Admitted in part, denied in part. AFS admits it has no plans to resume outbound telemarketing for the sale of publications. AFS denies that the only basis for that decision was "because it does not make any business sense to do so" as stated. Specifically, from 2015 to 2021, AFS saw the number of subscriptions placed for its newsletters, publications, and books sold via telemarketing sales decrease steadily. *See* Exhibit X to AFS's Motion, Devor Rpt. at 4–5. After at least six years of declining profits, and two consecutive years of losses, AFS closed its telemarketing business entirely and stopped outbound telemarketing calls as of September 3, 2021. *See* AFS S.J. Br. at Exhibit X, Devor Rpt. at 8; AFS S.J. Br. at Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; AFS S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 5; Exhibit L, Townsend Dep. at 249:3–5. AFS has no plan, intention, or incentive to resume any telemarketing for the sale of any newsletters, publications, or books. *See* AFS S.J. Br. at Exhibit A, Drummond Dep., Vol I, at 17:24–18:6; 157:20–25; AFS S.J. Br. at Exhibit P, Satell Dep., Vol. II, at 342:15–21; AFS S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 7. Nor has the Commonwealth identified any reason why AFS might resume telemarketing. *See* AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 117:24–118:6.

29. Prior to its alleged cessation of telemarketing, AFS had a weekly or bi-weekly rotation of approximately 25 publications for which AFS used telemarketing to sell subscriptions. [PX 1, 19:20–20:11, 154:25–157:4, 229:21–231:5 (App. 00005-6; 00069-72; App. 00115-117).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Drummond estimated there to be approximately 25 publications for which AFS sold during the Relevant Time Period. AFS denies that it had all 25 publications during the Relevant Time Period. PX 1, 229:23—23:9.

30. AFS's typical newsletters were four or eight-pages. [PX 1, 320:10–15 (App. 00140); PX 35, Ex. 6, p. 5, 15 (App. 02057, 02067) (describing newsletter as four pages), 2, 4, 7–12, 17–18 (App. 02054, 02056, 02059-064, 02069-070) (describing newsletter as 8 pages).]

**RESPONSE:** Admitted.

31. AFS's newsletters covered topics such as accounts payable, payroll, and school safety and security. [PX 35, Ex. 6, p. 2, 10, 25 (App. 02054, 02062, 02077)]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the executive scripts identified in the referenced documents are for AFS's newsletters covering the topics of accounts payable, payroll, and school safety and security. AFS denies that its newsletters were limited to these topics. *See* PX 35, Ex. 6 (App. 02058; 02056; 02057; 02060—61; 02063; 02066; 02069—72; and 02078). AFS's newsletters also covered topics such as environmental compliance, finance and accounting, training and staff development, corporate development and fundraising; coding and billing best practices; sales and business development; employee benefits; human resources; employment law; higher education law in America; and special education and students with disabilities. *Id*.; Exhibit B, AFS0117038.

32. Some of the newsletter subscriptions also came with a book. [PX 1, 122:20–123:13 (App. 00052-53).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the referenced document contains a description of a single specific newsletter which has an accompanying book. AFS denies Plaintiffs' overly simplistic and generalized mischaracterization of AFS's subset of publications which included both a newsletter and "a paperback reference guide" or "desk book encyclopedia." *See* PX 1 123:9—1; Exhibit B, AFS0117038.

33. The subscription prices ranged from a couple hundred dollars [PX 35, Ex. 6, pp. 2–4, (App. 02054-2056)] to over $400 [PX 35, Ex. 6, pp. 14–16 (App. 02066-2068).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the documents referenced include the pricing structure of "a couple hundred dollars to over $400". AFS denies Plaintiffs' simplistic mischaracterization of AFS's newsletter pricing structure. Specifically, prices for AFS's newsletters varied on a number of factors, including the number of copies requested by the subscriber each month (*see* PX 35 (App. 02066) which offers a price of $295 for 5 copies or $432 for 10 copies of the newsletter The Selling Advantage) and the additional resources accompanying the newsletter such as access to AFS's online legal resource center (*see* PX 35 (App. 02096)); Exhibit B, AFS0117038.

34. AFS telemarketed its publications to employees of businesses, schools, police departments, churches and other organizations. [ECF 91 ¶ 1-2(a); PX 9, 27:16–21 (App. 00353).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that a single AFS telemarketing sales representative testified that she had made sales calls to schools, police departments, and churches. PX 9, 27:16–21 (App. 00353). That same telemarketing sales representative went on to clarify:

> Q: Were churches among the subscribers to AFS publications?
>
> A: I do think we had a couple churches or church organizations that were at least – I mean we had a – I'm fairly certain we had a publication that was specifically for that.
>
> Q: What about businesses? Did you tend to contact businesses as well?
>
> A: Yeah. I would say that was most of the calls we made.
>
> Q: And in same cases were the businesses very big businesses?
>
> A: I'd say most of them probably …

Exhibit J, Luchette Dep. at 139:1—17. AFS denies that it telemarketed its publications to employees generally at the locations mentioned in Paragraph 34. *See* Drummond Dep. Vol II at 442:11—14 and *generally* 440:15—443:10. AFS sold its publications, including its newsletters and voluminous reference guides, in a "fast read" format, to executives so that they "could digest the information very rapidly and be able to integrate [the information contained therein] into their job the very next day." *Id*.

35. AFS purchased or swapped lists of companies to call from or with list brokers or other companies in the subscription business. These lists included the company name, its physical address, and usually the name of an individual employee as a potential contact. [PX 1, 296:25–297:21 (App. 00134-135); PX 9, 26:24–27:21, 28:8-20 (App. 00352-354); PX 10, 139:6–140:3 (App. 00390-391).]

**RESPONSE:** Admitted.

36. AFS would call people who "for the most part" were not expecting the call. [PX 1, 297:22–25 (App. 00134); PX 9, 27:22–25 (App. 00353); PX 10, 139:6–140:3 (App. 00390-391).]

**RESPONSE:** Objection. AFS objects to this Paragraph as vague and ambiguous, insomuch that Plaintiffs do not clarify the purpose of the call or the area of business at issue. AFS admits only that the referenced testimony supports the statement that "for the most part" people were not expecting AFS's publication telemarking sales representatives' calls. *See* referenced documents.

37. AFS would try to reach the potential contacts from lists, but a lot of the times those names were not accurate, so AFS told telemarketers to just ask for whatever person held the particular position AFS was looking for. [PX 9, 26:24–27:15 (App. 00352-353).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it would provide its telemarketing sales representatives with a list of leads for that day, specific to the publication being sold, which typically included a business name, a business executives' name, their respective title, a telephone number, and an address. PX 9, 26:24–27:15; Exhibit A Drummond Dep. Vol. 1 at 207:16—18; 208:16—209:2; PX 1, 297:7—21; Exhibit C Strosnider Dep. at 21:20—22:7; 17:14—18:3. In the event the executive listed on the lead sheet was no longer with the business, AFS sales representatives were instructed to ask for the person who took over that position. PX 9, 26:24–27:15. *See, e.g.*, Exhibit D, AFS0402543. AFS specifically denies Plaintiffs' mischaracterization of one former telemarketing employee's testimony that "a lot of the times those names were not accurate." PX 9, 26:24–27:15. In fact, Ms. Luchette only stated that at times when the information was not accurate, AFS's telemarketing sales representatives were instructed "to just go in asking for whatever person held that particular position we were looking for." *Id.*

38. AFS contacted people at their place of employment using technology that would autodial a group of telephone numbers. [PX 12, 103:11–24 (App. 00455); PX 9, 26:24–27:6, 28:1–7 (App. 00352-354).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it contacted executives at their place of employment, as AFS engaged in strictly business-to-business sales. PX 12, 103:11—24; PX 10, 139:6—12; Exhibit A, Drummond Dep. Vol. II at 381:22—23. AFS denies that it used technology that would autodial a group of telephone numbers. Exhibit A, Drummond Dep. Vol. I, 207:8—209:3.

39. AFS contends that orders are placed during the initial sales calls. [PX 15, 263:25–264:6 (App. 00597-598); PX 6, 84:16–19 (App. 00279).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that an order *may* be placed during an initial sales call. AFS denies that all sales calls result in an order being placed. Exhibit A, Drummond Dep. Vol. II, 299:2—301:13; Exhibit E, Orischak Dep., 172:24—174:24.

40. AFS trained its telemarketers to complete sales calls within two to three minutes, [PX 10, 86:22–87:11 (App. 00385-386); PX 35, Ex. 209 (pg. 3) (App. 02442)] and former AFS employees estimate that sales calls would last an average of anywhere from two to five minutes. [PX 10, 87:5–17 (App. 00386); PX 5, 29:8–17 (App. 00237).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that its executive scripts, when read verbatim, typically last two to three minutes. Exhibit E, Orischak Dep., 87:5—88:4. AFS denies that AFS limited its sales representatives to completing calls within two to three minutes. *Id.*; PX 9, at 63:24—64:2. In fact, a former morning manager who trained AFS's telemarketing sales teams, testified that calls would "obviously…take longer" than two to three minutes if "the executive would ask you a lot of questions" because AFS's sales representatives

are "just friendly people." Exhibit E, Orischak Dep. at 87:20—24. Moreover, AFS trained its telemarketing sales representatives to *not* "be[] too fast." PX 35 (App. 02439).

41. AFS gave telemarketers various scripts, "selling tools," and "call guides," including scripts (a) "to assist and train [telemarketers] on how to speak and ask for the right person to market to when they called for, you know, various publications" ("secretary scripts") [PX 1, 21:5–22:6 (App. 00007-8)]; (b) to present AFS's publication subscription offers (referred to by AFS as "executive scripts," and hereinafter as "sales scripts") [PX 1, 22:19–25 (App. 00008)]; (c) to use in responding to consumer questions or objections ("rebuttal scripts") [PX 14, 153:7–20 (App. 00507); PX 5, 117:12–19 (App. 00250); PX 17, 46:20–47:18.]; and (d) to use in placing a "second call" after the initial call "approximately 60 day after the order was placed," if the consumer had not paid or cancelled ("second call scripts") [PX 1, 23:2–9 (App. 00009).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of these documents and attempt at redefining terms used by AFS in the normal course of its business and by the parties in this litigation. Specifically, the Friday prior to a publication being introduced the following week, AFS's telemarketing sales representatives would typically be trained on that new publication. Exhibit C, Stronider Dep. at 21:20—24; Exhibit A, Drummond Dep. at 91:3—11. As part of that training, AFS would provide various materials and scripts. *See, e.g.,* Exhibit F, AFS0402027—2033. Those materials would typically include an "executive script," which certain portions must be read verbatim were used with the executive during the presentation of the sale.[1] PX 1, 22:15—25; Exhibit E, Orischak Dep. at 54:17—55:18. *See also, e.g.,* AFS S.J. Br. at Exhibits Land M. Other materials may include:

- A "secretary script" (*see e.g.* Exhibit F, at AFS0402031; PX 35 at App. 02115) was "a guide to help the telemarketing reps get the executive or the person they need[ed] to speak to on the phone" to begin the presentation of the publication subscription offer. Exhibit E, Orischak Dep. at 59:10—60:5.

- A "reference guide" or "sales tool" (*see, e.g.,* Exhibit F, at AFS0402032; Exhibit G, AFS0588579) was a tool provided by AFS to the telemarketing sales representative for them to review in order to become more informed about the publication they are selling, its benefits, the resources provided, and topics covered or generalized guidance on the sales process.

- A "rebuttal script" (*se,e e.g.,* Exhibit F, at AFS0402028; PX 35 at App. 02117—02129) was provided to assist AFS's telemarketing sales representatives in

---

[1] AFS referred to scripts used by its publication telemarketing sales team to "to present publication subscription offers" to executives were referred to by AFS and throughout this litigation, including in the twenty-six depositions and in Plaintiffs' own filings, as "executive scripts." PX 1, 22:15—25. Plaintiffs' attempt to redefine these scripts as "sales scripts" is confusing and misleading. AFS will continue to use the term "executive scripts" herein.

responding to customer questions during the course of the sales call. Exhibit H, Satell Dep. Vol. I at 153:7—12.

AFS denies that it would typically provide "second call scripts" (*see, e.g.*, PX 35 at App. 02130) to its telemarketing sales representatives, as AFS's customer service agents were principally in charge of making second calls to subscribers. Exhibit A, Drummond Dep. Vol II at 333:6—21. While expressly denying the existence of any written policy, AFS admits that a second call was not typically placed to subscribers that had already paid for its businesses' publication subscription, because their payment was an express confirmation of their satisfaction, rendering the purpose of the second call moot. Exhibit I, AFS's Supplemental Objection and Response to Plaintiffs' Joint Request for Admission No. 70.

42. Secretary scripts, sales scripts and "selling tools" that were produced by AFS are Exhibit 6 to Ed Satell's 2021 Deposition [PX 35 (App. 02053-2115)] and included attached as Exhibit 14 to the Declaration of Commonwealth Investigator Oleckna. [PX 19 (App. 01097-1160]. AFS admitted that some were in use at least as early as January 1, 2016. [Declaration of Amy Hocevar ¶¶ 2-4].

**RESPONSE:** Admitted in part, denied in part. AFS admits that the referenced documents include "secretary scripts," "executive scripts," and "sales tools" produced by AFS. AFS denies that it admitted that "some" of the referenced documents "were in use at least as early as January 1, 2016." Exhibit A, Drummond Dep. Vol I at 109:11—110:3. Specifically, AFS was unable to determine the exact dates of use of any of the referenced materials. *Id*.

43. AFS used "secretary scripts," also referred to as "gatekeeper scripts," to get transferred from whomever answered an AFS telemarketing call to an employee with responsibility for the topic of the publication that AFS was calling to sell (e.g. safety or finance or employment law or HR). [PX 186, FTC-00020505-20506 (App. 03957-3958); PX 1, 21:3–22:6, 48:23–49:8 (App. 00007-08, 00019-20); PX 35, Ex. 12 (App. 02134-2135); PX 10, 58:13–60:5 (App. 00381-383); PX 5, 81:22–82:6 (App. 00241-242).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it provided "secretary scripts" to its telemarketing sales representatives. AFS denies Plaintiffs' mischaracterization of the use and intent of such scripts. Exhibit A, Drummond Dep. Vol. I at 32:25—10. Secretary scripts "were selling tools" provided to AFS's telemarketing sales representatives to be used when "the executive didn't answer the phone," providing "instructions on how to ask for the right person, the person that would be most likely to read the publication and the online resource and also have the decision-making ability to purchase it." *Id*. By way of further response, AFS's telemarketing sales representatives did not have to follow the "secretary scripts" "word for word" but were provided them to help "make [AFS's telemarketing sales representatives] feel more comfortable that they are progressing and building their confidence when you are talking to someone." PX 10, at 59:15—24; Exhibit E, Orischak Dep. at 88:14—89:7.

44. Branch managers, regional managers and sometimes Colin Drummond drafted secretary scripts. [PX 1, 29:17–23 (App. 00012).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Drummond testified that from July 1, 2015 to September 3, 2021, when AFS closed its publication business, secretary scripts may have been drafted by branch managers, regional managers, and sometimes himself. AFS denies that Drummond drafted any secretary scripts that included the answer "no" to the question "Are you selling something?" Exhibit A, Drummond Dep. Vol. I at 81:11—82:23. By way of further response, sometime in 2018, Drummond discovered some "secretary scripts" drafted by branch managers included the answer "no" to the question "Are you selling something?" *Id*. Upon leaning this fact, Drummond held a meeting with branch managers and "told them not to say no to the customer, if and when the secretary asked are you selling something." *Id*.

45. Colin Drummond currently works for AFS, and has worked there for over 20 years, serving as AFS's head of telemarketing. [PX 1, 7:2–15 (App. 00003); PX 14, 7:19–24 (App. 00487); PX 15, 353:9–353:24 (App. 00622).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Drummond has worked for AFS for over 20 years. AFS admits that the above referenced title appears in the cited document. However, AFS denies that Drummond's title was "head of telemarketing." PX 1, at 7:12—15. From July 1, 2015 to September 3, 2021, when AFS closed its publication business, Drummond held the title of Director of Call Center Operations. *Id*.; Exhibit A, Drummond Dep. Vol. I at; 28:3—5; 33:17-19; 94:2-4; AFS S.J. Br at Exhibit Z, at ¶ 5; Exhibit L, Townsend Dep. at 249:3—5.

46. Secretary scripts are attached as Exhibit 14 to the Declaration of Commonwealth Investigator Lauren Oleckna and are included in Exhibit 6 to the Deposition of Ed Satell. [FTC-00020505-20506; PX 35 (Ex. 6, pp. 57-63 (PBP051615-51621) (App. 02109-2115)]; PX 19, Exhibit 14, same pages (App. 01097); Declaration of FTC Counsel Amy Hocevar ¶ 5.]

**RESPONSE:** Admitted. With the exception of FTC-00020505-20506, AFS admits that the documents cited can be categorized as "secretary scripts." By way of further response, FTC-00020505-20506 is a September 10, 2018 letter from counsel for AFS to the FTC which explains, in relevant part that "secretary scripts" "are utilized to assist in identifying the proper executives/employees who are authorized to purchase goods and services on behalf of their employer. … Once a proper executive/authorized employee is identified, the PBP sales representative makes contact with that executive/authorized employee where-in the Executive Script is utilized to solicit the sale of a PBP publication." *Id*.

47. In response to the question "where are you calling from," AFS had secretary scripts that instructed telemarketers to answer "Center for Employment Law," "Facilities Manager's Alert" "Foundation & Corporate Funding Advantage," School Safety & Security Alert," "Progressive Business," and "PBP." [PX 19 ¶¶ 12–13 and Exhibit 14 thereto (App. 00910, 01097).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that one of the documents referenced in Paragraph 47 includes an answer of "Progressive Business" or "PBP" to the question "where are you calling from." AFS denies that it has an answer to the question "where

are you calling from" as "Center for Employment Law," "Foundation and Corporate Funding Advantage," or "Facilities Manager's Alert," or "School Safety & Security Alert" within the referenced document. PX 19, Exhibit 14. By way of further response, the cited documents also have responses to "where are you calling from" as "The Center for Education and Employment Law," for instances in which that specific publication is being sold. PX 19, Exhibit 19 (App. 01152). AFS further denies it required its telemarking sales team to provide such an answer. Exhibit E, Orischak Dep. at 59:10—24; Exhibit A, Drummond Dep. Vol I at 136:2—9; Exhibit HH, Satell Dep. Vol. II at 29:12—18.

48. None of these are registered business entities or registered fictitious names in Pennsylvania. [PX 19 ¶ 9 and 11 (App. 00909-910).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it did not register the name of its publications "Foundation and Corporate Funding Advantage," "Facilities Manager's Alert," "School Safety & Security Alert," or "Center for Employment Law" as registered business entities or registered fictitious names in Pennsylvania. AFS denies that it did not register "Progressive Business Publications," which is commonly abbreviated as "Progressive Business" or "PBP," as a registered business entity or registered fictitious name in Pennsylvania. PX 19, at Exhibits 4—8; Exhibit A, Drummond Dep. Vol. I at 118:18—119:2; 119:18—23. AFS further denies that it did not register "Center for Education & Employment Law," which depending on the publication being sold, may have been abbreviated to "Center for Education Law" or "Center for Employment Law." PX 19, at Exhibits 9—10; PX 19, at Exhibit 14 (App. 01159).

49. Drummond emailed several AFS offices in August of 2016 with the subject line "LUT SCRIPTS FOR NEXT WEEK & CONFERENCE CALL FRIDAY" attaching a secretary script for the publication "Legal Update for Teachers" ("LUT Secretary Script"). [PX 53, AFS0402027-31 (App. 02691).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' incomplete characterization of the referenced document. Specifically, Plaintiffs have omitted material attachments to the email providing important context for the correspondence. Exhibit F, AFS0402027—2033 (providing a true and correct copy of the referenced document). AFS admits that in August of 2016 Drummond, sent an email with the subject line referenced in Paragraph 49, attaching various materials for the branch managers to use in training their telemarketing sales representatives on the publication "Legal update for Teachers" being introduced the following week. *Id.*; Exhibit C, Strosnider Dep. at 21:22—24. AFS also admits that among those materials was a document titled "LEGAL UPDATE FOR TEACHERS – SECRETARY SCRIPT." Exhibit F, AFS0402027—2033.

50. The LUT Secretary Script states "we are trying to get in and out of the call before the secretary can find out we are calling for CEEL and marketing a service. If a secretary learns we are CEEL and marketing a service, it makes it harder to get through on a 'try again' or 'call back'!" [PX 53, AFS0402027–31 (App. 02691).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the cited document. AFS denies Plaintiffs' selective mischaracterization of this citation, as

Plaintiffs have omitted relevant portions of the document providing context for the statement. By way of further response, the document titled "LEGAL UPDATE FOR TEACHERS – SECRETARY SCRIPT" states "***For principals who are not in or busy, we are trying to get in and out of the call before the secretary can find out we are calling for CEEL and marketing a service. If a secretary learns we are CEEL and marketing a service, it makes it harder to get through on a 'try again' or 'call back'! It is important to always be polite and respectful. Remember the secretaries are just doing their job!***" (emphasis in original, underline included to indicate the relevant portion omitted by Plaintiffs). AFS included this statement and similar messages in other training materials, because as one training manager explained, a secretary's role at a business is to be protective of their very busy executive's time and only put through select calls and "if this is going to be a half-hour call, then [they would ask you] to make an appointment." Exhibit E, Orischak Dep. at 88:17—7.

51. The LUT Secretary Script directed telemarketers to respond to the question "Who's calling?" with the following scripted response: "This is [Your Name] I just have a couple of question about CLASS ROOM MANAGEMENT and STUDENT DISCIPLINE…IS HE/SHE IN THE OFFICE TODAY?" [PX 53, AFS0402027–31 (App. 02691).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears within a document attached to PX 53 titled "LEGAL UPDATE FOR TEACHERS – SECRETARY SCRIPT." AFS denies that it directed its telemarketing sales representatives to respond to the question "Who's calling?" with the above scripted response, posed by anyone other than the secretary, receptionist, or operator. *Id*. AFS specifically denies that it directed its telemarketers to respond with the above scripted response when asked "Who's calling?" from an executive or decision maker of any kind. Exhibit A, Drummond Dep. Vol. I at 32:25—33:10. AFS had a strict policy not to sell its publications to "receptionists or secretaries or operators or people that have no influence on the decision making process." Exhibit A, Drummond Dep. Vol. I at 64:4—11.

52. In response to the question "are you selling something," some secretary scripts included the response "no." [PX 35, Ex. 6, p. 58, 62 (PBP051616, PBP051620) (App. 02110, 02114).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the two cited documents. AFS denies the Plaintiffs' mischaracterization of the referenced documents. Specifically, Plaintiffs have provided an incomplete quotation from the documents, which are in writing and speak for themselves. PX 35, Ex. 6, p. 58, 62 (PBP051616, PBP051620) (App. 02110, 02114). The two cited documents include the following responses to the question "Are you selling something?" when posed by a secretary or receptionist (not an executive or decision maker): "No, that's not it…I have some important information regarding grant research I wanted to send but I need to speak with them about it. Are they available?" [*See* PBP051616, utilized when calling to reach an executive regarding a publication titled Foundation & Corporate Funding] and "No, I have some important information I need to send, but want to make sure it does not duplicate what they are already receiving. Can you transfer me please?" [*See* PBP051620, utilized when calling to reach an executive about a publication titled Supervisor's Legal Update]. By way of further response, sometime in 2018, Drummond discovered some "secretary scripts" drafted by branch managers included the answer "no" to the

question "Are you selling something?" Exhibit A, Drummond Dep. Vol. I at 81:17—82:2; 83:7—84:15. Upon learning this fact, Drummond held a meeting with branch managers and "told them not to say no to the customer, if and when the secretary asked are you selling something." *Id.* By way of further response, Drummond testified:

> I want to add that, you know, based on my experience of doing this for a very long time and making the calls myself and listening to thousands and thousands of recordings, both secretary and executive, it was extremely rare for a secretary or an executive to ask the question are you selling something. So it didn't happen very often. So, therefore, any responses to it wouldn't happen very often. You know, after reviewing the scripts to get ready for this deposition, I did see that some of these selling tools had that on there and then I recollected that I told the branch managers to stop using that, because it didn't make any sense. It doesn't come up very often, so why even put it on there. And then secondly, ultimately we are selling something; not to the secretary, but to an executive. So I would think there are better ways to answer that question, if and when it comes up, which it rarely did.

Exhibit A, Drummond Dep. Vol. I at 83:7—84:15

53. An AFS branch manager instructed telemarketers that only the answer "no" be given and they not elaborate further. [PX 9, 62:7–64:10 (App. 00358-360).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that one former AFS telemarketing sales representative testified during her deposition that she was told by her branch manager to in Boardman, Ohio "only say 'No'" when asked by a receptionist or secretary (not an executive or decision maker), "Are you selling something?" PX 9, 62:7–64:10 (App. 00358-360). AFS expressly denies that AFS instructed its telemarketing sales representatives "that only the answer 'no' be given and they not elaborate further." Exhibit C, Strosnider Dep. at 41:2—7. Another former branch manager testified that over the course of her nine years of training AFS's telemarketing sales representatives she instructed telemarketers to never answer "No" to the question "Are you selling something?" Exhibit E, Orischak Dep. at 108:13—14; 109:6—8. She trained AFS's telemarketing sales representatives to always answer that question truthfully and never lie. Exhibit E, Orischak Dep. at 61:8—21. *See also* PX 123, App. 02963 (AFS0703420). By way of further response, sometime in 2018, Drummond discovered some "secretary scripts" drafted by branch managers included the answer "no" to the question "Are you selling something?" Exhibit A, Drummond Dep. Vol. I at 81:17—82:2; 83:7—84:5. Upon learning this fact, Drummond held a meeting with branch managers and "told them not to say no to the customer, if and when the secretary asked are you selling something." *Id.*

54. If the secretary asked "What's this regarding?" or "are you selling something" during a telemarketing call, other secretary scripts included scripted responses such as:

a) "I have a couple questions about building maintenance issues…so I probably need to talk to your Facility manager, maintenance manager or operations manager";

b) "I have some questions about billing and insurance that I need to speak to them about"; and

c) "I need to discuss some quality issues."

[PX 35, Ex. 6, p. 59–61 (PBP051617-51619) (App. 02111-2113).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text in "a)" appears in a cited document in response to the question "WHAT'S THIS REGARDING? OR ARE YOU SELLING SOMETHING?" when posed by a secretary, receptionist, or operator. AFS further admits that the extracted text in "b)" and "c)" appears in the cited documents in response to the question "WHAT'S THIS REGARDING?" when posed by a secretary, receptionist, or operator. AFS denies Paragraph 54 to the extent it offers an incomplete quotation and therefore, mischaracterizes the documents, which are in writing and speak for themselves. PX 35, Ex. 6, p. 59–61 (PBP051617-51619) (App. 02111-2113).

55. AFS has not identified any secretary script that requires telemarketers to inform secretaries that the telemarketer is selling something, and AFS telemarketers were not trained to answer yes, and did not answer yes, if the secretary asked if they were selling something. [PX 1, 60:11–61:2, 72:12–25, 73:2–8, 84:9–19 (App. 00021-22, 00023, 00024, 00033); PX 9, 67:9–68:20 (App. 00361-362); PX 15, 167:10–13 (App. 00569); PX 10, 61:4–18 (App. 00384); PX 17, 41:2–15 (App. 00666).].

**RESPONSE:** AFS objects to Paragraph 55 as vague and ambiguous as to the phrase "requires telemarketers to inform secretaries that the telemarketer is selling something" because AFS did not *require* its publication telemarketing sales representees to follow the secretary scripts "word for word." Exhibit E, Orischak Dep. at 59:10—24; Exhibit A, Drummond Dep. Vol. I at 32:25—33:10. AFS further objects to Paragraph 55 as irrelevant to the claims and defense in this litigation because it was AFS's policy to not sell its publications to secretaries, receptionists, or operators. Exhibit A, Drummond Dep. Vol. I at 64:4—11; Exhibit E, Orischak Dep. at 108:16—24; Exhibit J, Luchette Dep. at 140:15—22. AFS denies that it did not train its telemarketing sales representatives to answer yes, or that they did not answer yes, if the secretary asked if they were selling something. Exhibit C, Strosnider Dep. at 41:2—7. One former branch manager testified that over the course of her nine years of training AFS's telemarketing sales representatives she instructed telemarketers to never answer "No" to the question "Are you selling something?" Exhibit E, Orischak Dep. at 108:13—14; 109:6—8. She trained AFS's telemarketing sales representatives to always answer that question truthfully and never lie. Exhibit E, Orischak Dep. at 61:8—21. *See also* PX 123, App. 02963 (AFS0703420). By way of further response, sometime in 2018, Drummond discovered some "secretary scripts" drafted by branch managers included the answer "no" to the question "Are you selling something?" Exhibit A, Drummond Dep. Vol. I at 81:17—82:2; 83:7—84:5. Upon learning this fact, Drummond held a meeting with branch managers and "told them not to say no to the customer, if and when the secretary asked are you selling something." *Id*. Moreover, in her nine years with AFS, one branch manager testified that the question "Are you selling something?" did not come up very often. Exhibit E, Orischak Dep. at 62:12—16. In fact, forensic data expert, Margaret Daley found only 1 instance in a representative sample of 387 recorded calls that she reviewed where a

secretary answered the call and asked something to the effect of whether the representative was selling something. AFS S.J. Br. at Exhibit R (M. Daley Report).

56. In October 2016, Drummond sent to all of AFS's regional and branch office managers what he described as a "typical secretary script" which included the following:

a) Secretary Question: "*What's this regarding?*"

Scripted Response: "*I need to speak with a manager regarding some employment issues. Who would handle that?*"

b) Secretary Question/Statement: "*Are you selling something?*" or, "*They don't take sales calls*"

Scripted Response: "*No, I have some important information I need to send, but want to make sure it does not duplicate what they are already receiving. Can you transfer me please.*"

[PX 1, 74:7–77:25 (App. 00025-0028); PX 35, Ex. 12 (App. 02134-2135).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of the documents, and Drummond's intent or description thereof, which is in writing and speaks for itself. *See* referenced documents.

57. In January of 2018, Drummond sent an email to Mike Gorton, AFS's Director of Administration, and to two of AFS's offices stating, "Secretary script is the updated one we are using now on all pubs." The email attached a secretary script that included the following:

a) Secretary Question: "*What is this call regarding?*"

Scripted Response: "*I'm sending out some information on sales tax and 1099s, but I need to touch base with them first… Could you transfer me please*?"

b) This secretary script does not contain any reference to the question "Are you selling something," and provides no scripted response.

[PX 1, 26:8–11, 78:5–81:14 (App. 00011, 00029-00032); PX 35, Ex. 13 (App. 02136-2138).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of the documents, and Drummond's intent or description thereof, which is in writing and speaks for itself. *See* referenced documents.

58. In May of 2018, AFS was using a secretary script that included the response "no" to respond to the question "are you selling something." [PX 1, 86:8–89:9 (App. 00034-00037); PX 35, Ex. 14 (App. 02139-2141).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced documents. AFS denies Paragraph 58 as a whole because it provides an incomplete quotation, therefore mischaracterizing the statements made therein, which are in writing and speak for themselves. PX 35, Ex. 14 (App. 02139-2141). Specifically, the cited document provides as follows:

> Secretary Question: *"Are you selling something?"*
>
> Suggested Response: *"No, I wanted to touch base on some information I was sending over. Are they available?"*

PX 35, Ex. 14 (App. 02139-2141). In the thousands of recorded telemarketing calls that its quality managers and executive reviewed, AFS is not aware of any instance where an interchange like this was actually used by a telemarketing sales representative. Exhibit A, Drummond Dep. at Vol. I 81:3—84:15.

59. In 2020, Heather Wood (AFS's Regional Director of Telemarketing) was asked "I am just curious what you think a rep should say when the customer asks if it is a solicitation call? what do we tell reps to say?" and Ms. Wood responded as follows: "We generally coach to not say yes or no, just proceed with your intro if exec [executive]; If sec [secretary] – We just use the 'what's this regarding' response." [PX 127, AFS0706465 (App. 02971); PX 1, 17:6–10 (App. 00004).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced documents. AFS denies Paragraph 59 as a whole because it provides an incomplete quotation, therefore mischaracterizing the statements made therein, which are in writing and speak for themselves. PX 127, AFS0706465 (App. 02971). By way of further response, in 2020, when asked "I am just curious what you think a rep should say when the customer asks if it is a solicitation call? what do we tell reps to say?", Ms. Wood first responded by clarifying if the question was being posed by a secretary or an executive as this would change Ms. Wood's answer. PX 127 (App. 02972). Once it was clarified this question was posed by an executive's assistant, Ms. Wood responded with "We generally coach to not say yes or no, just proceed with your intro if exec [executive]; If sec [secretary] – We just use the 'what's this regarding' response." *Id.*

60. In 2020, an AFS branch manager wrote that she "wanted to remind everyone that if a secretary asks you if your [sic] are selling something do not say no or yes, use the scripted responses on your secretary scripts…If you say yes, they won't put you through…" [PX 123, AFS0703420 (App. 02962); PX 1, 172:11–173:4 (App. 00085-86) (showing title).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted test appears in the referenced document. AFS denies Plaintiffs' mischaracterization of this statement.

Specifically, Plaintiffs provided an incomplete recitation of the extracted text, which is in writing and speaks for itself. PX 123, AFS0703420 (App. 02962).

61. In 2021, Crystal Cashwell, a former AFS telemarketing branch manager who still works at AFS, circulated for use a secretary script that included the response "no" to respond to the question "are you selling something?" [PX 129, AFS0713426 (attaching AFS0713434) (App. 02976-977); PX 1, 171:16-18 (Cashwell's title).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced documents. AFS denies Paragraph 61 because it provides an incomplete quotation, therefore mischaracterizing the statements made therein, which are in writing and speak for themselves. PX 129, AFS0713426 (attaching AFS0713434) (App. 02976-977). Specifically, in May of 2021, Cashwell circulated a packet of materials for AFS's publication Supervisors Legal Update. Exhibit K, AFS0713425—434. Those materials included, (i) the executive script; (ii) a sales tool to assist the telemarketers in responding to common questions or concerns; (iii) a Supervisors Legal Update "Cheat Sheet" describing the publication, the subjects covered, and things to remember during the sales call; and (iv) a Supervisors Legal Update Secretary Script. *Id*. The Supervisors Legal Update Secretary Script (AFS0713434) provides as follows:

> Secretary Question: *"Are you selling something? or They don't take sales calls"*
>
> Suggested Response: *"No, I have some important information I need to send, but want to make sure it does not duplicate what they are already receiving. Can you transfer me please?"*

*Id*. at AFS0713434. In the thousands of recorded telemarketing calls that its quality managers and executive reviewed, AFS is not aware of any instance where an interchange like this was actually used by a telemarketing sales representative. Exhibit A, Drummond Dep. at Vol. I 81:3—84:15.

62. Sales scripts labeled PBP000685-710 were produced and used by AFS during part of the Relevant Time Period. [PX 35, Exhibit 6, p. 2-27 (App. 02054-2079); Declaration of Amy Hocevar ¶¶ 2-4, and Exhibit 14 to the Declaration of Commonwealth Investigator Oleckna (App. 01099-App. 01124.)]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the executive scripts cited in the referenced documents were produced by AFS to the FTC on November 21, 2017, two and half years before the FTC initiated this litigation. *See* Declaration of Amy Hocevar ¶ 3; Exhibit L, Satell Dep. Vol. I at 134:17—24; and ECF No. 1. AFS denies that it is aware if these executive scripts were used during the Relevant Time Period. Exhibit A, Drummond Dep. Vol. I at 108:20—109:2.

63. AFS required telemarketers to "follow closely" and "strictly abide by" the sales scripts, and AFS required telemarketers to read some parts of the script verbatim. [PX 1, 19:22–25, 22:15–25, 35:3–36:17 (App. 00005-10, 00015-16); ECF 91 ¶ 1-2(b).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of Drummond's testimony as stated in Paragraph 63. Specifically, Drummond testified AFS's telemarketing sales representatives must follow the scripts closely. *See* PX 1, at 19:22–25, 22:15–25. AFS allowed flexibility at the opening "of the presentation when asking engaging questions or describing the publication and its features and benefits and how it helps other customers." *Id* at 35:22—36:3. By way of further response, Drummond also testified that certain portions of the script (the offer and disclosure paragraphs) must be read "verbatim, word for word." *Id*. at 35:3—36:17. This was "strictly enforced by [AFS's] quality control team and branch management and regional management to execute [the offer and the disclosure paragraphs] verbatim." *Id*.

64. AFS contends that the sales scripts were not "materially" changed since 1998. Drummond drafted the sales scripts since July 2015. [PX 1, 92:4–93:11 (App. 00038-39).]

**RESPONSE:** Admitted.

65. The sales scripts were fairly uniform, using the same language, with some variations primarily related to differences between publications and whether the subscription also included a book. [PX 5, 69:17–20; 72:2–73:8 (App. 00238-240); PX 35, Exhibit 6, p.2-27 (App. 02053-2079).]

**RESPONSE:** Admitted.

66. AFS typed sales scripts into a computer system and telemarketers read the sales scripts from an electronic display during sales calls. [PX 1, 25:9–17 (App. 00010).]

