**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FEDERAL TRADE COMMISSION, *et al.*,

*Plaintiffs*,

v.

AMERICAN FUTURE SYSTEMS, INC., *et al.*

*Defendants*.

Civil Action No. 2:20-cv-02266

**REPLY IN SUPPORT OF DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

While Plaintiffs have made every effort to overwhelm the record and muddy the issues, there is a single question before the Court that is dispositive of the entire case: whether injunctive relief is available here. ***It is not.*** *See* AFS's S.J. Br. at 14–23; AFS's Resp. at 8–19.[1]

Plaintiffs' attorneys try to create a dispute of fact as to whether AFS ceased telemarketing by arguing that they dispute it. But "attorney arguments are not evidence." *Reiff v. Marks*, 511 F. App'x 220, 224 (3d Cir. 2013). The unrebutted, material evidence demonstrates that (1) AFS stopped the challenged telemarketing practices on September 3, 2021, after years of steadily declining revenues and profits and two consecutive years of losses for AFS's print publication subscription business; (2) that decline was consistent with industry trends, so there is no financial incentive to resume the conduct; and (3) AFS has no plan or intention of doing so. AFS's S.J. Br. at 19–23; AFS's Resp. at 13–19. AFS is thus entitled to summary judgment on all claims.

Beyond these undisputed, case-dispositive facts, there is a deep injustice in Plaintiffs' effort now—for the first time in AFS's thirty-year history—to enjoin past conduct with no tendency to deceive or likelihood of recurrence. Plaintiffs' adamant characterization of AFS as a "scam" defies the record, which shows millions of subscribers to AFS's valued newsletter service during its lifetime. It is also at odds with Plaintiffs' failure to take prior action to halt AFS's conduct, despite every opportunity and authority to have done so. Indeed, the Commonwealth announced to AFS in 2017 that it was ***closing*** its multiyear investigation without requiring ***any*** change to AFS's practices. And neither agency sought a preliminary injunction here—as they have done in nearly every other enforcement case they cite.[2]

---

[1] Contrary to Plaintiffs' view, there is nothing unconventional about leading with a case-dispositive legal issue.

[2] Every government body to investigate AFS's business practices has been satisfied and never taken action to enjoin them. The federal government did, nearly thirty years ago, bring a strikingly similar lawsuit in this court against AFS; but U.S. District Court Judge James Giles ***denied*** the preliminary injunction sought by the U.S. Department of Justice, and the U.S. Attorney walked away with a ***zero-dollar settlement*** that merely tweaked aspects of the Script and left the business to proceed as it has ever since. *See United States v. Am. Future Sys., Inc.*, No. 95-6886 (E.D. Pa.).

Rather than ask this Court to preliminarily enjoin AFS's then-ongoing subscription business, Plaintiffs embarked on a wide-ranging, three-year fishing expedition. Yet now, even after demanding eleven million pages of AFS documents, accessing thousands of recordings of customer interactions, and interviewing nearly 200 former AFS employees, Plaintiffs have developed no more evidence of "deception" than they had at the outset. Indeed, Plaintiffs have reverted to the one-page Script that AFS used for decades, fragments of employee chats that prove nothing, the excerpted statements of two former part-time telemarketing representatives who offer no factual basis for the case, and the same types of unrepresentative hearsay complaints that Plaintiffs have reviewed for years and which have now ceased entirely, as ***no*** BBB complaints have been lodged against AFS in nearly a year (and only 2 since Fall 2021). Incredibly, where the centerpiece of Plaintiffs' case is the implied "net impression" of the Script (which indisputably, on its face, expressly and correctly states the subscription's terms, price, and cancellation procedure), they do not cite ***a single recorded*** interaction with a customer, and they perversely ask this Court to ignore the email confirmations transmitted immediately after a customer places an order, which plainly recite the subscription terms and cancellation process, and which are part and parcel of the presentation to the customer. When Plaintiffs' conclusory invectives like "scam" and "fraud" are properly disregarded, they have no material facts to support their claim of deception.

## I. AFS Ceased the Trade Practice at Issue for Sound Business Reasons; No Cognizable Danger Exists That It Will Resume, So No Injunction Is Warranted

With AFS's print subscription newsletter business now closed, and the trade practice at issue ended, Plaintiffs cannot meet the standard for a permanent injunction under well-established Third Circuit and U.S. Supreme Court standards, which entitle them to forward-looking relief only. Plaintiffs are incorrect that Pennsylvania law allows an injunction for purely past conduct; the plain language of the UTPCPL provides for an injunction only for present and future violations.

The outdated, divided, intermediate-court decisions cited by Plaintiffs do not show otherwise.

**1. *Plaintiffs Must Meet the Cognizable Danger of Recurrence Test to Obtain Injunctive Relief.*** Under the FTC Act and the UTPCPL, Plaintiffs must show that a defendant "is violating, or is about to violate" the Act, 15 U.S.C. § 53(b)(1), or "is using or is about to use" a deceptive practice, 73 P.S. § 201-4. The unrebutted record demonstrates the challenged trade practice stopped two years ago, and there is not even a likelihood, much less a "cognizable danger" of resumption. *See* AFS's S.J. Br. at 19–23; AFS's Resp. at 13–19. Without a genuine dispute on this point, summary judgment for AFS is required. *See* Pls.' Resp. at 10–14 (no ***genuine*** dispute); Resp. to Add'l Facts ¶¶ 48–58; AFS's Resp. to Pls.' SMF ¶¶ 26, 33, 324–336.

Section 13(b) of the FTC Act "address[es] a specific problem, namely that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness." *AMG Capital Management v. FTC*, 141 S. Ct. 1341, 1348 (2021). To obtain relief for past conduct, the FTC must use its administrative proceedings, pursuant to Section 5(b) of the Act, which it did not invoke here. *Id.*; *see also FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159 (3d Cir. 2019).[3]

*Shire ViroPharma*'s pronouncement "that the 'about to violate' and 'likelihood of recurrence' standards coexist" does not alter this outcome; it merely recognizes differing evidentiary standards at the pleading and proof stages of litigation. 917 F.3d at 158. "[F]or the agency to actually succeed" in demonstrating that "the conditions for an injunction are actually met such that a decree should indeed issue," "it must convince the court . . . that a violation is either ongoing or about to occur." *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 27 (D.D.C. 2021).

The standard for injunction is heightened where, as here, it would "implicate[] a defendant's First Amendment right." *FTC v. AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020). In

[3] *Compare* 15 U.S.C. 45(b) (Section 5(b)) (proceedings against one "who ***has** been*" or "is violating" the Act) (emphasis added), *with id.* § 53(b) (Section 13(b)) (injunction only if one "is violating, or is about to violate," the Act).

*AbbVie* that right was to petition the courts; here Plaintiffs seek to enjoin AFS's print newsletter publications, a core First Amendment activity. With First Amendment rights at stake, any injunction "must 'burden no more speech than necessary to serve a significant government interest.'" *Id.* (citation omitted). In *AbbVie,* the requested injunction "was so 'overbroad and punitive'" that it could not satisfy its First Amendment burden. *Id.* at 380. The same core First Amendment issues are present here, and Plaintiffs have not identified any significant government interest that would be served by enjoining long-ceased conduct involving the sale of First Amendment protected newsletters. *See* AFS's Br. at 41–43; AFS's Resp. at 13 n.4, 67; p. 10, *infra*.

