UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION, *et al*.,

Plaintiffs,

v.

AMERICAN FUTURE SYSTEMS, INC., *et al.*,

Defendants.

Case No. 2:20-cv-02266

**PLAINTIFF FTC'S REPLY[1] IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**

[1] AFS purports to include a Counter-Statement of Facts in its Opposition to Plaintiffs' Motions for Summary Judgment but cites to AFS's Motion for Summary Judgment, not to evidence, and thus does not satisfy the requirements of Section V of Judge Slomsky's Policies and Procedures. [*See* ECF 349, at 14–18.] To the extent AFS attempts to incorporate its Statement of Facts in Support of its Motion for Summary Judgment, the FTC incorporates its corresponding response to those facts. [*See* ECF 348-3, at 2–28, ¶¶ 1–45.]

It is appropriate for the Court to consider the avalanche of admissible evidence of misled consumers and employee descriptions of AFS's deception. However, evidence of actual deception or reliance is not required, and the Court can grant summary judgment for the FTC (and the Commonwealth) solely on the face of AFS's sales scripts. A few ambiguous lines at the end of the scripts did not clarify the perception of an offer to send free samples. AFS did not legally or factually "cure" its deception through activities that occurred *after* the deceptive sales calls had already resulted in "orders" that AFS monetized via false and threatening invoices and collections.[2]

AFS's other summary judgment responses are equally without merit. Most significantly, AFS cannot avoid injunctive relief through its alleged cessation of telemarketing print publications *in the middle of litigation* and self-serving promises that AFS does not have current plans to telemarket them in the future. Further, the U.S. Constitution does not protect misleading commercial speech;[3] the undisputed facts establish Defendant Satell's individual liability arising out of his 30-years leading AFS's multi-million dollar scheme; and AFS cannot use bogus "affirmative defenses" to avoid judgment. Finally, AFS admits the facts of its automatic book renewal process, so its baseless opposition to summary judgment for this misconduct is futile. For these, and all of the reasons already provided, the Court should put an end to AFS's tactics once and for all, and enter summary judgment and corollary relief on all Counts.

---

[2] Post-hoc "disclosures" in "confirmatory emails," a quality control process designed to ensure adherence to a deceptive script, and a "cancellation" policy for "orders" that were never placed, do not cure AFS's deception. [*See* ECF 349, at 15-16, 51-53, 61, 64; ECF 348, at 32; *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (rejecting defendant's position that "if these consumers had read the disclosures sent to them" they would not have been deceived, and noting that defendant "offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales"); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201-02 (9th Cir. 2006) ("[T]he fact that the companies provided consumer a toll free number to call for refunds does not affect our conclusion that the solicitation violated FTCA § 5.")]

[3] This issue is addressed in the Commonwealth's Reply filed on the same date.

### A. The Scripts Are Facially Deceptive and Admissible Extrinsic Evidence Bolsters a Finding of Deception as a Matter of Law.

Even if accurate, parts of the sales scripts being "literally true" is no defense to their deceptiveness as a matter of law. [ECF 349, at 51;[4] *FTC v. Sterling Drug, Inc*., 317 F.2d 669, 675 (2d Cir. 1963) ("[Courts] have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true.'").][5] Moreover, *evidence of actual deception is not required*. [*FTC v. NHS Sys., Inc*., 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013); ECF 339-1, at 33-34; ECF 338-1, at 36-37 (collecting caselaw).] Accordingly, even if the Court disregarded all evidence of actual deception (consumer complaints and AFS employee testimony[6]/messages),[7] the Court can and should still hold that the scripts[8] are

[4] In citing ECF filings, the FTC refers to the ECF pagination.

