IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION, et al.,

Plaintiffs,

v.

AMERICAN FUTURE SYSTEMS, INC., et al.,

Defendants.

CIVIL ACTION

NO. 20-2266

## OPINION

**Slomsky, J.**                                                    **March 29, 2024**

### TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................................................ 1

II.  **FINDINGS OF FACT** ......................................................................................... 7

   A.   **Parties** ............................................................................................................ 7

      1.   Plaintiffs ..................................................................................................... 7

      2.   AFS Defendants ......................................................................................... 8

   B.   **Customer Journey** ......................................................................................... 9

      1.   Training Telemarketers .............................................................................. 13

      2.   Telemarketing Call .................................................................................... 13

        i.   Secretary Script ................................................................................... 15

        ii.   Executive Script .................................................................................. 18

3. Confirmation Emails.................................................................... 21

4. Welcome Letter and Newsletters............................................ 22

5. Follow up by AFS..................................................................... 23

6. Collections................................................................................ 23

7. Liberal Cancellation Policy ..................................................... 24

8. Renewals................................................................................... 24

10. Quality Control ........................................................................ 24

C. **Customer Complaints** ................................................................... 26

1. Informal Complaints................................................................. 26

2. Formal Complaints ................................................................... 28

D. **Investigation of AFS** ..................................................................... 29

E. **AFS Closes the Print Publication and Telemarketing Business and Creates "SuccessFuel" as a New Enterprise.**............................................... 30

III. **CONCLUSIONS OF LAW** ............................................................... 32

A. **Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Have Engaged in Deceptive Conduct**................................. 33

1. Facial Evaluation ..................................................................... 38

2. Extrinsic Evidence ................................................................... 41

B. **Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Violated the Unordered Merchandise Statute**.......................................... 47

**C.   Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Violated the Telemarketing Rules of the UTPCPL** ...................................................... 49

**IV.   CONCLUSION** ............................................................................................ 51

## I.      INTRODUCTION

This matter essentially arises from a telemarketing script.  The script at issue was created by Defendant American Future Systems ("AFS"), a Pennsylvania corporation that sold publications to businesses through telemarketing.  Plaintiffs Federal Trade Commission and the Commonwealth of Pennsylvania claim that the script deliberately misleads individuals, but Defendants counter that it was integral to the quality control and the success of their business. Contrary to Plaintiffs' assertion of wrongdoing, Defendants' success is borne out by their 30 years in business, thousands of satisfied customers and hundreds of employees that contributed to the quality of their publications and profitability.  Although Defendants no longer sell print publications through telemarketing,[1] the instant litigation continued, and is now before the Court for a ruling on the claims alleged by Plaintiffs.

Since approximately 2013, the Commonwealth of Pennsylvania and the Federal Trade Commission ("FTC") have investigated Defendant AFS and its telemarketing practices.  On May 13, 2020, this lengthy investigation culminated in the filing of the first Complaint.  (See Doc. No. 1.)  It was filed by the Federal Trade Commission and named six (6) Defendants: American Future Systems, Inc. ("AFS"), Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), Edward M. Satell, International Credit Recovery, Inc., Richard Diorio, Jr., and Cynthia Powell.[2]  (Id.)  On January 21, 2021, Plaintiff FTC filed an Amended Complaint

---

[1]   As will be discussed Section II(E), infra, AFS closed its publication division and created a different business with the registered name "SuccessFuel."

[2]   Edward M. Satell is the founder, sole owner and Chief Operating Officer ("CEO") of AFS and PBPNJ.  Richard Diorio, Jr., and Cynthia Powell were the vice president and manager of International Credit Recovery, Inc. ("ICR"), respectively.  (Doc. No. 445 at 4:21-11.)  ICR was an

against the same Defendants and joined as a co-Plaintiff the Commonwealth of Pennsylvania. (Doc. No. 43.)   In the Amended Complaint, Plaintiffs FTC and the Commonwealth of Pennsylvania assert eight claims, four under federal law and four under Pennsylvania law.  (See id.)

On March 23, 2023, following a stipulation between Plaintiffs and Defendants International Credit Recovery, Inc., Richard Diorio, Jr., and Cynthia Powell ("ICR Defendants"), the ICR Defendants were dismissed from the case.  (Doc. No. 296.)  In addition, Counts III and VII, which only involved the ICR Defendants, were terminated.[3]  (Id.)  Thus, at trial, the three (3) remaining Defendants were AFS, PBPNJ and Edward M. Satell (the "AFS Defendants" or "Defendants").[4]  Each remaining claim against them will be noted, and a short description will follow of the claim being asserted.

- **Federal Law Claims Alleged by the FTC:**

  - **Count I:** Misrepresentation of Trial Offers

    Plaintiffs allege that AFS Defendants engaged in false or misleading acts that constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by representing, directly or indirectly, that consumers will receive publications for free with no risk.

  - **Count II:** Failure to Disclose Negative Option Terms

---

independent debt collection business that AFS hired to collect on past due accounts.  (Id. at 5:12-6:9, 68:15-70:12.)  ICR closed its business in 2021.  (Id. at 12:16-20.)

[3]   Counts III and VII (both titled "ICR Defendants' False or Unsubstantiated Representations to Induce Payment") were withdrawn after a settlement was reached between Plaintiffs and Defendants International Credit Recovery, Inc., Richard Diorio, Jr. and Cynthia Powell.  (Doc. No. 296.)

[4]   As will be discussed infra, Defendant PBPNJ engaged in the same telemarketing business as AFS and was created, in part, for the purpose of compliance with the tax laws of New Jersey.

Plaintiffs allege that AFS Defendants violated Section 5(a) of the FTC Act by failing to disclose or disclose adequately to consumers material terms and conditions of their offer to subscribe to their print publication.

o **Count IV:** Sending and Billing for Unordered Merchandise

Plaintiffs allege that AFS Defendants violated the Unordered Merchandise Statute, 39 U.S.C. § 3009, by shipping newsletters and books to recipients without prior express request or consent.

- **Pennsylvania Law Claims Alleged by the Commonwealth of Pennsylvania:**

  o **Count V:** Deceptive Misrepresentations

  Plaintiffs allege that AFS Defendants engaged in unfair or deceptive acts or practices in violation of 73 P.S. § 201-3 by representing, directly or indirectly, that consumers will receive publications for free with no risk.

  o **Count VI**: Failure to Disclose Material Terms

  Plaintiffs allege that AFS Defendants violated 73 P.S. § 201-3 by representing, directly or indirectly, that consumers will receive publications for free with no risk and failed to disclose material terms of the offer.

  o **Count VIII**: Sending and Billing for Unordered Merchandise

  Plaintiffs allege that AFS Defendants violated 73 P.S. § 201-3 by engaging in the deceptive practice of sending unordered merchandise and seeking payment.

(See Doc. No. 43 at ¶¶ 58-95.)   Based on these allegations, Plaintiffs sought injunctive and monetary relief under both state and federal law.  (See id.)  More specifically, Plaintiff FTC sought at trial a permanent injunction against AFS Defendants for alleged violations of 13(b) of the FTC

Act, 15 U.S.C. § 53(b) [5] and 39 U.S.C. § 3009.[6]  The FTC cannot seek monetary damages for prior

acts, but here they allege that Defendants' violations are ongoing.   The Commonwealth of

Pennsylvania sought at trial money damages and a permanent injunction against AFS Defendants

for alleged violations of Section 4 of Pennsylvania's Unfair Trade Practices and Consumer

---

[5]   15 U.S.C. § 53(b) states in pertinent part:

> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating or is about to violate, any
>    provision of law enforced by the Federal Trade Commission, and
>    . . .
> (2). . .  the Commission by any of its attorneys designated by it for such purpose may
>    bring suit in a district court of the United States to enjoin any such act or practice.
>    . . Provided further, That in proper cases the Commission may seek, and after proper
>    proof, the court may issue, a permanent injunction. . .

15 U.S.C. § 53(b) (emphasis in original); see also F.T.C. v. AbbVie Inc., 976 F.3d 327, 374 (3d
Cir. 2020) (citing United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).

Courts may not award monetary damages for prior violations of the FTC Act, AMG Capital
Management, LLC v. F.T.C., 593 U.S. 67 (2021) (holding that Section 13(b) does not authorize
the FTC to receive equitable monetary relief such as restitution or disgorgement), and may only
issue a permanent injunction for past conduct where there is a "cognizable danger" of
reoccurrence, United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); see also AbbVie, 976
F.3d at 379; In re Nat'l Credit Mgmt. Grp., L.L.C., 21 F. Supp. 2d at 440.

[6]   39 U.S.C. § 3009, states in pertinent part:

> (a) . . . the mailing of un-ordered merchandise or of communications prohibited by
>    subsection (c) of this section constitutes an unfair method of competition and an
>    unfair trade practice in violation of section 45(a)(1) of title 15.
>
> . . .
>
> (d) For the purposes of this section, "un-ordered merchandise" means merchandise
>    mailed without the prior expressed request or consent of the recipient.

Protection Law ("UTPCPL"), 73 P.S. § 201-4.[7]   Under 73 P.S. § 201-4.1[8] and § 201-8(b)[9], Plaintiffs sought $24,734,172 as restitution pursuant to 73 P.S. § 201-4.1, and $10,000,000 in civil penalties pursuant to 73 P.S. §201-8(b).  (See Doc. No. 459-1 at 15.)

A fifteen-day non-jury trial was held from the end of September 2023 to mid-October 2023. (Doc. Nos. 425-35, 439-52.)   Plaintiffs called twenty-one (21) witnesses, many as of cross-examination:  three (3) were government employees[10], ten (10) were former and current employees

---

[7]   73 P.S. § 201-4 states:

> Whenever the Attorney General or a District Attorney has reason to believe that any person is using or is about to use any method, act or practice declared by section 3 of this act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice.

[8]   73 P.S. §201-4.1 authorizes restitution:

> Whenever any court issues a permanent injunction to restrain and prevent violations of this act as authorized in section 4 above, the court may in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of this act, under terms and conditions to be established by the court.

[9]   73 P.S. §201-8(b) authorizes civil penalties for a willful violation:

> In any action brought under section 4 of this act, if the court finds that a person, firm or corporation is willfully using or has willfully used a method, act or practice declared unlawful by section 3 of this act, the Attorney General or the appropriate District Attorney, acting in the name of the Commonwealth of Pennsylvania, may recover, on behalf of the Commonwealth of Pennsylvania, a civil penalty of not exceeding one thousand dollars ($1000) per violation, which civil penalty shall be in addition to other relief which may be granted under sections 4 and 4.1 of this act.

[10]   Plaintiffs' government witnesses were: (1) Lauren Oleckna, Senior Civil Investigator for the Commonwealth of Pennsylvania Office of Attorney General; (2) Sarah Frasch, Chief Deputy

of AFS[11], two (2) were former customers of AFS[12], and the last one was Edward Satell, the CEO of AFS.  Plaintiffs also called Andrew Goode, a Vice-President of the Better Business Bureau ("BBB")[13], Richard Diorio, the Vice-President of the now defunct ICR and William Sasso, Esquire, former counsel of AFS.  Plaintiffs only expert witness was Erik Lioy, a rebuttal witness.[14]

---

Attorney General for the Commonwealth of Pennsylvania; and (3) John Vega, senior investigator for the FTC.

[11] The ten (10) witnesses who were former or current employees of AFS were: (1) Colin Drummond, AFS's former director of call center operations and a current employee at SuccessFuel; (2) Amy Luchette, a former AFS telemarketer; (3) Denise Haney, an AFS Customer Service Representative, (4) Tara Orischak, a former AFS branch manager, (5) Susan Grabert, a former head of quality control at AFS, (6) Melissa Schwenk, a former AFS telemarketer, (7) Robin Biltheiser-Buck, a former AFS telemarketing representative and quality manager, (8) Jennifer Rann, a former AFS telemarketer and customer service representative, (9) Mike Gorton, AFS's former administrative director, and (10) Melissa Schwenk, a former AFS telemarketer and current SuccessFuel employee.  An additional witness, Kelly Strosnider, a former AFS telemarketer, was not available to testify so a portion of her deposition was read into the record.

