**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, *et al.*, | : |
| *Plaintiffs*, | : |
| v. | :   Civil Action No.  2:20-cv-02266 |
| AMERICAN FUTURE SYSTEMS, INC., *et al.* | : |
| *Defendants*. | : |

**AFS'S MOTION FOR FEES AND COSTS**
**UNDER THE EQUAL ACCESS TO JUSTICE ACT**

Pursuant to the Equal Access to Justice Act ("EAJA"), Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell (collectively "AFS") respectfully move this Court for an order awarding AFS its reasonable and necessary fees, expenses, and costs.  As the prevailing party in this litigation, AFS is entitled to this award because the litigation conduct and position of Plaintiff Federal Trade Commission ("FTC") was not substantially justified.  On the contrary, FTC's positions and contentions in this litigation, which FTC unnecessarily expanded and extended, lacked any reasonable basis in fact or law and lacked any reasonable connection between the facts and its legal theories.

In support of this Motion, AFS relies on the accompanying Memorandum of Law, which it expressly incorporates by reference herein.

WHEREFORE, AFS respectfully moves this Court for an order awarding AFS its reasonable and necessary fees, expenses, and costs as mandated by the EAJA.

Dated: September 3, 2024

Respectfully submitted,

**WHITE AND WILLIAMS, LLP**

**DLA PIPER LLP**

<u>/s/ David H. Marion</u>
David H. Marion, Esquire
Morgan S. Birch, Esquire
PA ID Nos. 3590; 319358
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
Fax: (215) 789-7517
*mariond@whiteandwilliams.com*
*birchm@whiteandwilliams.com*

<u>/s/ Ilana H. Eisenstein</u>
Ilana H. Eisenstein, Esquire
Marie Bussey-Garza, Esquire
PA ID No.  94907; 324584
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301
*ilana.eisenstein@us.dlapiper.com*
*marie.bussey-garza@us.dlapiper.com*

**FAEGRE DRINKER BIDDLE &
REATH LLP**

<u>/s/ Paul H. Saint-Antoine</u>
Paul H. Saint-Antoine, Esquire
PA ID No. 526224
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
*paulsaint-antoine@faegredrinker.com*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.,* | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Civil Action No.  2:20-cv-02266 |
| | : | |
| AMERICAN FUTURE SYSTEMS, INC., *et al.* | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF AFS'S MOTION FOR FEES**
**AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF THE ARGUMENT ......................................................1

PROCEDURAL SUMMARY ................................................................................................7

ARGUMENT ......................................................................................................................9

I.      Legal Standard for the Entitlement to Fees.........................................................9

II.     AFS is a "Party" Entitled to Reasonable Fees and Expenses ............................11

III.    FTC's Position Was Not Substantially Justified, and No Special Factors Apply ............12

        A.      FTC Cannot Demonstrate that Its Factual Position Was Substantially Justified...13

                1.      FTC's Unreasonable Facial Evaluation of the Script. ..............................13

                2.      FTC Had No Reasonable Basis to Assert or Believe that AFS Regularly Departed from the Script...........................................................................15

                3.      FTC's Failure to Verify or Investigate Customer Complaints Was Not Reasonable. ...........................................................................................17

                4.      FTC's *Own* Witnesses Provided No Support for Its Position. .................20

        B.      FTC's Legal Position Was Unjustified. ...............................................................22

                1.      FTC Unreasonably Disclaimed Its Own Framework for Establishing Deception in an Implied Net Impression Case. .........................................22

                2.      FTC's Proposed Injunction Was Unconstitutional and Improper..............24

                3.      FTC's Motion for Reconsideration Was Not Substantially Justified. .......26

IV.     The Fees and Expenses Sought Are Reasonable and Were Necessary to AFS's Defense................................................................................27

CONCLUSION....................................................................................................................34

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. FTC*,
    695 F.2d 681 (3d Cir. 1982)...................................................................................................15

*AMG Cap. Mgmt., LLC v. FTC*,
    141 S. Ct. 194 (2020) ..........................................................................................................7

*AMG Cap. Mgmt., LLC v. FTC*,
    141 S. Ct. 1341 (2021).........................................................................................................7

*Beneficial Corp. v. FTC*,
    542 F.2d 611 (3d Cir. 1976).................................................................................................15

*Bolick v. DFS Services LLC*,
    Civ. No. 10-5211, 2012 WL 13018253 (E.D. Pa. Jan. 25, 2012) ...........................................9

*In re Cliffdale Assocs., Inc.*,
    103 F.T.C. 110 (1984)...............................................................................................4, 15, 22

*FTC v. AbbVie Inc.*,
    976 F.3d 327 (3d Cir. 2020)................................................................................................25

*FTC v. Brown & Williamson Tobacco Corp.*,
    778 F.2d 35 (D.C. Cir. 1985)...............................................................................................25

*FTC v. DirecTV, Inc.*,
    No. 15-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...........................................4, 24

*Garcia v. Schweiker*,
    829 F.2d 396 (3d Cir. 1987).........................................................................................4, 27, 29

*Greenhill v. United States*,
    96 Fed. Cl. 771 (2011) .......................................................................................................21

*Hudson v. Sec. of Health and Human Svcs.*,
    839 F.2d 1453 (11th Cir. 1988), *aff'd* 490 U.S. 877 (1989)...................................................11

*INS v. Jean*,
    496 U.S. 154 (1990).......................................................................................................5, 6, 10

*Int'l Woodworkers, Local 3-98 v. Donovan*,
    792 F.2d 762 (9th Cir. 1985) ........................................................................................29, 30, 33

*In re Intuit Inc.*,
   No. 9408, 2023 WL 1861211 (F.T.C. Jan. 31, 2023) ................................................4

*In re Intuit Inc.*,
   No. 9408, 2023 WL 5970801 (F.T.C. Sept. 6, 2023) ..........................................4, 24

*LabMD, Inc. v. FTC*,
   No. 1:19-MI-00071-WEJ, 2019 WL 11502794 (N.D. Ga. Oct. 1, 2019),
   *adopted by* No. 16-16270 (11th Cir. Dec. 23, 2019) .........................................10, 19

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753, 765 (1994) .......................................................................................25

*Morgan v. Perry*,
   142 F.3d 670 (3d Cir. 1998) ..........................................................................1, 9, 10

*Myers v. Sullivan*,
   916 F.3d 659 (11th Cir. 1990) ..........................................................................10, 11

*In re Novartis*,
   127 F.T.C. 580 (1996) ............................................................................................22

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986) ...............................................................................................32

*Pierce v. Underwood*,
   487 U.S. 552 (1998) ....................................................................................... *passim*

*In re R.M.J.*,
   455 U.S. 191 (1982) ...............................................................................................25

*In re Stouffer Foods Corp.*,
   118 F.T.C. 746 (1994) ...................................................................................4, 22, 24

*In re Telebrands Corp.*,
   140 F.T.C. 278 (2005) .......................................................................................13, 22

*United States v. Hallmark Const. Co.*,
   200 F.3d 1076 (7th Cir. 2000) ...............................................................................11

**Rules & Statutes**

28 U.S.C. § 1920...........................................................................................27, 28

28 U.S.C. § 2412 ................................................................................. *passim*

39 U.S.C. § 3009 ..........................................................................................7

15 U.S.C. § 45(a) .........................................................................................7

Fed. R. App. P. 4(a)(1)(B) ..................................................................................9

Fed. R. Civ. P. 30(b)(6).............................................................................. *passim*

Fed. R. Civ. P. 52(b) ..........................................................................5, 26, 27

Fed. R. Civ. P. 59...............................................................................5, 26, 27

Pennsylvania Unfair Trade Practices and Consumer Protection Law .............................................7

**Other Authorities**

Debra Cassens Weiss, *Nearly $1,000 an hour is rate for second-year associates at these BigLaw firms*, ABAJournal (Apr. 3, 2023 9:20 am), https://www.abajournal.com/news/article/nearly-1000-an-hour-is-rate-for-second-year-associate-at-these-biglaw-firms ................................33

H.R. Rep. No. 96–1418 (1980) ....................................................................6

The 2024 Am Law 100: Ranked by Gross Revenue, Law.com (Apr. 16, 2024), https://www.law.com/americanlawyer/2024/04/16/the-2024-am-law-100-ranked-by-gross-revenue. ..........................................................................30

U.S. Securities and Exchange Commission, Investor Publications: "Beginner's Guide to Financial Statement," (Feb. 4, 2007), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsbegfinstmtguide. ..........................................................................12

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Having prevailed on all counts at trial against the Federal Trade Commission ("FTC"), AFS[1] is entitled to an award of attorneys' fees, expenses, and costs under the Equal Access to Justice Act ("EAJA"), which provides:

> [A] court **shall award** to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a) [court costs], incurred by that party in any civil action . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (emphasis added).

