IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN FUTURE SYSTEMS, INC., et al.,<br><br>Defendants. | CIVIL ACTION<br>NO. 20-2266 |

## OPINION

**Slomsky, J.**                                              **May 16, 2025**

**I.  INTRODUCTION** ................................................................................................ 4

**II.  BACKGROUND** ................................................................................................. 5

  A.   Factual Background ............................................................................................. 5

  B.   Procedural History ............................................................................................. 8

    1.   Initial Investigation into AFS's Business Practices ....................................... 8

    2.   Complaint and Amended Complaint ................................................................ 9

    3.   Motion to Dismiss and Motion for Judgment on the Pleadings ..................... 10

    4.   Appointment of Special Master ....................................................................... 10

    5.   Other Discovery Disputes ............................................................................... 11

    6.   Motions for Summary Judgment ..................................................................... 12

    7.   Trial and Post-Trial Motions ........................................................................... 12

**III.  STANDARD OF REVIEW** ............................................................................... 14

**IV.  ANALYSIS** ........................................................................................................ 16

  **A.   AFS is an Eligible "Party" Under the Equal Access to Justice Act** ......................... 16

**B.**    **AFS is Entitled to Fees and Expenses Under the Equal Access to Justice Act Because the FTC's Position Was Not "Substantially Justified"** ................................................................. 25

1.    FTC's Pre-Litigation Position Was Not Substantially Justified ..................... 26

2.    FTC's Litigation Position Was Not Substantially Justified ........................... 29

    a.    FTC Did Not Have a Reasonable Basis in Truth for the Facts Alleged .................. 29

       i.    Review of AFS's Script ................................................... 29

       ii.    Review of AFS's Customer Complaints ................................ 31

       iii.    FTC's Witnesses Did Not Support its Position ........................ 32

          A.    Testimony of Colin Drummond ................................... 33

          B.    Testimony of Kelly Rickard and Dr. Daniel Dewey ........... 37

          C.    Testimony of Denise Haney ...................................... 39

          D.    Testimony of Richard Diorio .................................... 40

          E.    Testimony of Andy Goode ....................................... 42

          F.    Testimony of John Vega ......................................... 43

          G.    Testimony of Amy Luchette ...................................... 44

       iv.    AFS's "Rebrand" as SuccessFuel ..................................... 45

       v.    FTC's Averment Regarding the Court's Rulings on Defendants' Motion to Dismiss, Motion for Judgment on the Pleadings, Motion for Summary Judgment and Other Discovery Findings is Insufficient to Prove Substantial Justification ..................... 46

    b.    FTC Did Not Have a Reasonable Basis in Law ........................ 48

       i.    Legal Findings in the Opinion Entering Judgment in Favor of AFS Defendants ................................................... 49

       ii.    Legal Findings in Opinion Denying FTC's Motion to Alter or Amend Judgment ............................................... 51

       iii.    FTC Abandoned Third Circuit Precedent ............................ 52

2

iv.    FTC Abandoned its Own Precedent of Providing Extrinsic Evidence
in an Implied Net Impression Case ........................................................... 53

**C.    Attorneys' Fees and Expenses** ........................................................................ 58

1.    Attorneys' Fees ....................................................................................................... 59

a.    AFS is Entitled to an Increase in the Statutory Fee Rate Based
on the Cost-of-Living Adjustment ................................................................. 59

b.    AFS Not Entitled to an Increase in the Statutory Rate Based
on Special Factors ........................................................................................... 60

i.    Ilana H. Einsenstein, Esquire ............................................................ 61

ii.    Paul Saint-Antoine, Esquire .............................................................. 61

iii.    David H. Marion, Esquire .................................................................. 61

c.    Reasonableness of Fees ................................................................................... 64

2.    Expenses ................................................................................................................... 66

**D.    Costs** ............................................................................................................................ 68

1.    Bill of Costs ............................................................................................................. 68

2.    AFS's Request for Costs Will Be Granted ......................................................... 69

**V.    CONCLUSION** ..................................................................................................................... 70

## I.    INTRODUCTION

From the actions of the Government and the facts presented at trial, it is evident that this case is a quintessential one of overreaching.  The case began when the Federal Trade Commission ("the FTC") filed suit against Defendants American Future Systems, Inc. ("AFS"), Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), and Edward M. Satell, Chief Executive Officer ("CEO") and sole shareholder of AFS (collectively, "AFS Defendants" or "Defendants").[1] Later on, the Commonwealth of Pennsylvania ("the Commonwealth") was joined as a co-Plaintiff. Plaintiffs essentially contended here that Defendants used deceptive scripts when selling publications to businesses through telemarketing calls.[2]

A fifteen-day bench trial was held in September and October 2023.  After twenty-five witnesses gave testimony during a non-jury trial, thousands of exhibits received in evidence, and careful consideration of the positions of the parties, the Court concluded Plaintiffs had not proven their claims.  They relied upon unsupportable facts and law and thereby engaged in needless litigation.

For these reasons, Defendants have now filed a Motion for Fees, Expenses and Costs under the Equal Access to Justice Act ("EAJA").  (Doc. No. 478.)  In the Motion, Defendants argue that as the prevailing parties in this lawsuit in which the FTC was not substantially justified in its factual or legal position in this case, they are entitled to be reimbursed their attorneys' fees and other

---

[1]    International Credit Recovery, Inc. ("ICR"), Richard Diorio, Jr., and Cynthia Powell were also named Defendants.  The claims involving the ICR Defendants in Counts III and VII of the Amended Complaint (both titled "ICR Defendants' False or Unsubstantiated Representations to Induce Payment") were withdrawn after a settlement was reached between Plaintiffs and ICR Defendants.  (Doc. No. 296.)

[2]    A complete description of AFS's telemarketing scripts can be found in the Court's prior Opinion granting judgment in favor of AFS Defendants.  (See Doc. No. 463.)

reasonable expenses and costs under the EAJA.[3]  In addition, Defendants assert that no special circumstances in this case make an award of these items unjust.

For the reasons stated below, Defendants' Motion (Doc. No. 478) will be granted in part.

## II.    BACKGROUND[4]

### A.    Factual Background

As previously noted in this Court's Opinion entering Judgment in favor of AFS Defendants, the following facts surround this dispute:

> In 1973, Defendant Edward Satell founded Defendant American Future Systems Inc. ("AFS"), as a Pennsylvania corporation that primarily sold cookware. (Doc. No. 444 at 76:19- 77:15.) In the late 1980's, AFS phased out its cookware sales and transitioned into the publication business. (Doc. No. 431 at 54:20-24.) From that point on, AFS used telemarking representatives to call businesses and organizations to sell yearly subscriptions to AFS's newsletters and books. (Id.) AFS did business under the names Progressive Business Publications ("PBP"), Progressive Business Publications, Inc., and the Center for Education and Employment Law ("CEEL"). In 2005, the third Defendant, Progressive Business Publications of New Jersey, Inc. ("PBPNJ"), was incorporated in New Jersey and engaged in the same business as AFS. (Doc. No. 429 at 95:16- 96:11.) PBPNJ was dissolved in 2019.
>
> During the relevant time period, Edward Satell was the Chief Executive Officer and the sole owner of Defendants AFS and PBPNJ. (Doc. No. 429 at 45:8-19.) AFS and PBPNJ transacted business in the Eastern District of Pennsylvania and throughout the United States.
>
> ***
>
> When AFS's telemarketers contacted a potential subscriber, they offered a "no risk" subscription model. "No risk" meant that a subscriber would have a sixty-day period to review the publication and the terms of the offer without charge and decide whether to subscribe. (Doc. No. 426 at 35:20-39:14.) During the sixty-day period, the subscriber received two newsletters. With the second newsletter, they

---

[3]    Co-Plaintiff the Commonwealth is not included in this Motion because Defendants can only recover fees from an agency of the United States under the Equal Access to Justice Act.

[4]    A complete recitation of this case, including findings of fact and conclusions of law on all claims asserted against AFS Defendants, can be found in this Court's Opinion dated March 29, 2024. (Doc. No. 463.)

usually received an invoice. (Id. at 100:18-101:3.) Once they received the invoice, the subscriber could complete the sales transaction by paying the yearly fee or they could write cancel on the invoice and send it back. (Id. at 21:15-19.) AFS utilized this model so businesses and organizations had a chance to review the information and decide if the subscription was the right fit for them. It was therefore critical that AFS's telemarketers correctly stated the details of the subscription. To do this, AFS followed a scripted comprehensive process.

***

Once a telemarketer reached the targeted potential subscriber, they were required to follow the one-page telemarketing script known as the "Executive Script" or "Script." (Doc. No. 427 at 35:4-14; Doc. No. 428 at 20:12-16.) If a telemarketer did not follow the "offer" or "no risk subscription disclosure" portions of the executive script word-for-word, AFS would cancel the subscription or seek additional confirmation from the customer before placing the order. (Doc. No. 428 at 20:12-16, 42:20-23.) While there were several iterations of the executive script, the scripts were virtually identical to one another, and their differences related mainly to the description of the particular publication being marketed. (See Def.'s Ex. 2002; Exh. 6 at 1-51.)

***

For example, in a script based on the publication "Communication Bulletin for Managers and Supervisors," the script reads as follows:

> Hi [Their name], this is [your name] from PBP! I was told that you're the person in charge of training/staff development or you have managers and supervisors reporting to you. Is that correct?
>
> My company published a newsletter called Communication Bulletin for Managers & Supervisors and I'm sending out a couple copies for you to look at, and then we'll call you back and see how you like it . . . and I was wondering . . . (Don't Pause)
>
> (Their name) Is there anything special you are currently using to help your people improve communication and teamwork? [Pause] (ie meetings, seminars, trainings) [wait for answer] RESPONSE: Yeah I'm hearing that a lot these days
>
> (Their name) Communication Bulletin is in a quick 4 page format, with a brand new website that is especially designed to help supervisors:
>
> • Communicate better with other departments and deal with difficult people
> • Motivate their team for higher productivity

6

> • And my favorite part, is the website has a search tool.. kind of like a
> communication 911. Where you can type in whatever challenge your
> department might be having and get results right away!
>
> (Name) I'd be happy to take you to a webpage and give you a quick preview
> right now, OR just email you a link and you can take a look at it later on
> today! Which is easier for you?

(Doc. No. 463 at 11-21.)

The telemarketer then read the "offer" paragraph, confirmed the name and company where the subscriber worked, recited the "no risk subscription disclosure" paragraph, and waited for an affirmative response. (Id. at 21-22.) The telemarketer next asked whether the subscription could work with the customer's budget, which also required an affirmative response. (Id. at 23.) They also asked for the subscriber's month and day of birth to confirm that they spoke to that specific customer on the phone. (Id.) Customers had the option not to provide their birthdate and AFS could still send the subscription. (Id.) Once these questions were asked and answered in the affirmative, the subscription began with a 60-day right of cancellation. (Id.) At that time, no payment was required to be made.

In addition, AFS sent two confirmation emails to the newly subscribed customers. These emails reiterated a description of the publication's features and benefits, the subscription cost, the timing and number of issues, and the cancellation procedure. An email would look like this:

> As you'll remember from our phone discussion, in addition to access to the rich
> web resources, you'll receive your first mailed issue in about three weeks. If you
> love the value you get from Nonprofit Executive Report, like thousands of other
> subscribers do, the cost for a full year is only $288. You can submit payment along
> with the invoice we mail you, or you can use the personal invoice under the "My
> Account" tab on the Nonprofit Executive Report website. If for any reason you
> don't find the service valuable, simply let us know by marking "cancel" on the
> invoice, within sixty days and return it to us – no questions asked. Otherwise your
> subscriptions will continue uninterrupted.

(Id. at 24-25 (citing Def. Ex. No. 121).)  Customers also had access to the publication's website where they could log in and view their personal account information as well as reach out to AFS if they wanted to subscribe or cancel the subscription.  (Id.)

AFS then sent customers a "welcome letter" and a first issue of the newsletter.  (Id. (citing Doc. No. 427 at 59:23-25, 54:18-55:11).)  Approximately two weeks later, AFS sent the second issue of the newsletter along with an invoice for the year.  (Id.)  If the customer did not pay the invoice within 60 days, AFS would call the customer.  (Id. at 26.)  They also sent four additional monthly invoices to the company's accounts payable department.  If the customer still did not pay the invoice, AFS referred the account to collections.

### B.    Procedural History

#### 1.  Initial Investigation into AFS's Business Practices

In the Opinion entering Judgment in favor of Defendants, the Court reviewed the FTC and the Commonwealth/Attorney General's ("AG") investigation of AFS's business practices.  (See Doc. No. 463 at 32-33.)  To summarize, the Commonwealth's investigation began in 2012.[5]  (Id. at 32.)  In July 2014, the AG's Office issued an administrative subpoena to AFS.  (Id.)  AFS responded to that subpoena with detailed information on its business and allowed employees of the AG's office to meet with its consumers.  (Id.)  The AG's employees also met with AFS personnel and listened to recorded telemarketing calls.  (Id. at 32-33.)

In 2017, another meeting was held with the Senior Deputy Attorney General and counsel for AFS, and the final correspondence from the AG's Office stated to AFS that they "look forward

---

[5]    Notably, the actions taken by the Commonwealth are not at issue in this Motion.  But their pre-litigation conduct is relevant as to how the FTC began its own investigation and commencement of its suit against AFS.

8

to the prospect of an amicable resolution." (Id. at 33.)  On July 13, 2018, the AG's Office administratively closed its investigation into AFS.  (Id.)

Coinciding with some of these events, the FTC began its investigation into AFS in 2017. On August 28, 2017, the FTC issued a Civil Investigative Demand requesting responsive documents.  (Id.)  The FTC's investigation culminated in the present action with the first Complaint being filed on May 13, 2020.  (Id.)

### 2. Complaint and Amended Complaint

In the original Complaint, the FTC claimed that AFS Defendants misrepresented that their offers were free, failed to disclose material terms of the offers, and sent unordered merchandise to consumers, in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a) (Counts I and II)[6], and the Unauthorized Merchandise Statute ("UMS"), 39 U.S.C. § 3009 (Count IV).[7]  (Doc. No. 1 at 13-16.)  It sought injunctive and monetary relief.  (Id. at 17.)

---

[6]  15 U.S.C. § 45(a)(1), the FTC violation, states in pertinent part:

> (1)  Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

[7]  29 U.S.C. § 3009 states in relevant part:

> (b). . . the mailing of un-ordered merchandise or of communications prohibited by subsection (c) of this section constitutes an unfair method of competition and an unfair trade practice in violation of section 45(a)(1) of title 15.

> . . .

> (d) For the purposes of this section, "un-ordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

Co-Plaintiff the Commonwealth was then brought into the case through the filing of an Amended Complaint. (See Doc. Nos. 41-43.) In the Amended Complaint, the FTC asserted the same claims noted above and the Commonwealth alleged two counts of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Counts V and VI), and one count under the UMS (Count VIII) against AFS Defendants. (Doc. No. 43 at ¶¶ 56-95.)