**RESPONSE:** Admitted.

67. The sales scripts began with the following introductory sentence: "Hi [consumer's name] this is [telemarketer's name] from…" [PX 35, Ex. 6 p. 1-51 (App. 02054-2103)].

**RESPONSE:** Denied. AFS denies the cited documents support the statement made in Paragraph 67. Specifically, not all of the referenced documents contain the extracted text. *See* referenced documents.

68. On May 31, 2016, AFS expressly directed:

> We legally must use a company name or the full pub[lication] name to introduce ourselves. We may NOT use the pub letters, such as ECA, SSB etc – These ARE NOT names that our company goes by.
>
> Company names include PBP, Progressive Business, Progressive Business Publications, any of the full pub names (Safety Compliance Alert) or Center for Education and Employment Law.

[PX 1, 143:14–146:15 (App. 00064-00067); PX 35, Ex. 17 (App. 02144-2145); PX 5, 109:7–115:16 (App. 00243-249); PX 15, 30:10–31:3 (App. 00535-536).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only the extracted text appears in the referenced documents. AFS denies as a matter of company policy, it "expressly directed" any of the instructions contained within the extracted language. PX 5, 114:1–4 (App. 00248). Specifically, Susan Grabert, the author of the referenced email, expressly testified at her deposition that this was *not* PBP policy, but simply her "exerting muscle out to the offices to get them to do what I wanted. It was not something that came from above." *Id*.

69. AFS knew that at times during the Relevant Time Period telemarketers used acronyms for publications to identify where they were calling from. [PX 1, 146:24–147:7 (App. 00067-00068).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that during the Relevant Time Period, Drummond became aware in a single branch office "there were a couple of [telemarketing sales reps] that we using the acronym[s]" for publications to identify where they were calling from." *See* referenced document. AFS denies that it "knew that at times during the Relevant Time Period" that any telemarketers outside of the limited instance described above were using "acronyms for publications to identify where they were calling from." *Id*.

70. AFS produced sales scripts from the Relevant Time Period directing telemarketers to state that they were calling from the following: PBP, Progressive Business, Environmental Compliance Alert, Foundation and Corporate Funding Advantage, The Selling Advantage, What's Working in Human Resources, and the newsletter Special Education Law Update, none of which are registered business entities or registered fictitious names in Pennsylvania. [PX 19 ¶ 13 (App. 00910-911).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the documents referenced in PX 19 ¶ 13 (App. 00910-911), identify scripts which include a greeting that the telemarketing sales representative is calling from the business entities and publications listed in Paragraph 70. AFS denies that it did not register any of the listed business entities or publications. Specifically, AFS registered "Progressive Business Publications," which is commonly abbreviated as "Progressive Business" or "PBP," as a registered business entity or registered fictitious name in Pennsylvania. PX 19, at Exhibits 4—8; Exhibit A, Drummond Dep. Vol. I at 118:18—119:2; 119:18—23. AFS further denies that it did not register "Center for Education & Employment Law," which dependent on the publication being sold, may abbreviated to "Center for Education Law" or "Center for Employment Law." PX 19, at Exhibits 9—10; PX 19, at Exhibit 14 (App. 01159).

71. The only publication names that are registered fictitious names in Pennsylvania are "Nonprofit Board Report" and "The Selling Advantage for Sales Professionals." [PX 19 ¶¶ 9-11 (App. 00909-910).]

**RESPONSE:** Admitted.

72. After stating where telemarketers are calling from, the sales scripts typically stated, "I understand you are in charge of…," "I understand you handle…," "I understand you are the (Director/Title) there," or other similar phrases. [PX 1, 226:3–227:8 (App. 00113-114); PX 35, Ex. 6, pp, 2-27, PBP000685-710 (App. 02054-2079)].

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

73. For example, a script for the publication "School Safety & Security Alert" said, "I understand you're in charge of safety and security of the students there… Is that correct?"; and, a "Non-Profit Board Report" script said "I understand you are the (Director/Title) there Is that correct? OR IF YOU DON'T KNOW THEIR TITLE (I understand you hold a senior FULL TIME position within your organization. Is that correct?)" [PX 1, 226:3–227:8 (App. 00113-114); PX 35, Ex. 6, p. 25 (PBP000708) (App. 02077) and p. 9 (PBP000692) (App. 02061).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

74. AFS refers to the process of confirming that the employee is in charge of a particular area as determining if the person is "qualified" in order for AFS to proceed with the sales script. [PX 1, 226:3–227:8 (App. 00113-114).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced documents. AFS denies Plaintiffs' selective mischaracterization of this process by providing an incomplete citation of Drummond's testimony on this topic. PX 1, 226:3–227:8 (App. 00113-114). Specifically, Drummond testified that the process of confirming if the executive was "qualified" for AFS to properly pitch its subscription publications, included: (1) ensuring that the executive was in charge of the topic at issue for the particular publication being sold; (2) ensuring the person they were speaking with was *not* a secretary or receptionist; and (3) that the sales representative received an affirmative response to the question "if you do find the resource valuable, do you think you could work it into your budget?" Exhibit A, Drummond Dep. Vol. I at 226:3—228:17.

75. The sales scripts do not expressly ask if the employee had the authority to purchase subscriptions on behalf of their employer. [PX 35, Ex. 6, pp. 2-27 (App. 02054-2079).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the text "do you have the authority to purchase subscriptions on behalf of your employer" do not appear in the referenced documents. AFS denies that its executive scripts do not otherwise seek to confirm that the potential subscriber is qualified to accept the publication subscription by virtue of their role in the organization and based on a positive response that they may have the budget to pay for the subscription. *See* AFS's Response to Paragraph 74.

76. If employees "affirmed" the question regarding the purview of their job, telemarketers proceeded to the next part of the sales scripts, which generally provided as follows:

a) stating "[m]y company" or "the center" "publishes a newsletter called [name of publication]";

b) informing consumers, "we're sending out a couple copies [of the publication] for you to look at"; and

c) telling consumers that AFS will "call you back and see how you like" the publication.

[PX 1, 114:4–14, 226:3–19 (App. 00049, 00113); PX 35, Ex. 6, pp. 2-27 (App. 02054-2079).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

77. For example, "My company publishes a newsletter called Keep up to Date on Accounts Payable and we are sending out a couple copies for you to look at, then we'll call you back and see how you like it," or "The center publishes a newsletter called Legal Notes for Education, and we're sending out a couple copies to all public schools, then we'll call you back and see how you like it." [PX 35, Ex. 6, PBP000685, PBP000704 (App. 02054, 02073).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

78. An AFS branch manager critiqued a telemarketer for pausing at this point in the script, "almost like you are looking for the permission to send it. I GIVE U THE PERMISSION.":

> Elizabeth Konwickie <meadville@pbp.com> 3/30/2020, 7:39 PM
>
> Hi! Take a listen to this call please. This is how all of your intros start. There is a hesitation after saying " we're sending out a couple copies to take a look at" almost like you are looking for the permission to send it. I GIVE U YOU THE PERMISSION 🙂 Why are you skipping on most "then we'll call you back to see how you like it." ? Keep your intros strong, assumptive, & scripted.

[PX 124, AFS0704066 (App. 02964); PX 1, 172:11–18 (App. 00085) (Konwickie title)]

**RESPONSE:** AFS objects to Paragraph 78 as confusing and vague as to what is meant by "pausing at this point in the script." AFS admits that the extracted text appears in the referenced document. However, AFS expressly denies that this conversation, when read as a whole, includes a critique by a branch manager, but rather is, in context, a dialogue between a branch manager and an AFS telemarketing sales representative on how to move through the script effectively to "help [the subscriber] understand why we are calling." PX 124, AFS0704066 (App. 02965).

79. AFS did not permit representatives to use the phrase "call you back to see ***if*** you like it" instead of "call you back to see ***how*** you like it" because AFS believed that the statements had two different meanings. [PX 35, Ex. 185 (App. 02412) (emphasis added).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS expressly denies Plaintiffs' mischaracterization of that text and Plaintiffs attempt to suggest AFS's position as to the difference between the two words and/or phrases. PX 35, Ex. 185 (App. 02412), as a whole. The words and/or phrase referenced in Paragraph 79 typically appear twice in the executive script. *See, e.g.*, AFS S.J. Br. at Exhibits L and M, at AFS0397012—13; PX 35, Ex. 185 (App. 02412) ("We use this line twice so even if they say it once, write it up."). It is unclear from the text of the document referenced in Paragraph 79 whether the deviation was in the introduction of the executive script or in the "Offer Paragraph." *See, e.g.*, AFS S.J. Br. at Exhibits L and M, at AFS0397012—13. By way of further response, AFS did not permit its telemarketing sales representative to deviate in any way from the text of the "Offer" or "Disclosure Paragraph." PX 1, 34:14–35:14, 37:8–38:4 (App. 00014-15, 00017-18). An example of those portions of the executive script are as follows:

> **OFFER PARAGRAPH - MUST BE READ WORD FOR WORD**
> So (their name), I'll get that link to you right away and then I'll send some copies and see if it would be a good resource for you and your team there. We'll send out (5/10) copies of the next issue, along with access to the website, at no risk, so you can see if it is a good fit with what you're already doing there, then we'll call you back and see how you like it, of course our hope is you'll become a paid subscriber, but we know we'll have to prove ourselves first ...
>
> **DISCLOSURE PARAGRAPH - MUST BE READ WORD FOR WORD**
> Here's how it works...we'll send the email out first and that will have our whole offer in writing. Then we'll send the first set of newsletters in 3 weeks and the second set 2 weeks later. Right AFTER the second issue, we'll send an invoice for THE YEAR directly to your attention. Of course, if you find Supervisor's Legal Update valuable, we'd like to have your subscription continue. The cost is only ($295/$432) for the year which includes (5/10) copies twice a month, 24/7 access to the website, and email updates on our related products. If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter. There's no further obligation. Keep the newsletters either way.OK? (MUST WAIT FOR RESPONSE) Great!
>
> If you DO find that it is a great resource; do you think you can work it into your budget?
>
> NEGATIVE RESPONSE: So, I guess it just depends on the value of the information, Right?
>
> Just to verify that I spoke to you, I just need just the month and day of your birthdate, but not the year.

AFS S.J. Br. at Exhibit M, at AFS0397012—13. The document referenced in Paragraph 79, includes guidance provided by Grabert, AFS's quality control manager from 1996 through 2018, following her review of AFS's outbound telemarketing sales calls, that any deviation, including the simple change of the word "if" to "how" should be "writ[en] [] up." PX 35, Ex. 185 (App. 02412); PX 5, 19:16–20:19 (title); Exhibit M, Grabert Dep. at 30:19—33:24 (job responsibilities). Grabert even provided guidance that the telemarketing sales representative should "callback…with something like 'I may have misspoke about our callback. It is a one time courtesy call if we have no heard back from you in a timely manner.' Then go back over the invoice, cancel [instructions]." PX 35, Ex. 185 (App. 02412).

80. The sales scripts then immediately move into asking one "quick question" or another, depending upon the publication being marketed. For example:

> …then we'll call you back and see how you like it and I was wondering if I could ask a quick question**…(don't pause)** [Consumer's Name] How often to [sic] you get a chance to get out of the office and go to a seminar or training to help strengthen your skill set…would you say frequently, occasionally, or not as often as you would like…?
>
> Or
>
> …then we'll call you back and see how you like it…and I was wondering…**(Don't Pause)** [Consumer's Name] Is there anything special you are currently using to help your people improve communication and teamwork?

[PX 35, Ex. 6, PBP000686, PBP000688 (App. 02055, 02057) (emphasis added)].

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS denies that all its executive scrips follow this format. *See, e.g.*, AFS S.J. Br. at Exhibit M, at AFS0398059.

81. Without any reference to the answer given by the consumer to this scripted question, many AFS sales scripts direct the telemarketer to respond, "I'm hearing that a lot!" [Ex. 6, pg. 2–3, 5–6 (App. 02054-055, App. 02057-58)] before proceeding substantially as follows:

a) for some publications, asking consumers if they have seen or "run into" the specific publication in the past, for example, "Have you ever seen CFO & Controller Alert in the past?" [PX 35, Ex. 6, PBP000687 (App. 02056)];

b) for some publications, describing the format of the publication, such as "[the newsletter] is in a quick 4 page format" or "[the publication] is in a quick 8 page format" [PX 35, Ex. 6, AFS0000157, PBP000689 (App. 02053, 02058)];

c) telling consumers that there is a website that accompanies the publication (ex. "It's in a quick 8 page format and now has a brand new website…" [PX 35, Ex. 6, PBP043247 (App. 02080)];

d) describing the substantive content of the publications, such as "quick summaries of case law…what school districts and special educators are doing to solve problems…" or "Clear and simple explanations of changing IRS, 1099, and state regulations. Also, performance boosters that other AP pros are using to streamline the process." [PX 35, Ex. 6, PBP000709, PBP043247 (App. 02078, 02080)].

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced documents. AFS denies Plaintiffs' mischaracterization of the application of the executive script in AFS's telemarketing sales calls. Specifically, AFS allowed flexibility at the opening "of the presentation when asking engaging questions or describing the publication and its features and benefits and how it helps other customers." Exhibit A, Drummond Dep. Vol. at 35:22—36:3.

82. After describing the newsletter and online content, the sales scripts typically offer to immediately take the consumer to the website for a preview or, alternatively, to email the consumer a link so they can look at the website later, then request the consumer's email if they choose the latter. [PX 35, Ex. 6, PBP000685–687 (App. 02054-2056).]

**RESPONSE:** AFS admits only that the referenced documents follow the format as stated in Paragraph 82.

83. For example, "I can take you to a website for a quick preview right now OR send you a link and you can look at it later on today! Which is easier for you? Ok Great what's your email address?" [PX 35, Ex. 6, PBP000685 (App. 02054).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

84. It was notable if a consumer wanted to go to the website during a call, with one AFS manager noting that the website wasn't working "the one time a customer wants to go to the website!" [PX 111, AFS0650626 (App. 02935); PX 5, 111:20–112:1 (McCunney title).]

**RESPONSE:** Objection. AFS objects to the term "notable" as vague and ambiguous, in that it is unclear what "notable" would include in this context. AFS admits the extracted text appears in the referenced document. AFS denies that the referenced document supports the statement made by Paragraph 84, and it is therefore denied. *See* referenced document.

85. With regard to offering to preview the website, one telemarketer said, "I feel like that shouldn't even be an option cuz it just feels more like a scam showing them barely anything just to tell them we still need their email." [PX 125, AFS0704817 (App. 02966).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

86. The full text of this section of one of AFS's sales script follows:

(Their name) I'm going to give you instant access to Environmental Compliance Alert. It's in a quick 8 page format, and is designed to help managers like you

- Keep tabs on what EPA regs are coming next
- Who is getting fined and why.
- And what trends are emerging in air, water and waste compliance.

So (Name), I can take you to a website for a quick preview right now OR send you a link and you can look at it later on today! Which would be easier for you? Ok Great what's your email address?

[PX 35, Ex. 6, PBP000689 (App. 02058).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

87. After the call, AFS would use the email address to send a purported "order confirmation," and AFS or its debt collectors used the email address as support for AFS's claim that the employee placed an order. [PX 1, 302:11–18 (App. 00136); PX 6, 172:8–25 (App. 00288); PX 11, 105:17–24, 158:9-165:3 (App. 00409, 00416-423); PX 35, Ex. 233 (App. 02445-2464); PX 7, 41:3–19 (App. 00327); PX 35, Ex. 69 (App. 02191); PX 35, Ex. 156 (App. 02399-2404).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that after a sales call, in which a customer signs up to receive AFS's publication subscription and an email address for the subscriber was obtained, AFS would send two confirmatory emails to the subscriber expressly incorporating the sales call by reference and, in short, plain language, confirmed the price, term, and cancellation process. *See e.g.* AFS S.J. Br. at Exhibit N, AFS0396626–AFS0396628 (Confirmatory Email in HTML); AFS S.J. Br. at Exhibit O, AFS0396629 (Confirmatory Email in Plain Text).

88. After obtaining an email address, the sales scripts require telemarketers to read verbatim what AFS calls the "Offer Paragraph" [PX 1, 34:14–35:14, 37:8–38:4, 126:22–127:11 (App. 00014-00015, 00017-00018, 00056-57).]

**RESPONSE:** Admitted.

89. Examples of Offer Paragraphs are:

a) "So we'll send that link out in just a few minutes and like I said I'll send a couple copies of the newsletter and see if it would be a good resource for you and your team there. We'll send out the next two issues out [sic], at no risk, along with access to the

online version as well, so you see if it is good fit with what you are already doing there…THEN WE'LL CALL YOU BACK AND SEE HOW YOU LIKE IT…of course our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first The address I have listed is…[address confirmation]" [PX 35, Ex. 6, PBP000685 (App. 02054).]

b) "So I'll get that link to you right away and like I said I'll also send out (5/10) copies of Supervisor's Safety Bulletin and see if it would be a good resource for you and your team there. We'll send the next two issues out, at no risk, along with access to the website so you can see if it is a good fit with what you are already doing there, then we'll call you back and see how you like it, of course our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first…CONFIRM MAILING ADDRESS AND OFFICIAL TITLE "[PX 35, Ex. 6, PBP000699 (App. 02068).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

90. All of AFS's sales scripts during the Relevant Time Period include "our hope is that you'll become a paid subscriber." [PX 1, 114:24–115:8 (App. 00049-50).]

**RESPONSE:** Admitted.

91. All of AFS's sales scripts during the Relevant Time Period include language promising to "send the next [number of] issues out at no risk." [PX 1, 115:9–16 (App. 00050).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced document. AFS denies that all of its executive scripts during the Relevant Time Period include language promising to "send the next [number of] issues out at no risk." *See e.g.* AFS S.J. Br. at Exhibit M, at AFS0397012; AFS0397332; AFS0397351; AFS0398059; and AFS0398483.

92. The sales scripts then required telemarketers to proceed to what AFS employees refer to as the "Disclosure Paragraph," often found under the heading "No Risk Subscription Disclosure." [PX 35, Ex. 6, PBP000685, PBP000686, PBP000689, PBP000690 (App. 02054-2055, 02058-2059).]

**RESPONSE:** Admitted.

93. Examples of Disclosure Paragraphs are:

a) So what we'll do is send the email out first. That should be there in just a couple minutes with our whole offer in writing. Then we'll send directly to your personal attention the first newsletter in three weeks, the second one 2 weeks later. Right ALONG with the second issue there's an invoice for THE YEAR. Of course, if you find Keep up to Date on Accounts Payable valuable, we'd like to have your

subscription continue. The cost for the year is only $299 for 23 issues and email updates on our related products. If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number in the newsletter. There's no further obligation. Keep the newsletters either way. I just want to know **now** – if you DO find that it's a good resource, CAN you work that into your budget? [wait for response] Great!

[PX 35, Exhibit 6, PBP000685 (App. 02054).]

b) Ok what we'll do is send the email/fax out first That should be there in just a couple of minutes with our whole offer in writing. Then we'll send the first set of newsletters in 3 weeks and the second set 2 weeks later. Right AFTER the second issue, we'll send an invoice for THE YEAR directly to your attention. Of course if you find Communication Bulletin impactful, we'd like to have your subscription continue. The cost is only ($295/$432) which includes (5/10) copies sent to you and your supervisors twice a month, 24/7 access to the online center, and email updates on our related products. If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter. There's no further obligation. Keep the newsletter either way. OK? (MUST WAIT FOR RESPONSE.)

[PX 35, Exhibit 6, PBP000688(App. 02057).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

94. AFS contends that Disclosure Paragraph is materially the same for all sales scripts during the Relevant Time Period. [PX 1, 115:17–116:16 (App. 00050-51).]

**RESPONSE:** Admitted.

95. AFS strictly enforced its requirement that telemarketers read the Disclosure Paragraph verbatim. [PX 1, 34:14–35:14, 37:8–38:4 (App. 00014-15, 00017-18).]

**RESPONSE:** Admitted.

96. AFS required telemarketers to read the entire "Disclosure Paragraph" as one complete sentence without unnecessary pauses. [PX 9, 46:19–48:13 (App. 00355-357); PX 10, 91:16–92:9 (App. 00387-388); PX 35, Ex. 209, AFS0405559-5563 (App. 02440-2444).]

**RESPONSE:** Denied. AFS denies that it required telemarketers to read the entire "Disclosure Paragraph" as one complete sentence without unnecessary pauses. PX 10, 91:24–92:9 (App. 00387-388); PX 9, 46:19–48:13 (App. 00355-357). Specifically, AFS would encourage and train its telemarketing sales representatives to "treat" the "Disclosure Paragraph" as one complete sentence and "avoid unnecessary pauses" to ensure the AFS telemarketing sales

representative stayed on script and that the potential subscriber understood they were signing up for a publication subscription with a right of cancellation. *Id.*

97. AFS uses the term "Budget Question" to refer to the scripted inquiry "if you do find that it is a great resource, do you think you can you work it into your budget?" [PX 5, 186:11–21 (App. 00253).]

**RESPONSE:** Admitted in part, denied in part. AFS denies that the extracted text is the complete "Budget Question." Specifically, AFS uses the term "Budget Question" typically to refer to the inquiry contained within the executive script, "So if you do find that it is a great resource, do you think you can work it into your budget?" PX 5, 186:11–21 (App. 00253). *See also, e.g.,* AFS S.J. Br. at Exhibit M, at AFS0398482.

98. AFS did not include the Budget Question in all of the sales scripts; "especially with public school principals or superintendents or police chiefs or fire chiefs or things of that nature, where maybe they were organizations that didn't have budget, [AFS] wouldn't have the budget question in there." [PX 1, 94:13–22, 227:10–21 (App. 00040, 00114).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

99. Telemarketers were looking for a "nonnegative response" to the Budget Question for an order to be placed. [PX 5, 188:8–13 (App. 00254); PX 10, 92:10–24 (App. 00388).]

**RESPONSE:** Admitted.

100. Some responses to the Budget Question that AFS considered "nonnegative," thereby putting through subscription orders, included "Yes, probably, we will have to look at it," "Maybe," and "Well, we'll see." [PX 10, 92:15–93:22 (App. 00388-389).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

101. After the Disclosure Paragraph, the sales scripts required telemarketers to ask for the employee's birthdate. For example, "OK, the VERY LAST THING – just to verify I spoke to you, and no one on your behalf, they ask that I get the MONTH and DAY of your birthday, but certainly not the year. Like mine is __/__ for (month/day)." [PX 35, Ex. 6, PBP000685 (App. 02054)].

**RESPONSE:** Admitted in part, denied in part. AFS admits after the Disclosure Paragraph, the executive script required AFS's telemarketing sales representatives to ask for the subscriber's month and day of birth. *See, e.g.,* AFS S.J. Br. at Exhibit M. AFS denies that the executive script required AFS's telemarketing sales representatives to ask for the subscriber's "birthdate," which may be interpreted to include the year. *Id.*

102. Finally, sales scripts conclude along the lines of, "OK [Consumer's Name] Your [sic] going to receive two emails…one confirming everything we talked about and the second

containing a link to the online resource along with your user name and password. Do me a favor, and wait for the newsletters to arrive in 3 weeks and share them with your colleagues…I'm confident that once you see them, you'll want to continue with it! Thanks for your time. I hope you have a great day!" [PX 35, Ex. 6, PBP000685 (App. 02054).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

103. AFS required telemarketers to read verbatim the portion of the sales scripts that asks for the employee's birthdate. [PX 1, 34:14-35:14 (App. 00014-15).]

**RESPONSE:** Admitted in part, denied in part. AFS admits it required its AFS's telemarketing sales representatives to read verbatim the portion of the executive script that asks for the subscriber's month and day of birth. PX 1, 34:14-35:14 (App. 00014-15). *See e.g.* AFS S.J. Br. at Exhibit M. AFS denies that the executive script required AFS's telemarketing sales representatives to ask for the subscriber's "birthdate," which may be interpreted to include the year. *Id*.

104. Despite telling consumers that they were requesting the birthdate to verify they "spoke with" the consumers, AFS or its debt collectors subsequently used the consumer's birthdate as evidence that the consumer placed an order. [See FACTS 161(d) and 234, PX 35, Ex. 208, AFS0624705(App. 02423); PX 155, FTC-JSDCID-00008204-05 (App. 03055); PX 35, Ex. 233 (App. 02445).]

**RESPONSE:** Objection. AFS objects to this Paragraph as confusing, nonsensical, and impermissibly compound. Specifically, AFS is not clear what distinction is being made between the first and the second phrases of the sentence. By way of further response, AFS admits that after the Disclosure Paragraph, the executive script required AFS's telemarketing sales representatives to ask for the subscriber's month and day of birth. *See, e.g.*, AFS S.J. Br. at Exhibit M. AFS denies that the executive script required AFS's telemarketing sales representatives to ask for the subscriber's "birthdate," because AFS never asked for or recorded the year of birth. *Id*. AFS denies Plaintiffs' mischaracterization of the referenced documents as a whole. Specifically, AFS obtained the subscriber's month and day of birth "to confirm that the sales rep spoke to THAT customer and it was THEM who placed the order." PX 35, Ex. 208, AFS0624705(App. 02423). AFS denies the document at PX 155, FTC-JSDCID-00008204-05 (App. 03055), an email authored by a third party, supports the remainder of the statements made in Paragraph 104, and they are therefore denied.

105. "In many cases" the call-back, or "second call" that AFS promised during the sales call took place more than 60 days after the "order" was placed. [PX 1, 336:3–337:6 (App. 00152-153).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of Drummond testimony, which does not support the statement made in Paragraph 105. Specifically, Drummond provided testimony about the content of the second call scripts, not the timing of the call, as follows:

> Q: I think you said that in the second call scripts, people were told that it was time to make a decision; is that correct?
>
> A: Well, that's not quite what I meant. What I meant is they were past the – in many cases, past the 60 days, so their invoices were steadily saying that they needed to make a decision. It wasn't our – it wasn't in our language or the conversation we were having with the customer at that point, if that's what you're asking.

PX 1, 336:3–337:6 (App. 00152-153).

106. AFS employees could leave voicemails during this second call and did not make additional attempts to reach the person live. [PX 15, 274:13–275:15 (App. 00604-605).]

**RESPONSE:** Admitted.

107. AFS made second calls only to who had not already paid for or cancelled the purported subscription. [PX 1, 23:1–9 (App. 00009).]

**RESPONSE:** Denied. While expressly denying the existence of any written policy, AFS admits that a second call was not typically placed to subscribers that had already paid for its businesses' publication subscription, because their payment was an express confirmation of their satisfaction, rendering the purpose of the second call moot. Exhibit I, AFS's Supplemental Objection and Response to Plaintiffs' Joint Request for Admission No. 70.

108. Even though the second calls often happened after payment was already due, AFS did not ask for payment during the calls. [PX 15, 273:1–274:9 (App. 00603-604).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Satell testified that the second call often happened after payment was already due and AFS did not ask for payment during the calls. PX 15, 273:1–274:9 (App. 00603-604). AFS denies Plaintiffs' mischaracterization of AFS's second calls as contained in Paragraph 108. Specifically, Plaintiffs provided only a portion of Satell's response to this line of questioning, therefore inappropriately mischaracterizing the purpose of the call. *Id*. AFS does not ask for payment during the second call because the purpose of the second call is "not a collection call." *Id*. The purpose of the call was to address any questions the subscriber may have or take a cancellation over the phone if they so desire. *Id*. In fact, AFS received a "percentage of cancellations" during the second call with subscribers. *Id*.

109. AFS produced an exemplar second-call script for live second calls and for voicemails. This exemplar second call script includes:

a) No request for payment, even though payment was already due in many cases where the call was made more than 60 days after the "order" was placed;

b) No reference to the consumer's right of cancellation unless raised by the consumer;

c) Additional steps a consumer must take if they wanted to cancel (writing cancel on an invoice or calling AFS's 800 number);

d) A description of the envelope in which newsletter publications would/should have been sent to the consumer;

e) A scripted message to leave on a voicemail or with a secretary if the AFS employee could not reach the employee named on the subscription; and

f) The circumstances under which the AFS employee making the second call is permitted to cancel the account (consumer is "***sure*** they already have cancelled," consumer claims they did not order anything, or consumer is "upset and refuses to abide by our cancellation policy").

[PX 183, FTC-00020339, ROG 11 (App. 03931-932); PX 35, Ex. 7, PBP000222-223 (App. 02130); PX 35, Ex. 50 (App. 02183).]

**RESPONSE:** Admitted in part, denied in part. AFS admits paragraphs "a)" through "e)" are contained within the two specific second call scripts referenced by the Plaintiffs in PX 35, Ex. 7, PBP000222-223 (App. 02130) and PX 35, Ex. 50 (App. 02183). AFS denies "f)" is contained within the two specific second call scripts referenced by the Plaintiffs. *Id*. Specifically, the document PX 35, Ex. 7, PBP000222-223 (App. 02130) provides "coding" guidance to the customer service representative who placed the second call on how the call should be coded internally within AFS's account system. *Id*. The text cited by Plaintiffs' in "f)" appears no where in the second call script. *Id*.

110. AFS changed its second-call script and used it from May 31, 2019 until sometime around the end of 2021. [PX 1, 434:23–438:25 (App. 00169-00173); PX 35, Ex. 63 (App. 02189-2190).

**RESPONSE:** Admitted, to the extent "sometime around the end of 2021" means no later than September 3, 2021.

111. The second-call script used after May 31, 2019 also did not include a request for payment even if the cancellation period had expired; only referred to cancellation **if** the "customer requests us to cancel"; and referred consumers to additional steps they must take to cancel the first time the consumer requested cancellation. [PX 35, Ex. 63 (App. 02189-2190).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS further admits the referenced documents do not include a request for payment because the purpose of the second call is "not a collection call." PX 15, 273:1–274:9 (App. 00603-604). The purpose of the call is to address any questions the subscriber may have or take a cancellation over the phone if they so desire. *Id*. In fact, AFS received a "percentage of cancellations" during the second call with subscribers. *Id*. AFS denies the remainder of Paragraph 111 (and Plaintiffs' fn. 7) as a mischaracterization of the referenced document, which is in writing, and speaks for itself. PX 35, Ex. 63 (App. 02189-2190).

112. In addition to newsletter subscriptions, AFS sold subscriptions for an annual newsletter together with what AFS refers to as "reference guides" ("combined subscriptions"). [PX 1, 116:3–16 (App. 00051); PX 16, 105:3–8 (App. 00658); PX 35, Ex. 6, PBP000702-0705 (App. 02071-2074).]

**RESPONSE:** Admitted.

113. These "reference guides" are four- to five-hundred page books written by AFS, and marketed using Satell's fictitious name "Center for Education and Employment Law" primarily to schools, fire departments, and police departments. [PX 35, Ex. 6, *see e.g.*, PBP000702, 703 (App. 02071-2072); PX 1, 123:8–13 (App. 00053); PX 15, 333:5–334:6 (App. 00614-615).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the "reference guides" were typically four to five-hundred-page books. AFS admits these books were sold under the name Center for Education and Employment Law. AFS denies Satell owned the fictious name "Center for Education and Employment Law" ("CEEL") in his personal capacity, but in his capacity of CEO of AFS. PX 15:8—13 (title); PX 19 at App. 01082—83 (listing AFS's Malvern, Pennsylvania headquarters as the Center for Education & Employment Law's principal address). AFS denies that it primarily marketed these publications to "schools, fire departments, and police departments," nor do the documents referenced by Plaintiffs in Paragraph 13 support that statement. The CEEL publications, which included a newsletter and reference guide, included:

Higher Education Legal Alert (newsletter) & Higher Education Law in America (book)

Private Education Law Report (newsletter) & Private School Law in America (book)

School Safety and Security Alert (newsletter) & Keeping Your School Safe & Secure: A Practical Guide (book)

Special Education Law Update (newsletter) & Students with Disabilities and Special Education Law (book)

Employment Law Report (newsletter) & Deskbook Encyclopedia of Employment Law (book)

Public Employment Law Report (newsletter) & Deskbook Encyclopedia of Public Employment Law (book)

K-12 Legal Notes for Education (newsletter) & K-12 Encyclopedia of American School Law (book)

Legal Update for Teachers (newsletter) & Legal Update for Teachers: The Complete Principal's Guide (book)

Exhibit N, AFS0429182—192; Exhibit B, AFS0117038. Each publication was marketed to a "different audience[]," including but not limited to superintendents, deans, professors, principals, vice principals, special education directors, business education teachers, guidance counselors, human resource professionals, lawyers, police chiefs, fire chiefs, and department training officers. Exhibit P, AFS0429179—81. AFS's CEEL publications are written by a team of lawyers employed by AFS. PX 1, at 174:12—25.

114. AFS would refer to the publications as a book internally, but as a "reference guide" in the sales scripts. [PX 17, 74:14–24 (App. 00670).]

**RESPONSE:** Admitted in part, denied in part. AFS admits one telemarketer testified that "around the office, we would refer to [the reference guide] as a book." PX 17, 74:14–24 (App. 00670). AFS denies that at any time during the Relevant Time Period did it have a position or policy stating what the reference guide may be referred to. PX 1, at 123:8—13. By way of further response, sales tools provided to AFS's telemarketing sales representatives to be used during the sales call use the term "reference guide" and "book" interchangeably. Exhibit Q, AFS0720737.

115. Drummond "basically admitted" to Melissa Schwenk, a customer service representative/collection specialist, "how they use the word reference [guide] as to not use book." [PX 16, 11:11–18, 12:4–13 (Schwenk's title) (App. 00630-31); PX 114, AFS0696939 (App. 02942).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted language appears within the referenced document. AFS denies that at any time during the Relevant Time Period did it have a position or policy stating what the reference guide may be referred to. PX 1, at 123:8—13. By way of further response, sales tools provided to AFS's telemarketing sales representatives to be used during the sales call use the term "reference guide" and "book" interchangeably. Exhibit Q, AFS0720737.

116. Sales scripts for the combined subscriptions differ from sales scripts for newsletter-only subscriptions in that the combined subscription scripts mention a "reference guide" in several places, as shown in the examples below:

a) "I don't know if you've run into Higher Education Legal Alert in the past…we've been around for over 30 years now. It's in a quick 12 page format, *and has a reference guide* and we just launched a brand new website…" [PX 35, Ex. 6, *see e.g.*, PBP000703 (App. 02072) (emphasis added).]

b) "We'll send out the next issue, *along with the reference guide,* at no risk, so you can see if it is a good fit with what you're already doing there…and then we'll call you back and see how you like it…of course our hope is that you'll become a paid subscriber but we know we'll have to prove ourselves first." [PX 35, Ex. 6, *see e.g.*, PBP000703(App. 02072) (emphasis added); PX 1, 122:16-123:6 (App. 00052-53).]

c) "So what we'll do is send the email/fax out first. That should be there in just a couple minutes with our whole offer in writing. Then we'll send directly to your personal

> attention the newsletter a*nd reference guide* in about three weeks. Right along with that there's an invoice for the year. Of course, if you find Higher Education Legal Alert valuable, we'd like to have your subscription continue. The cost for the year is only $236 which also includes 24/7 access to the Legal Reference Center and email updates on our related products. If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number in the newsletter, stick the reference guide back in the envelope it came in and there's no further obligation. Keep the newsletters either way. Okay?"

[PX 35, Ex. 6, *see e.g.*, PBP000703 (App. 02072) (emphasis added).]

**RESPONSE:** AFS admits only that the extracted text appears within the referenced document.

117. On February 13, 2019, two AFS customer service employees had the following exchange regarding sales scripts for the combined subscriptions:

> MS: do you feel like you have a lot of people calling about sy accts saying they weren't told about the book?
>
> VD: yes…but I don't pay much attention to it because I know the book is slipped in the script at the end..the boast about the website and then at the in its slipped in "we'll also send the companion reference guide I don't remember the exact verbiage of the script but I remember when they were still doing pubs in Pottsville office the book was snuck in at the end…
>
> MS: yeah I guess that could be it
>
> MS: i'm so sick of hearing the same sh*t over and over

[PX 113, AFS0695756 (App. 02939); PX 6, 61:10–12 (App. 00278).]

**RESPONSE:** AFS admits only that the extracted text appears within the referenced documents, which is part of a long chain of informal "chat" communications between these telemarketing employees.

118. Consumers complained that they did not understand that they were agreeing to buy a book. [PX 35, Ex. 261 (App. 02467); PX 35, Ex. 295 (App. 02487); PX 113, AFS0695756 (App. 02940); PX 32 ¶ 10, FTC-00000184 (App. 02019).]

**RESPONSE:** AFS admits only that the referenced documents include references to subscriber complaints. AFS expressly denies the admissibility and veracity of the complaints referenced therein.

119. AFS customer service representative Jennifer Rann described the scenario of a consumer not knowing they had to return the book in order to cancel as "the biggest issue since the cows came home." [PX 110, AFS06505335 (App. 02932).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

120. Ms. Rann also referred to the scenario of "I didn't know I had to return the book, I though[t] I only had to return the invoice" and "…I never wanted it and never ordered it" as "more than 50% of our calls" [PX 110, AFS0650537 (App. 02934).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced document. AFS denies Plaintiffs' selective mischaracterization of that text, insomuch as Plaintiffs' have provided an incomplete quotation. PX 110, AFS0650537 (App. 02934) ("ok. so I just gave you a scenario…'I didn't know I had to return the book, I though[t] I only had to return the invoice'…'its sitting here on my book shelf, I can return it, I never wanted it and never ordered it'" … how would you proceed?"). The conversation goes on to say:

NM: I think most of them…are trying to get out of paying

…

NM: they got bills for it

NM: how could they think it was free?