**2. *Percudani and TAP Pharma do not dictate a different outcome.*** Plaintiffs' suggestion that this Court blindly adhere to *Percudani*, *see* Pls.' Resp. at 8–9, is unsupportable. Plaintiffs acknowledge the cognizable-danger standard and that a federal court may disregard intermediate state court decisions when "it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). But, ignoring AFS's on-point briefing, *see* AFS's S.J. Br. at 17–19, Plaintiffs baldly assert that "AFS provides no 'persuasive data that the [Pennsylvania Supreme Court] would decide otherwise.'" *See* Pls. Resp. at 9 (citation omitted). *Percudani's* holding and *Tap Pharma*'s vacated dicta[4] are contrary to the text of the UTPCPL and have since been undermined by intervening Third Circuit and U.S. Supreme Court precedent interpreting nearly identical language in the FTC Act (which informs interpretation of the UTPCPL). *See* AFS's S.J. Br. at 18–19; AFS's Resp. at 9–12; *see also Pennsylvania v. Navient Corporation*, No. 17-1814, 2019 WL 1052014 (M.D. Pa. 2019) (acknowledging that *Shire ViroPharma* cast doubt on *Percudani* and *TAP Pharma*).

Nor does this case implicate *Percundani*'s "warning" that "a party could simply avoid

---

[4] The Pennsylvania Supreme Court expressed "concerns about the Commonwealth Court's credibility judgments" and stated it was "disturbed" by the Commonwealth's handling of the litigation. *TAP Pharm. Prods.*, 94 A.3d at 362–63.

liability under the [UTPCPL] by discontinuing its actions even after proceedings are commenced and claim that the matter is moot." *See* Pls.' Resp. at 9. The Third Circuit in *Shire ViroPharma* rejected the FTC's identical concern that a defendant, "[a]s soon as [it] got wind that the FTC was investigating its activities, . . . could simply stop those activities and render itself immune from suit in federal court." 917 F.3d at 159. The Third Circuit allayed those concerns, noting that Section 5 administrative proceedings may address "past violations," and otherwise "reject[ed] the FTC's contention that Section 13(b)'s 'is violating' or 'is about to violate' language can be satisfied by showing a violation in the distant past and a vague and generalized likelihood of recurrent conduct." *Id.* at 158–159. The Commonwealth, too, can avoid mootness concerns with the UTPCPL's provision for preliminary relief, and conduct ceased due to litigation or a preliminary injunction could be considered in evaluating a cognizable danger of recurrence. 73 P.S. § 201-4.

**3. *It is undisputed that AFS stopped the challenged trade practice when it ceased using outbound telemarketing to sell its print newsletters and subsequently closed that business altogether.*** The telemarketing branch offices have closed; the telemarketing representatives have been reduced from hundreds to a handful who work on other AFS businesses; AFS no longer prints newsletters or reference books; and the Script is no longer used. Plaintiffs cannot claim that AFS "is violating" the FTC Act or the UTPCPL. Nor do Plaintiffs' hypotheticals create a genuine issue of fact establishing a "cognizable danger" that AFS will resume these unprofitable activities in the future. Plaintiffs' bald objection does not refute objective evidence that the print newsletter business had long declined in revenues and lost money for two years before its closure. Plaintiffs point to no evidence suggesting those economic realities have any likelihood of changing.

Rather than dispute these facts, Plaintiffs point to AFS's ***other*** business lines as purported evidence that it could resurrect the ***particular*** trade practice at issue in this case. But the fact that

AFS engages in other businesses does not demonstrate a "cognizable danger" that the challenged conduct will recur. For example, Plaintiffs point AFS's lead generation business, called "SuccessFuel." Pls.' Resp. at 13–14. But they ignore the undisputed evidence that AFS ***does not sell anything*** to customers through its lead generation business. Instead, AFS is paid by a few large, nationally known enterprise software companies to collect information about the potential market and potential customers (leads) who might be interested in that software. *See* PX 1, Drummond Dep. Vol. I at 169:2–170:19 (App. 00082–83). That information is gathered by email, via one of AFS's online platforms, HRMorning, and, occasionally, by telephone calls with a "small team" of ten lead generation representatives that do not engage in telemarketing sales. *See id.*

Plaintiffs also attach a snippet of an employee chat relating to the HRMorning website to suggest that AFS is telemarketing subscriptions to that website. *See* Pls.' Resp. at 4–5. These chat excerpts do not rebut sworn testimony from all parties, the overwhelming record evidence that AFS has ceased telemarketing sales, and the objective evidence from the website itself. *See* AFS's S.J. Br. at 12, 19–23; AFS's Resp. at 13–19. As the website itself demonstrates, HRMorning is a ***free*** web-based service, with certain content behind paywalls purchased by simple online transactions—just like a broad range of other online subscription services. *See* https://www.hrmorning.com. The same is true for AFS's compliance poster business: a customer purchases those posters (and signs up for automatic updates to them) online with a click of a button and entry of credit card on the website.[5] If anything, this demonstrates how and why AFS terminated its print publication business and telemarketing sales operation—because the modern

[5] As Colin Drummond testified, "The vast majority of that is ordered online. So you just go to our site and you say, hey, I need the new minimum wage poster. You put your credit card in and you buy it. There may be a tiny bit of phone calling there just to follow up with customers to make sure they're fine or following up on people." *See* PX 1, Drummond Dep. Vol I at 180:12–19 (App. 00091).

world of e-commerce replaced those outmoded services.[6]

These circumstances demonstrate no genuine issue of fact that there is any cognizable danger of recurrence. Plaintiffs are wrong that no cases support that conclusion. In *Shire ViroPharma*, for example, the FTC sued a defendant that had filed citizen petitions to protect its monopoly for a particular drug. 917 F.3d at 152. When the FTC sought an injunction, generic competitors had entered the market, and the defendant had divested itself of the drug at issue. *See id.* at 149. Nevertheless, the FTC argued there was a cognizable danger of recurrence because the defendant knew "its petitioning campaign would enrich it at the expense of consumers," and it had both "incentive" and "opportunity to engage in similar conduct in the future" because it marketed other drugs that could become the subject of similar conduct. *Id.* at 153. The district court "flatly rejected" these arguments, and the Third Circuit agreed. *See id.*; *see also, e.g.*, *AbbVie Inc.*, 329 F. Supp. 3d at 145 (no cognizable danger of recurrence where, as here, conduct ceased years prior and market provided no incentive for recurrence). The same outcome is even more appropriate here, where AFS has a financial ***<u>dis</u>***incentive to resume the challenged conduct and could not do so without reconstructing substantial infrastructure for telemarketing that it no longer has.