[5] AFS narrowly focuses on secretary scripts directing telemarketers to expressly say "no" when asked if the telemarketer is selling something, but AFS does not dispute that misleading responses such as "I have some questions about billing and insurance" were used by telemarketers. [*Compare* ECF 349, at 54 and ECF 349, at 98-103, ¶¶ 51-61 *with* ECF 339-1, at 13-14.] The undisputed evidence is that telemarketers were not trained to (and did not) answer "Yes" in response to the question from a secretary as to whether the telemarketer was selling something, and the testimony cited by AFS does not contradict that telemarketers would either answer "No" or respond with a misleading answer. [ECF 349 ¶¶ 55, 59, 60.] These statements were material, as they contained information important to a consumer's purchasing decision. [ECF 339-1, at 43–44.] AFS's statement that "it is undisputed that AFS did not sell its publications to secretaries or gatekeepers" [ECF 349, at 55] is demonstrably false; AFS's orders show sales to "secretary" and "secretary to principal," along with numerous administrative assistants. [ECF 348-3 ¶ 8; ECF 348-4, at 108-113.] AFS's statement that the "sales representative verified the subscriber's authority" is also demonstrably false. [ECF 349, at 15.] There is no such verification in the sales scripts. [ECF 349, response to ¶¶ 74-75.]

[6] AFS's representation that Plaintiffs "interviewed" 200 former employees is both unsupported and false. [ECF 349, at 38.]

[7] Extrinsic evidence of actual deception can "bolster," but is not required for, a court's conclusion that a representative or practice is deceptive. *See, e.g*., *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); ECF 339-1, at 41; ECF 348, at 37-42 (collecting caselaw).]

[8] The sales scripts were likely to mislead consumers by, among other things, using the phrase "no-risk;" twice promising to call the consumer back; saying, "we *hope* you will become a paid subscriber, but we know we will have to prove ourselves first;" and twice saying that AFS is sending publications the consumer never requested. [ECF 338-1, at 49-53; ECF 339-1, at 37-41.]

facially descriptive as a matter of law, as they have the capacity to mislead consumers into believing that they were being offered free samples, not paid subscriptions.

As Plaintiffs will set forth in detail in a motion in limine to be filed on August 2, the various groups of consumer complaints[9] are admissible both to show notice and under F.R.E. 807, the residual hearsay rule.[10] The complaints are supported by sufficient guarantees of trustworthiness and are more probative on consumer misunderstanding than other evidence Plaintiffs can obtain through reasonable efforts. In *FTC v. Cyberspace.com, LLC*, the Court granted summary judgment for the FTC and held that consumer complaint emails and letters are admissible both to show notice and, under the residual hearsay exception, to show truth of matters asserted. 2002 U.S. Dist. LEXIS 25565, at *13 n.5 (W.D. Wash. July 10, 2002); *see also FTC v. Magazine Solutions, LLC,* 2009 U.S. Dist. LEXIS 20629 (W.D. Pa. Mar. 16, 2009) (admitting consumer complaints and declarations and collecting caselaw).[11]

[9] "Consumer complaints" include not only sworn consumer declarations, but also complaints sent directly to AFS in response to AFS's "confirmatory" and collection emails, complaints to AFS's debt collectors, and complaints to government and consumer agencies. Consumers from all over the country over a long period of time provided unsolicited descriptions of similar, often identical, confusion arising out the sales calls. [ECF 339-3 ¶¶ 198-306.]

[10] Federal Rule of Evidence 807 was amended in 2019 to remove the requirement of "equivalent" circumstantial guarantees of trustworthiness, that the evidence be of a material fact, and that its admission will best serve the purposes of these rules and the interests of justice.

[11] AFS attempts to distinguish *Magazine Solutions* because the defendants there failed to retain copies of complaints made to the company. [ECF 349 at 43] However, this was only one of many factors there, was not dispositive, and would actually *favor* the admission of consumer complaints made directly to AFS here. *FTC v. Magazine Solutions, LLC*, 2009 U.S. Dist. LEXIS 20629, *4-7 (W.D. Pa. Mar. 16, 2009). AFS's selective quotation from *AMG* also weighs against AFS's position, because there the Magistrate Judge *sua sponte* admitted the complaints under the residual hearsay exception, and the district court upheld the admissibility. *FTC v. AMG Servs.*, 2014 U.S. Dist. LEXIS 10240, *42-47 (D. Nev. Jan. 28, 2014) ("If the FTC were not permitted to admit the thousands of consumer complaints under Rule 807, FTC enforcement actions would be effectively halted and the agency would be barred from presenting the core information it uses to initiate investigations and prosecute cases."); *FTC v. AMG*, 2014 U.S. Dist. LEXIS 96689, *25-30 (D. Nev. July 26, 2014) (explaining that consumer complaints reported "roughly similar experiences,"