Out of these ten witnesses, all but one defended AFS and its business practices.  Even Amy Luchette, the one former employee who had criticisms of AFS's business practices, confirmed the commitment of AFS to produce quality publications.  See note 47, infra.

Some of the employees worked at AFS for many years.  (See Doc. No. 446 at 59:9-20 (Susan Grabert testified that she worked at AFS for 25 years); Doc. No. 432 at 98:6-7 (Jennifer Rann testified that she worked at AFS for 10 years); Doc. No. 431 at 82:21-22:1 (Tara Orishak testified that she worked at AFS for 9 years); Doc. No. 432 at 5:17-21 (Melissa Schwenk testified that she had worked at AFS for 14 years, was temporarily laid off, but is presently employed at SuccessFuel)).

[12] The two witnesses who were former customers of AFS were: (1) Kelly Rickard, an employee of Clavesvista and (2) Daniel Dewey, a chemist.

[13] A discussion of Andrew Goode's relevance to the litigation and testimony will be discussed Section II(C)(2), infra.

[14] Erik Lioy is a certified public accountant who testified as a rebuttal witness for Plaintiffs.  (Doc. No. 450 at 41:12-13.)  See note 72 infra, for a full discussion of Lioy's expert testimony.

6

Defendants called four (4) witnesses: two current employees of AFS[15] and two expert witnesses.[16]  In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court's findings of fact and conclusions of law follow.[17]

## II.     FINDINGS OF FACT

### A.     Parties

#### 1.  Plaintiffs

The two Plaintiffs in this action are the Federal Trade Commission ("FTC") and the Commonwealth of Pennsylvania (the "Commonwealth").  The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45, which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Unordered Merchandise Statute, 39 U.S.C. § 3009.  The Commonwealth of Pennsylvania, through its Attorney General, is authorized to initiate

---

[15]  They were: Curt Brown, an editorial director for AFS and Heather Wood, Edward Satell's executive assistant, who also previously worked at AFS as a telemarketer and a member of the quality control department.

[16]  Defendants' expert witnesses were Margaret Daley, a forensic data expert and Harris Devor, a forensic accountant.

[17]  Federal Rule of Civil Procedure 52(a)(1) provides:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a)(1).

proceedings in the public interest to restrain unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce. 73 P.S. § 201-1, et seq.

### 2. AFS Defendants

In 1973,[18] Defendant Edward Satell founded Defendant American Future Systems Inc. ("AFS"), as a Pennsylvania corporation that primarily sold cookware.[19]  (Doc. No. 444 at 76:19-77:15.)  In the late 1980's, AFS phased out its cookware sales and transitioned into the publication

---

[18]  In this case, the relevant time period is from 2015 to the present.  For purposes of providing background information, the Court will go outside of that period.

[19]  In 1954, Satell was first introduced to the cookware business as a college student when he worked for a company that sold cookware to young women.  (Doc. No. 444 at 78:4-13.)  Satell became very skilled in training and recruiting other college students to work with him.  (Id.; Doc. No. 431 at 53:18-19.)  In 1973, Satell took his expertise from his previous company to found American Future Systems Inc. as his own enterprise selling cookware.  (See Doc. No. 458 at 4; Doc. No. 444 at 77:25-78:8.)  AFS sold cookware through both in-person and telemarketing sales.  (See Doc. No. 444 at 81:7-82:16.)

Throughout the 1980's, cookware declined in popularity as more women began pursuing higher education and careers.  (Doc. No. 431 at 64:11-25 ("For four years from 1985 to 1989, the business—that business had declined because women had changed.  They were going to college, and the interests were different in getting [cookware] at that time."));  see id. at 67:1-4 ("The world changed in that period as it did, and we moved on to this other business. . .").

Facing this decline in cookware's popularity, Satell decided to expand his business into other areas in which he believed he could be successful—telemarketing and order fulfillment.  (See Doc. No. 444 at 82:16-83:20.)  When Satell was interviewing a potential telemarketer for AFS's cookware division, he learned about a company selling publication subscriptions to businesses.  (Id.)  Recognizing an opportunity to leverage AFS's existing telemarketing expertise in a new venture, Satell transitioned AFS into the publication business.  He did not have experience in publishing so he hired experienced editors to create high-quality publications.  (Id. at 83:21-84:7.)  Satell described this transition when he testified that AFS:

> didn't have any editorial experience, so I brought these people on.  We looked for very good editors, and we would—people with excellent experience in that area, and they loved us because we could drive in customers for the[m].

(Id.)  As a result, AFS entered in telemarketing publication business in the late 1980's.  (Doc. No. 431 at 54:20-24.)

business.  (Doc. No. 431 at 54:20-24.)  From that point on, AFS used telemarking representatives

to call businesses and organizations to sell yearly subscriptions to AFS's newsletters and books.

(Id.)  AFS did business under the names Progressive Business Publications ("PBP"), Progressive

Business Publications, Inc., and the Center for Education and Employment Law ("CEEL").  In

2005, the third Defendant, Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), was

incorporated in New Jersey and engaged in the same business as AFS.[20]  (Doc. No. 429 at 95:16-

96:11.)  PBPNJ was dissolved in 2019.

During the relevant time period, Edward Satell was the Chief Executive Officer and the

sole owner of Defendants AFS and PBPNJ.[21]  (Doc. No. 429 at 45:8-19.)  AFS and PBPNJ

transacted business in the Eastern District of Pennsylvania and throughout the United States.  In

September 2021, AFS ended its practice of telemarketing print newsletters.[22]  (Doc. No. 441 at

14-52:11.)

### B.    Customer Journey

For more than three decades, AFS published and sold specialty newsletters and books to

thousands of businesses and organizations.  AFS's telemarketing calls resulted in numerous

---

[20]  As noted, PBPNJ was created, in part, to comply with New Jersey state tax law.  (Doc. No. 429 at 95:16-96:11.)

[21]  At some point prior to 2015, Satell was the 98% owner of AFS.

[22]  Satell and Colin Drummond, the former head of AFS's telemarketing division, testified that the print publication business began its descent because customers were more interested in online based newsletters and there was a general decline in landline use.  (Doc. No. 427 at 85:4-18.) Plaintiffs claim they ended the business because of their investigation of AFS and the filing of this case.  Both reasons do not affect whether Plaintiffs have proven their case by a preponderance of the evidence.

satisfied customers who renewed their subscriptions year after year.[23]  (See Doc. No. 432 at 36:11-19.)  At its height, it published over thirty newsletters on many topics, including human resources, accounting and administrative matters.[24]  (Doc. No. 426 at 48:24-49:2.)  And in addition to its telemarketing staff,[25] AFS employed a fulltime editorial staff which created original content for

---

[23]  For example, the Thirteenth Circuit Court in Columbia Missouri subscribed for 5 years (see Pl. Ex. 2210 at 1), the Administrative Office of Courts in Annapolis Maryland subscribed for 10 years (see id. at 4), and South Florida Water Management subscribed for 7 years (see id. at 433).  Melissa Schwenk, a former customer service representative for AFS, testified as follows regarding CEEL reference guides:

> Very many subscribers appreciated the reference guide. In my consultation time with the company, it was my job to call CEEL customers and follow up with them to see what their likes and dislikes were about the product to kind of, like, get, you know, feedback, encourage them to keep going with it in the future. And many people told us that it was an invaluable resource to them.

(Id.)

[24]  For example, PBP's newsletters had titles such as:

> Safety and Compliance Alert (Def. Ex. 2041);
> Facilities Managers Alert (Def. Ex. 2042);
> CFO & Controller Alert (Def. Ex. 2043);
> Primary Care Coding & Reimbursement (Def. Ex. 2049);
> Supervisors Legal Update (Def. Ex. 2050);
> Corporate Foundation Funding and Funding Advantage (Def. Ex. 2051);
> What's New in Benefits & Compensation (Def. Ex. 2055);
> Non-Profit Board Report (Def. Ex. 2056);
> Keep Up to Date on Payroll (Def. Ex. 2057); and
> Employment Law Report (Def. Ex. 2062).

[25]  Colin Drummond, AFS's former head of telemarketing, testified:

> I had overall responsibility for approximately a dozen branches across Western Pennsylvania and Ohio and we had one in New Jersey as well. . . there was a

its publications.[26]  (Doc. No. 433 at 17:10-14, 19:1-20:1.)  In each issue of a newsletter, AFS published practical and timely information that would be relevant to the newsletter's target industry.  (Doc. No. 430 at 64:10-65:8.)

In addition to its initial line of newsletters, in or around 2003, AFS began selling a line of products specifically geared toward educational institutions and public employers.  AFS adopted this line when it purchased "The Center for Education and Employment Law" ("CEEL") from Oakstone Publishing.  (Doc. No. 433 at 34:14-20.)  AFS adopted CEEL's standing business practices, including its newsletter and subscriber base.[27]  (Id. at 54:6-10.)  The big difference between CEEL and AFS's other subscriptions was that CEEL subscriptions included a book, often referred to as a "reference guide," in addition to the newsletter.  (Id. at 35:3-24.)

---

point where we had the largest in-house business-to-business telemarketing operation in the United States that we know of.

At our height, we had close to 500 sales rep[resentatives] in these various different locations.

(Doc. No. 426 at 5:2-10.)

[26]  AFS' publication staff included persons with previous experience as editors at well-known publications, including the Philadelphia Inquirer and USA today.  At its height, AFS employed approximately thirty-two editors.  (Doc. No. 433 at 19:14-22, 21:17-21.)

[27]  CEEL's newsletters focused on educational related matters.  CEEL's newsletters and reference guides had titles such as:

Environmental Safety Compliance Alert (Def. Ex. 283);
School Safety & Security Alert (Def. Ex. 2045; Def. Ex. 2052);
Private Education Law in America (Def. Ex. 2053);
K-12 Legal Notes for Education (Def. Ex. 2059);
Special Education Law Update and Students with Disabilities (Def. Ex. 2060);
Legal Update for Teachers (Def. Ex. 2061);
Public Education Law Report (Def. Ex. 2064); and
Higher Education Law in America (Def. Ex. 2066).

AFS sold its newsletters through a yearly subscription that included not only print materials—newsletters and for CEEL orders, books—but also access to digital publications via AFS's online websites.  (Doc. No. 441 at 70:8-71:6.)  To market and sell its subscriptions, AFS utilized telemarketers that "cold-called"[28] potential subscribers.  (Doc. No. 439 at 99:16-19.)  The potential subscribers included businesses, schools, churches, non-profit organizations and government entities such as fire departments, police departments and courts.  (Doc. No. 426 at 49:3-8; Doc. No. 441 at 13-23.)

When AFS's telemarketers contacted a potential subscriber, they offered a "no risk" subscription model.  "No risk" meant that a subscriber would have a sixty-day period to review the publication and the terms of the offer without charge and decide whether to subscribe.[29]  (Doc. No. 426 at 35:20-39:14.)  During the sixty-day period, the subscriber received two newsletters. With the second newsletter, they usually received an invoice.[30]  (Id. at 100:18-101:3.)  Once they received the invoice, the subscriber could complete the sales transaction by paying the yearly fee or they could write cancel on the invoice and send it back.  (Id. at 21:15-19.)  AFS utilized this model so businesses and organizations had a chance to review the information and decide if the

---

[28]  "Cold calling" is defined as contact from one business to another business without any previous relationship of any relevance.  (Doc. No. 426 6:7-19.)

[29]  Colin Drummond, AFS's former head of telemarketing testified that:

> No risk is industry terms.  Subscription services use it all the time.  It just means no money up front.  You're not going to have to invest in anything.  You're going to be able to cancel it without owing any money.  That's all no risk means.