AFS is the "prevailing party" and meets the eligibility criteria for a statutorily mandated fee award under the EAJA because it is a corporation with a net worth under $7 million and had fewer than 500 employees at the time the Complaint was filed.  *See* § II, *infra*.  Therefore, the Act requires that reasonable fees, costs, and expenses "shall" be awarded to AFS unless FTC can sustain **its burden** of demonstrating that its position was substantially justified.  It plainly cannot. This is not merely because FTC lost every claim on the merits after a one-month trial, although that is certainly significant and extraordinary; but also because FTC's positions and contentions lacked any reasonable basis in fact or law and, furthermore, lacked any reasonable connection between the facts and its legal theories.  *See Morgan v. Perry*, 142 F.3d 670, 684 (3d Cir. 1998). Indeed, FTC utterly failed to prove **any** of the factual or legal bases for its claims.  That is clear from both this Court's March 29, 2024 Opinion entered at the conclusion of the trial (ECF No. 463, hereinafter "Op. I") **and** from this Court's June 11, 2024 Opinion denying FTC's motion for

---

[1] AFS refers collectively to Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell.

reconsideration, which FTC pursued without any regard for the required legal standard (ECF No. 475, hereinafter "Op. II").

At trial, FTC stood up for its opening statement and told this Court that AFS's 30-year print publication business was a "scam" which routinely "tricked" and "deceived" its business and organizational customers into entering into subscriptions for newsletters and books that they did not order or thought were "free."  But this Court properly found that FTC did not and could not prove that any of those assertions were true.  To the contrary, FTC lacked evidence that ***even a single*** customer had been misled by AFS.  Op. I at 44 ("Plaintiffs have failed to prove, under any definition or percentage level, not only that a significant minority were misled by Defendants' telemarketing calls, but also a reasonable consumer was misled. . . . Put differently, they did not prove that reasonable consumer or a 'significant minority' were deceived."); *see also id.* at 43 n.74.  The contrast between FTC's litigation position and the actual evidence is stark and dramatic.

None of this could have been a surprise to FTC.  It had to have been clear to FTC that its position from the start was unsupported—and unsupportable—long before trial.  Through years of investigation and discovery, FTC demanded and received massive quantities of information from AFS, including ***12 million*** pages of documents, ***17,000*** recordings of customer interactions, and depositions and interviews of dozens of AFS employees and former employees, all of whom confirmed the integrity, quality, and customer-centricity of the company.  The monumental task of searching for and producing all of these documents, recordings, and witnesses, required thousands of hours of work by AFS's employees and attorneys to search for, locate, categorize, review, inspect for relevance and privilege, and produce.  But FTC ignored all of that information. It did not use the recordings or company records to determine whether customer complaints were accurate or reliable—they were frequently neither, as this Court found.  Op. I at 28–29 ("[I]t was

shown at trial that these complaints were not reliable.").  It did not consider customer complaints in the context of AFS's business as a whole—indeed, both the FTC's own 30(b)(6) witness and its lead investigator disclaimed any knowledge that the customer complaints were only a tiny fraction of the hundreds of thousands of customers AFS contacted or served.  *See* § III(A)(3), *infra*.  And FTC also ignored the overwhelming evidence showing that AFS applied rigorous quality control measures to ensure adherence to its telemarketing Script, which provided a clear explanation of the subscription price, terms, and cancellation procedures.  Instead, FTC charged ahead, refusing to discuss the merits of its claims with AFS and its lawyers, while simultaneously demanding tens of millions of dollars in settlement and ignoring the comprehensive discovery in its possession.

FTC's dramatic overreach massively expanded the scope of discovery, the number of unnecessary and irrelevant disputed issues (FTC's statement of purportedly "undisputed" material facts contained *387* paragraphs), and the length of trial (FTC's exhibit list proposed over *1000* trial exhibits).  But having hauled into court bankers' boxes full of AFS documents, recordings, and deposition transcripts, FTC could not prove that *even a single* AFS customer had been misled or that any reasonable business customer likely would have been.  *See* Op. I at 44; *id.* at 43 n.74; Op. II at 18.

Furthermore, FTC failed to apply—and seemingly conducted years of prelitigation activity and embarked on trial without knowledge of—the well-established legal standards that govern a net impression case such as this one.[2]  First, contrary to its own precedent and binding law that

---

[2] At the close of opening statements, FTC's lead counsel, Amy Hocevar, argued, "Your Honor, it's our position that the significant minority test used in Defendants' opening is erroneous.  And we intend to submit a bench memo on the issue tomorrow morning."  ECF No. 425 at 46:7–10.  When FTC filed its bench memo—not the next morning, but a week later—it argued for a standardless, *ipse dixit*, know-it-when-we-see-it approach, which is contrary to FTC's own well-established precedent.  *See* ECF No. 408 (FTC's bench memo).

requires evaluation of the implied net impression of the communication as a whole, FTC resorted to textual gymnastics to distort the Script in order to claim (falsely) that AFS represented the subscription as "free with no risk," when, as the Court found, the Script accurately discloses all material subscription terms and "explicitly describes to the consumer how the subscription will work," Op. I at 39, including the price, invoice procedure, and cancellation instructions. This Court found, "[n]o reasonable employee with purchasing power of a business or organization would hear this information and believe, as Plaintiffs suggest, that they are receiving free newsletters into perpetuity." Op. I at 39; *see also* Op. II at 6 n.2 (same). FTC knew or should have known this well before trial—indeed, at the very outset of its investigation in 2017, when it first received the Script.

FTC further disclaimed application of its own test for evaluating the "implied net impression" of a representation, which requires extrinsic evidence that a "significant minority" of target customers would likely be misled as a result of the sales presentation. *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 177 n.20 (1984). FTC inexplicably failed to follow its own example in cases like *DirecTV*, *Intuit*, and *Stouffer*,[3] where FTC employed highly credentialed experts to evaluate the challenged advertisements. Instead, FTC cobbled together "compilations of complaints by consumers . . . and the testimony of two witnesses who received telemarketing calls," none of which supported FTC's case. *See* Op. I at 42. The failure to recognize or follow the applicable legal standard and its own administrative precedent cannot be justified. *See Garcia v. Schweiker*,

---

[3] *FTC v. DirecTV, Inc.*, No. 15-01129, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018); *In re Intuit Inc.*, No. 9408, 2023 WL 1861211 (F.T.C. Jan. 31, 2023); *In re Intuit Inc.*, No. 9408, 2023 WL 5970801 (F.T.C. Sept. 6, 2023); *In re Stouffer Foods Corp.*, 118 F.T.C. 746 (1994).

829 F.2d 396, 400 (3d Cir. 1987) ("The Secretary continuously flouted well-established precedents and thus, its position ***cannot be considered substantially justified***." (emphasis added)).

Even after this Court issued a thorough and detailed 52-page opinion following a month-long trial and comprehensive closing arguments, FTC improperly added to the delay and expanded the scope and costs of this litigation by filing a motion for reconsideration under Rules 59 and 52(b) that wholly ignored the governing legal standard under those Rules. ECF No. 466. Despite acknowledging that Rules 59 and 52(b) permit changes to an opinion only to correct clear errors of fact or law, *see* ECF No. 466-1 at 2–3, FTC failed to apply this legal standard and instead repeatedly asked the Court to "rethink" its reasoning and conclusions.

An award of fees in this case will effectuate the core purpose of the EAJA, which is "to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions" and to "curb[] excessive regulation and the unreasonable exercise of Government authority." *INS v. Jean*, 496 U.S. 154, 163, 165 (1990). AFS is a small business. But AFS is one of the very rare companies with the wherewithal and fortitude to insist on its day in court and to take FTC (here combined with the Pennsylvania Attorney General's Office) to trial.[4] This was undertaken at great expense—over $7 million in legal fees alone—and involved enormous time and effort on the part of AFS employees and management. As a result of a statutory fee cap, the requested award will not come close to making AFS whole and will provide no compensation for the significant time and resources diverted from AFS's business to this litigation. Moreover, AFS is seeking its costs and fees only since litigation commenced, meaning this Motion will provide

---

[4] Notably, the Pennsylvania Attorney General's Office was added to the case as an additional plaintiff on FTC's motion more than three years after the Attorney General had ended its own investigation of AFS, having not sought any change to AFS's business practices.

no recourse or recovery for the substantial money and resources that AFS expended while cooperating with FTC over the course of its multiyear prelitigation investigation, which should have prevented litigation if FTC's conduct in assessing the Script and materials in its possession had been reasonable.  But granting this Motion will lessen the burden unfairly imposed by FTC's unjustified and unsupportable case.  AFS refused to surrender to FTC's exorbitant and unjustified pre-trial settlement demands, and proceeded to trial facing FTC and the Pennsylvania Attorney General's threat of tens of millions of dollars in claimed disgorgement, millions of (if not over a billion) dollars in wrongly asserted civil penalties, and FTC's demand for a wide-ranging injunction that posed an existential threat to its ongoing businesses, which threats and demands were wholly unrelated to and unjustified by the challenged business practices.  Congress was acutely aware of just such threats when it passed the EAJA.  A portion of the 1980 House Report on the EAJA, quoted by the U.S. Supreme Court, observed:

> [T]he Government with its greater resources and expertise can in effect coerce compliance with its position.  Where compliance is coerced, precedent may be established on the basis of an uncontested order rather than the thoughtful presentation and consideration of opposing views.  In fact, ***there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue***.  This kind of truncated justice undermines the integrity of the decision-making process.