### 3. Motion to Dismiss and Motion for Judgment on the Pleadings

AFS Defendants filed a Motion to Dismiss the Commonwealth's claims in the Amended Complaint (Doc. No. 55), which was denied by the Court on April 30, 2021. (Doc. No. 85.) Then, Defendants filed a Motion for Judgment on the Pleadings. (Doc. No. 97.) In that Motion, they argued that under the recent United States Supreme Court decision AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n, 593 U.S. 67 (2021), the FTC's claims must be dismissed. (Id. at 5.) In AMG Cap. Mgmt., the Supreme Court held that the FTC could not obtain court-ordered monetary relief under Section 13(b) of the FTC Act. Id. at 75. In the Order denying AFS Defendants' Motion for Judgment on the Pleadings, the Court found that the FTC's claims for monetary relief were no longer valid, but it could continue to pursue the action to obtain a permanent injunction. (Doc. No. 108 at 6.)

### 4. Appointment of Special Master

This case underwent an extensive discovery process and a Special Master was appointed to resolve numerous disputes. The Special Master reviewed several motions to compel which were generally favorable to the FTC. For example, in one motion, the Special Master permitted the FTC to seek certain discovery relating to AFS's business conduct starting from January 1, 2015. (See Doc. No. 122.) The Court affirmed the Special Master's Recommendation but changed the time period to start on July 1, 2015. (Doc. No. 128.) On another motion to compel, the Special

Master recommended that AFS be required to produce relevant Slack data that its employees used to communicate with one another.[8]  (Doc. No. 302.)  In total, the Special Master assisted in resolving approximately six (6) discovery disputes between the FTC and AFS Defendants.[9]  (See Doc. Nos. 122, 141, 145, 167, 302, 328.)

### 5.  Other Discovery Disputes

In addition to the prior Reports and Recommendations submitted by the Special Master, the Court also conducted several hearings with the parties on various discovery issues.  For example, on June 6, 2022, the Court, among other things, ordered AFS Defendants to supply Plaintiffs with the names and addresses of approximately 25 employees from each branch at which AFS was conducting business.  (Doc. No. 199 at 24.)  AFS stated that they had approximately 10 or 11 branches throughout the country, so the Court estimated that Plaintiffs would have access to approximately 250 of AFS's current and former employees.  (Id.)

The Court held three (3) additional status conferences on August 5, 2022, November 3, 2022 and December 13, 2022, respectively, where it resolved more discovery disputes including Defendants' Motion to Compel Plaintiffs to provide request for admissions and interrogatories (Doc. No. 212), Plaintiffs' joint Motion for a Protective Order (Doc. No. 232), and Plaintiffs' joint Motion for Leave to Extend the Time Limit for the Rule 30(b)(6) depositions (Doc. No. 250).  (See Doc. No. 226, 243, 263.)  As noted by the FTC, these rulings were generally favorable to Plaintiffs and gave them the opportunity to obtain a significant amount of discovery in this case.

---

[8]    Slack is a messaging platform that AFS employees used to communicate with one another.

[9]    Some discovery issues did not involve either the FTC and/or AFS Defendants.  For example, the Special Master issued three (3) R&Rs regarding disputes involving ICR Defendants and the Commonwealth that are not relevant to this Motion.  (Doc. Nos. 129, 133, 138, 313.)

### 6.  Motions for Summary Judgment

On June 26, 2023, the FTC and AFS each filed respective Motions for Summary Judgment. (Doc. Nos. 339, 342.)  On September 20, 2023, the Court denied both Motions.  (See Doc. Nos. 392, 393.)

### 7.  Trial and Post-Trial Motions

A fifteen-day non-jury trial was held from the end of September 2023 to mid-October 2023. (Doc. Nos. 425-35, 439-52.)  Plaintiffs presented twenty-one (21) witnesses, many as of cross-examination:  three (3) were government employees,[10] ten (10) were former and current employees of AFS,[11] two (2) were former customers of AFS,[12] and Edward Satell, the Chief Executive Officer ("CEO") of AFS.  Plaintiffs also presented Andrew Goode, a Vice President for the Better Business Bureau ("BBB"), Richard Diorio, the Vice President of Internal Credit Recovery ("ICR") and

---

[10]  Plaintiffs' government witnesses were:  (1) Lauren Oleckna, Senior Civil Investigator for the Commonwealth of Pennsylvania Office of Attorney General; (2) Sarah Frasch, Chief Deputy Attorney General for the Commonwealth of Pennsylvania; and (3) John Vega, senior investigator for the FTC.

[11]  The ten (10) witnesses who were former or current employees of AFS were: (1) Colin Drummond, AFS's former director of call center operations and a current employee at SuccessFuel, a new business started by CEO Satell; (2) Amy Luchette, a former AFS telemarketer; (3) Denise Haney, an AFS Customer Service Representative; (4) Tara Orischak, a former AFS branch manager; (5) Susan Grabert, a former head of quality control at AFS; (6) Melissa Schwenk, a former AFS telemarketer; (7) Robin Biltheiser-Buck, a former AFS telemarketing representative and quality manager; (8) Jennifer Rann, a former AFS telemarketer and customer service representative; (9) Mike Gorton, AFS's former administrative director; and (10) Melissa Schwenk, a former AFS telemarketer and current SuccessFuel employee.  An additional witness, Kelly Strosnider, a former AFS telemarketer, was not available to testify so a portion of her deposition was read into the record.

[12]  The two witnesses who were former customers of AFS were:  (1) Kelly Rickard, an employee of Clavesvista, and (2) Daniel Dewey, a chemist.

William Sasso, Esquire, former counsel of AFS. Plaintiffs' only expert witness was Erik Lioy, a rebuttal witness.

AFS Defendants presented four (4) witnesses: two current employees of AFS,[13] and two expert witnesses.[14]

On March 29, 2024, this Court issued a 52-page Opinion (Doc. No. 463) with an accompanying Judgment (Doc. No. 464) in favor of AFS Defendants on each claim alleged in Plaintiffs' Amended Complaint. (Doc. Nos. 463, 464.)

On April 26, 2024, the FTC filed a Motion to Alter or Amend Judgment and for Other Relief (Doc. Nos. 466, 468), and the Commonwealth filed a Motion to Amend or Make Additional Findings Pursuant to Federal Rule 52(b) and to Alter or Amend Judgment Pursuant to Federal Rule 59(e) (Doc. No. 467). The Motions were denied in a joint Opinion and Order (Doc. Nos. 475, 476) dated June 11, 2024.

On September 3, 2024, AFS Defendants filed the instant Motion for Attorneys' Fees, Expenses and Costs Pursuant to the Equal Access to Justice Act ("EAJA") against the FTC. (Doc. No. 478). On October 1, 2024, the FTC filed a Response in Opposition to the Motion. (Doc. No. 481.) On October 8, 2024, AFS Defendants filed a Reply. (Doc. No. 482.) AFS Defendants' Motion (Doc. No. 478) is now ripe for disposition.

---

[13] The two AFS employees that testified were Curt Brown, an editorial director for AFS, and Heather Wood, Edward Satell's executive assistant, who also previously worked at AFS as a telemarketer and a member of the quality control department.

[14] Defendants' expert witnesses were Margaret Daley, a forensic data expert, and Harris Devor, a forensic accountant.

## III.    STANDARD OF REVIEW

The Equal Access to Justice Act ("EAJA") was created in 1980 and amended in 1985 to aid small businesses which were subject to strict governmental regulation.  As noted by Justice Brennan in the seminal case Pierce v. Underwood:

> Concerned that the Government, with its vast resources, could force citizens into acquiescing to adverse Government action, rather than vindicating their rights, simply by threatening them with costly litigation, Congress enacted the EAJA, waiving the United States' sovereign and general statutory immunity to fee awards and creating a limited exception to the "American Rule" against awarding attorneys fees to prevailing parties. S.Rep. No. 96-253, pp. 1-6 (1979) (S.Rep.).

487 U.S. 552, 575 (1988) (Brennan, J. concurring).

Congress' intent in creating the EAJA was aimed to "provide an incentive for private parties to contest government overreaching, to deter subsequent government wrongdoing, and to provide more complete compensation for citizens injured by government action."  Harold J. Krent, GENERAL TOPICS IN LAW AND POLICY: Fee Shifting Under the Equal Access to Justice Act—A Qualified Success, 11 YALE L. & POL'Y REV. 458, 458 (1993).

The EAJA reads in pertinent part:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a)[15], incurred by that party in any civil

---

[15]  Section § 2412(a), the provision for awarding costs under the EAJA, states:

> **(1)** Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

action . . . brought by or against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).[16]

Thus, eligibility for a fee award in a civil action requires:  (1) that the claimant be a "prevailing party"; (2) that the Government's position was not "substantially justified"; (3) that no "special circumstances make an award unjust"; and (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that "any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement." Comm'r, I.N.S. v. Jean, 496 U.S. 154, 158 (1990).  Such a determination is made by the district court.  Pierce, 487 U.S. at 559 (finding that the words "unless the court finds . . . the United States was substantially justified" give district courts decision-making authority) (emphasis in original).

When defining "substantially justified," the government's conduct must have been "justified to a degree that could satisfy a reasonable person." Morgan v. Perry, 142 F.3d 670, 683 (3d Cir. 1998) (quoting Pierce, 487 U.S. at 565).  "[A] position can be justified even though it is not correct, and we believe it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." See Pierce, 487 U.S. 566 n.2; see also Hanover Potato Prods., Inc. v. Shalala, 989 F.2d 123, 127 (3d Cir. 1993). Moreover, "a court cannot assume that the government's position was not substantially justified simply because the government lost on the merits." Id.  An inquiry into the government's pre-litigation and litigation efforts must be taken into account in order to determine whether its position

---

[16]  The term "United States" includes any agency and any official of the United States acting in his or her official capacity, i.e., the Federal Trade Commission.  28 U.S.C. § 2412(d)(2)(C).

was substantially justified.  See Jean, 496 U.S. at 159 (finding that "one threshold determination for the entire civil action is to be made").

## IV.    ANALYSIS

The FTC argues that Defendants are not entitled to fees and other expenses under the EAJA for three reasons:  (1) Defendant Edward Satell is not an eligible "prevailing party" as defined by the EAJA, and this bars recovery for AFS; (2) the position of the FTC was "substantially justified"; and (3) any award must be apportioned and limited to the relief authorized by the EAJA pursuant to 28 U.S.C. § 2412(d)(2)(A).[17]  (See generally Doc. No. 481.)  Each argument will be discussed in turn.

### A.    AFS is an Eligible "Party" Under the Equal Access to Justice Act

The FTC argues that AFS is not an eligible "party" under the EAJA because Defendant Edward Satell, CEO of AFS and a named defendant in this case, does not meet the requirements for an individual to receive fees under the statute because his net worth is in excess of $2,000,000. (Id. at 34.)  It avers that "Congress could not have intended for [the] EAJA to apply where a corporate defendant that technically qualifies as an eligible 'party' is wholly owned and controlled by a co-defendant like Mr. Satell whose net worth renders him ineligible to receive an EAJA award."  (Id. at 9.)

When assessing claims for attorneys' fees, expenses and costs under the EAJA, the first question is the whether the prevailing litigants are proper "parties" entitled to recovery.  Jean, 496

---

[17]    28 U.S.C. § 2412(d)(2)(A) states in pertinent part:

> (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

U.S. at 158. Under the EAJA, a "party" who is entitled to a judgment of costs and fees must either be: "(i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed . . . ." 28 U.S.C. § 2412(d)(2)(B). As noted by the Supreme Court, the "prevailing party" requirement is a "generous formulation." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see also Jean, 496 U.S. at 160-61.

Here, there is no dispute that Defendants prevailed at trial against Plaintiffs. (See generally Doc Nos. 463, 475.) Additionally, AFS is an eligible "party" under the EAJA. In its Motion, it submits that on December 13, 2019, the corporation's net worth was $6,272,300, which decreased to $5,089,754 by December 31, 2020.[18] (Doc. No. 478 at 19; Tr. Ex. 332 at AFS0639822.) The original Complaint was filed on May 13, 2020. (Doc. No. 1.) Therefore, AFS had a net worth below $7,000,000 at the time the Complaint was filed. Additionally, the declaration submitted by Edward Satell confirms the company had 191 employees on May 13, 2020, far below the 500 or less requirement of the EAJA. (Doc. No. 478-1.) Therefore, AFS has satisfied the necessary requirements under § 2412(d)(2)(B)(ii) and is an eligible party to be reimbursed for fees, expenses and costs.

---

[18] FTC Trial Exhibit 332 shows AFS's Consolidated Balance Sheet from December 31, 2019 to December 31, 2020. Under Liabilities and Shareholder's Equity, the total shareholder's equity for 2019 was $6,273,300. In 2020, the equity decreased to $5,089,754. (Tr. Ex. 332 at AFS0639822.)

Whether Edward Satell as an individual satisfies the requirements of § 2412(d)(2)(B)(i) is another matter.[19]  The FTC avers that Satell has a net worth in excess of $2,000,000 and for this reason is ineligible as a "prevailing party" under the EAJA.  It maintains this position because Satell is the sole owner of AFS, operates a family foundation worth $8 million, has a charitable trust worth $1.2 million, and has endowed the "Satell Institute" with $15 million.  (Doc. No. 481 at 34 n.9.)  Defendants do not address the issue of Satell's net worth, apparently conceding that he is ineligible on his own to receive reimbursement under the EAJA.  Instead, they treat him as falling under the AFS corporate umbrella because he is the CEO and sole shareholder.  The question remains, though, whether AFS can recover because its sole owner and CEO, a named defendant, is ineligible under the EAJA.

Courts are split in awarding fees and expenses when there are multiple prevailing litigants, but not all of them satisfy the requirements for eligibility under the EAJA.  In support of its position that the ineligibility of Satell to receive reimbursement renders AFS ineligible, the FTC primarily relies on Unification Church v. INS, 762 F.2d 1077 (D.C. Cir. 1985).  In Unification Church, a church and three individual plaintiffs successfully brought claims against the Immigration and Naturalization Service ("INS").  Id. at 1079.  There, the court found that the Church was ineligible to be reimbursed fees under the EAJA because it was a Section 501(c)(3) organization, which is

---

[19]  AFS Defendants filed the Motion for Attorneys' Fees, Expenses and Costs on behalf of AFS, PBPNJ and Edward Satell.  They categorize themselves as a single defendant throughout the Motion, identifying Satell as the corporate president rather than as an individual.  But Satell was named as a separate Defendant and the Court must determine whether each named Defendant is considered a "prevailing party."  However, the Court need not determine whether PBPNJ is an eligible party because (1) the FTC does not argue that it is an ineligible party, and (2) as noted above, PBPNJ engaged in the same telemarketing business as AFS and was created, in part, to comply with the tax laws of New Jersey.

explicitly restricted from receiving fees under the statute.  Id. at 1083-84.  And the court further found that while the other three individual plaintiffs were technically eligible parties, they were ultimately ineligible for an award of fees and costs because "the fee arrangement between the individual [plaintiffs] and the Church . . . made the Church the only 'real party in interest' with respect to fees . . . ."  Id. at 1081.  Put differently, the court held that if an ineligible party pays the fees for an eligible party, then the eligible party cannot recover under the EAJA.  The court's rationale was that "[i]f [it] were to award fees in this case on the basis that the individual appellants qualified under subsection (d)(2)(B)(i), [it] would open the door for the wholesale subversion of Congress' intent to prevent large entities from receiving fees under subsection (d)."  Id. at 1082.