MG: hmmm

MG: is a good [question] there

NM: they got conf[irmation] email saying to send it back

JR: …and also 8 months of invoices.

Exhibit R, AFS0650533—538.

121. Until at least May 2021, AFS required consumers to return the book in order to "cancel" the purported subscription. [PX 12, 71:11–72:3 (App. 00444-445); PX 17, 64:2–12; PX 184 (App. 00669), FTC-00020418, 4(d) (App. 03942); PX 35, Ex. 97 (App. 02352); PX 35, Ex. 207 (App. 02421); PX 35, Ex. 260 (App. 02465-2466); PX 35, Ex. 297 (App. 02517-2530); PX 63, AFS0455373 (App. 02767).]

**RESPONSE:** Denied. Under certain circumstances, AFS's customer service representatives would cancel a subscription without receiving the CEEL book back. PX 6, at 306:21—307:14.

122. AFS did not include postage prepaid envelopes with the book when it mailed the book to consumers. [PX 185, FTC-00020463, #4 (App. 03948).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it would not send out a postage prepaid envelopes with the book, along with a customer's order of the CEEL publication. *See* referenced document. AFS denies Plaintiffs' selective mischaracterization of the options available to subscribers to cancel and return the CEEL book to which they have subscribed, as described by counsel for AFS in a May 2018 letter to the FTC in response to its Civil Investigative Demand in the referenced document. *See* PX 185, FTC-00020463, #4 (App. 03948). First, AFS's subscribers were told at the time of the solicitation they could "stick the reference book back in the envelope in which it came and send it back to [AFS]." *Id*. Second, there were instructions contained within the Welcome Letter each subscriber received, that if they "wish to cancel, mark cancel on the invoice and return it [to AFS] with the book." *Id*. Third, subscribers could "return the book by placing it back in the envelope in which it came with no postage, the USPS will typically mark 'refused return to sender' on the envelope and [AFS] will be charged for the return." *Id*.; Exhibit S, Haney Dep. at 305:14—307:14. Alternatively, if a subscriber contacted AFS and requested a return label, it would be provided to them "automatically", in whatever manner was most convenient for the subscriber. *Id*. For example, (i) a link to a return label could be emailed to the subscriber; (ii) a customer service agent could read the website URL off to the subscriber over the phone for them to access the return label online; (iii) the return label could also be faxed to the subscriber; or (iv) a hard copy could be mailed to the subscriber. *Id*.; Exhibit A, Drummond Dep. Vol. II at 270:9—271:5; Exhibit BB, Schwenk Dep. at 88:21—14.

123. Some rebuttal scripts during the Relevant Time Period included the scripted question, "Do I have to pay to send [the book] back?" and the scripted response, "Just stick it back in the envelope it came in, it's only couple dollars postage." The telemarketer would only inform the consumer that AFS would pay for the return if the consumer said no to paying the "couple dollars postage." [PX 103, AFS0639066 (App. 02912); PX 35, Ex. 325, AFS0626184(App. 02650).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text – "Do I have to pay to send [the book] back?" and the scripted response, "Just stick it back in the envelope it came in, it's only couple dollars postage." – appears in a rebuttal script found at PX 103, AFS0639066 (App. 02912). AFS denies that the same rebuttal script only allows the telemarketing sales representative to inform the potential subscriber that AFS would pay for the return if the potential subscriber said no to paying the "couple dollars postage." Specifically, the referenced rebuttal script provides the option for the AFS telemarketing sales representative to also say "…if you don't find the reference guide and newsletter beneficial and helping to protect your department, call our customer service number and they will be happy to either email or fax you a shipping label to send the book back at no cost to you!", after being told "No" to the question "I think you should take a look & see for yourself…Ok?". *Id*. *See also* PX 35, Ex. 325, AFS0626184 (App. 02650) (providing a similar response). Other rebuttal scripts during the Relevant Time Period included the following response to the question "Do I have to pay to send it back?":

> I can understand that, (name) here's what I can do- if you don't find the reference guide and newsletters beneficial and helping to protect your department, call our customer service number and



30904792v.1

> they will be happy to either email or fax you a shipping label to send the book back at no cost to you! Fair enough? … 1-800-365-4900 [AFS's customer service number]

Exhibit Q, AFS0720737. The rebuttal script even directs the telemarketing sales representative to give the subscriber AFS's customer service number during the initial sales call, should they wish to contact AFS to obtain the free shipping label to return the book. *Id*.

124. Other rebuttal scripts from the Relevant Time Period provide a scripted response of "Just stick it back in the envelope it came in. The cost is minimal." Or "just stick it back in the envelope it came in. the book is about the size of a local telephone book so it's only a couple dollars postage…" [PX 35, Ex. 6, PBP051644, PBP051645, PBP051647-50 (App. 02123-2124, 02126, 02129).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

125. AFS was "selling something" during telemarketing calls. [PX 15, 165:21–24 (App. 00568).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs' simplistic mischaracterization of the statement contained therein. Specifically, AFS was "presenting publication subscription offers" to executives at businesses during telemarketing sales calls. PX 1, at 22:22—25; Exhibit C, Strosnider 18:4—9. AFS was not "selling something" or "presenting publication subscription offers" to secretaries, receptionists, or operators during the telemarketing calls or to individuals for personal or household use. Exhibit A, Drummond Dep. Vol. I at 64:4—11; 224:10—22; Exhibit J, Luchette 140:15—22.

126. The sales script did not use the words "sell" or "selling," except if the name of the publication happened to contain one of those words (for example the Selling Advantage) or a description of the contents of the publication would use "sell" or "selling". [PX 1, 123:14–124-13 (App. 00053-54).]

**RESPONSE:** Admitted that those two specific words do not appear in the executive scripts.

127. Susan Grabert, AFS's quality control manager from 1996 through 2018, was not aware of any sales script that used the word "selling"; she believes that using the words "subscription" and "invoice" within the sales scripts made it clear that the purpose of the telemarketing calls was to sell a good or service. [PX 5, 19:16–20:19, 146:11–19, 146:20–147:3 (App. 00232-233, 00251-252).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS further admits Grabert was not aware of an executive script which used the word "selling." However, AFS denies Plaintiffs' partial characterization of Grabert testimony on this topic. Graber went on to state:

> Can I just make a statement here? I just think this whole thing sounds so twisted. I mean, my husband is a sales rep. He doesn't go into the office and the first thing he says is that he is selling something. He asks questions, which is what salespeople do. They ask questions, and then you let them know that you want to sell them something, which I feel that's what our scripts do. I mean, these follow general sales guidelines, as far as asking questions and finding a customer's need, and then going into the offer and, you know, what the whole call is about. So I'm not quite sure what you are asking me here.

Exhibit M, Grabert Dep. at 149:4—18. AFS admits that Grabert testified that she believed the inclusion of the words "subscription" and "invoice" within the executive scripts, when viewed in their entirety, made it clear that the purpose of the telemarketing call was to sell a good or service. *See* referenced documents. Grabert went on to clarify this testimony, providing:

> Q: [Did the AFS executive script] expressly state that the purpose of the call was to sell a good or service?
>
> A: Well, it did in the offer and the disclosure paragraphs.
>
> Q: It expressly stated that the purpose of the call was to sell a good or service?
>
> A: Yes, it explained it, yeah.

PX 101 at 158:22—159:8 (objections omitted) (App. 00393-394).

128. A former telemarketing branch manager testified:

> Q: Were you aware that Pennsylvania law required the telemarketer to first clearly, affirmatively and expressly state that the purpose of the call, the telemarketing call, is to sell a good or service?
>
> A: No.
>
> Q: …[D]id the [sales script] first clearly state that the purpose of the call was to sell a good or service?
>
> A: It did not say those words, but I feel that the disclosure and the offer paragraph explained that.
>
> Q: …if someone said to you, did the AFS [sales] script first clearly state that the purpose of the call was to sell a good or service, what would your answer be?
>
> A: No.

[PX 10, 16:16–17:5 (title) 157:21–159:8 (objections omitted) (App. 00379-380, 00392-393).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of this testimony by providing an incomplete response to this line of questioning. PX 101, 57:21–159:8 (App. 00392—393). Specifically, Grabert went on to state:

> Q: [Did the AFS executive script] expressly state that the purpose of the call was to sell a good or service?
>
> A: Well, it did in the offer and the disclosure paragraphs.
>
> Q: It expressly stated that the purpose of the call was to sell a good or service?
>
> A: Yes, it explained it, yeah.

*Id*. at 158:22—159:8 (objections omitted).

129. Amy Luchette, a former AFS telemarketer, testified that none of the sales scripts expressly required telemarketers to state that the purpose of the telemarketing calls was to sell a good or service. [PX 9, 14:22–25, 23:23–24:5, 117:23–118:3 (App. 00340, 00349-350, 00371-372); PX 35, Ex. 6 (App. 02053-2129).]

**RESPONSE:** Admitted in part, denied in part. AFS admits Luchette is a former AFS telemarketing sales rep. AFS denies Plaintiffs' mischaracterization that the referenced testimony and documents support the statement that "none of the sales scripts expressly required telemarketers to state that the purpose of the telemarketing calls was to sell a good or service." ***See*** PX 9, at 117:23—118:3. Specifically, Luchette, who worked as an AFS telemarketing sales representative on and off for a combined total of two years, testified that she did not recall any of the executive scripts that she specifically used to require her to "state that the purpose of the call was to sell a good or service." ***Id.***; 15:21—16:4; 16:8—18; 20:21—22 (employment history).

130. Additionally, in response to a line of questioning by AFS's attorney, Ms. Luchette explained:

> "Q: Did you have any concerns about the script itself in terms of clarity?"
>
> . . . .
>
> A: I did feel that the beginning of the script wasn't clear. It almost seemed like a different message than what we ended up communicating at the bottom of the script. But the bottom of the script I felt was clear.
>
> . . .

> Q. When you say it conveyed a different message, can you be more specific?
>
> A: So I feel like we started out talking about this really cool thing that we're just going to let you, you know, take a look at, there's no risk, meaning like put your guards down, you're good, don't worry about it, and then we moved then into saying, actually you have a responsibility to follow up. And maybe that just – it seems like we weren't very forthcoming at the beginning.
>
> [PX 9, 146:14–15, 146:23–147:2, 147:14–25 (App. 00374-375).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of this testimony by providing an incomplete quotation omitting material testimony. PX 9, 146:14–15, 146:23–147:2, 147:14–25 (App. 00374-375). Specifically, Luchette, stated:

> Q: Did you have any concerns about the script itself in terms of clarity?
>
> **<u>A: No.</u>**
>
> ….
>
> A: I did feel that the beginning of the script [which discussed the publication itself and the benefits of the publication] wasn't clear. It almost seemed like a different message than what we ended up communicating at the bottom of the script. But the bottom of the script [including the offer and disclosure paragraph] I felt was clear.

*Id.* at PX 9, 146:14–16, 146:23–147:25 (App. 00374-375) (emphasis added to highlight Plaintiffs' intentional omission).

131. In response to questions about why she left AFS, former AFS telemarketer Kelly Strosnider testified:

> A: So, you know, I guess an attack [of] conscience would be an accurate way to describe it, where I just wasn't comfortable doing the work anymore.
>
> Q: What was it about the work that you were not comfortable doing at AFS?

> A: It was – it was more so the tiptoeing around, you know. Basically it was a trial subscription. We weren't allowed to say those things. There were lots of things we weren't allowed to say. And I just felt like I was somewhat misleading folks. So I just decided that I couldn't do it any longer.
>
> Q: In what way do you think that you were misleading folks?
>
> A: By not, you know, not telling them until the end of the call that it was a subscription with a right of cancellation. And I think that's where a lot of the confusion came in, where people assumed it was a free trial and not something that they had to opt out of. Even though, again, that's stated by us as the sales reps.
>
> I just – I just feel like it was just something I wasn't comfortable doing anymore.

[PX 17, 17:14–20 (title), 75:5–76:22 (App. 00665; 00671-72).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies that Plaintiffs' selective excerpt provides the complete testimony provided by Strosnider as to why she left AFS. Exhibit C, Strosnider Dep. 13:3—15. Specifically, Strosnider testified that she left AFS "10 to 12 times" in her 15 years of working as an AFS telemarketing sales representative because she would feel burned out and wanted to try other forms of employment. *Id*. When those other employment opportunities wouldn't work out, Strosnider continued to return to AFS as a telemarketing sales representative. *Id*.; PX 17, 75:9—21. In fact, when asked if she ever told counsel for the FTC is she "had an attack of conscience," Strosnider specifically denied she recalled using that verbiage. *See* PX 17, 75:7—10 ("I don't recall using that specific verbiage with you guys.").

132. Ms. Strosnider also had concerns about the structure of the script:

> Q: [W]hen you worked for AFS, did you have concerns about the structure of the scripts?
>
> A: I did.
>
> Q: And what were those concerns?
>
> A: That we weren't giving the customer enough information that the way that the offer paragraph was worded, again, was somewhat misleading as to not giving them all the information they needed about how things work. And I felt like we were bombarding people at the very end of the call to then say, okay, here is the price. Here is what you have to do, when it was very easy and laid back and no talk of cost or anything like that throughout the entire call until the last 45 seconds of the call.

[PX 17, 76:23–77:13 (App. 00672-73).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. But again, Plaintiffs' cite only a portion of Strosnider's testimony. Stronsider went on to affirm that she "strove to make sure that each and every one understood the offer and disclosure." Exhibit C, Strosnider Dep. at 81:8—14. Strosnider explained how she was confident that customers understood the offer when she interacted with them:

> Q: [I]s it correct that you felt strongly about making sure that the customers you spoke with understood the offer and the terms of the subscription?
>
> A That's correct. I was always very clear. I was always very distinct. I always took my time in saying, this is how this works. This is what it will cost. Here's how you cancel. I was very meticulous in not speeding through that part of the call because I wanted them to fully be aware that they were, indeed, take the subscription that they had the right to cancel.

Strosnider elaborated in her own words:

> I would go -- again, I would go over everything and clarify everything. And even if I had already disclosed to them the disclosure paragraph, I would again at the end of the call say, hey, I know I've already told you this. But I'm just going to go over it again, one more time, to make sure you understand everything. And I would read the disclosure paragraph and proceed through the end of the call. ***So yes, I do feel like the customers I dealt with understood***.

*Id.* 82:1—11.

133. When asked, "Did AFS believe that the no risk subscription disclosure was sufficient for potential customers to understand that the purpose of the call was to sell subscriptions?" Drummond testified as follows:

> I would say that the [sales] script in its entirety done with our – done expertly, like we expect our telemarketers to do, and again, we're speaking to some of the smartest people in America…I can't imagine doing the full disclose [sic], the offer and the entire script, that [consumers] wouldn't understand that they ordered a subscription.

[PX 1, 124:23–125:13 (App. 00054-55)].

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of this quotation, insofar as Plaintiffs' have only provided portions of Drummond's response to the question posed. Specifically, Drummond stated:

> I would say that the **executive** script in its entirety done with our – done expertly, like we expect our telemarketers to do, and again, we're speaking to some of the smartest people in America. **They're running companies, they're running divisions, they're superintendents, they're police chiefs, they're officers.** I can't imagine doing the full disclose [sic], the offer and the entire script, that [potential subscribers] wouldn't understand that they ordered a subscription.

PX 1, 124:23–125:13 (App. 00054-55) (emphasis added to highlight Plaintiffs' omissions).

134. In a 2019 internal message, AFS's Administrative Director of Call Center Operations Mike Gorton described a "thin line we maintain that the subscription starts when we hang up," explaining "We maintain the thin line so we can [] send to collections…hence the bad company reputation." [PX 133, AFS0724718 (App. 02985); PX 176, at 2 (Gorton title) (App. 03163).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS expressly denies Plaintiffs' mischaracterization of these comments, taken out of context without the appropriate understanding or explanation as to what was being discussed. *See* Exhibit T, AFS0724716—718. Specifically, the exchange at issue is between Michelle Klingbell, AFS's Head of Quality Control, and Mike Gorton, in reference to an Office Quality Assurance Report[2] done by Lynn McCullough, a member of AFS's Quality Control Team. Exhibit U, AFS0407706—712; Exhibit M, Grabert Dep. at 270:10—17. In the Office Quality Assurance Report, McCullough wrote up a sales call conducted by Shatera Robinson, an AFS telemarketing sales representative who had been on the job for less than one week.[3] McCullough wrote up the call because of Robinson's deviation by just three words in the Disclosure Paragraph. Exhibit U, at AFS0407709. Robinson changed "We'd like to have your subscription continue" to "We'd like you to become a paid subscriber." *Id*. As a result of this change, McCullough is recommending Robinson be put on "Daily Tape Review" ("DTR"). *Id*. at AFS0407709 and AFS0407711. This Office Quality Assurance Report was sent to Klingbell and Gorton the morning of April 3, 2019. Exhibit U, AFS0407706—712. Within minutes the two began the exchange referenced in Paragraph 134. *Id*. They discuss the differences in the two sentences and ways they can coach managers and telemarketers to ensure they are staying on script. *Id*.

---

[2] *See* Exhibit M, Grabert Dep. at 275:8—13.

[3] Exhibit V, AFS0006849-907, at AFS0006899 (showing Robinson's hire date of 3/25/2019 and a termination date of 4/9/2019). *See also* AFS S.J. Br. at Exhibit J ("100% of new reps' orders in their first week are listened to by branch managers and staff before the order processed.").

> MG: There is a grain of difference I suppose but a mighty small grain. Maybe a comment to [the manager] to make sure [Robinson] knows this is a [subscription] with a right to cancel.
>
> MK: I just thought the other one spoke more to the starting the subscription right now rather than becoming a subscriber later.
>
> MK: But I can [definitely] just talk to [the branch manager]

*Id*. at AFS0724718. Gorton goes on to describe the "thin line" between the two phrases, which he asserts "both speak to subscribing" and confirm AFS's position that "the subscription starts when we hang up [the phone]" but he thinks "We'd like to have your subscription continue" is "cleaner." *Id*. Gorton goes on to stress the importance of this clarification because in the event the customer does not pay for the subscriber, AFS may have to "send [the account] to collections." *Id*.

135. Prior to 2020, the sales scripts did not include any reference to a 60-day cancellation policy or any time period to cancel; telemarketers only told consumers that AFS had a specific time period for cancellation if consumers asked. [PX 1, 97:10–21 (App. 00043).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that prior to 2020, the term "60-days" did not appear in the executive script. AFS further admits that in 2020, AFS added the phrase "within 60 days" to its subscription with a right to cancel publication as follows:

> **No Risk Subscription Disclosure – MUST BE READ WORD FOR WORD**: So, what we'll do is send the email out first. That should be there in just a couple minutes with our whole offer in writing. Then we'll send directly to your personal attention the first newsletter in 3 weeks, the second one 2 weeks later. Right ALONG with the second issue there's an invoice for THE YEAR. Of course, if you find Safety Compliance Alert valuable, we'd like to have your subscription continue. The cost for the year is only $299 for 23 issues, Complete access to the online safety training center, and email updates on our related products. If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number within 60 days, there's no further obligation. Keep the newsletters either way. OK? **(MUST WAIT FOR RESPONSE)** Great!

Exhibit W, AFS0455589 (emphasis in original). AFS denies that prior to 2020, the executive script did not include any reference to the "cancellation policy." *See e.g.* PX 19, at App. 01098—10. AFS further admits, prior to 2020, if a potential subscriber asked during the initial sales call how long they had to cancel, AFS would respond with the appropriate cancellation period. PX 1, 97:10–21 (App. 00043).

136. Prior to 2020, the word "order" was not included in the sales script. [PX 15, 155:25–156:7 (App. 00564-565); PX 1, 97:22–98:20, 103:15–18, 106:25–107:11 (App. 00043-44, 00045, 00046-47).]

**RESPONSE:** Admitted that the specific word "order" did not appear in the executive scripts.

137. In 2020, Satell required mention of a 60-day cancellation period to be added to the sales script and he either requested or approved the addition of the word "order" to the sales script, but maintained the word "offer" as well, as shown in the example below.

> So, what we'll do is send the email out first. That should be there in just a couple minutes ***with our whole offer in writing***. Then we'll send directly to your personal attention the first newsletter in 3 weeks, the second one 2 weeks later. Right ALONG with the second issue there's an invoice for THE YEAR. Of course, if you find Safety Compliance Alert valuable, we'd like to have your subscription continue. The cost for the year is only $299 for 23 issues, Complete access to the online safety training center, and email updates on our related products. If you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 800 number ***within 60 days***, there's no further obligation. Keep the newsletters either way. OK? (**MUST WAIT FOR RESPONSE**)
>
> If you DO find that it's a good resource, CAN you work that into your budget? Great!
>
> Ok, just one last thing to ***verify your order*** and that I spoke to you, I need just the MONTH and DAY of your birth date, but certainly not the year.

[PX 15, 155:21–156:7 (App. 00564-565); PX 1, 95:14–98:20 (App. 00041-44); 103:15–18 (App. 00045); 106:25–107:11 (App. 00046-47); PX 50, AFS0266743 (App. 02684) (emphasis added).]

**RESPONSE:** Admitted.

138. After the addition of "60 days" to the script, an AFS telemarketer wrote "I would feel scammed we don't mention that they have to cancel after 60 days until the VERY end." [PX 125, AFS0704818 (App. 02698).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of this informal exchange, between two telemarketing sales representatives, lamenting over the loss of a sale because the potential subscriber declined the offer after hearing they would have to cancel within 60 days. *See* referenced document.

139. AFS sent a "confirmatory email" to the consumer the same day that an "order" was placed during a telemarketing call. [PX 35, Ex. 3 (App. 02049-2052); ECF 91 ¶ 1-2I; PX 1, 302:14–303:6; 305:17–306:3 (App. 00136-137, 00138-139).]

**RESPONSE:** Denied in part, admitted in part. AFS denies that it sent a single "confirmatory email" to the subscriber the same day they placed an order. *See, e.g.,* Exhibit N to AFS's Motion, AFS0396626–AFS0396628 (Confirmatory Email in HTML); Exhibit B to AFS's Motion, AFS0396629 (Confirmatory Email in Plain Text). AFS admits that it sent *two* confirmatory emails to the subscriber the same day they placed an order, expressly incorporating the sales call by reference and, in short, plain language, confirmed the price, term, and cancellation process. *Id*.

140. One of the example "confirmatory emails" provided by AFS contains the terms "no-risk order," "no-risk subscription," and "no-risk offer" and the subject lines for confirmatory emails include "Our Phone Call – The Information You Requested!" or "Our Phone Call: CFO/Controller intelligence you requested." [PX 183, FTC-00020338, ROG 11 (App. 03930-31); PX 194, Ex. 43, PBP000037 (App. 04101.]

Exhibit
0043

CONFIDENTIAL

Order confirmation

~~Sharon Mchugh~~

| | |
|---|---|
| From: | CFO & Controller Alert <newsletters@progressivebusinesspublicationsnews.com> |
| Sent: | Tuesday, September 12, 2017 5:48 PM |
| To: | ~~Sharon Mchugh~~ |
| Subject: | Our phone call: CFO/Controller intelligence you requested |

Dear Redacted :

Thanks for taking the time to speak with me and placing your no-risk order to CFO & Controller Alert – a print newsletter, plus daily e-newsletters and exclusive online resource center, that gives you alerts on new IRS and federal regs, plus best practices to help you boost cash flow, fight fraud, control expenses and create world-class financial processes.

You've made a smart decision to start your no-risk subscription, and I want to confirm exactly what we discussed today. Please see your personal account information and how this no-risk offer works. Your user name and password for access to the webinar will be arriving by email within 24 hours.

.........................................

We will mail your newsletters and correspondence to the address below. Please reply to this email with any corrections:

Redacted

As you'll remember from our phone discussion, in addition to access to CFO & Controller Alert's extensive online resource center, you'll receive your first mailed issue in three weeks and your second one two weeks later. If you value the alerts and tips you get, as thousands of other financial executives do, the cost for a full year is just $299.00. You can submit payment using the invoice we mail you, or you can use your personal invoice under the "My Account" tab on the CFO & Controller Alert website. If for any reason you don't find the service valuable, simply let us know by marking "cancel" on the invoice – within 60 days – and return it to us, no questions asked. Otherwise, your subscription will continue uninterrupted.

We look forward to helping you run an even more successful financial department.

Sincerely,

Jessica Oleary

Account Representative

Confirmation Number: #87591898

1

PBP000037

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

141. A second email contains a user name and password and multiple references to "no risk." [PX 1, 302:23–303:6 (App. 00136-137); PX 183, FTC-00020339, ROG 11 (App. 03931); PX 35, Ex. 132 (App. 02384-2387); PX 188, PBP000078 (App. 03962).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within PX 35 and PX 188. AFS denies Plaintiffs' mischaracterization of the contents of the second email confirmation sent to AFS's subscribers following the initial sales call. PX 1, 302:23—303:6. The second email, sent shortly after the first, "was sent with the links to the website and the materials that we had promised, along with a user name, password, access to a My Account Page, which would show them how much time they had left in their subscription, how to cancel and our 1-800 number." *Id.*

142. If neither the first or second email is opened, AFS sends a third and fourth email. [PX 183, FTC-00020339, ROG 11 (App. 03931).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it will send a third and fourth confirmatory email to subscribers following the initial sales call in which they place an order, mirroring that of the first and second confirmatory email. ***See e.g.*** PX 187. AFS denies that it will send the third and fourth email "if neither the first or second email is opened." ***Id.*** AFS will send the third and fourth email if the subscriber has not yet logged into the newsletter's website using their log-in credentials provided in the second confirmatory email. ***Id. See, e.g,*** AFS S.J. Br. at Exhibit N and Exhibit B.

143. AFS sends the first newsletter (along with the book for combined subscriptions) approximately 2-3 weeks after the initial telemarketing call. (PX 35, Ex. 62, PBP000036 (App. 02186-2187); PX 187, PBP000077 (App. 03960); PX 189, PBP000119 (App. 03964).)

**RESPONSE:** Admitted.

144. AFS sends subsequent issues of the newsletter approximately every two weeks for the newsletter-only subscription and every four weeks for the combined newsletter/book subscriptions. [PX 35, Ex. 62, PBP000036 (App. 02188); PX 187, PBP000077 (App. 03960); PX 189, PBP000119 (App. 03964).]

**RESPONSE:** Admitted.

145. Consumers and AFS's outside debt collector describe the newsletters as looking like "junk mail." [PX 31 ¶ 5, FTC-00000157 (App. 02005); PX 13, 47:2–48:21 (App. 00477-478); PX 2, 108:14–110:18, 118:24–120:8 (App. 00180-182, 00183-185); PX 70, AFS0496436 (App. 02796); PX 74, AFS0519625 (App. 02808); PX 143, FTC-BBBPA-00002339 (App. 03012); PX 144, FTC-BBBPA-00002602 (App. 03013); PX 145, FTC-BBBPA-00002716 (App. 03016); PX 146, FTC-BBBPA-00002721 (App. 03022).]

**RESPONSE:** Admitted in part, denied in part. AFS denies the term "junk mail" appears in the documents found at PX 31 ¶ 5, FTC-00000157 (App. 02005) or PX 13, 47:2–48:21 (App. 00477-478). AFS admits the extracted text appears within the remainder of the documents

referenced. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20.

146. A collection script used by ICR, one of the debt collectors used by AFS, described the newsletters as follows: "Publications are tri-folded in an envelope 3-5 pages long. It's not a magazine. It kind of looks like junk mail if you weren't looking for it." [PX 11, 112:7–19 (App. 00410); (discussing PX 35, Ex. 69 (App. 02191)) PX 2, 108:14–110:18, 118:24–120:8 (App. 00180-182, 00183-185).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

147. There is no disclosure sent with the newsletters or books that they can be treated as a gift or a free sample. [PX 15, 92:7–8 (App. 00549); PX 3, 202:10–203:5 (App. 00222-223).]

**RESPONSE:** Objection. AFS objects to Paragraph 147 as vague and ambiguous as to what is meant by "disclosure." AFS further objects to the term "newsletters or books" as it is unclear what type of subscription is being referenced. Moreover, the referenced excerpt from both Satell (PX 15) and the FTC's 30(b)(6) witness, Bandy (PX 3) do not support the statement contained in paragraph 147 and it is therefore denied. Satell Dep. Vol. II at 86:3—96:21 (discussing the CEEL renewal process, *not* newsletters or books generally). By way of further response, AFS admits that its newsletter or book publication subscriptions are not a "gift" or "free sample."

148. After placing an order for consumers at the conclusion of the initial telemarketing call, AFS sent a series of invoices to those consumers. [PX 14, 45:14–20 (App. 00492); PX 15, 263:25–264:8 (App. 00597-598); PX 35, Ex. 45–49 (App. 02176-2182).]

**RESPONSE:** Admitted, but, for clarity, AFS again notes that it placed orders only for business customers and did not sell to consumers making purchases for personal, family, or household use.

149. The following are examples of first invoices that AFS sent for newsletter subscriptions and for combined subscriptions, respectively:

**Exhibit 0045**

**CONFIDENTIAL**

Invoice # : 06749141

Account # : A639471503

Date : 08/17/2017

**INVOICE**

CFO CONTROLLER *Alert*

370 Technology Drive P.O. Box 3019
Malvern, PA 19355

*************************MIXED AADC 190
518 -1- MAAD 2 1 2 P323681603 CFO
Redacted

| Amount Due: | $299.00 |
|---|---|

☐ Check enclosed, payable to:
Progressive Business Publications

**Return this portion with payment for proper credit**

---

Thank you for subscribing to CFO & Controller Alert newsletter and CFO online!
The one-stop online resource and reference for thousands of Financial Professionals like you!

Invoice # : 06749141 Account # : A639471503 Date : 08/17/2017

**Ordered By:** Redacted
**Original Order Date & Written Confirmation Sent: July 12, 2017**
**Customer's Birth Date:** [redacted]

By now, you've had a full month of access to our paid subscription site, including our popular compliance checks and money savers guides, and you've also received 2 mailed newsletters.
Online access is active at CFOandControllerAlert.com.
Your Username: [redacted]
Your Password: [redacted]
Pay now online: www.pbp.com/invoice

| Description | AMOUNT |
|---|---|
| 12 months/23 issues of CFO & Controller Alert (CFO)<br>The fast-read newsletter written for financial pros | $299.00 |
| 12 month unlimited, exclusive access to CFOandControllerAlert.com<br>The most-respected, one-stop site for Financial Professionals | Included |
| 12 months of CFO e-newsletter - daily financial insights and tips email | Included |
| 12 months of CFO Compliance Checks - up-to-date regulatory guidance | Included |
| 12 months of CFO Money Savers - innovative cost-cutting strategies | Included |
| Total annual subscription price including postage and handling... Balance Due | $299.00 |

A639471503

**Your subscription is backed by our 100% guarantee.**
If at any time, you aren't enthusiastic about your subscription, we'll refund the unused balance of your subscription without delay.

Progressive Business Publications - 370 Technology Drive - P.O. Box 3019 - Malvern, PA 19355

(19)

PBP000055

2



30904792v.1

Exhibit 0049

CONFIDENTIAL

Center for Education & Employment Law

370 TECHNOLOGY DRIVE • P.O. BOX 3008 • MALVERN, PA 19355-9562

Redacted

| Invoice # | DATE | ACCOUNT |
|---|---|---|
| O7097791 | 9/14/2017 | A26829200 |

| | | |
|---|---|---|
| Higher Education Law in America | 99.00 | |
| + Tax | 0.00 | |
| + Shipping and Handling | 5.95 | 104.95 |
| Higher Education Legal Alert | | 195.00 |
| *Combination Discount* | | (58.00) |
| REDUCED COMBINATION PRICE | | 241.95 |
| Amount Due | | 241.95 |

## INVOICE

Thank you for ordering the annual, updated edition of HIGHER EDUCATION LAW IN AMERICA and its companion newsletter HIGHER EDUCATION LEGAL ALERT, designed to help organizations prevent legal problems.

These are leading authoritative sources of information, to prepare you and your organization to deal with legal issues quickly and efficiently - before you find your organization in costly litigation. The combined price of the two publications and website offers a substantial discount.

LOG IN NOW to HigherEducationLegalAlert.com to see everything that comes with your subscription:

USERNAME: [redacted]

PASSWORD: [redacted]

BALANCE DUE 241.95

CEEL Tax ID# 23-1897431

RETURN THIS PORTION WITH PAYMENT FOR PROPER CREDIT

Center for Education & Employment Law

370 TECHNOLOGY DRIVE • PO BOX 3008 • MALVERN, PA 19355-9562

Redacted

ACCOUNT # A26829200
INVOICE # O7097791
DATE 9/14/2017

☐ Payment Enclosed (Payable to: CEEL)
☐ VISA ☐ MC ☐ AMEX ☐ DISCOVER
Acct. # ______ Exp. ______
Signature ______

PLEASE PAY THIS AMOUNT 241.95

(14) PBP000134

HEO

[PX 1, 321:19–322:8 (App. 00141-142); PX 35, Ex. 45 (App. 02176); PX 1, 331:16–22 (App. 00149); PX 35, Ex. 49 (App. 02181-2181).]

**RESPONSE:** Admitted.

150. The first invoice showed a balance due for a subscription. [PX 1, 322:23–323:8 (App. 00142-143); PX 35, Ex. 45 (App. 02176); PX 35, Ex. 49 (App. 02181-2182).]

**RESPONSE:** Admitted.

151. Even though AFS says it had a 60-day cancellation policy (that was not included in the sales script until 2020), the first invoice does not include any reference to a 60-cancellation policy or to cancellation at all. [PX 14, 47:6–9 (App. 00494); PX 15, 155:21–24 (App. 00564); PX 1, 95:14–97:21, 106:25–107:11 (App. 00041-43, 00046-47); ECF 91 ¶ 1-2(g); PX 35, Ex. 45, 49 (App. 02176, 02181-2182).]

**RESPONSE:** AFS admits only that the referenced documents do not include a reference to AFS's 60-day cancellation policy.

152. AFS normally sent the first invoice for newsletter-only subscriptions with or after the second newsletter and sent the first invoice for combined subscriptions with the first newsletter and book. [PX 14, 45:14–20 (App. 00492); PX 189, PBP000119 (App. 03964); PX 35, Ex. 62, PBP000036 (App. 02188); PX 187, PBP000077(App. 03960).]

**RESPONSE:** Admitted.

153. AFS sent the first invoice earlier than 60 days after the telemarketing call. [PX 35, Ex. 62, PBP000036 (App. 02188); PX 187, PBP000077 (App. 03960); PX 189, PBP000119 (App. 03964); PX 136, AFSINVOICE00000001 (App. 02991); PX 139, AFSINVOICE010442623 (App. 02997).]

**RESPONSE:** Admitted.

154. The following is an example of a second invoice sent by AFS:

PROGRESSIVE BUSINESS PUBLICATIONS

370 TECHNOLOGY DRIVE • P. O. BOX 3019 • MALVERN, PA 19355

CONFIDENTIAL

ACCOUNT # ...5600
INVOICE # (06730822)
DATE 08/17/201

DCN 2 TM

Exhibit 0046

***********************************SNGLP
517 -1- SNG 2 1 13 P323551783 CFO
Redacted

## INVOICE

2nd NOTICE - PAYMENT IS NOW OVERDUE.
YOU HAVE ALREADY RECEIVED 4 NEWSLETTERS PLUS OVER
60 DAYS OF UNLIMITED ACCESS TO OUR PAID SUBSCRIPTION SITE.
Original Order & Written Confirmation Sent:May 25, 2017
Order Verification: Customer's Birth Date: [redacted]
provided by customer, verifying your original order.

Subscription: 23 newsletter issues/12 months site access
Subscriber name: Redacted
Pay now online: www.pbp.com/invoice
Our generous 60-day cancellation period has expired!
Please disregard if payment has been made.

Thank you for subscribing to CFO & Controller Alert -
your most complete and reliable resource to help you boost
cash flow, control expenses, and stay compliant with regs.

Annual subscription price, including postage and handling ... 299.00

BALANCE DUE 299.00

RETURN THIS PORTION WITH PAYMENT FOR PROPER CREDIT

PROGRESSIVE BUSINESS PUBLICATIONS

370 TECHNOLOGY DRIVE • P. O. BOX 3019 • MALVERN, PA 19355

ACCOUNT # A637756003
INVOICE # (06730822)
DATE 08/17/2017

DCN 2 TM

A637756005172PCFO
Redac
ted

26

PLEASE PAY THIS AMOUNT 299.00

PBP000084

[PX 1, 325:12–20 (App. 00144); PX 35, Ex. 46 (App. 02177).]

**RESPONSE:** Admitted.

155. The second invoice states:

> 2nd NOTICE – PAYMENT IS NOW OVERDUE. YOU HAVE ALREADY RECEIVED 4 NEWSLETTERS PLUS OVER 60 DAYS OF UNLIMITED ACCESS TO OUR PAID SUBSCRIPTION SITE.
>
> [PX 35, Ex. 46 (App. 02177).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

156. The following is an example of a third invoice:

PROGRESSIVE BUSINESS PUBLICATIONS
370 TECHNOLOGY DRIVE • P. O. BOX 3019 • MALVERN, PA 19355

CONFIDENTIAL

ACCOUNT # A63775600
INVOICE # (06730822)
DATE 08/17/201

DCN 3 TM

************************************SNGLP
517 -1- SNG 2 1 14 P323551783 CFO
Redacted

Exhibit 0047

## INVOICE

3RD NOTICE - PLEASE PAY NOW TO AVOID SERVICE CHARGES.
YOU HAVE ALREADY RECEIVED 6 NEWSLETTERS PLUS OVER
3 MONTHS OF UNLIMITED ACCESS TO OUR PAID SUBSCRIPTION SITE.
Original Order & Written Confirmation Sent:May 25, 2017
Order Verification: Customer's Birth Date: [redacted]
provided by customer, verifying your original order.