While the Third Circuit opinions in *Shire ViroPharma* and *AbbVie* are directly on point, Plaintiffs rely on cases that are factually distinct in material ways. Indeed, the closest case Plaintiffs could find is from Iowa state court and, contrary to Plaintiffs' representations, bears little similarity to the facts here. AFS's Resp. 45–50; Pls.' Resp. at 35. Plaintiffs' other cases do not contain "situations factually similar to this case." Pls.' Resp. at 11–13. In *FTC v. GTP Marketing*, for

[6] This is also the case with AFS's other ongoing businesses, which operate from a web-based platform where purchases are made with online payments (not through telemarketing), and involve webinars, whitepapers, online publications, and marketing services that are entirely different from the historic print subscription business. The current website for SuccessFuel explains these business lines and demonstrates these fundamental distinctions. *See* https://www.successfuel.com/insights-products.

example, involving a preliminary injunction—which Plaintiffs never sought here—the defendants mailed postcards to consumers guaranteeing valuable prizes (*e.g.*, a new car) for simply calling the number on the postcard. No. 4-90-123, 1990 WL 54788, at *2 (N.D. Tex. Mar. 15, 1990). The prize was a ruse. When consumers called, defendants went off script, made numerous misrepresentations, and attempted to sell expensive merchandise by claiming a purchase would entitle the consumer to two prizes far exceeding the cost of the goods. *See id*. But consumers never received their prizes or purchases. *See id.* at *3. There are no similar facts here.[7]

## II. The Commonwealth Has Not, As Matter of Law, Established a Basis for Any Monetary Recovery Under Section 201-4.1 of the UTPCPL

In pursuit of an extraordinary monetary claim against AFS, the Commonwealth (a) relies on federal decisions construing the FTC Act that ***pre-date*** the U.S. Supreme Court's 2021 *AMG Capital* decision, and (b) an unprecedented construction of its own statutory authority, Section 201-4.1, which even its own 30(b)(6) representative does not accept.

First, tacitly recognizing the oddity of relying on pre-2021 federal decisions overruled by the U.S. Supreme Court, the Commonwealth drops a footnote to argue that "nothing in *AMG* negates the usefulness" of these cases. Pls.' Resp. at 18 n.14. One fundamental problem with this argument is that the statutory language at issue in the pre-2021 federal decisions, contained in Section 13(b) of the FTC Act, is not the same as the language of Section 201-4.1 of the UTPCPL.

[7] *See also, e.g., United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) (preliminary injunction for "repeated violations" of FD&C Act where "wheat in [defendant's] elevators was moldy and contaminated with live and dead insects, insect larvae and rodent excreta"); *FTC v. Neora LLC*, 552 F. Supp. 3d 628 (N.D. Tex. 2021) (denying motion for judgment on pleadings where defendants were "currently engaging in the alleged conduct"); *FTC v. SuperTherm Inc.*, No. 20-08190, 2021 WL 3419035, at *7 (D. Ariz. Aug. 4, 2021) (default judgment and injunction where FTC's allegations were "[t]aken as true" and advertising was literally false); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) (defendants targeted "individuals who were especially vulnerable" to sell supplements with "advertising [that] was chock-full of false, misleading, and unsubstantiated information" and where they "callously continue[d] to use" brochure at issue in case); *FTC v. Accusearch, Inc.*, No. 06-105, 2007 WL 4356786, at *2 (D. Wyo. Sep. 28, 2007) (injunction pursuant to unfair trade practices claim, not deception claim, where defendants sold detailed personal phone records that could only have been obtained "through theft or deception" and without applying the cognizable danger of recurrence standard). These cases are nothing like the case before this Court, and, notably, the Third Circuit has rejected *Accusearch*. *See Shire ViroPharma, Inc.*, 917 F.3d at 157.

Section 13(b) provides that the "Commission may seek . . . a permanent injunction," 15 U.S.C. § 53(b), and prior to *AMG*, the FTC relied on general equitable principles to claim restitution.[8]

Unlike Section 13(b), Section 201-4.1 specifies that any monetary award in the Court's discretion, upon issuance of a permanent injunction, is only to "restore to persons in interest moneys or property . . . acquired by means of a[] violation of the Act." *Id.* The Commonwealth's own 30(b)(6) witness acknowledged such persons do ***not*** include those who cancelled the subscription before payment was made or agreed to and valued the subscription. AFS S.J. Br., Ex. Q, Oleckna Dep. at 255:5–256:20. The Commonwealth attempts to distance itself from this testimony as "irrelevant and/or nonbinding," Pls.' Resp. at 20 n.16, but it fell squarely within two 30(b)(6) deposition topics and, more importantly, accords with the Pennsylvania Supreme Court's decision, vacating the award in *Tap Pharma*, because the Court required ***proof of harm*** and ***accounting of damages*** for restoration under the UTPCPL. *TAP Pharm. Prods.*, 94 A.3d at 363 (vacating $27.7 million restoration award where Commonwealth "proved no harm"); *see also, e.g.*, *Northview Motors, Inc. v. Pennsylvania*, 562 A.2d 977, 980 (1989) (restitution to five consumers who proved damage by defendant's violative conduct).

Unable to identify a single customer harmed by AFS's conduct, the Commonwealth advocates an interpretation of Section 201-4.1 that contravenes the language of the statute and basic equitable principles.[9] This inequity is highlighted by the fact that ***all*** of the revenues it seeks were generated ***after*** it commenced an investigation of AFS in 2012 without seeking a preliminary injunction, and most were generated ***after*** the Commonwealth advised in 2017 that it was closing

[8] Even the pre-*AMG* restitution cases do not support the Commonwealth's enormous monetary claim. *See, e.g.*, *F.T.C. v. Magazine Solutions, LLC*, 432 F. App'x. 155, 158 (3d. Cir. 2011) (wholesale costs deducted from revenues).

[9] In *Pennsylvania v. Think Finance, Inc.*, No. 14-7139, 2016 WL 183289, at *23 (E.D. Pa. Jan. 14, 2016), which Plaintiffs also cite, the Court held that the Commonwealth was not obligated to identify the precise customers harmed by the defendants or the precise harm ***at the pleading state***, not that the Commonwealth was entitled to recover millions of dollars under Section 201-4.1 without any such identification of customers or harm.

its multiyear investigation and ***after*** it allowed AFS to continue using the now-challenged Script.

## III. AFS's Communications Were Not Deceptive & Plaintiffs' Remaining Arguments Fail

**1.** ***The sales communication—the call and confirmatory emails—must be considered as a whole and is not deceptive.*** AFS's S.J. Br. at 27–32. Plaintiffs ignore the clear language in the call and emails that cross-incorporate each other, Pls.' Resp. at 25, and rely on materially distinct cases with facially deceptive communications, followed by hidden, fine-print disclosures with new or different terms. *See, e.g.*, *FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018), *rev'd on other grounds*, 141 S. Ct. 1341 (2021) (loan scheme targeting "cash-strapped" consumers that facially misrepresented loan cost and hid fine-print details). Here, the call expressly incorporated the emails that merely ***confirmed*** the terms in one to two pages of standard font. Plaintiffs' "alternative" argument that the confirmatory emails were deceptive also fails. AFS's S.J. Br. at 31.

**2.** ***Expert testimony shows the hearsay complaints Plaintiffs rely on are insignificant and unrepresentative of AFS's customers.*** Through counsel, Plaintiffs seek to misrepresent Ms. Daley's expert report. Pls.' Resp. at 31–34. But the proper way to rebut expert testimony is through a rebuttal expert, and—again—counsel's arguments are not evidence. *Reiff*, 511 F. App'x at 224.

**3.** ***AFS had consent*** that was broader than, as Plaintiffs argue, customers "agreeing to keep two newsletters." Pls. Resp. at 35. But Plaintiffs' admission is dispositive of their unordered merchandise claims. 39 U.S.C. § 3009(d) (no violation with "consent of the recipient").