AFS's attacks on the validity of the consumer complaints ignore the facial deceptiveness of the scripts. [ECF 349, at 50-51.] That a telemarketer read the script, spoke with a consumer, or tricked the consumer into providing a birthdate is *not* evidence that the consumer understood that AFS was placing an "order" for a paid subscription. [ECF 349 at 34–43, 66.] These "facts," even if true, do not reflect *consumer understanding* of what occurred during the call. This understanding, instead, is reflected in consumer complaints where consumers repeatedly and consistently state that they *did not* place orders and/or they believed they agreed to receive free samples. [ECF 339-3 ¶¶ 198-306.][12]

Plaintiffs have already explained that AFS's expert *did not* make a finding that a "substantial percentage of the BBB complaints were not valid for various reasons, including that they were demonstrably inaccurate or made by someone other than the person to whom the sale was made." [ECF 349, at 51 (citing ECF 342-18, Ex. R, Daley Rpt. at 22-23); ECF 348, at 39-42 (discussing in detail AFS's mischaracterizations of its expert's report).] Moreover, Plaintiffs have already demonstrated that AFS's relentless instance on counting *only* BBB complaints for what AFS describes as "small subgroup of customers" is factually inaccurate and legally irrelevant. [*See* ECF 348, at 37-39.] On the "complaint" side of AFS's equation, AFS counts *only* BBB complaints,

---

were submitted by unrelated members of the public, were obtained from three different independent sources, were voluminous, and the combination of volume and similarity indicated that there was little risk that the statements were the product of faulty perception, memory or meaning; and rejecting argument that live consumer witnesses would produce more reliable evidence because the main purpose for the FTC's use of the statements was not to support an assertion that *some* consumers were confused, but that a *large number* of consumers were confused and it would be unreasonable to bring hundreds of consumers in to court to swear under oath and subject to cross-examination that the contents of their complaints were true).

[12] AFS referring to complaints as "unverified" is a red herring where many of the complaints are replies to AFS's "confirmatory emails," replies to AFS's collection emails, and messages on AFS's customer service line from people who received invoices. AFS's expert stated that AFS matched the complaints to a specific order in 96% of its responses to BBB complaints. [ECF 342-18, p. 6.]

ignoring in their entirety complaints made directly to AFS, its debt collectors, online forums and governmental agencies. [ECF 339-3, ¶¶ 198-306.] On the "order" side of the equation, AFS includes every "order" that *its own telemarketers* ever recorded, without regard to whether the very fact of the "order" was subsequently contested by a consumer, which countless "orders" were. [ECF 339-3 ¶¶ 172-73, 237, 308; ECF 339-10, at 57–61; ECF 339-6 ¶¶ 42-46.] More importantly, "**the number of complaints filed is not determinative of whether a violation of Section 5 [of the FTC Act] has occurred.**" *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 442 n.31 (D.N.J. 1998) (declining to address as "meritless" the defendants' argument "that only a limited number of consumers complained about the [defendants'] practices and procedure"); *see also FTC v. RagingBull.com, LLC,* 507 F. Supp. 3d 629, 634 (D. Md. 2020) ("[R]easonable consumers may be misled even where some consumers claim to be satisfied with a service or only a few consumers actually complained.")

AFS's "consumer survey" argument is equally meritless. The cases AFS cites involve private litigants that used surveys to satisfy their required showing of deception or other instances where a party chose to use a survey. These, of course, are irrelevant to Plaintiffs' enforcement actions where no proof of deception is required.

Finally, AFS's apparent hearsay challenge to employee testimony and internal messages fails where (1) the employee deponents will be present at trial or their testimony will be admissible if they are unavailable [Fed. R. Civ. P. 32]; and (2) the statements made during the course of employment are not hearsay. [F.R.E. 801(d)(2)(D).] Further, even if employees from one branch made the statements they remain applicable to all AFS operations.[13] [ECF 338-1 at 28.]

[13] For example, "If we wanted a d*amn implied agreement we wouldn't trick the customer to say OK by ending the script with OK" would apply to every branch that used the script, which was all of them. [ECF 339-3 ¶ 337(h).]