(Doc. No. 426 at 36:25-37:3.)

[30]  If the invoice did not come directly with the second newsletter, it would come shortly thereafter.

subscription was the right fit for them.  It was therefore critical that AFS's telemarketers correctly stated the details of the subscription.  To do this, AFS followed a scripted comprehensive process.

### 1.  Training Telemarketers

Before a telemarketer could begin calling potential subscribers, new telemarketing hires were trained by branch managers and other experienced employees.[31]  (Doc. No. 428 at 12:9-21; Doc. No. 431 at 86:16-19.)  For about a week, new hires learned about the scripts they would use during the calls, AFS's publications, AFS's subscription model, the overall sales process and the importance of potential subscribers understanding the subscription offer.  (Doc. No. 431 at 90:10-11, 90:18-91:13, 92:3-94:23.)  New hires also would "role-play" phone calls and eventually be coached during a live call.  (Id.)  AFS continuously revised and improved its telemarketing training.  (Doc. No. 441 at 7:12-19, 107:24-108:21.)  After they completed training, new telemarketers began making calls.  But even past the initial training, branch managers provided additional trainings and monitored the telemarketers' calls for quality.[32]  (Id. at 133:1-16; Doc. No. 427 at 31:6-8.)

### 2.  Telemarketing Call

AFS used targeted telemarketing practices to reach business and organization managers and executives, tell them about AFS's specialized newsletters and reference guides, and present the subscription terms.  AFS's telemarketers would be provided with a list of numbers to "cold call" and scripts to follow on the call.  (Doc. No. 426 at 6:7-19.)

---

[31]  AFS had telemarketing call centers, referred to as "branches" in Ohio, Pennsylvania and New Jersey.  (Doc. No. 441 at 117:18-119:113.)  Telemarketers would be trained at the branches.  (Doc. No. 428 at 12:9-21.)

[32]  See Section II(B)(10), infra, for a full discussion on the quality control process at AFS.

When making the initial sales call, telemarketers were instructed to only speak to a manager or executive that had purchasing power.[33] (Doc. No. 339 at 101:16-20; Doc. No. 427 at 16:21-23, 19:23-20:3.) If a secretary answered the call, telemarketers could follow the "Secretary Scripts" or "Gatekeeper Scripts" to aid the telemarketer in getting to the person that they needed to speak with. (Doc. No. 427 at 16:25-17:10; Doc. No. 426 at 14:7-24.) These initial contact scripts were tools that could be followed but it was not required. (Doc. No. 439 at 100:12-24.)

Once a telemarketer reached the targeted potential subscriber, they were required to follow the one-page telemarketing script known as the "Executive Script" or "Script." (Doc. No. 427 at 35:4-14; Doc. No. 428 at 20:12-16.) If a telemarketer did not follow the "offer" or "no risk subscription disclosure" portions of the executive script word-for-word, AFS would cancel the subscription or seek additional confirmation from the customer before placing the order.[34] (Doc. No. 428 at 20:12-16, 42:20-23.) While there were several iterations of the executive script, the

---

[33] Telemarketers were given this instruction because AFS would cancel the order if the individual the telemarketer was speaking to did not have purchasing authority or could not obtain purchasing power. (See Doc. No. 426 at 22:13-24:13.) For example, AFS telemarketers were not permitted to sell subscriptions to secretaries. (Doc. No. 427 at 26:20-27:3.)

[34] Telemarketers were also provided with a list of "no-no phrases." (Doc. No. 440 at 56:2-14, 58:10-21; Ex. 1191, Ex. 1124.) "No-no phrases" included "free," "trial," and "trial offer." (Id. at 58:16-59:12.) Telemarketers were prohibited from using these phrases during the call because they would change the potential subscriber's understanding of AFS's offer. (Id.) As Colin Drummond, AFS's former head of telemarketing, testified at trial:

> we didn't want [telemarketers] to go off the script or, when they were trying to answer a question, change anything that may change the customer's understanding of the transaction.

(Id.)

scripts were virtually identical to one another,[35] and their differences related mainly to the description of the particular publication being marketed.[36]  (See Def.'s Ex. 2002; Exh. 6 at 1-51.)

 i. Secretary Script

 As previously noted, telemarketers were instructed to only speak to a manger or executive that had purchasing power.  If a secretary answered the call, telemarketers could follow the "Secretary Script" to aid the telemarketer in reaching the person they needed to speak with.  (Doc. No. 427 at 16:25-17:10; Doc. No. 426 at 14:7-24.)  Unlike the different versions of the "Executive Script" that were virtually identical, there were numerous iterations of the "Secretary Script" introduced at trial.  (See Pl. Ex. 6 at 6-52, 6-53, 6-56, 6-57, 6-58, 6-59; Doc. No. 426 at 16:22-17:4.)  While AFS referred to these documents as "Scripts," the documents read more like a set of instructions or tools for the telemarketer, rather than a script that must be followed.[37]  For example, the "Secretary Script" for the "Quality Assurance Alert" newsletter begins:

---

[35] The parties agree that the "Executive Scripts" were materially the same.  (See Doc. No. 459 at 19 ("The offer paragraphs and the disclosure paragraphs in AFS's sales scripts were materially the same for all of the company's publications"); Doc. No. 442 at 34:20-24.)

[36] One of the main differences is that CEEL orders inform customers that they will be receiving a "reference guide" in addition to the newsletter and provide them with additional information on how to return the reference guide.  Non-CEEL orders do not come with a reference guide.

[37] For example, one secretary script includes a section titled "GUIDELINES FOR INCREASING CONTACTS" that instructions telemarketers to "Sound CONFIDENT with a sense of URGENCY & SPEAK LOUDLY!!"  (Id. at 6-53) (alteration in original).

Further, Colin Drummond, AFS's former head of telemarketing, testified:

> This is not the executive script. So the executive script was sacrosanct. No messing around with that. We're very bullish on that. These secretary scripts were training tools that were written by the branches. And they were circulated around either via email or they would swap them back and forth. Or when we had managers meetings, they would go, hey, I wrote a secretary script. It's very effective, so on and so forth. So they wanted to help one another, the 14 or 15

> Good Morning, I NEED to speak to the person in charge of quality control or quality assurance for your location.  Who would that be?

(Pl. Ex. 6 at 6-52) (alteration in original).  Below this introduction, the telemarketer is given several instructions on how to respond to the secretary depending on what the secretary asked.  For example, if a secretary asks, "[w]here are you calling from?" the telemarketer can respond "Progressive Business, Is he/she in the office today?"[38]  (Id.)

_____

> branches wanted to help one another. So in the course of a year, you know, if you have 26 pub changes and 14 branches rotating off these secretary scripts, there was a lot of them moving around.

(Doc. No. 427 at 20:7-17.)

[38] Reproduced in full, the "Secretary Script" for the "Quality Assurance Alert" newsletter is as follows:

> Good Morning, I NEED to speak to the person in charge of quality control or quality assurance for your location.  Who would that be?
>
> Name on the lead with ***(3stars)
> Good morning/afternoon (secretary name), is (name on the lead) available?
>
> Who's Calling?
> It's (your name).  Is she/he available?
>
> We don't have anyone like that or what do you mean?
> Ok.. Who would be in charge of ensuring that product or service is meeting company standards. (Quality assurance, quality control) or (perhaps Plant Manager, Operations Manager, General Manager, Project Manager).
>
> Where are you calling from?
> Progressive Business, Is he/she in the office today?
>
> What's this regarding?
> It has to do with information to help with quality control… Is she/he in right now?

(Id.) (alteration in original).

Because there were numerous versions of the secretary script, and they were created by branch managers, not upper-level management, some scripts mistakenly included language that were explicitly against AFS's policies.  (Doc. No. 426 at 15:3-18:7).  For example, one "Secretary Script" included the question "[a]re you selling something?" and instructed the telemarketer to answer "No, that's not it. . . I have some important information regarding grant research I wanted to send but I need to speak with them about it.  Are they available?"  (Pl. Ex. 6 at 6-58.)  Senior management at AFS worked hard to find these mistakes and correct them.[39]  (Doc. No. 426 at 15:22-16:4.)

---

[39] For example, Colin Drummond, the former head of telemarketing at AFS, testified about the "Secretary Scripts":

> these particular documents, there could be hundreds, if not thousands, of them . . . there would be time to time where there may be things on there that we would find out about as senior management and say that's not appropriate.  And we would tell them to take it out of their training materials.  And I do recall that happening with this.

(Doc. No. 426 at 15:22-16:4.)  When asked about the "are you selling something" question and the answer on some of the secretary scripts, Drummond testified:

> Q:  So is it your testimony that this question [are you selling something?] and this answer [no that's not it] is inappropriate?
>
> A:  Like I said, I don't think it's the best way to handle that question from the secretary, no.  I would not train my people to do that
> . . .
> and by the way, I get on the phones a lot, you know, to kind of test products and everything like that.  And I could go through 500, 600 contacts with a secretary.  And that question, are you selling something, just doesn't come up.   Its extraordinarily rare.
>
> So it's somewhat insignificant.  And so it's probably why it slipped through the cracks, and I didn't really see it when it got circulated around on email.

(Id. at 16:5-18.)  No party firmly quantified at trial the number of these mistakes to the point that the numbers were reliable.   It was evident, however, that they were not part of the business model of AFS.

ii.     Executive Script

As previously noted, once a telemarketer reaches the targeted potential subscriber, they are required to follow the "Executive Script."  Pursuant to the "Executive Script", the telemarketer would begin the call by introducing themselves and asking some engaging questions.  (Doc. No. 426 at 28:11-29.5.)  For example, in a script based on the publication "Communication Bulletin for Managers and Supervisors," the script reads as follows:

> Hi [Their name], this is [your name] from PBP!  I was told that you're the person in charge of training/staff development or you have managers and supervisors reporting to you.  Is that correct?
>
> My company published a newsletter called Communication Bulletin for Managers & Supervisors and I'm sending out a couple copies for you to look at, and then we'll call you back and see how you like it . . . and I was wondering . . . (Don't Pause)
>
> (Their name) Is there anything special you are currently using to help your people improve communication and teamwork? [Pause] (ie meetings, seminars, trainings) [wait for answer] RESPONSE: Yeah I'm hearing that a lot these days
>
> (Their name) Communication Bulletin is in a quick 4 page format, with a brand new website that is especially designed to help supervisors:
>
> • Communicate better with other departments and deal with <u>difficult</u> people
> • Motivate their team for higher productivity
> • And my favorite part, is the website has a search tool.. kind of like a communication 911. Where you can type in whatever challenge your department might be having and get results right away!
>
> (Name) I'd be happy to take you to a webpage and give you a quick preview right now, OR just email you a link and you can take a look at it later on today! Which is easier for you?

(Pl. Ex. 0006 at 6-5) (emphasis in original).  If the potential subscriber chose to look at the webpage later that day, the script instructs the telemarketer to ask for the potential subscriber's email, then move directly to the "offer" paragraph.  (<u>See</u> <u>id.</u>)  If the potential subscriber chooses to look at the

webpage during the call, the telemarketer is instructed to provide them with a website link and then move to the "offer" paragraph.  (See id.)

The telemarketer then moves to the "offer" paragraph, which must be read word for word.  (Doc. No. 428 at 20:12-16, 42:20-23.)  The offer paragraph reads:

> So (their name) we're just going to send out (5/10)[40] copies of Communication Bulletin and see if it would be a good resource for you and your team.  We'll send out _ copies of the next two issues, along with access to the online version, at no risk, so you can get some feedback from your folks there, and see if it's a good fit with what you are already doing there, then we'll call you back and see how you like it.  Our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first. . .