*Jean*, 496 U.S. at 165 n.14 (emphasis added) (quoting H.R. Rep. No. 96–1418, p. 12 (1980)).

Although it faced the enormous coercive power of the federal government, AFS did not surrender because it believed in the integrity of its business, the fair treatment of its customers, and the validity of its own legal position.  This is precisely the type of action that Congress intended to recompense with fees and expenses when it passed the EAJA to enable small companies like AFS to take on the government when its agencies proceed without substantial justification as FTC did here.

## PROCEDURAL SUMMARY

This Court is, by now, familiar with the facts of this case, after presiding over it for many years, conducting a lengthy non-jury trial, issuing a detailed 52-page opinion, and rejecting FTC's post-trial motion to reverse the well-supported judgment. However, for the sake of completeness, we present this brief overview of the relevant procedural posture of the case.

On May 13, 2020, FTC filed its Complaint against AFS claiming violations of Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), including purported violations of the Unordered Merchandise Statute, 39 U.S.C. § 3009. FTC sought both an injunction and monetary disgorgement. ECF No. 1, ¶ 1. On July 9, 2020, however, the U.S. Supreme Court granted *certiorari* in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 194, and the Court ultimately ruled unanimously that FTC has no authority to obtain monetary disgorgement under Section 13(b), and instead that its remedies are limited to prospective injunctive relief. *See AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).

On July 23, 2020, two weeks after the Supreme Court agreed to review the *AMG Capital* decision, which led to rejecting FTC's authority to demand monetary remedies, FTC moved to amend its Complaint to add the Commonwealth of Pennsylvania as an additional plaintiff, even though the Commonwealth had terminated its own investigation of AFS's publication sales nearly three years earlier without any finding that AFS had violated Pennsylvania law and without taking any enforcement action. *See* ECF No. 20. Thereafter, the Commonwealth asserted that it had the disgorgement power under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") that the federal government lacked. FTC did not amend its own claims, but asserted that the Pennsylvania claims "arise from the same set of facts" and claimed the state laws were "substantially similar to the FTC's claims." ECF No. 20-1, at 3. On January 20, 2021, FTC's

motion to amend was granted.  Significantly, unlike nearly every other case where the government had asserted a misleading or deceptive trade practice, neither FTC nor the Commonwealth sought an administrative cease and desist order, a temporary restraining order, or a preliminary injunction, thereby depriving AFS of any early opportunity to disprove FTC's bald allegations and to advance the strong merits of its legal defenses.[5]

Thus, without the scrutiny of any early evidentiary proceedings, FTC was able to use the baseless averments of its pleadings to carry on the hugely burdensome discovery described above over a period of nearly three years.  During this time, FTC exploited every opportunity to conduct sweeping discovery that ultimately compelled AFS's production of nearly every digital and paper document in its possession relating to the allegedly relevant timeframe.  FTC's demands were so complex and far sweeping that this Court appointed a special master to adjudicate the numerous discovery issues.  Throughout this process, FTC forced AFS to spend millions of dollars responding to FTC's vast and unjustified discovery demands.

Prior to trial, the parties filed pretrial memoranda and motions in limine, including four motions in limine by the government, one of which sought to "pre-admit" numerous hearsay statements that were demonstrably false and another that sought to disavow the deposition testimony of the designated Rule 30(b)(6) representatives of FTC and the Commonwealth.  In addition, the parties filed cross-motions for summary judgment, which on September 20, 2023, this Court denied in one-page orders, after determining the issues would be best resolved after

---

[5] Notably this was not the first case that the federal government brought and lost against AFS in this Court.  In 1995, the U.S. Department of Justice brought a similar complaint against AFS challenging the Script.  On that occasion, the federal government tried and failed before U.S. District Court Judge James Giles to obtain a temporary restraining order or preliminary injunction after an early evidentiary hearing.  They were left with a zero-dollar settlement that made only three minor changes to AFS's business practices that sunset after two years.  *See* Ex. N.

trial.  The Commonwealth and FTC each filed a separate motion for summary judgment, and, with exhibits, FTC's motion was 3,246 pages.

A 15-day trial was held over the course of one month from September 2023 through mid-October 2023.  Post-trial, the parties filed lengthy proposed Findings of Fact and Conclusions of Law.  Closing arguments were held on December 19, 2023.

On March 29, 2024, this Court issued a 52-page opinion granting judgment in favor of AFS on all counts.  ECF No. 463.  Still undeterred despite the complete lack of evidence supporting their claims, FTC and the Commonwealth each filed motions for reconsideration that merely reargued their positions and asked this Court to change its judgment.  *See* ECF Nos. 466 & 467. This, of course, required AFS to invest even more time and resources to defend itself post-judgment.  *See* ECF No. 470.

On June 11, 2024, this Court entered a well-reasoned Opinion and judgment denying the government's request for a "second bite at the apple."  Op. II at 6 (quoting *Bolick v. DFS Services LLC*, Civ. No. 10-5211, 2012 WL 13018253, at *1 (E.D. Pa. Jan. 25, 2012)).  FTC's deadline to appeal that judgment expired on August 12, 2024, *see* Fed. R. App. P. 4(a)(1)(B), and AFS now timely files this Motion seeking to recover its fees, expense, and costs under the EAJA, *see* 28 U.S.C. § 2412(d)(1)(B).

## ARGUMENT

### I.    Legal Standard for the Entitlement to Fees

The entitlement to fees is governed by the EAJA, 28 U.S.C. § 2412.  The Third Circuit has held that "[u]nder the EAJA, a prevailing party in non-tort litigation against the United States is entitled to attorney's fees and costs, unless the court finds that the position taken by the government 'was substantially justified or that special circumstances make an award unjust.'"  *Morgan*, 142

F.3d at 682 (quoting 28 U.S.C. § 2412(d)(1)(A)).[6]  The government bears the burden of proving substantial justification or special circumstances.  *Id.* at 684.

"Substantial justification" means that FTC's position must have been "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person."  *Id.* at 683 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1998)).  Put another way, the position of the government must have a "reasonable basis in both law and fact."  *Pierce*, 487 U.S. at 564. The Third Circuit has divided this analysis into three elements, requiring the government to "show: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced."  *Morgan*, 142 F.3d at 684.

The government's position must be considered as "an inclusive whole," meaning this Court must make a single determination based on its evaluation of the government's position throughout the case.  *See Jean*, 496 U.S. at 161–62 ("[T]he EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items.").  This inquiry "encompasses an evaluation of *both* the agency's prelitigation conduct and [its] subsequent litigation positions."  *Myers v. Sullivan*, 916 F.2d 659, 666 n.5 (11th Cir. 1990) (emphasis in original).  The Supreme Court has allowed the court to consider a wide range of information to determine the overall justification for the FTC's position, observing:

> Not infrequently, the question [of whether the government's position was substantially justified] will turn upon not merely what was the law, but what was the evidence regarding the facts.  By reason of settlement conferences and other pretrial activities, the district court may have insights not conveyed by the record,

---

[6] The term "United States" means any agency, including the FTC.  28 U.S.C. § 2412(d)(2)(C); *see also LabMD, Inc. v. FTC*, No. 1:19-MI-00071-WEJ, 2019 WL 11502794, at *26 (N.D. Ga. Oct. 1, 2019) (recommending award of fees against FTC under EAJA), *adopted by* No. 16-16270 (11th Cir. Dec. 23, 2019).

into such matters as whether particular evidence was worthy of being relied upon,
or whether critical facts could easily have been verified by the Government.

*Pierce*, 487 U.S. at 560.

Under this broad and wholistic inquiry, "it is not sufficient for the government to show that some of its earlier positions or arguments were valid.  Unless the government ***can establish that all of its positions were substantially justified***, the claimant is entitled to receive attorney's fees." *Myers*, 916 F.3d at n.5 (emphasis added); *see also United States v. Hallmark Const. Co.,* 200 F.3d 1076, 1081 (7th Cir. 2000) ("This global assessment comprehends that the district court will examine not simply whether the government was substantially justified in its position at the beginning or end of the proceedings, but whether the government was substantially justified in continuing to push forward at each stage."); *Hudson v. Sec'y of Health and Hum. Servs.*, 839 F.2d 1453, 1456 n.3 (11th Cir. 1988) (finding it "without consequence" that the court "determined that some of the Secretary's positions were valid" because "*all* of the Secretary's positions have to be substantially justified" to avoid fees under the EAJA), *aff'd* 490 U.S. 877 (1989).

## II.    AFS is a "Party" Entitled to Reasonable Fees and Expenses

A "party" entitled to fees and other expenses under the EAJA includes, "any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed."  28 U.S.C. § 2412(d)(2)(B).  AFS clearly meets these qualifications.  *See* Decl. of E. Satell ¶ 3.