As noted in Unification Church, the D.C. Circuit utilizes a "real party in interest" standard in determining fee eligibility, and, in a later decision, found that district courts should consider the following factors to determine who is a "real party in interest":

> First, a district court should consider whether there is one counsel representing several plaintiffs of disparate size or wealth, especially where the size or wealth of one or more of those plaintiffs would likely disqualify it from recovering fees under the EAJA. Cf. Unification Church, 762 F.2d at 1082. Second, a court should determine who is counsel of record for each plaintiff and when and how long that attorney became and has been counsel of record for that plaintiff. We note that parties can manipulate who is counsel of record and caution courts not to consider this determinative. Third, a court should consider appearances and representations made by the various attorneys on behalf of their respective clients—a counsel cooperating with another client's counsel but retaining the responsibility to speak for his client supports a finding of multiple real parties in interest.[20]

Am. Ass'n of Retired Persons v. E.E.O.C., 873 F.2d 402, 405-406 (D.C. Cir. 1989).

---

[20]  The court in Am. Ass'n of Retired Persons also considered a fourth factor:  whether some plaintiffs have retained pro bono or legal aid society counsel.  However, this factor is inapplicable here.

In this case, Third Circuit precedent guides this issue.  In <u>Citizens Council of Delaware v.</u>

<u>Brinegar</u>, the court examined whether a township or other government entity may be considered

an eligible party under the EAJA.  741 F.2d 584, 586 (3d Cir. 1984).  In doing so, it looked to the

legislative history of the statute, which intended to benefit individuals and small businesses:

> While the influance [sic] of the bureaucracy over all aspects of life has increased, the ability of most citizens to contest any unreasonable exercise of authority has decreased. Thus, at the present time, the Government with its greater resources and expertise can in effect coerce compliance with its position. Where compliance is coerced, precedent may be established on the basis of an uncontested order rather than the thoughtful presentation and consideration of opposing views. <u>In fact, there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue.</u> This kind of truncated justice undermines the integrity of the decision-making process.

<u>Id.</u> at 590 (quoting H.Rep. No. 1418, 96th Cong., 2d Sess. 10 (1980), reprinted in 1980 U.S. Code

Cong. & Ad.News at 4988) (emphasis in original).

In <u>Brinegar</u>, the Third Circuit held that that the two township plaintiffs were ineligible, but

the two other eligible plaintiffs, a college and civic association, were still entitled to fees:

> Our decision that the Townships are not entitled to attorneys' fees does not dispose of the appeal from the order granting fees, or the cross-appeal, because two other plaintiffs (the College and the Civic Association), neither of which is a governmental body, joined in the petition.
>
> ***
>
> Only two of the four plaintiffs (the College and the Civic Association) represented by the attorneys who submitted the fee petition were eligible to obtain fees under EAJA. However, the petition was submitted jointly, as to four plaintiffs; the attorneys did not apportion their fee request among the plaintiffs.

<u>Id.</u> at 592, 597.  <u>Brinegar</u> utilized a proportionality framework when awarding fees under the EAJA

and remanded the case to the district court to determine which fees were allocable to the two

eligible plaintiffs.  <u>Id.</u>

While this Court is bound to follow the holding of the Third Circuit in Brinegar, it should be noted that other circuits have discussed the standard when there is an eligible and ineligible party for reimbursement. For example, the Second Circuit, while noting that there is no case law directly on point as to whether one prevailing party's ineligibility under the EAJA should be attributed to all prevailing parties, held that even if some prevailing parties do not qualify, it does not bar the eligible parties from receiving an award of fees and costs. See Sierra Club v. United States Army Corps of Engineers, 776 F.2d 383, 393–394 (2d Cir. 1985). In Sierra Club, eleven (11) out of twelve (12) plaintiffs qualified under the EAJA, and the court found that the single EAJA ineligible plaintiff did not preclude recovery. Id. The Second Circuit, relying on Brinegar, directed the district court to award fees "based on the ratio of eligible plaintiffs to total plaintiffs."[21]

Later, in United States v. 27.09 Acres of Land, the Second Circuit held that special circumstances made an award of fees unjust because three (3) out of four (4) plaintiffs were ineligible, and the sole eligible plaintiff's interests were protected by the other ineligible plaintiffs. 43 F.3d 769, 774-775 (2d. Cir. 1994). In comparing its decision to Sierra Club, the Second Circuit noted that "where the role of the ineligible party is nominal or passive, then EAJA fees will be available to the eligible parties—subject, of course, to apportionment, and assuming that no other reason justifies denial of the application." Id. at 775. "The basic question is whether the actions of the eligible parties and their counsel were reasonable and necessary to the successful prosecution

---

[21]  Notably, Judge Thomas Meskill, one of the three judges who decided this case, dissented on this issue. Instead, he believed that because one party was ineligible, all other plaintiffs were also ineligible. Sierra Club, 776 F.2d at 394. "Indeed, it seems incongruous to hold that if the ineligible plaintiff alone challenged [defendant], fees could not be awarded under the EAJA, but because the ineligible plaintiff was joined by less wealthy friends, fees may be awarded." Id. But two other judges found that the proportionality standard is appropriate when one party is eligible and another is ineligible.

of the case." Id. (quoting Washington Dep't of Wildlife v. Stubblefield, 739 F. Supp. 1428, 1432

(W.D. Wash. 1989)).

The Fifth Circuit has also discussed this issue.  In Louisiana ex rel. Guste v. Lee, it held

the following:

> [I]n special circumstances the participation of a party ineligible for EAJA fees may
> make a fee award for other eligible parties unjust. Judge Meskill's concern in Sierra
> Club is legitimate. When parties eligible for EAJA fees join parties ineligible for
> EAJA fees, the district court must account for the free-rider problems that will
> inevitably exist. If the party ineligible for fees is fully willing and able to prosecute
> the action against the United States, the parties eligible for EAJA fees should not
> be able to take a free ride through the judicial process at the government's expense.
> Conversely, if the ineligible party's participation is nominal or narrow, then the
> eligible parties should not be denied the access that Congress sought to ensure by
> enacting the EAJA.
>
> ***
>
> The district court should consider whether the party ineligible for EAJA fees was
> fully willing and able to prosecute this suit against the United States. The district
> court should consider whether the eligible and ineligible parties had overlapping
> but not coextensive interests. And the district court should consider whether the
> ineligible party was willing to commit a limited amount of resources to this action.

853 F.2d 1219, 1225 (5th Cir. 1988).

The Fifth Circuit has not adopted the "real party in interest" test established in Uniform

Church.  Rather, in Nail v. Martinez, a corporation and its sole president and shareholder

successfully brought claims against the Department of Housing and Urban Development.  391

F.3d 678 (5th Cir. 2004).  The district court declined to award the corporation costs because its

president, who was ineligible party under the EAJA, was the "alter ego" and "real party in interest."

Id. at 681-682.  But the Fifth Circuit reversed, finding:

> . . . Congress has precisely defined the term "party." Although we do not say that
> the D.C. Circuit was incorrect in its assessment of Congress's intent, its resort to
> the legislative history for the inclusion of a non-statutory requirement for EAJA
> eligibility was unnecessary. There is no ambiguity in the statutory language that
> would warrant looking beyond the plain language of the statute for additional

understanding of Congress's intent. <u>Zapata Haynie Corp. v. Arthur</u>, 926 F.2d 484, 487 (5th Cir. 1991) ("Where a statute is unambiguous and there is no room for interpretation or construction of [a] provision, we cannot circumvent its clear words.").

It is certainly true that Congress was concerned that large entities capable of purchasing legal services might inappropriately recover fees and costs under the EAJA. That concern is precisely why it included in the EAJA the net-worth and employee-number limitations. If Congress had wanted to incorporate a real party in interest test into the EAJA's definition of a "party," then it could have done so. Nowhere does Congress limit the EAJA's application to corporations whose shareholders individually are eligible for an award of fees and costs under the EAJA.

<u>Id.</u> at 683-684.

This distinction between eligible corporations and its ineligible members and shareholders has been adopted in other courts. For instance, in <u>Nat'l Ass'n of Mfrs. v. Dep't of Labor</u>, the D.C. Circuit Court expanded its analysis in <u>Uniform Church</u>:

[A]lthough the "real party in interest" doctrine does bar fee awards from which only ineligible parties would benefit, it does not require us to rewrite the statute to exclude eligible associations whenever their litigation benefits ineligible members.

159 F.3d 597, 603 (D.C. Cir. 1998) (rejecting the notion that National Association of Manufacturers ("NAM") was barred from receiving attorneys' fees because it had members who were ineligible);[22] <u>see also</u> <u>Tri-State Steel Const. Co. v. Herman</u>, 164 F.3d 973 (6th Cir. 1999) (relying on the "basic premise that a corporation is separate from its shareholders" when assessing fees under the EAJA).

Taking these cases together and considering the decision of the Third Circuit in <u>Brinegar</u>, which this Court must follow, AFS is an eligible party under the EAJA, irrespective of the

---

[22]  In <u>Nat'l Ass'n of Mfrs. v. Dep't of Labor</u>, the "members" of NAM were not named parties in the case, unlike CEO Satell here. And in that case, the court found that the members "played no part in the legal prosecution or decision-making processes of this case." <u>Nat'l Ass'n of Mfrs.,</u> 159 F.3d at 603-604. But here, Defendant Satell was involved in the litigation.

ineligibility of Defendant Satell.  AFS has always been the targeted party by Plaintiffs, starting

with the Commonwealth's initial investigations into the company in 2012 and the FTC's

supplemental investigation in 2017, which culminated into this case.  And the ultimate issue here

was whether AFS, the corporation, was conducting a telemarketing scheme in violation of federal

law, which the Court concluded it was not.  (See Doc. No. 463.)  Satell was named as a defendant

because he was the sole owner of the corporation, and his involvement in this case has been limited

to his conduct on behalf of the corporation.  With or without Satell named as a defendant, AFS

was required to defend its interests in this case in the same manner.  And although AFS and Satell

may have similar interests, Satell was a nominal party compared to AFS.  See Lee, 853 F.2d at

1225; Sierra Club, 43 F.3d at 774-775.

> Moreover, this distinction is consistent with the purpose of the EAJA:

> [T]he statute's purpose, by its plain language, is to make corporations eligible for
> an award on each corporation's own terms. A small corporation that is properly
> organized as an independent entity should not be excluded from eligibility merely
> because a majority of its stock is held by an ineligible company, any more than any
> corporation should be excluded from liability because some, most, or all of its
> individual shareholders are wealthy individuals. A fundamental characteristic of a
> corporation, which the Congress presumably understood in specifically listing
> "corporation" among eligible parties, is the separation of ownership from
> management and the creation of a separate legal personality.

Gregory C. Sisk, The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's

Fees for Unreasonable Government Conduct (Part One), 55 La. L. Rev. 217 (1994).

> Finally, and as noted by Defendants, the holding in Unification Church, that the ineligible

party was the "real party in interest" because it was the only party that incurred fees, is the reverse

of the situation presented in this case.  See Unification Church, 762 F.2d at 1082.  Here, AFS

incurred legal fees and was the primary party targeted by the FTC.  And, more importantly, the

24

Third Circuit has not adopted the "real party in interest" standard when assessing fees under the EAJA.

Therefore, consistent with the Third Circuit's holding in <u>Brinegar</u>, AFS is eligible for fees and costs under the EAJA even if Defendant Satell is ineligible.  Any fee award will be apportioned between Defendants.

**B.    AFS is Entitled to Fees and Expenses Under the Equal Access to Justice Act Because the FTC's Position Was Not "Substantially Justified"**

The next question to address is whether AFS is entitled to fees and other expenses under the EAJA, 28 U.S.C. § 2412(d)(1)(A)-(B).[23]  AFS argues that the FTC's position was not substantially justified because, even after the voluminous investigations and discovery obtained in this case, the evidence at trial "overwhelmingly supported AFS's business model" and did not establish a violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1), and the Unordered Merchandise Statute ("UMS"), 39 U.S.C. § 3009, which were the bases of the FTC's claims against Defendants.  (Doc. No. 478 at 20.)  The Court agrees.

As noted earlier, under the EAJA, the actions of the FTC in this case must have been "substantially justified."  <u>See</u> § 2412(d)(1)(A) ("[A] court shall award a prevailing party . . . fees and other expenses . . . unless the court finds that the position of the United States was substantially justified.")  The legislative history suggests that "[t]he test of whether the Government's position is substantially justified is essentially one of reasonableness in law and fact."  H.Rept. 96-1434,

_____

[23]  AFS's Motion seeks attorneys' fees, expenses and costs.  (<u>See generally</u> Doc. No. 478.)  Under the EAJA, only an award of attorneys' fees and "other expenses" triggers the substantially justified analysis.  <u>See</u> 28 U.S.C. § 2412(d)(1)(A).  An award of costs, however, does not.  <u>See</u> 28 U.S.C. § 2412(a)(1).  Therefore, AFS will be awarded costs consistent with the requirements of the EAJA.  This award will be discussed further in Section D.

96th Cong., 2nd sess., 22 (1980), reprinted in 1980 U.S.C.C.A.N. 5003, 5011.  The Supreme Court

has held that substantial justification is to a "degree that could satisfy a reasonable person."  Pierce,

487 U.S. at 565.  This determination is based on the facts set forth in the record.  Morgan, 142

F.3d at 683.  As the Supreme Court found in Pierce:

> To begin with, some of the elements that bear upon whether the Government's
> position "was substantially justified" may be known only to the district court.  Not
> infrequently, the question will turn upon not merely what was the law, but what
> was the evidence regarding the facts.  By reason of settlement conferences and
> other pretrial activities, the district court may have insights not conveyed by the
> record, into such matters as whether particular evidence was worthy of being relied
> upon, or whether critical facts could easily have been verified by the Government.
> Moreover, even where the district judge's full knowledge of the factual setting can
> be acquired by the appellate court, that acquisition will often come at unusual
> expense, requiring the court to undertake the unaccustomed task of reviewing the
> entire record, not just to determine whether there existed the usual minimum
> support for the merits determination made by the factfinder below, but to determine
> whether urging of the opposite merits determination was substantially justified.

Pierce, 487 U.S. at 560 (emphasis in original).

The FTC has the burden of establishing its substantial justification and must show:  "(1) a

reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it

propounded; and (3) a reasonable connection between the facts alleged and the legal theory

advanced."  Morgan, 142 F.3d at 684 (citing Hanover Potato Products, 989 F.2d at 128).

### 1.  FTC's Pre-Litigation Position Was Not Substantially Justified

The Court must take into consideration the entirety of the Government's case when making

a substantial justification determination.  Morgan, 142 F.3d at 685.  This includes the complete

record at all stages including pre-litigation and litigation.  See id. at 684; see also 28 U.S.C.