Subscription: 23 newsletter issues/12 months site access
Subscriber name: Redacted
Pay now online: www.pbp.com/invoice
Our generous 60-day cancellation period has expired!
Please disregard if payment has been made.

Thank you for subscribing to CFO & Controller Alert -
your most complete and reliable resource to help you boost
cash flow, control expenses, and stay compliant with regs.

Annual subscription price, including postage and handling ... 299.00

BALANCE DUE 299.00

RETURN THIS PORTION WITH PAYMENT FOR PROPER CREDIT

PROGRESSIVE BUSINESS PUBLICATIONS
370 TECHNOLOGY DRIVE • P. O. BOX 3019 • MALVERN, PA 19355

ACCOUNT # A637756003
INVOICE # (06730822)
DATE 08/17/2017

DCN 3 TM

A637756005173PCFO
Redac
ted

30

PBP000068

PLEASE PAY THIS AMOUNT 299.00

[PX 1, 329:20–25 (App. 00147); PX 35, Ex. 47 (App. 02178).]

**RESPONSE:** Admitted.

157. Third invoices included the statement, "PLEASE PAY NOW TO AVOID SERVICE CHARGES," which is not included in the first or second invoices. [PX 1, 329:23–330:7 (App. 00147-148); PX 35, Ex. 47 (App. 02178); PX 35, Ex. 45 (App. 02176); PX 35, Ex. 46 (App. 02177); PX 35, Ex. 49 (App. 02181).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. AFS further admits the extracted text does not appear in the first or second invoice sent to AFS's subscribers.

158. Although AFS included this language in its invoices, AFS never imposed service charges on consumers. [PX 1, 328:24–329:2 (App. 00146-147); PX 15, 269:17–20 (App. 00601).]

**RESPONSE:** Admitted.

159. The fourth invoice included the statement "UNPAID BILLS ARE REFERRED TO A COLLECTION AGENCY," [PX 35, Ex. 48, PBP000071 (App. 02180)], and the fifth invoice stated that it was a "FINAL NOTICE," and that "UNPAID BILL ARE REFERRED TO A COLLECTION AGENCY NORMALLY IN 30 DAYS FROM THIS FINAL NOTICE," [PX 35, Ex. 48 (App. 02180)], which does not appear in the first, second, or third invoices. [PX 35, Ex. 45–47 (App. 02176-2178); PX 35, Ex. 49 (App. 02181).]

**RESPONSE:** AFS admits only that the extracted text appears within the referenced documents.

160. AFS sent invoices with the statement that "UNPAID BILLS ARE REFERRED TO A COLLECTION AGENCY" even after AFS stopped using collection agencies for the accounts. [PX 1, 330:23–331:10, 354:11–19 (App. 00148-149, 00156); PX 35, Ex. 94 (App. 02335) (June 15, 2020 CEEL invoice); PX 137–138, AFSINVOICE005563405-6 (App. 02993-96) (November 8, 2021 invoices)].

**RESPONSE:** Admitted.

161. Differences between first invoices and subsequent invoices include:

a. AFS sent first invoices to the individual the telemarketer had spoken with, but AFS generally sent subsequent invoices to "Accounts Payable." [PX 1, 321:13–17, 326:7–11 (App. 00141; 00145); PX 35, Ex. 270 (App. 02470); PX 35, Ex. 271 (App. 02471); PX 35, Ex. 310 (App. 02571); PX 35, Ex. 311 (App. 02572).]

b. First invoices, which were sent prior to 60 days from the telemarketing call, made no mention of cancellation, but subsequent invoices all stated, "Our generous 60-day cancellation period has expired!" [PX 35, Ex. 62, PBP000036 (App. 02188); PX 187, PBP000077 (App. 03960); PX 189, PBP000119 (App. 03964); PX 136, AFSINVOICE00000001 (App. 02992); PX 139, AFSINVOICE010442623 (App. 02997); PX 35, Ex. 45-49 (App. 02176-2182).]

c. The first invoices may list a month and day after "Customer's Birth Date," while subsequent invoices included the following: "Order Verification: Customer's Birth Date: [date] provided by customer, verifying your original order." [PX 35, Ex. 45-49 (App. 02176-2182).]

**RESPONSE:** Admitted.

162. Sometimes the company name on invoices was not the name that had been used during the telemarketing call to state where the telemarketer was calling from. [Compare PX 13, 28:14–38:5 (call not mentioning Progressive Business Publications) with PX 13, 104:9–22 (App. 00481); PX 35, Ex. 312, FTC-00035250-51 (App. 04104-05) (invoice sent from Progressive Business Publications)].

**RESPONSE:** Objection. AFS objects to the term "company name" as vague and ambiguous, insofar as it is unclear if Plaintiffs are referring to the name of the publication being sold or the business which publishes the publication. AFS admits only that the invoice cited in the referenced documents is on Progressive Business Publications letterhead, which is the publisher of the publication being sold. PX 13, 28:14–38:5; PX 35, Ex. 312, FTC-00035250-51 (App. 04104-05). *See also* PX 1, at 140:21—141:2 (describing the Center for Education & Employment Law as a publisher of certain books sold by Progressive Business Publications).

163. Some consumers ignored the newsletters or invoices believing they were junk mail. [PX 80, AFS0524832-36 (AFS0524834) (App. 02827, 02830); PX 70, AFS0496436 (App. 02797); PX 74, AFS0519625 (App. 02809); PX 143, FTC-BBBPA-00002339 (App. 03011); PX 145, FTC-BBBPA-00002716 (App. 03015); PX 146, FTC-BBBPA-00002721 (App. 03021); PX 144, FTC-BBBPA-00002602 (App. 03013); PX 13, 47:2–48:21 (App. 00477-478).]

**RESPONSE:** Admitted in part, denied in part. AFS admits some subscribers claim to have ignored the newsletters or invoices sent by AFS. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20.

164. AFS sent accounts that had not been paid to two collection agencies: JSD and ICR. [PX 1, 352:13–353:14 (App. 00154-155); ECF 91 ¶ 32.]

**RESPONSE:** Admitted in part, denied in part. AFS admits that at times during the Relevant Time Period it utilized the collection services of two third-party collection agencies, JSD and ICR, to collect on unpaid accounts. AFS denies that it utilized the services of third-party collection agencies for the entire duration of the Relevant Time Period. PX 1, 354:11–19 (App. 00156); PX 7, 65:16–66:6 (App. 00328-329); PX 12, 11:24–25, 19:6–21, 23:11–24:14 (App. 00428, 00434, 00438-439). AFS further denies that a single account would be sent to *both* collection agencies. *Id.*

165. Typically, AFS sent newsletter subscription accounts to ICR for collection and combined subscriptions (including book renewal) accounts to JSD for collection. [PX 1, 353:15–354:4 (App. 00155-156); PX 6, 21:16–17, 101:12–16 (App. 00265, 00282).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it would typically refer delinquent newsletter subscription accounts to ICR for collection and that it would typically refer CEEL newsletter and book subscription accounts to JSD for collection. *See* referenced

documents. AFS denies that it utilized the services of third-party collection agencies for the entire duration of the Relevant Time Period. PX 1, 354:11–19 (App. 00156); PX 7, 65:16–66:6 (App. 00328-329); PX 12, 11:24–25, 19:6–21, 23:11–24:14 (App. 00428, 00434, 00438-439).

166. JSD performed collections for AFS from early 2011 to November of 2017. [PX 1, 354:11–14 (App. 00156).]

**RESPONSE:** Admitted.

167. JSD sent emails on AFS's delinquent accounts, culminating in a "FINAL NOTICE." [PX 147, FTC-JSDCID-00004124-26 (App. 03023); PX 149, FTC-JSDCID-00004780 (App. 03033).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the two referenced documents include a subject line that includes the phrase "FINAL NOTICE." The documents cited by Plaintiffs fail to support the generalized statement made in Paragraph 167 and it is therefore expressly denied. PX 147, FTC-JSDCID-00004124-26 (App. 03023); PX 149, FTC-JSDCID-00004780 (App. 03033). *See also* Exhibit Y, PBP000218—219 (a workflow chart for how and when accounts are referred to ICR and JSD).

168. For instance, the "FINAL NOTICE" email generally told the employee that JSD "must now assume you are attempting to avoid the debt" and that JSD was mailing another Final Notice. The "FINAL NOTICE" stated, "As a courtesy, I will pend this file 10 days to allow for your response and receipt of our notice. If no resolution is obtained by then we will recommend that the client pursue accordingly." [PX 147, FTC-JSDCID-00004126 (App. 03026); PX 151, FTC-JSDCID-00004904 (App. 03040).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the two referenced documents. The documents cited by Plaintiffs fail to support the generalized statement made in Paragraph 168, and it is therefore expressly denied.

169. JSD told consumers who resisted paying after the final notice that "the Center for Education and Employment Law will decide how they would like to proceed further." [PX 151, FTC-JSDCID-00004902 (App. 03038); PX 148, FTC-JSDCID-00004598 (App. 03028).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the two referenced documents. The documents cited by Plaintiffs fail to support the generalized statement made in Paragraph 169, and it is therefore expressly denied.

170. ICR performed collections for AFS from around the mid-1990s to no later than October 1, 2021. [PX 1, 354:15–19 (App. 00156); PX 7, 65:16–66:6 (App. 00328-329).]

**RESPONSE:** Admitted.

171. ICR received 25% percent of the amount that it collected on the AFS accounts. [PX 14, 82:5–14 (App. 00498); PX 2, 310:18–311:9 (App. 00214-215).]

**RESPONSE:** Admitted.

172. Consumers complained about ICR's collection tactics, which included complaints that ICR threatened additional charges and fees, threatened legal action, threatened to report the debt on the employee's personal credit or their employer's credit report (when no such reporting occurred), and lied and told individuals that ICR and/or AFS had their personal information, including social security numbers, when they did not. [PX 35, Ex. 168 (App. 02408); PX 35, 169 (App. 02409); PX 2, 173:14-20, 188:1–190:22, 199:23–201:9, 201:18–203:13, 203:17–207:12, 207:23-209:18, 219:5–221:22, 232:20–234:1 (App. 00191, 00193-209, 00211-213); PX 35, Ex. 75 (App. 02193-2194); PX 192, Ex. 77 (App. 03976, 03986); PX 22 ¶ 5, FTC-00000013 (FTC-00000013); PX 24 ¶ 4 (App. 01900), FTC-00000058; PX 30 ¶ 9, FTC-00000147 (App. 01994-995).]

**RESPONSE:** Objection. AFS objects to the term "personal information" as vague and ambiguous insofar as it is not clear if a subscriber's month and day of birth is considered "personal information." AFS admits that on occasion subscribers complained to AFS about ICR's collection practices. *See* referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. AFS further denies that it was aware of ICR lying during its collection calls. Drummond Dep. Vol II at 365 20—3. By way of further response, ICR expressly denied that several of the instances referenced in Paragraph 172 ever happened. Exhibit Z, DiOrio Dep. at 175:17—176:24.

173. AFS was aware of complaints about ICR's collection tactics, but continued using ICR until ICR stopped collections no later than October 2021:

**RESPONSE:** AFS objects to this Paragraph as impermissibly compound and will respond to each sub-part separately. Admitted in part, denied in part. AFS admits that while using ICR as a third-party collection agency, AFS became aware of "a few isolated complaints" that were "small" as compared to the volume of accounts they were handling on AFS's behalf. Drummond Dep. Vol II at 363:15—22. AFS further admits that it continued to use ICR as a third-party collection agency until October 2021. PX 1, 354:15–19 (App. 00156); PX 7, 65:16–66:6 (App. 00328-329). AFS denies it was aware of complaints generally, aside from those specific complaints brought to AFS's attention. Drummond Dep. Vol II at 363:15—22. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, ICR

expressly denied that several of the instances referenced in Paragraph 172 ever happened. Exhibit Z, DiOrio Dep. at 175:17—176:24.

- In 2016, AFS customer service representative Lisa Kott (lk) and AFS's Administrative Director of Call Center Operations Mike Gorton (mikeg) had the following exchange:

  lk: …I've had two very angry complaints today that Cynthia Thomas [from ICR] is telling the customer that she has their personal credit report pulled up and if they don't give a [credit card] over the phone right now she's going to mark it on their report. She really shouldn't be saying that, I thought we talked to her about that before and she stopped but it seems like she's back at it again.

  mikeg: pls ask denise to call her tomm cynthia really is a snake

  lk: I will. Yeah, she's really raking them in today

  mikeg: needs bonus

  [PX 107, AFS0643386 (App. 02923); PX 6, 47:5–12 (Kott title) (App. 00273)]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

- In 2017, AFS Customer Service Representative Jennifer Rann wrote Gorton regarding ICR: "I know they have 'ta[c]tics', as do we, but they flat out lie to the customers. . . I know you said they make us a lot of money...BUT, if you allowed me to say whatever I want to, I could make you a lot of money too." [PX 106, AFS0640772 (App. 02920).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

- In 2019, Kott and another Customer Service Representative, Denise Haney, discussed ICR lying to a customer about having her date of birth and threatening that there would be additional fees imposed if the account wasn't paid that day. Kott asked Haney: "Are they lying even more than before?" to which Haney responded, "YEP" [PX 116, AFS0698280 (App. 02946); PX 6, 17:2–6 (Haney title) (App. 00262).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

- Also in 2019, Haney told Gorton, "we've been hearing more especially that they [ICR] are telling customer there's extra fees if they don't pay today via [credit

card]" and that "we've even had complaints about [Cynthia from ICR] say[ing] the extra fee thing." Gorton responds "They know the ftc is on them, you would think they would go quiet." [PX 120, AFS0700010 (App. 02956).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

- Haney and Kott corresponded again in 2020 that, "ICR's new thing is charging people for 6 months to cancel even though they onl[y] got 5 months of service." Haney responded "You'd think [since] they were named in the suit from the FTC they'd try to be more careful" and "they are once again just trying to get extra money." [PX 118, AFS0698478-79 (App. 02950).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

- AFS Customer Service Representative Melissa Schwenk wrote in 2020 that "the manager lady" of ICR is a "liar" and that ICR will tell customers AFS has their social security number when AFS does not have it, "but I guess they earn us too much money so no one ever thought to fire them." [PX 119, AFS0699544–45 (App. 02953).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

174. AFS customer service representative Schwenk testified that she would hear that ICR "would lie to [customers] sometimes because like we as a company, never asked people for their social security number. But sometimes ICR would call someone and say, well, we have your social security number. Things like that. They would tell them things that we never did." She also testified that consumers would report to her that ICR was "saying to the customer that our company is just a bunch of scammers, and we do this to everybody." [PX 16, 25:12–26:19 (App. 634-35.)]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

175. AFS used its own employees for (1) collection of the combined subscription accounts after JSD stopped collecting those accounts; and for (2) collection of the newsletter subscriptions after ICR stopped collecting those accounts. [PX 12, 23:11–14, 66:8–67:11; 68:9–17 (App. 00438, 00441-443); PX 1, 281:22–25 (App. 00127); PX 6, 110:6–16 (App. 00283).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that beginning in or around 2017 or 2018 AFS employee Jennifer Rann began collections efforts on delinquent CEEL publication accounts. AFS further admits that in or around "early 2022" AFS employee Melissa Schwenk began collection efforts on delinquent newsletter publication accounts. Exhibit BB,

Schwenk Dep. at 23:15—24:10. AFS denies that it utilized its own employees for collection efforts for any other periods of time besides the aforementioned. *Id. See also* referenced documents.

176. AFS used its own employees to perform collections until at least 2022. [PX 6, 148:9–149:5 (App. 00286-87).]

**RESPONSE:** Admitted.

177. AFS paid a percentage of collections to its internal collectors based upon the amount of collections. [PX 12, 77:14–78:10 (App. 00446-447).]

**RESPONSE:** Admitted in part, denied in part. AFS admits during the period of time Jennifer Rann was performing collections efforts on delinquent CEEL publication accounts, she would receive a 5% "bonus" of the amounts she collected from delinquent accounts. PX 12, 77:14–78:10 (App. 00446-447). AFS denies that the referenced documents support the generalized statement made in Paragraph 177 and it is therefore denied. *Id.*

178. AFS sent collection emails that contained the following standard language: "The intent is to clear this matter without any further escalation and/or negative reporting. Therefore, we were asked to reach out one final time prior to commencing collection activity on the outstanding balance." [PX 16, 53:7–21 (App. 00643); PX 35, Ex. 316 (App. 02573); PX 35, Ex. 292 (App. 02483-2484); PX 35, Ex. 293 (App. 02485-2486).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

179. "Further escalation" meant AFS would turn an account over to a collection agency and "negative reporting" meant negative information for the credit reporting score. [PX 12, 93:4–94:25 (App. 00449-450).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Rann testified that her understanding of the term "further escalation" meant AFS "could turn [the account] over to a collection agency. PX 12, 93:21—94:6. AFS denies that Rann testified that her understanding of the term "further escalation" meant AFS would turn an account over to a collection agency. *Id.* AFS further denies that Rann testified that "negative reporting" meant negative information for the credit reporting score. PX 12, 93:4–94:25 (App. 00449-450). Specifically, Rann testified:

> Q: You said the negative reporting was about credit scores; is that correct?
>
> A: **I don't know that that's exactly what that verbiage was to mean**. Basically, the further escalation and negative reporting meant if it was to be turned over to a collection agency. When I would speak with a customer directly, there were times that the customer may ask, you know, "Is this something that's going to affect my credit?" I would let them

> know that, no, that is not something is going to happen from my department.

*Id*. at 95:23—96:10 (emphasis added).

180. AFS accounts were not reported to credit bureaus, and after AFS employees began doing collections internally, the only collection activity would have been for AFS to contact the consumer again. [PX 16, 53:7–55:19 (App. 00643-645) (discussing PX 35, Ex. 316 (App. 02573)); PX 12, 84:9–24, 93:4–98:2 (App. 00448-454); PX 2, 174:9–11 (App. 00192).]

**RESPONSE:** Objection. AFS objects to the term "the only collection activity" as vague and ambiguous insomuch as it is unclear if Plaintiffs are using that term to mean AFS's only available option for collection efforts at the time. AFS admits that as a matter of practice it did not report delinquent accounts to credit bureaus. Exhibit AA, Rann Dep. at 84:9—12; Exhibit BB, Schwenk Dep. at 55:2—6. AFS further admits that as a matter of practice Rann and Schwenk, who attempted to collect on delinquent accounts, did reach out to the subscriber multiple times by phone and then by email as part of those efforts. PX 12, 98:3—13. *See, e.g.*, PX 35 at App. 02573 ("5 previous attempts have been made to contact you regarding this matter prior to [sending the collection email] and we have received no reply.").

181. AFS employee Jennifer Rann performed collections full-time on the CEEL books from around 2017 or 2018 until October 1, 2021. [PX 12, 11:24–25, 19:6–21, 23:11–24:14 (App. 00428, 00434, 00438-439).]

**RESPONSE:** Admitted.

182. Consumers would often her tell her that they misunderstood the terms of AFS's offer. [PX 12, 72:4–14 (App. 00445).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears at the referenced document. AFS denies Plaintiffs' mischaracterization of the testimony provided by Rann insomuch as they have provided an incomplete explanation as to the frequency of this complaint under this specific circumstance. Rann testified that as part of her job responsibilities she made calls to CEEL subscribers whose accounts have not been paid for "six to eight months." Exhibit AA, Rann Dep. at 68:24—69:8; 70:17—25. During those calls, Rann would have all the information that was provided by the subscriber at the time the order was placed, as well as the dates they had received invoicing of the product. *Id*. Rann would remind the subscriber of the offer, the cancelation process, and inform them because they missed the cancelation period to return the book and not be charged, they would be responsible for the payment. *Id*. at 71:11—72:3. During those calls, Rann testified that she would often hear that the subscribers – who had not made a payment for six to eight months – "'Well, I didn't understand.'" *Id*. at 72:7—14. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—306.

183. However, Rann took the position that, "ultimately, it didn't mean that just because [consumers] misunderstood [AFS's offer] that they weren't responsible for it or, you

know, that was the approach that I took. 'You placed the order. If you misunderstood it, that's unfortunate, but that doesn't mean that you are not responsible either, or accountable for it." [PX 12, 178:3–14 (App. 00461).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears at the referenced document. AFS denies Plaintiffs' mischaracterization of the testimony provided by Rann insomuch as they have provided an incomplete excerpt of Rann's response. In circumstances where a subscriber communicated to Rann that they did not understand the order, Rann would remind the subscriber of the offer, the cancelation process, and inform them because they missed the cancelation period to return the book and not be charged, they would be responsible for the payment. ***Id***. at 71:11—72:3; 177:19—178:14. Rann further testified that she would "dig in" to the customer's account with them to help them recollect the order process, find the book, and locate the invoices that were sent to the organization, and that frequently her explanations led the customer to remember the initial sales call or to appreciate the history of the order. Exhibit AA, Rann Dep. at 173—177. Alternatively, Rann would also just cancel the order depending on how the conversation was going. ***Id***. at 177:19—178:14.

184. AFS book publications were marketed under the name Center for Education and Employment law, also referred to as "CEEL." [PX 15, 333:5–334:6 (App. 00614-615); PX 1, 140:6–8 (App. 00062).]

**RESPONSE:** Admitted.

185. The sales script for combined subscriptions does not describe or disclose AFS's renewal methods for these subscriptions. [PX 185, FTC-00020463–64 (Response 6(a) (App. 03948-3949); PX 15, 88:14–20 (App. 00545).]

**RESPONSE:** Admitted.

186. Referring to a book subscription as a "standing order," AFS included the following statement on the back of CEEL invoices for the combined subscriptions:

CONVENIENT UPDATE SERVICE (for BOOK ORDERS only)
When you subscribe to Center for Education & Employment Law books, we'll send you advance notice of future issues about two months before your annual subscription expires. If you want to extend your standing order, do nothing. We'll send you the new updated volume of your publication. If you don't want to continue subscribing on a standing-order basis, let us know in writing on the advance notice we send you. In either case, you always have thirty days to decide.

AFS0516466

[PX 193, Ex. 41 (App. 04099); PX 185, FTC-00020463–64 (Response 6(b)) (App. 03948-49); PX 1, 271:10–16 (App. 00124); PX 15, 88:21–89:6 (App. 00545-546); PX 35, Ex. 94 (App. 02335-2336).]

**RESPONSE:** Admitted.

187. For consumers that paid a CEEL invoice, AFS sent a letter and postcard approximately 60 or 80 days prior to sending a CEEL renewal book. [PX 1, 266:22–267:6 (App. 00122-123); PX 35, Ex. 40, PBP000168–169 (App. 02169-2170); PX 14, 161:14–162:5 (App. 00509-510); PX 35, Ex. 8, PBP000168 (App. 02132); ECF 91 ¶ 24; PX 184, FTC-00020418–19 (Response 5(b)) (App. 03942-3943).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it sent a letter and postcard as identified in Paragraphs 188—190, 60 or 80 days prior to the new CEEL book being available. AFS denies it sent out the "letter and postcard" referenced in Paragraph 187 for the duration of the Relevant Time Period. Specifically, as of November 2020, AFS stopped sending out the "renewal postcard" and letter as shown in Paragraph 188. Exhibit A, Drummond Dep. Vol. II at 273:7—275:8. In order for a subscriber to receive the new edition of their publication, they would have had to affirmatively pay in advance of receiving the publication. *Id*.

188. An example of the letter follows:

Center for
Education & Employment Law

**The Brand-New 18th Edition of**
***Higher Education Law in America***
**Will Soon Be Yours**

We are pleased to announce the release of the latest edition of ***Higher Education Law in America***. This new **18th Edition** has been updated to give you the authoritative information you need to ensure you are in compliance with current legislation and administrative regulations. It brings you brief summaries of a host of decisions on important new cases, such as:

- A female student was sexually assaulted in her unlocked dorm room. She sued saying that the university was negligent in securing the premises and complying with industry standards regarding door locks. **How did the court rule?**
- A depressed student continued to binge drink at school even after getting leave for medical treatment. The school dismissed the student, and he claimed disability discrimination. **Did the court find evidence of discrimination?**
- A 16-year-old soccer recruit said she was given alcohol and assaulted at a campus frat party while visiting the college. She filed a Title IX suit, alleging the college's response was deliberately indifferent. **Was the college found liable?**

The answers to these questions and other issues can be found in your **18th Edition** of ***Higher Education Law in America***. I trust that you will find it a valuable addition to your resource library.

For your convenience, the new **18th Edition** of ***Higher Education Law in America*** is being sent to you automatically unless you advise us to the contrary by returning the enclosed card any time within the next 20 days. The **18th Edition** is priced at $99.00 plus $5.95 shipping and handling. Please return the enclosed card only if you do not wish to receive the **18th Edition**.

If you need a purchase-order prior to shipment, you may wish to have one issued now. Please call our toll-free number at 1-800-365-4900 to have your purchase-order number added to your notice.

Thank you for your continued interest in the Center for Education & Employment Law.

Sincerely,

Curt J. Brown, Esq.
Editorial Director

Exhibit
0008

2HENO18

P.O. Box 3008 Malvern, PA 19355 • *toll free* 800-365-4900 • *fax* 610-647-8089

PBP000168

[PX 35, Ex. 8, PBP000168 (App. 02132); PX 183, FTC-00020341, ROG 11 (App. 03933).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the referenced document is an example of a letter sent out prior to November 2020. AFS denies that this is an exemplar letter sent to subscribers after November 2020. As of November 2020, in order for a subscriber to receive the new edition of their publication, they would have had to affirmatively pay in advance of receiving the publication. Exhibit A, Drummond Dep. Vol. II at 273:7—275:8.

189. The postcard instructs consumers that if they do not want to receive a new edition of the CEEL book, they must return the postcard within a set number of days. (PX 1, 267:7–12 (App. 00123); PX 35, Ex. 8, PBP000169 (App. 02133); ECF 91 ¶ 24.

**RESPONSE:** Admitted in part, denied in part. AFS admits prior to November 2020, the postcard would include the instruction referenced in Paragraph 189. AFS denies that this postcard was sent to subscribers after November 2020. Specifically, as of November 2020, in order for a subscriber to receive the new edition of their publication, they would have had to affirmatively pay in advance of receiving the publication. Exhibit A, Drummond Dep. Vol. II at 273:7—275:8.

190. An exemplar postcard is below:


Center for
Education & Employment Law

PLEASE AFFIX FIRST-CLASS POSTAGE HERE

CENTER FOR EDUCATION & EMPLOYMENT LAW
PO BOX 3008
MALVERN PA 19355-0708

(FRONT)

Return this card any time within the next 20 days <u>only</u> if you do not wish to receive the newly updated 18th Edition of *Higher Education Law in America.*

❑ No, I do not wish to receive this volume.

Name ______
School ______
Street Address ______
City ______
State ______ Zip ______
Phone (___) ______
Fax (___) ______
Email ______
Note: If you need to update your contact information for book delivery, please call our customer service department.
2HEN018

(BACK)

PBP000169

[PX 183, FTC-00020341, ROG 11 (App. 03933); PX 35, Ex. 8 (App. 02132-2133).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the referenced document was once an exemplar of the CEEL renewal postcard. AFS denies that the referenced document was always an exemplar of the CEEL renewal postcard. Exhibit CC, AFS0465036 (providing 30 days to return the card if the subscriber did not wish to receive the new edition of the reference guide). AFS further denies that this postcard was sent to subscribers after November 2020. Specifically, as of November 2020, in order for a subscriber to receive the new edition of their publication, they would have had to affirmatively pay in advance of receiving the publication. Exhibit A, Drummond Dep. Vol. II at 273:7—275:8.

191. Unless a customer returns the postcard to inform AFS that they do not want to receive the book, AFS sends the renewal book to the customer and invoices them for it in the same pattern as the initial book. [PX 184, FTC-00020418–19 (Responses 5(a) & 5(c)) (App. 03942-3943); PX 1, 267:7–16 (App. 00123); PX 35, Ex. 40, PBP000168–169 (App. 02169-2170); PX 14, 161:3–13 (App. 00509); PX 15, 91:25–92:3 (App. 00548-549).]

**RESPONSE:** Admitted in part, denied in part. AFS admits prior to November 2020, the postcard would operate as stated in Paragraph 191. AFS denies that this postcard was sent to subscribers after November 2020. Specifically, as of November 2020, in order for a subscriber to receive the new edition of their publication, they would have had to affirmatively pay in advance of receiving the publication. Exhibit A, Drummond Dep. Vol. II at 273:7—275:8.

192. Like the newsletter invoices, the exemplar CEEL book renewal invoice series show a balance due, does not reference a cancellation policy until the deadline had passed, states "Please pay now to avoid any service charges" and "unpaid bills are referred to a collection agency" and "final notice." PX 174, PBP000751-758 (App. 03152). *See supra* ¶¶ 149-161.

**RESPONSE:** Objection. AFS objects to the term "CEEL book renewal invoice series" as vague and ambiguous. Specifically, the referenced documents are invoices for CEEL book publications. *See* referenced documents. There is no indication of the face of the referenced documents if these invoices are for a first-time subscriber or a renewal subscriber, therefore the Paragraph is denied.

193. CEEL books are not free, they are not labeled as free sample, and there is no disclosure that accompanies the CEEL books stating that they can be kept as a gift. (PX 15, 92:4–8 (App. 00549); PX 1, 278:24–279:5 (App. 00125-126); PX 3, 202:10–203:5 (App. 00222-223).]

**RESPONSE:** Admitted.

194. AFS used this CEEL renewal process from as early as 2000 until 2021 or 2022. [PX 15, 99:1–9, 99:21–100:11 (App. 00551-552); PX 1, 283:3–24 (App. 00128).]

**RESPONSE:** Objection. AFS objects to the term "this CEEL renewal process" as vague, ambiguous, and undefined. Specifically, if Plaintiffs are referring to Paragraphs 184 to 194 above, AFS incorporates its objections and responses to those Paragraphs herein. AFS objects to this Paragraph to the extent it makes reference to a period of time outside of the Relevant Time Period in this litigation. *See* definition of Relevant Time Period, above.

195. AFS used JSD as its debt collector for delinquent CEEL book renewals for part of the Relevant Time Period, and AFS employees performed collections for CEEL book renewals beginning in 2018. [PX 1, 354:11–14 (App. 00156); PX 12, 23:11–14, 66:8–67:11, 68:9–17 (App. 00429, 00441-443).]

**RESPONSE:** Admitted.

196. Consumers complained to AFS that they had not ordered CEEL renewal books but received them anyway. [PX 35, Ex. 42, AFS0516462–66 (App. 02171-2175); PX 69, AFS0494987 (App. 02791).].

**RESPONSE:** Admitted in part, denied in part. AFS denies the referenced documents support the statement contained in Paragraph 196. AFS admits the document referenced at PX 35, Ex. 42, AFS0516462–66 (App. 02171-2175), is an exchange between an AFS employee, Rann, and a CEEL subscriber, initiated by Rann after she had made 8 attempts to contact the subscriber. PX 35, at App. 02173. The subscriber asked Rann if he consented to renew the subscription. *Id*. at App. 02172. In response, Rann directs the subscriber to the renewal terms on the back of the 12 invoices he had received prior to this correspondence and provides a copy of the renewal terms for his review. *Id*. at App. 02171—72. AFS denies that the referenced document supports the statement contained within Paragraph 196. By way of further response, AFS admits the document referenced at PX 69, AFS0494987 (App. 02791), is an exchange between an AFS employee, Rann, and a CEEL subscriber, initiated by Rann after she had made 8 attempts to contact the subscriber. *Id*. The subscriber asks Rann a series of clarifying questions regarding the subscription and its terms. *Id*. Rann responds that despite the subscriber failing to cancel the book subscription within the prescribed period of time, he simply needs to return the book with the pre-paid shipping label she provided and Rann would cancel the account and ensure there was no balance due. *Id*. AFS denies that the referenced document supports the statement contained within Paragraph 196. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—306.

197. When performing internal collections for delinquent CEEL accounts, Jennifer Rann would explain to consumers that “the book was basically a standing order,” meaning “the new edition of the book would ship out when the new edition was ready.” [PX 12, 19:3–19:21, 147:11–20 (App. 00434, 00460).]

**RESPONSE:** AFS admits only that the extracted text appears within the referenced documents. AFS denies, however, that it characterized the CEEL subscription as a “standing order,” rather, CEEL customers were provided with notice of the new edition and the option to fill out a simple post-card form, checking off that they no longer wanted to receive the book. By way of further response, AFS incorporates its responses and objections to Paragraphs 184-196, above.

198. AFS received complaints directly from consumers in many ways, including the following:

a. verbal complaints by consumers made directly to AFS telemarketers during sales calls [PX 9, 85:11–90:2; 93:10–94:20 (App. 00363-368, 00369-370)];

b. consumer replies to emails that AFS sent consumers following the telemarketing calls (“confirmatory emails”) [PX 1, 400:23–401:9 (App. 00166-167); PX 35, Ex. 195 (App. 02415)];

c. calls to AFS customer service representatives who answered AFS's 1-800 customer service line [PX 12, 21:17–23:10 (App. 00436-438); PX 16, 15:15–24, 31:1–15, 77:11–78:1; PX 1, 392:19–393:16 (App. 00159-160)];

d. voicemails left by consumers who called AFS [PX 6, 238:11–21 (App. 00295); PX 1, 392:19–393:16 (App. 00159-160); PX 35, Ex. 285 (App. 02472-2473); PX 35, Ex. 286 (App. 02474); PX 16, 56:2–57:17 (App. 00646-47) (discussing PX 35, Ex. 317) (App. 02574-2575)];

e. emails from consumers to AFS that were reviewed by AFS's customer service employees [PX 6, 235:19–236:5 (App. 00292-93); PX 35, Ex. 147 (App. 02388); PX 35, Ex. 148 (App. 02389-2390); PX 35, Ex. 151 (App. 02392); PX 35, Ex. 152 (App. 02393-2398); PX 35, Ex. 288 (App. 02476-2482); PX 62, AFS0446845 (App. 02748)];

f. letters mailed to AFS [PX 1, 393:23–25 (App. 00160)];

g. written on invoices returned to AFS [PX 6, 49:15–52:15 (App. 00274-277); PX 35, Ex. 149 (App. 02391); PX 1, 394:2–5 (App. 00161)]

h. and in response to AFS's internal collection efforts [PX 35, Ex. 296 (App. 02503-2516); PX 35, Ex. 297 (App. 02517-2530); PX 35, Ex. 318 (App. 02578-2584)); PX 35, Ex. 320 (App. 02595-2621); PX 35, Ex. 321 (App. 02622-2634); PX 35, Ex. 322 (App. 02635-2644); PX 16, 68:24–71:21 (App. 00650-653)].

[PX 1, 392:19–394:10, 378:15–379:5 (App. 00159-161, 00157-158).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that, like any modern business, it received complaints (and for that matter, any other customer inquiry or request) from customers in a number of different ways. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 199—306.

199. Complaints made directly to AFS included that consumers did not order a subscription, that they misunderstood the offer, that they thought the publications were free, that AFS was a scam or involved with fraudulent activity, and that the employee was not even authorized to order a subscription. [PX 18, ¶ 31-41 (App. 00691-702), PX 177-181 (App. 03166-3694).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it received a variety of complaints from customers, which were far fewer than of percent of total sales, but it denies that the Plaintiffs' characterization of the complaints in this Paragraph, or even that the nature of the customers' complaints were always clear. Specifically, AFS incorporates by reference its response to Paragraphs Nos. 198; 200—306.

200. Amy Luchette, a former AFS telemarketer characterized many consumer complaints:

> Q: And do you think that the people that you were trying to sell a subscription, do you think that they always knew that they were actually at the end of the call signing up for a subscription for which they would receive a bill?
>
> A: No, not necessarily.
>
> Q: And what is the basis of that opinion?
>
> A: Mostly because of the feedback that we would get if we did receive cancellations on our orders where people would explicitly state that, that they didn't understand. I heard that pretty frequently. And even though it was stated explicitly, I think sometimes when someone is talking for a period of time just word after word after word, people kind of tune out.

[PX 9, 119:1–17 (App. 00373).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS expressly denies Plaintiffs' mischaracterization of that excerpt as Luchette characterizing "many consumer complaints." *See* referenced document. Specifically, as a telemarketing sales representative Luchette was "separated from AFS customer service." Exhibit J, Luchette Dep. 97:16—22. Luchette did not communicate throughout the day or even during the week with anyone at AFS customer service. *Id*. Moreover, Luchette had no access to emails received from subscribers sent to AFS's customer service. *Id*. at 95:4—18. The only "complaints" Luchette had any firsthand knowledge of were those she received from subscribers during the initial sales call and those she read on the Better Business Bureau website. *Id*. at 86:11—16. Therefore, Luchette has no ability to accurately characterize any subscriber complaints. *Id*. at 86:11—16; 95:4—18; 97:16—22; 119:1–17.