**4.** ***Plaintiffs' remaining arguments are equally baseless.*** Plaintiffs seek to avoid judgment on their negative option and failure to disclose claims by misrepresenting AFS's argument and the Script. Pls.' Resp. at 34–39. They then argue this Court should overlook their failure to identify any public interest, but, tellingly, ***they still fail to identify one***. *Id.* at 39. And, the Commonwealth's technical maneuvering, *id.* at 40–45, is insufficient to evade the defense of laches. AFS's S.J. Br. at 43–47; AFS's Resp. at 66–67. For these reasons, summary judgment should be entered for AFS.

Respectfully submitted,

**WHITE AND WILLIAMS, LLP**

*/s/ David H. Marion*
David H. Marion, Esquire
Morgan S. Birch, Esquire
PA ID Nos. 3590; 319358
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
Fax: (215) 789-7517
*mariond@whiteandwilliams.com*
*birchm@whiteandwilliams.com*

**DLA PIPER LLP**

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein, Esquire
Marie Bussey-Garza, Esquire
PA ID No. 94907
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
*ilana.eisenstein@us.dlapiper.com*
*marie.bussey-garza@us.dlapiper.com*

**FAEGRE DRINKER BIDDLE & REATH, LLP**

/s/ *Paul H. Saint-Antoine*
Paul H. Saint-Antoine, Esquire
Henry M. Grabbe, Esquire
PA ID No. 526224; 328928
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
*paulsaint-antoine@faegredrinker.com*
*henry.grabbe@faegredrinker.com*

*Attorneys for Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell*

Dated: July 24, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of July, 2023, the foregoing Reply in Support of Defendants' Motions for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

*/s/ Morgan S. Birch*
Morgan S. Birch

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>AMERICAN FUTURE SYSTEMS, INC., *et al.*<br><br>*Defendants*. | : | Civil Action No. 2:20-cv-02266 |

**AFS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS**

Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell (collectively referred to herein as "AFS"), by their undersigned counsel, submit this Response to Plaintiffs' Statement of Additional Facts. *See* ECF No. 348-3 at 29–35.

**GENERAL OBJECTIONS**

AFS sets forth below specific responses to each of the individually numbered paragraphs of Plaintiffs' Statement of Additional Facts. In addition, AFS asserts the following general objections:

With their Statement of Additional Facts, Plaintiffs have now submitted over four hundred "facts" purportedly in support of their Motions for Summary Judgment and against AFS's Motion for Summary Judgment. As with the original set, totaling 387 paragraphs, most of these stated "facts" are misleading excerpts of deposition testimony or selective out-of-context quotes from documents that distort their meaning. In responding to Plaintiffs' Statement of Additional Facts, AFS does not concede that the substance of any excerpted document or deposition testimony is accurate, complete, or contextualized, such that it provides any probative value to the Court on

summary judgment. Further, within Plaintiffs' submission, many statements are irrelevant, are hearsay, have been proven to be invalid, or contain hearsay within hearsay. By responding, AFS does not waive any objections to the admissibility of any document. Because many statements within Plaintiffs' Statement of Additional Facts draw from and cite to Plaintiffs' Statement of Undisputed Facts (ECF No. 339-4), AFS incorporates by reference its Response to Plaintiffs' Statement of Undisputed Facts (ECF No. 349 at 84–225).

Finally, AFS objects to Plaintiffs' Counterstatement in Opposition to AFS's Statement of Facts (ECF No. 348 at 2–28). Plaintiffs' "Counterstatement" attempts to spin AFS's straightforward statement of facts, but it fails to create any genuine issue to AFS's Motion for Summary Judgment. As just one example, Plaintiffs do not dispute that AFS ceased the allegedly violative conduct years ago, despite providing a lengthy, convoluted response to AFS's factual proposition:

> 44. [After at least six years of declining profits, and two consecutive years of losses, AFS closed its telemarketing business entirely and stopped outbound telemarketing calls as of September 3, 2021. See Exhibit X, Devor Rpt. at 8; Exhibit A, Drummond Dep., Vol. I, at 28:3–5; 33:17–19; 94:2–4; Exhibit Z, Dep. Ex. 18 (Sworn Statement of Colin Drummond) ¶ 5; Exhibit AA, Townsend Dep. at 249:3–5.]
>
> ***Admitted that financial data provided by AFS for the combined revenue of AFS's telemarketing division, consisting of first year subscriptions and renewal subscriptions of newsletters and CEEL books referred to by AFS as "reference guides," shows "six years of declining profits, and two consecutive years of losses."*** Denied that this profit and loss data accurately reflects the value of telemarketing to AFS's overall profits. [PX 225 (App. 4271–4275), showing cross-marketing of online workshops, (App. 4274–4275) and lead generation (App. 4272) at end of telemarketing calls); ECF 339-3, ¶ 336(f) & (g) (discussing lead generation to telemarketing customers).] ***Admitted that AFS says that as of September 3, 2021, it ceased "all outbound telemarketing for the sale of any newsletter, publication, or book,"*** with AFS defining telemarketing as "outbound sales telephone calls to business managers, followed by confirmatory emails, to obtain and confirm subscriptions for newsletters, publications or books." [ECF 342-26, Exhibit Z, Depo. Ex. 18 (Sworn Statement of Colin

> Drummond) ¶ 5; ECF 342-1, Exhibit A, Drummond Depo., Vol. I, 18:4-6 (AFS designee testifying "[W]e ceased all outbound telemarketing calls to market the publications on a 60-day review period with the right of cancellation."); *Id.* 157:22-25 (same).]
>
> Denied that AFS has ceased all telemarketing activities as of September 3, 2021 and/or is not currently engaged in any telemarketing activities, including telemarketing activities related to publication subscriptions. [PX 230 (App. 4293) (February 15, 2022 Slack message from AFS employee stating that "most" subscribers to AFS's digital publication "HR Morning" "come from TM [telemarketing] followed by our webinars"); PX 229 (App. 4289–4290) (May 31, 2022 Slack message from AFS employee stating that "previously [leads] were very much inbound, and the TM stuff was like supplemental Now they're majority TM"); PX 231 (App. 4296) (March 3, 2023 Slack message from one AFS employee inquiring about the identity of another employee, to which a second AFS employee responds "lol a TM [telemarketing] rep they call them Lead Development Reps now (LDR)").]

ECF No. 348-3 ¶ 44 (emphases added). Cutting through all of the distractions attempted by Plaintiffs, their Counterstatement fails to identify any record evidence that rebuts AFS's Statement of Material Facts or that creates any genuine dispute of fact that would merit denial of AFS's Motion for Summary Judgment (ECF No. 342).

**RESPONSES AND OBJECTIONS**

46.[1] AFS telemarketed its book and newsletter subscriptions nationwide using the same telemarketing approach until at least September 2021, which was more than 16 months after the litigation commenced. [*supra* ¶¶ 1 & 6; ECF 342, p. 22, 56; ECF 339-3, ¶¶ 25, 26, 62-65; ECF 1 (showing filing date of May 13, 2020).]

**RESPONSE:** Admitted in part, denied in part. AFS admits that as of September 3, 2021, AFS ceased all outbound telemarketing for the sale of any newsletter, publication, or book. PX 35, Ex. 18 ¶ 5 (App. 02148). AFS denies Plaintiffs' implication that the decision to cease telemarketing operations was tied to or because of this litigation. The evidence in the record demonstrates that the profitability of AFS's telemarketing business declined for several years prior to the instant action and that it sustained losses prior to its termination in September 2021. *See* AFS S.J. Br. at Exhibit X, Devor Rpt. at 8 (including corresponding exhibits); AFS Resp. to Pltfs' S.J. Mot. at Exhibit A, Drummond Dep., Vol. I at 28:3–5, 33:17–19, 94:2–4; AFS S.J. Br. at Exhibit Z ¶ 5 (Sworn Statement of Colin Drummond); AFS S.J. Br. at Exhibit Y, Devor Dep. at 176:20–177:11.