**B. Summary Judgment Should Be Granted in Favor of the FTC on Counts I, II and IV Based on the Unordered CEEL Renewal Books.**

AFS proffers no evidence to rebut Plaintiffs' evidence that consumers did not consent to receive *renewal books*,[14] and AFS admits that the scripts did not disclose (much less seek consumer consent for) AFS's book process. [ECF 349, at 150-54, ¶¶ 185-93.] AFS also admits that consumers paid $2,126,992 for books renewed pursuant to this process. [*Id.* at 154, ¶¶ 195-96, 307 (columns 3 & 4)[15].] AFS's admitted failure to disclose during the telephone call that consumers would be enrolled in a continuity plan for books is sufficient to establish liability under Count I (risk of being unknowingly enrolled in a continuity plan for annual books); Count II (continuity plan was not adequately disclosed); and Count IV (sending of and billing for the renewal books without the expressed consent of consumers).[16]

**C. AFS's Collections and Billing Practices Coerce Payment on AFS's Sham Subscriptions.**

Counts IV and VIII are premised on AFS's sending *and billing* for unordered merchandise and, in that regard, the billing itself is a basis for summary judgment on those Counts. [ECF 43] Additionally, AFS's relentless deceptive and harassing invoicing and collection practices are relevant to Plaintiffs' other claims, because they were the manner by which AFS got paid for sham subscriptions,[17] they demonstrate the falsity of AFS's "no risk" representations, and they evidence AFS's failure to "disclose or to disclose adequately" that consumers will be financially

[14] AFS's discussion of the Telemarketing Sales Rule ("TSR") is superfluous since there is no TSR claim in this case. [ECF 349, at 67-69; *see also* ECF 348, at 46-47.]

[15] AFS's objections to their own net revenue (revenue minus refunds and chargebacks) figures do not invalidate these numbers as reflecting the amount of money that consumers paid pursuant to the automatic book renewal process. [ECF 349, at 195-96, ¶ 307.]

[16] AFS's only argument related to the Unordered Merchandise Statute (Count IV) does not address renewal books. [ECF 342, at 47-48; ECF 349, at 70–72.]

[17] AFS's statement that there is no record evidence that any customer ever paid for a subscription that was "unwittingly ordered" is false. [*Compare* ECF 349, at 61 *with* ECF 339-3 ¶¶ 237, 308; ECF 339-10, at 57–61; and ECF 339-6 ¶¶ 42-46.]

bound. AFS's collection revenue figures are astounding: ~$9 million of the ~$22 million paid for AFS's telemarketed books and newsletters came from its outside debt collectors.[18] [ECF 339-3, ¶ 307.] The collections for CEEL book renewal are similarly astonishing: for the two years that AFS had an outside debt collector on CEEL renewals (before it started doing the collections itself), between *38-39%* of the payments came from collections. [*Id.*, last two columns]

**D. Defendant Satell Is Personally Liable.**

Satell's direct involvement in reviewing and responding to countless consumer complaints shows that Satell had the requisite knowledge or reckless indifference for individual liability. *See* ECF 339-3 ¶¶ 357–387.[19] AFS's attempt to distinguish this case from those involving "egregious" violations based on "literally false representations"[20] is unavailing because the undisputed evidence shows Satell knew or should have known of the deception. Satell approved the deceptive sales scripts; declined to require changes to misleading language; was routinely apprised of AFS's negative online reputation; took action to suppress negative online reviews and search results; and directly received and prepared responses to complaints and negative news articles. [ECF 339-3 ¶¶

---

[18] The revenue from collections would certainly be higher if it included amounts collected by AFS internal collectors. [ECF 349, at 147-48 (response to ¶ 175)].

[19] *FTC. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1139–41 (9th Cir. 2010) (finding awareness of customer complaints was a factor in considering defendant's reckless indifference); *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 638 (7th Cir. 2005) ("To claim ignorance in the face of the consumer complaints and returned checks amounts to, at the least, reckless indifference to the corporations' deceptive practices."); *Fed. Trade Comm'n v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1341-43 (N.D. Ga. 2022) (granting summary judgment on individual liability, noting individual defendant's knowledge of deception due to public reports and personal contacts apprising of consumer complaints and individual defendant's reference to such reports as "fake news"); *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 445–48 (D. Md. 2020) (finding individual liable where he was heavily involved in managing negative publicity, drafted a response to an unfavorable news article, hired someone to eliminate negative online search results, and referred to the FTC's case as a "witch hunt"); *F.T.C. v. Cap. Choice Consumer Credit, Inc.*, 2004 WL 5149998, at *29 (S.D. Fla. Feb. 20, 2004), *aff'd*, 157 F. App'x 248 (11th Cir. 2005) (liability due in part to continuing use of same sales script following notice of consumer complaints).