(Pl. Ex. 0006 at 6-5.)  The telemarketer then confirms the first and last name of the potential subscriber, the name of the company they work for and their title at the company.  (See id.)  Next, the telemarketer reads the "no risk subscription disclosure" paragraph, which also must be read word for word.  (Doc. No. 428 at 20:12-16, 42:20-23.)  The "no risk subscription disclosure" reads:

> Ok what we'll do is send the email/fax out first[.]  That should be there in just a couple of minutes with our whole offer in writing.  Then we'll send the first set of newsletters in 3 weeks with the second set 2 weeks later.  Right AFTER the second issue, we'll send an invoice for THE YEAR directly to your attention.  Of course if you find Communication Bulletin impactful, we'd like to have your subscription continue.  The cost is only ($295/$432) which includes (5/10) copies sent to you and your supervisors twice a month, 24/7 access to the online center, and email updates on our related products.  If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter.  There's no further obligation. Keep the newsletter either way.  OK?

(Pl. Ex. 0006 at 6-5) (alteration in original).  After asking "OK?", the telemarketer is instructed that they must "(MUST WAIT FOR RESPONSE)."  (Id.) (emphasis in original).  After a telemarketer receives a response, they are instructed to say:

---

[40]  Right before the "offer" paragraph, telemarketers are instructed to ask "[h]ow many supervisors and managers do you have in your company that would benefit from this type of information?" (Id.)  If there are over 10 managers, the telemarketer is instructed to send 10 copies of each issue of the newsletter.  (Id.)  If there are under 10, they are instructed to send 5.  (Id.)

> If you DO find that it is a great resource, do you think you can work it into your budget? GREAT! Just to verify that I spoke to you, I need just the month and day of your birthdate, but not the year.  Like mine is (_).

(Id.)  If the potential subscriber refuses to give the telemarketer their month and day of birth, the telemarketer is instructed to respond:

> You don't have to[.] It's just a verification, we can still send your subscription with the right of cancellation. Okay? (MUST GET OKAY)

(Pl. Ex. 2000).  If they do provide their month and day of birth, the telemarketer finishes up the call:

> OK (their name) Your going to receive two emails. . . one confirming everything we talked about and the second containing a link to the online resource along with your user name and password.  Do me a favor, and wait for the newsletters to arrive in 3 weeks and share them with your colleagues. I'm confident that once you see them, you'll want to continue with it! Thanks for your time.  I hope you have a great day!

(Pl. Ex. 0006 at 6-5.)

If the potential subscriber gave an affirmative positive response to the "Offer and Disclosure Paragraphs" and an affirmative response to the "CAN you work that into your budget?" question, and either their month and date of birth or a verbal affirmation to the alternate question[41] their subscription begins with a 60-day right of cancellation.  (Doc. No. 426 at 20:12-21:23.)  Without those three affirmations, the subscription does not begin.[42]  (Id. at 45:24-46:6.)  But, as

---

[41]   If a potential subscriber refuses to give their month and date of birth, they have not accepted the offer until they verbally affirm the statement:

> You don't have to[.] It's just a verification, we can still send your subscription with the right of cancellation. Okay? (MUST GET OKAY).

[42]   As Colin Drummond, the former head of telemarketing at AFS, testified:

the script indicates, the sales transaction itself does not take place until the subscriber pays the invoice that usually arrives with the second newsletter.  And as noted, the subscriber could write "cancel" on the invoice and return it within sixty (60) days to end the subscription.  But during the initial call, telemarketers never sought or obtained any payment information.  (Id. at 83:25-84:2.) Right after the call ends, the customer is sent a follow up email with the written terms of their subscription.  (Doc. No. 439 at 33:19-36:15.)

### 3.  Confirmation Emails

After the call ends, AFS sent customers two confirmation emails to their email address. (Doc. No. 427 at 43:4-44:9.)  Two emails were sent, rather than just one, to increase the chance that the customers received the email.[43]  (Id. at 43:6-10, 43:21-44:2.)  These emails reiterated a description of the publication's features and benefits, the subscription cost, the timing and number of issues, and the cancellation procedure.  (See Doc. No. 439 at 33:19-36:15.)  For example, one email stated:

> As you'll remember from our phone discussion, in addition to access to the rich web resources, you'll receive your first mailed issue in about three weeks.  If you love the value you get from Nonprofit Executive Report, like thousands of other subscribers do, the cost for a full year is only $288.  You can submit payment along

> so then we're going to do the budget question. And then to verify that we spoke to them, and nobody on their behalf, we're going to ask for the month and day of their birthday but not the year.

> This is the last place where a customer can, you know, decline our offer.  And some do.  Some say, oh, wow, okay.  I don't want to give you my date of birth so—they opt out.

(Id.)

---

[43]  AFS recognized that emails often contain "spam filters" that prevents emails from going to customer's inbox if it included "an attachment or pictures or a lot of HTML".  (Id. at 43:6-10, 43:21-44:2.)  To combat this impediment, one email would be sent with just the text of the email. (Id.)

with the invoice we mail you, or you can use the personal invoice under the "My Account" tab on the Nonprofit Executive Report website.  If for any reason you don't find the service valuable, simply let us know by marking "cancel" on the invoice, within sixty days and return it to us – no questions asked.  Otherwise your subscriptions will continue uninterrupted.

(Def.'s Ex. No. 121.)

The confirmation emails also provided logon information and a direct link to the publication's home webpage.  (Id.)  The webpage provided not only substantive content of the publication, but also included the phone number to reach AFS if a customer wanted to subscribe or cancel.  (Trial Ex. 280; see also Trial Ex. 132 at AFS0246092.)  Once logged in, a customer can view their personal account profile which provides customers with the number of days remining in the cancellation period and how to cancel.  (See Ex. 132; Doc. No. 427 at 52:9-15.)

### 4.  Welcome Letter and Newsletters

Approximately two to three weeks after the initial sales call, and after the customer received two confirmation emails and access to AFS's website, AFS sent the customer a "welcome letter" and first issue of the newsletter.  (Doc. No. 427 at 59:23-25, 54:18-55:11.)  Both the "welcome letter" and the newsletter featured the name of the publisher, Progressive Business Publications or CEEL for CEEL orders, and AFS's phone number.  (Id. at 56:20-57:14; Doc. No. 439 at 75:21-77:10; see also Ex. 44, Ex. 2043.)

About two weeks after sending the first issue, AFS sent the customer the second issue of the newsletter along with an invoice for the year.  (Id. at 60:1-9.)  The invoice included the customer's name, the order date, the month and day of birth of the person the telemarketer spoke to if that had been provided on the sales call and the balance due for the year subscription.  (See Ex. 309.)  The invoice also included another link to the newsletter's website.  (See e.g., Ex. 309; Ex. 1241; see also Doc. No. 427 at 60:10-66:4.)

### 5. Follow up by AFS

If a customer had not paid the invoice within 60 days of the initial telemarketing call, an AFS employee would call the customer to ask if they had received the newsletters and confirmation emails.[44] (Doc. No. 427 at 67:11-16.) After this call, AFS would send the customer four more monthly invoices directed to their company's accounts payable department.[45] (Doc. No. 427 at 73:24-74:1.) The fourth invoice arrives once an account is over 90 days past due and states that "[u]npaid bills are referred to a collection agency." (Doc. No. 426 at 104:9-18; see also Ex. 48.)

### 6. Collection

If a customer had received newsletter issues and invoices for five months without paying or canceling their subscription, AFS referred the account to collections agencies, including to a previous Defendant in this case, International Credit Recovery ("ICR"). (Doc. No. 426 at 104:19-105:4.) After ICR went bankrupt in 2021, collection activity was performed in-house by AFS customer service representatives and consisted of a phone call or email to customers with an outstanding balance. (Doc. No. 432 at 6:8-11, 25:2-12, 27:13-17.)

---

[44] At this point, notwithstanding mailing or technical issues, the customer should have received two newsletters and the invoice.

[45] AFS would send the initial invoice directly to the customer, but if the customer did not pay or cancel, it would send subsequent invoices directly to the accounts payable department. The invoice would be sent to the accounts payable department because AFS wanted to ensure that someone in the company saw the invoices and newsletters in the event that the initial customer might be busy or traveling. (Doc. No. 427 at 74:2-23) (As Drummond testified, "[b]ecause if somebody hadn't paid or canceled after 60 days, our concern was whether or not they were getting the newsletters and getting the first invoice, so on and so forth, because we hadn't heard from them. And we get it. Executives are busy. They could be traveling. They could be on FMLA [Family Leave Medical Act], all kinds of different things.")

### 7.   Liberal Cancellation Policy

AFS' standard cancellation period was 60 days.  (Doc. No. 426 at 87:9-13.)  Customers who canceled during that period were not required to provide any payment to AFS.  (Id. at 38:4-12.)  AFS also had an informal cancellation policy that extended the standard cancellation period. Up to 150 days.[46]  (See Doc. No. 426 at 38:4-12, 87:10-13; Doc. No. 428 at 104:18-23.)  While AFS instructed customers to cancel by returning the invoice with the word "cancel" marked on it, AFS also honored cancellations communicated by other methods, including phone, voicemail, email, fax or letter.  (Doc. No. 427 at 48:13-22, 61:6-14; Doc. No. 446 at 71:1-5.)

### 8.   Renewals

Subscription renewals were crucial to AFS's success.  From 2016 to 2021, renewal revenues were more than twice the value of new telemarketing revenues. (See ex. 334 at 2-3.) Because AFS did not store subscribers' credit card information, subscribers had to affirmatively opt in every year.  (Doc. No. 427 at 64:22-65:7.)

### 9.   Quality Control

Apart from AFS's telemarketing and publication employees, AFS maintained a quality control department which ensured, among other things, that telemarketers adhered to the script and that customers understood and agreed to the subscription terms.  (Doc. No. 441 at 133:1-16; Doc. No. 427 at 31:6-8, 92:4-9.)  It was crucial to AFS's success and mission that customers understood their offer.  Quality control employees took this responsibility very seriously.[47]

---

[46]  Even after 150 days, AFS customer service representatives could, in their discretion, cancel orders or provide refunds if customers identified problems with the transaction.

[47]  For example, Amy Luchette, a former AFS quality control representative, testified at trial:

The first level of quality control was at the branch management level, which included direct monitoring of sales calls and regular reviews of the sales call recordings.  (Doc. No. 431 at 101:13-16.)  When personnel in quality control reviewed a call and found that a telemarketer deviated from the "offer" and "disclosure" paragraphs of the "Executive Script" or if the reviewer believed it was unclear whether the subscriber understood the offer, the offer was canceled by AFS.  (Doc. No. 427 at 50:15-23; Doc. No. 428 at 42:18-43:3.)  This cancellation was called a "quality cancel." (Doc. No. 441 at 131:16-132:7.)  If a telemarketer had a "quality cancel," the telemarketer would receive a written warning, no commission on the order and had to meet with a manager.[48]  (Doc. No. 441 at 132:8-25; Doc. No. 446 at 114:6-20.)  Quality control personnel also reviewed sales records whenever a customer complained to AFS or if the customer service department referred a matter to quality control based on a customer's complaint about the sales process.  (Doc. No. 443 at 80:4-21; Doc. No. 432 at 32:18-23.)

---

Q: And you took it seriously to make sure that customers understood the calls when you were reviewing them, didn't you?

A: Especially as time went on that I was there and I became more invested in my work, yes I did.

(Doc. No. 428 at 48:20-23.)  Luchette further testified that when reviewing a recorded call to determine if a customer understood the terms:

if I was even a little bit questionable or questioning it, if I felt that it was probably good, but just not like I wouldn't bet my life on it, then I would tell that rep to actually call back and make sure.

(Id. at 50:18-51:25.)

[48]   If a telemarketer received three "quality cancels" within a 90-day period, they would be recommended for termination.