FTC filed its Complaint on May 13, 2020.  *See* ECF No. 1.  AFS's consolidated financial statements, which were admitted at trial, demonstrate that AFS meets the "net worth" requirement of a party eligible for fees under the EAJA because its independently audited financial statements

show "shareholder equity," which is the measure of "net worth,"[7] was $6,272,300 as of December 31, 2019, and down to $5,089,754 by December 31, 2020.  Tr. Ex. 332 at AFS0639822.  Thus, at the time FTC filed its Complaint, AFS's net worth was below $7 million.  *See id.*; *see also* Decl. of E. Satell ¶ 3.  In addition, AFS had far fewer than 500 employees at the time the Complaint was filed.  Decl. of E. Satell ¶ 3.  AFS therefore qualifies as a "party" entitled to fees and expenses.

## III.    FTC's Position Was Not Substantially Justified, and No Special Factors Apply

Long before this case came to trial, FTC was well aware that it lacked any factual or legal support for its position.  Even before it filed the Complaint, FTC had the Script, information and documents concerning the entire customer journey, and over one hundred recorded calls, all of which were voluntarily produced by AFS.  Even though AFS's one-page Script was, by FTC's choice, the predominant issue in this litigation,[8] FTC repeatedly represented to this Court the purported complexity of this case.[9]  FTC demanded and received in discovery nearly every piece of paper (or digital document) in AFS's possession since 2015; spoke to dozens of current and former AFS employees (although FTC did not document these interviews); took formal depositions of fourteen witnesses, including AFS employees, managers, customers, vendors, and

---

[7] *See* U.S. Securities and Exchange Commission, Investor Publications: "Beginner's Guide to Financial Statement," (Feb. 4, 2007) (explaining that "Shareholders' equity is sometimes called capital or net worth" and constitutes the company's assets minus its liabilities), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsbegfinstmtguide.

[8] As this Court explained, "This matter essentially arises from a telemarketing script."  Op. I at 1.

[9] *See, e.g.*, ECF No. 75-1 at 5 (acknowledging FTC's discovery requests seek "substantial amounts of information that AFS has stored electronically"); *id.* at 9 (seeking to compel voluminous discovery and arguing it is proportional because "this is a multimillion dollar case affecting tens of thousands of businesses and organizations"); ECF No. 98-1 at 6 (arguing FTC needs broad discovery of "complaint and quality assurance reports provided to Defendant Ed Satell, samplings of recordings of incoming voicemails and outgoing calls, other communications with consumers, quality assurance documents, and AFS's communications with debt collectors (including ICR) . . . to establish the claims alleged in the First Amended Complaint").

owner, Ed Satell; and obtained from AFS approximately 17,000 recorded sales calls with customers.  Yet, as demonstrated at trial, this information **overwhelmingly** supported AFS's business model and fundamentally undermined FTC's core claim—that the one-page sales Script AFS used for decades was somehow misleading customers into ordering subscriptions under the belief its publications were "free."  *See* Op. I at 1 ("Contrary to Plaintiffs' assertion of wrongdoing, Defendants' success is borne out by their 30 years in business, thousands of satisfied customers and hundreds of employees that contributed to the quality of their publications and profitability."). Notwithstanding the vast quantity of information contradicting its position, and the utter lack of evidence in support, FTC steadfastly and unreasonably clung to its unsubstantiated views of the facts and untenable positions under the law.

FTC, moreover, compounded its meritless position by taking a heavy-handed and coercive approach to AFS and seeking a sweeping injunction that threatened to shut down not only the already-closed print publication business, but also AFS's new and distinct SuccessFuel business without any factual or legal justification (and in ways that would violate AFS's most basic First Amendment rights and freedoms of speech and of the press).  Meanwhile, FTC refused at all times to discuss with AFS the basis for its claims.  FTC simply repeated its demands for payment of millions of dollars.  FTC cannot show this approach was "substantially justified" under the EAJA, as described more fully below.

### A.   FTC Cannot Demonstrate that Its Factual Position Was Substantially Justified.

1.   <u>FTC's Unreasonable Facial Evaluation of the Script</u>.

In a "net impression case," the first step of the inquiry is "a facial evaluation to determine if the alleged 'net impression' is conveyed by the representation."  Op. I at 37 (citing *In re Telebrands Corp.*, 140 F.T.C. 278, 291 (2005)).  Here, it was unreasonable for FTC to assert that,

on its face, the Script misled customers into believing AFS's subscription newsletters and reference guides were "free." As this Court found, the Script expressly "disclosed the material terms and conditions of the offer, including the structure of the subscription, the cost of the subscription and the cancellation policy." Op. I at 41; *see also* Op. II at 5–6 ("[T]he script does not imply the alleged 'net impression' that consumers would receive publications 'for free at no risk.'" (internal quotation marks omitted)). As this Court noted, the "offer" and "disclosure paragraphs of the Script "explicitly describe[] to the consumer how the subscription will work." Op. I at 39; *see also* Op. II at 5 ("[T]he script 'explicitly describes to the consumer how the subscription will work' and 'explains what a consumer can do to cancel the subscription.'"). Moreover, the Script required "the consumer [to] verbally affirm that they accept the terms of the subscription," thus refuting FTC's allegation that AFS signed up customers for newsletter subscriptions that they did not order or want. Op. I at 40. All of these material terms, moreover, were immediately confirmed by two simple, one-page emails sent directly to the customer's attention—another indisputable fact FTC unreasonably ignored throughout this litigation. Op. I at 21 ("These emails reiterated a description of the publication's features and benefits, the subscription cost, the timing and number of issues, and the cancellation procedure."); *see* Tr. Ex. 529 (Rule 30(b)(6) Dep. of FTC) at 67:2–3 ("[T]he e-mails don't seem to be a focus of the FTC's case."); ECF No. 348 at 24–28 (setting forth at summary judgment FTC's unjustifiable position disclaiming consideration of confirmatory emails); ECF No. 356 at 5 (unjustifiably disclaiming relevance of confirmatory emails in government's pretrial memorandum). Given all of this, "[n]o reasonable employee with purchasing power of a business or organization would hear this information and believe, as Plaintiffs suggest, that they are receiving free newsletters into

14

perpetuity." Op. I at 39; *see also* Op. II at 6 n.2 (same). And no reasonable government official should have concluded or alleged otherwise.

Indeed, FTC should have been able to discern all of this from the very outset of its investigation in 2017, when it first received samples of the Script (which remained materially unchanged for AFS's thirty years in the print-publication business). *See* Op. I at 14–15 & n.35. FTC adopted its opposing position only by picking apart and distorting the Script's structure, taking words and phrases out of context, and ignoring the Script's express and clear disclosures. Trial Tr., Sept. 26, 2023 (AM Session) at 11:15–14:15 (Hocevar, A.) (setting forth, in its opening statement, FTC's position on the Script based on dissecting and considering isolated words and phrases divorced from its context); ECF No. 356 at 1–3 (doing same in pretrial memorandum). FTC's approach was not only irrational, it was contrary to binding precedent that the representation "must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." *Beneficial Corp. v. FTC*, 542 F.2d 611, 616–17 (3d Cir. 1976); *see also Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) (same); *In re Cliffdale Assocs., Inc.*, 103 F.T.C. at 166 (requiring evaluation of the "entire document").

    2.    <u>FTC Had No Reasonable Basis to Assert or Believe that AFS Regularly Departed from the Script</u>.

FTC had no justification for its claim that AFS sales representatives regularly departed from the Script, and FTC unreasonably ignored AFS's robust and effective quality assurance procedures. FTC's baseless assertions about Script departures again greatly expanded discovery, including the production of 17,000 recordings (which had to be manually pulled and required significant cost and time expended by AFS employees and lawyers given their large data size). *See* ECF No. 75-1 at 14–16 (moving to compel call recordings with customers).

After demanding this vast amount of information,[10] FTC unreasonably ignored it.  Indeed, under these circumstances, it is inconceivable that FTC never evaluated the recordings, produced no statistical samples, introduced no meaningful or useful expert testimony, and in fact, introduced only a handful of recordings at trial, all of which substantially adhered to the Script.  *See* Op. I at 24 ("AFS maintained a quality control department which ensured, among other things, that telemarketers adhered to the script."); *id.* at 42–45 (Plaintiffs did not present any expert witnesses to show how reasonable consumers interpret the telemarketing script. . . . Rather, Plaintiffs relied on compilations of complaints by consumers, presented as exhibits at trial, and the testimony of two witnesses who received telemarketing calls. . . . [T]heir testimony showed that they understood Defendants' offer.").  Meanwhile, AFS, at its own expense, hired a forensic data expert, Margaret Daley, who demonstrated through statistical sampling the "remarkable adherence" of AFS sales representatives to the Script in over 99% of recorded calls, and produced her expert report to that effect months before trial.  Trial Tr., Oct. 18, 2023 (AM Session) at 108:3–25 (M. Daley) ("[T]here was a remarkable adherence to the script here.  I've actually not had another case that had this high of a level.").