§ 2412(2)(D) (defining "position of the United States" as "in addition to the position taken by

the United States in the civil action, the action or failure to act by the agency upon which the civil

26

action is based . . . .")[24]  But, "only one threshold determination for the entire civil action is to be made."  Jean, 496 U.S. at 159.

As noted earlier, the Pennsylvania Attorney General's Office ("AG") began investing AFS's business practices in 2012.  (Doc. No. 435 at 23:13-16.)  AFS fully complied with the AG's requests for documents and allowed AG employees to review recorded telemarketing calls.  (Id. at 39:9-40:1.)  In 2018, the AG administratively closed its investigation.  (Doc. No. 439 at 14:23-15:15.)  However, the FTC began its own investigation into AFS in 2017, which culminated into this case.

Even assuming the FTC had an initial reasonable basis to investigate AFS's business practices based on the small number of complaints received at its office and at the AG's office when compared to the large number of AFS customers, it should have become crystal clear after reviewing the scripts, listening to the recorded calls and conferring with AG employees that AFS was not engaging in deceptive business practices.  As noted, in 2018, the AG administratively closed its investigation.  But minimal efforts were taken by the FTC, other than reading the scripts and putting its own gloss on them, to verify the accuracy of the complaints received.  Additionally, the testimony of Colin Drummond, Vice President of Business Development and former head of

---

[24]  Neither the FTC nor Defendants discuss in their briefs the adequacy of the FTC's initial investigation of AFS prior to the commencement of this litigation.  However, Defendants note that they only seek fees and costs since the litigation commenced, "meaning this Motion will provide no recourse or recovery for the substantial money and resources AFS expended while cooperating with FTC over the course of its multiyear prelitigation investigation, which should have prevented litigation if FTC's conduct in assessing the Script and materials in its possession had been reasonable."  (Doc. No. 478 at 12-13.)  But the Court must analyze the FTC's pre-litigation efforts under the EAJA.  See 28 U.S.C. § 2412(2)(D); see also Johnson v. Gonzales, 416 F.3d 205, 210-11 (3d Cir. 2005) (finding that the government "must meet the substantially justified test twice—once with regard to the underlying agency action and then again with regard to [the government's] litigation position in the proceedings arising from that action").

telemarketing for AFS, suggested that AFS complied with all requests from the AG's Office during the initial investigation and did not receive a request or demand to change anything about their business practices:

> Q:  Let me put it this way:  Were you aware between 2014 and 2017 that the AG had communicated concerns about AFS's business practices to AFS?
>
> A:  Yes.
>
> Q:  And AFS didn't make changes to its business practices despite those communications from the Commonwealth; isn't that right?
>
> A:  Yeah.  Nobody from the PAAG Office told me to change anything.
>
> Q:  But AFS didn't make any changes despite concerns that were raised; is that correct?
>
> A:  Why would we do that?  We weren't doing anything wrong.
>
> Q:  AFS didn't make any changes; is that correct?
>
> A:  We didn't need to.

(Doc. No. 442 at 12:12-13:1.)

The FTC had access to the AG's concerns, which at the time resulted in the administrative closing of the case.  The FTC opened its own investigation, issued a civil investigative demand, received thousands of documents and recordings from a compliant AFS, and only determined that it did not like the telemarketing scripts because a small percentage of AFS customers filed complaints.  The discovery sought by the FTC convinced the Court that during the investigatory phase of this case the FTC did not do enough of an investigation to substantially justify its biased interpretation of the telemarketing scripts.

### 2.  FTC's Litigation Position Was Not Substantially Justified

#### a.  FTC Did Not Have a Reasonable Basis in Truth for the Facts Alleged

AFS further argues that the FTC's factual position in this case was not substantially justified because the FTC misconstrued and cherry-picked AFS's script, failed to adequately review customer complaints and did not present sufficient evidence at trial, notably witness testimony, that supported its theory of the case.  (See generally Doc. No. 478.)  Each assertion will be discussed seriatim.

#### i.    Review of AFS's Script

First, AFS maintains that the FTC's position in this case relied upon "picking apart and distorting [AFS's] Script's structure, taking words and phrases out of context, and ignoring the Script's express and clear disclosures."  (Id. at 20-22.)  It further argues that the FTC received over 17,000 recorded conversations between AFS employees and its customers, never fully evaluated those phone calls and only introduced a few of the recordings at trial.  (Id. at 22-23.)  Moreover, the FTC did not obtain an expert witness, whereas AFS retained a forensic data expert who demonstrated that a statistical sampling of the recordings showed a 99% adherence to its script. (Id. at 23.)

As previously found in the Court's Opinion entering Judgment in favor of AFS Defendants and the Opinion Denying the FTC's Motion to Alter or Amend Judgment, AFS's scripts were not misleading or deceptive.  (See Doc. No. 463 at 41-42; Doc. No. 475 at 5-6).  The script "explicitly describes to the customer how the subscription [would] work" when the telemarketers stated the offer, recited the "no risk subscription disclosure" verbatim and waited for verbal confirmation from the customer.  (Id.)  The telemarketers specifically were prohibited from using words such as "free," "trial," and "trial offer."  (See id. at 17 (quoting Doc. No. 440 at 56:2-14, 58:10-21; Ex.

1191, Ex. 1124).)  And if a telemarketer did not follow the offer or "no risk subscription disclosure" portions of the script, then AFS cancelled the order.  (See id. (quoting Doc. No. 428 at 20:12-16, 42:20-23).)  Moreover, AFS's quality control department was top-grade in making sure telemarketers abided by the script.  (Id. at 27.)  The recordings were reviewed by branch managers and quality control employees.  If they felt that a customer did not understand AFS's offer, it was cancelled.  (Id. at 28 (quoting Doc. No. 427 at 50:15-23; Doc. No. 428 at 42:18-43:3).)

More importantly, two (2) follow up emails were sent to customers with the written version of the subscription.  (Id. at 24 (quoting Doc. No. 427 at 43:4-44:9).)  The instructions in the emails were explicit.  For example, the first confirmation email looked like this:

> As you'll remember from our phone discussion, in addition to access to the rich web resources, you'll receive your first mailed issue in about three weeks.  If you love the value you get from Nonprofit Executive Report, like thousands of other subscribers do, the cost for a full year is only $288.  You can submit payment along with the invoice we mail you, or you can use the personal invoice under the "My Account" tab on the Nonprofit Executive Report website.  If for any reason you don't find the service valuable, simply let us know by marking "cancel" on the invoice, within sixty days and return it to us – no questions asked.  Otherwise your subscriptions will continue uninterrupted.

(Id. at 24-25 (citing Def.'s Trial Ex. No. 121).)  And, as noted earlier, the customer was set up with an account on the publication's webpage which also provided information on how to cancel the subscription.  (Id. at 25 (citing Trial Ex. 132; Doc. No. 427 at 52:9-15).)

AFS made valiant efforts to ensure its telemarketers complied with the script.  There was adequate training of its telemarketers, clear guidelines on what they could and could not say to customers and ample measures in place to make sure they adhered to the script.  Its telemarketers were also required to receive verbal confirmation that the customers understood the offer and terms.  And even if a customer decided to cancel the subscription, AFS had a generous cancellation policy and honored cancellations that extended past the standard sixty (60)-day period.  Therefore,

the FTC had no reasonable basis to believe that AFS regularly departed from its script or that there were inadequate procedures that resulted in AFS misleading its customer base.

### ii.    Review of AFS's Customer Complaints

Second, AFS Defendants aver that the FTC's investigation into AFS's customer complaints was deficient because it did not evaluate the complaints and determine their legitimacy. (Doc. No. 478 at 24.)

In this case, the FTC failed to provide evidence of legitimate customer complaints that supported the notion that AFS was deceiving and misleading its customers. For example, Colin Drummond, AFS's former head of telemarketing testified that based on the number of complaints received by email, only 2-3% were from customers who felt they were misinformed during the sales call. (Doc. No. 463 at 30 (quoting Doc. No. 440 at 32:14-33:14).) As to complaints left by voicemail, of the 500 voicemails chosen by Plaintiffs for review, 61 of them contained complaints, which AFS listened to and responded by canceling the customer's order. (Id. at 30 (quoting Doc. No. 443 at 68:7-23, 69:3-70:23).) As to complaints that were cancelled on the invoice sent to customers and mailed back to AFS, of the 500 invoices reviewed by Defendants' forensic data expert, Margaret Daley, only 2.4% of invoices contained statements that the customer "did not order" or "did not subscribe." (Id. (quoting Doc. No. 451 at 41:24-42:6).)

And the formal complaints filed with the Better Business Bureau ("BBB") fared no better. Between January 5, 2015 and March 31, 2020, the BBB received 671 complaints about AFS's business. (Id. at 31 (citing Trial Ex. 248).) But these complaints represented only .09% of all orders made during that time period. (Id. at 31 (citing Doc. No. 451 at 11:11-21).) Moreover, the testimony at trial, discussed infra, showed that many of these complaints were unreliable. (Id.)

31

In sum, as this Court has already found, "the small number of customer complaints when compared to the number of orders during the relevant time frame do not conclusively prove deceptive conduct." (Id. at 46.) Thus, the complaints were minimal and unreliable, and the FTC failed to take sufficient steps to verify their accuracy.

### iii. FTC's Witnesses Did Not Support its Position

But, most importantly, the large majority of the FTC's witnesses at trial did not support its theory of the case. At trial, the FTC presented twenty-one (21) witnesses in its case-in-chief.[25] Notably, the testimony provided by these witnesses overwhelmingly supported Defendants. While the Court will not recount all the witness testimony, several witnesses who testified against the FTC's position in this case are discussed below.

---

[25] The witnesses were: (1) Lauren Oleckna, Senior Civil Investigator for the Commonwealth of Pennsylvania Office of Attorney General; (2) Colin Drummond, AFS's former director of call center operations and a current employee at SuccessFuel; (3) Amy Luchette, former AFS telemarketer; (4) Kelly Rickard, employee of Clavesvista; (5) Denise Haney, AFS Customer Service Representative; (6) Daniel Dewey, chemist and former customer of AFS; (7) Edward Satell, CEO of AFS; (8) Richard DiOrio, Vice President of International Credit Recover from 2015-2021; (9) Andy Goode, Vice President of the Better Business Bureau in Metro Washington, D.C. and Eastern Pennsylvania; (10) Tara Orischak, former AFS branch manager; (11) Melissa Schwenk, former AFS telemarketer; (12) Robin Biltheiser-Buck, former AFS telemarketing representative and quality manager; (13) Jennifer Rann, former AFS telemarketer and customer service representative; (14) Mike Gorton, AFS's former administrative director; (15) John Vega, senior investigator for the FTC; (16) Kelly Strosnider, former AFS telemarketer, who was not available to testify so a portion of her deposition was read into the record; (17) William Sasso, Esquire, AFS's former attorney who represented them in connection with the investigation initiated by the Commonwealth; (18) Heather Wood, Edward Satell's executive assistant, who also previously worked at AFS as a telemarketer and a member of the quality control department; (19) Harris Devor, forensic accountant; (20) Erik Lioy, Plaintiffs' rebuttal witness; and (21) Sarah Frasch, Chief Deputy Attorney General for the Commonwealth of Pennsylvania.

### A.  Testimony of Colin Drummond

The FTC's second witness, Colin Drummond, Vice President of Business Development and former head of telemarketing for AFS, testified over four days.  (See generally Doc. Nos. 439, 426, 440, 441, 427, 442.)  First, he explained how AFS explicitly trained telemarketers not to use words such as "free," "trial," and "trial offer" when making calls.  (Doc. No. 440 at 58:16- 59:12.)  Rather, as to the phrase "no risk" used in the script, he said:

> No risk is industry terms. Subscription services use it all the time. It just means no money up front. You're not going to have to invest in anything. You're going to be able to cancel it without owing any money. That's all no risk means.

(Doc. No. 426 at 36:25-37:1-3.)

He also testified about AFS's lenient cancellation policy and stated that even if a customer forgot to cancel the subscription after the 60-day deadline, AFS would cancel it at the customer's request.  (Doc. No. 426 at 87:10-13.)  Moreover, he further confirmed that if the customer did not have authority to buy on behalf of their employer, AFS would not process the order.[26]

Drummond also testified in depth about the quality control measures taken by AFS.  For example, if a customer took issue with an order, AFS had a policy of investigating the interaction and reviewing the recorded conversation.  (Doc. No. 426 at 95:6-17.)  He further testified about

---

[26]   For example, Drummond testified:

> Q:  And if a person said, I do not have authority to buy anything on behalf of my employer, AFS would still process that as an order?

> A:  No, that would not be our policy at all.  We would not process that.

(Doc. No. 426 at 22:13-17.)

the role of the branch managers at AFS who kept track of customer complaints.  For example, he

stated:

> [I]f [a customer] was to say, hey, look pal, I have no responsibility for this or
> whatever, you can send it if you want, but I'm telling you I don't have any
> authority, we're not going to process it. It's a waste of our money, and it's a waste
> of the customer's time, too. It has to be a win-win. And so our stringent quality
> control department, if one was to go through or something like that, we had a
> system in place to go ahead and monitor that and—and decline them or pull them
> or what have you. But the branch managers were well trained. They knew if they
> listened to a phone call where that occurred, where somebody goes, listen, I have
> nothing to do with this, I'm not going to be able to pay for this, so on and so forth.
> They would catch that and say to the rep, hey, look, that's not a good order. We're
> not going to put that through.
>
> ***
>
> We tracked the number of e-mail confirmations that came in that would have a
> customer complaining about how they felt misinformed.  We tracked it, and we
> did it by representative, by branch, time.  We checked it every day, and we also
> did cumulative reports to make sure that there wasn't any trends in particular
> branches of having more of these—we called them quality complaints—than
> others.  And they were miniscule too.  They were in the 2 to 3 percentiles.

(Doc. No. 440 at 33:3-14; Doc. No. 426 at 23:8-22.)  And Drummond stated that, even outside of

the typical 2–3-day window of cancellation, a quality control manager would still address the

complaint.  (Id. at 33:20-34:4.)  He also explained that it was not good for AFS to acquire

customers for a "first year acquisition," that is, only obtain that customer for one year and the

customer would not re-new the subscription, because the company lost money from those types of

sales.  (Doc. No. 427 at 28:1-11.)  Therefore, AFS did not seek to push people to purchase products

who were not genuinely interested in the publications.  (Id. at 31:4-8 (". . . [I]t would not be in

our best interest just to willy-nilly sign people up, throw it up against the wall and see if it sticks.

That's why we were so bullish on quality measures and quality control, not only for protection of

the customer because it's the right thing to do, but it's just good business.")