201. AFS does not track the number of complaints that it receives directly from consumers; the only consumer complaints that AFS tracks numerically are complaints made to the Better Business Bureau and Attorneys General. [PX 1, 399:3–16 (App. 00165); PX 6, 176:10–25, 300:5–302:12, 341:4–19 (App. 00289, 00314-316, 00322).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that is does not numerically track the number of complaints that it received directly from subscribers. *See* referenced documents. AFS also admits that it did numerically track the number of complaints it received from the Better Business Bureau and Attorneys General. *Id.* AFS denies that it did not track complaints that it received directly from subscribers in any way; rather the record reflects that AFS maintained records of its communications in a variety of ways including recordings of inbound voicemails, internal communications, email and in writing with customers. PX 35, Exhibit 3 (App. 02049—52) (AFS's Quality Control Overview); *see also e.g.* Exhibit M, Grabert Dep. at 41:13—42:9; 51:12—54:8; 223:25—225:6; Exhibit S, Haney Dep. at 287:16—288:7.

202. During sales calls, some consumers complained to telemarketers. The complaints were "generally all the same type of complaints, [consumers] would say that, you know, they

felt the company was deceptive, just sneaky, not – not doing good business." [PX 9, 85:24–87:1 (App. 00363-365).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs attempt to use the anecdotal testimony of a single witness, Amy Luchette, to establish that AFS's customers routinely complained during sales calls, and therefore the remainder of the Paragraph is denied. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—201; 203—306, which includes AFS's response to Paragraph 200, clarifying the Luchette' s role as a part-time telemarketing sales representative for two years at a single branch of AFS in Ohio did not include receipt of customer complaints.

203. Ms. Luchette understood consumer complaints about being "sneaky" as "accusing [AFS telemarketers] of, like – basically, like the same thing as deceptive, that we were trying to trick them into something." [PX 9, 88:6–15 (App. 00366).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs attempt to use the anecdotal testimony of a single witness, Amy Luchette, to establish that AFS's customers routinely complained during sales calls, and therefore the remainder of the Paragraph is denied. With incorporation by reference to AFS's response to Paragraph 200, Luchette' s role as a part-time telemarketing sales representative for two years at a single branch of AFS in Ohio did not include receipt of customer complaints.

204. Ms. Luchette continued, "I vaguely remember someone, like, actually telling me that they felt not being clear enough or up front enough they felt was just bad business etiquette. And I'm not sure what word I'm looking for there, but just that they didn't think it was a good way to do business." [PX 9, 88:21–89:2 (App. 00366-367).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs attempt to use the anecdotal testimony of a single witness to establish that AFS's customers routinely complained during sales calls, and therefore the remainder of the Paragraph is denied. With incorporation by reference to AFS's response to Paragraph 200, Luchette' s role as a part-time telemarketing sales representative for two years at a single branch of AFS in Ohio did not include receipt of customer complaints.

205. "Fairly often," Ms. Luchette was told by consumers during sales calls that in the past these consumers had received a bill from AFS but had not ordered anything or that they had a subscription in the past with AFS but thought it was a free trial. [PX 9, 93:10–94:22 (App. 00369-370).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of the referenced testimony. Specifically, Luchette testified that during a sales call she had heard a customer complain that they previously ordered a subscription from AFS but thought it was a free trial. PX 9, 93:10–94:22 (App. 00369-370). Luchette did not offer any measure of frequency to that

complaint. *Id*. Luchette further testified that "maybe like once a month, roughly" she received a complaint from a customer during a sales call that they had received a bill from AFS but did not believe that they had ordered anything. *Id*. AFS further denies Plaintiffs attempt to use the anecdotal testimony of a single witness to establish that AFS's customers routinely complained during sales calls, and therefore the remainder of the Paragraph is denied. With incorporation by reference to AFS's response to Paragraph 200, Luchette' s role as a part-time telemarketing sales representative for two years at a single branch of AFS in Ohio did not include receipt of customer complaints.

206. During sales calls, consumers threatened to report AFS to a third party, such as the BBB or an Attorney General's office, and/or threatened to take legal action [PX 9, 89:3–11 (App. 00367).]

**RESPONSE:** Admitted in part and denied in part. AFS admits the one former telemarketing sales representative testified that she received a complaint from a customer during a sales call "threatening to report AFS to a third party, such as the BBB or an attorney general's office." PX 9, 89:3–11 (App. 00367). AFS denies Plaintiffs attempt to use the anecdotal testimony of a single witness to establish that AFS's customers routinely threatened to report AFS to a third-party during sales calls, and therefore the remainder of the Paragraph is denied. *Id*. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—205; 207—306.

207. AFS sends "confirmatory emails" the same day that it records the order after the telemarketing call. [PX 35, Ex. 3 (App. 02049-2052); ECF 91 ¶ 1-2(e)]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it sends two confirmatory emails the same day a customer places an order for an AFS's publication subscription. PX 135 at App. 03930-31. *See e.g.* AFS's S.J. Br. at Exhibit N, AFS0396626–AFS0396628 (Confirmatory Email in HTML); AFS's S.J. Br. at Exhibit O, AFS0396629 (Confirmatory Email in Plain Text). AFS admits that it sent *two* confirmatory emails to the subscriber the same day they placed an order, expressly incorporating the sales call by reference and, in short, plain language, confirmed the price, term, and cancellation process. *Id*. If the subscriber had not yet logged into the newsletter's website using their log-in credentials provided in the second confirmatory email, AFS further admits that it would send a third and fourth confirmatory email to a subscriber following the initial sales call in which they placed an order, mirroring that of the first and second confirmatory emails. PX 135 at App. 03930-31. *See, e.g.*, PX 187. AFS denies Plaintiffs' mischaracterization of this process. *Id.*

208. Many consumers reply to the "confirmatory emails," most within three or four days of the "order." [PX 14, 48:14–49:1, 51:1–11 (App. 00495-497) (discussing Ex. 3); PX 35, Ex. 3, page 3 (App. 02051); FTC-00020337 (App. 03929); PX 35, Ex. 195 (App. 02415-2418)]

**RESPONSE:** Denied. AFS denies that the referenced documents support the statement made in Paragraph 208. Specifically, the document referenced at PX 35, Ex. 3, page 3 (App. 02051), only supports the statement, *if* a customer responds to the confirmatory emails sent by AFS following their order, those responses are typically received within three to four business

days of the confirmatory email being sent. PX 35, Ex. 3, page 3 (App. 02051). These responses "mostly are expressing a wish to correct mailing information or typos, cancel the subscription, or in some cases to express a complaint." *Id*.

209. Examples of complaints in such replies that people did not agree to any order or subscription, that they thought it was free, that they did not know there was a book or that they had to return the book, and that AFS is a scam are attached as PX 177 (App. 3166-3294), and include the following:

- September 1, 2021 reply from a police department on the same day the "confirmatory email" was sent – "I wanted to clarify your email. We have not signed up for any subscription with your company. We are receiving a sample newsletter as a trial phase to determine our need. I just want to confirm that we have not been signed up for any contractual subs[c]ription." [PX 177, page 128, row 51031 (App. 03294).]

- September 1, 2021 reply from a fire chief on the day after the "confirmatory email" was sent – "I'm not sure what phone conversation you were involved in, but I did not order anything from you. If that is what you interpreted then feel free to cancel now." [PX 177 page 127, row 51026 (App. 03293).]

- July 9, 2021 reply from a payroll administrator on the same day the "confirmatory email" was sent – "Good morning, I thought in our conversation you said these were free, nothing about actually placing an order. Please notate I do not want any subscriptions or invoices sent to this company." [PX 177, page 126, row 50668 (App. 03292).]

[*See also* PX 18 ,¶¶ 40-41) (App. 00701-02.)]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS expressly denies Plaintiffs' attempt at mischaracterizing and inaccurately summarizing these documents as contained in the opening statement of Paragraph 209. *See* PX 177 (App. 3166-3294). The referenced documents are in writing and speak for themselves. *Id*.

210. Denise Haney began working at AFS in 2002. Ms. Haney has worked as a telemarketer, a customer service representative, a customer service supervisor, and a client success representative. During the entire Relevant Time Period, Ms. Haney was an AFS customer service representative. [PX 6, 16:13–17:12; 19:19–20:2; 23:25–24:12 (App. 00261-264, 00266-267).]

**RESPONSE:** Admitted.

211. Melissa Schwenk worked at AFS from 2002 to 2004 and 2008 to 2022. Ms. Schwenk worked as a customer service representative from 2009 through 2022. She also performed collections for approximately a year between 2021 and 2022. [PX 16, 11:4–10, 12:2–13:9 (App. 00630-632).]

**RESPONSE:** Admitted.

212. Jennifer Rann worked for AFS from December of 2010 to October 2021. Ms. Rann worked approximately a year in telemarketing, six months as a morning manager at a telemarketing branch, and five years as a customer service representative. During her years in customer service, Ms. Rann spent 100 percent of her time accepting inbound calls to AFS's 800 number and dealing with issues related to those calls. She performed collections for combined book-newsletter subscriptions from 2017 or 2018 until the end of her employment. [PX 12, 11:22–12:9, 13:10–13, 15:16–18, 18:16–23, 19:6–20:21 (App. 00428-431, 00433-435).]

**RESPONSE:** Admitted.

213. The most common customer service complaint that Ms. Haney received from AFS subscribers who wanted to cancel was "[p]robably that they misunderstood the offer, that they thought it was free." [PX 6, 178:2–7 (App. 00290).]

**RESPONSE:** Admitted in part and denied in part. AFS admit that the extracted text appears in the referenced document. AFS denies Paragraph 213 to the extent Plaintiffs attempt to substitute firsthand customer testimony with hearsay from a single witness testifying anecdotally about customer interactions. The nature of customer complaints, which amounted to far fewer than one percent of sales, were not always clear and on many occasions were based on erroneous recollections of the sales calls. *See, e.g.*, Exhibit PP, Declaration of Kelly Rickard *with* Exhibit, SS, Rickard Dep. at 75:4–6 ("I think by the time I filed my complaint in June, I wasn't recalling all of that conversation."); *id.* at 70:20–21 ("At the time of the declaration, I didn't recall that."); *id.* at 108:13–18 ("After listening to that phone call yesterday for the first time, I realized that I did provide my birth date."); *id.* at 124:17–19 ("I can't believe I provided my birth date. I honestly had no recollection and would not have thought I would have done this."). By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—212; 214—306. By way of further response, Haney went on to clarify when receiving such complaints, she would "go back and research," listening to the initial sales call, confirming all aspects of the call including the month and day of birth, email address, mailing address, and that the customer understood they were signing up for a subscription with a right of cancellation. Exhibit S, Haney Dep. at 172:1—175:6. She would report back to the individual who lodged the complaint with this information. *Id*. ("You know, I don't know at that point what to say. I clearly heard them give the offer, they clearly stated everything, you gave the information, but yet you're still saying you didn't place an order when it was clear you placed an order. So that's where you have to decide are you going to fight it or not, are you going to just let it go."). Haney went on to further clarify:

> Q: Okay. So you -- the didn't order complaint, how often would you hear AFS customers complain that they didn't order?
>
> A: I don't know what you're looking for as far as how often. Are you asking for a percentage? Are you –
>
> Q: Is this a complaint that you would hear on a daily basis?

> A: Probably, but not always from the actual customer. Sometimes it could be a secretary, an [Accounts Payable] person saying that that person didn't order. … A lot of times we had [Accounts Payable] people saying this order wasn't placed because you don't have a PO from me. Well, whether we have a PO or not from the purchasing department, the actual customer on the account could have placed the order. So --

*Id.*

214. Ms. Haney estimates the following:

a. between 2015 and 2017, AFS received 400-500 customer service calls a day; and in 2016 and 2017, only half these calls did not involve customer complaints. [PX 6, 284:24–285:20, 329:2–330:14 (App. 00308-309, 00320-321).];

**RESPONSE:** Admitted in part, denied in part. AFS admits Haney testified during particularly busy periods, in 2016 and 2017, half the customer service calls she received were "good" or "non-complaint" calls. *See* referenced documents; Exhibit S, Haney Dep. at 287:16—288:7. Those days typically occurred after "invoicing went out," where subscribers would call to pay; make changes to their subscription including a change of address, a change of subscriber in instances an executive was leaving the company, upgrade an account to receive more copies; cancel; or in some instances, lodge a complaint. *Id*. Exhibit S, Haney Dep. at 303:17—305:5. AFS denies Haney provided testimony that 400-500 "customer service calls a day" was a regular occurrence between 2015 and 2017. *Id*. In fact, Haney later retracted her estimate that half the calls "did not involve customer complaints," asserting that that number was likely much smaller, given her particularized job responsibilities she would have seen more than others. Exhibit S, Haney Dep. at 320:13—323:9; 305:1—13 ("Q: And so you talked about hundreds of phone calls at the height of the time that you would get. Those weren't hundreds of complaints? A: No. No."). AFS further denies that the estimate provided by a single witness during her deposition, can suffice for Plaintiffs' lack of any statistical sampling or analysis. *See* AFS S.J. Br. at Exhibit K, Bandy Dep. at 350:13–353:11 (confirming that in bringing this lawsuit the FTC performed no investigation of the factual accuracy, nor any quantitative analysis, of the unverified hearsay complaints received from customers, who constitute a fraction of one percent of the customers who placed orders with AFS and who represent an infinitesimal percentage of the millions of potential customers with whom AFS made telephone contact over the same time period); AFS S.J. Br. at Exhibit K, Bandy Dep. at 36:4–38:15; 48:5–52:9; 118:22–130:7; 206:14–211:22;350:13–353:11 and AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 148:23–155:9; 172:7–22; 206:3–9; 214:24–215:23 (confirming to this to this day—notwithstanding AFS's production of millions of pages of discovery demanded by Plaintiffs, its production of thousands of audio recordings of customer interactions, and the inclusion of complete correspondence with complainants—Plaintiffs have not subjected the complaints that are the cornerstone of their case to any kind of systematic scrutiny and have simply assumed them to be true).

b. between 25% and 30% of the customer service complaints were complaints that consumers misunderstood AFS's offer, that consumers never ordered AFS's

publications, and/or that they thought the publications were free [PX 6, 239:4–22 (App. 00296).];

**RESPONSE:** Denied. AFS denies the referenced documents support the statement contained within Paragraph 214(b). Specifically, Haney estimated that between 25% and 30% of *all* customer service complaints received by AFS – including by telephone, email, or voicemail – thought the publication subscription being offered by AFS was "free." *See* referenced document. AFS expressly denies that the estimate provided by a single witness during her deposition, can suffice for Plaintiffs' lack of any statistical sampling or analysis. *See* AFS S.J. Br. at Exhibit K, Bandy Dep. at 350:13–353:11 (confirming that in bringing this lawsuit the FTC performed no investigation of the factual accuracy, nor any quantitative analysis, of the unverified hearsay complaints received from customers, who constitute a fraction of one percent of the customers who placed orders with AFS and who represent an infinitesimal percentage of the millions of potential customers with whom AFS made telephone contact over the same time period); AFS S.J. Br. at Exhibit K, Bandy Dep. at 36:4–38:15; 48:5–52:9; 118:22–130:7; 206:14–211:22;350:13–353:11 and AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 148:23–155:9; 172:7–22; 206:3–9; 214:24–215:23 (confirming to this to this day—notwithstanding AFS's production of millions of pages of discovery demanded by Plaintiffs, its production of thousands of audio recordings of customer interactions, and the inclusion of complete correspondence with complainants—Plaintiffs have not subjected the complaints that are the cornerstone of their case to any kind of systematic scrutiny and have simply assumed them to be true). AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. Exhibit S, Haney Dep. at 196:9—197:10.

c. Up to 40% of the total complaints that come in via email, voicemail, and phone calls were complaints that "I didn't order." [PX 6, 278:11–19 (App. 00307).]

**RESPONSE:** Denied. AFS denies the referenced documents support the statements made within Paragraph 214(c). Specifically, when the Plaintiffs required her to guess, Haney testified between 25% and 30% of *all* customer service complaints received by AFS – including by telephone, email, or voicemail – thought the publication subscription being offered for "free, and they didn't order." PX 6, 239:16—22. When asked again, Haney guessed "maybe thir[ty] – forty." *See* referenced document. AFS expressly denies that the estimate provided by a single witness during her deposition, can suffice for Plaintiffs' lack of any statistical sampling or analysis. *See* AFS S.J. Br. at Exhibit K, Bandy Dep. at 350:13–353:11 (confirming that in bringing this lawsuit the FTC performed no investigation of the factual accuracy, nor any quantitative analysis, of the unverified hearsay complaints received from customers, who constitute a fraction of one percent of the customers who placed orders with AFS and who represent an infinitesimal percentage of the millions of potential customers with whom AFS made telephone contact over the same time period); AFS S.J. Br. at Exhibit K, Bandy Dep. at 36:4–38:15; 48:5–52:9; 118:22–130:7; 206:14–211:22;350:13–353:11 and AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 148:23–155:9; 172:7–22; 206:3–9; 214:24–215:23 (confirming to this to this day—notwithstanding AFS's production of millions of pages of discovery demanded by Plaintiffs, its production of thousands of audio recordings of customer interactions, and the

inclusion of complete correspondence with complainants—Plaintiffs have not subjected the complaints that are the cornerstone of their case to any kind of systematic scrutiny and have simply assumed them to be true). AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. Exhibit S, Haney Dep. at 196:9—197:10.

215. Customers who called the 800 number reported that they did not believe they had ordered anything from AFS. [PX 12, 21:17–23:12 (App. 00436-438).]

**RESPONSE:** Denied. AFS denies the referenced documents support the statement made within Paragraph 215. Specifically, the extracted testimony simply provides an affirmative response by a former AFS employee that she did receive calls from subscribers that they did not believe that they had in fact ordered an AFS publication subscription. *See* referenced document. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—214; 216—306. By way of additional response, AFS incorporates by reference its response and objections to Paragraphs 213 and 214.

216. Ms. Schwenk estimates that 50% of the customer service calls she took were customers saying that they did not understand the terms of AFS's subscription offer, including, "They would say I don't remember saying yes. They would say I don't recall being told there would be an invoice. I didn't know I would have to pay for this. Things like that." [PX 16, 31:1–15 (App. 00638).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Paragraph 216 to the extent Plaintiffs attempt to substitute firsthand customer testimony with hearsay from a single witness testifying anecdotally about customer interactions. AFS expressly denies that the estimate provided by a single witness during her deposition, can suffice for Plaintiffs' lack of any statistical sampling or analysis. *See* AFS S.J. Br. at Exhibit K, Bandy Dep. at 350:13–353:11 (confirming that in bringing this lawsuit the FTC performed no investigation of the factual accuracy, nor any quantitative analysis, of the unverified hearsay complaints received from customers, who constitute a fraction of one percent of the customers who placed orders with AFS and who represent an infinitesimal percentage of the millions of potential customers with whom AFS made telephone contact over the same time period); AFS S.J. Br. at Exhibit K, Bandy Dep. at 36:4–38:15; 48:5–52:9; 118:22–130:7; 206:14–211:22;350:13–353:11 and AFS S.J. Br. at Exhibit Q, Oleckna Dep. at 148:23–155:9; 172:7–22; 206:3–9; 214:24–215:23 (confirming to this to this day—notwithstanding AFS's production of millions of pages of discovery demanded by Plaintiffs, its production of thousands of audio recordings of customer interactions, and the inclusion of complete correspondence with complainants—Plaintiffs have not subjected the complaints that are the cornerstone of their case to any kind of systematic scrutiny and have simply assumed them to be true). AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. Exhibit S, Haney Dep. at 196:9—197:10.

217. Some customers told customer service that they did not have authority to make decisions for their company. [PX 16, 39:6–23 (App. 00642).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the testimony cited. Specifically, Plaintiffs have omitted material portions of the testimony, providing context for the instances referenced. *See* referenced document. In full, the testimony is as follows:

> Q: When you were working customer service calls, did customers ever call and tell you that they lacked authority to enter into a binding financial contract with PBP?
>
> MS. EISENSTEIN: Objection.
>
> THE WITNESS: Customers would say that they -- they didn't have authority to make decisions for their company. But at the time that they were offered the publication, we had simply asked for them to review it and show it to those that can make the decisions. And then all they would need to do was either pay the invoice or contact us to let us know that it is not something they could do. So if someone would call me and say I'm not qualified to do this or I wasn't authorized to even take this, I would just cancel out the account for them at that time.

PX 16, 39:6–23 (App. 00642). By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—216; 218—306.

218. Schwenk knew when consumers were "genuinely confused" by AFS's offer "by the way the customer comes across when they say, I didn't order this, or I didn't know what this was. Because a lot of times, they believe that because they have an invoice that they have to pay it. They don't for whatever reason, understand that they can write cancel and return it or tell us that they don't want to go forward with the service. . . . So if they are automatically assuming that they have to pay, they obviously missed something." [PX 16, 119:25–120:15, 120:25–121:2 (App. 00659-661).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies Paragraph 218 to the extent Plaintiffs attempt to substitute firsthand customer testimony with hearsay from a single witness testifying anecdotally about customer interactions. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—217; 219—306.

219. In response to a coworker telling her that a woman wanted to report AFS "to the FBI as a scam," an AFS employee responded, "the fbi? That escalated quickly" "they usually start with a sheriff's deputy." [PX 109, AFS0649351 (App. 02928).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

220. AFS only kept track of customer service calls if they involved issues like payments or renewals, but "never like a tally of why the customer was calling or anything like that" and AFS did not keep track of consumers who reported during calls that they did not believe they had ordered anything [PX 16, 29:24–30:6 (App. 00636-637); PX 12, 22:9–23:10 (App. 00437-438).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document found at PX 16, 29:24–30:6 (App. 00636-637). AFS denies the remainder of Paragraph 220 as an express mischaracterization of the testimony provided at PX 12, 22:9–23:10 (App. 00437-438). Specifically, the cited testimony provides in full:

> Q: Would you ever make a note anywhere in the computer that a person had reported to you that they believed that they did not order anything from PBP?
>
> . . .
>
> A: I did not make a note, per se. If someone called stating that they didn't understand the offer that was made to them, I would explain what and when the offer was made to them, and then the customer would let me know how they wished to proceed.

*Id*. at 22:24—23:10 (objection omitted). AFS further denies that it did not track customer service calls in other ways, rather, AFS maintained records of its interactions with customers in a variety of ways, as described in AFS's response to Paragraph 201. PX 35, Exhibit 3 (App. 02049—52) (AFS's Quality Control Overview); *see also e.g.* Exhibit M, Grabert Dep. at 41:13—42:9; 51:12—54:8; 223:25—225:6; Exhibit S, Haney Dep. at 287:16—288:7.

221. Examples of emails to customer service from February 2021 showing that people did not agree to any order or subscription, that they thought it was free, that they did not know there was a book or that they had to return the book, and that AFS is a scam are attached as PX 178 (App. 03295-337.)

**RESPONSE:** Denied. AFS denies Plaintiffs' generalized mischaracterization of the referenced documents, which are in writing and speak for themselves. PX 178 (App. 03295-337). AFS further denies that this cherry-picked excerpt of customer communications is in any way representative of the opinions or perceptions of the hundreds of AFS customers.

222. Emails to customer service include the following:

a) "When I spoke to [the AFS telemarketer], I was under the impression that she was only going to send me some information and a link so that I might be able to research the product when it was more convenient. I was not aware that I was ordering." [PX 48, AFS0018100 (App. 02677).]

b) "Please cancel account A494203902 and void invoice. I did not realize this was a paid publication subscription. I have never even looked at the publication and my company has been billed $299.00. The phone call was quite misleading. I had no

idea we would be billed. Please cancel whatever you have [my company] down for. We should not be held responsible for the invoice." [PX 47, AFS0016579 (App. 02675).]

c) "Please accept this email as formal notification to cancel all service, subscriptions and products ordered from your company. My understanding from the phone call I received was that a sample of your CFO & Controller Alert would be provided free for my review to determine whether or not I wanted to place an order for this service. It was not clear that my acceptance of your offer for a free sample was an implied agreement to order this service that I would have to cancel separately if I did not want the service." [PX 49, AFS0130839 (App. 02680).]

d) "I just got a call from [an AFS telemarketer] and he had requested my email address so he could send me a letter talking about the products offered and when I got the email I noticed that we would be charged if not canceled so the Confirmation Number listed at the bottom of his email is [number] no account # because we should not have an account never ordered any products nor do we intend to order anything." [PX 35, Ex. 193 (App. 02413-2414).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced documents. AFS denies that this cherry-picked excerpt of customer communications is in any way representative of the opinions or perceptions of the hundreds of thousands of AFS customers. In addition, AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. Exhibit S, Haney Dep. at 196:9—197:10. There is no evidence that any of these customers paid any money to AFS; to the contrary, the undisputed evidence demonstrates in such instances AFS would have cancelled the subscription without any charge.

223. Consumers mailed complaint letters directly to AFS and demanded that AFS not contact them again. The consumers complain in the letters that they did not agree to any order or subscription, that they thought it was free, that they did not know there was a book or that they had to return the book, and that AFS is a scam. [PX 1, 392:19–393:25 (App. 00159-160); PX 6, 94:14–95:2 (App. 00280-281); PX 18, ¶¶ 29-30, 38 and Ex. 8 thereto (App. 00690-691, 698-701, 887-906); PX 179 (App. 03338-3423.)]

**RESPONSE:** Denied. AFS denies Plaintiffs' generalized mischaracterization of the testimony and referenced documents, which are in writing and speak for themselves. *See* referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—222; 224—306. AFS further denies that this cherry-picked excerpt of customer communications is in any way representative of the opinions or perceptions of the hundreds of AFS customers.

224. Examples include:

- From a medical center – "I never agreed to receive charges for this publication. I want it canceled immediately and it's sad you have to use phone sales tactics while I'm on the job to get money from people like me. This total came out of my pocket, not the hospitals!" [PX 164, FTC-PBP-0013047-8 (App. 03079).]

- From a nurse manager – "Your company called me and offered a free sample of your newsletters. You keep sending more newsletters and billing for them even though neither I, nor anyone else in my department, ever ordered them." [PX 163, FTC-PBP-0011273 (App. 03077).]

- From the Senior Vice President and Chief Legal Officer of a healthcare foundation – "I represent [employee] and the [name of Foundation]. Relative to the attached invoice from your company, please be advised that neither [employee] nor the Foundation, nor anyone on their behalf, ever ordered the referenced materials or subscribed to the referenced online services. Your company's repeated and constant calls and other efforts to collect on this and/or other similar invoices are thus fraudulent and deceptive, and all in violation of Massachusetts law…. If these calls and collection efforts do not cease immediately, I will not hesitate to commence litigation against you and your company." [PX 66, AFS0460605-09 (App. 02778).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaints referenced therein. AFS denies that this cherry-picked excerpt of customer communications is in any way representative of the opinions or perceptions of the hundreds of thousands of AFS customers. In addition, AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. Exhibit S, Haney Dep. at 196:9—197:10. There is no evidence that any of these customers paid any money to AFS; to the contrary, the undisputed evidence demonstrates in such instances AFS would have cancelled the subscription without any charge.

225. Consumers notated complaints on invoices that they returned to AFS that they did not agree to any order or subscription and that they thought it was free. [PX 180 App. 03424-3592); PX 18 ¶ 30, 36 and PX 35, Ex. 6 thereto (App. 00690, 00697, 00817).]

**RESPONSE:** Denied. AFS denies Plaintiffs' generalized mischaracterization of the referenced documents, which are in writing and speak for themselves. *See* referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—224; 226—306. By way of further response, AFS produced tens of thousands of returned invoices by customers who followed the preferred cancellation instructions AFS sales representatives provided in the initial phone call and explained in the confirmatory emails: simply write cancel on the invoice and return the invoice to AFS. *See, e.g.*, Exhibit DD. While AFS would take cancellations by any method (phone, email, voicemail or even fax), when the invoice was returned with "cancel" marked on it, AFS could automatically scan the invoices and effectuate

the cancellation. Exhibit S, Haney Dep. 309:12—17. In fact, the vast majority of customers understood and followed these instructions. The handful of examples of invoices with complaints written on them are not representative of the whole. *See, e.g.*, Exhibit DD.

226. Examples include:

- From a Special Education Coordinator of a school district – "*CANCEL* I never wanted this. My email is also incorrect." [PX 180, FTC-PBPPA-0184373 (App. 03427).]
- From a school district – "Please Cancel! I did not order this! Only agreed to FREE sample!" [PX 180, FTC-PBPPA-8183204 (App. 03429.).]
- From a pregnancy center – "I told you we didn't want this. Please cancel this I will not waste another stamp." [PX 180, FTC-PBPPA-0183517 (App. 03440).]
- From a school district – "CANCEL Return to Sender Please stop sending these! Did not order – Returning for 2nd time" [PX 180, FTC-PBPPA-0183650 (App. 03443).]
- From a company – "cancel I was told this was a free month trial. I have not seen an invoice until this one and we do not want this subscription. Thank you." [PX 180, FTC-PBPPA-0173494 (App. 03462.)]
- From the U.S. Secret Service – "Did not order Cancel Immediately" [PX 180, FTC-PBPPA-0029229 (App. 03472.)]
- From a retirement community – "Close our account. We've never received any of your newsletters, and have never initiated nor executed any agreements with you. You don't list a phone number so here is written notice. Stop the harassing notices & letters. *you aren't a vendor of ours.* [PX 180, FTC-PBPPA-000141 (App. 03588.)]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. By way of further response, AFS further incorporates by reference its response to Paragraph 225.

227. AFS did not track or collect notes on returned invoices. [Ex. 185, FTC-00020466, #11 (App. 03951.)]

**RESPONSE:** Objection. AFS objects to the phrase "did not track or collect notes" as vague and ambiguous as to what method of "tracking" or "collecting" is intended. By way of further response, AFS invoices that are returned via mail and have any writing related to cancelation are canceled. *See* referenced document. *See also e.g.* Exhibit DD (sampling of returned invoices). If any other action beyond cancellation is requested, such as suppression, AFS honors that request. *Id*. AFS maintains physical copies of each invoice received back from AFS's subscribers during the Relevant Time Period and has produced tens of thousands of them in this litigation. Exhibit DD. By way of further response, AFS further incorporates by reference its response to Paragraph 225.

228. Consumers replied to collection emails sent by AFS with complaints about AFS's business practices. [PX 181 (App. 3593-3694); PX 35, Ex. 299 (App. 02531-2547), PX 35, Ex. 300 (App. 02548-2563).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced documents, which are in writing and speak for themselves. AFS further denies that this cherry-picked excerpt of customer communications is in any way representative of the opinions of perceptions of the hundreds of thousands of AFS customers. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—227; 229—306.

229. Examples include:

- "I will forward this to our legal department if necessary but based on all information available to me this is a scam. The "Free" sample is misleading and miscommunicated and is fraudulent behavior at a minimum. Please cease and desist all further harassing communications regarding this matter immediately." [PX 181 (AFS0526215) (App. 03622.)]

- From a jail administrator – "I have tried numerous times to contact this 'CEEL' place to cancel this product with them but of course none of the 'Invoice' that they send has a contact number on it. I do not have any idea what all this is or why they are sending it to me. I have never ordered anything like this from anyone. I will be happy to send everything back to them because I have it all in a pile in my office, my only concern is how they can just bill someone for something that they did not order in the first place." [PX 76, AFS0521736, p. 1 (App. 02814).]

- From a school – "We may have discussed this company and your resources, but rest assured that it could not have been made clear to me that it would be a financial commitment. Even the language of the email you forwarded make it seem as though a formal commitment was still needed. Any trial 'resources' were just that, trial. …There are no formal orders that anyone from our school ever sent to this company. There isn't any commitment or interest from me indicated on this 'email confirmation.' If there was a cold call sales attempt made, it was made incorrectly. As mentioned before, only an administrator or purchasing secretary could have ordered this." [PX 77, AFS0522731, p. 1 (App. 02817).]

- "The Federal Trade Commission protects business and consumers from businesses such as yours. You are not allowed to send merchandise and then bill me for it without my express consent of ORDERING a product. All I agreed to on the phone was for your business to send me some information." [PX 86, AFS0575081, p. 1 (App. 02855).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. AFS further incorporates its response to Paragraph 224, and denies that these select

communications are in any way representative of the views of the hundreds of thousands of customers that AFS interacted with every year.

230. Consumers complained directly to both ICR and JSD about AFS's business practices. [*infra* FACTS 231-241.]

**RESPONSE:** Denied. The forthcoming paragraphs referenced by Plaintiffs (¶¶ 231–41) do not support the proposition that consumers complained directly to both ICR and JSD about AFS's business practices. AFS expressly denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—229; 231—306.

231. Consumers told ICR that they thought AFS was operating a scam. [PX 2, 163:20–24 (App. 00190).]

**RESPONSE:** Denied. AFS denies the complete testimony referenced by Plaintiffs supports the statement made in Paragraph 231. Exhibit Z, Diorio Dep. at 163:20—164:15. Specifically, Diorio testified he did not "hear those kind of words, scam" and his collectors "knew [AFS] wasn't a scam." *Id*. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—230; 232—306.

232. Based upon written complaints that ICR reviewed and complaints heard during phone calls that ICR made, customers perceived it to just be a trial period only and not a subscription. [PX 2, 89:5–17, 162:23–163:24, 320:16-20 (App. 00179, 00189-190, 00216); PX 11, 88:15–89:3, 143:23–145:12 (App. 00403-404, 00411-413).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the deposition testimony referenced contains the statement made by Paragraph 232. AFS denies Paragraph 232 to the extent Plaintiffs attempt to substitute firsthand consumer testimony with hearsay from a witness testifying anecdotally about customer interactions. AFS further denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—231; 233—306. These complaints to ICR, moreover, represent only a small selection of customers who are not representative of the opinions of AFS customers generally, particularly since they involve statements of those customers who are interacting with a third-party collections company.

233. Consumers who refused to pay ICR would tell ICR that they never ordered the subscription or that the customer did not understand the terms. [PX 11, 74:11–75:2, 88:15–89:14 (App. 00401-404).]

**RESPONSE:** Denied. AFS denies the testimony referenced by Plaintiffs support the statements made in Paragraph 233. *See* referenced documents. *Id*. Specifically, Powell, testified as follows:

> Q: What were the most common reasons for an account to be…identified as [refused to pay]?

> A: I couldn't tell you that. I mean there are many reasons. But it would depend on the customer, what they felt was right or wrong, you know.

PX 11, 74:11–75:2 (App. 00401-402), Powell goes on to provide examples of what she personally heard from customer, which included claims that the subscriber did not order the subscription, they did not understand the terms of the cancellation, but declined to estimate "what [ICR] heard the most of." *Id*; PX 11, 88:15–89:14 (App. 00403—404). AFS further denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—232; 234—306. These statements to ICR, moreover, are not representative of the opinions of AFS customers generally particularly since they involve statements of those customers who are interacting with a third-party collections company and providing excuses for the customers' failure to respond after receiving months of newsletters, multiple invoices and ignoring multiple attempts by AFS to contact them.

234. When consumers told ICR that they did not order anything from AFS, ICR would "rebut" them by saying "this is how you ordered it," and give them the date of birth and email address that had been given to the telemarketer. [PX 11, 40:9–20, 105:17-24 (App. 00400, 00409); PX 7, 41:3–19 (App. 00327) (discussing PX 35, Ex. 69 (App. 02191)); PX 2, 156:13–158:18 (App. 00186-188) (discussing PX 35, Ex. 72 (App. 02192)), 326:11–327:17 (discussing PX 35, Ex. 69 (App. 02191)); PX 26 ¶ 6, FTC-00000075 (App. 01917).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of this testimony, which is comprised of only a verification of text that appears in an exhibit being presented to the witness, not statements made as it pertains to ICR's policy or practices as it relates to rebuttals. *See* referenced documents. AFS further denies the admissibility and veracity of the complaints referenced therein.

235. ICR collectors were required to keep handwritten notes recording their interactions with consumers on collection cards. [PX 2, 188:1–189:2 (App. 00193-194); PX 35, Ex. 75, FTC-ICRIH-00000440-441(App. 02193-2194).]

**RESPONSE:** Objection. AFS objections to the term "interactions" as vague, undefined, and unsupported by the referenced testimony. AFS admits the reference testimony supports the statement ICR collectors were required to keep "a record of each conversation they had with the debtor on [the] collection card[s]." PX 2, 188:1–189:2 (App. 00193-194).

236. Some notes from one month of collection cards included:

a) "not ordered" ; "did not order"; "nvr ord a thing ; "never ordered" ; "did not order anything ; "nvr agreed to a subscription ; "nvr ord" ; "nvr wanted to order"; or "no pub ordered @ all[.]"

b) "must have misunderstood"; "must have misunderstood terms"; "misunderstood terms"; and "didn't understand[.]"

c) "took trial" ; "was taking trial"; "took trial only"; "only gave info for free trial"; "thought it was an example"; "got pub as a trial"; "agreed to trial"; "only aware of trial"

d) this is fraudulent"; "[said] scam"; "feels scam"; "thinks scam"; "it's a scam"; or simply "scam"

[PX 165, ECF 111-3, 111-4 (excerpts of ICR Collection Cards) (App. 03082-3135); *see also* PX 18, ¶¶ 43-46 (App. 00702-703).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents. AFS further incorporates its response to Paragraph 223, that customer excuses to a collections agency are not representative of the opinions of AFS customers.