[1] AFS submitted 45 Statements of Undisputed Material Fact in support of its Motion for Summary Judgment. ECF No. 342 at 62–71. Plaintiffs' Statement of Additional Material Facts added to that list, picking up at Paragraph 46. That numbering convention is mirrored here.

47. AFS used cold calls to telemarket its subscriptions. [Drummond Depo., 296:21–24 (ECF 339-5, at 145); ECF 339-3 ¶ 36; Strosnider Depo., PX 212, 23:7-18 (App. 4209); Orischak Depo., PX 209 136:2-7 (App. 4178).]

**RESPONSE:** Objection. AFS objects to this Paragraph as vague and ambiguous, insomuch that Plaintiffs do not specify the area of AFS's business at issue. AFS admits only that the referenced testimony supports the statement that some of the businesses contacted by AFS to sell its publication subscriptions were not expecting AFS's publication telemarking sales representatives' call. *See* referenced documents.

48. After September 2021, AFS continued to invoice and accept payments for publication subscriptions resulting from telemarketing sales calls that occurred prior to September 3, 2021. [PX 239, Responses to RFAs 166, 169 (App. 4341–4344).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that as of September 3, 2021, AFS ceased all outbound telemarketing for the sale of any newsletter, publication, or book. AFS further admits that it may have accepted payments for telemarketing services after it ceased proactively making telephonic sales for orders placed prior to September 3, 2021. However, AFS denies Paragraph 48 to the extent that Plaintiffs' statement is unsupported with any such specific examples.

49. Ed Satell testified that he decided to stop telemarketing newsletter and book subscriptions in September of 2021, and that he has the authority to restart telemarketing activities if he ever feels AFS should invest in that again. [ECF 339-3, ¶ 324.]

**RESPONSE:** Admitted in part, denied in part. AFS admits that as of September 3, 2021, AFS ceased all outbound telemarketing for the sale of any newsletter, publication, or book. PX 35, Ex. 18 ¶ 5 (App. 02148). AFS further admits that Satell testified that he made the "final decision" to stop telemarketing newsletters and book subscriptions. PX 15, 26:4–12 (App. 00533). AFS denies that the referenced documents support the statement that Satell "has the authority to restart telemarketing activities if he ever feels AFS should invest in that again." Specifically, Satell testified as follows:

> Q: Do you have the authority to restart telemarketing activities at AFS?
>
> A: Well, I'm interpreting that as do I have the legal authority to do that. And the answer is, I have the legal authority to anything that I want that's legal.

PX 15, 26:27:4–9 (App. 00534).

50. Three weeks after allegedly ceasing telemarketing, AFS registered a new fictitious name, SuccessFuel, and AFS no longer uses the fictitious names Progressive Business Publications or Center for Education and Employment Law in advertising its products, instead using the name SuccessFuel or the unregistered names of the products, such as "HR

Morning." [ECF 339-3, ¶¶ 26, 325-326; ECF 339-7, App. 00910, ¶ 10(g); PX 239, Response to RFA 151 (App. 4337).]

**RESPONSE:** Objection. AFS objects to the term "products" as vague and ambiguous in this context, insomuch as it is not clear what products Plaintiffs are referring to. AFS further objects to Paragraph 50 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 21, 22, 23, 325, and 326. AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS admits that it officially registered "Successfuel" as a registered fictious name of AFS on September 20, 2021. PX 35 (App. 01094). AFS denies the referenced testimony supports the statement contained in ECF 339-3 ¶ 325. *See* referenced document. Specifically, Drummond testified that AFS is "not using Progressive Business Publications anymore because we stopped the activity" and "we're not selling [CEEL publications] anymore either." *Id*. AFS denies that "SuccessFuel" includes the publication business and objects to Plaintiffs' attempt to characterize SuccessFuel as such. PX 15, 118:12–14 (App. 00555). AFS admits that it did not register its "HR Morning" digital experience platform as a business entity or fictious name in Pennsylvania. Without understanding what "products" are being referenced, AFS denies any of the referenced documents support the statement that "AFS markets its products using the name of the product, such as HR Morning." *See* referenced documents.

51. AFS is still monetizing outbound calling; employs telemarketing employees, telemarketing managers (including Colin Drummond, AFS's publication editor, and AFS collectors; and is still using telemarketing call lists. [ECF 339-3, ¶ 336; PX 239, Responses to RFAs 149-150, 160-166 (App. 4336–4342).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 51 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 51 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraph 336(a)-(n). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' mischaracterization of the referenced documents. *See* referenced documents. Specifically, AFS advertises that its representatives "could" make outbound calls on one of its business-to-business brands and introduce the client's company and campaign content asset to the prospect. PX 1, 203:3–18 (App. 00104); PX 35, Ex. 19 (App. 02149-2165). AFS admits that it has a team of sales representatives that generate leads for other businesses through telephone calls. *See* referenced documents. AFS admits that a number of those representatives were previously employed by AFS in other capacities.

52. AFS's lead generation activities utilize AFS's telemarketing resources and closely mirror telemarketing activities. [ECF 339-3, ¶ 336(b)–(h), (j) & (m).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 52 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 52 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary

Judgment, including but not limited to, Paragraph 336(a)-(d), (f), and (h). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' mischaracterization of the referenced documents. *See* referenced documents. Specifically, AFS denies Plaintiffs' mischaracterization of documents cited in ECF No. 339-3 ¶ 336, insomuch as Plaintiffs have offered incomplete and out of context extracted words and phrases to assert a plainly misleading statement. *Id*. Drummond testified that AFS's lead generation business, which generates leads for outside clients (not AFS), is conducted through "e-mail campaigns or search engine optimization." PX 1, 168:11–25 (App. 00081). When asked where AFS gets the e-mails to use for the e-mail campaigns, Drummond testified as follows:

> A. The vast majority of them house lists of people that we've done business with in the past across our divisions. And some are purchased from, you know, vendors like Zoom Info and stuff like that.
>
> Q. Would the house lists include former subscribers to AFS publications that were secured through telemarketing?
>
> A. It could, yeah, uh-hum.
>
> Q. You said it could, but would it?
>
> A. Yeah, I would think so, yeah. I mean they would be part of the blend of customers. They would be in there, yeah.

PX 1, 168:11–25 (App. 00081)

Further, Plaintiffs mischaracterized one of the referenced documents, PX 35, Ex. 19 (App. 02152), which states:

> SuccessFuel's B2B Content Syndication Program Benefits
>
> . . .
>
> Fully managed U.S. based lead development reps (LDRs) and access to thoroughly vetted, quality controlled offshore call center teams for international campaigns, and to accommodate lower costs, increased volume and velocity campaigns with quick turn around times.

53. Companies hire AFS to make outbound calls to other companies to get information regarding the employees, invite them to free memberships that also offer paid digital content, and sell those sales leads to other companies. [ECF 339-3, ¶ 336 (b)–(e), (g)].