[20] [ECF 349, at 74-75.]

344–348, 355–387.] Despite all this knowledge that dates back to at least 2005, Satell continually maintained that the complaints were "impossible and blatantly false" [*Id.* ¶ 355 (citing *AFS v. BBB*, 872 A.3d 1202 (PA Super. Ct. 2005))], "hyperbole," and "lying." [ECF 339-3 ¶¶ 358, 362.] Accordingly, Satell's argument that his efforts to minimize negative publicity and respond to complaints evidence his "good faith" lacks evidentiary support and fails to adequately rebut Plaintiffs' right to summary judgment on Satell's individual liability.[21]

**E. Plaintiffs Have Established a Cognizable Danger of Recurrence.**

Even if accepted as true, AFS's alleged cessation of, and current plans not to resume, the narrow activity of telemarketing (print) publications[22] is insufficient to preclude summary judgment on injunctive relief in light of evidence that there *is* a cognizable danger of recurrence, whether the recurrence be with the print publications, with digital publications, workplace posters or any of AFS's other products or the products of its clients.[23] *See FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905, at *25–26 (D. Wyo. Sept. 28, 2007) (granting summary judgment, explaining that to obtain injunctive relief, the FTC does not have to prove that a defendant is "likely

---

[21] *Cap. Choice*, 2004 WL 5149998, at *37 ("[A]ny good-faith belief that Defendants may have had that their program was not deceptive had to have been shattered by actual performance. . . Their good faith is simply farfetched and, if anything, their abandonment of a more clear way to market their program, particularly when confronted with evidence that consumers were obviously misled, demonstrates fraudulent intent."); *Bay Area Bus.*, 423 F.3d at 635 ("Any doubt that consumers were misled is dispelled by the number of consumer complaints."); *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d at 452–53 (explaining that "good faith," even if true, would not insulate individual defendant from liability).

[22] AFS limits its arguments to telemarketing for "*print* publication" only, leaving open the possibility of telemarketing other products. *See, e.g.*, ECF 349, at 29-30 (discussing the closure of its "print publication business"); ECF 342, p. 23, ECF 350, p. 6.] AFS testified "Every business has to – if they want to stay alive, they have to market their company and make sales and the telephone is part of that." ECF 339-5, at 100–01.

[23] *See also FTC v. Netran Dev. Corp.*, 2006 U.S. Dist. LEXIS 98308, *9 (S.D. Fla. June 7, 2006) ("The apparent abandonment of illegal practices coupled with a disclaimer of the intention to revive them does not end the controversy, because the district court must insure that the public interest is protected from the threat of future injury.").

to engage in the *same precise conduct* found to be in violation of the law.") (*affirmed*, 570 F.3d 1187 (10th Cir. 2009). In addition, there is no genuine issue of material fact that AFS *currently* engages in business activities that mirror telemarketing, and that AFS's own employees refer to as "telemarketing." [ECF 338-1, at 67-68; ECF 339-1, at 58-59; ECF 348, at 20-22; ECF 348-3 ¶ 44.] AFS admits most of the facts[24] regarding its current activities, including its use of the telephone for lead generation, its failure to always identify itself as calling from its legal name or a registered fictitious name, and its continued invoicing and acceptance of payments for publication subscriptions obtained through telemarketing prior to September 2021. [ECF 349, at 204–08 (response to ¶ 336); ECF 348-4, at 215–16, 220–23 (RFAs 149-151, 166-67, 169).] AFS testified that AFS salespeople "in most instances" use the phone "to sell lead generation campaigns." [ECF 339-5, at 101.] AFS also continues to sell some of the same newsletters, simply converting them into a "digital" format. [*Id.* at 86–87.]