### C.  Customer Complaints

Between 2015 and 2021, AFS had a total of 765,940 customer orders for its publications.[49]

(See Trial Ex. 334; see also Doc. No. 451 at 9:3–10.)   A small number of customers filed

complaints through formal and informal channels.   Customers complained informally by

responding to AFS's email confirmations, by contacting AFS's customer service department,

writing negative online reviews or by writing on canceled invoices.   Customers filed more formal

complaints by writing letters to AFS, by filing consumer complaints with the Better Business

Bureau ("BBB") or by filing complaints with the Pennsylvania Attorney General's Office.   The

two categories of complaints will be discussed next in turn.

#### 1.  Informal Complaints

As noted above, customers would informally complain to AFS by responding to AFS's

email confirmations, calling and emailing AFS's customer service department, writing negative

online reviews or by writing on canceled invoices.   First, customers would sometimes respond to

AFS's email confirmations with complaints.   (Doc. No. 440 at 32:14-33:14; See Pl. Ex. 1246.)

AFS would track and investigate these complaints.[50]   (Id.)   These investigations would usually

---

[49]   The number of orders by year is as follows:

       2015: 218,749
       2016: 187,708
       2017: 138,878
       2018: 92,500
       2019: 70,053
       2020: 41,144
       2021: 16,908

(Trial Ex. 334.)

[50]   In regard to complaints, Colin Drummond, AFS's former head of telemarketing, testified:

result in the customer's order being cancelled.[51]  (Id. at 33:15-34:21.)  Second, customers would

leave complaints on AFS's customer service voicemail.  (Id. at 36:24-37:5.)  Defendants provided

Plaintiffs with over 50,000 of AFS's customer service voicemails.  (Doc. No. 425 at 84:20-25.)

Plaintiffs selected 500 of those voicemails.  They were randomly selected by an economist and

transcribed.  (Id. at 85:4-7.)  Out of those 500 voicemails, 179 contained no message and 321

contained messages.  (See Pl. Ex. 1188.)  Out of the 321 voicemails that contained messages, 61

contained complaints.   (See id.)  For all voicemails, Defendants' customer service department

would listen and respond to them and when appropriate, cancel the customer's order.  (Doc. No.

443 at 68:7-23, 69:3-70:23.)

Third, sometimes customers would write negative reviews about AFS online.  AFS would

investigate the reviews and, if necessary, invest resources to address the problem.  (See Doc. No.

441.)  Finally, when following the standard cancellation policy of writing "cancel" on the invoice,

customers would sometimes also write on the invoice additional complaints.  (Doc. No. 440 at

45:7-13.)  Examples of these additional complaints would be: "I have never agreed to this.  Please

Remove!" or "It was my understanding this was provided as a trial and was not obligated to pay

---

We tracked the number of e-mail confirmations that came in that would have a customer complaining about how they felt misinformed.  We tracked it, and we did it by representative, by branch, time.  We checked it every day, and we also did cumulative reports to make sure there wasn't any trends in particular branches of having more of these—we called them quality complaints—than others.  And they were miniscule too. They were in the 2 to 3 percentile.

(Id. at 33:6-14.)

[51]  Not all email responses to email confirmations were complaints.  Some were communications that showed that customers understood the subscription, but decided not to continue for the year.  (See Pl. Ex. 1246 at Row 30 ("Hello, I talked to several people around here and no one is interested in the publication. Can you please cancel the order? Thanks"), Row 1107 ("Hi Lorie, After speaking with the President of the Company, we'll pass on this service. Thank you for your time.").)

anything or required to enroll, per phone conversation."  (Pl. Ex. 1166 at 6, 83.)  While some of these complaints indicate that a customer was confused or upset, some showed that the customer understood the offer, and was now canceling.  Plaintiffs' expert, Margaret Daley, a forensic data expert, testified that out of a random sample of 500 invoices, only 2.4% (12 of 500) contained the statements "did not order" or "did not subscribe."  (Doc. No. 451 at 41:24-42:6.)

### 2.  Formal Complaints

Customers also lodged formal complaints against AFS by writing letters to AFS, filing complaints with the Better Business Bureau ("BBB") or by filing complaints with the Pennsylvania Attorney General's Office.  AFS also received letters from customers requesting cancellation. Some letters indicated that the customer was confused by AFS's offer (See Ex. 1167 at 64) ("I was given a telephone call regarding your publication and was told at the time that it was a free trial.  I did not subscribe, nor do I wish to subscribe to it at this time") or that they wanted to receive no further communications from AFS (See id. at 35) ("Please cancel the attached subscription as this was only to be a free trial. Also please remove my contact information [from] all your communications.").   AFS investigated these letters and when appropriate, canceled the subscription.

Some customers also filed complaints against AFS with the Better Business Bureau ("BBB").  The BBB is a private organization that collects information about businesses.  (Doc. No. 430 at 4:19-5:3; 26:18-27:7.)  Between January 5, 2015 and March 31, 2020, the BBB received 671 complaints about AFS.  (Trial Ex. 248.)[52]  However, it was shown at trial that these complaints

---

[52]  At trial, Plaintiffs' expert Margaret Daley, a forensic data expert, testified that these 671 complaints to the BBB represent less than .09% of all orders between January 5, 2015 and March 31, 2020.  (Doc. No. 451 at 11:11-21.)

were not reliable.  Andrew Goode, BBB's Vice-President, testified that not all BBB consumer complaints are direct evidence of wrongdoing, but rather "sometimes there's just a difference of opinion or consumer disputes" and that the BBB "often see[s] cases that don't rise to a level of violation of laws."  (See Doc. No. 430 at 29:10-17.)  Notably, well-known companies are often complained about frequently to the BBB.  (Id. at 46:25-47:23; see also Def. Ex. 253-11.)  For example, in the year 2015 when AFS had 205 complaints filed against it with the BBB, Comcast had over 12,000 complaints.[53]  (Id.)

Finally, the Attorney General's Office of Pennsylvania and the FTC received complaints about AFS.   From July 2015 to 2021, the FTC received 153 complaints about AFS and the Pennsylvania Attorney General's office received 51 complaints.  (Doc. No. 425 at 104:25-105:3; Doc. No. 448 at 124:3-127:11.)

### D.  Investigation of AFS

In 2012, the Commonwealth of Pennsylvania opened an investigation of AFS's business practices through the Pennsylvania's Attorney General's Office (the "AG's Office").  (Doc. No. 435 at 23:13-16.)  In July 2014, the AG's Office issued an administrative subpoena to AFS.  (Id. at 27:4-7.)  On August 25, 2014, AFS responded the AG's administrative subpoena with a 208-page document providing information on AFS's business.  (Id. at 27:8-20; 29:9-11; Trial Ex. 1151.)  The AG's Office also interviewed 20 to 30 consumers about AFS's business practices. (Doc. No. 439 at 11:8-13.)

On October 9, 2015, following a meeting with AFS, the AG's office requested additional documents and call tapes.  (Doc. No. 435 at 39:9-40:1; Pl. Ex. 115.)  In response, on March 25,

---

[53]  Other examples include: 950 complaints against Geico, 563 complaints against Pep Boys, 312 against the United States Postal Service and 179 complaints against IKEA.  (Def. Ex. 253-11.)

2016, members of the AG's Office were invited to one of AFS's call centers to listen to tape-recorded sales calls.  (Doc. No. 435 at 24:1-9, Ex. 2038.)  On May 17, 2017, there was a meeting between AFS and members of the AG's Office.  (Doc. No. 435 at 52:10-53:6.)  After the meeting, on May 26, 2017 a Senior Deputy Attorney General at the AG's Office wrote to Mark Stewart, Esquire, then counsel for AFS, thanking AFS for the meeting, citing an ongoing dispute about the script, and indicating that the AG's Office was "look[ing] forward to discussing these issues again" and that the AG's Office "look[s] forward to the prospect of an amicable resolution."  (Doc. No. 435 at 54:15-23; Def. Ex. 117.)  This was the last written correspondence from the AG's Office to AFS about its investigation.  (Doc. No. 435 at 54:24-55:6.)  On July 13, 2018, the AG's Office administratively closed its investigation into AFS.[54]  (Doc. No. 439 at 14:23-15:15.)

In 2017, the FTC opened its investigation into AFS.  On August 28, 2017, the FTC issued a Civil Investigative Demand requesting responsive documents.  (See Pl. Ex. 39.)  The FTC's investigation into AFS culminated in the present action with the first Complaint being filed on May 13, 2020.  (Doc. No. 1.)

### E.  AFS Closes the Print Publication and Telemarketing Business and Creates "SuccessFuel" as a New Enterprise

In or around 2008, AFS's print publication business saw a gradual decline in revenue.  This decline accelerated after 2015.  (Doc. No. 433 at 58:19-25.)  Several factors contributed to this decline, including a nationwide decrease in popularity of print publications in favor or more online based content and a decline in landline use.  (Id. at 58:22-25; Doc. No. 434 at 15:9-16:9.)  Revenue

---

[54]  Administrative closure means that the AG's Office is closing the investigation, but could reopen the investigation at any time.  (Doc. No. 439 at 11:20-13:9.)

from Progressive Business Publications ("PBP") and Center for Education and Employment Law ("CEEL") publications declined from 2016 to 2021.  From 2009 to 2020, AFS stopped publishing approximately 28 publications and closed 15 telemarketing branches.[55]  (Doc. No. 433 at 60:3-2.)

On September 3, 2021, AFS stopped outbound telemarketing sales of its newsletters and reference guides.  (Doc. No. 433 at 58:16-18.)  On September 20, 2021, AFS began a new enterprise named "SuccessFuel."[56]  (Ex. 528 at 3; Doc. No. 441 at 15:20.)  SuccessFuel is distinct from AFS's previous telemarketing and publication enterprise.  SuccessFuel engages in lead generation[57], online workshops and webinars for business executives and provides on its website

---

[55] Colin Drummond, AFS's former head of telemarketing, testified that during this period:

> . . . we measure everything. So our key performance indicators, the revenue, the costs were really starting to skyrocket. Revenues were going down. There were certain publications that were becoming so archaic and mature that we couldn't market or even invest the time and money to write them.

> So little by little, we paired down our portfolio of newsletters and products down to ones that were reasonably hanging in the game, if you will. So we went from, I don't know, 25 or something like that, down to about 12. Subsequently, if there's less product to sell, then you need less sales people. So I just started closing branches down to fit the hours that would be needed to market the survivors, if you will.

(Doc. No. 427 at 84:13-25.)

[56] On September 20, 2021, "SuccessFuel" was registered as a fictitious name of AFS.  (Ex. 528 at 3; Doc. No. 441 at 15:20.)

[57] AFS defines lead generation as helping companies target businesses that would be interested in their product.  (Doc. No. 441 at 55:8-24) ("And so our job is to find those people, those prospects—we call them leads, lead generation—for those outside clients.").

both free and paid content for business executives.[58]  For example, AFS's website HRMorning[59] includes both a free and a paid subscription.  (Doc. No. 427 at 102:11-24.)  AFS does not utilize telemarketing to obtain paid subscribers to HRMorning.  (Id. at 103:2-104:3.)  Rather, subscribers enter their credit card information online if they wish to subscribe.  (Id.)

## III.   CONCLUSIONS OF LAW

As noted previously, in the Amended Complaint, following the stipulation of dismissal of the three ICR Defendants and the claims alleged against them, six (6) claims remained against Defendants AFS, PBPNJ and Edward Satell.[60]  The sufficiency of the evidence on the six (6) claims and the conclusions of law that follow will be discussed next.

---

[58]  The content on the websites would be promoted under different categories with names such as; Women's Leadership Today, Premiere Learning Solutions and HRMorning.  (Doc. No. 441 at 63:8-13.)

[59]  HRMorning is a website and online newsletter for Human Resource ("HR") Managers.  (Doc. No. 427 at 94:1-6.)