Similarly, FTC well knew that its reliance on "secretary scripts" was equally unavailing and irrelevant because "gatekeepers" were not the decisionmakers for purchasing a subscription, and because the few problematic exemplars FTC highlighted were isolated and unsanctioned.  As this Court found, "it was evident" that mistakes in secretary scripts (that would have the representative answer "no" to a gatekeeper's question about whether it was a sales call) "were not

---

[10]  During discovery, FTC adamantly refused AFS's proposals to provide reasonable samples of recordings and litigated this issue at length before the Special Master, who eventually ordered AFS to produce half of all recordings available at great expense and time.  *See* ECF No. 145 at 4–7.

part of the business model of AFS" and that "[s]enior management at AFS worked hard to find these mistakes and correct them." Op. I at 17. Again, this was not a surprise at trial. This was the consistent position of AFS witnesses at their depositions and was obvious from the recordings of customer interactions.[11] Notwithstanding these unambiguous facts to the contrary, FTC unjustifiably continued to make "secretary scripts" a centerpiece of their contentions during trial and attempted to cherry-pick the rare examples of such mistakes to falsely make it appear to be a common AFS practice. *See* Trial Tr., Sept. 26, 2023 (AM Session) at 10:23–11:8 (A. Hocevar) (mispresenting, in FTC's opening statement, that use of this secretary script was routine); *id.* at 22:10–13 (same).

3.    FTC's Failure to Verify or Investigate Customer Complaints Was Not Reasonable.

FTC's investigation of AFS attempted to capitalize on a small number of customer complaints filed with FTC, the Pennsylvania Attorney General, or the Better Business Bureau ("BBB"). FTC also found that some customers communicated dissatisfaction with AFS by phone, voicemail, email, or letter, and others posted negative reviews of AFS online. *See* Op. I at 26–27. Notwithstanding the extended duration of FTC's investigation, which began in 2017 (and used some information collected by the Pennsylvania Attorney General's Office during its investigation which began in 2012), FTC unreasonably failed to evaluate these complaints or make any effort to determine whether they were valid. FTC's own 30(b)(6) witness (its Chief Litigation Counsel, Bikram Bandy) and its lead investigator (John Vega) admitted that FTC did not verify the accuracy

---

[11] Forensic data expert Daley, found that only one of the sampled recordings (0.32%) involved a gatekeeper even asking whether the sales representative "was selling something." Trial Tr., Oct. 18, 2023 (PM Session) at 3:12–4:12 (Daley, M.). That report was available to FTC as of April 7, 2023. Given the extremely low prevalence of such events, FTC must have culled through **hundreds** of recorded calls with customers to find the few examples of secretary-script mistakes that they attempted to highlight at trial.

17

or reliability of complaints, had not evaluated what fraction of complaints were relevant to FTC's claims of deception, and had no idea that the complaints were a tiny percentage of the hundreds of thousands of customers AFS served, a fact that was apparent from the information and data produced over many years of investigation and discovery. Trial Tr., Oct. 12, 2023 (PM Session) at 141:22–142:10, 143:9–10 (J. Vega); Tr. Ex. 529 (Rule 30(b)(6) Dep. of FTC) at 119:2–125:19, 126:17–127:7.

It is truly staggering that, after demanding the production of thousands of recordings of customer interactions with AFS (at huge time and expense for AFS), FTC did not take the simple step of comparing customer complaints to the available recordings and business records to determine their reliability and accuracy. In contrast, AFS's own forensic data expert, Margaret Daley, undertook a straightforward analysis of the BBB customer complaints to determine who had made them, the nature of the complaint, and the number of total orders during the relevant time period, and she found that those claiming they did not understand the subscription amounted to less than 2 out of 10,000 orders (0.02%). Trial Tr., Oct. 18, 2023 (PM Session) at 19:16–20:4 (M. Daley). Again, this information was available to FTC early in its discovery process (if not before), was laid out in Daley's April 2023 expert report, and explained in detail during her May 2023 deposition—all of which took place months before trial.

But FTC's conduct was far worse than just a failure to investigate. FTC went so far as to rely at trial on a **sworn declaration** by AFS customer Kelly Rickard that she had admitted **was materially false** at her prior deposition after hearing the recording of her sales call with AFS (in FTC's possession and played at the deposition), and which she again disclaimed on the stand at trial. Trial Tr., Oct. 3, 2023 (AM Session) at 73:15–77:1 (K. Rickard); *see also* ECF No. 359-1 (seeking pretrial admission of sixty hearsay exhibits for the truth of the matters asserted based on

18

claim that they were "corroborate[d]" by Ms. Rickard's admittedly false declaration).  That FTC insisted on proffering this *false* information to the Court, and relying on Ms. Rickard as one of only two customer witnesses, is inexcusable.  That was just the tip of the iceberg: FTC knew that the customer complaints it submitted were frequently "not relevant to Plaintiffs' deceptiveness claim," Op. I at 45; many reflected that the complainants "understood the offer and sought to cancel," *id.*; and others had obvious reliability problems (*e.g.*, filed an average of six months after the initial sales call, by persons who lacked first-hand knowledge of the sales call, containing implausible or internally inconsistent assertions, or directly contradicted by the available recordings).

FTC's failure to verify complaints and check the evidence was not reasonable.  In *Pierce v. Underwood*, the seminal case defining "substantial justification," the Supreme Court stated that the district court could consider "whether particular evidence was worthy of being relied upon, or *whether critical facts could easily have been verified by the Government*" as a basis for determining if the government's position was substantially justified or not.  487 U.S. at 560 (emphasis added); *see also LabMD, Inc.*, 2019 WL 11502794, at *9 (finding no substantial justification where "[e]ven if the FTC could be excused for not verifying the facts before issuing a complaint (which it should not be), it became clear during the trial before the ALJ that the [complainant's] assertions . . . were lies.  Instead of dismissing the case . . . the FTC kept going after [the defendant].").  Here, the facts were not only in FTC's possession; but, in addition, AFS laid them out clearly for FTC in its expert reports, in summaries of the complaints, and in depositions like that of Ms. Rickard.  FTC's insistence on proceeding with an unqualified and uninvestigated presentation of customer complaints and, indeed, attempting to make them the centerpiece of its case, was clearly unjustified.  Even further, FTC's insistence on pursuing a

reversal of the judgment following trial by simply rearguing its identical unsubstantiated and resoundingly debunked points underscores the degree to which its position has remained substantially ***un***justified throughout this case.

4.   FTC's ***Own*** Witnesses Provided No Support for Its Position.

FTC called twenty-one witnesses at trial, ten of whom were current or former AFS employees, many of whom had worked for AFS for decades, and Ed Satell himself, who founded AFS sixty years earlier, was its CEO throughout, and built it into the successful enterprise that it became decades later.  This Court heard and credited all of these witnesses, but ***none*** of these witnesses supported FTC's position.[12]  Quite the opposite, these witnesses gave heartfelt and earnest testimony about AFS's exceptional efforts to ensure customer understanding of the sales transactions, to maintain quality control, and to do the right thing for customers at every stage of their interaction with AFS.  *See* Op. I at 6 n.11 ("Out of these ten witnesses, all but one defended AFS and its business practices.  Even Amy Luchette, the one former employee who had criticisms of AFS's business practices, confirmed the commitment of AFS to produce quality publications.").

Moreover, FTC called these witnesses in ***its case in chief***, ***well knowing*** this would be their testimony.  All of them had been previously deposed; some, like Colin Drummond, for days on end.  *See, e.g.*, Trial Tr., Sept. 27, 2023 (AM Session) at 77:5–9 (C. Drummond); Trial Tr., Oct. 3, 2023 (AM Session) at 49:5–52:5 (A. Luchette) (confirming deposition testimony concerning

---

[12] Nor did FTC's own organizational deposition testimony support its position.  Notably, FTC did not call at trial its Chief Litigation Officer, Bikram Bandy, who was designated and testified on behalf of FTC as its Rule 30(b)(6) representative.  Instead, FTC filed a motion in limine before trial seeking to disavow the testimony of its own 30(b)(6) representative, specifically asking for an order permitting FTC to "depart from that testimony at trial."  ECF No. 365 at 1.  FTC's attempt to take disparate positions in its binding organizational deposition and at trial was substantially unjustified and contrary to Rule 30(b)(6).

substantial efforts to ensure customer understanding: "if I felt that it was probably good, but just not like I wouldn't bet my life on it, then I would tell the rep to actually call back and make sure"); Trial Tr., Oct. 4, 2023 (AM Session) at 69:6–15, 91:14–17 (E. Satell) (confirming deposition testimony that AFS employs significant efforts aimed at truthfulness, compliance with the law, and "do[ing] the right thing ethically and to make sure that [AFS's] messages are clear"); Trial Tr., Oct. 10, 2023 (PM Session) at 113:19–114:20 (S. Grabert) (confirming deposition testimony that quality assurance representatives would listen to call recordings "from the customer's perspective," and departures from the Script would result in a cancelled order and discipline for the representative who made the error); Trial Tr., Oct. 13, 2023 (AM Session) at 9:8–10:10 (K. Strosnider) (reading into the record by FTC of deposition testimony that Ms. Strosnider "never put through a sale that [she] didn't feel a customer was aware of what they were getting into" and "would go over everything and clarify everything" if she thought the customer was distracted or misunderstood).