The FTC argues that "Drummond admitted that a consumer could reasonably understand the script's opening line as describing an offer for free, trial samples of a publication." (Doc. No. 481 at 24.)  But this argument takes his testimony out of context.  At trial, FTC's counsel questioned him about the opening remarks a telemarketer would typically make to a potential consumer on a call.  (Doc. No. 426 at 29:9-32:21.)  For example, Drummond was asked about the following language:  "My company publishes a newsletter called Supervisors Legal Update and we are sending out a couple copies for you to look at and then we'll call you back to see how you like it."  (Id.)  Drummond testified that, based solely on that introductory language, a customer may interpret it as a free sample of a newsletter.  (Id.)  But Drummond also testified that the first few seconds of a call are "critical" and dedicated to stating the reason for the call, not to immediately offer a subscription without an explanation.[27]  (Id.)  And, later in the call, the offer

---

[27]  Specifically, Drummond testified:

> Q:  And now at this point, the telemarketer hasn't asked whether the consumer wants these copies or not; is that correct?
>
> A:  No. The purpose of this is just to state the purpose of the call. The first 7 to 10 seconds of the call are very critical. An executive will either listen to you or they'll opt out, you know, just hang up and move on. So it's important for you to state exactly who you are, what's the purpose of your call right out of the gates.
>
> Q:  And so isn't it true that if a person you are selling to figures out that you are marketing something, that they will often just terminate the call?
>
> A:   Some will, yeah.
>
> Q:   So you would want to avoid that; right?
>
> A:  Well, yeah. I mean, if you sell something, you want to create an engagement process where the person is apt to go, okay, I know this guy is selling something, but what he's saying is somewhat interesting or it seems like there's some hope there that might be able to do my job better or whatever. He'll hang

and disclosure statements discuss the terms of the sale. Therefore, Drummond's testimony did not

support the impression, as argued by the FTC, that the script could only be interpreted as a free

trial.

Moreover, as previously noted, Drummond praised the small percentage of complaints

received in comparison to the amount of business Defendants conducted.[28]    Summarily,

Drummond described AFS's business practices as follows:

> . . . [w]e put together operational systems to provide a great service for executives
> for close to 30 years, and we had measurements in everything we did to make sure
> that people don't feel [misled].  And no matter what you do, you're going to have
> people, you know, they are going to complain.  It's just the way it is running a
> business.  That's the way it works.  You can't be all thing[s] to all people all the
> time.
>
> You can dig around, you're going to find some people like this all you want.  All
> I'm saying is we did the best we could.

(Doc. No. 442 at 33:13-34:7.)

---

> in there. But I think any common sense business executive in these first 7 to
> 10 seconds, they're like, okay, this is some guy calling to sell something.

(Doc. No. 426 at 30:10-31:5.)

[28] Notably, Drummond compared the number of complaints AFS received to a company like
Comcast:

> . . . For the amount of volume we did, I thought we did a pretty darn good with
> complaints.  I think the other companies would like that small percentage of
> customer complaints.  I'm sure Comcast would.

(Doc. No. 440 at 29:12-16.)  In this regard, testimony was presented at trial that Comcast had over
12,000 complaints filed against it in 2015 while AFS had 205 complaints filed against it.  (Doc.
No. 430 at 47:8-12.)

**B.   Testimony of Kelly Rickard
and Dr. Daniel Dewey**

Out of the hundreds of customers apparently interviewed, the FTC only had two former AFS customers testify at trial:  Kelly Rickard, a Certified Public Accountant who received a telemarketing call from Progressive Business Solution ("PBP"), i.e., AFS, in 2021, and Dr. Daniel Dewey, a chemist at the Mine Safety and Health Administration Approval and Certification Center.  (Doc. No. 428 at 55; Doc. No. 429.)  Both witnesses submitted written declarations in support of the FTC.

At trial, Rickard testified that, after receiving two invoices from PBP in April and June 2021, she called PBP inquiring about why she received the invoices.  (Id. at 60.)  When PBP told her she signed up for a newsletter, and after PBP sent her another email after that phone call, she emailed PBP asking them to cancel her subscription because she never agreed to a subscription.  (Id. at 62.)  The next day, June 15, 2021, she received a call from Credit Collections Agency demanding that she pay the balance, or it would be sent to collections.  (Id. at 64-65.)  Rickard filed a complaint with the FTC on the same day.  (Id. at 66:2-12.)

One day later, PBP emailed Rickard and notified her that her account was closed, and no balance was due.  (Id. at 67:4-16.)  After speaking with the FTC, Rickard submitted a sworn declaration that she never provided her date of birth on the call nor was she told that she needed to cancel the subscription within a certain amount of time.  (Id. at 75:25-76:8.)  However, while Rickard adamantly maintained that she did not agree to any subscription, she later admitted that, after reviewing the recording of her telephone call with the PBP telemarketer, she did provide her date of birth and that many of her statements in the declaration were inaccurate.  (Id. at 74:15-18.)

She also admitted that she "probably didn't open the [follow-up] email" sent after the telemarketing call. (Id. at 87:6-10.)

Importantly, Rickard testified that she would not have signed the same declaration after hearing the recorded telephone conversation and that the FTC never asked her to sign a new declaration:

> Q: Knowing what you now know and having listened to the audio recording, would you submit the same declaration with the same factual assertions to a Court or a governmental agency as truthful?
>
> A: No.
>
> Q: Did the Federal Trade Commission, in connection with the preparation for your testimony today, ask you to sign a new declaration with corrections made?
>
> A: No.
>
> Q: Did they tell you during the course of your preparations that they were going to submit your old declaration, your original declaration with the factual inaccuracies into evidence in this proceeding?
>
> A: I don't recall.

(Id. at 79:2-19.)

Additionally, Dr. Dewey testified that he received a telemarketing call from PBP on January 30, 2019. (Doc. No. 429 at 7:21-24.) He stated that he told the telemarketer that he did not have authority to order a subscription, and after receiving the confirmation emails and invoices in the mail, he wrote on the invoice that he did not have "authorization to bill" and sent the invoice back. (Id. at 9:22-25, 16:3-9.) He then filed a complaint with the Pennsylvania Attorney General's Office and submitted a declaration in this case that he was offered a "free trial" and that the call did not discuss pricing details or the cancellation policy. (Id. at 27:10-12.)

Notably, neither he nor his company were ever charged or sent to collections. Rather, Dr. Dewey was able to follow the process by which to cancel the subscription, that is, writing and mailing back the invoice to PBP, without issue. (See id. at 36:18-37:7.)

### C. Testimony of Denise Haney

Denise Haney, a devoted employee of AFS for over 21 years, also testified at trial as a FTC witness. (See Doc. Nos. 428, 443.) Haney worked in the customer service department and also trained new telemarketers. She testified about the importance of making sure the customer fully understood the terms of the offer as follows:

> We made sure that the person was scripted which she was telling them it's a subscription with a right of cancellation, telling them they're getting invoiced, telling them how to cancel. A lot of customers would ask questions. So when I get the invoice, what do I have to do? You know, that way—if someone is just yeah, yeah, yeah, yeah, sometimes you can tell they're not listening. And if we heard that a lot of times we wouldn't put that through because we weren't sure that the customer was clear.
>
> Sometimes certain supervisors would call the customer back after the new person and say, hey, I'm doing quality control, it's a new person, we want to make sure you understand. And then we were comfortable putting it through. So we wanted to insure that they understood the offer.

(Doc. No. 443 at 57:20-58:10.) She also testified that when she reviewed recordings, if there was something stated by the telemarketer that she was "uncomfortable with," she would report it to Susan Grabert, head of quality control, who would talk with the telemarketer who made the call. (Id. at 80:8-21.) Additionally, as to the cancellation policy, she stated that AFS allowed customers to cancel within 150 days after the telemarking call, even though the agreed upon term was 60 days, and AFS would not charge customers until after their account was sent to collections. (Id. at 66:9-21.)

Finally, regarding the script, Haney testified:

Q:  Ms. Haney, in all of the years that you were working at AFS, did you have concerns personally about the clarity of the script?

 A:  No.

Q:  In those years working at AFS, did you have concerns about the way in which you or the customer service department treated customers?

A:  No.

(Id. at 87:19-88:1.)

### D.  Testimony of Richard Diorio

Richard Diorio, Vice President of Internal Credit Recovery ("ICR"), and former defendant in this case, also testified at trial.  (Doc. No. 445.)  ICR did debt collection for AFS, its largest client.  (Id. at 5:12-14; 6:7-17.)  ICR received 25% of what it could collect every month from AFS customers who failed to pay their invoices.  (Id. at 7:12-16.)

Diorio testified about the customer time cards ICR kept when contacting AFS customers to collect payment.  These cards identified the name of the customers who placed the order, a phone number, the company's name and the address where the publication invoices were sent, AFS's account number for the subscription, the customers' date of birth which was used to verify the order, and their e-mail addresses.  (Id. at 21:11-18.)  Diorio testified that many of the customers who stated either that they did not want the publication or refused the pay the invoice did not listen to what the AFS telemarketers stated in the sales call and ignored the terms and instructions sent in the later emails.  For example, Diorio testified about one customer, Thomas Krigbaum, who told ICR that he refused to pay the invoice and did not want the publication:

> [H]e did have the opportunity to cancel correctly, number 1. Number 2, if he did not want the publication, he could have simply hung up the phone on the sales representative and said, Have a nice day. He did[] neither.

(Id. at 25:14-18.)

Additionally, when asked whether ICR heard often from customers that they were not authorized to purchase a subscription, he stated:

> I wouldn't say often, but it was heard.
>
> ***
>
> If an employee wasn't authorized, it was our intention that he would know better than to go ahead and place the order. They would go to a supervisor and ask them, May I purchase this.
>
> It would seem logical to us on the back end of the collection, if you were not authorized to order the product, then why would you engage in the sales representative on the telephone. Correct?
>
> ***
>
> Let me clarify once again, that goes back to the other account card where the person indicated they weren't authorized. That doesn't make sense to us. If you were not authorized you would know you're not authorized. As you probably have people in your office who aren't authorized to purchase on behalf of your company, they would know that they're not authorized, I would assume. So when that line of rebuttal comes up, that leads to us believe that all that person had to do was just say I'm not interested, I'm not authorized, I can transfer you to a person who is authorized or I can just hang up the phone and say I'm not interested.

(Id. at 26:10-19; 48:19-49:6.)  FTC counsel went through approximately seven (7) customer cards where ICR received feedback that the customer either did not purchase a product or was not authorized to purchase a product.  Notably, none of these witnesses testified at trial except for Kelly Rickard.  Diorio also supported AFS's position that AFS never offered customers a free trial and that it always emailed customers with all the terms and conditions of the subscriptions.  (Id. at 56:5-19.)

And, most importantly, Diorio testified that the percentage of complaints received compared to the total number of accounts AFS had from 2015 to 2018 was "extremely, extremely low."  (Id. at 86:21-24.)   Specifically, approximately 80,000 accounts were opened during that time and the number of complaints relative to those accounts was .269 percent.  (Id. at 87:12-18.)

41

And the number of complaints submitted to the Attorney General's Office was "far smaller" than that percentage.  (Id. at 88:3-6.)

### E.  Testimony of Andy Goode

Additionally, the FTC called Andy Goode, Vice President of the Better Business Bureau ("BBB") for Metro Washington, D.C. and Eastern Pennsylvania, to testify.  (See Doc. No. 430.) He stated that in 1998, the BBB added language to AFS's business profile regarding complaints from customers about issues regarding subscriptions.  (Id. at 10:15-11:1.)  However, Goode stated that the BBB does not investigate a customer's specific allegations nor make factual determinations about whether a customer's complaint was valid or reliable.  (Id. at 27:21-24; 28:16-19.)  Moreover, as noted in the Court's Opinion entering Judgment in favor of AFS Defendants, not all BBB complaints were direct evidence of wrongdoing, but rather "sometimes there's just a difference of opinion or consumer disputes" and that the BBB "often see[s] cases that don't rise to a level of violation of laws."  (Id. at 29:10-17.)

Goode also acknowledged that AFS had a steady decrease in the number of complaints made to the BBB from 2015 to 2020.  For example, he testified that AFS had 205 complaints in 2015, then 128 complaints in 2016, then 82 complaints in 2018, then 68 complaints in 2019, and 2 complaints in 2022.[29]  (Id. at 47:2-49:18.)  And, most notably, compared to the complaints received from companies like Comcast, which had over 12,000 complaints in 2015, AFS's number of complaints was relatively small.

---

[29]  Again, it should be noted that during the relevant time period, AFS had 218,749 orders in 2015, 187,708 orders in 2016, 138,878 orders in 2017, 92,500 orders in 2018, 70,053 orders in 2019, 41,144 orders in 2020 and 16,908 orders in 2021.  (Trial Ex. 334.)  The number of orders dropped over the years because of the decline in the print publication business.

**F.  Testimony of John Vega**

John Vega, a senior investigator at the FTC, also testified on behalf of Plaintiffs.  (Doc. No. 448 at 106.)  He was assigned to investigate AFS in August 2018.  (Id. at 108:1-8.)  He testified about the FTC's internal database called Consumer Sentinel, which maintained complaints that came from various law enforcement agencies, the Better Business Bureau and from customers who reported directly to the FTC.  (Id. at 119:14-25.)  Specifically, Vega testified about various summary charts he created in connection with the number of orders AFS received that were either canceled or paid.

The charts, however, were unconvincing and did not take into account the total number of orders placed during the investigated time period.  For example, at trial the FTC asked Vega about Exhibit 1204, a pie chart he created for orders that were either paid or canceled in October 2016.  (Id. at 128:12-23; see also Tr. Ex. 1204.)  The FTC presented this chart to showcase that in October 2016, out of the 18,650 orders placed, only 13% of AFS customers paid for the order while 87% of the orders were canceled.  (Id. at 130:2-139:12.)  But, as pointed out by Defendants on cross-examination, no analysis was performed by the FTC to determine whether the October 2016 data was materially the same for other months during the relevant time period.  (Id. at 146:11-24.)  Moreover, Vega could not testify as to the total number of orders placed and the total amount of complaints received, nor did the FTC create consumer surveys.  (Id. at 145:9-146:1.)  This witness was a lame attempt to summarize unsuccessful orders without considering the total number of orders and complaints received.  And the charts also failed to categorize the types of complaints made and instead posited to portray a lump sum of complaints without any sort of organization or process behind it.

### G. Testimony of Amy Luchette

In the Court's view, the only witness that supported the FTC's position in this case was Amy Luchette, a former sales representative/telemarketer and manager for AFS/PBP. (See generally Doc. No. 428.) Luchette testified that she felt AFS's business practices were "not clear" and "deceptive." (Id. at 36:23-37:2.) Regarding the script, she opined that she felt it was written "in a way to overload people with a lot of information as quickly as possible. To kind of toe the line to make sure that it's okay . . . basically trying to get people sort of off guard or not fully present in the conversation." (Id. 30:24-31:3.) But, even considering this testimony, she ultimately confirmed that AFS made tremendous efforts to have its telemarketers to follow the script:

> Q:  Did PBP instruct you as to how closely you should follow the pub or executive script?
>
> A:  Yes. The bottom half of the script, which they called the disclosure paragraph, specifically had to be read word for word. We were told that it was specifically written up by a legal team and that no matter what, every word, word for word, had to be said in that order.
>
> Q:  And so with regard to the offer and disclosure paragraphs, to what extent were you allowed to deviate from the script?
>
> A:  The offer paragraph, we maybe might have had a little more wiggle room. But basically, both of those last two paragraphs were supposed to be read word for word.
>
> ***
>
> A:  And the last two paragraphs did need to be read word for word. And then as long as I felt that the customer was agreeing and not objecting to any part of it, then it was a solid sale.