237. Consumers also complained to ICR by email and letters, including:

a) 2020 email - "[T]hey keep calling and catch me off guard a year after the fact by rambling on and using different words/different company names so I don't know it's the same company while I am distracted at work juggling multiple things. I refuse to pay this collection. I paid once before…It's a SCAM and I am completely done with everything to do with this company." [PX 197, ICRCC0000714-c and d (App. 04110).]

b) 2018 letter sent from Senior Legal Counsel to ICR and to Ed Satell via registered mail - "[AFS] fraudulently invoiced for an unrequested and undelivered one year subscription to 'Keep Up to Date on Payroll' Such act may be considered a violation of [various Pennsylvania statutes], among others. Such violations are punishable as felonies in Pennsylvania and amounts involved in deceptive or fraudulent business practices pursuant to one scheme or course of conduct.may be aggregated in determining the grade of the offense." [PX 198, ICRCC0001942-c (App. 04113).]

c) July 2, 2020 letter to ICR and AFS - "Your company has attempted to invoice [facility] for services we do not require….our facility has never approval billable services from your company and your company is not an approved vendor. In fact, your company is listed as a scam vendor with the facility's parent company…and therefore no business can be transacted with your company and no payment will be made under any circumstances." [PX 200, ICRCC0054895-c (App. 04119)]

d) 2018 letter to ICR and AFS - "It has come to our attention that Progressive Business Publications sent unauthorized and unrequested packages of magazines to [company]. PBP then invoiced [company] for these magazines at outrageous prices, though [company] did not order or request them…We are aware that your

activities have been reported as a widespread fraudulent scam that has been perpetrated for many years (see enclosed Alert on Fraudulent Company Scam)." [PX 199, ICRcc0054082-c-e, App. 04115-17).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents. AFS further incorporates its response to Paragraph 223, that customer excuses to a collections agency are not representative of the opinions of AFS customers.

238. JSD received complaints directly from consumers about AFS, including:

a) July 26, 2017 email from a high school principal – "[J]ust because some company has our address and emails and is mailing or emailing us stuff does not oblige us to pay if we did not, in good faith, agree to place an order. As per our earlier conversations, I can verify that I have received emails from this company, but had no idea it was anything more than junk email or solicitations. I also am unaware of any encyclopedia's we have ordered from this company, nor am I aware of us attempting to purchase any…we receive lots of solicitation phone calls and emails, often times by overzealous sales reps who drive through a script and purposefully attempt to 'hook' or confuse prospective customers. Based on what I know at this point, I believe that to be the case here." [PX 156, FTC-JSDCID-00009761-62 (App. 03058).]

b) September 25, 2017 email from a college dean – "Please be advised that I feel there has been a misunderstanding. As the Associate Dean and Chair of Liberal Arts and Science, many companies sent me complementary copies of books for my review. I never requested a copy [of] this book and/or newsletter, nor did I agree to pay for it. If I had realized there was payment involved, I would have graciously declined." [PX 147, FTC-JSD-CID-00004124-26 (App. 03023-3026).]

c) September 25, 2017 email – "I am not sure what you are referring to, but I have never agreed to purchase anything from the Center for Education and Employment Law. Do not contact me by phone, or email again. If you continue to harass me about this I will pursue legal action against you, and JSD Management Inc. [PX 149, FTC-JSDCID-00004780 (App. 03032).]

d) August 23, 2017 email – "It's ridiculous this is how they treat prospective clients by trying to trap them into a payment…You can't just send someone something they didn't ask for and charge them for it…" [PX 150, FTC-JSDCID-00004897-98 (App. 03034).]

e) August 28, 2017 email – "Apparently your client 'Progressive Business Publications' has received numerous complaints about unethical practices to consumers…Is this legal where I'm sent a package I did not request?..." [PX 152, FTC-JSDCID-00004910-14 (App. 03041).]

f) August 29, 2017 email from an assistant principal – "I had no idea that there was a cost to item that was sent. The person wanted me to try whatever product that was." [PX 153, FTC-JSDCID-00005004-06 (App. 03047).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents. AFS further incorporates its response to Paragraph 223, that customer excuses to a collections agency are not representative of the opinions of AFS customers.

239. When consumers complained to JSD about not having agreed to purchase the materials, JSD relied on AFS having their email address and date of birth as proof of authorization. [PX 152, FTC-JSDCID-00004910-14 (App. 03041-3046); PX 154, FTC-JSDCID-00005082-84 (App. 03051).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced documents, which are in writing and speak for themselves. *See* referenced documents. AFS further denies the admissibility and veracity of the complaints referenced therein.

240. JSD relayed consumer complaints to AFS. [PX 201, PBP006474-46 (App. 04120-23); PX 68, AFS04947 (App. 02787671.]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced documents, which are in writing and speak for themselves. *See* referenced documents. AFS further denies the admissibility and veracity of the complaints referenced therein.

241. JSD emailed AFS that "[a] few times lately we've had customers complaining stating their sales rep offered to send then a 'free trial' they can keep and not be billed for it. Now they are getting bills and are livid," to which AFS responded, "Our sales reps have a very specific script. It is a free trial with a right of cancelation." [PX 157, FTC-JSDCID-00010436 (App. 03061).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

242. Consumers filed complaints against AFS with the Better Business Bureaus or state Attorneys General, and these complaints were forwarded to AFS. [PX 1, 396:5–16 (App. 00163); ECF 91 ¶ 29; PX 18, ¶¶ 8-10 (App. 00678-679); PX 19, ¶¶ 607 (App. 00907) and Ex. 1 thereto (App. 00914-1052.).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it is aware complaints against AFS were filed with the Better Business Bureau and state Attorneys General. AFS further admits that it has received complaints against AFS that were filed with the Better Business Bureau and state Attorneys General. AFS denies the referenced testimony supports the suggestion that all complaints filed with the Better Business Bureau and state Attorneys General "were forwarded to AFS." *See* referenced documents. AFS further denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—241; 243—306.

243. AFS numerically tracks the number of complaints made about it to Better Business Bureaus and Attorneys General. [PX 1, 395:22–397:3, 399:3–16 (App. 00162-164, 00165).]

**RESPONSE:** Denied. AFS denies the referenced documents supports the statement contained within Paragraph 243. Specifically, AFS "keep[s] an eye on the number of Better Business Bureau complaints and AG complaints." PX 1, 399:3–16 (App. 00165). AFS later quantified the complaints and its forensic data expert, Margaret Daley, offered unrebutted testimony that these complaints comprise a tiny percentage of all AFS customers, specifically 5/100ths of 1% (.05%) of all orders. AFS S.J. Br. at Exhibit R (M. Daley Report).

244. In Defendants' Answer to the First Amended Complaint, AFS calculates that "the number of complaints to AFS in the last 3 years represents only 5/100ths of 1% of the number of orders taken." [ECF 91 ¶ 1-2(m).]

**RESPONSE:** Admitted.

245. The Answer includes Defendants' contention that Better Business Bureau and state agency complaints are a "small fraction" of a small percent of "subscription orders." [ECF 91 ¶ 1-2(j).]

**RESPONSE:** Admitted.

246. Defendants based their calculation only on the number of complaints made to the Better Business Bureau and to state agencies. [PX 1, 285:2–286:17, 289:13–291:12 (App. 00129-130; 00131-133) (discussing ECF 11); ECF 11 ¶ 1-2(j) and (m).]

**RESPONSE:** To the extent Plaintiffs are using the term "calculation" to refer to the figure set forth within ECF 91 ¶ 1-2(m), restated in Paragraph 244 above, admitted.

247. The BBB PA provided a true and correct sworn declaration on July 29, 2021 for use in this litigation. [PX 20 (App. 01191-1197); PX 4, 217:23–218:9 (App. 00227-228).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Andrew Goode testified at his deposition that the referenced declaration found at PX 20 (App. 01191-1197), was true and correct. As explored in Goode's deposition, AFS denies that all of the statements contained within Goode's declaration are true and correct, and it objects to the admissibility of Goode's declaration. *See* Goode's deposition generally.

248. Around 1998, the BBB PA began including language on the publicly available Business Profile for AFS informing readers that the BBB PA observed a pattern of complaints against AFS alleging billing for unordered merchandise. [PX 20 ¶ 12 (App. 01193); ECF 91, ¶ 27.]

**RESPONSE:** Admitted in part, denied in part. The statement in Paragraph 248 is incomplete with respect to the information about AFS that appeared on the BBB website during the Relevant Time period.

249. In March 2001, the BBB PA's Business Profile for AFS included language that "While this company responds to customer complaints presented to it by this Bureau, this company has an unsatisfactory business performance record due to a pattern of customer complaints alleging billing for unordered merchandise. Some consumers have claimed that they cancelled subscriptions but their cancellations were not honored." [PX 20 ¶ 13 (App. 01193).]

**RESPONSE:** AFS admits the extracted text appears in the referenced document. AFS has vigorously disputed the BBB's characterization of its business and has for more than 20 years disputed the BBB's opaque and inconsistent system of rating businesses, its policy of reporting of complaints without verification, and its continued publication of complaints even when those complaints are proven to be false and malicious.

250. Satell became aware of this language in early 2001. *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1206 (Superior Court of PA 2005).]

**RESPONSE:** Admitted.

251. Satell contested the language of the March 2001 BBB PA Business Profile for AFS and sought a retraction. [PX 20 ¶ 13 (App. 01193); *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1207 (Superior Court of PA 2005).]

**RESPONSE:** Admitted.

252. As of April 2001, the BBB PA had updated the language as follows:

> While this company responds to customer complaints presented to it by this Bureau, this company has an unsatisfactory business performance record due to a pattern of customer complaints alleging billing for unordered merchandise. Some consumers have claimed that they cancelled subscriptions but their cancellations were not honored. On March 16, 2001, [PBP] responded to the BBB concerning the company's unsatisfactory business performance report. The company sells its publications through telemarketing solicitations. It claims that it tape records telephone solicitations for quality control purposes. The company states that it obtains the ordering person's birthdate to verify the order at a later date. According to the correspondence, orders are confirmed by fax within 24 hours, giving the orderer an opportunity to respond. The company claims it has a liberal cancellation policy permitting the customer to cancel anytime within the first three months of the telephone order and receiving a refund on all unsent issues. New subscribers receive two free issues with the right to cancel according to the company. The company claims that its BBB complaint volume is negligible compared to its volume of business.

[PX 20 ¶ 14 (App. 01193-1194); *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1207 (Superior Court of PA 2005).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS expressly denies the BBB PA's characterization of AFS's businesses.

253. AFS d/b/a Progressive Business Publications sued the BBB PA in November of 2001 for defamation, and Mr. Satell served as AFS's chief witness, testifying that it was impossible for a pattern of legitimate complaints for unordered merchandise to exist. [PX 20 ¶ 14 (App. 01193-1194); *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1207-08, 12414 (Superior Court of PA 2005); ECF 91 ¶ 27.]

**RESPONSE:** Admitted in part and denied in part. AFS admits that AFS sued the BBB PA for defamation in November of 2001. AFS denies that Satell "served as AFS's chief witness" and also denies Plaintiffs attempt to summarize Satell's testimony, which is in writing and speaks for itself and is therefore, denied. *See* referenced documents.

254. The jury determined that the profiles for PBP were not defamatory. A judgment was entered on the jury's verdict in favor of the BBB. PBP appealed the judgment, and the judgment was upheld on appeal. [PX 20 ¶ 15 (App. 01194); *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1209 (Superior Court of PA 2005); *Am. Future Sys. V. Better Business Bureau*, 592 Pa. 66 (PA 2007).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the statements contained within Paragraph 254 appear within the declaration found at PX 20 ¶ 15 (App. 01194). AFS denies the statements contained within Paragraph 254 accurately and completely characterize the procedural history and opinions of the Court in *Am. Future Sys. V. Better Business Bureau*, 872 A.3d 1202, 1209 (Superior Court of PA 2005); *Am. Future Sys. V. Better Business Bureau*, 592 Pa. 66 (PA 2007). *See* referenced documents.

255. According to the BBB PA, from 2001 until at least July 29, 2021, the date of the BBB PA's declaration, the language on the BBB PA's profile has been substantially the same, with minor revisions to the language a few times over the years. The language as of July 29, 2021 included the statement that "While this company responds to customer complaints presented to it by this Bureau, this company's business performance record demonstrates a pattern of customer complaints alleging billing for unordered merchandise. Some consumers have claimed that they cancelled subscriptions but their cancellations were not honored."

[PX 20 ¶ 17 (App. 01194-1195); PX 20, Ex. B (App. 01215-1219).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the declaration found at PX 20 ¶ 17 (App. 01194). AFS expressly denies the extracted text is a truthful or accurate characterization of AFS's business practices.

256. According to the BBB PA, AFS was a significant generator of complaints in the BBB PA's service area of Metropolitan Washington D.C. and Eastern Pennsylvania, which included approximately 160,000 company reports as of July 2021. From 2010 to 2016, AFS was consistently one of the top 10 most complained-about companies in the BBB PA's service area. From 2016 to 2019, AFS has been in the top 100 most complained-about companies each year.

[PX 20 ¶ 22 (App. 01195).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 256 appear within the declaration found at PX 20 ¶ 22 (App. 01194). AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. As for the list of companies complained about, even the BBB puts little stock in who is at or near the top. *Id.* at 181:21—182:24 ("sometimes the top of the list is less interesting to me than the bottom of the list …"); *id.* at 186:23—187:4 ("without the context and without knowing about companies, it's a blank list. There isn't the context. A member of the public wouldn't know what to do with it.").

257. According to the BBB PA, as of at least July 2021, the pattern of consumer complaints filed with the BBB about PBP has remained constant over time. [PX 20 ¶ 22 (App. 01195).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 257 appear within the declaration found at PX 20 ¶ 22 (App. 01194). AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. Moreover, the BBB's deposition testimony and website information contradicts the assertion of a pattern of complaints. As Andrew Goode, the BBB's corporate representative, testified, there was a drop in complaints between 2020 and 2021, and a further drop from 2021 to 2022. *Id.* at 165:23—166:13. The BBB website reflects only two complaints in the last 12 months, and zero since October 2022.[4]

258. According to the BBB PA, more than 3,750 complaints about PBP were filed with the BBB PA from 2010 to March 2020, and the BBB PA received more than 680 complaints about PBP from 2015 to July 30, 2020. [PX 20 ¶¶ 21, 26 (App. 01195-1196).]

---

[4] https://www.bbb.org/us/pa/malvern/profile/trade-publications/progressive-business-publications-0241-80012821/complaints.

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 258 appear within the declaration found at PX 20 ¶ 21 (App. 01194). AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. Forensic data expert, Margaret Daley, conducted an analysis of the 680 complaints received between 2015 and 2020. As an initial matter, these complaints reflect only 0.05% of the customers who placed orders with AFS during that same time period. AFS S.J. Br. at Exhibit R (M. Daley Report). Of this tiny fraction of customers who complained, these complaints involved various issues, many of which have no relevance to the issues in the complaint. *Id*. Moreover, she found that nearly 50% of these complainants were made by a person other than the person who spoke with AFS, approximately 40% of these complainants affirmatively stated that they were "satisfied" after seeing AFS's explanation in response to their complaint. *Id*. A large fraction of these complaints are internally inconsistent, non-sensical, or are provable mistaken and false. *Id*. In nearly all instances, AFS responded and provided the customer with cancellation or other relief they were seeking. *See* Exhibit X, Goode Dep. at 129:14-130:2 ("PBP generally has resolved the complaints that they received from us in the favor of the consumers"); *id.* at 136:8—14 ("it would be very rare for AFS or PBP to have that, because typically have answered and resolved the complaints"). What remains is a handful of complaints that represent an infinitesimal fraction of total AFS customers.

259. The complaint text, certain complainant identifying information and the complaint opening date for complaints that the BBB received during the Relevant Time Period was attached as Exhibit E to the Declaration of Andrew Goode. [PX 20 ¶ 26 (App. 1196) and Ex. E (excerpt) thereto (App. 01257-01375.]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 259 appear within the declaration found at PX 20 ¶ 26 (App. 01194). AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, AFS incorporates by reference its response to Paragraph 258.

260. Hundreds of these complaints are from the Relevant Time Period and support that people did not agree to any order or subscription, that they thought it was free, that they did not know there was a book or that they had to return the book, and that AFS is a scam. [PX 20 ¶ 26 (App. 1196), and Ex. E thereto (App. 01257-1375) (excerpt).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced documents found at (App. 01257-1375). AFS further denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't,

you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—259; 261—306. By way of further response, AFS incorporates by reference its response to Paragraph 258.

261. Examples of complaints from the Relevant Time Period include:

- March 2020 – "I work in a school and our main office was contacted by a sales representative of this company. They asked some questions and offered a free trial of a service via newsletters and email. An email was sent that gave different information than what was discussed on the phone. At this point I am receiving invoices for a service our company never wanted…I was told this service cannot be cancelled because payment has not been made. This is an extremely frustrating situation and definitely a company that is preying on people with shady sales tactics. [PX 20, Ex. E (App. 01375).]

- February 2020 from a YMCA – "This company called our organization several times, I finally gave them the time to listen to what they were selling and somehow that made me enter a contract with them for their newsletter via phone. They are now calling me to collect $299 dollars from something that I didn't agree to. I looked at your website reviews from other customers and it looks like this is a common concern." [PX 20, Ex. E (App. 01375).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, AFS has for over twenty years disputed the BBB's so-called "star rating" system or that such a system has any significance. The BBB website reports that the *Wall Street Journal* received 245 complaints over the last three years, and also has a 1 star rating (https://www.bbb.org/us/ny/new-york/profile/news-services/dow-jones-company-inc-0121-465). The BBB similarly reports 261 complaints against the *The New York Times* in the last three years which likewise posts a 1-star rating on the BBB website (https://www.bbb.org/us/ny/new-york/profile/publishers-periodical/the-new-york-times-company-0121-229). By way of further response, AFS incorporates by reference its response to Paragraph 258.

262. As of July 13, 2020, PBP had a 1-star rating based upon the average of the customer reviews from the last 3 years. A true and correct copy of the 32 published reviews from July 13, 2017 to July 13, 2020 are attached as Exhibit D to the declaration of Andrew Goode. [PX 20 ¶ 25 (App. 01196), Ex. D (App. 01224-1256).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 262 appear within the declaration found at PX 20 ¶ 26 (App. 01194). AFS expressly denies the admissibility and veracity of the reviews referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the

complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20.

263. Examples include:

- “This company scams you into an annual subscription giving you free issues. If you don’t cancel they send you a bill for an annual subscription. Don’t give them any information They will take that as a ‘yes’ to pay for the annual subscription.” (PX 20, Ex. D, page 2 (App. 01226).]
- “Received multiple invoices for items that we did not order. These people are SHADY and have not responded to my phone calls to let them know how shady they are.” [PX 20, Ex. D, page 4 (App. 01228).]
- “They set up an account we did not ask for and tried to bill us for subscription we did not order.” [PX 20, Ex. D, page 15 (App. 01239).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. By way of further response, AFS incorporates by reference its response to Paragraph 258.

264. Consumer complaints against ICR with the BBB NY are based on complaints about AFS. [PX 2, 228:18–23 (App. 00210); (PX 21, ¶¶ 13-16, 29-30 (App. 01378-1380, 01382-1384) and Ex. D thereto (App. 01525-1877).]

**RESPONSE:** Denied. AFS denies the Plaintiffs’ characterization of the referenced documents, including Plaintiffs’ mischaracterization of the testimony of DiOrio. PX 2, 228:18–23 (App. 00210). Specifically, DiOrio only testified that he was aware of complaints against ICR based on PBP or AFS customers. *Id*. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. By way of further response, ICR is an independent company that served as a third-party vendor to AFS.

265. 99% of ICR’s business came from collecting debt on behalf of AFS. [PX 2, 43:21–44:1 (App. 00177-178); PX 11, 26:20–22 (App. 00399).]

**RESPONSE:** AFS admits only that the referenced testimony supports the statement contained within Paragraph 265. By way of further response, ICR is an independent company that served as a third-party vendor to AFS.

266. The BBB NY provided a declaration on March 13, 2020 for use in this litigation. [PX 21 (App. 01376-1386).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the referenced document is a March 13, 2020 declaration of Jessica Poleon, an employee of the BBB NY. AFS denies the referenced document supports the statement that the declaration was provided for use in this litigation. *See* referenced document.

267. As of March 2020, the BBB NY encompasses businesses in 48 counties in Upstate New York and handles approximately 60,000 company records. [PX 21 ¶ 5 (App. 01377).]

**RESPONSE:** AFS admits only that the statements contained within Paragraph 267 appear within the declaration found at PX 21 ¶ 5 (App. 01377).

268. On May 3, 2016, the BBB NY sent a letter to ICR notifying ICR of a pattern of complaints concerning collection attempts for Progressive Business Publications and asked for a response outlining the steps ICR would take to eliminate the pattern of complaints. The letter also asked whether ICR was operating illegally since the company was dissolved in 2004. [PX 21 ¶ 13 (App. 01378), Exhibit A (App. 01387-1394).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 268 appear within the declaration found at PX 21 ¶ 13 (App. 01378). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. By way of further response, ICR is an independent company that served as a third-party vendor to AFS.

269. ICR responded that the majority of complaints involve customers that are upset they are being billed for a product they feel they didn’t order, that they misunderstood that it was a 1-year subscription, and they expressed to ICR that they thought it was only a trial or free issue. [PX 21 ¶ 14 (App. 01378-1379), Exhibit A (App. 01387-1394).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 269 appear within the declaration found at PX 21 ¶ 14 (App. 01378-1379). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. By way of further response, ICR is an independent company that served as a third-party vendor to AFS.

270. Around May 19, 2016, the BBB NY began including an Alert on the publicly available Business Profile for ICR, available at www.bbb.org, informing readers of a pattern and

high volume of complaints regarding collection activities on Progressive Business Publications accounts. [PX 21 ¶ 16 (App. 01379-1380), Exhibit B (App. 01395-1522).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 270 appear within the declaration found at PX 21 ¶ 16 (App. 01379-1380). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, ICR is an independent company that served as a third-party vendor to AFS. In addition, AFS denies that these complaints involve either a "pattern," or "high volume" and disputes these terms as vague and not defined herein. Plaintiffs have conceded that they have undertaken no effort to quantify the complaints at issue in this litigation at all, much less put them in perspective given the hundreds of thousands of customers AFS interacts with each year and millions who have ordered AFS publications in the relevant timeframe.

271. The language of this Alert has been substantially the same since May 2016 until at least March 13, 2020 (the date of the BBB NY declaration) and includes the following:

> BBB finds a pattern and high volume of complaints regarding collection activities for consumers on client accounts for Progressive Business Publications of Malvern, P.A. Consumers have advised BBB that they have not ordered any publications from Progressive Business Publications and therefore they do not owe any debt to International Credit Recovery.

[PX 21 ¶ 16 (App. 01379-1380), Exhibit B (App. 01395-1522).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 271 appear within the declaration found at PX 21 ¶ 16 (App. 01379-1380). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20.

272. ICR had an F rating with the BBB NY for all but a few months from 2010 until at least 2020, and when the BBB NY provided a declaration in 2020, ICR was rated 1 out of 5 stars based upon customer reviews (which are separate from customer complaints). [PX 21 ¶¶ 25, 26 (App. 01381).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 272 appear within the declaration found at PX 21 ¶ 25, 26 (App. 01381). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X,

Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. AFS has, for over twenty years, disputed that the rating system by the BBB bears any significance whatsoever. Indeed the BBB was investigated by both governments and journalists, which found it engaged in a “pay to play,” system for such ratings.[5] A facial review of the rating system shows no discernible bearing to the subjective criteria that it purports to apply. For example, the *Wall Street Journal* receives a “D minus” rating from the BBB, while *The New York Times* receives an “A plus” rating — notwithstanding their receipt of a similar volume of complaints.[6] By way of further response, AFS incorporates by reference its response to Paragraph 258.

273. ICR was the most complained about company in the Binghamton, NY region from 2008 to 2019, with the exception of 2018 when it was the second most complained about company. At the time the BBB NY provided a declaration in early 2020, there were approximately 4,268 companies in the Binghamton region in the BBB NY database. [PX 21 ¶ 28 (App. 01382).]

**RESPONSE:** AFS admits only that the statements contained within Paragraph 269 appear within the declaration found at PX 21 ¶ 25, 26 (App. 01381).

274. ICR also had 22 entries from 2015-2020 in the BBB’s scam tracker, which states “Spot a business or offer that sounds like an illegal scheme or fraud? Tell us about it.” [PX 21 ¶ 33 (App. 01385).]

**RESPONSE:** AFS admits only that the statements contained within Paragraph 269 appear within the declaration found at PX 21 ¶ 33 (App. 01385). No evidence in the record explains what, if any significance, the BBB’s scam tracker should be afforded.

275. The BBB NY believes that the nature of consumer complaints filed with the BBB NY about ICR is generally the same and has remained constant over time. [PX 21 ¶ 29 (App. 01382).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 275 appear within the declaration found at PX 21 ¶ 29 (App. 01382). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that “we can’t, you know, verify the accuracy of the information coming from third parties.” *Id.* at 222:13-20. By way of further response, the undisputed evidence is that ICR is now bankrupt and therefore is no

[5] https://www.cbsnews.com/newyork/news/better-business-bureau-accused-of-pay-to-play-scheme/

[6] *Compare* https://www.bbb.org/us/ny/new-york/profile/news-services/dow-jones-company-inc-0121-465, *with* https://www.bbb.org/us/ny/new-york/profile/publishers-periodical/the-new-york-times-company-0121-229.

longer receiving complaints, therefore it is patently incorrect that the nature or volume of complaints "has remained constant over time." The BBB website reflects *zero* complaints against ICR in the last 12 months, and that ICR is out of business.[7] The undisputed evidence further shows that AFS stopped utilizing ICR's services in or around September 2021.

276. The BBB NY has received at least 1,975 complaints about ICR, many during the Relevant Time Period supporting that people did not agree to any order or subscription, that they thought it was free, that they did not know there was a book or that they had to return the book, and that AFS is a scam. [PX 21 ¶ 34 (App. 01385) and Exhibit D (App. 01525-1877.)]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 275 appear within the declaration found at PX 21 ¶ 34 (App. 01385). AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. In this instance, the complaints against a third-party collection company lack probative value for additional reasons and do not "support" any conclusions about whether customers agreed to order publication subscriptions.

277. The complaints include statements by consumers such as:

- "I received a call today from a Cynthia Thompson with International Credit Recovery. My receptionist answered the phone and Cynthia told her she needs to speak to me immediately, she has a credit against our company & me personally….I told her I did not order any publications. She told me I spoke with a customer service rep & she has all my personal information and if I don't pay the invoice he is going to ruin my credit personally. I asked her for my social security and some sort of proof that I ordered as again I do not order anything like that…I just work in Human Resource but don't have the authority to order anything. This company is a scam…[PX 21 ¶ 34 (App. 01385), Ex. D (App. 01650)]

- "My co-workers and I have received several harassing phone calls and voicemail messages from Katie Dotman at International Credit Recovery over the last week, claiming that there is a delinquent invoice in our company's name for a Quality Managers Alert from Progressive Business Publications that I ordered in October 2016. When I asked for support for this claim, Katie Dotman said that she could not provide that information She threatened to send my company to collections if I did not send a $299 check immediately. I did not sign up for this Progressive Business Publications alert newsletter. This is a complete and total scam…" [PX 21 ¶ 34 (App. 01385), Ex. D (App. 01729)]

[7] https://www.bbb.org/us/ny/vestal/profile/collections-agencies/international-credit-recovery-inc-0041-47001067.

- "Predatory collection attempt on a Newsletter subscription that we never subscribed to. PBP continued to mail invoices for a newsletter that we never ordered, and now the collection attempts persist saying we agreed verbally to a trial magazine subscription (which we did not) and that it was not canceled in time and we owe $299. The collector, obviously has attempted this process with multiple businesses, many times and continues this practice." [PX 21 ¶ 34 (App. 01385), Ex. D (App. 01857)]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the above referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, AFS incorporates by reference its response to Paragraphs 258 and 276.

278. The complaints include as a "Desired Resolution" statements such as the following:

- "Given the extremely high number of similar complaints of fraud, I recommend turning these 470+ complaints over to the authorities in NY and PA, on both ICR and PBP. I would also like this to be turned over to the NY Attorney General's office for their business license to be revoked due to fraud." [PX 21 ¶ 34 (App. 01385), Ex. D (App. 01640).]

- "That this team of Predatory Businesses PBP and International Credit Revocery [sic] would stop." [PX 21 ¶ 34 (App. 01385), Ex. D (App. 01857).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the above referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein, made against a third-party. Specifically, the BBB has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit X, Goode Dep. at 77:6—10. Indeed, the BBB includes an admonition on its website that "we can't, you know, verify the accuracy of the information coming from third parties." *Id.* at 222:13-20. By way of further response, AFS incorporates by reference its response to Paragraphs 258 and 276.

279. Between April 1, 2010 and August 31, 2021, the Commonwealth received a total of 392 consumer complaints against AFS's registered fictitious entity Progressive Business Publications and Ed Satell's registered fictitious name (and d/b/a of AFS) Center for Education and Employment Law. [PX 19 ¶ 6 (App. 00907).]

**RESPONSE:** Admitted in part, denied in part. AFS admits Progressive Business Publications is a registered fictious entity of AFS. AFS denies Satell owns the fictious name "Center for Education and Employment Law" ("CEEL") in his personal capacity, but in his capacity of CEO of AFS. PX 15:8—13 (title). AFS further denies the referenced document

provides any factual support for the claim related to the total number of complaints asserted in Paragraph 279. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the Commonwealth has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit EE, Oleckna Dep. at 152:18—24. Indeed a significant fraction of these complaints were received before or during the time that the Commonwealth and Pennsylvania Attorney General conducted its investigation of AFS, which lasted from 2012 until 2017. Yet after conducting a full investigation of AFS's conduct, including its review of these very complaints, the Attorney General closed the investigation into AFS in 2017, without requiring further action by AFS. Exhibit HH, Satell Dep. Vol. II, at 320:9—321:12; 342:24—343:16.

280. 51 of these complaints were received or mediated during the Relevant Time Period (the "PA-OAG Complaints") and are attached as Exhibit 1 to the Declaration of Lauren Oleckna. [PX 19 ¶ 7 and Exhibit 1 thereto (App. 00907, 00914-01052).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 280 appear within the declaration found at PX 19 ¶ 7 (App. 00907). AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the Commonwealth has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit EE, Oleckna Dep. at 152:18—24. By way of further response, AFS incorporates by reference its response to Paragraphs 279.

281. Some examples of the PA-OAG Complaints include:

a) "I received a phone call from Administrative Professionals Update, offering a monthly publication. I declined, at which point they pushed and offered a FREE 'trial period' copy. I received said copy on December 5, 2016. Dissatisfied with the publication, I called Progressive Business Publications' customer service number and demanded they cancel our account. Today, December 30, 2016, I received an invoice from them, despite the fact that I (1) never entered into an agreement to purchase this ridiculous publication (2) previously demanded they cancel our account." [PX 19, Ex. 1 (App. 00918).]

b) "Company engages in cold calling; I never consented to any subscription; I did receive envelopes from them but were discarded as the junk mail they are since I never ordered anything and figured they were just further solicitations. Now I am getting calls from a collection agency saying that they will be damaging my credit and demanding payment for a product or service I never ordered or agreed to; I never engage such solicitations and find the business practice abhorrent." [PX 19, Ex. 1 (App. 00956).]

c) "A call from this business came in, soliciting free/complimentary medical coding e-newsletter. One of our staff accepted the free offer. A couple of months later, an invoice for $240 comes in stating it's the 2nd notice and it is now overdue." [PX 19, Ex. 1 (App. 00931).]

d) "Over the summer I was contacted by Progressive Business Publications the lady insisted that I would benefit greatly from their newsletter. I insisted that I was not interested but she said it would come free. I never recall seeing this newsletter and only re-heard of this when we received a collection notice. When I called in to get more information I was advised that a cancellation form was included in the newsletter, however since I never actually saw the newsletter I also never received this form. They are charging us $299 for the newsletter however when I called to dispute this the sales rep said she would lower it to $130, this is still an outrageous charge for a newsletter that I did not authorize or ever see. This company is a scam and is wrongfully charging us for a service that was not authorized." [PX 19, Ex. 1 (App. 00971).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears within the referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. Specifically, the Commonwealth has disavowed any role in investigating the facts asserted in the complaints it received, including those filed against AFS. *See* Exhibit EE, Oleckna Dep. at 152:18—24.

282. The FTC's consumer complaint database contains approximately 222 complaints against AFS's registered fictitious entity Progressive Business Publications. [PX 18 ¶ 7 (App. 00677).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 282 appear within the declaration found at PX 18 ¶ 7 (App. 00677). AFS expressly denies the admissibility and veracity of the complaints referenced therein. The FTC has not undertaken any effort itself to verify these complaints. As AFS's response to Paragraph 258 indicates, when forensic data expert, Margaret Daley, examined similar BBB complaints, she found almost half were lodged by a person different than whom ordered the subscription, that the remainder were plagued by objectively false statements that were disproven by the contemporaneous business records and recordings, and/or involved customers ultimately satisfied by AFS's explanation and response. AFS S.J. Br. At Exhibit R (M. Daley Report).

283. Consumers complained that they did not believe they had placed an order, that they thought it was free, that they thought AFS was operating a scam, and that if they did not pay, their personal or employer's credit would be negatively impacted. [PX 182 (App. 03695-3922); PX 18 ¶¶ 7(a)–(c) (App. 00677).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the statements contained within Paragraph 283 appear within the declaration found at PX 18 ¶ 7 (App. 00677). AFS expressly denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraphs Nos. 198—282; 284—306.

284. Examples of the FTC Complaints include:

a) "This company has sent an invoice stating we owe for a subscription that we not only have never received, we also NEVER authorized the transaction. Progressive

Business Publications has now sent us to a collection agency. Is there no way to stop this company for getting away with false billing?" [PX 141, FTC-00031237-39 (App. 03003-3006)].

b) "Started receiving notices from Progressive Business Publications for past due invoices for products we never ordered. We never paid this invoice due to the fact that we did not order the material, and read numerous complaints online that it was a scam. Now we are constantly being harassed by International Credit Recovery over the phone trying to collect on this invoice for Progressive Business Publications. We are a small family owned business servicing HVAC needs in Tallahassee, FL and do not have the time or patience to deal with the constant harassment. From the other complaints, I have read online we are not alone. Someone needs to put a stop to this company's business practice." [PX 142, FTC-00031587-89 (App. 03007-3010.)]

c) "I had a company call my office about a no risk free trial to a subscription. I gave them information they were requesting and went on my way. They sent me junk mail and junk email for several months. I never accessed the online portal they supposedly offer. Several months go by, and we keep getting invoices; I thought that the free trial was over and in order to continue the subscription we would need to pay 299, until we got a call from a collection agency threatening to take us to collections. I never consented to a subscription service, and I am furious with the predatory nature of this telemarketing service. I am just an underpaid, overworked expecting mother trying to get through the day, answering phone calls no one else wants to answer and trying to get off the phone so I could do the job I'm paid to do. I hope this company will be investigated and prevented from preying on other small businesses in the future." [PX 140, FTC-00030405-07 (App. 02999-3002.)]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced documents. AFS expressly denies the admissibility and veracity of the complaints referenced therein. By way of further response, AFS incorporates by reference its response to Paragraph 282.

285. On April 13, 2017, a consumer emailed AFS's Customer Service Department demanding that AFS cease and desist sending a newsletter that was never ordered and copying more than a dozen negative online reviews posted by other consumers, many of which referred to AFS as a scam. AFS's Customer Service Department forwarded the consumer's email to Mike Gorton, AFS's Administrative Director of Call Center Operations. [PX 60, AFS0442672 (App. 02718)]

**RESPONSE:** Admitted in part, denied in part. AFS admits on April 13, 2017, AFS's Customer Service Department received an email from a representative of a subscribing company. AFS denies Plaintiffs' mischaracterization of that correspondence, which is writing and speaks for itself. PX 60, AFS0442672 (App. 02718). Specifically, the correspondence requested AFS "cease and desist contacting us anymore." *Id*. Less than two hours after receiving the referenced email, AFS's customer service team responded, confirming receipt of the email, and requesting

the "account, order or email confirmation number" associated with the subscription which would enable AFS's customer service team to look up the account and take the requested action. *Id*.; Exhibit S, Haney Dep. at 33:13—35:12. However, instead of responding to AFS's customer service team the representative filed a complaint with the BBB, to which AFS promptly responded taking the requested action. Exhibit FF, FTC-BBBPA-00024090—94. Notably, the representative who initiated and drafted the complaint was not the individual who ordered the publication subscription from AFS. *Id*. In fact, the representative acknowledged in her complaint that she had not spoken to that individual who placed the subscription order with AFS, nor would that individual be in the office until the following week. *Id*. Following AFS's response to the complaint, the representative wrote back to the BBB asserting she was satisfied. *Id*. at FTC-BBBPA-00024093—94.

286. Colin Drummond routinely reviewed individual Yelp reviews posted by consumers [PX 93, AFS0589226 (App. 02880); PX 71, AFS0507158 (App. 02799)] and in some instances considered them credible enough to warrant reprimanding AFS employees. [PX 95, AFS0589283 (App. 02885).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced documents. Specifically, each document cited by Plaintiff in this Paragraph speaks for itself, and none support the proposition that Drummond routinely viewed Yelp reviews, gave any credence to Yelp reviews, or reprimanded AFS employees based on Yelp reviews. *See* referenced documents.