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 53 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 53 as entirely duplicative of multiple "statements"

contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraph 336(a)-(d), (f), and (h). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' mischaracterization of the referenced documents. *See* referenced documents. AFS admits that it advertises that its representatives "could" make outbound calls on one of its business-to-business brands and introduce the client's company and campaign content asset to the prospect. PX 1, 203:3–18 (App. 00104); PX 35, Ex. 19 (App. 02149-2165).

54. When doing lead generation, AFS contacts lists of its former telemarketing customers, and hides its identity from consumers by using names other than AFS or one of its registered fictitious names. [PX 239, Response to RFA 151 (App. 4337); ECF 339-3, ¶ 336; PX 227 (App. 4282)].

**RESPONSE:** Objection. AFS objects to Paragraph 54 as involving other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 54 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraph 336(a)-(d), (f), and (h). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' express mischaracterization of the referenced documents. *See* referenced documents. Specifically, AFS does not "hide[] its identity from consumers" when operating its lead generation, which is wholly unique from the publication business that is pertinent to this litigation, nor do the referenced documents support any such assertion. *See* referenced documents.

55. During lead generation calls, AFS does not disclose that it is calling for purpose of selling contact information to third-parties. [PX 227 (App. 4282–4283).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 55 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies that the referenced document—the "Avalara Script," which is in writing and speaks for itself—provides any information about AFS's "lead generation calls," generally.

56. As part of its lead generation activities, AFS has said, "I'm just sending over the report with upcoming 2021 sales and use tax changes," before asking for an email address and job title to sell as a "lead" to other companies. [PX 227 (App. 4282).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 56 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS denies that the referenced document—the "Avalara Script," which is in writing speaks for itself—provides any information about AFS's "lead generation activities," generally.

57. AFS has a poster business selling workplace regulation posters and still engages in the automatic sending of "updated" posters when there is a change in regulations. [ECF 339-3, ¶ 336(l).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 57 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 57 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraph 336(a) and (l). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' mischaracterization of the testimony incorporated by referenced in its citation. Specifically, Drummond testified that customers of AFS's poster business—which produces laminated posters typically seen in a break room featuring topics like minimum wage laws or safety alerts—can purchase an additional service "where any time there's any changes in regulation, [AFS] will automatically send out a new poster for you for no extra cost." PX 1, 181:13–21 (App. 00092).

58. AFS sells the posters (and other products) over the telephone. [ECF 339-3, ¶ 336(a).]

**RESPONSE:** Objection. AFS objects on the basis that Paragraph 58 involves other areas of AFS's business that have no bearing or relation to the claims or defenses at issue in this litigation. AFS further objects to Paragraph 58 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraph 336(a) and (l). AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS denies Plaintiffs' mischaracterization of the testimony incorporated by referenced in its citation, which is in writing and speaks for itself. AFS further denies Paragraph 58 to the extent it suggests that AFS proactively seeks new subscriptions for any products via telephone, which it does not. AFS Resp. to Pltfs' S.J. Mot. at Exhibit A, Drummond Dep. Vol. I 160:17—162:6.

59. AFS denies that it committed any of the violations alleged by the FTC or the Commonwealth. [ECF 91 (denying all claims); ECF 339-3, ¶ 354; ECF 342-2, at 25 (Drummond Depo. 417:3-4) ("To this day, we still feel we're not doing anything wrong.")]

**RESPONSE:** Admitted.

60. The "confirmatory" emails include subject lines such as "Our phone call: Access to the CFO/Controller intelligence you requested" [ECF 342-14, Ex. N] or "Our phone call: CFO/Controller intelligence you requested.") [ECF 342-15, Ex. O.]

**RESPONSE:** Objection. AFS objects to Paragraph 60 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 87, 139, 140, 142, 207, and 208. AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS admits that it sent two confirmatory emails to subscribers the same day they placed an order, expressly incorporating the sales call by reference and, in short, plain language, confirming the price, term, and cancellation process. *See referenced documents*. AFS denies that the referenced documents are representative of confirmatory emails that were sent for all of AFS's products and subscriptions.

61. The "confirmatory" email uses the term "no-risk" three times, referring to a "***no-risk order***" in the first paragraph, a "***no-risk*** subscription" at the beginning of the second paragraph, and then saying toward the end of the body of the email, "Please see…how this ***no risk offer works***." [ECF 342-15, Ex. O.]

**RESPONSE:** Objection. AFS objects to Paragraph 61 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 87, 139, 140, 142, 207, and 208. AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS admits the extracted text appears in the referenced document. AFS denies Plaintiffs' incomplete characterization of the referenced document, which is in writing and speaks for itself.

62. AFS employees testified that the emails confirmed "orders" that had already been placed for consumers. [ECF 339-5, PX 6, Haney Depo. 84:12-19 (App. 00279); Grabert Depo., PX 207, 138:24-139:6; 197:6-16 (App. 4165–4167).]

**RESPONSE:** Objection. AFS objects to Paragraph 62 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 87, 139, 140, 142, 207, and 208. AFS incorporates by reference its responses to those paragraphs as if set forth herein. Admitted that after a sales call, in which a customer signs up to receive AFS's publication subscription and an email address for the subscriber was obtained, AFS would send two confirmatory emails to the subscriber expressly incorporating the sales call by reference and, in short, plain language, confirming the price, term, and cancellation process. *See e.g.* AFS S.J. Br. at Exhibit N, AFS0396626–28 (Confirmatory Email in HTML); AFS S.J. Br. at Exhibit O, AFS0396629 (Confirmatory Email in Plain Text). AFS denies the Plaintiffs' characterization of the cited testimony, which is transcribed and speaks for itself, to the extent Paragraph 62 does not reflect the fact that the call during which the subscription terms are conveyed to the customer expressly references the emails that were immediately sent after the call and are part of the sales communication.

63. During her deposition, the Commonwealth's designee acknowledged that she was aware AFS had a practice of sending emails after the sales call, and that the emails were referenced in the script. [ECF 342-17, Ex. Q, Oleckna Depo. 129:19-130:2.]

**RESPONSE:** Admitted.

64. During his deposition, the FTC's designee testified, "I don't think that we are saying that the two emails weren't sent," and that "the script says two e-mails" were coming after the call. [ECF 342-11, Ex. K, Bandy Depo. 66:5-12.]

**RESPONSE:** Admitted.

65. Consumers complained directly to AFS by phone, email and in writing; to the BBB and state attorneys general; to AFS's debt collectors; and via online forums. [ECF 339-3, ¶¶ 198-299.]

**RESPONSE:** Objection. AFS objects to Paragraph 65 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 198-299. AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS admits that it received various customer complaints. AFS denies the truth of any particular complaint or any complaint's relevance to this litigation.

66. Consumers complained that they did not order a subscription, that they misunderstood the offer, that they thought the publications were free, that AFS was a scam or involved with fraudulent activity, and that the employee was not even authorized to order a subscription. [ECF 339-3, ¶¶ 198-299.]

**RESPONSE:** Objection. AFS objects to Paragraph 66 as entirely duplicative of multiple "statements" contained within Plaintiffs' Statement of Material Facts accompanying its Motion for Summary Judgment, including but not limited to, Paragraphs 198-299. AFS incorporates by reference its responses to those paragraphs as if set forth herein. AFS admits that it received various customer complaints. AFS denies the truth of any particular complaint or any complaint's relevance to this litigation.

67. Both the Secret Service and the First Judicial District of Pennsylvania (Philadelphia Court) were sent and/or billed for publications they never ordered. [PX 237 (App. 4313) ("Did not order Cancel Immediately"); PX 217 (App. 4236) ("[T]his was never ordered by the First Judicial District of PA.")]