Taking into account the "the bona fides of [AFS's] expressed intent to comply [and] the effectiveness of [AFS's] discontinuance,"[25] along with AFS's continued denial of wrongdoing, accusations of consumers' "lying" despite countless similar complaints, and failure to even acknowledge the similarities between its former and current business practices, there is a cognizable danger of recurrence. Therefore, the Court should grant summary judgment on

---

[24] AFS objects to relevant factual statements as not "bearing" on the litigation or as mischaracterizing testimony, but AFS does not, as a general matter, deny the factual statements themselves. [ECF 349, at 204–208 (response to ¶ 336).] Accordingly, these facts are admitted. Judge Slomsky's Scheduling and Motion Policies and Procedures, Updated Nov. 2021, Section V. ("All material facts set forth in the statement required to be served by the moving party shall be admitted unless controverted by the opposing party.")

[25] *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (affirming summary judgment for the FTC and stating, "the district court is in the best position to judge the sincerity of a litigant's contrition.")

injunctive relief to insure that the public interest is protected from the threat of future injury. [*See* Section D, *supra*; ECF 348, at 22–23.][26]

**F. AFS's Affirmative Defenses Do Not Preclude Summary Judgment.**

AFS bears the burden of proof for its affirmative defenses, and Plaintiffs have properly addressed the absence of legal and evidentiary support for these defenses. [ECF 339-1, at 59-63; ECF 338-1, at 71-74.][27] In response, AFS ignores controlling Third Circuit decisions holding that laches is unavailable against the government, *see* ECF 339-1, at 60, instead citing to inapplicable decisions from other jurisdictions, as well as an inapposite case involving the unique circumstance of government intervention into a False Claims Act matter. *See United States ex rel. Monahan v. Robert Wood Johnson Hosp.*, 2009 U.S. Dist. LEXIS 111347, at *17-18 (D.N.J. Dec. 1, 2009).

The FTC's enforcement of a congressional mandate is certainly in the public interest. *Regina Corp. v. F. T. C.*, 322 F.2d 765, 768 (3d Cir. 1963) ("The purpose of the [FTC] Act is to protect the public."). AFS's demand to have "its day in court" based on "defenses" that are either legally unavailable, or unsupported by sufficient evidence after years of discovery should be rejected. [*See* ECF 349, at 76.]

---

[26] ECF 348-4, at 169 (internal May 2022 AFS communications stating that "**99% of the BB leads across the board are being generated via phone**"); *see also* ECF 348-4, at 175 (internal March 2023 AFS communication explaining "[T]hey call [telemarketing reps] Lead Development Reps now").

[27] Summary judgment is the proverbial "put up or shut up" time for the nonmoving party. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Where, as here, the non-moving party would have the burden of proof at trial, that party must set forth sufficient facts to preclude summary judgment. *Id.*; *Daubert v. NRA Grp., LLC*, 2016 U.S. Dist. LEXIS 94366, *27 (M.D. Pa. July 20, 2016) ("Contrary to Defendant's assertion, I did not place Plaintiff's burden of proving his TCPA claim on Defendant. Rather, after finding that Plaintiff satisfied his burden of establishing a prima facie case of his TCPA claim, which Defendant does not dispute, I found that there was insufficient evidence to establish a genuine issue of material fact as to whether Defendant was entitled to its affirmative defense, which Defendant would bear the burden of proof for at trial. Because there was no genuine issue of material fact as to whether Plaintiff established his prima facie case and there was insufficient evidence for a reasonable juror to conclude that Defendant was entitled to an affirmative defense, summary judgment was entered in favor of Plaintiff."]

Respectfully submitted,

Dated: 7/24/2023

/s/ *Amy C. Hocevar*

AMY C. HOCEVAR (Ohio Bar #0075510)
DEREK E. DIAZ (Ohio Bar #0069755)
CHRISTIAN M. CAPECE (New York Bar #4045936)
MARIS K.V. SNELL (Florida Bar #125585)
CONOR P. DUFFY (New York Bar #5203757)
Federal Trade Commission
1111 Superior Avenue, Suite 200
Cleveland, Ohio 44114
Hocevar: (216) 263-3409 | ahocevar@ftc.gov
Diaz: (216) 263-3421 | ddiaz@ftc.gov
Capece: (216) 263-3419 | ccapece@ftc.gov
Snell: (216) 263-3412 | msnell@ftc.gov
Duffy: (216) 263-3401 | cduffy@ftc.gov

Fax: (216) 263-3426

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2023, copies of the foregoing ***PLAINTIFF FTC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES*** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

/s/ *Amy C. Hocevar*

Attorney for Plaintiff Federal Trade Commission