[60]  Of those six counts, three allege violations of federal law and three of Pennsylvania law.  They are:

- **Federal Law**
  - **Count I:** Misrepresentation of Trial Offers, in violation of the FTC Act, 15 U.S.C. § 45(a)(1).
  - **Count II:** Failure to Disclose Negative Option Terms, in violation of the FTC Act, 15 U.S.C. § 45(a)(1).
  - **Count IV:** Sending and Billing for Unordered Merchandise, in violation of 39 U.S.C. § 3009.
- **Pennsylvania Law**
  - **Count V:** Deceptive Misrepresentations, in violation of 73 P.S. § 201-3.
  - **Count VI**: Failure to Disclose Material Terms, in violation of 73 P.S. § 201-3.
  - **Count VIII**: Sending and Billing for Unordered Merchandise, in violation of 73 P.S. § 201-3.

See Section I, supra.

### A.    Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Have Engaged in Deceptive Conduct

In the Amended Complaint, Plaintiffs allege in four counts (I, II, V and VI) "deceptive acts or practices" by Defendants in violation of state and federal law.  (See Doc. No. 43 at 14-16, 19-20.)   In Counts I and II of the Amended Complaint, Plaintiffs contend that Defendants' telemarketing calls constituted "deceptive acts or practices," in violation of the FTC Act, 15 U.S.C. § 45(a)(1).[61]  (Id. at 14-16.)  In Counts V and VI of the Amended Complaint, Plaintiffs assert that Defendants' telemarketing calls constituted "deceptive acts or practices," in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-3[62] as defined by 73 P.S. § 201-2(4)(ii), (iii), (v) and (xxi). [63]  (Id. at 19-20.)  The legal test for

---

[61]   15 U.S.C. § 45(a)(1), the FTC violation, states in pertinent part:

> (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

[62]   The UTPCPL, 73 P.S. § 201-3, states in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful.

[63]   73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi) provide:

> Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
>
> > (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> > (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

deceptive conduct alleged in Counts I, II, V and VI is the same, and accordingly, they will be analyzed together.[64]   See Gregg v. 76 Ameriprise Fin., Inc., 245 A.3d 637, 647 (Pa. 2021)

---

. . .

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

. . .

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding;

(xvii) [m]aking solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating:

> (A) the identity of the seller;
>
> (B) that the purpose of the call is to sell goods or services;
>
> (C) the nature of the goods or services. . .

73 P.S. § 201-2(4)(ii), (iii), (v), and (xxi).

Violations of subsections (iii) and (v) were not pursued by the Commonwealth of Pennsylvania in its post-trial Findings of Fact and Conclusions of Law (Doc. No. 459).  Plaintiffs' claims under (xvii) will be discussed in Section III(C), infra.

[64]  The parties agree that courts have consistently analyzed the UTPCPL and the FTC Act under the same standard.  (See Doc. No. 459 at 99-100.)  Thus, the claims in the four Counts can be analyzed together because courts have consistently turned to the FTC Act to interpret the UTPCPL.  For example, in Gregg, the Pennsylvania Supreme Court used the FTC Act to interpret the UTPCPL.  There, the court refers to the UTPCPL as the "CPL" and states:

> As we have explained, the CPL is based upon the Federal Trade Commission Act ("FTCA") . . . (observing that parts of the CPL are identical to the FTCA. . .

664 Pa. at 584 (internal citations omitted).  The Pennsylvania Supreme Court issued the same holding in Commonwealth by Shapiro v. Golden Gate National National Senior Care LLC, et al.,:

(discussing that the UTPCPL is based upon the FTC Act); see also Pennsylvania v. Monumental

Props., Inc., 329 A.2d 812, 817–18 (Pa. 1974) (collecting cases for same).

> To prove a violation of the FTC Act or UTPCPL, a plaintiff must establish:
>
> (1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material.[65]

F.T.C. v. Click4Support, LLC, No. 15-5777, 2015 WL 7067760, at *4 (E.D. Pa. Nov. 10, 2015)

(quoting F.T.C. v. NHS Sys., Inc., 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013)).

Here, the first element is satisfied because the telemarketing call is a representation.[66]

However, Plaintiffs have failed to prove by a preponderance of the evidence the second element,

that the "representation was likely to mislead consumers acting reasonably under the

circumstances."  On the second element, the crux of Plaintiffs' argument is that (1) Defendants

misrepresented to consumers that that they would "receive publications for free with no risk[]"

and failed to disclose the material conditions of the offer; (2) that these misrepresentations were

---

> This Court has ruled that we may look to decisions rendered under the Federal Trade Commission Act, 15 U.S.C. § 45, and the Lanham Act, 15 U.S.C. § 1114, for guidance in interpreting the Pennsylvania Consumer Protection Law.

194 A.3d 1010, 1024 n. 7 (Pa. 2018).

[65]  Under both the FTC Act and the UTPCPL, violations for "deceptive acts or practices" involve strict liability because they do not require plaintiffs to prove by a preponderance of the evidence that Defendants intended to deceive.  F.T.C. v. NHS Systems, Inc., 936 F.Supp.2d 520, 531 (E.D. Pa. 2013) (citing Beneficial Corp., 542 F.2d at 617) ("Intent to deceive is not a required element to establish a deceptive practice.").

[66]  Merriam-Webster dictionary defines "representation" as "a statement or account made to influence opinion or action."  Here, the telemarketing calls are "representations" because they are calls describing subscriptions to Defendants' publications made to influence action by the customer.

likely to mislead consumers acting reasonably under the circumstances; and (3) these misrepresentations were material because they tricked consumers into entering into a subscription that, contrary to the misrepresentations, was not free.[67]   (Doc. No. 43 at 14-15.)   The evidence elicited at the non-jury trial, however, shows otherwise.

As noted, the second element a plaintiff must establish to prove a violation of the FTC Act and UTPCPL is to show that a defendant's representations "w[ere] likely to mislead consumers acting reasonably under the circumstances."   Click4Support, 2015 WL 7067760, at *4 (quoting NHS Sys., Inc., 936 F.Supp. 2d at 531).   Even if there are no affirmatively false statements in the representation, a plaintiff can still satisfy this element by showing that the "overall net impression" of the representation was likely to mislead reasonable consumers.   See F.T.C. v. DIRECTV, Inc., No. 15-01129, 2018 WL 3911196, at *5 (N.D. Cal. Aug. 16, 2018) ("Even if [a representation] contains some truthful disclosures, a representation still 'may be likely to mislead by virtue of the

---

[67]   As noted earlier, Plaintiffs' allegation of deceptive acts or practices as alleged in Counts I, II, V and VI of the Amended Complaint focuses on two primary matters: (1) Defendants misrepresented in its telemarketing calls "that consumers will receive publications for free with no risk"; and (2) Defendants "fail[ed] to disclose or disclose adequately to consumers material terms and conditions of the offer . . ."  (Doc. No. 43 at 14-15.)

The material terms Plaintiffs allege Defendants failed to disclose were:

    a.    That consumers must cancel before a trial period ends to avoid charges for publication subscriptions;

    b.    That consumers must return books and newsletters to avoid charges for publication subscriptions;

    c.    That acceptance of the offer will financially bind the consumer;

    d.    That Defendants will automatically enroll consumers in continuity plans; and

    e.    The steps consumers must take to cancel the continuity plans to avoid additional charges.

(Id. at 15, 20.)  Plaintiffs, however, have failed to prove by a preponderance of the evidence not only the accuracy of some of these terms, but also that they violate the script used by AFS.

net impression it creates.'") (quoting F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006)).   A deceptive "net impression" can include both what is explicitly stated in the representation and material information that is omitted.  See In re Novartis Corp., et al., 127 F.T.C. 580, 680 (F.T.C. 1999) ("Claims can either be express or implied."); In re National Credit Management Group, LLC, 21 F. Supp.2d 424, 441 (D.N.J. 1998) ("the omission of material information, even if an advertisement does not include falsehoods, may result in a violation of Section 5.").  Further, if a representation is targeted at a particular audience, the court will analyze the representation from the perspective of that audience.  In re Telebrands Corp., 140 F.T.C. 278, 291 (2005) (citing Deception Statement, 103 F.T.C. at 178-79). [68]

In a "net impression" case, once a plaintiff states what the alleged deceptive "net impression" is, the court follows a two-step inquiry.  See id. at 290-91.  First, the court will make a facial evaluation to determine if the alleged "net impression" is conveyed by the representation. Id. at 290 (citing Novartis, 127 F.T.C. at 680; Stouffer, 118 F.T.C. at 798).  Second, if it is unclear from the facial evaluation whether the alleged "net impression" would mislead reasonable consumers, the court can then look to "extrinsic evidence" for evidence that reasonable consumers were deceived.  Id. at 290-92 (citing Novartis, 127 F.T.C. at 680).

---

[68]  As discussed in Telebrands:

> Different target audiences come to an ad with different perceptions. Consumers cannot understand an ad — or any communication — without applying their own knowledge, associations, or cultural understandings that are external to the ad itself. For that reason, the purpose of ad interpretation is to determine the claims that consumers — particularly the target audience — take away from an ad, whether or not an advertiser intended to communicate those claims.

140 F.T.C. 278 at 291-92.

Here, Defendants' telemarketing script does not contain any affirmatively false statements.[69]  Thus, Plaintiffs are proceeding on a "net impression" theory of liability.  Plaintiffs' alleged "net impression" that a reasonable consumer would take away from the telemarketing call is that consumers will receive the publication "for free, with no risk."  In support of this claim, Plaintiffs contend that Defendants omitted material terms of the offer to mislead reasonable consumers into believing that the publication was free.  (Doc. No. 43 at 14-15.)  However, Plaintiffs have not proven this "net impression" by a preponderance of the evidence under either step of the Court's inquiry.

## 1.  Facial Evaluation

Turning first to the facial evaluation of the telemarketing script, Plaintiffs have not proven by a preponderance of the evidence that the telemarketing script, read as a whole, is misleading to a reasonable consumer.  As a preliminary matter, the facts show that here, a reasonable consumer is a business or organization's employee with purchasing power, because Defendants' telemarketing was only targeted at businesses and organizations.  Thus, the Court will analyze the script through the perspective of this employee at a business or organization.[70]  Further, when making a facial evaluation of the script, the court must evaluate "such factors as the entire

---

[69]  As noted, there were what appears to be a small number of mistakes made in scripts that were corrected by AFS personnel as expeditiously as possible.  Given the size of the organization and the large number of telemarketers and employees across many branches, mistakes will inevitably occur, but they were not AFS sanctioned affirmative false statements.  Extensive quality control was in place to prevent mistakes.  But at its height, AFS employed close to 500 telemarketers.  (See Doc. No. 426 at 5:9-13.)

[70]  The Court recognizes that while AFS only targeted business and organizations, these consumers vary widely in size, sophistication and industry.  However, business employees are expected to have a level of focus and responsibility when they receive a phone call at their place of work.  The evidence does not show that confusion on their part was caused by AFS.

document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction."  Matter of Cliffdale Associates, Inc., 103 F.T.C. 110 (F.T.C. 1984).

With these factors in mind, the script does not imply the alleged "net impression" that consumers would receive publications "for free at no risk."  Based upon the language in the script, Plaintiffs' proffered "net impression" claim has not been proven by a preponderance of the evidence for three reasons.  First, the script explicitly describes to the consumer how the subscription will work.  The "offer" paragraph of the script states:

> So (their name) we're just going to send out (5/10) copies of Communication Bulletin and see if it would be a good resource for you and your team.  We'll send out _ copies of the next two issues, along with access to the online version, at no risk, so you can get some feedback from your folks there, and see if it's a good fit with what you are already doing there, then we'll call you back and see how you like it.  Our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first. . .