As the Court of Federal Claims aptly put it, "[w]hen testimony presented at trial **by the Government's own witnesses** contradicts the Government's contentions, **courts have not hesitated to find that the Government's position was not substantially justified**." *Greenhill v. United States*, 96 Fed. Cl. 771, 777 (2011) (emphasis added). When not just one, but *every* one of the FTC's witnesses testifies against its position, there is no possible justification, much less a "substantial" justification.

**B**.      **FTC's Legal Position Was Unjustified.**

1.      FTC Unreasonably Disclaimed Its Own Framework for Establishing Deception in an Implied Net Impression Case.

Throughout this litigation, FTC avoided and ignored its ***own*** longstanding precedents, as well as binding caselaw, in attempting to prove that the implied net impression of AFS's representations to its customers or potential customers was deceptive.

This Court outlined the well-established framework for establishing deception in an implied net impression case: if the representation was not facially deceptive (which it was not), FTC was required to prove ***with extrinsic evidence*** that a "significant minority" of reasonable customers would likely be misled by the Script.  *See* Op. I at 41–42 (explaining the extrinsic evidence requirement); *In re Cliffdale Assocs., Inc.*, 103 F.T.C. at 177 n.20; *see also In re Telebrands Corp.*, 140 F.T.C. at 291.  As this Court held, "[w]hile a wide range of extrinsic evidence is permissible, courts have emphasized that the fact finder must 'carefully assess the quality and reliability of any extrinsic evidence' and has placed particular emphasis on the importance of consumer surveys."  Op. I at 41–42 (citing FTC's own decisions in *In re Novartis*, 127 F.T.C. 580, 680 (1996) and *Stouffer*, 118 F.T.C. at 779, for the proposition that "[c]onsumer surveys are the best extrinsic evidence of what words in an ad mean to consumers").  This had been FTC's own practice and binding precedent for forty years.

Yet FTC unreasonably rejected the application of this clear framework and entered trial unprepared to meet its own legal standard.  FTC did not make any reference to this standard in any of its pretrial or summary judgment filings and did not mention the standard in its opening statement.  *See* ECF No. 356 (pretrial memorandum); ECF Nos. 339, 348, 352 (summary judgment briefing); Trial Tr., Sept. 26, 2023 (AM Session) at 5:15–21:11 (A. Hocevar) (opening statement).  To the contrary, when AFS raised in its opening statement the requirement that FTC prove that a

substantial minority of customers would likely be deceived, FTC's lead counsel **objected**, and stated it was FTC's "position that the significant minority test used in [AFS's] opening is erroneous" and that FTC intended "to submit a bench memo" the next morning.  Trial Tr., Sept. 26, 2023 (AM Session) at 46:7–10 (A. Hocevar).  FTC did file a 4-page trial brief the following week in which it contended that "deception is an 'impressionistic determination,'" denied the need for extrinsic evidence, and rejected the "significant minority" analysis by relying on inapposite **express** deception cases.  ECF No. 408.  FTC doubled down on that incorrect view of the law in its post-trial Proposed Findings of Fact and Conclusions of Law.  ECF No. 459 at 82–85.

Relying on its erroneous legal position, FTC failed to prove that a "significant minority" would have been deceived by AFS's telemarketing presentation, and this Court also found that FTC failed to prove **any** reasonable customer was or would be deceived.  Op. I at 43–44 ("Plaintiffs have failed to prove, under any definition or percentage level, not only that a significant minority were misled by Defendants' telemarketing calls, but also a reasonable consumer was misled."); *see also* Op. II at 6 ("[T]he script's terms were not misleading."); *id.* at 18 ("[R]egardless of whether the standard requires one reasonable consumer to be misled, every reasonable consumer to be misled, or even the possibility of the script being interpreted in a misleading way, Plaintiffs did not prove at trial any of those theories by a preponderance of the evidence.").  The Court observed, "[n]otably, Plaintiffs did not present any expert witnesses to show how reasonable consumers interpret the telemarketing script," and indeed found that "none of the additional extrinsic evidence offered by Plaintiffs proved . . . that [AFS's] conduct was deceptive and misleading to customers."  Op. I at 42, 45.

This failure is particularly hard for FTC to justify when its own precedents provide multiple examples where, in analogous cases involving evaluation of whether an advertisement is implicitly

misleading, FTC had adduced substantial extrinsic evidence including the use of highly credentialed customer survey experts. *See DirecTV, Inc.*, 2018 WL 3911196, at *9–19; *In re Intuit Inc.*, 2023 WL 5970801, at *47–51; *In re Stouffer Foods Corp.*, 118 F.T.C. at 782–84. These prior cases highlight the rigorous analysis required to prove that misperceptions about an advertisement emanated from the advertisement itself, rather than from the customer's own inattention or unreasonable behavior. *See DirecTV, Inc.*, 2018 WL 3911196, at *11 (rejecting "survey [that] did not test, and therefore cannot establish, *why* a consumer responded that he or she did not know or recall the terms" because the survey failed to assess "whether these survey participants saw the key terms but just could not recall what they had seen in the print advertisement earlier, or whether they had the wrong impression about these terms based on the advertisements" (emphasis in original)).

2.  <u>FTC's Proposed Injunction Was Unconstitutional and Improper.</u>

Because this Court found that FTC failed to prove the facts of its case, it did not reach the gross impropriety of the sweeping injunction sought by FTC. This proposed injunction would have enjoined not only the challenged Script, but also would have shut down AFS's new and distinct SuccessFuel business without any allegations, let alone evidence, that SuccessFuel's business practices were at all similar to the challenged conduct, much less that they were deceptive or misleading. FTC's pretrial memorandum demanded an expansive injunction "banning Defendants from telemarketing and from using any continuity plan or negative option feature in connection with the sale of any goods or services," *i.e.*, publications, and "prohibit[ing] Defendants from engaging in similar practices with respect to any product [*i.e.*, publication] that they advertise or sell (*e.g.*, products [*i.e.*, publications] sold via email marketing) and in other communications impacting trade or commerce, including lead generation," and including "when making outbound

telephone calls or sending emails or other communications." ECF No. 356 at 18–20. This overreach would have threatened AFS's ongoing business lines that were completely unrelated to the challenged Script.

FTC's proposed injunction would have also violated AFS's First Amendment right to free speech, including its right to discuss with potential customers its original, now-online expressive content. While the government may restrain pure commercial speech that is actually false or "inherently misleading," even restrictions of purely commercial speech must be "narrowly drawn" and "no more extensive than reasonably necessary to further substantial interests." *In re R.M.J.*, 455 U.S. 191, 203, 207 (1982); *see also FTC v. AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020) ("An injunction that implicates a defendant's First Amendment rights must 'burden no more speech than necessary to serve a significant government interest.'" (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994))); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 36 (D.C. Cir. 1985) (rejecting "injunction [as] broader than reasonably necessary to prevent deception"). Here, the challenged speech was entitled to even greater protection because it was not purely commercial, but FTC made no effort to tailor its proposed injunction as constitutionally required. FTC's overreach was compounded by its disregard of the First Amendment overlay of this case. In seeking to enjoin SuccessFuel (an online publisher of original content, webinars, and training), FTC gave no apparent consideration to the fact that it was targeting not only a small business, but a small ***publisher*** of online expressive content engaging in core First Amendment-protected activity.

While FTC's overreach was not essential to this Court's judgment, FTC's unconstitutional position was substantially unjustified, and these incorrect positions and their coercive threat required enormous effort to defend and substantial fortitude on behalf of AFS to oppose.

3.    <u>FTC's Motion for Reconsideration Was Not Substantially Justified.</u>

Even after this Court issued its comprehensive 52-page opinion setting forth the governing facts and law, FTC refused to accept or follow its own precedents. Instead, it further expanded the scope and costs of litigation for AFS by filing a motion for reconsideration under Rules 59 and 52(b) that wholly ignored the governing legal standards. *See* ECF No. 466. FTC **acknowledged** that the legal standard under Rules 59 and 52(b) permit changes to an opinion only to correct clear errors of fact or law, ECF No. 466-1 at 2–3, but FTC then failed to apply that standard to the facts of the case. On the contrary, in direct contravention of that standard, FTC improperly and repeatedly asked this Court to "rethink" its opinion. *See* Op. II at 5 ("Here, a 'second bite at the apple' is what the FTC is seeking."); *id.* at 6 ("[S]ince the Court previously evaluated and held that the FTC did not prove its 'net impression' claim by a preponderance of the evidence, the FTC's argument for reconsideration fails because it is only expressing dissatisfaction with the Court's ruling and seeking a 'second bite at the apple' which may not provide a basis for relief under Federal Rule of Civil Procedure 52(b) and 59."); *id.* at 7 ("[T]he FTC is attempting to reargue a matter the Court previously analyzed and rejected."); *id.* ("[T]he Court found the telemarketers' disclosures to be adequate, and although the FTC attempts to reargue its claim now, nothing argued by the FTC changes the finding that it did not prove its claim by a preponderance of the evidence."); *id.* ("[T]he FTC once again asks this Court to reconsider its finding that Defendants' telemarketing script did not have a deceptive 'net impression.'"); *id.* at 8 ("[T]his argument is once again asking the Court to rethink its finding that the script did not have a deceptive 'net impression' and that the telemarketers' disclosures were adequate."); *id.* ("[T]he FTC is asking the Court to rethink its finding that the telemarketing script was not deceptive."); *id.* at 9 ("Plaintiffs are improperly asking the Court to rethink what it has already thought through."); *id.* at 10 ("Plaintiffs

are asking the Court to rethink its finding that Defendants' CEEL book renewal process did not violate the UMS.").