(Doc. No. 428 at 20:5-16; 30:6-9.)  And, as previously noted, Luchette testified that even if she was "a little bit questionable" about whether the customer understood the terms of the offer, she

would tell the telemarketer to "actually call back and make sure." (Doc. No. 463 at 25 n.47 (quoting Doc. No. 428 at 50:18-51:25).)

The inability of the FTC to present more AFS customers or employees like Luchette to testify at trial was palpable. Instead, the FTC called thirteen (13) witnesses who either worked for or directly with AFS. These witnesses testified to the stringent quality control measures that were in place to ensure that customers understood the terms of the subscriptions. They also attested to the generous cancellation policy that would allow for customers to cancel well past the 60-day window for cancellation. Additionally, the FTC did not retain an expert witness to show how reasonable consumers would interpret the telemarketing script. Simply put, the evidence presented by the Government in this case expressly refuted its allegation that the was deceptive. And "[w]hen testimony presented at trial by the Government's own witnesses contradicts the Government's contentions, courts have not hesitated to find that the Government's position was not substantially justified." Greenhill v. United States, 96 Fed. Cl. 771, 777 (2011) (citing cases).

### iv.    AFS's "Rebrand" as SuccessFuel

Alternatively, the FTC argues that AFS's new company, SuccessFuel, was created as a result of negative online reviews that damaged its reputation. (Doc. No. 481 at 20-21.) But, as noted, AFS suffered from the decline in the print publication business for over a decade. In September 2021, AFS officially stopped outbound telemarketing sales of its newsletters and reference guides and created SuccessFuel, which focused on lead generation, online workshops and webinars. (Doc. No. 433 at 58:16-18.) Additionally, Colin Drummond testified to the following regarding the creation of SuccessFuel:

Q:    Was one part of the strategy to rebrand the company as SuccesFuel in order
       to escape the negative online reputation of PBP?

45

A:   The rebranding of [SuccesFuel] was primarily because we were building a brand-new enterprise.  We were going in a completely different direction from publications.  And so therefore Progressive Business Publications didn't fit what we did anymore so it didn't make any sense.

(Doc. No. 441 at 15:12-20.)  While he also admitted that part of this rebrand "certainly wouldn't hurt" and made "good business sense" to distance itself from PBP, the primary motivation in creating SuccessFuel was to modernize by creating an electronic platform.  (Id. at 17:5-8.)

> **v.    FTC's Averment Regarding the Court's Rulings on Defendants' Motion to Dismiss, Motion for Judgment on the Pleadings, Motion for Summary Judgment and Other Discovery Findings is Insufficient to Prove Substantial Justification**

The FTC also contends that because the Court denied Defendants' Motion to Dismiss, Motion for Judgment on the Pleadings, Motion for Summary Judgment and granted various discovery related issues in favor of the FTC, these rulings are sufficient evidence to establish substantial justification.  (See generally Doc. No. 481 at 13-14, 22-23.)

As noted above, the Court must take into consideration the entirety of the Government's case when making a substantial justification determination.  Morgan, 142 F.3d at 685.  But while prior rulings of the Court should be considered, they are ultimately not dispositive.  See United States v. Pecore, 664 F.3d 1125 (7th Cir. 2011) (finding that just because the government's complaint survived a motion to dismiss and motion for summary judgment is "not necessarily conclusive" to show substantial justification); Int'l Custom Prods., Inc. v. United States, 843 F.3d 1355 (Fed. Cir. 2016) ("[A]voiding summary judgment does not necessarily mean that the position taken at that stage has a reasonable basis in law and fact.")

Thus, that the Court denied Defendants' Motion to Dismiss, Motion for Judgment on the Pleadings and Motion for Summary Judgment is relevant, but not conclusory.  At the motion to

dismiss and motion for judgment on the pleadings stage, the Court is required to review the facts alleged in the complaint in a light most favorable to the plaintiff. A complaint, however, is not evidence, just a pleading. And at the motion for summary judgment stage, while more facts are available to the Court, the standard nevertheless remains that the facts must be viewed in a light most favorable to the plaintiff. Much more evidence and facts, however, are adduced at trial.

For example, in the Order denying Defendants' Motion for Judgment on the Pleadings, the Court found that the First Amended Complaint adequately alleged "existing or impending" violations of the FTC Act by Defendants in the selling and collection of payment for the subscriptions. (See Doc. No. 108.) But, as noted above, much of the evidence and testimony elicited at trial expressly refuted its allegation that the script was deceptive and that Defendants violated Section 5(a) of the FTC Act and the UMS.

The FTC relies in part on United States v. Thouvenot, Wade & Moerschen, Inc., 596 F.3d 378 (7th Cir. 2010) and argues that because the Court denied Defendant's Motions to Dismiss and Summary Judgment, there is a presumption that it was substantially justified to bring this case. (Doc. No. 481 at 13.) But in Thouvenot, the Seventh Circuit found that the district judge awarded fees "solely because the jury's verdict was adverse to the government" and failed to take into consideration the prior rulings. Thouvenot, 596 F.3d at 382. Notably, it also held:

> Of course something might emerge at trial that showed that the government really had no case at all. Or the district judge might on reflection decide that he had erred grievously in refusing to grant the defendant's motion to dismiss or motion for summary judgment.

Id. This admonition rings true here. At trial, it became overwhelmingly apparent that the FTC could not support its claims of deception with adequate witness testimony or other relevant evidence, and on reflection the case should not have been allowed to proceed.

In sum, upon extensive review of this case, including the FTC's initial investigation into Defendants' business practices, the pre-trial motions, discovery issues and other related matters, the oversight of a fourteen-day bench trial with dozens of witnesses and thousands of exhibits, the post-trial findings of fact and conclusions of law (Doc. No. 463), and the denial of the FTC's Motion to Amend or Alter Judgment (Doc. No. 475), the Court finds that the FTC has not established a reasonable basis in fact to show that its position was substantially justified.

### b.  FTC Did Not Have a Reasonable Basis in Law

Next, the Court must decide whether the FTC had a reasonable basis in law for the theory it propounded.  Morgan, 142 F.3d at 684.  AFS argues that the FTC's legal position was unjustified because it failed to follow its longstanding precedent in an implied net impression case, that is, the FTC was required to "prove with extrinsic evidence that a 'significant minority' of reasonable customers would likely be misled by the Script."  (Id. at 29 (quoting Doc. No. 463 at 41-42).) Rather, the FTC submitted a bench memo during trial denying the need for extrinsic evidence and rejecting the "significant minority" test.  (Id. at 30; see also Doc. No. 408.)  The FTC counters that it followed Third Circuit precedent for deceptive marketing claims established in Beneficial Corp. v. FTC, 542 F.2d 611 (3d Cir. 1976) and American Home Products Corp. v. FTC, 695 F.2d 681 (3d Cir. 1987).  (Doc. No. 481 at 27.)  These cases are discussed in detail, infra.

"[A] legal position is substantially justified if it relates to an unsettled or close question of law, but not if it offends established precedent."  Hanover Potato Prods., Inc. v. Shalala, 989 F.2d 123, 130 (3d Cir. 1993) (quoting Russell v. Heckler, 814 F.2d 148, 153 (3d Cir.1987), remanded for reconsideration, result reinstated, 866 F.2d 638 (3d Cir.1989)).

The Court has already analyzed in prior Opinions the applicable law in this case for deceptive practices claims brought by the FTC.  (See Doc. Nos. 463, 475.)  However, for

completeness, a brief review of the prior legal findings is discussed below as well as further analysis as to why the FTC's legal position in this case was not substantially justified.

### i.   Legal Findings in the Opinion Entering Judgment in Favor of AFS Defendants

In two Counts, the Amended Complaint alleged that AFS Defendants committed "deceptive acts of practices," in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1)[30] (Counts I and II), and in one count a violation of the Unordered Merchandise Statute ("UMS"), 39 U.S.C. § 3009[31] (Count IV).  (See Doc. No. 43 at 14-16.)

In the Opinion entering Judgment in favor of Defendants, the Court found that to prove a violation of the FTC Act, a plaintiff must establish:  "(1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material."  (See Doc. No. 463 at 38 (citing F.T.C. v. Click4Support, LLC, No. 15-5777, 2015 WL 7067760, at *4 (E.D. Pa. Nov. 10, 2015))).

---

[30]   As noted previously, 15 U.S.C. § 45(a)(1), the FTC violation, states in pertinent part:

> (2) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

[31]   29 U.S.C. 3009 states in relevant part:

> (b). . . the mailing of un-ordered merchandise or of communications prohibited by subsection (c) of this section constitutes an unfair method of competition and an unfair trade practice in violation of section 45(a)(1) of title 15.
>
> . . .
>
> (d) For the purposes of this section, "un-ordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

As previously held, the FTC failed to prove the second element, that the representation was likely to mislead consumers acting reasonably under the circumstances.  (See id. at 38-39.)  The Court noted that, in a net impression case, the FTC had the burden of establishing that the "overall net impression" of the representation was likely to mislead reasonable customers.  (Id. (quoting F.T.C. v. DIRECTV, Inc., No. 15-01129, 2018 WL 3911196, at *5 (N.D. Cal. Aug. 16, 2018).)  The Court, following precedent in FTC cases, conducted the two-step inquiry for "net impression" cases:

> First, the court will make a facial evaluation to determine if the alleged "net impression" is conveyed by the representation. Id. at 290 (citing Novartis, 127 F.T.C. at 680; Stouffer, 118 F.T.C. at 798). Second, if it is unclear from the facial evaluation whether the alleged "net impression" would mislead reasonable consumers, the court can then look to "extrinsic evidence" for evidence that reasonable consumers were deceived. Id. at 290-92 (citing Novartis, 127 F.T.C. at 680).

(Id. at 40.)

A facial evaluation of the script convinced the Court that the FTC had not proven by a preponderance of the evidence that the telemarketing script was misleading to a reasonable customer.  (Id. at 41-43 ("No reasonable employee with purchasing power of a business or organization would hear this information and believe, as Plaintiffs suggest, that they are receiving free newsletters into perpetuity."))

Next, the Court found that the extrinsic evidence, notably the consumer complaints and testimony of Kelly Rickard and Dr. Daniel Dewey, the only customers who testified at trial that received the telemarketing calls, did not support the FTC's position and was insufficient to prove a "net impression" case.  (Id. at 43-45.)  It also determined that "Plaintiffs did not reliably prove that a reasonable consumer or even a 'significant minority' of reasonable consumers were deceived by Defendants' telemarketing calls."  (Id. at 46.)

50

Second, regarding the UMS claim, the FTC argued that the Center for Education and Employment Law ("CEEL") books were mailed to customers without their consent. (Doc. No. 43 at 17.) But the Court found that, based on what was stated in the scripts, Defendants did in fact receive consent from the customer before sending out the newsletters and books. (Doc. No. 463 at 50-52.)

### ii. Legal Findings in Opinion Denying FTC's Motion to Alter or Amend Judgment

Thereafter, the FTC filed a Motion to Alter or Amendment Judgment, asserting four (4) reasons to do so: (1) "The Opinion applies a perpetual-giving theory of consumer understanding, which lacks the persuasiveness and universality of the FTC's actual theory"; (2) "the Opinion overlooked the FTC's alternative statement of its claim, which contests the adequacy of the script's disclosures"; (3) "AFS's telemarketing script, when analyzed for adequacy of disclosure and through the prism of a two-sample trial, has a deceptive net impression"; and (4) "[t]he Opinion overlooks the FTC's argument about the unlawful process AFS used to market updates to its CEEL books." (Doc. No. 466-1 at 1-19.)

The Court analogized the FTC's Motion as its attempt to take a "second bite at the apple" and readily found its averments meritless. (Doc. No. 475 at 5.) For example, it explained how it considered, and rejected, the FTC's "two free, trial sample" proposed net-impression argument (id. at 5-6), its argument that AFS failed to "adequately disclose" material terms as alleged in Count II of the Amended Complaint (id. at 7), its argument that the script had a deceptive "net impression" through the prism of a two-sample trial (id. at 7-8), and its argument that the CEEL renewal process violated the UMS (id. at 9-11). Notably, this Court found that "[the FTC was] improperly asking the Court to rethink what it has already thought through." (Id. at 9.)

51

### iii.    FTC Abandoned Third Circuit Precedent

The FTC argues that "no extrinsic evidence [was] necessary to conclude that AFS's scripts easily lend themselves to a reading that the company was offering consumers free samples of its publications." (Doc. No. 408 at 4.) It relies on <u>Beneficial Corporation v. FTC</u>, 542 F.2d 611 (3d Cir. 1976), and <u>American Home Products Corporation v. FTC</u>, 695 F.2d 681 (3d Cir. 1987), in support of its position. (Doc. No. 481 at 27-28.)

In <u>Beneficial Corp.</u>, the FTC alleged that Plaintiff's loan service was false and misleading. 542 F.2d at 613-14. The Third Circuit held the following as it relates to deceptive practices under Section 5 of the FTC Act (15 U.S.C. § 45(a)):

> The law is clear that properly interpreted, the statute requires review by the substantial evidence in the record as a whole standard. The parties agree that the tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context. An intent to deceive is not an element of a deceptive advertising charge under [Section] 5. Moreover, the FTC has been sustained in finding that advertising is misleading even absent evidence of that actual effect on customers; the likelihood or propensity of deception is the criterion by which advertising is measured. Whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law. <u>Cf.</u> <u>FTC v. Colgate-Palmolive Co.</u>, 380 U.S. 374, 385, 80 S.Ct. 155 (1965).

<u>Id.</u> at 616-17.

Next, <u>Am. Home Prods. Corp. v. F.T.C.</u> similarly held that "the tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." 695 F.2d 681, 687 (3d Cir. 1982) (quoting <u>Beneficial</u>, 542 F.2d at 617). It further held that while the FTC "lacked direct evidence that consumers were in fact misled . . . the Commission need not buttress its findings that an advertisement has the inherent capacity to deceive with evidence of actual deception." <u>Id.</u>

Applying the standards set forth in <u>Beneficial</u> and <u>Am. Hom Prods. Corp.</u>, the FTC failed to follow these precedents.  For example, while it challenged other specific sections of the scripts, it repeatedly harped on the words "no risk" in the script and argued that the opening remarks between a telemarketer and potential customer failed to state that it was a sales call.  This argument inherently goes against <u>Beneficial Corp.</u>, which held that the alleged deception "must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context," which it did here.  <u>Beneficial Corp.</u>, 542 F.2d at 616.  Rather, when analyzing the script as a whole, including the introduction, the explanation of service, and the offer and disclosure paragraphs, a reasonable business or organization would understand the terms of the offer and that Defendants were selling a subscription service.  Thus, there was no deception in the sales offer.