287. Colin Drummond was aware of numerous complaints on Yelp and Google about AFS. [PX 71, AFS0507158 (App. 02880); PX 72, AFS0507576 (App. 02801); PX 89, AFS0588977 (App. 02867); PX 75, AFS0521315 (App. 02812); PX 98, AFS0589462 (App. 02892-84).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Drummond was aware complaints had been made on Yelp and Google platforms about AFS. AFS expressly denies the admissibility and veracity of the complaints referenced therein.

288. Colin Drummond informed Satell on September 7, 2018, that PBP had (1) 1 star on Yelp from 42 reviews, and 1 star on Consumer Affairs from 182 reviews; and that (2) PBP's star average on Google had increased from 2.4 to 3.7 stars in the last two months as a result of AFS asking customers to post 5 star reviews. [PX 35, Ex. 95 (App. 02337-2342).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that on September 7, 2018 Drummond sent an email to Satell. AFS denies Plaintiffs incomplete characterization of the referenced document, which is in writing and speaks for itself. *See* referenced document. AFS further denies Plaintiffs' alteration of the referenced document, which includes annotations that are not contained within the original document produced by AFS in this litigation.

289. AFS's Head of Quality Control Michelle Klingbell recognized in June of 2018 that AFS has "like a zillion sh**ty reviews on yelp" and "[Colin Drummond's] trying to figure out how to fix it." Klingbell further admitted, "it's not just yelp, it's the BBB and google and

like everywhere else [on the] internet u could possible [sic] post something." [PX 112, AFS0653228 (App. 02937); PX 5, 21:7–17 (App. 00234) (Klingbell title).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' unsupported characterization of Klingbell's state of mind. *See* referenced document. AFS further denies the admissibility or veracity of the complaints referenced therein.

290. In December 2018, Colin Drummond announced his recent efforts to "improve [AFS's] online reputation" by "soliciting our paid subscribers to post 5 star reviews of our publications on Google and Yelp." [PX 52, AFS0399498 (App. 02688).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' unsupported characterization of the referenced document, including the assertion that the referenced text was part of Drummond's "recent efforts." *See* referenced document.

291. In October 2019, Colin Drummond reiterated his plan to "improve our google and Yelp reviews on CEEL to get ready for all the invoicing we will be doing in the next 3 to 6 weeks on CEEL." [PX 94, AFS0589271 (App. 02882).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' unsupported characterization of the referenced document, including the assertion that the referenced text was part of Drummond's "plan." *See* referenced document. By way of further response, the FTC's own draft guidance supports the ability of companies to seek positive online reviews from customers, see 16 CFR Part 465: Trade Regulation Rule on the Use of Consumer Reviews and Testimonials (ftc.gov). Moreover, Yelp has more recently removed all reviews of AFS, consistent with its policy of limiting its reviews to consumer-facing business and not reviewing business-to-business companies.

292. For example, in a 2020 email response to a consumer who cancelled their "subscription," Colin Drummond wrote, "If you feel we took care of your customer service inquiry promptly and expertly please feel free to give us a 5 Star Review!" and included a link to AFS's CEEL Yelp review page. [PX 65, AFS0456176 (App. 02776).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of the content of that document, which is in writing and speaks for itself. Specifically, Plaintiffs have provided an incomplete exhibit without its referenced attachment, providing important context for the interaction at issue. Exhibit GG, AFS0456176—77 (which includes Drummond's attachment of a prepaid postage shipping label emailed to the subscriber for the return of the CEEL publication received). *See also* AFS's Response to Paragraph 122, above.

293. Colin Drummond wrote to another consumer who cancelled an AFS subscription, "We'd appreciate if you'd consider writing a favorable 5 Star review on our CEEL Google Review Page or CEEL Yelp Review." [PX 91, AFS0589144 (App. 02872).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

294. Colin Drummond also advised one consumer to "consider posting a positive review on how quickly we helped you your [sic] cancellation... it will help other school districts with the process!" [PX 92, AFS0589209 (App. 02875).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

295. In response to one of Colin Drummond's emails soliciting a 5-star Yelp review, a consumer responded, "I wouldn't feel comfortable giving a 5 star review as my teacher feels that there was some deceptive practices in the company's sales practices." [PX 88, AFS0588968 (App. 02861).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of the content of that document, which is in writing and speaks for itself. *See* referenced document. Specifically, Plaintiffs have provided an incomplete recitation of the subscriber's response, which goes on to state: "I would be more than happy to share with your manager how pleased I was working with you if you would like to share their contact information. You have been very helpful and professional." *Id.*

296. Colin Drummond repeatedly asked consumers to "amend" their negative reviews. [PX 90, AFS0589032 (App. 02869); PX 96, AFS0589314 (App. 02887).]

**RESPONSE:** Denied. AFS denies the referenced documents support the statement contained within Paragraph 296. *See* referenced documents. Specifically, the two documents cited by the Plaintiffs do not support the proposition that Colin Drummond "repeatedly asked consumers to 'amend' their negative reviews." *Id*. In one email, Mr. Drummond says, "[i]f you wish to amend your review after this discovery…that would be great, if not I understand." *Id*. In the second email, Drummond is communicating internally to Haney, an AFS customer service representative, not a subscriber. *Id*.

297. In 2019, Colin Drummond began inducing consumers to leave positive reviews by offering "all new positive reviewers" the opportunity to be entered into a "$100 Visa card raffle." [PX 97, AFS0589372 (App. 02889).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' mischaracterization of the referenced document, which is in writing and speaks for itself. *See* referenced document. Specifically, AFS denies the referenced document supports Plaintiffs' proposition that the purpose of the raffle was to "induc[e] consumers to leave positive reviews." *Id.*

298. Subscribers who completed a survey were offered the chance to win a $100 Visa card, "all [they] have to do is give us a 5 star review at one of the review sites below and your in!" [PX 64, AFS0455782-85 (App. 02771).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' generalized mischaracterization of the referenced document, which is in writing and speaks for itself. *See* referenced document. By way of further response, this particular subscriber not only left a 5 star review of AFS but wrote back to Drummond stating his company has never had a problem with AFS's billing practices and that he expressly understood AFS's cancellation policy ("If we didn't want the publication that you sent a trial issue for, I wrote 'cancel' on the bill and sent it back."). *Id*.

299. Colin Drummond also unsuccessfully attempted to remove consumer reviews from Yelp. [PX 87, AFS0588382 (App. 02859); PX 196, AFS0509544 (App. 04108).]

**RESPONSE:** Denied. AFS denies the referenced document indicates who, if anyone, requested the specific Yelp reviews being discussed to be removed, let alone Drummond. *See* referenced document. AFS further denies the referenced documents indicate why particular Yelp reviews were scrutinized by Yelp, much less indicate whether Drummond was ever successful at removing the referenced reviews. *Id*.

300. AFS customer service representatives would apologize for miscommunication and close an account "if a customer would call right out the gate threatening that they're going to call the cops on us, the FBI…They're going to report us to every agency that they can possibly think of reporting us to. We would, of course, not want them to go and report us to someone." [PX 16, 35:15–36:12 (App. 00639-0640).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

301. If a customer threatened to report AFS to the Better Business Bureau, customer service would try to reduce the likelihood of reporting. [PX 16, 36:13–37:13 (App. 00640-0641); PX 35, Ex. 57 (App. 02185); PX 35, Ex. 158 (App. 02405); PX 35, Ex. 164 (App. 02406); PX 35, Ex. 166 (App. 02407).]

**RESPONSE:** Denied. AFS denies the referenced documents support Plaintiffs' blanket proposition that AFS took any action with the sole purpose of reducing the likelihood of reporting to the BBB. *See* referenced documents.

302. In 2017, AFS assigned Jenn Rann to the position of Customer Service Specialist to work closely with two other AFS employees "taking on people who have filed a more serious complaint – either via email to us or in some other way." Her goal was to "handle the complaint in such a way that it does not escalate further – hopefully lowering [AFS's]

company complaint level and improving our Reputation Management." [PX 105, AFS0640339-40 (App. 02916).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

303. Mike Gorton, AFS's former Administrative Director of Call Center Operations, instructed AFS's customer service representatives "Reputation Mgmt is now more important than any other factor in your job," "if they say BBB or AG – do your best to try and stop that complaint." [PX 104, AFS0639857 (App. 02914).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

304. AFS instructed telemarketers to inform branch managers when consumers threatened to report AFS to the BBB, attorneys general, or to take legal action. [PX 9, 89:3–22 (App. 00367).]

**RESPONSE:** Admitted.

305. In 2016, Lisa Kott followed up, at the request of Gorton, with the local police because "they are getting all these complaints from companies that we are scammers." [PX 108, AFS0644158 (App. 02925).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaints referenced therein.

306. In 2019, a customer service employee wrote that she was uncertain about cancelling a consumer's subscription who "said she called the BBB" and "knows it's a scam." The customer service employee was told "no, you should have if they say bbb." [PX 115, AFS0698185 (App. 02943).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaints referenced therein.

307. AFS's net revenue from telemarketing and CEEL renewals between 2016 and 2021 was $24,734,172 calculated as follows:

| **Year** | Revenue received by AFS for new | Revenue received by AFS from any collection agency | Revenue received by AFS for orders renewed pursuant to | Revenue received by AFS from any collection agency for orders |
|---|---|---|---|---|

| | telemarketing orders of books or newsletters | for new telemarketing orders of books or newsletters | the CEEL book renewal process described in paragraph 24 of AFS's answer | renewed pursuant to the CEEL book renewal process described in paragraph 24 of AFS's answer |
|---|---|---|---|---|
| 2016 | $4,107,781 | $3,067,097 | $275,830 | $182,785 |
| 2017 | $3,108,289 | $2,638,884 | $271,596 | $172,110 |
| 2018 | $2,440,984 | $1,621,602 | $390,814 | $0 |
| 2019 | $1,895,971 | $965,716 | $379,424 | $0 |
| 2020 | $1,141,468 | $682,113 | $275,703 | $0 |
| 2021 | $755,041 | $182,234 | $178,730 | $0 |
| **Total** | **$13,449,534** | **$9,157,646** | **$1,772,097** | **$354,895** |

[PX 19 ¶¶ 14–15 and Ex. 15 & 16 thereto (App. 00911-912, 01175-78, 01185-88).]

**RESPONSE:** Denied. AFS denies the chart set forth in Paragraph 307 or the referenced documents support the statement that the amounts listed above are AFS's "net revenue" from telemarketing and CEEL renewals between 2016 and 2021. *See* referenced documents. Specifically, Plaintiffs have mischaracterized the categories of revenue and their applicability to "net revenue." *Id.* Furthermore, Plaintiffs have failed to make adjustments to the revenue figures (e.g., adjusting for overhead and variable costs), which would be an essential part of any calculation of net revenue earned by AFS from its telemarketing business. The evidence in the record demonstrates that the profitability of AFS's telemarketing business declined for several years and that it sustained losses prior to its termination in September 2021. *See* AFS S.J. Br. at Exhibit X, Devor Rpt. at 8 (including corresponding exhibits); Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; AFS S.J. Br. at Exhibit Z ¶ 5 (Sworn Statement of Colin Drummond); AFS S.J. Br. at Exhibit Y, Devor Dep. at 176:20–177:11. AFS also objects to the extent Plaintiffs purport to relate the amounts set forth in this Paragraph to the amount of any money or property that a person is entitled to be "restored" within the meaning of the UTPCPL. There is no such relationship, as demonstrated by the testimony of the Commonwealth's 30(b)(6) representative. Exhibit EE, Oleckna Dep. at 242:4—244:22; 266:10—268:16.

308. Consumers agreed to pay for subscriptions that they did not order, some from their own pockets:

- "[T]hey said I had until the end of the day to pay the $299 or I will lose my job . . . [s]o without thinking I paid the $299 with my personal credit card" and "I hope to god BBB and others shut this business down. Or possibly the Federal

Government jails the entire company, management, and staff." [PX 158, FTC-PBP-0005627-29 (App. 03063).]

- "I will be happy to pay for the subscription up to this point. I do not want your subscription and I find it very disturbing and unprofessional to threaten a governmental agency with collections, seriously?" [PX 82, AFS0526186 (App. 02836).]

- "I received a letter from a collections business that the city I work for owed your company $400.00. My administrators are not happy as this money was not in the budget. I was unaware during my phone call that I was going to be billed, I was under the impression that I was going to be receiving some material to review and see if it met any needs we may have and then I would be able to subscribe. . . It is my belief that I was mislead [sic] and that this is not good business practice. Who do I need to speak with about being refunded the $400.00 that I we [sic] had to pay to collections?" [PX 67, AFS0482260 (App. 02784).]

- "I think I was misinformed about a trial offer and if these have come to the school through district mail, I did not know what they were. I will pay the fee. I do not agree with it." [PX 78, AFS0523822 (App. 02822).]

- "I spoke with my superintendent and she still feels like she did not order this. However, she has instructed me to pay the invoice anyway." [PX 79, AFS0524577 (App. 02824).]

- "When this was 'ordered' I repeatedly told your sales rep I was not able to purchase anything for the school without prior approval and a purchase order. She insisted that I accept the book on a trial period, and sent it anyway. . . . I am willing to pay the invoice out of pocket, to defer collections to my school district[.]" [PX 81, AFS0525071 (App. 02833).]

- "I will gladly cover the cost of this scam and will need a receipt of this transaction for my records." [PX 73, AFS0516044 (App. 02806).]

[PX 8, 46:14–24 (App. 00334); PX 29 ¶ 17 (FTC-00000134-137) (App. 01982); PX 27 ¶¶ 13–14 (FTC-00000093-128) (App. 01935); PX 34 ¶ 10, FTC-00020561 (App. 02041).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced documents. AFS expressly denies that the extracted text, comprised of unverified and inadmissible complaints, supports the statement that AFS's subscribers "agreed to pay for subscriptions that they did not order, some from their own pockets." *Id.*

309. AFS instructed JSD and ICR to accept personal payments from consumers and ICR accepted personal payments. [PX 11, 93:6–94:3, 97:19–98:11 (App. 00405-408); PX 175, PBP004568 (App. 03161).]

**RESPONSE:** Denied. AFS denies the referenced documents provide support for the statement contained in Paragraph 308, including any indication that AFS provided any such instruction. *See* referenced documents. To the contrary, AFS did not provide specific instruction to its debt collectors on how to operate their business. Exhibit A, Drummond Dep. Vol. II at 361: 23—362:19.

310. Consumers described the experience as "time consuming," "cumbersome," "stressful" and/or "frustrating" [PX 13, 66:21–67:17(App. 00479-480); PX 8, 55:16–24 (App. 00335); PX 33 ¶ 11, FTC-00035362 (App. 02031); PX 51, AFS0396823 (App. 02686); PX 191, PBP039252 (App. 03968).]

**RESPONSE:** Objection. AFS objects to the phrase "the experience" as overbroad, vague, and ambiguous. Specifically, it is not clear what "experience" is being referenced in this context and who may or may not be involved in said "experience." By way of further response, AFS admits that the extracted text appears in the referenced documents. AFS denies that the words in isolation, stripped of any context, are relevant to the instant action or that the allegations in the above-cited documents are accurate or admissible.

311. One high school wrote: "We have NEVER, nor has anyone from our school ever ordered anything from your company. We have in the past 2 years RETURNED at least (3) three different books and have subsequently been billed and sent 'Collections' notifications. All of which is very time consuming on our part." [PX 51, AFS0396823 (App. 02686).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaint referenced therein.

312. Another consumer complained that she remembered "giving [AFS] my email to send me more information," but then began receiving collection calls from ICR:

> ICR has made it a habit to call us way more than a couple times a week, saying there was a verbal agreement, there is no proof. I would like to have myself and our team focus on things that actually matter. With these kind of phone calls coming through, a normal workday can be hard to get through, as well as making it hard for our residents family members to get through to us. They insist that we pay $295.00 for something they cannot prove. When I suggested them sending information to us so that we could send it our legal department, the lady stated she wouldn't bother with us and would go ahead and send it to collections. Cynthia Thomas From International Credit Recovery Inc has made my life at work more complicated than I could ever imagine. Someone needs to do something about this.

[PX 25, FTC-00000064-70 (App. 01908-1914), Attachment A (App. 01911-1912).]

**RESPONSE:** Admitted in part, denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaint referenced therein.

313. One consumer sent an invoice to AFS for time spent discontinuing an unauthorized "subscription." [PX 162, FTC-PBP-0010559-60 (App. 03074).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced document, which is in writing and speaks for itself. *See* referenced document. Specifically, the term "unauthorized 'subscription'" appears nowhere in the referenced document. *Id*. The referenced document contemplates a publication subscription that was in fact ordered by an employee of the complaining business. *Id*. Moreover, the alleged invoice annotates "review of publications." *Id*. at FTC-PBP-0010560.

314. Consumers also incurred the cost of postage to return CEEL books in order to cancel. [PX 15, 355:2–358:5 (App. 00623-626); PX 6, 306:14–308:7 (App. 00317-319).]

**RESPONSE:** Denied. AFS denies the referenced testimony supports the statement made by Paragraph 314. *See* referenced documents. In fact, the first referenced document includes testimony by Satell specifically testifying that AFS would pay the postage charge for subscribers to return CEEL books. PX 15, 355:2–358:5 (App. 00623-626). The second referenced document includes testimony by Haney, an AFS customer service representative, that AFS would cancel CEEL publication subscriptions under certain circumstance where AFS did not receive the book back from the subscriber. PX 6, 306:14–308:7 (App. 00317-319); PX 6, 17:2–6 (Haney title) (App. 00262). By way of further response, AFS's subscribers were told at the time of the solicitation they could "stick the reference book back in the envelope in which it came and send it back to [AFS]." PX 185, FTC-00020463, #4 (App. 03948). Second, there were instructions contained within the Welcome Letter each subscriber received, that if they "wish to cancel, mark cancel on the invoice and return it [AFS] with the book." *Id*. Third, subscribers could "return the book by placing it back in the envelope in which it came with no postage, the UPSP will typically mark 'refused return to sender' on the envelope and [AFS] will be charged for the return." *Id*.; Exhibit S, Haney Dep. at 305:14—307:14. Alternatively, if a subscriber contacted AFS and requested a return label, it would be provided to them "automatically", in whatever manner was most convenient for the subscriber. *Id*. For example, (i) a link to a return label could be emailed to the subscriber; (ii) a customer service agent could read the website URL off to the subscriber over the phone for them to access the return label online; (iii) the return label could also be faxed to the subscriber; or (iv) a hard copy could be mailed to the subscriber. *Id*.; Exhibit A, Drummond Dep. Vol. II at 270:9—271:5; Exhibit BB, Schwenk Dep. at 88:21—14.

315. AFS is wholly-owned by Ed Satell [PX 183, FTC-00020334 (App. 03926)] and PBP-NJ was wholly-owned by Ed Satell. [PX 35, Ex. 96, FTC-00020398 (App. 02345); PX 15, 143:24–144:4 (App. 00560-561); ECF 91 ¶ 11.]

**RESPONSE:** Admitted.

316. PBP-NJ was created for tax purposes to handle AFS's New Jersey sales, and when New Jersey changed its ruling regarding taxes, PBP-NJ was dissolved. [PX 14, 95:8–24 (App. 00499); PX 15, 144:17–21 (App. 00561).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the testimony contained within the referenced documents. *See* referenced documents. Specifically, Satell did not provide any testimony regarding "New Jersey changed its ruling regarding taxes." *Id*.

317. The only distinction between AFS and PBP-NJ was for tax purposes. [PX 14, 128:23–129:6 (App. 00502-503).] PBP-NJ and AFS's sales and accounting practices were identical. [PX 15, 148:3–25 (App. 00563).]

**RESPONSE:** Objection. AFS objects to the statement made in Paragraph 317 as vague and overboard. By way of further response, there were many similarities between the two offices as discussed in the Paragraphs below. However, AFS denies the "only distinction" between the two "was for tax purposes."

318. The functions performed at PBP-NJ were the same as those performed at AFS's other telemarketing branch locations. PBP-NJ had one branch, located in Woodbury, New Jersey, from which it telemarketed AFS's newsletters and books using the same scripts used by AFS's telemarketing branches. [PX 14, 128:15–22 (App. 00502); PX 35, Ex. 96, FTC-00020397-98 (App. 02344-2345); PX 15, 144:22–145:2 (App. 00561-562).]

**RESPONSE:** Objection. AFS objects to the statement made in Paragraph 318 as vague and overboard. By way of further response, there were many similarities between the two offices as discussed in the Paragraphs below. However, AFS denies all "functions were the same."

319. AFS provided PBP-NJ's executive management, payroll and benefits, and certain telemarketing sales support and administrative services, including sales leads and sales reporting. [PX 35, Ex. 96, FTC-00020398 (App. 02345).]

**RESPONSE:** Admitted.

320. AFS provided PBP-NJ's customer service and quality control. [PX 16, 87:10–88:9 (App. 00656-657.).]

**RESPONSE:** Admitted.

321. AFS and PBP-NJ had identical officers, including Ed Satell who was CEO of both companies. [PX 35, Ex. 96, FTC-00020398 (App. 02345); PX 183, FTC-00020334 (App. 03926); PX 15, 143:24–144:4 (App. 00560-561); ECF 91 ¶ 11.]

**RESPONSE:** Admitted.

322. AFS and PBP-NJ shared the same headquarters or principal place of business in Malvern, Pennsylvania. [ECF 43 ¶¶ 9-10; ECF 91 ¶¶ 9-10.]

**RESPONSE:** Admitted.

323. Satell could hire and fire people at both AFS and PBP-NJ. [PX 15, 145:15–20 (App. 00562); PX 1, 408:8–11 (App. 00168).]

**RESPONSE:** Admitted.

324. Satell testified that he decided to stop telemarketing newsletter and book subscriptions in September of 2021, and that he has the authority to restart telemarketing activities if he ever feels AFS should invest in that again. [PX 15, 26:4–12, 27:4–9 (App. 00533-534); PX 35, Ex. 18 ¶ 5 (App. 02148).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that as of September 3, 2021, AFS ceased all outbound telemarketing for the sale of any newsletter, publication, or book. PX 35, Ex. 18 ¶ 5 (App. 02148). AFS further admits that Satell testified that he made the "final decision" to stop telemarketing newsletters and book subscriptions. PX 15, 26:4–12 (App. 00533). AFS expressly denies the referenced documents support the statement that Satell "has the authority to restart telemarketing activities if he ever feels AFS should invest in that again." Specifically, Satell testified as follows:

> Q: Do you have the authority to restart telemarketing activities at AFS?
>
> A: Well, I'm interpreting that as do I have the legal authority to do that. And the answer is, I have the legal authority to anything that I want that's legal.

PX 15, 26:27:4–9 (App. 00534).

325. AFS no longer uses the fictitious names Progressive Business Publications or Center for Education and Employment Law in advertising its products. [PX 1, 193:9–24 (App. 00096).]

**RESPONSE:** Denied. AFS denies the referenced testimony supports the statement contained in Paragraph 325. *See* referenced document. Specifically, Drummond testified that AFS is "not using Progressive Business Publications anymore because we stopped the activity" and "we're not selling [CEEL publications] anymore either." *Id*.

326. Instead AFS uses the fictitious name SuccessFuel or AFS markets its products using the name of the product, such as HR Morning. HR Morning is not a registered business entity or fictitious name in Pennsylvania. [PX 15, 118:12–14 (App. 00555); PX 1, 170:13–19, 193:25–194:2-7 (App. 00083, 00096-97); PX 6, 24:5–12 (App. 00267); PX 19 ¶¶ 9, 10(g), 11 and Ex. 13 thereto (App. 00908-910; App. 01094-96).]

**RESPONSE:** Objection. AFS objects to the term "products" as vague and ambiguous in this context, insomuch as it is not clear what products Plaintiffs are referring to. AFS does admit that it officially registered "Successfuel" as a registered fictious name of AFS on September 20, 2021. PX 35 (App. 01094). AFS denies that "SuccessFuel" includes the publication business. PX 15, 118:12–14 (App. 00555). AFS further admits that it did not register its "HR Morning" digital

experience platform as a business entity or fictious name in Pennsylvania. Without understanding what "products" are being referenced, AFS denies any of the referenced documents support the statement that "AFS markets its products using the name of the product, such as HR Morning." *See* referenced documents.

327. AFS is being "careful that SuccessFuel does not get any" complaints and is letting Progressive Business Publications "absorb the complaints." [PX 6, 261:22–268:7 (App. 00299-306); PX 35, Ex. 173 (App. 02410-2411).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted text appears in the referenced document. AFS denies that it has a policy or practice of "being 'careful that SuccessFuel does not get any' complaints and is letting Progressive Business Publications 'absorb the complaints.'" Specifically, none of the cited documents support any such inference. *See* referenced documents.

328. Defendants have long recognized that AFS has a poor reputation and have talked about "rebranding." [*infra* FACTS 329-335.]

**RESPONSE:** Admitted in part, denied in part. *See* AFS's Response to Paragraphs 329—335 for specific admissions and denials.

329. In an October 7-9, 2016 email exchange, Satell and Drummond discussed the ramifications of AFS's poor reputation as it affected several areas of AFS's operations.

- First Satell wrote: "Colin, Have you given thought to the idea of a separate name for tele[marketing] so we could contain the reputation issue. A problem is we introduce the company name at the out set or do we use the pub name. If we do this what would you recommend? New name, script. Etc. Let me know."

- Drummond responded, "We only use [ceel or pbp] in the first 10 seconds of the [telemarketing] call and I never hear customers or reps asking about what company we work for. If they do The rep identifies says they are from The name of the newsletter."

- Next, Drummond said that AFS's online reputation hurt recruiting of telemarketers, so AFS would "recruit under pb [sic] institute or pbp media"; and

- Finally, Drummond discussed whether AFS could "test billing and envelopes under different name and see if it improves pay up" because AFS would "get written cancels with comments about them looking us up online and being alarmed with what other customers are saying."

[PX 35, Ex. 15 (App. 02142).]

**RESPONSE:** Admitted in part, denied in part. AFS admits on October 7 and 9, 2016, Drummond and Satell sent emails to one another. AFS further admits the extracted text appears

in the referenced document. AFS denies Plaintiffs' multiple mischaracterizations of this exchange, which is writing and speaks for itself. *See* referenced document.

330. On September 7, 2018, Drummond told Satell, "I am finding that the only way to get completely out of the shadow of the poor PBP online reputation is to re-brand." [PX 35, Ex. 95 (App. 02337-2342).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that on September 7, 2018 Drummond sent an email to Satell, which includes the extracted text. AFS denies Plaintiffs incomplete characterization of the referenced document, which is in writing and speaks for itself. *See* referenced document. AFS further denies Plaintiffs' alteration of the referenced document, which includes annotations that are not contained within the original document produced by AFS in this litigation.

331. In June 2018, Satell hired an outside Public Relations professional, Anna Adams-Sarthou. [PX 15, 42:6–13, 44:9–10 (App. 00538-539).]

**RESPONSE:** Admitted.

332. Ms. Sarthou drafted a statement for Drummond that says, "We respect that there are those who may not be pleased with our company and we are very sorry about that. It is within their right to post their feelings on Internet sites, however, in many of these instances, there is a misunderstanding of how our cancellation policy works. To be clear: our services are based on an 'opt-out' method, which is communicated up front, at the time orders are placed." Ms. Sarthou sent this draft statement to Satell, Drummond and other AFS employees on June 14, 2018. [PX 35, Ex. 92, AFS0431462, AFS0431464 (App. 02326, 02328).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

333. In March 2020, Curt Brown, AFS's Editorial Director, told another PBP employee, "[Drummond] has talked about using CEEL for some of the PBP pubs because of PBP's reputation." [PX 1, 137:7–9, 138:3–141:9 (App. 00059, 00060-63); PX 35, Ex. 16 (App. 02143).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

334. In December of 2021, AFS did not want to tarnish the reputation of its new name SuccessFuel, so AFS encouraged its employees to use a separate mailing address from what was used for PBP. [PX 16, 66:16–68:5 (App. 00648-650) discussing PX 35, Ex. 319 (AFS0589657) (App. 02590).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it took strategic steps to protect and delineate between its brands. *See* referenced documents. AFS denies the remainder of the mischaracterizations set forth by Plaintiffs in Paragraph 334, which are unsupported by the referenced documents. *Id*.

335. In October 2022, an AFS employee wrote that he wants "to put a more deliberate plan in place to manage the [SuccessFuel] brand," stating that, "[t]his profile is fairly clean right now, but if it goes the way our Progressive Business Publication Glassdoor page went, it can kill us. Fortunately, we shouldn't have the volume of telemarketers posted on there calling the company a scam telemarketing company." [PX 135, AFS1032696 (App. 20989).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

336. AFS still monetizes outbound calling, employs telemarketing employees, and uses telemarketing call lists in its present operations:

**RESPONSE:** AFS objects to this Paragraph as impermissibly compound and will respond to each sub-part separately. AFS expressly denies Plaintiffs' mischaracterization of the below referenced document. The undisputed testimony is that AFS has ceased all outbound telemarketing sales calls, no longer prints or sells its newsletters or books, and has retired for nearly two years any use of the challenged executive script. *See* AFS's S.J. Br. at Exhibit X, Devor Rpt. at 8; AFS's S.J. Br. at Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; AFS's S.J. Br. at Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 5; Exhibit L, Townsend Dep. at 249:3–5.

a) AFS has lines of business that sell products over the telephone, including calling people to see if they want to order more AFS minimum wage and safety posters and to cross-sell to those customers. [PX 1, 176:18–177:22, 180:5–181:21, 186:22–188:9 (App. 00089-90, 00091-00092, 00093-95).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(a), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. Moreover, AFS denies Plaintiffs' mischaracterization of the referenced testimony provided by Drummond, which is in writing and speaks for itself. *See* referenced documents.

b) AFS is engaged in the business of lead generation for which companies hire AFS to make outbound calls to get data. [PX 15, 351:10–352:13 (App. 00620-621).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(b), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. Moreover, AFS denies Plaintiffs' mischaracterization of the referenced testimony provided by Satell, which is in writing and speaks for itself. *See* referenced documents. *See also* PX 1, 166:9—167:3 (for a description of AFS's lead generation business).

c) AFS uses "lead development reps" operating under the name HRMorning to generate leads through telephone calls. AFS's lead generation team consists primarily of people whose prior roles at AFS were as telemarketers or telemarketing managers, including two AFS telemarketing branch managers, one

telemarketing morning manager, and six telemarketers. [PX 1, 169:2–174:11 (App. 00082-87).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(c), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS admits that it has a team of sales representatives that generate leads for other businesses through telephone calls. *See* referenced documents. A number of those representatives were previously employed by AFS in other capacities. *Id*.

d) AFS's lead generation team invites people to a free membership on a "digital experience platform" that also offers paid content, such as HR Morning. [PX 1, 162:25–167:5 (App. 00075-80); PX 1, 169:25–170:9 (App. 00082-83).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(d), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies Plaintiffs' mischaracterization of the referenced testimony, which is in writing and speaks for itself." *See* referenced document.

e) AFS calls companies that have accessed HR Morning, asks whether they are in the market for HR software, and if they answered affirmatively, these companies become a sales lead that AFS can sell to other companies. [PX 1, 166:9–167:12, 201:3–202:18, 209:12–214:22 (App. 00079-80, 00102-103, 00107-00112).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(e), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies Plaintiffs' mischaracterization of the referenced testimony, which is in writing and speaks for itself." *See* referenced document.

f) AFS advertises a database of 8.5 million leads on the SuccessFuel website. AFS generates leads by engaging in email campaigns, the "vast majority" of which are directed at "people [AFS has] done business with in the past," including previous telemarketing customers. [PX 1, 168:11–25, 197:17–198:15 (App. 00081, 00098-99); PX 35, Ex. 19 (App. 02149-2165).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(f), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies that the referenced documents support the statements made in Paragraph 336(f). *See* referenced documents. Specifically, AFS denies Plaintiffs' mischaracterization of the cited language contained above, insomuch as Plaintiffs have offered incomplete and out of context extracted words and phrases to assert a plainly misleading statement. *Id*. Drummond testified that AFS's lead generation business, which generates leads for outside clients (not AFS), is conducted through "e-mail campaigns or search engine optimization." PX 1, 168:11–25 (App. 00081). When asked where AFS gets the e-mails to use for the e-mail campaigns, Drummond testified as follows:

> A: The vast majority of them house lists of people that we've done business with in the past across our divisions. And some are

> purchased from, you know, vendors like Zoom Info and stuff like that.
>
> Q. Would the house lists include former subscribers to AFS publications that were secured through telemarketing?
>
> A. It could, yeah, uh-hum.
>
> Q. You said it could, but would it?
>
> A. Yeah, I would think so, yeah. I mean they would be part of the blend of customers. They would be in there, yeah.

PX 1, 168:11–25 (App. 00081)

g) On the SuccessFuel website, AFS advertises that its representatives make outbound calls on one of its business-to-business brands and introduces the client's company and campaign content asset to the prospect. [PX 1, 203:3–18 (App. 00104); PX 35, Ex. 19 (App. 02149-2165).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(g), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies Plaintiffs' mischaracterization of the referenced documents. *See* referenced documents. Specifically, AFS advertises that its representatives "could" make outbound calls on one of its business-to-business brands and introduces the client's company and campaign content asset to the prospect. *Id*.

h) Also on the SuccessFuel website, AFS advertise US-based lead development representatives, access to quality control offshore call center teams, and AFS also outsources lead generation to lead development representatives in other countries. [PX 1, 197:17–201:15 (App. 00098-102); PX 35, Ex. 19 (App. 02149-2165).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(g), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies Plaintiffs' mischaracterization of the referenced documents. *See* referenced documents. Specifically, PX 35, Ex. 19 (App. 02152), which states:

> SuccessFuel's B2B Content Syndication Program Benefits
>
> …
>
> Fully managed U.S. based lead development reps (LDRs) and access to thoroughly vetted, quality controlled offshore call center teams for international campaigns, and to accommodate lower costs, increased volume and velocity campaigns with quick turn around times.

PX 35, Ex. 19 (App. 02152).

i) AFS still accepts orders for its newsletters and books online or over the telephone, such as Environmental Compliance Alert and AFS's CEEL products, some of which are now in a digital format, which is less expensive than printing them. [PX 15, 336:24–337:12, 337:20–24, 340:16–341:13 (App. 00616-619); PX 1, 162:13–24, 165:3–6 (App. 00075; 00078); PX 6, 256:11–257:8 (App. 00297-298).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it will still accept renewals of certain publications still being produced online or allow an existing subscriber to add to their order, over the telephone. *See* referenced documents; PX 1, 158:8—159:17. However, typically, if subscribers want to renew these publication "they just renew online," AFS doesn't utilize "telemarketing for [renewals]." PX 1, 162:13–24. AFS also admits that any of its publications still in existence, with most being phased out by December 2023, are being produced digitally, not in hard copy form. PX 15, 336:24–337:12, 337:20–24, 340:16–341:13 (App. 00616-619); Exhibit A, Drummond Dep. Vol. I at 160:17—162:6. AFS further admits that it no longer publishes any available publications in hard copy form, during this "grace period" where it is still servicing its existing subscribers with active subscriptions. *Id*. AFS further admits digital publications are less expensive to produce than printed publications. *Id*. AFS denies Plaintiffs' mischaracterization of the referenced testimony to infer that AFS still publishes all of its newsletters and books and accepts new orders, which is not supported by the referenced documents. *See* referenced documents.

j) AFS uses the people who researched and wrote the hard copy newsletters to write the digital content that it provides to subscribers. [PX 1, 174:12–175:11 (App. 00087-00088).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that once AFS's stopped producing and selling its print publications, AFS's editorial team – comprised of "experts in the field of HR, finance, safety and general management," "lawyers," and "professors of law" – transitioned to writing digital content. *See* referenced documents. AFS denies Plaintiffs' mischaracterization of the referenced documents. Specifically, that the digital content produced by AFS's editorial team is only provided to AFS's remaining publication subscribers. *Id*.

k) AFS continues to service subscribers who seek to renew or add to previously ordered publication subscriptions, including contacting them by telephone. [PX 1, 33:11–13, 158:8–25, 159:2–17 (App. 00013; 00073; 00074); PX 35, Ex. 18 ¶ 6 (App. 02148).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that it will still accept renewals of certain publications that are available digitally and allows an existing subscriber to add or modify their subscription over the telephone, while those publications are being phased out. PX 1, 33:11–13, 158:8–17 (App. 00013; 00073; 00074); PX 35, Ex. 18 ¶ 6 (App. 02148). PX 15, 336:24–337:12, 337:20–24, 340:16–341:13 (App. 00616-619); Exhibit A, Drummond Dep. Vol. I 160:17—162:6. AFS denies that it proactively seeks any new subscriptions by telephone. *Id*.

l) AFS's poster business includes a feature where AFS automatically sends out new posters when there is a change in regulations. [PX 1, 181:13–21 (App. 00092).]