**RESPONSE:** Denied. AFS denies that the Secret Service or the First Judicial District of Pennsylvania "never ordered" a "publication," nor do the referenced documents support any such assertion. *See* referenced documents. By way of further response, the referenced documents show (i) an employee of the First Judicial District of Pennsylvania effectively canceling a subscription via email that was "no longer needed" and AFS's customer service team's prompt response confirming the cancellation and assuring the employee that the referenced account would have a "zero balance" as a result of that cancellations; and (ii) a copy of an invoice sent to the Secret Service of Greenville, SC, returned to AFS with writing across it requesting cancellation. *See* referenced documents.

68. One person filed a complaint with the BBB in 2017 stating that "This organization allegedly had mailings and representatives contacting our nonprofit peddling a newsletter on environmental issues, although we are not in that field. We work with families who have children with behavioral health issues. They say that our office manager, who is not authorized to make such agreements on behalf of our organization, agreed to a $299 per year subscription…Our office manager insists that she did not speak to a representative. This looks like a spam email and fraudulent practices. The collection agent insists that the subscription was purchased because they knew the office manager's month and date of birth." [PX 232 (App. 4298).]

**RESPONSE:** Admitted in part and denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the referenced document. AFS denies that this cherry-picked excerpt of a customer communication is in any way representative of the opinions or perceptions of the hundreds of thousands of AFS customers. In addition, AFS had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. AFS Resp. to Pltfs' S.J. Mot. at Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. *Id.* at 196:9—197:10. There is no evidence that any of these customers paid any money to AFS; to the contrary, the undisputed evidence demonstrates in such instances AFS would have cancelled the subscription without any charge. *See id.* at 37:14—25.

69. One person filed a complaint with the BBB in 2020 that was coded as "Resolved" stating that "I have reviewed the response made by the business… and find that this resolution is satisfactory to me. However, I fail to understand why this company is able to use the same tactics, over and over again, seemingly without escalation or punitive action…I'm sure many companies just pay the invoices, not realizing that it is a scam. When will something be done to stop them, versus just acting on individual claims?" [PX 233 (App. 4305).]

**RESPONSE:** Admitted in part and denied in part. AFS admits only that the extracted text appears in the referenced document. AFS expressly denies the admissibility and veracity of the referenced document. AFS denies that this cherry-picked excerpt of a customer communication is in any way representative of the opinions or perceptions of the hundreds of thousands of AFS customers. In addition, AFS further had a liberal cancellation policy that would allow customers to cancel their subscription without charge for any reason within 5 months of the initial call, including in an instance where a customer claimed they misunderstood the offer. AFS Resp. to Pltfs' S.J. Mot. at Exhibit S, Haney Dep. at 37:14—25. AFS also regularly agreed to cancel without charge, or with only prorated charges, cancellations after 5 months. *Id.* at 196:9—197:10. There is no evidence that any of these customers paid any money to AFS; to the contrary, the undisputed evidence demonstrates in such instances AFS would have cancelled the subscription without any charge. *See id.* at 37:14—25.

70. Ms. Daley testified that BBB complainants may have been "satisfied" because AFS cancelled their invoices, stating "[b]ecause if you get what you're asked – if you ask for something and it's given to you, you're often satisfied." [Daley Depo., PX 205, 103:3-16 (App 4149).]

**RESPONSE:** Admitted in part and denied in part. AFS admits only that the extracted excerpt of Ms. Daley's testimony appears in her deposition transcript. The pertinent portion of Ms. Daley's testimony, however, is cut off by Plaintiffs. Fairly excerpted, Ms. Daley testified as follows:

> Q. Okay. Have you been provided any evidence related to customer satisfaction arising out of AFS's response to the BBB?

> A. Yes.
>
> Q. What?
>
> A. That ***there were responses that said I'm fine. I'm happy with that. And the ones that were resolved, all of the ones that said that they were resolved are ones that the Better Business Bureau itself said these are resolved.*** There was a complaint. There was a response. They're happy. We're done.
>
> Q. Okay. Beyond what you just described, are there any other documents that you are aware of, that support this position?
>
> A. What position?
>
> Q. That customers may have been satisfied with AFS's response since outstanding invoices were always canceled?
>
> A. From my own experience, when I make an objection or a complaint to a company and they give me what I ask for, I'm satisfied.
>
> Q. Okay. Anything else beyond your experience?
>
> A. No.
>
> Q. Do you plan to offer the opinion that customers who received answers from AFS through the BBB were satisfied with AFS's response?
>
> . . .
>
> [A]. I'm simply reporting back what the Better Business Bureau itself has documented, with regard to these complaints. If you look at one. Closing status. On Page 13. Resolve. ***The complaint is verified the issue was resolved to their satisfaction. So the Better Business Bureau itself makes that determination and has said that a large percentage of the complaints that were made were resolved to the complainant's satisfaction***. I am going testify about that because that's part of the work that I did.

Exhibit B, Daley Dep. at 103:17–105:8 (emphases added).

71. AFS made affirmative efforts to prevent consumers from filing complaints with the BBB. [ECF 339-3, ¶¶ 300-306.]

**RESPONSE:** Denied. AFS denies the documents referenced in ECF No. 339-3 ¶¶ 300–306 support Plaintiffs' blanket proposition that AFS took any action with the sole purpose of reducing the likelihood of reporting to the BBB. *See* referenced documents.

72. Consumer Kelly Rickard did not swear "under oath" that she had not given her day and month of birth during the telemarketing call. [*See* ECF 342, at 22 n.35.]

**RESPONSE:** Denied. The distinction that Plaintiffs appear to be relying upon between an affidavit and a declaration is immaterial. Kelly Rickard signed on October 1, 2021, a declaration "under penalty of perjury of the laws of the United States" asserting that her declaration was "true and correct." *See* PX 13. Paragraph 8 of the Rickard Declaration incorporates by reference "Attachment D." A true and correct copy of "Attachment D" with its September 22, 2021 cover email from Rickard to FTC agent Katherine Moody, provides the following statement: "The invoice has my birthday of October 4 on it which I know I would not have provided to them at any point." Exhibit A at 1. AFS. By way of further response, Rickard testified at her deposition, which was under oath, as follows:

> Q. I want to ask some follow-up questions about the content of that email. The second sentence, "The invoice has my birthday as October 4 on it, which I know I would not have provided to them at any point"; do you see that?
>
> A. Yes.
>
> Q. And you knew at the time you were making a statement to the Federal Trade Commission, correct?
>
> A. I did not recall providing my birthday, but, yes, that was correct at the time. That's what I thought.
>
> Q. Okay. So you knew you were providing a statement to the Federal Trade Commission when you said that you would not have provided your birth date to CFO & Controller Alert, correct?
>
> A. Yes.
>
> Q. And you understood at the time that it was important to be accurate in your communications with the Federal Trade Commission?
>
> A. Yes.
>
> . . .

> Q. And in this email to the Federal Trade Commission, you were telling them basically that the publisher of CFO & Controller Alert was lying about the source of your birth date, correct?
>
> . . .
>
> A: Correct.
>
> . . .
>
> Q. And so the statement that you made to the Federal Trade Commission without qualification was that the invoice was false, correct?
>
> A. Not that the invoice was false, but that I didn't think I had provided that information.
>
> Q. And, in fact, you did provide that information?
>
> A. Yes. After listening to [a recording of the initial sales] call yesterday for the first time, I realized I did provide my birth date.
>
> Q. So the statement in the invoice about the source of the birth date was accurate, correct?
>
> A. It looks to be accurate, yes.
>
> Q. And your memory of that phone conversation with the sales representative on November 19 was inaccurate, correct?
>
> A. In that respect, yes, it was.