(Pl. Ex. 6 at 6-5.)  The no risk subscription disclosure reads:

> Ok what we'll do is send the email/fax out first[.]  That should be there in just a couple of minutes with our whole offer in writing.  Then we'll send the first set of newsletters in 3 weeks with the second set 2 weeks later.  Right AFTER the second issue, we'll send an invoice for THE YEAR directly to your attention.  Of course if you find Communication Bulletin impactful, we'd like to have your subscription continue.  The cost is only ($295/$432) which includes (5/10) copies sent to you and your supervisors twice a month, 24/7 access to the online center, and email updates on our related products.  If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter.  There's no further obligation. Keep the newsletter either way. OK? (MUST WAIT FOR RESPONSE)

(Id.)

No reasonable employee with purchasing power of a business or organization would hear this information and believe, as Plaintiffs suggest, that they are receiving free newsletters into perpetuity.  Not only does the script explicitly state that they are only receiving the first two

newsletters "at no risk", which is true, it also explains what a consumer can do to cancel the subscription.

Second, the consumer must verbally affirm that they accept the terms of the subscription. They are asked to affirm the terms in three different parts of the script.  First, they have to give a positive response to the question at the end of the "no risk subscription disclosure" paragraph.  As noted, the last two sentences of the "no risk subscription disclosure" paragraph states:

> If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter.  There's no further obligation. Keep the newsletter either way.  OK?  (MUST WAIT FOR RESPONSE.)

(Id.)  If a telemarketer does not get a positive response after "OK?", as indicated explicitly in the script, the telemarketer cannot put the order through.  (Doc. No. 427 at 15-18; Doc No. 426 at 44:15-45:6.)  Second, they have to give a positive response to the "budget" question and give their month and date of birth, which affirms that they are the one the telemarketer spoke to.  (Doc No. 426 at 44:15-45:6.)  Without those two final affirmations, the potential subscriber has not placed an order.[71]  (Id.)

Third, while the script contains a substantial amount of information, this fact also disproves Plaintiffs "net impression" theory of free publications into perpetuity.  On the contrary, a

---

[71]  As Colin Drummond, the former head of telemarketing at AFS and current Vice-President of business development at SuccessFuel, testified:

> so then we're going to do the budget question. And then to verify that we spoke to them, and nobody on their behalf, we're going to ask for the month and day of their birthday but not the year.

> This is the last place where a customer can, you know, decline our offer.  And some do.  Some say, oh, wow, okay.  I don't want to give you my date of birth so—they opt out.

(Id.)

reasonable consumer would understand that a telemarketer needs to inform the consumer on the benefits of the subscription before a consumer would agree to pay for a subscription.  Asking a business or organization to agree to a paid subscription before understanding the merits of it would be unreasonable.

Moreover, Plaintiffs' claims in Count II that Defendants purposely omitted material terms to deceive customers into taking away the "net impression" that the publications were free with no risk is similarly unavailing.  (See Doc. No. 43 at 15.)  On the contrary, the script disclosed the material terms and conditions of the offer, including the structure of the subscription, the cost of the subscription and the cancellation policy.  In sum, a facial evaluation of the telemarketing script does not prove that the script's "net impression" would mislead reasonable consumers into thinking the publication was "free at no risk."

### 2.  Extrinsic Evidence

Turning to the second part of the inquiry, Plaintiffs did not prove by a preponderance of the evidence that extrinsic evidence shows that the "net impression" of the script was deceptive because a reasonable consumer would conclude from it that the publications were "free at no risk" or that other terms and conditions were deceptive.

Extrinsic evidence may include "common usage of terms, expert opinion as to how a[] [representation] might reasonably be interpreted, copy tests, generally accepted principles of consumer behavior, surveys or 'any other reliable evidence of consumer interpretation.'" Telebrands, 140 F.T.C. at 291 (citations omitted).  While a wide range of extrinsic evidence is permissible, courts have emphasized that the fact finder must "carefully assess the quality and reliability of any extrinsic evidence" and has placed particular emphasis on the importance of

consumer surveys.  In re Novartis Corp., et al., 127 F.T.C. 580, 680 (citing Stouffer ("Consumer surveys are the best extrinsic evidence of what words in an ad mean to consumers.").  Finally, "an ad need not mislead a majority of reasonable consumers.  An ad is misleading if at least a significant minority of reasonable consumers are likely to take away the misleading claim." Telebrands, 140 F.T.C. at 291 (citations omitted).

Here, Plaintiffs failed to prove by a preponderance of the evidence that the extrinsic evidence introduced at trial proves that the "net impression" reasonable consumers take away from the telemarketing script is that the subscription was "free with no risk" or that the other terms and conditions were misleading.  Notably, Plaintiffs did not present any expert witnesses to show how reasonable consumers interpret the telemarketing script.[72]  Rather, Plaintiffs relied on compilations of complaints by consumers, presented as exhibits at trial, and the testimony of two witnesses who received telemarketing calls.[73]  The quality and reliability of this evidence is insufficient to prove the "net impression" standard by a preponderance of the evidence.

---

[72]  The only expert witness the Plaintiffs presented at trial was Erik C. Lioy, a rebuttal witness to Defendants' expert witness, Harris L. Devor.  (See Doc. No. 356 at 17.)  Both witnesses are certified public accountants who reviewed AFS's records as well as conducted research on the trends in the publication business during the relevant time period.  Neither witness conducted market research on interpretation on the script.  Rather, both testified to AFS's and to general trends in the publication business during the relevant time period.  Devor testified that AFS's decline in revenue was consistent with general trends in the publication industry at the time and that AFS's success relied on revenue from long-term subscribers.  (Doc. No. 434 at 11:19-13:16.) Lioy disagreed and contributed AFS's decline to its reputational harm based on consumer complaints.  (Doc. No. 450 at 50:14-51:4, 61:21-62:2.)  Devor's testimony was corroborated by employees of AFS, whose testimony the Court credits favorably.

[73]  These witnesses were Kelly Rickard and Daniel Dewey.  Rickard is a certified public accountant who works as a tax manager at ClavesVita tax and wealth advisors in Billings Montana.  (Doc. No. 428 at 55:2-21.)  Dr. Dewey works as a chemist at the Mine Safety and Health Administration Approval and Certification Center in Triadelphia, West Virginia.  (Doc. No. 429 at 4:8-20.)

First, Plaintiffs did not reliably prove that a reasonable consumer or even a "significant minority" of reasonable consumers were deceived by Defendants' telemarketing calls.[74] During the relevant time period, AFS placed a total of 749,032 orders for its publication.  (See Trial Ex. 334).  Sometimes, after the order was placed, customers would complain.  As with any business, some customer complaints are expected.  Accordingly, the small number of customer complaints when compared to the number of orders during the relevant time frame do not conclusively prove deceptive conduct.  See Cliffdale Assocs., Inc., 103 F.T.C. at 165 ("Virtually all representations, even those that are true, can be misunderstood by some consumers.")  Rather, because businesses exist in all different sizes, a plaintiff must prove that "at least a significant minority of reasonable consumers are likely to take away the misleading claim."[75]  Telebrands, 140 F.T.C. at 291 (citing

---

[74] Plaintiffs argue that the "significant minority" standard does not apply.  Rather, they contend that plaintiffs "need only demonstrate a reasonable consumer, not a majority or even a substantial number of consumers, would be [misled] by the advertisements."  (Doc. No. 459 at 94 (citing In re Nat'l Credit Mgmt. Group, LLC, 21 F. Supp. 2d 424, 442 n.31 (D.N.J. 1998) (quoting FTC v. U.S. Sales Corp., 785 F.Supp. 737, 748 (N.D.Ill. 1992))).  The quote in full reads:

> [T]he FTC needs only to show that a reasonable consumer, upon hearing the advertisement, likely would be misled to his detriment. In other words, the FTC is only required to show that it is likely, not that it is certain, that a reasonable consumer would be misled.  Accordingly, the FTC does not need to show that every reasonable consumer would be misled by the advertisements.... Indeed, advertisements are illegal if they have a "tendency" or "capacity" to deceive; actual deception of particular consumers need not be proven.

FTC v. U.S. Sales Corp., 785 F.Supp. 737, 748 (N.D.Ill. 1992).

Regardless, of whether the standard only requires one reasonable consumer to be misled, or a substantial or significant number of consumers to be misled, or every reasonable consumer to be misled, Plaintiffs have not proven by a preponderance of the evidence that such persons were misled by the script.

[75] For example, 200 customer complaints for a business of 250 customers would be significant.  But 200 complaints for a business with thousands of customers would not have the same significance.

In re Kraft, Inc., 114 F.T.C. 40, 60 (1991)).  While courts have not placed a bright-line numerical value on what constitutes a "significant minority," here, Plaintiffs have failed to prove, under any definition or percentage level, not only that a significant minority were misled by Defendants' telemarketing calls, but also a reasonable consumer was misled.[76]

Out of the 749,032 orders placed during the relevant time period, Plaintiffs could not reliably show how many or even whether consumer businesses or organizations were deceived by Defendants' telemarketing calls.  Put differently, they did not prove that reasonable consumer or a "significant minority" were deceived.  Some complaints Plaintiffs offered as exhibits to show

---

[76] All parties here agree that "[a] material practice that misleads a significant minority of reasonable consumers is deceptive."  See e.g., In re Kraft, 114 F.T.C. at 60 (citing Deception Statement, 103 FTC at 117 n.20.)  While courts have placed different numerical values on what constitutes a "significant minority", most courts have interpreted the term to mean at least 20% of reasonable consumers in a target audience.  As the Third Circuit discussed in Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.:

> With regard to what constitutes a substantial or significant number of consumers who are misled, the court cited to several cases which suggest that 20% would be sufficient.  Stiffel Co. v. Westwood Lighting Group, 658 F.Supp. 1103, 1114 (D.N.J. 1987) (potential that between 22% and 57% of consumers will be misled is not insubstantial), R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc., 511 F.Supp. 867, 876 (S.D.N.Y. 1980) ( "deception rate" of between 20% and 33% sufficient to warrant preliminary injunctive relief); McNeilab Inc. v. American Home Products Corp., 501 F.Supp. 517, 527 (S.D.N.Y. 1980) (23% not insubstantial number of consumers). While Johnson–Merck disputed the court's evaluation of the consumer surveys, it did not challenge the court's assumption of what constitutes a substantial or significant number of misled consumers for purposes of a Lanham Act violation. Therefore, we do not review that assumption.

19 F.3d 125, 134 n. 20 (3d Cir. 1994).  While the Johnson-Merck case involved a Lanham Act violation, courts have looked to the Lanham Act for guidance on the FTC Act and the UTPCPL because of the statute's similarities.  See Com., by Creamer v. Monumental Properties, Inc., 459 Pa. 450, 461-62 (Pa. 1974).  Courts have also reached similar conclusions in the context of FTC Act violations.  See In re Intuit Inc., No. 9408, 2023 WL 5970801, at *86 (Sept. 6, 2023) (finding that a consumer survey showing that 24.1% of consumers was a significant minority).

deceptiveness merely indicate that consumers understood the offer and sought to cancel after receiving the first two newsletters. Some complaints simply are not relevant to Plaintiffs' deceptiveness claim. Moreover, the evidence at trial proved that Defendants often sought to remedy complaints lodged against them by following up, investigating if there were quality control issues or reworking their systems.

Second, none of the additional extrinsic evidence offered by Plaintiffs proved by a preponderance of the evidence that Defendants' conduct was deceptive and misleading to customers. Plaintiffs had two employees of organizations contacted by telemarketers testify at trial, Kelly Rickard and Daniel Dewey. Notwithstanding that they do not constitute a significant minority of AFS subscribers, their testimony showed that they understood Defendants' offer.[77]

---

[77] Daniel Dewey properly followed the process to cancel his subscription. (See Doc. No. 429.) Dewey received a call from a telemarketer on January 30, 2019. On March 18, 2019, he wrote "cancel" on the invoice he received and mailed it back to Defendants. (See id. at 36:18-37:7.)