FTC's blatant disregard for the well-established governing legal standard under Rules 59 and 52(b)—like its disregard for its own precedents and caselaw—"cannot be considered substantially justified." *Garcia*, 829 F.2d at 400. AFS is therefore entitled to an award of attorneys' fees, expenses, and costs under the EAJA.

## IV. The Fees and Expenses Sought Are Reasonable and Were Necessary to AFS's Defense

Pursuant to the EAJA, the prevailing party is entitled to "a judgment for costs" and an award of its "fees and other expenses," including "the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees." 28 U.S.C. § 2412(a)(1) & (d)(2)(A). Costs that may be recovered include, for example, court costs, such as fees of the clerk and fees for transcripts. *See* 28 U.S.C. § 2412(a)(1); *id.* § 1920. The amount awarded for "reasonable attorney fees . . . shall be based upon prevailing market rates," but is capped at $125 per hour, adjusted upward for "an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved." 28 U.S.C. § 2412(d)(2)(A). In addition, the rate for any expert witness cannot exceed "the highest rate of compensation for expert witnesses paid by the United States." *Id.*

Here, AFS seeks $60,259.46 in costs; $4,463,628.93 in reasonable attorneys' fees; and $848,036.77 for its other reasonable expenses necessarily incurred as a result of this litigation and FTC's unjustified tactics in pursuing it. *See* Exhibit D (providing itemized list of costs, fees, and other expenses sought to be reimbursed by this Motion). These costs, fees, and other expenses are reasonable, were necessary for AFS's defense against FTC's claims, reflect a substantial discount

off of the total fees and costs actually incurred by AFS, and fall within the parameters established by the EAJA.

First, AFS seeks $60,259.46 in costs for "for printed or electronically recorded transcripts necessarily obtained for use in the case," "for printing," and "for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."  28 U.S.C. § 1920(1)–(4); *see* Decl. of I. Eisenstein ¶¶ 7, 16 & Exs. D, I.  Each of these costs is specifically enumerated under 28 U.S.C. § 1920 and expressly recoverable under the EAJA.

Second, AFS seeks the maximum rate of attorneys' fees allowed statutorily, adjusted for inflation or special factors, because most of the attorneys who represented AFS in its defense against FTC's unjustified claims have prevailing market rates far in excess of the statutory cap.[13] The complexity of defending a case against the government, with its substantial resources, combined with FTC's particularly aggressive approach in this litigation and its demand for voluminous discovery, called for highly experienced and skilled litigators.  The rates charged by the attorneys working on this matter are commensurate with the skill and experience of each lawyer and align with the rates of attorneys of similar skill and experience in the Philadelphia area who practice in this Court.  *See* Decl. of I. Eisenstein ¶¶ 9–10 & Ex. F.  In addition, the hours performed for the tasks required to defend AFS in this litigation were reasonable and necessary.  *See id.* ¶ 9. As the plaintiff, FTC drove—and improperly expanded—the scope of this litigation.  FTC demanded substantial discovery that was especially burdensome for AFS to gather, review, and produce, and FTC shifted its strategy and theories of the case often.  As a result, AFS's attorneys

---

[13] In the rare instance where an attorney's rate is below the statutory cap, adjusted for cost-of-living increases, AFS seeks the billed rate.

were required to expend substantial time and resources to adequately defend the action, as set forth in the detailed, itemized fee exhibit attached hereto.  *See* Ex. E.

Given that AFS's attorneys generally have prevailing and reasonable market rates in excess of the statutory cap after a cost-of-living adjustment, an upward increase is warranted to account for "an increase in the cost of living."  28 U.S.C. § 2412(d)(2)(A).  Based on the Consumer Price Index for All Urban Consumers (CPI-U) for the date on which AFS "became a prevailing party," AFS' attorneys should be compensated at a rate of at least $252.52 per hour.  *Garcia*, 829 F.2d at 402; *see* Ex. G.

In addition, three attorneys, Ilana H. Eisenstein, Paul Saint-Antoine, and David H. Marion, qualify for higher adjusted rates due to special factors.  28 U.S.C. § 2412(d)(2)(A).  The EAJA provides for enhanced rates where, as here, "a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  *Id.*  As the Supreme Court has explained, a special factor exists and warrants an increased fee award when an attorney has "some distinctive knowledge or specialized skill needful for the litigation in question."  *Pierce*, 487 U.S. at 572.  Courts have recognized a special factor where an attorney has specific substantive knowledge necessary for the case combined with federal litigation expertise.  *Int'l Woodworkers, Local 3-98 v. Donovan*, 792 F.2d 762, 766 (9th Cir. 1985) (finding enhanced fee award appropriate based on attorneys' combined substantive knowledge of the litigation subject matter and federal litigation skill).  In *International Woodworkers*, for example, Woodworkers of America ("Woodworkers") sued the Secretary of Labor, alleging that regulations it promulgated under the Redwood National Park Expansion Act were unconstitutional and negatively affected employment benefits under the Redwood Employee Protection Program ("REPP").  *See id.* at 764.  Woodworkers prevailed and was then awarded its fees and costs under the EAJA because the

29

district court found that the Secretary's interpretation of the relevant statute was not substantially justified. *See id.* On appeal, the Secretary challenged the fee enhancement, but the appellate court affirmed it, concluding that the attorney's "combined knowledge of REPP law and federal litigation skill and expertise [was] well supported by the record." *Id.* at 766. The same reasoning and outcome apply with equal force here.

Ms. Eisenstein and Mr. Saint-Antoine are widely recognized as among the most elite and skilled litigators in both Philadelphia and nationally, as they both practice at AmLaw 100 firms with national and global presences.[14] *See* Decl. of I. Eisenstein ¶¶ 3–5. And, critically for this particular case, they both possess specialized skill in litigating against the government. *See id.* In Ms. Eisenstein's case, for example, she spent twelve years as a government lawyer, as an Assistant United States Attorney prosecuting cases for the government in the District of Delaware, and as an Assistant to the U.S. Solicitor General, representing the federal government in the U.S. Supreme Court. *Id.* ¶ 4 & Ex. A. Now, as the Chair of U.S. Litigation for DLA Piper, Ms. Eisenstein focuses her practice on defending and pursuing actions against government-enforcement entities when—as FTC did here—they overreach and go beyond the bounds of their lawful enforcement authority. *Id.* For her prowess in litigation, Ms. Eisenstein has been recognized as a top litigator by *Chambers USA*. *Id.*

Similarly, Mr. Saint-Antoine has focused much of his practice on defending clients against government litigation. *Id.* ¶ 5 & Ex. B. He co-leads the firm's antitrust practice and has more than thirty years of experience defending companies sued under federal and state antitrust statutes. *Id.*

---

[14] DLA Piper ranked number 3 by total revenue on the most recent AmLaw 100 rankings, and Faegre Drinker ranked 55. *See* The 2024 Am Law 100: Ranked by Gross Revenue, Law.com (Apr. 16, 2024), https://www.law.com/americanlawyer/2024/04/16/the-2024-am-law-100-ranked-by-gross-revenue.

Mr. Saint-Antoine has a well-earned and longstanding reputation as a top litigator and has been recognized for his antitrust litigation expertise by *Chambers USA* since 2003. *Id.* In addition, he is a Fellow of the Litigation Counsel of America and has been recognized by *Benchmark Litigation* as a "Local Litigation Star." *Id.* There are few lawyers nationally, let alone in Philadelphia, who are willing to defend litigation against the FTC (here, combined with the weight and resources of the Pennsylvania Office of Attorney General) all the way through costly and burdensome discovery through trial to a judgment and through post-trial motions for reconsideration. But Ms. Eisenstein and Mr. Saint-Antoine uniquely possess the specialized skill specifically needed for this case.