### iv.    FTC Abandoned its Own Precedent of Providing Extrinsic Evidence in an Implied Net Impression Case

The FTC has established its own regulations when bringing deception cases under the Federal Trade Commission Act ("FTC Act").  In 1983, the FTC published a Policy Statement on Deception that outlines the standards for such cases.  <u>FTC Statement on Deception</u>, 103 F.T.C. 174, 175 (1984) (appended to <u>Cliffdale Assocs., Inc.</u>, 103 F.T.C. 110, 174 (1984)) ("the Policy").  Specifically, the Policy distinguishes between express and implied claims of deception:

> [T]he Commission must find that a representation, omission, or practice occurred. In cases of express claims, the representation itself establishes the meaning. In cases of implied claims, the Commission will often be able to determine meaning through an examination of the representation itself, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction. In other situations, the Commission will require extrinsic evidence that reasonable consumers reach the implied claims. In all instances, the Commission will carefully consider any extrinsic evidence that is introduced.

<u>Id.</u>

In the Matter of Novartis Corp., the Commission described what types of extrinsic evidence it may look to in order to determine whether deception has occurred:

> In cases where the claim is not manifest from an examination of the ad, the Commission will look to extrinsic evidence, Id. at 799; Kraft Inc, 114 FTC at 121; Thompson Med. Co., 104 FTC at 789. Such evidence might include, for example, the testimony of expert witnesses, market research studies regarding consumer reactions to the use of certain common terms, or consumer surveys. Kraft, Inc., 114 FTC at 121-22. The Commission will carefully assess the quality and reliability of any extrinsic evidence introduced by the parties. Stouffer, 118 FTC at 799; Deception Statement, 103 FTC at 176. While methodological perfection is not required, with regard to reliance on copy tests and other consumer surveys, flaws in methodology may affect the weight the Commission gives to such results. Id.

127 F.T.C. 580, 680 (1999).

"[The FTC's] practice is to view the ad first and, if it is unable on its own to determine with confidence what claims are conveyed in a challenged ad, to turn to extrinsic evidence." Kraft, Inc. v. F.T.C., 970 F.2d 311, 318 (7th Cir. 1992) (citing the Policy). It has followed this precedent of providing extrinsic evidence in many recent cases. See In the Matter of Intuit Inc., A Corp., Resp., No. 9408, 2023 WL 5970801, at *85 (F.T.C. Sept. 6, 2023) (describing extrinsic evidence as "reliable results from methodologically sound consumer surveys" and finding the FTC presented market research, a consumer perception survey by an expert witness, consumer testimony and other sufficient extrinsic evidence); FTC v. Fleetcor Techs., Inc., 620 F. Supp. 3d 1268, 1279, 1315-1317 (N.D. Ga. 2022) (holding that although extrinsic evidence was not required, the FTC presented "a swatch of 'highly probative' evidence of actual deception," including the defendant's internal customer surveys, concrete customer complaints, and an expert to survey the customer complaints, to prove deception); ECM BioFilms, Inc. v. F.T.C., 851 F.3d 599, 611 (6th Cir. 2017) (concluding that the FTC's reliance on two consumer surveys was a "valid form of extrinsic evidence"); In re Stouffer Foods Corp., 118 F.T.C. 746, 777 (1994) (requiring

54

that "if the implied claims may not be determined with confidence from the face of the ad, extrinsic evidence must be examined, including consumer surveys and expert testimony"); see also F.T.C. v. DIRECTV, Inc., 15-cv-01129, 2018 WL 3911196, at *5-6 (N.D. Cal. Aug. 16, 2018) (finding that under Section 5(a) of the FTC Act, the court must "consider[] the face of the advertisement, and may also consider extrinsic evidence" but ultimately holding that "neither a facial review of the[] advertisements nor the FTC's extrinsic evidence established that the[] materials [we]re likely to mislead a reasonable consumer").

Extrinsic evidence is not an absolute requirement. See Fanning v. F.T.C., 821 F.3d 164, 170-71 (1st Cir. 2016) ("Although the Commission may look at extrinsic evidence of consumer perceptions to guide its interpretation, this is not required."); Kraft, Inc., 970 F.2d at 320 ("[W]hen confronted with claims that are implied, yet conspicuous, extrinsic evidence is unnecessary because common sense and administrative experience provide the Commission with adequate tools to make its findings.") But, "[a]t the same time, evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead." Beneficial Corp., 542 F.2d at 616-17.

Here, the FTC only argued that the impression made by the scripts on their face was misleading.[32] When the Court found that there was no facial deception, it then examined whether there was extrinsic evidence to support implied deception, which, again, there was none:

---

[32] For example, in the trial brief submitted by the FTC, it argued the following:

> By contrast, when the conveyed claim is apparent on the face of the representation, no extrinsic evidence is needed to deduce the reasonableness of its reading. See In re Stouffer Foods Corp., 118 FTC 746, 798–800 (1994) ("If, after [] examining the interaction of all the different elements in the ad, the Commission can conclude with confidence that an ad can reasonably be read to contain a particular claim, a

> Second, if it is unclear from the facial evaluation whether the alleged "net impression" would mislead reasonable consumers, the court <u>can</u> then look to "extrinsic evidence" for evidence that reasonable consumers were deceived. <u>Id.</u> at 290-92 (citing <u>Novartis</u>, 127 F.T.C. at 680).

(Doc. No. 463 at 40) (emphasis added).

Again, reviewing the script on its face, there was no deception. And again, it is evident that the FTC misread the script with a bias to justify its position. But when it learned from its witnesses what "no risk" really meant in the telemarketing industry and the prohibition on using words like "free" or "free trial" and what it learned about the other components of the script, it was apparent that extrinsic evidence was required in this case. An expert witness or consumer survey to justify the net impression was never offered.[33]  Based on the evidence adduced at trial, it is inexplicable why no such evidence was presented when it was required beyond peradventure from a facial evaluation of the scripts. And considering the amount of discovery exchanged, including thousands of recorded calls, the FTC presented only the testimony of two customers at trial to testify about their perceptions of the scripts. As noted above, their testimony hardly supported the FTC's theory of deception.

---

> facial analysis is sufficient basis to conclude that the ad conveys the claim."). Here, no extrinsic evidence is necessary to conclude that AFS's scripts easily lend themselves to a reading that the company was offering consumers free samples of its publications.

(Doc. No. 408 at 4.)

[33]  As noted, the only expert witness the FTC presented at trial was Erik C. Lioy, a rebuttal witness to Defendants' expert witness, Harris L. Devor. (<u>See</u> Doc. No. 356 at 17.) Both witnesses are certified public accountants who reviewed AFS's records as well as conducted research on the trends in the publication business during the relevant time period. Lioy did not conduct market research on the interpretation of the script by a consumer.

Lastly, and most importantly, the FTC previously argued that the "significant minority" test did not apply here.  Rather, it argued that Plaintiffs "need only demonstrate a reasonable consumer, not a majority or even a substantial number of consumers, would be [misled] by the advertisements."  (Doc. No. 459 at 94.)  And the Court already addressed this averment and held that:

> Regardless, of whether the standard only requires one reasonable consumer to be misled, or a substantial or significant number of consumers to be misled, or every reasonable consumer to be misled, Plaintiffs have not proven by a preponderance of the evidence that such persons were misled by the script.

(Doc. No. 463 at 46 n.74.)[34]

For all these reasons, the FTC has not satisfied its burden of establishing that its position in this case was "substantially justified" in reasonable law or fact.[35]  Therefore, Defendants are eligible to recover reasonable attorneys' fees and other expenses under the EAJA.[36]

---

[34]  AFS also argues that the FTC was not substantially justified in seeking injunctive relief.  (Doc. No. 478 at 31.)  But because the Court never decided whether to impose an injunction, it need not analyze whether this this position was substantially justified.  See Hardisty v. Astrue, 592 F.3d 1072, 1077 (9th Cir. 2010) ("Section 2412(d)(1)(A) provides no indication that attorneys' fees should be awarded with respect to positions of the United States challenged by the claimant but unaddressed by the reviewing court.")

[35]  Because the Court finds that the FTC had no reasonable basis in law or fact, it need not discuss the third element:  whether there is "a reasonable connection between the facts alleged and the legal theory advanced."  Morgan, 142 F.3d at 684 (citing Hanover Potato Products, 989 F.2d at 128).

[36]  The third element in Jean, discussed supra, that no other "special circumstances make an award unjust," has not been raised by the FTC other than the issue of multiple prevailing parties.  Jean, 496 U.S. at 158.  Because the Court resolved that issue and does not recognize any other special circumstances in this case, it need not address the element further.

C.      Attorneys' Fees and Expenses

Because AFS is a prevailing party and the FTC has not proved that its position was substantially justified, the next step is to determine what fees and other expenses AFS is entitled to.[37]  Under the EAJA:

> "[F]ees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)

28 U.S.C. § 2412(d)(2)(A).  The eligible party must provide "the amount sought, including an itemized statement from any attorney or expert witness representing or appearing on behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed."  28 U.S.C. § 2412(d)(1)(B).  A district court has substantial discretion in awarding fees under the EAJA.  Jean, 496 U.S. at 161.

However, AFS has not provided the information required under the EAJA to support its requests for reimbursement.  AFS will have fourteen (14) days from the date of this Opinion to

---

[37]  Defendants' Motion for Fees and Expenses is timely under the EAJA.  As described in the statute, a prevailing party has thirty (30) days from date of final judgment in the case to submit an application for fees and other expenses.  28 U.S.C. § 2412(d)(1)(B).  "Final judgment" is defined in the EAJA as "a judgment that is final and not appealable, and includes an order of settlement." § 2412(2)(G).  The FTC had sixty (60) days from the date of judgment in this case, June 11, 2024, to file an appeal.  Fed. R. App. Pro. 4(B).  The time to file an appeal expired on August 10, 2024. AFS Defendants filed this Motion less than thirty (30) days from the date of final judgment on September 3, 2024.

provide supplemental information outlined below to support its request for attorneys' fees and expenses.

### 1.  Attorneys' Fees

AFS seeks $4,463,628.93 for attorneys' fees.  (Doc. No. 478 at 34.)  Its fee request consists of three categories:  (a) a request for an increase in the statutory fee rate based on the cost-of-living adjustment, (b) a request for an increase in the statutory fee rate based on the special factors provision, and (c) a request to determine what fees are reasonable under the EAJA.  Each will be discussed in turn.

### a.  AFS is Entitled to an Increase in the Statutory Fee Rate Based on the Cost-of-Living Adjustment

First, AFS seeks an increase in the statutory fee rate of $125 per hour to $252.52 per hour based on a cost-of-living adjustment.  (Doc. No. 478 at 36.)  AFS calculated this increase based on the Consumer Price Index published by the Bureau of Labor Statistics, which determined that $125 per hour in March 1996, the year the statutory cap was set to $125 per hour, "has the same buying power" as $252.52 per hour in July 2024.  (Doc. No. 478-9, Ex. G.)  The FTC has not objected to this adjusted fee cap.  (See Doc. No. 481 at 38.)

The Third Circuit has "expressly ruled that the Consumer Price Index may be used in determining cost of living adjustments under the EAJA."  See Garcia v. Schweiker, 829 F.2d 396, 401 (3d Cir. 1987) (quoting Nat. Res. Def. Council, Inc. v. U.S. E.P.A., 703 F.2d 700, 713 (3d Cir. 1983)); see also Moyer, 2025 WL 221802, at *2 (finding an increase to $252.50 per hour in January 2025 appropriate).

Therefore, AFS is entitled to the cost-of-living increase at the rate of $252.52 per hour for attorneys' fees.

### b. AFS Not Entitled to an Increase in the
### Statutory Rate Based on Special Factors

Second, AFS contends that a further enhanced fee is warranted for three (3) of its attorneys due to the "special factors" provision. (Doc. No. 478 at 36-40.) As noted above, under the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines . . . a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii).

In <u>Pierce</u>, the Supreme Court explained the "special factor" exception as follows:

> We do not think Congress meant that if the rates for all lawyers in the relevant city—or even in the entire country—come to exceed $[125] per hour (adjusted for inflation), then that market-minimum rate will govern instead of the statutory cap. To the contrary, the "special factor" formulation suggests Congress thought that $[125] an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be. If that is to be so, the exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation.

<u>Pierce</u>, 487 U.S. at 572.[38]  The Court also found that "broad and general applications" for an enhanced fee cannot be deemed special factors. <u>Id.</u> at 573.  Examples of specialized practices that could warrant a fee in excess of the statutory cap include patent and foreign law. <u>Id.</u>

AFS maintains that three attorneys, Ilana H. Einsenstein, Esquire, Paul Saint-Antoine, Esquire, and David H. Marion, Esquire, qualify for higher adjusted rates. (Doc. No. 478 at 36.) The FTC counters that the reasons provided by AFS do not warrant an increased fee rate. (Doc. No. 481 at 38-42.)  Relevant information on each attorney will be discussed next.

_____

[38]  The statutory fee cap was raised from $75 per hour to $125 per hour in 1996.

### i.      Ilana H. Einsenstein, Esquire

AFS argues that Ilana H. Einsenstein, Esquire, an attorney at DLA Piper LLP, is eligible for an enhanced fee for several reasons:  (1) she is "widely recognized as among the most elite and skilled litigators in both Philadelphia and nationally"; (2) she possesses a "specialized skill in litigating against the government," and has knowledge of the FTC Act; (3) she spent twelve years as an Assistant United States Attorney as well as an Assistant to the Solicitor General, which highlights her experience in representing the federal government; (4) her practice is focused on "defending and pursuing actions against government-enforcement entities;" and (5) she is recognized as a top litigator by *Chambers USA*.  (Id. at 37-38.)  Because of these factors, AFS believes that Ms. Einsenstein is entitled to an increased fee award at $950 per hour, which it also maintains is well-below market value and the standard rate for partners at Am Law 100 firms.  (Id. at 40.)

### ii.      Paul Saint-Antoine, Esquire

AFS next argues that Paul Saint-Antoine, Esquire, a partner at Faegre, Drinker, Biddle & Reath LLP, should also be eligible for a fee award in excess of the statutory cap.  (Id. at 37.)  It contends that Mr. Saint-Antoine co-leads the firm's antitrust practice and has more than thirty (30) years' experience defending companies under federal antitrust statutes.  (Id.)  It also claims that he has knowledge of the FTC Act and has been recognized by *Chambers USA* for his antitrust litigation expertise since 2003.  (Id. at 38.)  AFS seeks attorneys' fees for Mr. Saint-Antoine at a rate of $773.50 per hour.

### iii.      David H. Marion, Esquire

Lastly, AFS asserts that David H. Marion, Esquire, a partner at White and Williams LLP, is entitled to an enhanced fee.  (Id. at 39.)  His accolades begin in law school where he was the

Editor-in-Chief of the Law Review at University of Pennsylvania Law School.  (Id.)  Mr. Marion

was a former law clerk for the Honorable Abraham L. Friedman in the Eastern District of

Pennsylvania.  (Id.)  Additionally, he served as Chancellor of the Philadelphia Bar Association,

President of the Lawyers Club of Philadelphia and has also been appointed as a special master.

(Id.)  AFS avers that Mr. Marion has substantive knowledge on First Amendment issues and has

argued before the United States Supreme Court in a case involving the protection of news media.

(Id. at 39-40.)  AFS seeks attorneys' fees for Mr. Marion at a rate of $650 per hour.

There is little doubt that Ms. Einsenstein, Esquire, Mr. Saint-Antoine, Esquire, and Mr.