**RESPONSE:** AFS objects to the statements made in Paragraph 336(l), which involve other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies Plaintiffs' mischaracterization of the referenced testimony. Specifically, Drummond testified that customers of AFS's poster business – which produces laminated posters typically seen in a break room featuring topics like minimum wage laws or safety alerts – can purchase an additional service "where any time there's any changes in regulation, [AFS] will automatically send out a new poster for you for no extra cost." PX 1, 181:13–21 (App. 00092).

m) AFS still employs many people that were involved in AFS's telemarketing of publications:

i. Drummond still works for AFS and still reports to Ed Satell. [PX 1, 7:5–8, 245:24–246:2 (App. 00003; 00118-119).]

ii. AFS's chief editor of the publications Curt Brown still works at AFS. [PX 6, 231:6–12 (App. 00291).]

iii. AFS still employs Heather Wood, who used to lead the customer service team. [PX 6, 27:3–16 (App. 00270).]

iv. AFS still employs Denise Haney, who handles customer service for the publications. [PX 6, 24:3–8 (App. 00267).]

v. AFS still employs at least two AFS telemarketing branch managers, one morning manager, and six telemarketers. [PX 1, 169:18–174:11 (App. 00082-87).]

**RESPONSE:** Admitted.

n) Some AFS employees currently have email addresses for both PBP and Successfuel, e.g. dhaney@pbp.com and dhaney@successfuel.com. [PX 6, 32:24–33:3, 262:11–263:1 (App. 00271-272, 00300-301).]

**RESPONSE:** Admitted in part, denied in part. AFS admits Haney testified she had two email addresses, dhaney@pbp.com and dhaney@successfuel.com. *See* referenced document. AFS denies the referenced document supports the statement that other AFS employees currently have email addresses for both PBP and Successfuel, and it is therefore denied. *Id*.

337. AFS's employees describe a culture of lies, deceit, trickery and scamming at AFS:

a) In 2019, in discussing an employee's exit interview, customer service representative Rann wrote "all she is doing is making sure you don't put a bad review on yelp…this company lives and dies by yelp reviews...or reveal their SCAM." [PX 121, AFS0701795 (App. 02958).]

b) In 2020, customer service representative Melissa Schwenk stated that "Colin [Drummond] basically admitted to me how they use the word reference [guide] as to not use book," and customer service representative Lisa Kott agreed, noting that Mike Gorton previously "kept him in check" but now Drummond is "off the rails." [PX 114, AFS0696939 (App. 02941).]

c) In 2021, Rann wrote "I can tell you that between September and October of last year, nobody 'ordered this scam,'" and she "used to think the customers were liars, and some are, but after doing this for so long now, I firmly believe that people do send the book back, and we never record the return." [PX 122, AFS0702744 (App. 02960).]

d) In 2021, an employee wrote "I don't [like] to work for a company that pulls some crazy illegal sh*t every d*mn day" to which another AFS employee responded "yeah exactly. That's why I hate this job. I feel like I'm taking part in some illegal scam." [PX 132, AFS0724368–69 (App. 02982) (asterisks substituted).]

e) In 2020, an AFS employee wrote "its like scam after scam lol" and agreed that "COLD CALLS" are "exactly what it is." [PX 131, AFS0724046 (App. 02980).]

f) In 2020, an AFS employee wrote "I feel like I am being scammed while trying to scam others but it is what it is until I can find another work from home as the bills still need to be paid. . . . Such a weird feeling to have about a job." [PX 128, AFS0712370 (App. 02973).]

g) In 2021, an AFS employee wrote "I hate this job. It probably is a scam of some kind." [PX 126, AFS0704977 (App. 02969).]

h) In 2021, an AFS employee wrote "If we wanted a d*mn implied agreement we wouldn't trick the customer to say OK by ending the script with OK." [PX 130, AFS0715826 (App. 02978) (asterisk substituted).]

i) In a 2021 exchange, two AFS employees repeatedly referred to AFS's representations to consumers as "lies":

> J.W.: maria: we just lie about what we're gonna do
>
> J.W.: don't we all?
>
> R.M.: I was gonna say, that's our reader gen strategy!
>
> R.M.: pbp's whole business model
>
> J.W.: selling products? lies! writing stories? lies!
>
> R.M.: offering a "free" newsletter trial? LIES!

[PX 134, AFS0833580 (App. 02987).]

**RESPONSE:** Denied. AFS expressly denies Plaintiffs' outrageous mischaracterizations of the referenced documents, which are in writing and speak for themselves. *See* referenced documents. Even if such casual online "chats," between sales representatives and similar employees had any probative value, these statements reflect a rank mischaracterization of the full conversations. In one stark example, referenced in Paragraph 337(d) above, cites to an employee as complaining: "I don't [like] to work for a company that pulls some crazy illegal sh*t every d*mn day," to which another AFS employee responded "yeah exactly. That's why I hate this job. I feel like I'm taking part in some illegal scam." But these employees were not talking about anything of relevance to this case. Rather, the source document (AFS0724368, cited in Paragraph 337(d) above) shows that this comment was a telemarketing representative complaining to a colleague that a customer contact information included a personal cell phone number, not a work phone number, and that employee asserts this is "illegal." The rest of this document includes a highly inappropriate chat string between these sales representatives, who use explicit terms to rant about their life and job. This is hardly evidence of "deceptive" trade practices. By way of further response, the other citations fare no better and show just how far Plaintiffs will distort the record to advance their baseless claims of deception by AFS. First, the comments cited by Plaintiffs are in a context that expressly recognizes they are being "snarky" or tongue-and-cheek. *See, e.g.,* AFS0715826, cited at Paragraph 337(h) above. In several instances, the quoted sections are not employees reporting on their own opinions, but rather are criticizing customers for immediately assuming the service as a "scam," without giving them a chance to actually explain the offer. *See* AFS0724046, cited in Paragraph 337(e) above, (online chat between two AFS college interns complaining that customers respond to their cold calls with concerns that they are offering a "scam"). In another chat among two employees, prominently cited by the Plaintiffs, the full context makes clear that the chat exchange is making fun of a co-worker "Maria's" view of the world – that "Maria" is suspicious of the company, that Maria thinks everything are "lies," and then these coworkers berate her for being "socially awkward," and insinuating that she believes other conspiracy theories such that she "didn't get vaccinated" and is concerned about "5G." They joke that "we bullied her out of the company." *See* AFS0833580, cited in Paragraph 337(i) above. This is hardly probative of anything, and by its own terms does not reflect anyone's actual opinion, much less one that sheds any light on whether AFS's Script was deceptive.

338. Satell is the founder of AFS and has always been its CEO. He has been the sole owner of AFS for most if not all of the Relevant Time Period, prior to which he was the 98% owner of AFS. [PX 15, 14:24–16:13 (App. 00526-528); PX 14, 6:23–7:4, 126:3–13 (App. 00486-487; 00500); ECF 91 ¶ 11.]

**RESPONSE:** Admitted.

339. Satell, through AFS, has been in the publication business for over 30 years. [PX 14, 15:24–16:12 (App. 00488-489).]

**RESPONSE:** Admitted.

340. Satell has responsibility for AFS; he is the final decision maker and person in charge of AFS, and he signed off on significant policy changes. [PX 14, 126:24–127:8 (App. 00500-501); PX 15, 17:6–14, 78:25–79:7 (App. 00529, 00541-542); PX 35, Ex. 93 (App. 02333-2334).]

**RESPONSE:** Admitted in part, denied in part. AFS admits Satell testified that he is "the person in charge," the "final determinant," and would sign on significant policy changes. *See* referenced documents. AFS denies that the referenced documents support the statement that "Satell has responsibility for AFS." *Id*. AFS further objects to PX 35, Ex. 93 (App. 02333-2334), in that it was altered by the Plaintiffs to include annotations not in the original version produced by AFS in this litigation.

341. Satell describes his duties as "I'm the final determinant. I am the person in charge." [PX 14, 127:2–8 (App. 00501).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

342. Drummond reports to Satell, and Satell had the authority to terminate AFS employees, including Drummond. [PX 14, 127:9–13 (App. 00501); PX 1, 408:6–11; PX 15, 20:23–21:4 (App. 00530-531).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that Drummond reports to Satell and that Satell had the authority to terminate AFS employees. AFS denies Plaintiffs' mischaracterization of Satell's testimony regarding the potential firing of Drummond. PX 15, 20:23–21:4 (App. 00530-531). Specifically, Satell testified as follows:

> Q. Can you fire Colin Drummond if you want to?
>
> A. That is so circumstantial. I would not give a direct yes or no answer to that. Legally do I have the authority, yes. But there's much more involved than legality. There's practical matters; how it would affect the organization, how it would affect the subordinates, what it would be. You have to have humanity when you run an organization and you have to --
>
> Q. Have you ever --
>
> A. And you can never go ahead and have all power rest with one person.

PX 15, 20:23–21:4 (App. 00530-531).

343. In a March 2019 internal email, Drummond described himself to other AFS employees as "going 'Ed' on you with the micro-managing." [PX 54, AFS0405149 (App. 02697)]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

344. Drummond sent telemarketing "weekly recaps" to Satell that sometimes included a section on "online reputation" discussing improving AFS's poor online reputation; Satell replied to these recaps with comments. [PX 55, AFS0405579-82 (App. 02701); PX 35, Ex. 21 (App. 02166-2168); PX 99, AFS0589563 (App. 02895); PX 100, AFS0590870 (App. 02898).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that on occasion Drummond sent telemarketing "weekly recaps" to Satell that sometimes included a section on "online reputation." AFS admits that the referenced documents indicate Satell replied to the telemarketing "weekly recaps" on two occasions. AFS denies Plaintiffs' characterization of AFS's online reputation as "poor," nor do the documents cited support this inference, and it is therefore denied. *See* referenced documents.

345. Satell signed off on the Offer Paragraph and the Disclosure Paragraph many years prior to the Relevant Time Period, and he had the authority to draft language for AFS's sales scripts. [PX 1, 93:12–22 (App. 00039); PX 15, 25:13–16 (App. 00532).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that the referenced testimony asserts that Satell signed off on the Offer Paragraph and the Disclosure Paragraph many years prior to the Relevant Time Period and that Satell had the authority to draft language for AFS's sales scripts. AFS denies Plaintiffs' mischaracterization of this authority. Specifically, Plaintiffs have omitted material portions of Satell's testimony on this topic. PX 15, 25:13—26:3. In full, Satell testified that revisions to the script are "a collaborative thing," and that he would only exercise his authority to act unilaterally on certain occasions, such as when there was "an issue of law or an issue of practicality or an issue of values." *Id.*

346. Satell paid specific attention to the language used in sales scripts, as that was a core part of AFS's business, and the sales scripts were not supposed to be changed in any significant way without his approval. [PX 15, 25:13–20 (App. 00532); PX 14, 131:22–132:7 (App. 00504-505); PX 35, Ex. 91 (App. 02324-2325).]

**RESPONSE:** Admitted.

347. In response to Satell's June 2017 request, Satell was sent 2016 and 2017 sales scripts that stated that telemarketers were calling from "PBP," "What's Working in Human Resources" and "Environmental Compliant Alert." [PX 101, AFS0623408 and attachments (App. 02901-08).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

348. Satell did not require a review of secretary scripts to see if they included "no," in response to the question "are you selling something;" he did not terminate whoever drafted the secretary scripts containing an instruction to answer "no" in response to the question "are you selling something," and he did not even ask who drafted the scripts that contained such language. [PX 15, 165:21–167:9 (App. 568-69).]

**RESPONSE:** Denied. AFS denies Plaintiffs' express mischaracterization of Satell's testimony, including the omission of an entire page of testimony relevant to this topic (PX 15 goes from pg. 165 to 167, omitting pg. 166); PX 15, 165:21–167:9 (App. 568-69); Exhibit HH, Satell Dep. Vol. II at 165:21—167:19. Specifically, Satell testified that at one point he learned that a certain secretary script included the answer "no" to the question "are you selling something," but had no reason to suspect it was a "chronic problem." *Id*. In further response, Satell "spoke to the managers" and told them such a response was "not allowed." *Id*.

349. Satell listened to many hundreds of tapes of AFS sales calls and knew that AFS telemarketers were instructed to identify themselves as calling from the names of publications. [PX 14, 147:13–19 (App. 00506); PX 15, 31:17–32:5 (App. 00536-537).]

**RESPONSE:** Admitted.

350. Satell requested and received the language used in "confirmatory emails." [PX 35, Ex. 204 (App. 02419-2420).]

**RESPONSE:** Denied. AFS denied Plaintiffs' mischaracterization of the referenced document. Specifically, the referenced document includes a November 2015 exchange between Satell and Grabert, wherein Satell requests and Grabert provides examples of the first sentence of the "text only" email confirmation used at the time. *See* referenced document.

351. Satell knew that invoices included the language that "Our generous 60-day cancellation period has expired." [PX 15, 265:10–266:21 (App. 00599-600); PX 35, Ex. 46 (App. 02177).]

**RESPONSE:** Admitted.

352. Satell is "not really" concerned that invoices threatened service charges, even though AFS never imposed service charges. [PX 15, 269:7–270:19 (App. 00601-602).]

**RESPONSE:** Denied. AFS expressly denies Plaintiffs' mischaracterization of Satell's testimony. Specifically, Satell testified as follows:

> Q. Do you see the first line, "Please pay now to avoid service charges"?
>
> A. Yes.
>
> Q. Did AFS impose service charges?
>
> A. Not normally.
>
> Q. Did they ever?
>
> A. I don't know that we ever did.

> Q. Did you approve of this language?
> …
> A. I don't know that I did.
>
> Q. Do you have a concern that this language is in the invoice?
>
> A. Not really, because we accepted cancellations thereafter and as a courtesy to customers, we often did better than we advertised. We gave more time, not less.

PX 15, 269:7–270:19 (App. 00601-602) (objection omitted).

353. During the Relevant Time Period, Satell was aware of the second call, the purpose of it and in general what was said. [PX 1, 334:13–336:2 (App. 00150-152); PX 14, 158:3–5 (App. 00508).]

**RESPONSE:** Admitted.

354. Satell was aware of the CEEL book renewal procedures while it was happening. [PX 14, 161:18–164:2 (App. 00509-512): PX 15, 86:3–5, 86:17–90:7 (App. 00543-547).] In 2023, when Mr. Satell was asked repeatedly whether at the time consumers were sent the renewal books, the consumer had ordered them, he refused to give a yes or no answer, testifying: "I think it was our position that most would want the book and we sent it to them and we gave them -- if they weren't going – if they didn't want it, before we sent it, we sent them a card giving them the opportunity to say no, they didn't want it sent. And even after we sent it to them, they could cancel it." [PX 15, 90:15-25 (App. 00547).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted appears in the referenced document. AFS further admits that generally speaking, Satell was aware of the CEEL book renewal procedures while it was happening. PX 14, 161:18–164:2 (App. 00509-512): PX 15, 86:3–5, 86:17–90:7 (App. 00543-547). AFS expressly denies Plaintiffs' mischaracterization of Satell's testimony, insomuch as Satell did not "refuse[] to give a yes or no answer." ***Id***. Satell's deposition testimony is in writing and speaks for itself. ***Id***.

355. Since well before and during the Relevant Time Period, Satell had knowledge of the BBB's profile about AFS. [PX 15, 285:9–16 (App. 00609); PX 20 ¶¶ 12–15 (App. 01193-1194); *Am. Future Sys. v. Better Business Bureau*, 872 A.3d 1202, 1207 (Superior Court of PA 2005).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that since prior to the Relevant Time Period, Satell was aware of AFS's profile on the BBB website. AFS denies that the referenced documents provide support that "since well before and during the Relevant Time Period, Satell had knowledge" of the specific content of AFS's profile on the BBB website or the complaints included therein, and it is therefore denied. *See* referenced documents.

356. Satell was emailed by an AFS employee in 2016 that "[t]he BBB alert which named ICR and recommended reporting ICR and PBP to the NY AG [New York Attorney General]

has been removed from the ICR website. ICR's rating has also improved from an 'F' to a 'D' with the BBB." [PX 56, AFS0435534 (App. 02706).]

**RESPONSE:** AFS admits only that the extracted language appears in the referenced document.

357. Mike Gorton, AFS's former Administrative Director of Call Center Operations, brought a "huge box of actual complaints" to Satell in 2017 or sometime before. [PX 106, AFS0640773-74 (App. 02919).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the extracted language appears in the referenced document. AFS further admits in or before July of 2017, Gorton claims to have brought a box of complaints to Satell. AFS is without knowledge, nor do the referenced documents support, any confirmation is Gorton did in fact bring a box of complaints to Satell and if Satell ever received or reviewed any such complaints. *See* referenced document.

358. Drew Parenti, the Vice President for Corporate Security at Penske Truck Leasing Co., L.P. ("Penske") sent a letter to Satell in 2017 regarding AFS's deceptive business practices, which Satell regarded as a "lot of hyperbole." The letter stated in part that:

> [R]epresentatives of Progressive Business Publications have made unsolicited contact with one or more Penske facilities and employed deceptive business practices to secure alleged orders of its various publications… Your company thereafter transmitted one or more invoices demanding payment for the above products, which were not knowingly ordered or requested by Penske.

[PX 15, 212:15–215:6 (App. 00574-577); PX 35, Ex. 105, AFS0436005 (App. 02353-2354).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document found at PX 35, Ex. 105, AFS0436005 (App. 02353-2354). AFS denies Plaintiffs' assertion that Satell regarded the letter as a "lot of hyperbole." PX 15, 212:15–215:6 (App. 00574-577). AFS denies the referenced documents support the assertion that AFS employed any "deceptive business practices," and it is therefore denied. *See* referenced documents. By way of further response, AFS expressly denies the admissibility and veracity of the statements contained within the referenced document.

359. The letter also informed Satell that AFS's debt collection agency ICR had "placed increasingly threatening and intimidating telephone calls to Penske associates" demanding payment. [PX 15, 215:12–19 (App. 00577); PX 35, Ex. 105 (App. 02353).]

**RESPONSE:** AFS admits the extracted text appears in the referenced document found at PX 35, Ex. 105 (App. 02353). By way of further response, AFS expressly denies the admissibility and veracity of the statements contained within the referenced document.

360. Satell knew that the letter came from a "very high official" at Penske. The letter demanded AFS immediately cease and desist from further contact with Penske; that Penske did not want to have any business relationship with AFS; and that Penske would not pay any invoice from AFS. [PX 15, 215:4–11, 219:20–231:2 (App. 0577-590); PX 35, Ex. 105 (App. 02353-2354); PX 35, Ex. 107 (App. 02355); PX 35, Ex. 108 (App. 02356-2363).].

**RESPONSE:** AFS admits the extracted text appears in the referenced document. AFS admits Plaintiffs' have accurately summarized the document found at PX 35, Ex. 105 (App. 02353). By way of further response, AFS expressly denies the admissibility and veracity of the statements contained within the referenced document.

361. Nevertheless, Satell drafted a response to the Vice President of Corporate Security at Penske requesting payment and also a letter to Penske's CEO. [PX 15, 219:20–230:22 (App. 00578-589); PX 35, Ex. 107 (App. 02355); PX 35, Ex. 108 (App. 02356-2363).]

**RESPONSE:** Admitted.

362. Satell dismissed the allegations from the Vice President of Security for Penske as lying. [PX 15, 230:23–231:2 (App. 00589-590).]

**RESPONSE:** Denied. The referenced documents do not support the statement that "Satell dismissed the allegations from the Vice President of Security for Penske," and it is therefore denied. PX 15, 230:23–231:2 (App. 00589-590). AFS further denies Plaintiffs mischaracterization of Satell's testimony. Specifically, Satell testified:

> A: I thought the president would like to know -- this is a bad business practice [the Vice President of Secretary] did. [He] lied. And [he] used the power of a high official to reinforce a lie. And that is not the way to do business. And I knew Penske as a fine company that was originated near not far from where I lived. … But I knew them as an outstanding company that would want to do the right thing. And I don't think when you lie you do the right thing. And I wanted to bring it to his attention, that not only did he lie, he used the Penske name to do it and he used his high official capacity he had there. And I did not think he would support what they did.

PX 15, 230:2–231:2 (App. 00589-590).

363. Satell "may have gone ahead and told our people to ignore" Penske's request to not be contacted. [PX 15, 238:5–239:18 (App. 00594-595).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of Satell's testimony on this topic, including providing an incomplete and out of context quotation. PX 15, 238:5–239:18 (App. 00594-595). Specifically, Satell testified that in response to Penske's letter he "may have gone ahead and told our people to ignore it. <u>I have no recollection of that</u>." *Id*. (emphasis added).

364. AFS continued to solicit and send invoices to Penske. [PX 15, 235:12–240:12 (App. 00591-596); PX 35, Ex. 108 (App. 02356-2363).]

**RESPONSE:** Denied. The referenced documents do not support the statements made in Paragraph 364 and are therefore expressly denied. *See* referenced documents.

365. With regard to AFS's online reputation, Drummond advised Satell in August 2018 that he would meet with Matt Satell (Ed Satell's son and an AFS employee) to figure out a way to "push negative links" onto the second page of online search results, and that attempts were being made by AFS to "drive positive reviews on Yelp and Google." [PX 35, Ex. 21 (App. 02166-2168); PX 15, 108:14–109:2 (App. 0553-554).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

366. Drummond informed Satell on September 7, 2018, that PBP had (1) 1 star on Yelp from 42 reviews, and 1 star on Consumer Affairs from 182 reviews; and that (2) PBP's star average on Google had increased from 2.4 to 3.7 stars in the last two months as a result of AFS asking customers to post 5 star reviews. [PX 35, Ex. 95 (App. 02337-2342).]

**RESPONSE:** Admitted.

367. Satell never reviewed what the reviews said about AFS on Consumer Affairs, Google, or Yelp. [PX 15, 133:6–11, 140:20–23 (App. 00558-559).]

**RESPONSE:** Admitted.

368. In May of 2019, the Philadelphia Inquirer published an article about AFS titled "A prolific Malvern publisher leaves some disgruntled customers and stirs warnings from the BBB," which Satell read at the time it came out. [PX 15, 201:9–202:5 (App. 00572-573); PX 35, Ex. 118 (App. 02364-2383).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

369. The May 2019 Philadelphia Inquirer article included:

a. an experience between AFS and a nonprofit executive, stating that "[his] story fits a pattern found in hundreds of complaints filed by the publisher's customers. In the last three years, more than 300 people have filed complaints with the Better Business Bureau, many claiming that the company billed them for newsletters they never ordered, or in some cases, didn't receive. In 2013, the bureau's St. Louis office warned the public about the company, saying 2,400 complaints were filed nationwide over three years."

b. the following quote from the Vice President of the BBB PA about AFS: "This company has at least a two-decade history of treating customers in the manner

> reflected in our Business Profile on it…The company may have a bias against us, but our profile of this firm has been reviewed by a jury and numerous judges. We believe it is an accurate reflection of this business's practices."

[PX 35, Ex. 118 (App. 02364-2383); PX 20 ¶ 16 (App. 01194) and Ex. A (App. 01198-1214).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents.

370. Satell reviewed complaints from the Better Business Bureau about AFS, and he reviewed "state attorney general requests" because he "considered that a legal problem." [PX 15, 282:24–284:18 (App. 00606-608); ECF 91 ¶ 49.]

**RESPONSE:** Admitted in part, denied in part. AFS admits that the excerpted text appears in the referenced documents. AFS denies Plaintiffs' mischaracterization of the testimony provided by Satell on this topic. Specifically, Satell testified that it was AFS's practice to review and respond to every single complaint filed with the BBB. *See* referenced documents. Satell went on to say:

> Q. Did you review [the BBB complaints]?
>
> A. No, I didn't. We had people who that was their job.
>
> Q. Did you review some of them?
>
> A. If there was a reason for me to review it, I might. But it was not normal for me to review them.
>
> Q. How many have you reviewed?
>
> A. Since 2015?
>
> Q. Yes.
>
> A. I have no idea.
>
> Q. Under a hundred?
>
> A. Probably under a hundred. I would only review them if there was a reason for me to review them.
>
> Q. And who would decide whether there was a reason for you to review them?
>
> A. Well, there wouldn't -- well, within the company, I guess if they got something that was complex, that was not normal for them to get, they might run it by me. I don't recall that. If we were dealing

> with states that had a complaint and they had -- and it was sent to both places, I might review that. I would certainly review state attorney general requests. I considered that a legal problem and so we would -- I would review that. But it wasn't normal for me to review these. Most of the answers were pretty much the same. We investigate every single one. We'd pull up the information we have and we answer specifically for that customer what seems to be the important material.

*See* referenced documents.

371. Satell read reviews on the BBB's website about ICR during the FTC's investigation of AFS. [PX 15, 293:19–294:17 (App. 00610-611).]

**RESPONSE:** Admitted.

372. Satell received reports on BBB complaints. [PX 57, AFS0435630-31 (App. 02708); PX 58, AFS0435661-62 (App. 02710).]

**RESPONSE:** Admitted.

373. In 2019, Satell requested an analysis of BBB complaints against AFS. [PX 102, AFS0623527-28 (App. 02909).]

**RESPONSE:** Admitted.

374. Grabert told Satell in 2017, "I am also seeing more anger from the customers in the past few months – using the same type of buzz words that they must be seeing online. I do not think it is a coincidence that at the same time, the BBB changed their website format." [PX 83, AFS0529009-10 (App. 02840).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document.

375. Consumers sent complaints directly to Satell regarding AFS's deceptive sales tactics. [PX 59 (App. 02713), AFS0438585; PX 61, AFS0443287 (App. 02743); PX 160, FTC-PBP-0007446 (App. 03070); PX 159, FTC-PBP-0005859 (App. 03067); PX 84, AFS0529165 (App. 02843).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that Satell has received complaints directly from subscribers. AFS expressly denies the admissibility and veracity of the complaints referenced therein, and it disputes Plaintiffs' characterization of the referenced complaints, which are in writing and speak for themselves. *See* referenced documents.

376. One consumer emailed Satell directly in December 2015 that:

> I cancelled two subscriptions with your firm in 2014…after being issued invoices for products that were marketed as a free trial. There was never any notice to continue

> the subscription and agree to pay for the products, which struck me as a particularly dubious way to operate a business. . . .
>
> Now I understand that your company makes itS money by marketing these free materials to people in low levels of companies by securing some personal information and then holding those companies liable for subscriptionS and then holding them up for Collections at some point in the not-too-distant future. I get it. Great business model. A sucker is born every day.

[PX 84, AFS0529165 (App. 02844).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the complaint referenced therein.

377. In 2016, the Assistant General Counsel of Old Dominion Freight Line sent a letter addressed to Ed Satell with the subject line "Fraudulent Invoice No 6040915." The letter demanded that ICR and PBP "cease and desist from further contact with Old Dominion of the above-referenced fraudulent invoice…Old Dominion does not, and has not, ordered the referenced product and Old Dominion never agreed to pay for the referenced Supervisors Safety Bulletin. We are well aware of the voluminous complaints that have been lodged against ICR and PBP for similar deceptive trade practices, and PBP and ICR's self-serving responses about their business. The 'order' referenced in Invoice No. 6040915 was never placed." [PX 159, FTC-PBP-0005859 (App. 03068) and PX 28, Ex. A, Declaration of Peter Murphy (App. 01973-1975).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents. AFS expressly denies the admissibility and veracity of the complaint referenced therein.

378. The Associate Counsel for Sam's Club sent a certified letter to Ed Satell in March of 2017 stating "Once again, American Future Systems, Inc., d/b/a Progressive Business Publications, has directly contacted Sam's Club locations soliciting orders for your business and sending invoices for alleged orders…As you have been advised for over 13 years, Sam's Club managers and other club-level employees do not have the authority to enter into binding agreements with you or your company, and such contracts are void."

The letter continued:

This letter serves as formal notice to American Future Systems, Inc., d/b/a Progressive Business Publications to cease and desist all direct store solicitation and communications.

As a reminder of one of many previously sent cease and desist letter sent to your company, in 2006 Walmart stated:

> Let me reiterate Wal-Mart's position once again so that there is no misunderstanding about the non-relationship between our two companies:
> 1. No Wal-Mart employee is authorized to subscribe to or purchase any PBP product. "Wal-Mart" includes Wal-Mart Stores, Wal-Mart Supercenters, Wal-Mart Neighborhood Markets, Sam's Clubs, and all facilities operated by any of the above.
> 2. As of no later than December 8, 2003 Wal-Mart cancelled all subscriptions to all PBP products as to all Wal-Mart facilities and demanded that PBP cease all solicitation activities as to Wal-Mart facilities. (See the attached December 8, 2003 letter from Wal-Mart to PBP.)
> 3. Wal-Mart demands that all Wal-Mart Stores, Wal-Mart Supercenters, Wal-Mart Neighborhood Markets, Sam's Clubs, and all associated facilities be placed on PBP's "No-call" list and that PBP cease and desist from all soliciting activity as to all of the above entities.

[PX 23 (App. 01896); PX 161, FTC-PBP-0007450 (App. 03072); PX 160, FTC-PBP-0007446 (App. 03070)).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced documents. AFS expressly denies the admissibility and veracity of the complaint referenced therein.

379. Even after March 2017, AFS continued to telemarket to Wal-Mart, recorded orders based on those calls, sent Wal-Mart to collections, and collected money from Wal-Mart:

| Sales Call Date | Company | Title | Names of Collection Agency if AFS sent for collections | Source Bates Number |
|---|---|---|---|---|
| 4/21/17 | Walmart | Asset Protection Manager | | PX 44, AFS0000631 (App. 02669) |
| 5/8/17 | Sams Club | Personal Training Coordinator | ICR | PX 36, AFS0000467(App. 02653); PX 167, ICR0000323 (App. 03138) (shows payment) |
| 8/3/17 | Sam's Club | Asset Protection Manager | ICR | PX 37, AFS0000473 (App. 02655); PX 171, ICR0000372 (App. 03144) |
| 5/21/18 | Sam's Club | Personnel Training Coordinator | ICR | PX 38, AFS0000474 (App. 02657); PX 168, ICR0000324 (App. 03140) |

| | | | | |
|---|---|---|---|---|
| 5/31/18 | Wal*Mart | Senior Operations Manager | | PX 45, AFS0000636 (App. 02671) |
| 7/9/18 | Sam's Club | Personnel Training Coordinator | ICR | PX 39, AFS0000475(App. 02659); PX 169, ICR0000326 (App. 03142) |
| 11/2/18 | Sam's Club | HR Representative | ICR | PX 40, AFS0000476 (App. 02661); PX 172, ICR0000376 (App. 03148) |
| 9/13/18 | Walmart Pharmacy | Certified Technician | | PX 42, AFS0000627 (App. 02665) |
| 1/30/20 | Sam's West, Inc. | Accountant | ICR | PX 41, AFS0000477 (App. 02663); PX 173, ICR0000378 (App. 03150) |
| 3/4/20 | Wal-Mart | Store Manager | ICR | PX 43, AFS0000628 (App. 02667); PX 170, ICR0000327 (App. 03144) |
| 4/27/20 | Sams Club Center | Safety Manager | ICR | PX 46, AFS0006442; PX 166 (App. 03136), ICR0000225 (App. 02673) |

**RESPONSE:** Denied. AFS expressly denies Plaintiffs' interpretation and mischaracterization of the referenced documents, which are in writing and speak for themselves.

380. Satell provided input for standard responses to BBB complaints that changed over time, and Satell reviewed and edited some draft responses to complaints. [PX 6, 25:1–26:10, 137:11–138:24, 294:12–297:16 (App. 00268-269, 00284-285, 00310-313).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced testimony. *See* referenced documents. Specifically, Haney testified that "it wasn't often" that Satell reviewed responses to BBB complaints and during her employment at AFS, Satell might have reviewed somewhere between five to 10 responses. PX 6, 294:12–297:16 (App. 00310-313).

381. In March of 2020, Haney wrote that Satell "made so many changes that I have to pretty much rewrite all my BBB docs." [PX 117, AFS0698387 (App. 02948).]

**RESPONSE:** AFS admits only that the extracted language appears in the referenced document.

382. Satell periodically reviewed customer replies sent in response to the "order confirmation" emails. [PX 15, 69:4–12 (App. 00540).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced document. Specifically, Satell testified, from "time to time," he would review individual replies from subscribers to the confirmatory emails "if it involved a serious grievance." *See* referenced document.

383. If telemarketers followed the sales script and answered all customer questions clearly, Satell testified that "customer comments are not seen as a legitimate complaint." [PX 14, 48:14–49:1, 51:1–11 (App. 00495-497); PX 35, Ex. 3, page 3 (App. 02051).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterized summary of the referenced document, PX 35, Ex. 3, page 3 (App. 02051), which is in writing and speaks for itself. Specifically, the refenced excerpt appears in AFS's Quality Control Overview, under the heading AFS's Quality Control Department's Audit Procedure, which in full provides:

> **<u>Customers Email Response Audits</u>**
>
> Quality Department audits and manages customers' email responses daily that are received from customers who recently ordered a publication through telemarketing. These responses are customer activated replies from the email confirmations sent the same day as the order was placed after the telemarketing call is made and order is completed.
>
> Most customer responses to the confirmation emails come by email within three or four business days of their being sent. These mostly are expressing a wish to correct mailing information or typos, cancel the subscription, or in some cases to express a complaint.
>
> 1. First, all who request to cancel or have a complaint are immediately canceled without exception
>
> 2. The cancelled orders are deducted from reps weekly sales count and can reduce their hourly wage which incentivizes the rep to stay scripted.
>
> 3. For cancels, where the customer expressed a complaint or a misunderstanding, then the tape of the call is listened to and reviewed by a manager in the branch telemarketing office where the call was made. Tapes are kept for two weeks and then recycled thereafter so the tape was available for that period for the purposes mentioned. If the manager finds that the script was faithfully followed and did not create any misunderstandings mentioned by the customer, the manager can contest it as an illegitimate complaint. It is then sent to quality control person at the main office to again review the tape. If they agree the script was

> followed correctly and answered all customer questions clearly, the cancellation still stands but the customers comments are not seen as a legitimate complaint. If it is seen as a legitimate complaint, then it is reviewed with the calling rep and advised that the transgression Is not permitted. The hard copy version of a legitimate customer complaint is normally signed by the rep and stored in their employee file. The rep is told at that time that If they have three such transgressions in a 90-day period, they can be terminated.
>
> Quality Control Dept also tracks the number of cancels by rep, including cancels with customer complaints, to recommend escalating degrees of discipline and send out written warnings if needed. Termination of reps for poor quality seldom happens because of both the rep's awareness and knowledge that we take such situations seriously. Those who have trouble adjusting, usually quit far earlier than the third transgression. Most of the reviewed calls show that the script was properly followed, and the reps clearly answered properly the questions asked.
>
> Our sole interests are in truth and that our clear standards are followed in good faith. This is done if the reps faithfully follow the script, particularly with stating the price, the terms and cancellation rights as stated in the script. All cancellations are noted in the customer file and all efforts as collections then cease. The quality department and branch management's efforts are to be proactive to solve and catch problems before they develop. The tapes show we are successful at that.

PX 35, Ex. 3, page 3 (App. 02051).

384. Satell was aware of consumer complaints that ICR was collecting AFS debts that people claimed were not owed. [PX 15, 299:18–300:4 (App. 00612-613).]

**RESPONSE:** Denied. The referenced testimony does not support the statement contained within Paragraph 384 and it therefore denied. Specifically, Satell only testified that AFS "would get some complaints" from ICR. *See* referenced document

385. Satell received routine reports regarding ICR's collection of money on AFS accounts. [PX 14, 82:5–15 (App. 00498).]

**RESPONSE:** Admitted.

386. Satell did not require AFS to keep a complaint log. [PX 14, 166:22–167:6 (App. 00513-514).]

**RESPONSE:** Denied. AFS denies Plaintiffs' mischaracterization of the referenced testimony. Specifically, Satell testified that AFS does not keep a complaint log and he did not instruct anyone at AFS to keep such a log. *See* referenced document. Satell did not provide any testimony about what he did or did not require as it relates to complaints received. *Id*.

387. In June 2019, Satell received an article titled "Malvern Firm Billing Companies for Unwanted Newsletters, BBB Warns" which included the following statements about AFS:

- "the vast majority of the BBB complaints follow a disturbing pattern."
- "They complain that the company tries to get them to pay for products they never ordered and did not want, or that they believe were provided without charge."
- "Today, we're sending out an alert on a company that targeted business in a subscription scam"
- "The BBB suggests caution when dealing with [PBP.]

[PX 85, AFS0529309-email with attachment (App. 02845).]

**RESPONSE:** AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the mischaracterization of AFS's business referenced therein.

Respectfully submitted,

**WHITE AND WILLIAMS, LLP**

*/s/ David H. Marion*
David H. Marion, Esquire
Morgan S. Birch, Esquire
PA ID Nos. 3590; 319358
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
Fax: (215) 789-7517
*mariond@whiteandwilliams.com*
*birchm@whiteandwilliams.com*

**DLA PIPER LLP**

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein, Esquire
Marie Bussey-Garza, Esquire
PA ID No. 94907; 324584
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
*ilana.eisenstein@us.dlapiper.com*
*marie.bussey-garza@us.dlapiper.com*

**FAEGRE DRINKER BIDDLE & REATH, LLP**

*/s/ Paul H. Saint-Antoine*
Paul H. Saint-Antoine, Esquire
Henry M. Grabbe, Esquire
PA ID No. 526224; 328928
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
*paulsaint-antoine@faegredrinker.com*
*henry.grabbe@faegredrinker.com*

*Attorneys for Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell*

Dated: July 17, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of July, 2023, the foregoing AFS's Response to Plaintiffs' Statement of Material Facts, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

*/s/ Morgan S. Birch*
Morgan S. Birch