AFS's S.J. Br. at Exhibit GG, Rickard Dep. at 105:4–108:24 (objections omitted).

73. Ms. Rickard testified that she had misremembered giving her birthdate when emailing the FTC about her experience with AFS, and that she "still can't believe" she gave AFS her birthdate. [Rickard Depo., PX 210, 38:22-40:23, 124:5-19 (App. 4187–4189, 4191); PX 215 (App. 4225–4227).]

**RESPONSE:** Admitted in part and denied in part. AFS admits that Ms. Rickard told the FTC that she did not give AFS her birth date, but she eventually acknowledged that had given AFS her birthdate, after hearing a recording of her phone conversation with AFS. AFS Resp. to Pltfs' S.J. Mot. at Ex. SS, Rickard Dep. at 107:3–108:20. AFS denies Plaintiffs' attempt to summarize Ms. Rickard's testimony, which is transcribed and speaks for itself.

74. Ms. Rickard testified that she did not have authority to bind her company to a subscription, and that after the telemarketing call ended, she thought she was receiving free information, and she did not think there was any financial obligation. [Rickard Depo., PX 210, 23:6-24:21, 42:2–10 (App. 4185–4186, 4190).]

**RESPONSE:** AFS denies Plaintiffs' attempt to summarize Ms. Rickard's testimony, which is transcribed and speaks for itself.

75. Mike Gorton, AFS's Director of Administration, wrote a co-worker in 2017 "im never signing a deposition again – not spending retirement in jail…for PA AG and Washington st AG – Tom and I had to sign written depositions to protect ed." [PX 226 (App. 4278); ECF 339-3, ¶ 57 (PX 1, 26:8-11, App. 00011) (showing Gorton's title).]

**RESPONSE:** Admitted in part, denied in part. AFS admits the extracted text appears in the referenced document. AFS expressly denies any implication Plaintiffs attempt to make based on Mr. Gorton's 2017 comment, which is taken out of context without any explanation as to what was being discussed or what the "deposition" was in reference to. *See* referenced document.

76. On January 11, 2023, pursuant to a Notice of Deposition issued under Federal Rule of Civil Procedure 30(b)(6), AFS deposed Lauren Oleckna, Senior Civil Investigator, Pennsylvania Office of Attorney General Bureau of Consumer Protection. [PX 214 (App. 4217–4223) (Notice of Deposition of Plaintiff Commonwealth of Pennsylvania) ("Commonwealth 30(b)(6) Depo Notice").]

**RESPONSE:** Admitted.

77. AFS designated two topics related to restitution in the Commonwealth 30(b)(6) Depo Notice. [PX 214, Topic 12 (App. 4221) ("The factual basis of the facts related to Your allegations…that AFS has been unjustly enriched as a result of its unlawful acts or practices") and Topic 13 (App. 4222) ("The monetary amount by which you claim that AFS has been unjustly enriched by its alleged unlawful acts or practices…").]

**RESPONSE:** Admitted.

78. During Ms. Oleckna's deposition, AFS asked whether restitution should be awarded for a consumer "who valued the subscription," "Has the Commonwealth identified persons to whom money should be restored?", and other questions related to restitution that were not included in the designated topics. (Oleckna Depo., PX 204, 255:10-257:13 (App. 4143–4145).

**RESPONSE:** Admitted in part and denied in part. AFS admits that the above-excerpted questions were posed to Ms. Oleckna. AFS expressly denies that they fall outside the designated topics for her testimony.

79. AFS has or could get contact information for individuals that it identified as having knowledge important to their defense who have moved or retired. [Drummond Depo., PX 202, 423:24–425:19 (App. 4128–4130).]

**RESPONSE:** Objection. AFS objects to the statements as overbroad, to the extent it purports to cover witnesses with relevant information generally. AFS further denies Plaintiffs' attempt to summarize Mr. Drummond's testimony, which is transcribed and speaks for itself.

80. AFS did not provide any specific details about what information former employees might have regarding AFS's defense and does not know of anyone from AFS reaching out to any of the former employees to request that they provide evidence in the case. [Drummond Depo., PX 202, 424:8-425:15 (App. 4129–4130).]

**RESPONSE:** Objection. AFS objects to the statements as overbroad, to the extent it purports to cover witnesses with relevant information generally. AFS further denies Plaintiffs' attempt to summarize Mr. Drummond's testimony, which is transcribed and speaks for itself. Specifically, Drummond provided multiple examples of information former employees possess that pertain to AFS's defenses in this litigation. *See* referenced document. Moreover, while Drummond testified he was not aware if anyone at AFS reached out to the referenced employees, AFS denies that it did not do so.

81. AFS identified Mike Gorton as a former employee who would have "very strong institutional knowledge to help with [AFS's] defense." [Drummond Depo., PX 202, 426:5-16 (App. 4131).]

**RESPONSE:** AFS denies Plaintiffs' attempt to summarize Mr. Drummond's testimony, which is transcribed and speaks for itself. Specifically, Drummond testified as follows:

> Q: …And what specific evidence would each of those individuals have that would be helpful to your case?
>
> A. I'm just going back to their institutional knowledge of operating. For instance, Mike Gorton was the Administrative Director, so he would have a very good understanding of things like our relationship with the collection agencies, Better Business Bureau complaints, AG complaints, running of Customer Service. The Quality Control Department reported to him. So, yeah, he would have very strong institutional knowledge to help with our defense.

*See* referenced document.

82. In preparation for his corporate designee deposition, Colin Drummond did not reach out to Mike Gorton to "ascertain that institutional knowledge." [Drummond Depo., PX 202, 426:17-20 (App. 4131).]

**RESPONSE:** AFS denies Plaintiffs' attempt to summarize Mr. Drummond's testimony, which is transcribed and speaks for itself. Specifically, while Drummond testified that he did not reach out to Gorton specifically in "preparation for [his] 30(b)(6) testimony," it is denied that AFS did not do so. *See* referenced document.

Respectfully submitted,

**WHITE AND WILLIAMS, LLP**

*/s/ David H. Marion*
David H. Marion, Esquire
Morgan S. Birch, Esquire
PA ID Nos. 3590; 319358
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
Fax: (215) 789-7517
*mariond@whiteandwilliams.com*
*birchm@whiteandwilliams.com*

**DLA PIPER LLP**

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein, Esquire
Marie Bussey-Garza, Esquire
PA ID No. 94907; 324584
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
*ilana.eisenstein@us.dlapiper.com*
*marie.bussey-garza@us.dlapiper.com*

**FAEGRE DRINKER BIDDLE & REATH, LLP**

*/s/ Paul H. Saint-Antoine*
Paul H. Saint-Antoine, Esquire
Henry M. Grabbe, Esquire
PA ID No. 526224; 328928
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
*paulsaint-antoine@faegredrinker.com*
*henry.grabbe@faegredrinker.com*

*Attorneys for Defendants American Future Systems, Inc.,*
*Progressive Business Publications of New Jersey, Inc., and Edward M. Satell*

Dated: July 24, 2023