While Kelly Rickard did seem to be confused by Defendants' offer, Plaintiffs did not prove that the alleged deception was the cause of Rickard's confusion. Rather, her testimony at trial indicated that Rickard simply forgot about the telemarketing call and ignored all follow-up correspondence from AFS, including the confirmation emails and a follow-up phone call. (Doc. No. 428 at 73:6-77:9.) At trial Rickard testified:

> Q: . . . I believe [we] just testified that during the initial sales call you were told that an email would be coming; correct? And you did receive an email that same day; correct?
>
> A: Yes.
>
> Q: That email was sent to your work email address?
>
> A: Yes.
>
> Q: And both the email and the call were from CFO and Controller Alert?
>
> A: I believe so.

Moreover, Defendants showed that complaints were made by a very small minority of consumers contacted by telemarketers and that given the number of subscribers over the years who paid for the publications, the strong inference is that the consumers understood Defendants' offer.  Thus, Plaintiffs have not shown by a preponderance of extrinsic evidence through extrinsic evidence that Defendants' telemarketing calls were misleading.

In sum, because Plaintiffs did not show through a facial evaluation of the script nor through extrinsic evidence that Defendants' offer "was likely to mislead consumers acting reasonably under the circumstances", Plaintiffs did not prove by a preponderance of the evidence the second element of a violation of the FTC Act or the UTPCPL.  Thus, the claims alleged against the AFS Defendants in Counts I, II, V and VI have not been proven.[78]

---

> Q:  I believe your testimony was that you did not read the email when it came in?
>
> A:  Correct. I think I deleted it.

(Id. at 84:4-16.)  It was also shown at trial that after listening to the recording of Rickard's phone call with the telemarketer, several of the statements Rickard provided to the FTC in her declaration were false:

> Q:  Several of the statements in your declaration, Ms. Rickard, were not accurate; correct?
>
> A:  At the time I believed they were accurate but looking back now, yes.

(Id. at 74:15-18.)  For example, in Rickard's declaration she stated she was "not told on the phone call that I would need to cancel in a certain amount of time," but that after she listened to the recording, Rickard testified that on the phone call she was told that she "could cancel within 60 days by calling the 1-800 number or by writing cancel on the invoice and returning it."  (Id. at 75:25-76:8.)  Rickard also did not remember providing her day and month of birth, which she did give as confirmed on the phone call.  (Id. at 9-22.)

[78] Because Plaintiffs have not proven the second element of a "deceptive acts or practices" claim under the FTC Act and the UTPCPL, there is no need to analyze the third element.

**B. Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Violated the Unordered Merchandise Statute**

The UMS prohibits businesses from sending "unordered merchandise", which is defined as "merchandise mailed without the prior expressed request or consent of the recipient" and that businesses may not mail a recipient of unordered merchandise a bill for that merchandise. 39 U.S.C. § 3009. Specifically, Plaintiffs argue that the CEEL books were mailed without the prior express consent of the recipient. (Doc. No. 43 at 17.) The evidence presented at trial does not support this claim by a preponderance of the evidence.

Plaintiffs assert in Counts IV and VIII[79] of the Amended Complaint that AFS Defendants violated the Unordered Merchandise Statute ("UMS"), 39 U.S.C. § 3009.[80] Not all of Defendants'

---

[79] Counts IV and VIII will be addressed together because they both allege violations of the UMS, 39 U.S.C. § 3009. (See Doc. No. 43 at 16-17, 21-22.) Count VIII alleges that a violation of the UMS is a per se violation of the UTPCPL "catch all" provision, 73 P.S. § 201-3. (See id. at 21.) 73 P.S. § 201-3 states in pertinent part that:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful.

73 P.S. § 201-3. 73 P.S. § 201-2(xxi) states that it is a violation to:

> Engage[e] in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

The latter section is referred to as the "catch-all" provision. Plaintiffs argue that Defendants' alleged violation of the UMS by mailing the CEEL books without consent also violates 73 P.S. § 201-3 as defined by 73 P.S. § 201-2(xxi) because it alleges that Defendants' actions created a likelihood of confusion or misunderstanding. (Doc. No. 43 at 22.) Accordingly, the counts will be addressed together.

[80] As stated above, the UMS, 39 U.S.C. § 3009, states in pertinent part:

subscriptions included a book[81] in addition to the newsletter, but when it did, Defendants' telemarketers received consent from the customer to send the book.  For example, in the "Employment Law Report" script, after describing what the newsletter contains, the telemarketer states "[w]e'll send out the next issue out [sic], <u>along with the reference guide</u>, at no risk, so you can see if it is a good fit with what you're already doing there. . ." the telemarketer then confirms the consumer's address and informs the customer of the cost, they continue:

> if you DON'T find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 in the newsletter within 60 days, <u>stick the reference guide back in the envelope</u> it came in and there's no further obligation.  Keep the newsletters either way. OK? [wait for a response].

As shown in the text of the script, telemarketers must get an affirmation from the consumer before they can send out the newsletters and the book.  And sales call recordings that did not contain affirmative consent by the customer to receive AFS's publications were subject to "quality cancels," and no newsletters or books were sent.  Thus, at trial, Plaintiffs were unable to show that Defendants mailed any CEEL books without the expressed consent of recipient.  Consequently,

---

(b). . . the mailing of un-ordered merchandise or of communications prohibited by subsection (c) of this section constitutes an unfair method of competition and an unfair trade practice in violation of section 45(a)(1) of title 15.

. . .

(d) For the purposes of this section, "un-ordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

[81] Defendants referred to their CEEL books interchangeably as "books" and as "reference guides." (<u>See</u> Doc. No. 433 at 17:2-9, 35:8-16.)  CEEL reference guides summarized relevant legal opinions for use of private, public and higher-education administrators and managers.  (<u>See id.</u> at 38:23-39:12.)  Titles included "Higher Education Law in America" (Trial Ex. 2232), "Keeping Your School Safe and Secure" (Trial Ex. 2045), "Special Education Law Update" (Trial Ex. 2060), "Legal Update for Teachers" (Trial Ex. 2061), "Employment Law Report" (Trial Ex. 2062) and "Public Employment Law Report" (Trial Ex. 2064).  (<u>Id.</u> at 17:7-9, 36:1-8.)

Plaintiffs claims under the UMS have not been proven by a preponderance of the evidence. This failure of proof requires a finding in favor of AFS Defendants in Counts IV and VIII.

**C. Plaintiffs Have Not Proven by a Preponderance of the Evidence that Defendants Violated the Telemarketing Rules of the UTPCPL**

In Count VI, in addition to the deceptive practice claim discussed in Section III(A), supra, Plaintiffs contend that Defendants violated the UTPCPL by failing to comply with the UTPCPL's telemarketing rules as defined by Section 201-2(4)(xvii). (Doc. No. 43 at 19-20.) Section 201-2(4)(xvii) of the UTPCPL provides that "unfair or deceptive acts or practices" include:

> (xvii) [m]aking solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating:
>
>> (A) the identity of the seller;
>>
>> (B) that the purpose of the call is to sell goods or services;
>>
>> (C) the nature of the goods or services. . .

73 P.S. § 201-2(4)(xvii)(A)-(C).[82] Plaintiffs allege that Defendants violated this section because its telemarketers did not clearly, affirmatively and expressly first state the identity of the seller and that the purpose of the call was to sell goods or services. This claim was not proven by a preponderance of the evidence.

Here, Defendant's "Executive Script" proves that Defendants complied with the requirements of 73 P.S. § 201-2(4) (xvii). First, in the initial sentence of the "Executive Script", the telemarketer states their identity:

> Hi [Their name], this is [your name] from PBP!

---

[82] 73 P.S. § 201-2(4) (xvii) also includes a section (D) that relates to "prize-promotions" and the disclosures a telemarketer must make if a "prize promotion is offered." This section does not apply to this case.

(Pl. Ex. 0006 at 6-5.)   Then, after clarifying that they are speaking to the targeted potential subscriber they continue:

> My company published a newsletter called Communication Bulletin for Managers & Supervisors and I'm sending out a couple copies for you to look at, and then we'll call you back and see how you like it. . .

(Id.)  This portion clearly identifies who they telemarketer works for and the purpose of the call. Next, the telemarketer explains the publication and the benefits it could provide to the potential subscriber.[83]   Once the potential subscriber understands the merits of the newsletter and online website, the telemarketer moves to the offer paragraph:

> So (their name) we're just going to send out (5/10) copies of Communication Bulletin and see if it would be a good resource for you and your team.  We'll send out _ copies of the next two issues, along with access to the online version, at no risk, so you can get some feedback from your folks there, and see if it's a good fit with what you are already doing there, then we'll call you back and see how you like it.  Our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first. . .

---

[83]   For example, for the newsletter "Communication Bulletin for Managers & Supervisors" the telemarketer described that:

> Communication Bulletin is in a quick 4 page format, with a brand new website that is especially designed to help supervisors:
>
> - Communicate better with other departments and deal with <u>difficult</u> people
> - Motivate their team for higher productivity
> - And my favorite part, is the website has a search tool.. kind of like a communication 911. Where you can type in whatever challenge your department might be having and get results right away!
>
> (Name) I'd be happy to take you to a webpage and give you a quick preview right now, OR just email you a link and you can take a look at it later on today! Which is easier for you?

(Id.)

(<u>Id.</u>)  After confirming the name of the potential subscriber, the telemarketer moves to the no risk

subscription disclosure paragraph:

> Ok what we'll do is send the email/fax out first[.]  That should be there in just a couple of minutes with our whole offer in writing.  Then we'll send the first set of newsletters in 3 weeks with the second set 2 weeks later.  Right AFTER the second issue, we'll send an invoice for THE YEAR directly to your attention.  Of course if you find Communication Bulletin impactful, we'd like to have your subscription continue.  The cost is only ($295/$432) which includes (5/10) copies sent to you and your supervisors twice a month, 24/7 access to the online center, and email updates on our related products.  If you don't find it valuable, or don't get approval for it, just write cancel on the invoice or call the 1-800 number in the newsletter. There's no further obligation. Keep the newsletter either way.  OK?

(<u>Id.</u>)  Thus, the telemarketers script clearly identifies the purpose of the call, the nature of the goods

and services and the offer it is providing to the potential subscriber.  Accordingly, Plaintiffs did

not prove a violation of 73 P.S. § 201-2(4)(xvii)(A)-(C) by Defendants.[84]

## IV.    CONCLUSION

For the foregoing reasons, Judgment will be entered in favor of Defendants American

Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell

and against Plaintiff Federal Trade Commission on Counts I, II and IV brought under 15 U.S.C. §

45(a) and 39 U.S.C. § 3009 in the Amended Complaint (Doc. No. 43).  Judgment also will be

entered in favor of Defendants American Future Systems, Inc., Progressive Business Publications

---

[84] Plaintiffs argue that Defendants' "Secretary Scripts" also violated 73 P.S. § 201-2(4)(xvii)(A)-(C) because some of the scripts contain the question, "are you selling anything" and prompted telemarketers to respond "no that's not it. . ."  Notwithstanding that the language was a mistake that was deleted, Plaintiffs' argument fails because the target of Defendants' calls was not the secretary.  Telemarketers were not allowed to offer subscriptions to secretaries.  To the contrary, they were only selling to businesses and organizations through employees that were permitted to make purchases or recommend purchases on behalf of the business or organization.  These were the persons the solicitations were directed to and the first ones to be provided with the required information.  As discussed above, once the telemarketer reached the target customer, they made all of the necessary disclosures.

of New Jersey, Inc., and Edward M. Satell against Plaintiff the Commonwealth of Pennsylvania on Counts V, VI and VIII brought under 73 P.S. § 201-3 in the Amended Complaint (Doc. No. 43).  Because the Court has found in favor of Defendants on all six (6) Counts in the Amended Complaint, Plaintiffs' request for a permanent injunction and money damages under the different statutes will be denied.  An appropriate Order follows.