While their unmatched experience for litigation against the federal government is a special factor standing alone, Ms. Eisenstein and Mr. Saint-Antoine combine that specialized skill with distinctive knowledge of the Federal Trade Commission Act (as well as the UTPCPL), particularly as used in the context of civil government enforcement actions. *See id.* ¶¶ 4–5 & Exs. A, B. Both are well-versed in the contours of the statute in a way that was necessary for this specific case, which required deep substantive knowledge to identify and successfully argue complex defenses. In contrast, even FTC's own lawyers came to Court unprepared to articulate or apply the legal standard that governs net impression cases under the FTC Act—a standard that Ms. Eisenstein and Mr. Saint-Antoine know well. In short, here, as in *International Woodworkers*, special factors call for an enhanced fee award for Ms. Eisenstein and Mr. Saint-Antoine due to their "combined knowledge of [the FTC Act] and federal litigation skill and expertise" specifically against the government. 792 F.2d at 766.

Similarly, Mr. Marion's "distinctive knowledge" and "specialized skill" in litigating complex matters qualify him for a fee enhancement. *See Pierce*, 487 U.S. at 572. Mr. Marion is

nationally recognized as a "titan" or "legend" of the Philadelphia Bar.  For over sixty years, Mr. Marion has enjoyed an illustrious legal career in Philadelphia, dating back to his time at the University of Pennsylvania Law School, where he had the esteemed honor of serving as the Editor-In-Chief of the Law Review.  Decl. of I. Eisenstein ¶ 6 & Ex. C.  His first legal job was as a Law Clerk to the late Honorable Abraham L. Friedman in this very Court.  *Id.*  Mr. Marion has served on Penn Law's Board of Overseers and as head of its Alumni Association, as Chancellor of the Philadelphia Bar Association, and as President of the Lawyers Club of Philadelphia.  *Id.*  He is the only Philadelphia lawyer to have been elected to fellowship in the American College of Trial Lawyers, the International Academy of Trial Lawyers, ***and*** the American Academy of Appellate Lawyers.  *Id.*  In addition, he has received the highest award given to an alumnus by the University of Pennsylvania Law School—The James Wilson Award for a Lifetime of service to the Law School, the legal profession, and the community.  *Id.*  In presenting that Award, the Law School Dean noted that in downloading all of his litigated cases, Mr. Marion never lost a reported case in about sixty years of major business litigation—in the U.S. Supreme Court, multiple federal and state courts of appeal, and the courts of a number of foreign countries.  *Id.*

Mr. Marion was integral to developing AFS's defenses, with a particular focus on navigating the nuances of this Court—which Mr. Marion knows uniquely well, having been appointed on multiple occasions to serve as a special master in this Court.  *See id.*  In addition, Mr. Marion's deep substantive knowledge concerning the intricacies of the First Amendment was particularly relevant to addressing the First Amendment overlay to this case.  Indeed, Mr. Marion's First Amendment expertise is longstanding and well-recognized both locally and nationally.  He successfully defended a local Philadelphia newspaper in the United States Supreme Court, securing a key change in the law for the protection of the news media, protecting its First

Amendment rights.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768 (1986) (requiring plaintiff to show falsity to succeed on defamation claim against a newspaper).  Thus, like Ms. Eisenstein and Mr. Saint-Antoine, Mr. Marion's combined substantive knowledge of the First Amendment and his deep understanding of practice in this Court constitute special factors that justify an enhanced fee award for his services.  *See Int'l Woodworkers*, 792 F.2d at 766.

Based on their level of skill and experience, Ms. Eisenstein, Mr. Saint-Antoine, and Mr. Marion's prevailing market rates are at or well in excess of $1,000 per hour, but they are conservatively seeking only the lowest rates they actually billed AFS during the litigation: $950 per hour, $773.50 per hour, and $650 per hour, respectively.  These rates are below market and below the standard rates for each of them.  Indeed, at firms like DLA Piper and many of its Am Law 100 peers, the prevailing hourly rate for associates or non-partner attorneys is reported to be as high as $1,000.  *See* Debra Cassens Weiss, *Nearly $1,000 an hour is rate for second-year associates at these BigLaw firms*, ABAJournal (Apr. 3, 2023 9:20 am), https://www.abajournal.com/news/article/nearly-1000-an-hour-is-rate-for-second-year-associate-at-these-biglaw-firms.  Moreover, a recent analysis of "[b]illed rates, i.e., the rates firms actually charge on invoices," found that, in 2023, the typical billed rate for partners at the top 25 firms in the Am Law 100, based on total revenue, was $1,433 per hour, nearly $500 more per hour than AFS seeks to recoup for Ms. Eisenstein's uniquely skilled representation here.  *See* Ex. H at 7. That same report found that the typical partner rate for firms ranked between 26 and 75 on the Am Law 100 is between $729 and $1,198.  *See id.*  As the co-lead of the antitrust group—and with almost thirty-five years of experience—Mr. Saint-Antoine commands a market rate in excess of that average.  The same is true for Mr. Marion, with his decades of experience, service, and success

in the Philadelphia legal community and beyond.  *See* Ex. I (setting Mr. Marion's rate at $1,000 per hour for his service as a special master in a complex multidistrict litigation in this District).

Finally, AFS seeks its other reasonable expenses in the amount of $848,036.77, which includes $598,680.86 for expert witnesses; $150,228.09 for database hosting and e-discovery services that were required due to the voluminous discovery sought by FTC in this action; $41,340.00 for trial technology services; $55,220.92 for the expense of a court-appointed special master; and $2,566.90 for expenses associated with subpoenas needed to summon witnesses to appear for key depositions.  *See* Decl. of I. Eisenstein ¶¶ 7, 16 & Exs. D, K–M.  These expenses were incurred for services that AFS's counsel required in order to adequately defend the case and secure the outcome they achieved.  Furthermore, with respect to expert-fee expenses, AFS is seeking less than the full amount it invested in expert counsel and testimony.  Consistent with the terms of the EAJA, AFS has reduced the amount of expert fees sought so that "no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States" in this litigation. 28 U.S.C. § 2412(d)(2)(A).  In short, all of the costs, fees, and other expenses AFS seeks are reasonable, were necessary for successfully defending the lawsuit, **which the FTC brought and improperly expanded**, and fall within the guideposts of the EAJA.  AFS is entitled to their recovery.

## CONCLUSION

For the foregoing reasons, as the prevailing party, AFS is entitled to an award of reasonable expenses, fees, and costs.  FTC has not, will not, and cannot demonstrate substantial justification of its position or any other special factors that would prevent such an award.  To the contrary, an award in this case will effectuate the terms, provisions, and purposes of the EAJA to incentivize small businesses like AFS to challenge the government's enforcement power, and to discourage

the government from persisting in unjustified and unreasonable litigating positions and conduct as

it did here.  AFS respectfully requests this Court enter an award of $5,371,925.15, which represents

its reasonable fees, costs, and expenses recoverable under the EAJA.


Dated: September 3, 2024                              Respectfully submitted,

**WHITE AND WILLIAMS, LLP**                          **DLA PIPER LLP**

/s/ David H. Marion                                  /s/ Ilana H. Eisenstein
David H. Marion, Esquire                             Ilana H. Eisenstein, Esquire
Morgan S. Birch, Esquire                             Marie Bussey-Garza, Esquire
PA ID Nos. 3590; 319358                              PA ID No.  94907; 324584
1650 Market Street                                   1650 Market Street
One Liberty Place, Suite 1800                        One Liberty Place, Suite 5000
Philadelphia, PA 19103                               Philadelphia, PA 19103
Tel: (215) 864-7000                                  Tel: (215) 656-3300
Fax: (215) 789-7517                                  Fax: (215) 656-3301
mariond@whiteandwilliams.com                         ilana.eisenstein@us.dlapiper.com
birchm@whiteandwilliams.com                          marie.bussey-garza@us.dlapiper.com

**FAEGRE DRINKER BIDDLE &**
**REATH LLP**

/s/ Paul H. Saint-Antoine
Paul H. Saint-Antoine, Esquire
PA ID No. 526224
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757
paulsaint-antoine@faegredrinker.com

*Attorneys for Defendants American Future Systems, Inc.,*
*Progressive Business Publications of New Jersey, Inc., and Edward M. Satell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of September 2024, the foregoing documents were filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt who may access this filing through the Court's system.

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *et al.,* | : |
| *Plaintiffs*, | : |
| v. | : Civil Action No.  2:20-cv-02266 |
| AMERICAN FUTURE SYSTEMS, INC., *et al.* | : |
| *Defendants*. | : |

**[PROPOSED] ORDER GRANTING AFS'S MOTION FOR FEES AND
COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT**

Upon consideration of Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell's (collectively referred to herein as "AFS") Motion for Fees and Costs Under the Equal Access to Justice Act ("Motion"), and any responses and replies thereto, it is hereby:

**ORDERED** that, pursuant to the Equal Access to Justice Act, AFS's Motion is hereby **GRANTED**; and it is further

**ORDERED** that, within fourteen (14) days of entry of this Order, the Federal Trade Commission shall remit payment to American Future Systems, Inc. and/or Edward M. Satell in the amount of $5,371,925.15, which sum includes the reasonable costs, expenses, and attorneys' fees AFS reasonably incurred in defending against this lawsuit.

**IT IS SO ORDERED** this ___ day of _____ 2024.

_____
JOEL H. SLOMSKY, J.

1