Marion, Esquire, have impressive credentials and are exceptionally qualified attorneys.  Their

efforts in this litigation were noteworthy and contributed to the successful resolution of this case

on behalf of AFS.  However, these attributes and their experience are not special factors that justify

a higher hourly fee than the hourly statutory fee plus a cost-of-living adjustment that may be

awarded under the EAJA.  See Pierce, 487 U.S. at 573 (stating that special factors do not include

the "'novelty and difficulty of issues,' 'the undesirability of the case,' [or] 'the work and ability of

counsel'"); In re Sealed Case 00-5116, 254 F.3d 233, 236 (D.C. Cir. 2001) (finding that no special

factors existed because the attorneys specialized in federal election law and had experience with

federal litigation); Patel v. Att'y Gen. of the U.S., 426 F. App'x 116, 119 (3d Cir. 2011) (holding

that, although the attorney was an "experienced attorney who specialize[d] in immigration, and the

case did involve issues beyond straightforward application of established standards, the 'novelty

and difficulty' of the issues involved and the 'work and ability of counsel' d[id] not justify piercing

the statutory ceiling"); Johnson v. Gonzales, 416 F.3d 205, 213 (3d Cir. 2005) (same).

More specifically, Ms. Einsenstein, Esquire, stresses her general knowledge of federal law

stemming from her positions as an Assistant United States Attorney and Assistant to the U.S.

Solicitor General. While her practice is related to government enforcement actions, her prior federal service is insufficient to qualify her under the EAJA as having a specialized skill or knowledge. She has not provided information, other than her familiarity with the FTC Act, that shows to a specialized skill that led to the successful resolution of this particular case. Similarly, Mr. Saint-Antoine's specialty is in antitrust litigation. As the FTC correctly points out, this case did not involve antitrust claims or issues. While his reputation as a "top litigator" is commendable, it is nevertheless insufficient to qualify as a special factor in this case. Likewise, Mr. Marion is certainly a well-respected and highly successful litigator in Philadelphia. But First Amendment law was not central to the issue in this case.

Alternatively, AFS argues that three (3) of its former firms were "unwilling to see the case though to completion" and that the above-mentioned attorneys' firms had to "combine their skills and resources to combat FTC's overreach . . . ." (Doc. No. 482 at 8.) But the Third Circuit has held that just because different counsel did not want to handle the case, this does not qualify as there being a "limited availability" of qualified attorneys, nor does the fact that a case was a difficult one compel a finding of special factors. Garcia, 829 F.2d at 400. Moreover, "[i]f the limited availability of qualified attorneys for the proceedings involved meant merely that lawyers skilled and experienced enough to try the case are in short supply, it would effectively eliminate the [statutory] cap." Pierce, 487 U.S. at 571. And "[t]o justify a rate greater than the statutory maximum, something more must be present than unreasonable governmental action." Brinegar, 741 F.2d at 597. Thus, AFS has not met its burden for increased fees with the information presented about Ms. Einsenstein, Esquire, Mr. Saint-Antoine, Esquire, or Mr. Marion, Esquire.

### c.  Reasonableness of Fees

The next step is to determine whether the fees asserted by AFS are reasonable.  The FTC argues that the fees sought "exceed the bounds of reasonableness" because they were represented by six (6) different firms and had three (3) senior attorneys assigned to the case, each from high-billing law firms.  (Doc. No. 481 at 42.)

To determine reasonableness of attorneys' fees, the Court must conduct a "thorough and searching analysis" and "go line, by line, by line through the billing records."  <u>Evans v. Port Auth. of New Jersey</u>, 273 F.3d 346, 362 (3d Cir. 2001) (internal citations omitted).  "Summaries showing the daily activities of the lawyer, as well as 'a general description of the activities provided' have been held sufficiently specific."  <u>Moyer v. Colvin</u>, No. 1:23-CV-2137, 2025 WL 221802, at *3 (M.D. Pa. Jan. 16, 2025) (citing <u>Keenan v. City of Phila.</u>, 983 F.2d 459, 473 (3d Cir. 1992)).  Then, "[t]he [C]ourt must make an initial fee calculation based on the 'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'"  <u>Id.</u> (quoting <u>Hensley v. Eckerhard</u>, 461 U.S. 424, 433 (1983)).

Here, the Court has conducted a comprehensive review of the timesheets submitted.  (<u>See generally</u> Doc. No. 478-9.)  Six (6) law firms represented AFS in this litigation:  White & Williams LLP (<u>id.</u> at 2-221), DLA Piper LLP (<u>id.</u> at 222-286), Faegre, Drinker, Biddle & Reath LLP (<u>id.</u> at 287-315), Eckert Seamans (<u>id.</u> at 316-375), MoloLamken (<u>id.</u> at 376), and Godfrey Kahn (<u>id.</u> at 377).  A total of 379 pages of timesheets were submitted.  (<u>Id.</u>; Doc. No. 482-3.)

Altogether, the work performed as reflected on the timesheets submitted by the six (6) law firms was reasonable and necessary for the preparation of AFS's case.  Each firm provided detailed summaries of the activities of their attorneys and/or support staff.  And a review of the timesheets does not reveal unspecific, unclear or repetitive entries between the firms.  See <u>Brinegar</u>, 741 F.2d

at 596 (finding "sufficient substantiation if the submissions provide fairly definite information as to the hours devoted to various general activities").  While the FTC notes that there were over thirty (30) attorneys who worked on this case, the hours spent were necessary and warranted given the voluminous discovery, time and resources required to prepare and litigate this case through trial.

However, none of the six (6) law firms provided the Court with entries for the total time billed for each attorney and paralegal.  Given the reduced amount of the hourly award for some attorneys, the Court cannot calculate the final attorneys' fee award AFS did not provide the total amount of time billed for each attorney and paralegal.  As noted above, AFS submitted over 375 pages of timesheets with thousands of entries for time billed.  AFS must provide the Court with timesheets that include the total number of hours billed for each firm member and for the firm as a whole, along with the total fees requested for reimbursement.  See Hensley, 461 U.S. at 433 (holding that the court must calculate fees based on the hours worked and rates claimed).

Additionally, contained within the timesheets are various paralegal and litigation support entries.  (See generally Doc. No. 478-9.)  AFS is entitled to be reimbursed for fees paid to paralegals as attorneys' fees under the EAJA.  See Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 581 (2008) (holding that the EAJA "must be interpreted as using the term 'attorney . . . fees' to reach fees for paralegal services as well as compensation for the attorney's personal labor").  However, AFS has not presented evidence as to why its paralegals should be awarded fees at the rates requested or whether the rates are within the prevailing market rate in accordance with the

EAJA.[39]  AFS will have fourteen (14) days from the date of this Opinion to submit this information to the Court.

### 2. Expenses

Next, AFS seeks $848,036.77 in expenses.  (Doc. No. 478 at 41.)  These expenses are as follows:  (1) $598,680.86 for expert witnesses, which is "less than the full amount [AFS] invested in expert counsel and testimony"; (2) $150,228.09 for "database hosting and e-discovery services that were required due to the voluminous discovery sought by FTC in this action"; (3) $41,340 for trial technology services; (4) $55,220.92 for the expense of a court-appointed special master; and (5) $2,566.90 for subpoenas.  (Id.)  The FTC objects to the award of expert fees because it argues that AFS failed to provide the documentation required by the statute to support its request for expert fees.  (Doc. No. 481 at 43.)  It also objects to reimbursement for database hosting and e-discovery services as well as for the fees for the special master.  (Id. at 43-45.)

> As previously noted, to be awarded expenses under the EAJA a party must:
>
> [S]ubmit to the court an application for fees and other expenses which shows that the party is a  prevailing party and  is eligible to receive an  award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing on behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.

---

[39]  For example, in DLA Piper LLP's timesheets, paralegals billed at a rate of $252.52 per hour.  (See e.g., Doc. No. 478-7 at 276, 280, 284-286.)  Under the EAJA, paralegal rates must be based upon prevailing market rates.  The authority provided by Defendants states that, pursuant to Community Legal Services, paralegals with one to ten years' experience bill at a rate of $190 to $240 per hour, and "senior and supervisory paralegals" bill at a rate of $245 to $285 per hour.  (Doc. No. 478-8 at 3.)  AFS has not differentiated under which category its paralegals fall.  AFS must submit billing records in accordance with the requirements of the EAJA and keep in mind that its attorneys may only bill at a maximum rate of $252.52 per hour.  See Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 581 (2008).

28 U.S.C. § 2412(d)(1)(B).  The statute specifies that "expenses" include "expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case."  28 U.S.C. § 2412(d)(2)(A).

First, regarding expert witnesses, AFS has not complied with the EAJA because it failed to provide "the actual time expended and the rate at which fees and other expenses were computed" for its expert witnesses.  (See Doc. No. 478-13, Ex. K.)  Exhibit K provides fifteen (15) pages of invoices from AFS's experts that are redacted and only reveal the total amount invoiced.  (See id.)  While AFS submits that the invoices are redacted due to "privileged and commercially sensitive information" and that it could submit the unredacted invoices for in camera review, this would be prejudicial to the FTC, which is entitled to review invoices and argue whether or not they are reasonable at the rates charged.  AFS will have fourteen (14) days from the date of this Opinion to submit new invoices in compliance with the requirements of § 2412(d)(1)(B).

Second, regarding the $150,228.09 request for "database hosting and e-discovery services," AFS has not provided specific information as to what these expenses covered.  (See Doc. No. 478-6.)  Additionally, e-discovery services are generally covered under a costs analysis pursuant to 28 U.S.C. § 1920(4).[40]  See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 674 F.3d 158 (3d Cir. 2012).  AFS will have fourteen (14) days from the date of this Opinion to submit

---

[40] 28 U.S.C. § 1940(4) states that the Court may tax as costs "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." In Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 674 F.3d 158 (3d Cir. 2012), the Third Circuit outlined what types of e-discovery are recoverable as costs.  AFS is instructed to review its "database hosting and e-discovery services" request under this Third Circuit precedent.

evidence in compliance with Third Circuit precedent as to what types of e-discovery expenses or costs and other database hosting it believes it is entitled to under the EAJA.

Lastly, regarding the fees for a special master, trial technology services and subpoenas, AFS has not provided support that these fees are recoverable as expenses or as costs under the EAJA.  AFS will have fourteen (14) days from the date of this Opinion to submit authority and/or evidence that it is entitled to this expense and that it was "necessary for the preparation of the party's case."  28 U.S.C. § 2412(d)(2)(A).

### D.    Costs

Unlike fees and expenses, an award of costs under the EAJA does not require a finding of substantial justification.  Rather, the statute states:

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

28 U.S.C. § 2412(a)(1).  Section 1920 identifies costs as items such as fees for transcripts, disbursements for printing and witnesses, making copies of materials and docketing fees.  See 28 U.S.C. § 1920; see also Patel v. Att'y Gen. of the U.S., 426 F. App'x 116 n.6 (3d Cir. 2011) (same).  "Broad discretion rests with the trial court in awarding costs."  Cruz v. Comm'r of Soc. Sec., 630 F.3d 321, 325 (3d Cir. 2010).

### 1.   Bill of Costs

The FTC argues that AFS is not entitled to costs because it failed to timely file a Bill of Costs in accordance with § 1920 and E.D. Pa. Local Civil Rule 54.1, which states that a party must

submit a Bill of Costs within 75 days of the entry of final judgment.[41]  (Doc. No. 481 at 46; E.D.

Pa. L. Civ. R. 54.1(a)(1).)

Local Rule 54.1 works in tandem with Federal Rule of Civil Procedure 54.  Regarding

costs, the federal rule states:

> (1) Costs Other Than Attorney's Fees. Unless a federal statute, these rules, or a
> court order provides otherwise, costs—other than attorney's fees—should be
> allowed to the prevailing party. But costs against the United States, its officers, and
> its agencies may be imposed only to the extent allowed by law. The clerk may tax
> costs on 14 days' notice. On motion served within the next 7 days, the court may
> review the clerk's action.

Fed. R. Civ. Pro. 54(d)(1) (emphasis added).

Here, the EAJA is an intervening statute that allows a party to seek costs under its own

subset of requirements.  Thus, Federal Rule of Civil Procedure 54 and Local Civil Rule 54.1 are

not totally applicable.  Therefore, AFS's Bill of Costs contained within their Motion for Attorneys'

Fees, Expenses and Costs pursuant to the EAJA is permissible.

### 2.  AFS's Request for Costs Will Be Granted

Here, AFS seeks $60,259.46 in costs.  (Doc. No. 478; Doc. No. 478-6 at 2.)  This consists

of $44,243.58 for transcripts and $16,015.88 for printing and copying.  (Id.; Doc. No. 478-12.)

The cost of photocopies and transcripts is recoverable under 28 U.S.C. § 1920(2) & (4).  See

---

[41]  Local Rule 54.1 states in relevant part:

> Any party requesting taxation of costs by the Clerk must file a notice of taxation of
> costs using form AO133 (Bill of Costs), along with the required supporting
> documentation, within seventy-five (75) days of the entry of final judgment, or, if
> the judgment is appealed, within seventy-five (75) days after final disposition of
> the appeal, unless otherwise ordered by the court.  Submission of the form along
> with supporting documentation shall constitute notice in accordance with Federal
> Rule of Civil Procedure 54(d)(1).

E.D.Pa. L. Civ. R. 54.1(a)(1).

Kutoloski v. Astrue, No. CIV.A. 08-0075, 2010 WL 199307, at *2 (E.D. Pa. Jan. 20, 2010); see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 674 F.3d 158 (3d Cir. 2012). The FTC has not objected to these costs other than arguing that the Bill of Costs was submitted untimely. (See Doc. No. 481 at 46.)

Therefore, AFS is entitled to $60,259.46 in costs pursuant to 28 U.S.C. § 2412(a)(1) and 28 U.S.C. § 1920. If AFS believes there are other costs it is entitled to, it can submit additional requests, along with the fees and expenses mentioned above, within fourteen (14) days.

Based on the foregoing, AFS's Motion for Fees, Expenses and Costs will be granted in part. AFS will be afforded the opportunity to supplement its request for attorneys' fees, expenses and costs as outlined above. See Dunn v. United States, 775 F.2d 99, 103 (3d Cir. 1985) (holding "deficiencies in the contents of the claim [for fees under the EAJA] may be corrected if the government cannot show any prejudice arising from the later correction of those deficiencies"); United States v. Eleven Vehicles, Their Equip. & Accessories, 200 F.3d 203 (3d Cir. 2000) (same).

## V.    CONCLUSION

For the reasons stated above, AFS Defendants' Motion for Attorneys' Fees, Expenses and Costs under the EAJA (Doc. No. 478) will be granted in part. Defendants AFS and PBPNJ are prevailing parties in this litigation and the FTC has not met its burden that its position in this case was substantially justified. AFS and PBPNJ are entitled to fees, expenses and costs under the EAJA.

AFS shall submit supplemental documentation as described above for fees, expenses and costs in conformance with EAJA requirements within fourteen (14) days of the date of this Opinion. The FTC will have seven (7) days to respond to AFS's supplemental documentation request. An appropriate Order follows.